ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE
_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

No. 22-3064
_____

UNITED STATES OF AMERICA,                    Appellee,

v.

THOMAS WEBSTER,                              Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
BRIAN P. KELLY
HAVA MIRELL
\* DAVID B. GOODHAND, DC Bar 438844
Assistant United States Attorneys
\* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
david.goodhand2@usdoj.gov
Cr. No. 21-cr-208 (APM)          (202) 252-6829

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee states as follows:

## Parties and Amici

The parties to this appeal are appellant, Thomas Webster, and appellee, the United States of America.

## Rulings Under Review

Webster challenges the district court's denial of his pretrial motion for a change of venue, its decision to restrict cross-examination of one of the government's witnesses, the court's jury instructions, and several features of the court's sentence, including a body-armor enhancement pursuant to U.S.S.G § 3B1.5(2)(B). These rulings are unreported.

## Related Cases

Appellee is unaware of any related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are reproduced in the addendum of Webster's brief.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE............................................. 1

    Background.................................................................2

        The Government's Case.................................................2

        Webster's Sentencing.................................................7

SUMMARY OF ARGUMENT.......................................................11

ARGUMENT ...............................................................12

    I.    The District Court Properly Exercised Its Discretion In Denying Webster's Transfer Motion. ......................................12

        A.   Relevant Procedural History ............................................14

        B.   Webster's Case Was Not an "Extreme" One Warranting a Presumption of Prejudice. ..........................24

            1.   The size and characteristics of the District of Columbia's jury pool did not support a presumption of prejudice. ..........................................25

            2.   The media coverage of his case did not support a presumption of prejudice. ...........................................31

            3.   The 15-month period between the Capitol riot and Webster's trial reduced the volume of pretrial publicity.......................................................34

        C.   The District Court's Thorough and Careful Voir Dire Guaranteed an Impartial Jury, and Webster Has Not Demonstrated Any Actual Prejudice. ................................36

    II.   The District Court Did Not Plainly Err by Restricting Cross-Examination of Officer Rathbun.....................................43

        A.   Relevant Procedural Background.......................................44

B.   Webster Waived His Confrontation Clause Claim, and Cannot Show Plain Error in any Event. ............................47

III. Any Error in the § 111 Instructions Did Not Prejudice Webster. ...................................................................49

A.   Relevant Procedural Background......................................49

B.   Webster Has Not Demonstrated Any Error Substantially Prejudiced Him. ..........................................51

IV. The District Court's Below-Guidelines Sentence Is Procedurally Correct and Substantively Reasonable. ..............55

A.   Standard of Review............................................................55

B.   The District Court Properly Applied the Body-Armor Enhancement. ....................................................................56

C.   The District Court Properly Weighed All the § 3553 Factors, Including The Need To Avoid Unwarranted Sentencing Disparities........................................................58

CONCLUSION ............................................................................62

# TABLE OF AUTHORITIES*

**Cases**

*Beck v. Washington*, 369 U.S. 541 (1962) ................................................ 41

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ...................................... 48

*Gall v. United States*, 552 U.S. 38 (2007) ............................................. 55

*In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015) ........................................... 32

*Irvin v. Dowd*, 366 U.S. 717 (1961) ....................................................... 13

*Jones v. Gasch*, 404 F.2d 1231 (D.C. Cir. 1967) .................................... 13

*Morgan v. Illinois*, 504 U.S. 719 (1992) ................................................ 13

*Murray v. Schriro*, 882 F.3d 778 ............................................................ 32

*Musacchio v. United States*, 577 U.S. 237 (2016) .................................. 54

*Rideau v. Louisiana*, 373 U.S. 723 (1963) ....................................... 24, 34

*Ristaino v. Ross*, 424 U.S. 589 (1976) ................................................... 36

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ............................................ 24

\* *Skilling v. United States*, 561 U.S. 358
  (2010) ................................................ 11, 14, 24-26, 32-33, 36-39, 42-43

*United States v. Abbo*, 515 F. App'x 764 (10th Cir. 2013) ...................... 48

*United States v. Anderson*, 881 F.2d 1128 (D.C. Cir. 1989) ............. 48, 49

---

\*  Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Ayers*, 795 F.3d 168 (D.C. Cir. 2015)..............................59

*United States v. Barrett*, 552 F.3d 724 (8th Cir. 2009)............................58

*United States v. Bikundi*, 926 F.3d 761 (D.C. Cir. 2019) .................55, 58

*United States v. Brock*, 628 F. Supp. 3d 85 (D.D.C. 2022) ...............27, 28

*United States v. Campa*, 459 F.3d 1121 (11th Cir. 2006).......................33

\* *United States v. Chapin*, 515 F.2d 1274
      (D.C. Cir. 1975) ..........................................................25, 30-31, 34-35

*United States v. Childress*, 58 F.3d 693 (D.C. Cir. 1995). ...............14, 31

*United States v. Coffee*, 2023 WL 4450443 (D.D.C. July 11, 2023)........26

*United States v. Eiland*, 738 F.3d 338 (D.C. Cir. 2013) ...................48, 49

*United States v. Garcia*, 2022 WL 2904352
      (D.D.C. July 22, 2022)................................................26, 27, 28, 30, 35

*United States v. GossJankowski*, 2023 WL 395985
      (D.D.C. Jan. 25, 2023).......................................................................27, 29

\* *United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976)
      (en banc)............................................................. 13, 26, 30-34, 36, 37

*United States v. Johnson*, 913 F.3d 793 (9th Cir.....................................57

*United States v. Long*, 997 F.3d 342 (D.C. Cir. 2021) ............................47

*United States v. Lopesierra-Gutierrez*, 708 F.3d 193 (D.C. Cir. 2013)...60

*United States v. Mangieri*, 694 F.2d 1270 (D.C. Cir. 1982)...................53

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000).......................43

*United States v. Mattea*, 895 F.3d 762 (D.C. Cir. 2018) .........................60

*United States v. Otunyo*, 63 F.4th 948 (D.C. Cir. 2023) ........................61

*United States v. Rafidi*, 829 F.3d 437 (6th Cir. 2016) ............................52

*United States v. Rhine*, 2023 WL 372044 (D.D.C. Jan. 24, 2023) ....27, 29

*United States v. Russell*, 600 F.3d 631 (D.C. Cir. 2010).........................56

*United States v. Sayan*, 968 F.2d 55 (D.C. Cir. 1992) ............................53

*United States v. Siler*, 734 F.3d 1290 (11th Cir. 2013).........................52

*United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019.............................26

*United States v. Tsarnaev*, 142 S. Ct. 1024 (2022) ...........................13, 31

*United States v. Tucker*, 12 F.4th 804 (D.C. Cir. 2021).........................54

*United States v. Warren*, 700 F.3d 528 (D.C. Cir. 2012). .......................55

*United States v. Washington*, 670 F.3d 1321 (D.C. Cir. 2012) ...............55

*United States v. Williams*, 980 F.2d 1463 (D.C. Cir. 1992) ....................61

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010)....................45, 48

**Statutes and Rules**

18 U.S.C. § 111(a)(1) ................................................................ 1, 49, 52

18 U.S.C. § 111(b) ........................................... 1, 34, 50, 52, 53, 54, 56

18 U.S.C. § 231(a)(3) ................................................................ 1, 51

18 U.S.C. § 1752(a)(1) .................................................................... 1

18 U.S.C. § 1752(a)(2) .................................................................... 2

18 U.S.C. § 1752(a)(4) .................................................................... 2

18 U.S.C. § 1752(b)(1)(A) ............................................................ 1, 2

18 U.S.C. § 3553(a) .................................................................... 9, 12

18 U.S.C. § 3553(a)(6) ................................................................ 7, 59

40 U.S.C. § 5104(e)(2)(F) ................................................................. 2

U.S.S.G. § 3B1.5(2)(B) ........................................................... 12, 56, 58

D.C. Cir. R. 47.1(b) ...................................................................... 44

# ISSUES PRESENTED

I. Whether the district court abused its discretion in declining to transfer Webster's criminal trial where a presumption of prejudice due to pretrial publicity was not warranted and the court's thorough voir dire ensured a fair and impartial jury?

II. Whether the district court plainly erred in limiting Webster's cross-examination of Officer Noah Rathbun?

III. Whether the district court plainly erred in instructing the jury on the elements of the assaulting-a-federal-officer offense?

IV. Whether the district court committed either procedural or substantive error in sentencing Webster to a variance sentence of 120 months, which was 90 months below the applicable Sentencing Guidelines range?

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 22-3064

————————————

UNITED STATES OF AMERICA,                                        Appellee,

v.

THOMAS WEBSTER,                                                  Appellant.

————————————

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————————

### BRIEF FOR APPELLEE

————————————

## COUNTERSTATEMENT OF THE CASE

After appellant, Thomas Webster, participated in the January 6, 2021, attack on the United States Capitol, he was indicted for: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon (18 U.S.C. § 111(a)(1), (b)) (Count 1); Civil Disorder (18 U.S.C. § 231(a)(3)) (Count 2); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(1), (b)(1)(A)) (Count 3); Disorderly and Disruptive Conduct in a Restricted

Building (18 U.S.C. § 1752(a)(2), (b)(1)(A)) (Count 4); Engaging in Physical Violence in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(4), (b)(1)(A)) (Count 5); and an Act of Physical Violence in the Capitol Grounds (40 U.S.C. § 5104(e)(2)(F)) (Count 6) (ECF #76). Following a four-day trial, a jury found Webster guilty on all counts (5/2/22-AM-4-5). On September 1, 2022, the Honorable Amit Mehta sentenced Webster to concurrent terms of imprisonment of 120 months on Counts 1, 3, 4, and 5; 60 months on Count 2; and 6 months on Count 6 (9/1/22:63). Webster timely appealed (ECF #109).

## Background

### *The Government's Case*

Following the 2020 presidential election, Webster – an ex-Marine and New York City police officer – travelled to Washington, D.C., to protest the election results and attend the "Stop the Steal" rally at the Ellipse (4/27/22-PM-56; 4/28/22-AM-81-90). Wearing a distinctive red-white-and-black coat and his NYPD-issued bulletproof vest and carrying a large Marine Corps flag on a metal pole, Webster – along with thousands of other protestors – marched to the U.S. Capitol at the rally's conclusion (4/27/22-PM-66-67; see Exh. 307). The Capitol and its grounds

were closed to all unauthorized persons because of the then-ongoing Electoral College vote certification, which was overseen by Vice-President Mike Pence, a United States Secret Service protectee.[1]

Though the Capitol and its grounds were off-limits to unauthorized persons, thousands of rioters – including Webster – violently breached both (4/26/22-AM-77-79, 91-102; Exh. 200.1 (compilation video)). The rioters overwhelmed the Capitol Police's security measures by, among other things, throwing objects and spraying chemicals (4/26/22-PM-110-12; 4/27/22-PM-71-78). It was an "extremely dangerous" and "scary" situation, with threats "all around" (4/26/22-PM-115). Despite their efforts to repel the mob, the Capitol Police officers were "overrun" and the rioters breached several Capitol entrances (4/26/22-AM-77-82, 95-98).[2]

---

[1] To ensure Vice-President Pence's safety and in preparation for the certification, the United States Capitol Police established a "security perimeter" around the Capitol and its grounds using bike racks, snow fencing, and area-closed signs (4/26/22-AM-58-61; see Exh. 601.1 (depicting restricted area)).

[2] The breaches forced the Senate and House to cease the certification at 2:13 p.m. and 2:30 p.m., respectively (Stip. 702). Further, the Secret Service evacuated Vice-President Pence at 2:12 p.m. (Stip. 702). The Senate and House did not reconvene until 8:06 p.m. and 9:02 p.m., respectively (Stip. 702).

Metropolitan Police Department (MPD) Officer Noah Rathbun arrived at the Capitol at 1:30 p.m. to "reinforce" the police line and "protect[ ]" the Lower West Terrace's security perimeter (4/27/22-AM-13-16). After Webster advanced through the "sea" of "hostile" rioters to the police line (4/27/22-AM-16-17; Exh. 217), an agitated Webster began screaming at Officer Rathbun, conduct that the officer's body-worn camera captured (see Exh. 204):



Webster hurled insults at Officer Rathbun – "[y]ou fucking piece of shit" – and challenged Officer Rathbun to "[']take your shit off,[']" which is what "people say when they want to fight" (4/27/22-AM-25).

"[E]ngaging in physically aggressive behavior," Webster also grabbed a bike rack and pushed it toward Officer Rathbun (4/27/22-AM-30-31; Exh. 204 (14:28:36)).[3] Wielding his flagpole "as a weapon," Webster then repeatedly and forcefully swung the pole, striking the bike rack where Officer Rathbun was positioned (4/27/22-AM-33; Exh. 204 (14:28:38-42)). Officer Rathbun believed Webster was trying to hit him with the flagpole (4/27/22-AM-33):



---

[3] In an effort "to maintain th[e] perimeter," using an open hand Officer Rathbun pushed Webster back and inadvertently made contact with Webster's face (4/27/22-AM-31-32), which Webster claimed justified the force he subsequently used (see note 5 infra).

Soon thereafter, the mob – including Webster – breached the police line and surged forward, forcing many of the officers to retreat (4/27/22-AM-34-35). Determined to disarm Webster, Officer Rathbun did not initially retreat but wrested the flagpole from Webster (4/27/22-AM-34; Exh. 204 (14:28:42-47)). Webster then crouched down, charged at Officer Rathbun, and tackled him (4/27/22-AM-35-36; Exh. 204 (14:28:53-14:29:06)). Webster also tried to pull Officer Rathbun's gas mask off, which inhibited his breathing as he "struggled" to get Webster off him (4/27/22-AM-36-37; Exh. 204 (14:29:00-02)). Following his assault of Officer Rathbun,[4] Webster made his way to the inauguration stage, where he was captured on another rioter's livestream exhorting the audience to "[s]end more patriots," noting "[w]e need some help" (Exh. 208).[5]

---

[4] Webster's attack caused bruises and abrasions to Officer Rathbun's knee, shin, calf, and forearm (4/27/22-AM-41-43; see Exhs. 604-06, 608, 610 (photos of injuries)).

[5] Webster testified, claiming he used his body armor because January 6 was his "first protest" and he was "concerned" for his "safety, being down there by [him]self" (4/28/22-AM-99; see also *id.* at 114 (Webster used body armor because it was a "cold day" and he was "concerned about maybe some type of counterprotests"). Webster additionally claimed Officer Rathbun "really want[ed] to fight," asserting Rathbun "taunt[ed]" him

(continued . . . )

### *Webster's Sentencing*

Based on a total offense level of 37 and a Criminal History category

of I,[6] the Probation Office calculated Webster's Sentencing Guidelines

range as 210-262 months' imprisonment, though this was capped at 240

months due to the assaulting-an-officer statutory maximum (ECF #102,

¶120; see 9/1/22:53). The government requested a 210-month sentence,

noting Webster played "a critical role" in the Capitol attack because he

"directly contributed to the collapse of the police line at the Lower West

Plaza, enabling thousands of rioters to penetrate the grounds" (ECF

#104, 33).[7] In his sentencing memorandum, Webster asked the court to

---

and then "start[ed] pushing" him (*id.* at 128, 130, 132). Further, Webster claimed, Officer Rathbun "hit" him "hard" – "I felt like I got a concussion" (*id.* at 136-39). Webster asserted he was thus "concerned for [his] safety" (*id.* at 142, 144).

[6] Webster's base offense level was 14 and he received several enhancements, including a four-level enhancement for his use of body armor during a crime of violence and a two-level enhancement for his false testimony (ECF #102, ¶¶50-58).

[7] Addressing the need to avoid "unwarranted" sentencing disparities, 18 U.S.C. § 3553(a)(6), the government also noted that, by the time of Webster's sentencing, four other January 6 defendants had been sentenced for assaulting an officer with a deadly or dangerous weapon: *United States v. Mark Ponder*, 21-CR-259 (63 months) (flagpole); *United States v. Robert Palmer*, 21-CR-328 (63 months) (fire extinguisher and wooden plank); *United States v. Devlyn Thompson*, 21-CR-461 (46

(continued . . . )

impose a time-served sentence (ECF #105, 3). Without identifying *any* purportedly similar January 6 defendant, Webster also generally declared that a within-Guidelines sentence "would result in a sentence far greater than that imposed to date on any of the defendants who have been charged with similar offenses" (*id.* at 10-11).[8]

---

months) (metal baton); *United States v. Nicholas Languerand*, 21-CR-353 (44 months) (large traffic bollard and stick-like objects) (ECF #104, 39-41 & n.4). Unlike Webster, however, none of these defendants had "tackled and restrained an officer," "choked an officer," or "caused bodily injury to an officer" (*id.*). Also unlike Webster, all four had pleaded guilty. Indeed, the government maintained (albeit mistakenly, *see infra*), only one January 6 defendant had thus far been sentenced following a trial. *See United States v. Guy Reffitt*, 21-CR-32 (87 months). In advance of Webster's sentencing, the district court thereafter provided notice that, in "considering" his sentence, it had "reviewed sentencing materials" in four other January 6 cases, three of which – *Reffitt*, *Ponder*, and *Palmer* – the United States had previously identified, plus one other: *United States v. Thomas Robertson*, 21-CR-34 (8/30/22 Minute Order). After a jury convicted Robertson of six offenses, including obstruction of an official proceeding and interfering with law enforcement during a civil disorder, the Honorable Christopher Cooper had sentenced him to 87 months' imprisonment (ECF ##124, 140 (21-CR-34)).

[8] At Webster's sentencing hearing, his counsel ultimately identified one purportedly similar defendant: *United States v. Howard Charles Richardson*, 21-CR-721 (46 months) (see 9/1/22:5-7). As the government noted, however, Richardson was not similarly situated because, unlike Webster, he had pleaded guilty and had not been convicted of using a dangerous weapon (*id.* at 6).

Following the parties' arguments and Webster's allocution,[9] Judge Mehta – who had given "a lot of thought" to the "appropriate" sentence (9/1/22:63) – reviewed the pertinent sentencing factors. *See* 18 U.S.C. § 3553(a). First, the court recognized, Webster had had a "challenging childhood" that he "rose above," ultimately serving 25 years as a "public servant in the truest sense of the word" (9/1/22:54). Second, regarding Webster's conduct, the court emphasized that Officer Rathbun's body-worn-camera footage "speaks for itself" – Webster was the "first aggressor" who "taunt[ed]" Officer Rathbun and then, with "extraordinary force," swung his flagpole "multiple times" in a way that could have "seriously hurt" Officer Rathbun (*id.* at 57). Moreover, until Webster approached the police line, it was "intact"; but, once Webster got there, "all hell broke loose" and "thousands of people" poured through (*id.* at 58). Further, after instigating this breach, Webster tackled Officer Rathbun, held him to the ground, and forcibly tried to remove his gas mask (*id.* at 57). The "seriousness" of Webster's offenses and the need for

---

[9] In his sentencing remarks Webster emphasized that he had "faithfully served" his country and apologized to Officer Rathbun (9/1/22:52-53).

deterrence weighed in favor of "a strong sentence" (*id.* at 62).[10] Finally, with respect to avoiding unwarranted sentencing disparities, the court "considered" the four January 6 cases it had identified in its pre-sentencing order (*id.*; see note 7 supra). Webster's conduct, the court concluded, was distinguishable and "worthy of a stiff[er] sentence" because, among other things, neither Reffitt nor Robertson "touched a police officer" and neither Palmer nor Ponder "hurt somebody" (9/1/22:62).[11]

Ultimately, the court determined, a variance sentence of 120 months – i.e., 90 months below the bottom of the applicable range – was appropriate (9/1/22:63). "The reasons for that," the court explained, were

---

[10] The court also emphasized Webster's obstructive conduct, *viz.*, his "utterly fanciful and incredible" trial testimony (9/1/22:60).

[11] During the government's sentencing remarks, Judge Mehta had focused in particular on Ponder, who "twice arm[ed] himself with a pole," breaking one on an officer's riot shield and using a second to strike an officer's shoulder (9/1/22:39). Noting the government was seeking a 210-month sentence for Webster, the court asked the prosecutor how the court could "give Mr. Webster three-plus times" Ponder's 63-month sentence (*id.*). As the prosecutor explained, Ponder's case was not like Webster's: Ponder pleaded guilty; Ponder's assaults had not led to any "reported bodily injury"; and Ponder did not receive either a body-armor or obstruction enhancement (*id.* at 39-40).

"primarily to avoid unwarranted disparities and also in acknowledgement of Mr. Webster's 25 years of service" (*id.*). Further, the court gave Webster "some credit for accepting responsibility, albeit belatedly" (*id.* at 66).

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in denying Webster's transfer motion. Webster has not shown that either the publicity surrounding the January 6th riot or the characteristics of D.C.'s jury pool warranted a presumption of prejudice, which "attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 381 (2010). Rather, as the court correctly determined, voir dire of Webster's prospective jurors could – and did – ensure an impartial jury.

The district court did not plainly err in precluding cross-examination about MPD's unrelated use-of-force investigation of Officer Rathbun. By the time of Webster's trial, MPD had finished its investigation and concluded Officer Rathbun's actions were justified. Indeed, when informed the investigation was completed, Webster's counsel agreed that any bias cross-examination was moot.

The district court also did not plainly err in instructing the jury on the § 111 elements. If anything, the court *added* an element to the assaulting-a-federal-officer offense, which increased the government's burden and did not prejudice Webster.

Finally, the district court properly calculated Webster's Guidelines range when it applied the body-armor enhancement. By wearing his body armor when he assaulted Officer Rathbun (an armed police officer), Webster certainly "use[d]" it within the meaning of U.S.S.G. § 3B1.5(2)(B). Further, the court appropriately weighed the 18 U.S.C. § 3553(a) sentencing factors, including the need to avoid unwarranted sentencing disparities. The court carefully considered several other January 6th defendants, but reasonably determined they were differently situated.

## ARGUMENT

## I. The District Court Properly Exercised Its Discretion In Denying Webster's Transfer Motion.

"Motions for change of venue invoke 'the sound discretion of the trial court,' which 'should not be overturned where there is no clear

showing of abuse.'" *Jones v. Gasch*, 404 F.2d 1231, 1242 (D.C. Cir. 1967) (citations omitted). Webster makes no such showing here.

"It is fundamental that the right to jury trial guarantees to the criminal accused a fair trial by a panel of impartial, 'indifferent' jurors." *United States v. Haldeman*, 559 F.2d 31, 60 (D.C. Cir. 1976) (en banc) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). The primary safeguard of this right is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Voir dire ensures that "jurors have 'no bias or prejudice that would prevent them from returning a verdict according to the law and evidence.'" *United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022) (citation omitted). A defendant, such as Webster, who "claims he was denied a fair trial because the jury was not sufficiently 'indifferent'" thus may do so "only by reference to the voir dire." *Haldeman*, 559 F.2d at 60.

Webster, however, asserts (at 19-28) the magnitude of pretrial publicity and the characteristics of D.C.'s jury pool required a presumption of prejudice. But such a presumption is appropriate in only the "most egregious cases" where, for example, "the community has been saturated with particularly damning publicity." *United States v.*

*Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995). Webster's case is not such an "extreme case." *Skilling,* 561 U.S. at 381. Indeed, the voir dire revealed, of the 53 venire members questioned, only one had heard *anything* about Webster's case and even that prospective juror had heard only that Webster's trial was scheduled to start.

## A.    Relevant Procedural History

Without identifying an alternative venue, Webster moved to "transfer [his] trial from the District of Columbia" (ECF #49, 10). Citing "public opinion polls" "commissioned" by the Federal Defender Service, Webster claimed voir dire would be "incapable" of protecting his right to an impartial jury (*id.* at 4-10 (citing telephone surveys conducted by Select Litigation, LLC)).

The court denied Webster's motion, concluding he had not demonstrated his was "an 'extreme case' in which juror prejudice can be presumed" (ECF #78, 1). To the contrary, there was "no reason to believe that members of the jury venire w[ould] even know who [Webster] [wa]s or what he allegedly did on January 6, much less that a significant number of the members of the venire w[ould] lack the capacity to evaluate the case against [him] based solely on the facts of his case" (*id.*

at 2 (citation omitted)). "Should voir dire prove to be ineffective in identifying a fair jury," the court added, Webster could renew his motion (*id.*).

The court conducted a day-long voir dire, from 9:30 a.m. to 6:00 p.m. (see 4/25/22-PM-226). The court first asked the venire members to record their affirmative answers to 21 agreed-upon questions,[12] and then followed up with each venire member in a separate courtroom.[13] The first four questions addressed the possibility that venire members might know of the case, the parties, their attorneys, witnesses, or court personnel (4/25/22-AM-14-17). In particular, after summarizing Webster's alleged criminal conduct, question one asked if any venire member knew of or had "heard anything about this particular case or Mr. Webster" (*id.* at 14-15). Questions five through nine addressed the venire members' possible association with the Capitol – *e.g.*, question five: "Do any of you

---

[12] In advance of voir dire, the parties jointly submitted 22 proposed venire questions (ECF #74, 2-6), all of which the court asked with the exceptions and slight modifications noted infra.

[13] During these private sessions, the court first questioned the venire members and then permitted counsel to follow up. But, if the court did not ask counsel if they had any follow-up, it was because the court had "already concluded the juror would be excused for cause" (4/25/22-AM-43).

live or work at or near the U.S. Capitol?" – and their knowledge of the January 6 attack, including Webster's alleged participation in it (*id.* at 19).[14]

The next two questions addressed the possibility that a venire member's "strong feelings or opinions" about the "events that took place at the U.S. Capitol on January 6th" or former-President Trump or his supporters would make "it difficult for you to serve as a fair and impartial

---

[14] With the parties' consent, the court clarified question six's language, asking: "Were you or someone you know a participant in or physically present as a witness to the events that occurred at the U.S. Capitol on January the 6th of 2021[?]" (4/25/22-AM-17-18; *cf.* ECF #74, 2; see 4/21/22:12-14). Question seven asked if venire members had "closely or regularly followed the news about the events that took place on January 6th, 2021, or the government's investigation of those events" (4/25/22-AM-18). Question eight asked if venire members had "ever watched video of what happened at the U.S. Capitol on January 6th, 2021, on the news or on the Internet" (*id.*). And, finally, question nine asked: "Have you ever watched video of this defendant, that is, Mr. Webster, from January 6th of 2021, on the news or on the Internet *or read a news story about this defendant*[?]" (*id.* at 18-19 (emphasis added)). Without objection, the court expanded this latter question to include the highlighted portion (see 4/21/22:14-15). Additionally, although the parties had originally proposed that, if any venire members responded in the affirmative to questions seven through nine, they should also document, for example, their media "sources" and "how many times" they had seen any videos (ECF #74, 3), with the parties' consent the court determined that such follow-up questions should be done in person, by the court and counsel (if necessary) (4/21/22:14).

juror" (questions ten and eleven) (4/25/22-AM-19).[15] Similarly, the court asked if anyone's "strong feelings or opinion about the police" would make it difficult for them "to treat the testimony of current or former police officers the same as for any other witnesses" (question twelve) (*id.* at 19-20). And, given the nature of the assault allegations against Webster, the court additionally agreed to his proposal that venire members be asked if they, their family, or their friends had "ever been involved in a physical altercation with a member of law enforcement" (question 13E) (4/25/22-AM-22; see 4/21/22:22).

The court thereafter asked a series of questions (fourteen to eighteen) to ensure the jurors could: adhere to the presumption of innocence "unless and until" the government met its burden of proof; not hold Webster's silence "against him"; follow the court's legal instructions; consider "the opinions and points of your fellow jurors" but "also follow your own conscience"; and "avoid all media coverage relating to this case" (4/25/22-AM-23-26).

_____

[15] Though the government had objected to Webster's proposed question about President Trump or his supporters (ECF #74, 8), the court agreed it was a "fair question" (4/21/22:16-17).

Finally, in addition to standard questions about scheduling hardships (nineteen), COVID concerns (twenty), and the venire members' (or their family members' and close friends') association with law-enforcement officers, military members, and lawyers (questions 13A-D), the court asked this catch-all question (twenty-one): "Do you have any religious, moral, or philosophical reason or personal or political beliefs, or is there any other reason not already mentioned that you believe would make it hard for you to be a fair and impartial juror in this case, or to sit in judgment of another person?" (4/25/22-AM-20-22, 26-28).[16]

---

[16] Without objection from either party, the court declined to ask three of the parties' jointly proposed questions, which the court deemed either repetitive or irrelevant (4/21/22:15-16, 22). Further, the court declined to ask five of Webster's proposed voir dire questions (see ECF #74, 7-8), noting they were "essentially redundant" of the questions the court had already agreed to ask or not "designed to elicit anything that's terribly useful" (4/21/22:23-24). Webster did not object to these omissions (see *id.* at 24). Additionally, although the parties had jointly proposed a series of "background" questions – addressing the prospective jurors' education, marital status, occupation, English-language skills, hearing ability, etc. (ECF #74, 8-11) – the court declined to pose these "questionnaire"-type inquiries, noting "some" were redundant and, additionally, the court would be conducting "individual voir dire of everybody," which would permit the court to identify those potential jurors who might have "trouble seeing or hearing" (4/21/22:24-27). So long as the court was confident it could identify potential jurors who did not "understand English" or were otherwise unable to "follow" the testimony, Webster did not object to "jettisoning" these inquiries (*id.* at 26-28).

Though a substantial number of venire members responded affirmatively to questions seven and eight – which asked about their exposure to any coverage of the events at the U.S. Capitol on January 6, see note 14 supra – only one venire member (Juror 178) responded affirmatively to either question one or nine, which specifically asked if any member had "heard anything about this particular case or Mr. Webster," "ever watched video" of Webster "on the news or on the Internet," or "read a news story" about him (*id.* at 14-15, 18-19).[17] And, consistent with the court's earlier promise, see note 16 supra, it followed up with every venire member who said they had either followed the news about January 6 or watched a January 6th video. As these representative colloquies with two seated jurors demonstrate, among other things, the court generally asked these venire members if they could set "aside" anything they had learned from such coverage and consider only the evidence adduced at Webster's trial:

> THE COURT: [Y]ou're like most citizens who have read news or watched videos. Could you put those, whatever you've seen

---

[17] As Juror 178 was "getting dressed" on the morning of Webster's voir dire, her television was on "in the background" and she heard "jury selection or something, trial, was starting for a case related to January 6th events" (4/25/22-PM-98). Juror 178 heard nothing "more" (*id.*).

and read, aside and focus on the evidence as it's presented in this case, ma'am?

JUROR 479: I most certainly can.

THE COURT: Any reason to think you can't be fair and impartial to this defendant?

JUROR 479: Not at all.

THE COURT: And if you were convinced that the government had not carried its burden beyond a reasonable doubt, would you have any trouble acquitting this defendant?

JUROR 479: No, if I don't think that they met the burden of proof, then, no, I would do what I have to do as a juror. (4/25/22-AM-71-72.)

\* \* \* \* \*

THE COURT: [M]ost all Americans have been exposed to the events of January 6th in varying degrees. The question, though, in this case, is . . . whether this defendant is guilty of committing the offenses that's he's charged with. Do you think you could put aside what you've read and what you've seen about that day and judge the evidence and the defendant based only on the evidence that's presented in the courtroom?

JUROR 269: I believe that I could.

THE COURT: Any reason to doubt that you would not be able to do so?

JUROR 269: No, I don't believe so, not that I can think of.

THE COURT: Okay. And this defendant, like every defendant, is presumed innocent. Is that a presumption you would have any trouble applying?

JUROR 269: No, it is not. (4/25/22-PM-90.)

Additionally, although many venire members admitted they had seen or read news coverage around the time of the January 6 riot, many further indicated they had not been thereafter exposed to such coverage. As one seated juror (No. 178) put it, "like most of the country," she watched "what was happening, unfolding at the Capitol on that day," but that "was like a year ago" and her "interest" had "faded" (4/25/22-PM-98-99).[18]

---

[18] See also 4/25/22-AM-64 (Juror 1429 followed the news closely "in the beginning," but didn't recall seeing "any news stories in last couple of months"); 4/25/22-PM-5 (Juror 1086 saw a "handful" of videos around January 6 but "not really since"); *id.* at 8-9 (Juror 799 "ha[dn't] looked at stuff in, like, a year"); *id.* at 14-15 (Juror 950 watched "a lot" of coverage on January 6 but "ha[dn't] really followed much" since); *id.* at 21-22 (Juror 1343 "saw some of the news reports at the time" but hadn't "watched" anything "in the last year"); *id.* at 30 (Juror 974 saw "a lot at the beginning"); *id.* at 89-90 (Juror 269 only "followed it relatively close" until November 2021); *id.* at 105 (Juror 1543 "watched it when it occurred"); *id.* at 118-19 (Juror 30 followed the news "pretty closely" but "we're over a year out, so not so much anymore"); *id.* at 122 (Juror 1216 saw news "when it happened," but it "kind of like tailed off so [she] ha[dn't] really been focusing on it after"); *id.* at 152 (Juror 1194 watched it "in real-time" and kept up with coverage "pretty closely" for the "first couple of months" but "[m]uch less so lately"); *id.* at 185 (Juror 1113 "saw a few videos" just "around the time of the events" but "[n]othing since"); *id.* at 192-93 (Juror 735 "saw the initial events" but "tried not to watch too much after"); *id.* at 199 (Juror 780 "saw a lot" of coverage "that day" but "ha[dn't] watched any footage recently"); *id.* at 216 (Juror 517 watched coverage on "day of" riot).

The court qualified 34 venire members after questioning 53. Of the 19 members struck for cause, the court dismissed nearly 50% – 9 of 19 – because of hardships unrelated to the trial's subject-matter.[19] The court sua sponte dismissed seven of the remaining ten because, for a variety of reasons, they admitted they would have difficulty being impartial.[20] Of the remaining three: one was in the Capitol on January 6 and a "firsthand" witness (Juror 709); another currently works in the Senate

---

[19] The court excused: Jurors 1153 and 1114 due to scheduled trips; Jurors 1132 and 951 due to recent family-member deaths; Juror 571 due to an upcoming medical appointment; Jurors 1464 and 176 due to COVID concerns; Juror 419 due to hearing issues; and Juror 1262 due to his faith, which forbade him to sit in judgment of others.

[20] Juror 87 lived close to the Capitol, said the riot made him "very angry," and could "not guarantee" he could put that aside (4/25/22-AM-51-56). Juror 1554 had been a lobbyist on the Hill for 45 years and would have had "a lot of difficulty" being impartial because the Capitol Police had "protected" her all those years (id. at 62-64). Similarly, Juror 518 used to work at the Capitol, had a "good friend" who was a Capitol Police officer, and said it would be a "struggle" to be fair (id. at 78-80). Juror 245 had been personally impacted by the riot because he was sent home from his job and did not believe he could be impartial (4/25/22-PM-94-96). Juror 210 used to work at the House and Senate, knew "a lot of people who [we]re very affected" by January 6, and it would be "extremely hard" to be impartial (id. at 110-13). Juror 625's ex-mother-in-law was a current Member, had "pretty deep ties" to Capitol Hill, and admitted that, if he were Webster's counsel, he "probably wouldn't want me" on the jury (id. at 126-41). Finally, Juror 453 believed the January 6 riot was "a coup" and thought it would be "bizarre" if Webster chose not to exercise his constitutional right not to testify (4/25/22-AM-40-43).

and had "knowledge of these events" (Juror 689); and the third had been a prosecutor in the D.C. U.S. Attorney's Office for over ten years (Juror 780) (4/25/22-AM-57-60; 4/25/22-PM-51-56, 172-183, 196-98).

The court denied three for-cause motions made by Webster – Jurors 482, 974, and 1156  (4/25/22-AM-39, 97; 4/25/22-PM-41) – but none of these prospective jurors ended up on his jury (see 4/25/22-PM-221-22).

Following the jury-selection process, Webster renewed his transfer motion (4/26/22-AM-5-6). The court denied it, reasoning that, although at the start of the prior day's voir dire there had been a "handful" of prospective jurors "who indicated that they couldn't be fair and impartial due to their connections to the events of that day or just because of their views," that "changed very dramatically" as the voir dire progressed (*id.* at 6). In the end, the number of prospective jurors who had been "stricken for cause based upon their representations that they couldn't be fair and impartial" was "actually relatively low" (*id.* at 7). The voir dire, the court thus concluded, did not "bear out the concerns" at the "root" of Webster's transfer motion (*id.*).

### B. Webster's Case Was Not an "Extreme" One Warranting a Presumption of Prejudice.

Though voir dire revealed no prospective jurors who knew of Webster or his particular crimes, he asserts (at 19-28) a presumption of prejudice was necessary because the "intense concentration of local media coverage of the January 6th protest" made it "impossible" for prospective jurors to be "truly fair and impartial" and "polling data" showed "most" D.C. residents were predisposed to find January 6 defendants guilty. But a presumption of prejudice "attends only the extreme case," *Skilling*, 561 U.S. at 381,[21] which this is not.

---

[21] The Supreme Court has applied such a presumption only once. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). After Rideau kidnapped three bank employees and killed one of them, the police, without Rideau's consent and without providing him counsel, filmed his confession. A local television station thereafter broadcast it three times to audiences ranging from 24,000 to 53,000 in a parish with a total population of approximately 150,000. *Id.* at 724-25. In such extreme circumstances, *Rideau* held, it was unnecessary "to examine a particularized transcript of the *voir dire*" to understand the "kangaroo court proceedings" trailing the televised confession violated due process. *Id.* at 726-27. Webster suggests (at 24) two other decisions support his claim, but they do not (citing *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532 (1965)). "[T]hose cases involved media interference with courtroom proceedings *during* trial," *Skilling,* 561 U.S. at 82 n.14, which Webster does not allege.

In assessing the necessity of a presumption, *Skilling* weighed four factors: (1) the community's "size and characteristics" (i.e., was there a "large" and "diverse" jury pool); (2) the type of information included in the media coverage (i.e., did it include "blatantly prejudicial information" that "invited prejudgment"); (3) the "elapsed" time between the crime and trial (i.e., did the "decibel level of media attention" diminish "somewhat"); and (4) the jury's verdict (i.e., did the "jurors' actions" – for example, acquittals on some counts – "run counter" to "a presumption of prejudice"). 561 U.S. at 381-84; *see also United States v. Chapin*, 515 F.2d 1274, 1286-89 (D.C. Cir. 1975) (weighing similar factors).

> **1.  The size and characteristics of the District of Columbia's jury pool did not support a presumption of prejudice.**

Webster does not contend his jury pool was too small to mitigate the potential prejudice stemming from any pretrial publicity. This is understandable, because *Skilling* recognized a "reduced likelihood of prejudice where [the] venire was drawn from a pool of over 600,000 individuals." 561 U.S. at 382. And, as of three months before Webster's trial, this district's Master Jury Wheel "was comprised of 599,237

citizens." *United States v. Garcia*, 2022 WL 2904352, *8 n.14 (D.D.C. July 22, 2022). The jury pool was thus undoubtedly "large enough to include individuals who ha[d] paid little or no attention to the January 6 cases," *id.*, and there was no reason to believe that "12 impartial individuals could not be empaneled," *Skilling*, 561 U.S. at 382; *see also United States v. Taylor*, 942 F.3d 205, 223 (4th Cir. 2019) (reduced likelihood of prejudice where venire drawn from Baltimore's 621,000 residents).

Instead of questioning his jury pool's size, Webster focuses on its purported characteristics, contending (at 20-22) "polling data" showed that D.C.'s residents were "predisposed" to guilt. This Court, however, has cautioned that such "public opinion poll[s]" – i.e., those "taken in private by private pollsters and paid for by one side" – are "suspect" because their data is "open to a variety of errors." *Haldeman*, 559 F.2d at 64 n.43.[22] And, indeed, numerous courts have chronicled precisely such flaws in Webster's Select Litigation poll. *See United States v. Coffee*, 2023 WL 4450443, *4 (D.D.C. July 11, 2023); *United States v. GossJankowski*,

---

[22] *See also United States v. Rodriguez*, 581 F.3d 775, 786 (8th Cir. 2009) ("At least three other circuits have declined to rely on public opinion polls[.]") (citing the 11th and 5th Circuits, as well as this Circuit).

2023 WL 395985, \*\*4-5 (D.D.C. Jan. 25, 2023); *United States v. Rhine*, 2023 WL 372044, \*4 (D.D.C. Jan. 24, 2023); *United States v. Brock*, 628 F. Supp. 3d 85, 96-97 (D.D.C. 2022); *Garcia*, 2022 WL 2904352, at \*\*10-13.

To begin, the Select Litigation poll apparently did not "target the full range of this district's jury pool," *Garcia*, 2022 WL 2904352, at \*10, which is drawn from three sources – registered voters, individuals with driver's licenses or valid identification cards, and income-tax filers. Though Select Litigation said it solicited the views of "juror-eligible" residents (ECF #49-1, 1), it did not define that term or identify the source of respondents' phone numbers. Moreover, the poll explains, 99% of the D.C. respondents were "officially registered to vote in Washington D.C." (*id.* at 13), which strongly suggests the poll excluded many potential jurors "who live or work here but may have no particular political affiliation or interest," *Garcia*, 2022 WL 2904352, at \*10; *see also GossJankowski*, 2023 WL 395985, at \*4 (Select Litigation's survey "not representative of the D.C. jury pool").

Further, "[m]any" of the poll questions were "drafted using impossibly broad language." *Brock*, 628 F. Supp. 3d at 96. Question five,

for example, asked: "Are you more likely to vote that [a January 6 defendant] is guilty or not guilty of [the] charges[?]" (ECF #49-1, 14). And, though Webster assigns significant weight (at 21) to this question's results, noting that 52% of D.C. residents "admitted" they were "likely to vote 'guilty,'" respondents "were not given an option to share that they had not yet formed an opinion as to the guilt of every January 6th defendant." *Brock*, 628 F. Supp. 3d at 96. Nonetheless, despite this "unduly restricted choice," *Garcia*, 2022 WL 2904352, at *12, "almost 50% of respondents in Washington, D.C.[,] *volunteered* that they did not have a fixed opinion, answering either '[d]epends' or '[d]on't know/refused,' suggesting that at least half of the venire ha[d] no preconception of guilt, let alone an unshakeable one," *Brock*, 628 F. Supp. 3d at 96 (emphasis added). Contrary to Webster's contention, this indicates that "a considerable portion" of any D.C. venire would have acted in "a manner that is *consistent* with the presumption of innocence and wait[ed] to hear the evidence." *Garcia*, 2022 WL 2904352, at *12 (emphasis added).

Moreover, although Webster asserts (at 21) the poll showed 71% of D.C. residents had "already formed" an opinion that all January 6 defendants were "'guilty' of the charges brought against them," he omits

the clumsy and heavy-handed question that produced that percentage: "From what you have *heard or read*, do you think the people who were *arrested* for activities related to those demonstrations are guilty or not guilty of the charges brought[?]" (ECF #49-1, 14 (emphasis added)). In addition to suffering from the same binary-choice flaw described above, "the belief that most people arrested for crimes are guilty as charged is widespread." *Ballenger*, 2022 WL 16533872, at *4. Moreover, those jurors who would infer guilt simply from what they have "'heard or read'" could be "screened out with voir dire." *Id.* Indeed, in contrast to the voir dire here, the Select Litigation poll never asked this "key" screening question: "whether the respondent could lay aside any prior impressions and render an impartial verdict based on the testimony and evidence submitted at trial." *Rhine*, 2023 WL 372044, at *4. The poll thus did "not offer much insight on what potential jurors who are 'screened for biases during voir dire and asked if they can put aside what they have read or heard, and who are specifically instructed that they may base their verdicts only on the evidence, will do when called upon to render a verdict with respect to an individual defendant.'" *GossJankowski*, 2023 WL 395985, at *12 (citation omitted).

Finally, Webster contends (at 22-23), the poll showed President Trump was "inextricably linked" with the January 6 riot, and the District's residents' "extreme" voting patterns – 92.1% of them voted for Trump's 2016 opponent – meant it was "impossible" to empanel a jury not comprised of people "preordained" to find a Trump supporter like Webster guilty. But, this Court has explained, a "community's voting patterns" are not "at all pertinent to venue." *Haldeman*, 559 F.2d at 64 n.43. Moreover, even assuming the relevance of such patterns, Select Litigation apparently polled *only* D.C. registered voters, see p. 27 supra. The District's jurors, however, "are drawn from sources in addition to voter registration polls" and, indeed, "a substantial portion of eligible voters in the community did not vote at all." *Garcia*, 2022 WL 2904352, at *10 n.22 (noting 36.3% of estimated eligible D.C. voters did not vote for anyone in 2020 election).

Thus, the "proof" Webster has proffered is "not nearly sufficient for [this Court] to overturn a decision within the sound discretion of the trial court." *Chapin*, 515 F.2d at 316. "[I]n determining whether a fair and impartial jury could be empanelled" in Webster's case, Judge Mehta properly relied on a "comprehensive voir dire examination conducted by

the judge in the presence of all parties and their counsel pursuant to procedures, practices, and principles developed by the common law since the reign of Henry II," *Haldeman*, 559 F.2d at 64 n.43, and not Webster's deeply flawed poll.

> ### 2. The media coverage of his case did not support a presumption of prejudice.

In the year before his trial, Webster notes (at 26-27), "D.C. newspapers published at least five hundred articles about January 6th and local news syndicates broadcast[ ] over seven thousand news stories covering these events." The "mere existence of intense pretrial publicity," however, is "not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *Childress*, 58 F.3d at 706. The "right to an 'impartial' jury 'does not require *ignorance*.'" *Tsarnaev*, 142 S. Ct. at 1034 (citation omitted). Rather than simply tally media mentions, *Skilling* thus asks if the coverage included, for example, a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." 561 U.S. at 383; *see also Chapin*, 515 F.2d at 318 ("virulent and sensational").

Here, there was nothing inherently prejudicial about the news coverage of Webster's alleged crimes. Though he cites (at 24 & n.5) an article that labeled him an "'eye gouger'" and another where an official "likened" his actions to a "'junkyard dog,'" these are characterizations a properly instructed juror could reasonably be expected to ignore. Certainly these descriptions were "less memorable and prejudicial" than the televised confession in *Rideau*, which "was likely imprinted indelibly in the mind of anyone who watched it." *Skilling*, 561 U.S. at 383; *see also In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015) (though "'not kind,'" Boston-Marathon-bomber publicity not "of the grossly prejudicial character that attended *Rideau*" (quoting *Skilling*, 561 U.S. at 382)). Moreover, any media coverage that consisted of January 6th videos would have been largely "fact-based" and thus not constitute a "barrage of information that would be inadmissible at trial." *Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018); *see also Haldeman*, 559 F.2d at 61 n.34 ("overwhelming bulk of the publicity dealing with the [Watergate] conspiracy related to information properly brought out at trial").

Additionally, although Webster repeatedly highlights (at 23, 26, 27) the "enormity of the publicity given to *the January 6th protest*," the

voluminous "news concerning the *events occurring at the Capitol*," and the "concentration of local media coverage of *the January 6th protest*" (emphasis added)), this was pretrial coverage of the riot writ large, not Webster's case. And, when "publicity is about the event, rather than directed at individual defendants, this may lessen any prejudicial impact.'" *Skilling*, 561 U.S. at 384 n.17; *see also United States v. Campa*, 459 F.3d 1121, 1144 (11th Cir. 2006) ("[W]e are not aware of any case in which any court has ever held that prejudice can be presumed from pretrial publicity about issues other than the guilt or innocence of the defendant.").[23]

Finally, even assuming, as Webster posits (at 26), "the citizens of D.C. have been inundated with unrelenting information and news concerning the events occurring at the Capitol," he has not shown such

---

[23] In contrast, Webster makes only a single – generic – reference to the volume of coverage about *his* case, suggesting (at 25) "a Google search using the terms 'Thomas Webster Capitol' garnered 4,690,000 search results at the time of the motion to change venue." Similarly, although Webster notes (at 25) that, soon after his indictment, the U.S. Attorney gave an interview "suggesting that *some* of the January 6th defendants could face the rarely used sedition charges" (emphasis added), the U.S. Attorney did not identify Webster as such a defendant and, as Webster himself notes (at 26), the government has charged at least "769 American citizens" in connection with the riot.

publicity was "sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, enabling the change [of venue] to serve its purpose[.]" *Chapin*, 515 F.2d at 317. To the contrary, Webster's own poll data confirms the January 6th riot was "simply not a local crime of peculiar interest to the residents of the District of Columbia." *Haldeman*, 559 F.2d at 64 n.43. The Select Litigation poll indicates that 30% of Atlanta residents said they had been exposed to "[a] lot" of January 6th news coverage, which was only 3% less than the D.C. residents who said they had seen "[a] lot" of such coverage (ECF #49-1, 14). Any change of venue would thus "have been of only doubtful value." *Haldeman*, 559 F.2d at 64 n.43.

3. **The 15-month period between the Capitol riot and Webster's trial reduced the volume of pretrial publicity.**

"Unlike cases in which trial swiftly followed a widely reported crime," *Skilling*, 561 U.S. at 383, 15 months elapsed between the January 6 attack and Webster's trial. This is far more time than in *Rideau*, where the defendant's trial came just two months after his televised confession. 373 U.S. at 724. This significant interval not only led, as the district court

correctly noted, to "at least some reduced 'decibel level of media attention'" (ECF #78, 1 (quoting *Skilling*)),[24] it also caused Webster's prospective jurors' attention to wane. Of those venire members who had followed news of the January 6 riot, many expressed thoughts similar to Juror 1216's, who "watch[ed]" coverage of the riot "when it happened," but "ha[dn't] been paying attention after the height of it [had] gone away from the news" (4/25/22-PM-122; see p. 21 & note 18 supra).

Moreover, although the court obviously did not "sequester[ ]" Webster's jury, *Chapin*, 515 F.2d at 1289, the court repeatedly admonished both the venire members and the seated jurors to avoid any media coverage of Webster's case (see 4/25/22-AM-11, 14; 4/25/22-PM-223-24; 4/26/22-AM-22; 4/26/22-PM-120; 4/29/22-PM-95). Further, the court added, if any seated jurors found themselves "exposed" to such coverage, they were to inform the court "so that we can talk to you about it separately" (4/25/22-PM-223-24). As the court thus repeatedly made

---

[24] Though publicity about the Capitol riot "no longer dominated the news and had become less intense than it was in the immediate aftermath of the riot," it did "regain[ ] prominence" when the House Select Committee conducted its January 6th hearings. *Garcia*, 2022 WL 2904352, at *9. But the House did not hold its first hearing until June 2022, *id.*, which was *after* Webster's trial.

clear, the jurors were to decide Webster's case "based on what occurs in the courtroom," and should not "read or review any news stories about th[e] case" (4/26/22-AM-22; see also 4/29/22-PM-11 ("may consider only the evidence properly admitted in this case")).[25]

### C. The District Court's Thorough and Careful Voir Dire Guaranteed an Impartial Jury, and Webster Has Not Demonstrated Any Actual Prejudice.

Webster alternatively claims (at 29, 34) the "voir dire in this case was inadequate" and he has shown "actual prejudice." He is wrong on both counts.

"No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Skilling*, 561 U.S. at 386. Jury selection is "particularly within the province of the trial judge." *Ristaino v. Ross*, 424 U.S. 589, 594-95 (1976); *see also Haldeman*, 559 F.2d at 65 ("a matter left primarily to the trial judge"). Accordingly, "absent abuse of his broad discretion and a showing that the rights of the accused have been substantially

---

[25] The jury convicted Webster of all counts and thus the jurors' actions did not necessarily run counter to a presumption of prejudice, which is the final *Skilling* factor. Nonetheless, as detailed supra, the other three *Skilling* factors strongly support a no-presumption finding.

prejudiced, the trial judge's rulings as to the scope and content of voir dire will not be disturbed." *Haldeman*, 559 F.2d at 65 (citation omitted).[26]

The court properly exercised its discretion in determining the substance and breadth of the voir dire necessary in Webster's case. Indeed, as the parties and court worked together to refine the proposed voir dire questions, Webster's counsel repeatedly expressed his agreement with the court's proposed alterations (4/21/22:11-12 ("that would be fine"); *id.* at 14 ("That's perfect, Judge."); *id.* at 17 ("That's perfect, Judge.")). Moreover, in refining the voir dire, the court displayed a keen sensitivity to the unique issues raised by this January 6th case. Thus, for example, it was the court that suggested broadening a critical question jointly proposed by the parties, i.e., whether anyone had watched video of Webster from January 6th. As the court noted, the

---

[26] Webster asserts (at 28) that "[a]ctual prejudice focuses on whether the opinions expressed by *potential* jurors during jury selection demonstrate impermissible bias" (emphasis added). But "[s]tatements by nonjurors do not themselves call into question the adequacy of the jury-selection process; elimination of these venire members is indeed one indicator that the process fulfilled its function." *Skilling*, 561 U.S. at 390 n.24. Critically, as discussed infra, all the seated jurors said either they could set aside anything they had learned from the news or could adjudge Webster impartially or, in most cases, both.

parties' proposal did not "capture[ ] where anybody had *read* about the story" (*id.* at 14-15 (emphasis added)). Similarly, over the government's objection, Judge Mehta agreed to add Webster's proposed voir dire question about the venire members' "opinions of former President Trump and his supporters," declaring, "I think that's a fair question" (*id.* at 16-17). Similarly, because Webster was charged with assaulting a police officer, the court agreed – again, over the government's objection – to ask venire members if they or any of their family members and close friends had "ever been involved in a physical altercation with a member of law enforcement" (*id.* at 21-22).[27]

Moreover, the court conducted its voir dire "aware of the greater-than-normal need, due to pretrial publicity, to ensure against jury bias." *Skilling*, 561 U.S. at 389. For example, to ensure the court and parties got to see, and potentially question, every prospective juror, the court did "an individual voir dire of everybody" (4/21/22:27).[28] Further, the court

---

[27] Though the court rejected other of Webster's proposals because they were "redundant" or not "terribly useful," Webster did not object to those omissions (see 4/21/22:23-24).

[28] In particular, the court questioned Jurors 235 and 945, each of whom did not respond to any voir dire questions (see 4/25/22-PM-107-09, 141-49).

conducted this individual voir dire in another courtroom, which "prevent[ed] the spread of any prejudicial information to other venire members." *Skilling*, 561 U.S. at 389. The court also assured the venire members that, if there was "something particularly sensitive" they wanted to discuss, the court would use the husher (4/25/22-AM-12-13), which undoubtedly encouraged candor. These procedures seemingly satisfied Webster's counsel – although the court afforded the parties an opportunity to ask follow-up questions of every prospective juror that the court did not sua sponte dismiss for cause, see note 13 supra, Webster's "counsel declined to ask anything of . . . half of the venire members questioned individually, including [seven] eventually selected for the jury[.]" *See Skilling*, 561 U.S. at 390.[29]

---

[29] Specifically, the court questioned 53 venire members and dismissed 19 of them without the necessity of follow-up questions from counsel, which meant Webster's counsel had the chance to individually question 34 venire members. Of those 34, Webster's counsel declined to question 17. And, although the court admonished *government counsel* to "be mindful of follow-up questions[,]" the court made clear it was not "addressing" Webster's counsel who, the court noted, was "doing just fine" (4/25/22-PM-28-29). Webster is thus mistaken when he suggests (at 30) his "counsel was limited by the court in questioning" Juror 1216, who indicated she had "felt unsafe during the Trump presidency." The court did not "limit[ ]" counsel's questions but, in response to counsel's first attempted follow-up question ("I was listening closely about your

(continued . . . )

As for the specific issue of pretrial publicity, unsurprisingly, every one of the 12 jurors who ultimately considered Webster's case had seen January 6th videos or read about the event. But in response to the court's careful follow-up questions, all 12 also affirmed either that they could set aside that external information or adjudge Webster's guilt impartially or both.[30] Similarly, although Webster notes (at 3, 30) that three venire members (Jurors 799, 1216, 1429) seated on his jury responded

---

concerns about your safety as these things were unfolding. But now we're more than a year later and – "), the court interrupted counsel and clarified Juror 1216's response: "I think she was talking about her safety as to that era of that presidency, not specific to January 6th" (4/25/22-PM-125). Upon confirming that that was the import of Juror 1216's response ("Is that true?"), Webster's counsel *voluntarily* ceased his questioning – "Then I'm going to sit down" (*id.*).

[30] See 4/25/22-AM-30 (Juror 864 could be "fair and impartial"); *id.* at 66 (Juror 1429 could "set all that aside" and be "fair and impartial"); *id.* at 71 (Juror 479 "most certainly" could "set aside" what she had seen, "focus on the evidence," and be "fair and impartial"); 4/25/22-PM-10 (Juror 799 could be "fair and impartial notwithstanding [his] political views"); *id.* at 22 (Juror 1343 could be "fair and impartial"); *id.* at 90 (Juror 269 could "put aside" coverage and judge Webster "based upon only the evidence"); *id.* at 99 (Juror 178 "absolutely" could "set all of that aside," "focus on the evidence," and be "fair and impartial"); *id.* at 105 (Juror 1543 could "put aside" coverage and be "fair and impartial"); *id.* at 114 (Juror 1312 could "put aside" coverage and evaluate evidence "fairly and impartially"); *id.* at 119 (Juror 30 could "set aside" coverage and evaluate evidence "fairly and impartially"); *id.* at 122-23 (Juror 1216 could "put aside" coverage, "focus on the evidence," and be "fair and impartial"); *id.* at 158 (Juror 284 could "evaluate the evidence fairly and honestly").

affirmatively to question eleven – which asked if any venire members had "such strong feelings" about Trump "or his supporters" that it would be "difficult for you to serve as a fair and impartial juror" (4/25/22-AM-19) – the court and counsel's follow-up questions ensured they could, in fact, be fair and impartial.[31] Webster apparently agreed because he did not move to strike any of these three, which is "strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt." *Beck v. Washington*, 369 U.S. 541, 557-58 (1962).[32]

---

[31] Juror 1216, for example, explained that she "felt unsafe" as a "black woman" during Trump's presidency but that that would not "impact [her] ability to be fair and impartial" in Webster's "case" because "that individual [i.e., Webster] . . . ha[dn't] impacted [her] personally" and, even if Webster "felt strongly" about Trump, she could still judge Webster fairly (4/25/22-PM-123-24). Similarly, Juror 799 wasn't a "fan of Trump['s]" and believed his supporters weren't "fun to be around when they're being wild around the streets," but he unhesitatingly affirmed ("Yes") he could be "fair and impartial notwithstanding [his] political views" (*id.* at 9-10). Additionally, Juror 799 confirmed he could apply the presumption of innocence and "would not" have "any trouble" acquitting Webster if the government failed to demonstrate his guilt (*id.* at 10). Finally, though Juror 1429 did not have a "high opinion" of Trump and, "by extension," his supporters, Juror 1429 could set aside his "feelings," "focus on the evidence," and "be fair and impartial to [Webster]" (4/25/22-AM-65-66).

[32] On several occasions during the morning's voir dire, Webster's counsel asked a venire member if Webster's support for Trump put his "client at a disadvantage" (4/25/22-AM-91-92; *see id.* at 37, 67). Following the lunch

(continued . . . )

Finally, *none* of the jurors that Webster challenged for cause (Jurors 482, 974, 1156) ultimately sat on his jury. Nonetheless, Webster asserts (at 30-31, 32-33), the district court "should have" struck the latter two. But a trial court's determination of impartiality is entitled to significant deference because it is "ordinarily influenced by a host of factors impossible to capture fully in the record – among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling*, 561 U.S. at 386. Here, the court reasonably concluded Juror 1156 did not have to be struck because, "when he was asked specifically about the presumption of innocence on multiple occasions and about would he vote to acquit, he said unequivocally that he would be able to do that" (4/25/22-AM-97). Similarly, the court properly concluded, Juror 974 could be impartial

---

break, the court suggested the term "disadvantage" was a "little indefinite" and "ask[ed]" counsel to phrase his follow-up questions in terms of "presumptions and burdens," which the court deemed "more precise" (4/25/22-PM-3-4). Counsel agreed to do so: "I'll adopt the court's view." (*Id.* at 4.) Now, however, Webster contends (at 33-34) the court "chill[ed]" his questioning by "limit[ing]" him to "legal jargon" as opposed to "words that jurors may understand." But the court did not plainly err in asking counsel not to use the vague term "disadvantage," which, the court correctly noted, "can mean lots of things to lots of different people" and really elicits only a "general sentiment" (4/25/22-AM-97).

where, among other things, she "repeatedly" said she could be "fair" and would have no difficulty in acquitting Webster if the government did not meet its burden (4/25/22-PM-41). In any event, "'if [a] defendant elects to cure [a trial judge's erroneous for-cause ruling] by exercising a peremptory challenge, and is ultimately convicted by a jury on which no biased juror sat,'" the Supreme Court has "held, 'he has not been deprived of any . . . constitutional right.'" *Skilling*, 561 U.S. at 395 n.31 (quoting *United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000)) (bracketed material added by *Skilling*).

* * * * *

"In sum, [Webster] failed to establish that a presumption of prejudice arose or that actual bias infected the jury that tried him." *Skilling*, 561 U.S. at 398.

## II. The District Court Did Not Plainly Err by Restricting Cross-Examination of Officer Rathbun.

Webster asserts (at 34-40) the district court improperly restricted his cross-examination of Office Rathbun. Webster, however, waived this claim. In any event, it is meritless.

## A. Relevant Procedural Background

Five months after the Capitol riot, Officer Rathbun "responded to an active kidnapping situation where he discharged his service weapon after the alleged kidnapper pointed a rifle at him, resulting in the suspect's death" (ECF #59, 4). As is "standard practice in such cases," MPD "opened an administrative investigation into Officer Rathbun's use of force" (*id.*). Before trial, the government moved to preclude admission of any evidence of the shooting incident and the use-of-force investigation (*id.* at 7-11 (citing Fed. RR. Evid. 401-04, 608)).[33] The government also maintained that any cross-examination about the still-pending administrative investigation should be precluded because "pending internal investigations far removed from the facts of the underlying case generally are not relevant to show bias" (*id.* at 11). In the alternative, if the court "were to permit some cross-examination into the pending investigation it should be narrowly limited to the fact of the existence of the investigation (assuming it is still pending at the time of the trial),

---

[33] Though the pleadings associated with the government's motion in limine were originally sealed, in August 2023 the district court unsealed both those pleadings and the pretrial conference where the motion was discussed. *See* D.C. Cir. R. 47.1(b).

rather than the subject-matter of that investigation" (*id.* at 11-14 (citing *United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010)).[34]

For his part, Webster sought a continuance of his trial "until" MPD "had concluded its investigation," asserting "any determination precluding or limiting cross-examination regarding the investigation would be premature" because it was still possible Officer Rathbun could "be charged and convicted of a crime in relation to this shooting" or "found to have been untruthful in connection with this investigation" (ECF #66, 2).

The court denied Webster's continuance request and granted the government's in limine motion "except as to potential bias cross-examination" (ECF #75, 2; see 4/21/22:61-62). As the court explained, *Wilson* recognized the "propriety of bias cross-examination regarding an ongoing internal investigation" but "observ[ed] that the investigation's subject-matter would not have 'assisted in portraying [the officer] as biased'" (ECF #75, 2 (quoting *Wilson*, 605 F.3d at 1006)).

---

[34] By the time of the government's in limine motion, the D.C. U.S. Attorney's Office – which "reviews all police-involved fatalities" – had already "declined to prosecute Officer Rathbun in connection with the incident" (ECF #59, 4).

At a pretrial conference, the court reiterated that Webster's cross-examination could not "entail the substance and the nature of the investigation into excessive force," reasoning the investigation's subject matter (*i.e.*, the shooting) was "highly prejudicial" and "inflammatory," especially because the shooting could have been "justified" (4/21/22:63). But, the court also reiterated, the "fact of a pending investigation" was "certainly fair game" for cross-examination (*id.*; see also *id.* at 67 ("the existence of the investigation is okay")). Webster could thus ask Officer Rathbun "is there a pending investigation but not characterize it as a use-of-force investigation" (*id.* at 65-66). Because Webster wanted to ask Officer Rathbun about the investigation's subject matter, however, his counsel "offer[ed] [his] respectful exception" to this ruling (*id.* at 66 (emphasis added)).

Several days later, in advance of Officer Rathbun's trial testimony, the government announced that MPD had found Officer Rathbun's use of force "justified" and had "closed" its "outstanding administrative investigation" (4/27/22-AM-4-5). "[G]iven that," the government asked that Webster "not be permitted to engage in any cross-examin[ation] inquiry into any pending investigations, as there no longer is a pending

investigation" (*id.* at 5). Webster's counsel agreed that such bias cross-examination was no longer relevant: "the government's position is right" (*id.*; see also *id.* ("the government's position is correct")).

### B. Webster Waived His Confrontation Clause Claim, and Cannot Show Plain Error in any Event.

Webster claims (at 36) the district court violated his Confrontation Clause right by precluding him from cross-examining Officer Rathbun about MPD's investigation. But Webster never sought to cross-examine Officer Rathbun about the *completed* investigation and, indeed, affirmatively agreed any bias inquiry was mooted by its completion. Because Webster's counsel "'induce[d]'" any purported cross-examination error "through [his] litigation conduct," *United States v. Long*, 997 F.3d 342, 353 (D.C. Cir. 2021) (citation omitted), he has waived his present claim (at 34) that the court's "*exclusion* of the investigation into Rathbun's conduct was error as the fact of the investigation . . . was relevant to potential bias" (emphasis added).[35]

---

[35] As explained supra, the only claim Webster preserved below was his contention that the investigation's subject-matter was appropriate cross-examination fodder. But Webster has now expressly abandoned that

(continued . . . )

Even if Webster has not waived but merely forfeited this claim, he would still have to show plain error to obtain reversal. *See, e.g., United States v. Abbo*, 515 F. App'x 764, 768 (10th Cir. 2013) (failure to attempt allegedly precluded cross-examination subject to plain-error review). Webster has failed to show the district court "clearly or obviously" erred in precluding cross-examination about the recently closed DC-USAO and MPD investigations. *United States v. Eiland*, 738 F.3d 338, 363-64 (D.C. Cir. 2013) (outlining plain-error standard). District courts have "'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination [for potential bias] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Anderson*, 881 F.2d 1128, 1139 (D.C. Cir. 1989) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 676 (1986)); *see also Wilson*, 605 F.3d at 1006. And, although it may be true that "[e]vidence that a prosecution witness is subject to *re*indictment by

_____

claim, asserting (at 39) he should have been permitted to "limit[ ] the confrontation to the existence of the investigation *without delving into the subject matter*" (emphasis added). In any event, as the district court correctly concluded, *Wilson* defeats this claim. *See* 605 F.3d at 1006.

the prosecution is, by itself, probative of potential bias," *Anderson*, 881 F.2d at 1139 (emphasis added), Webster has never shown the DC-USAO and MPD investigations could similarly be resuscitated. Nor has Webster suggested that Officer Rathbun might have perceived some connection between his trial testimony and the closed investigations. *Cf. id.* (detective whom witness had met in connection with dismissed murder charge "was one of the officers who served her with subpoena for her testimony"). Alternatively, Webster has not shown any error affected his substantial rights or "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Eiland*, 738 F.3d at 363-64. Officer Rathbun's testimony about Webster's assaultive and obstructive acts was fully corroborated by Rathbun's body-worn-camera footage, which shows Webster repeatedly swinging his flagpole at the officer and then tackling him.

## III.  Any Error in the § 111 Instructions Did Not Prejudice Webster.

### A.    Relevant Procedural Background

Section 111 makes it a crime to forcibly assault, resist, oppose, impede, intimidate, or interfere with an officer of the United States while he is engaged in his official duties. 18 U.S.C. § 111(a)(1). "[W]here the

acts in violation of this section constitute only simple assault," the offense

is a misdemeanor. *Id.* § 111(a). But if "such acts involve physical contact

with the victim of that assault or the intent to commit another felony,"

the maximum penalty is eight years. *Id.* Further, subsection (b)

authorizes an enhanced penalty of up to 20 years if, "in the commission

of any acts described in subsection (a)," the assailant "uses a deadly or

dangerous weapon" or "inflicts bodily injury." *Id.* § 111(b).

Consistent with Webster's indictment (ECF #76, 2) and the parties'

jointly proposed jury instructions (ECF #74, 5-6),[36] the court instructed

that, to find Webster guilty of the § 111(b) offense, the jurors had to find,

among other things, that he "made physical contact with a person who

was assisting officers of the United States" or he "acted with the intent

to commit" the felony "charged in Count Two" (4/29/22-PM-21 (fifth

---

[36] The indictment charged this: on January 6, Webster, "using a deadly or dangerous weapon, that is, a metal flagpole, did forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of the United States . . . and any person assisting such an officer and employee, that is, Officer [Rathbun], . . . while such officer or employee was engaged in or on account of the performance of official duties, *and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony* (ECF #76, 2 (emphasis added)).

element)).[37] Additionally, the jurors had to find that, "in doing the foregoing acts, [he] used a deadly or dangerous weapon" (*id.* (sixth element)).

In its closing, the government argued Webster could have satisfied the fifth "element" in one of two ways (4/29/22-PM-56-57). First, although Webster only "tr[ied] to hit Officer Rathbun with the pole," he made "physical contact" with Rathbun after the officer took Webster's pole – "He was tackled, he was pinned to the ground, dragged by his helmet, choked, gas mask ripped off his face. Physical contact, to say the least." (*Id.* at 56.) Or, "even putting that one aside," Webster assaulted Officer Rathbun with the intent to commit the civil-disorder offense (*id.* at 57; see note 37 supra).

## B. Webster Has Not Demonstrated Any Error Substantially Prejudiced Him.

Webster now contends (at 17, 40-48) that the instructions on the § 111 elements constructively amended his indictment. Specifically, as Webster correctly notes (at 40-41), "physical contact is not required as a

---

[37] Count Two charged Webster with obstructing, impeding, or interfering with Officer Rathbun as he was engaged in his official duties during a civil disorder (ECF #76, 2). *See* 18 U.S.C. § 231(a)(3).

predicate act or element of § 111(b) so long as acts encompassed in the first separate crime [of § 111(a)(1)] were committed and in doing so the defendant used a deadly or dangerous weapon or inflicted bodily injury." *United States v. Siler*, 734 F.3d 1290, 1297 (11th Cir. 2013); *see also United States v. Rafidi*, 829 F.3d 437, 445 (6th Cir. 2016). The government thus was not, in fact, required to prove physical contact; it could have proved Webster's § 111(b) violation simply by showing that, in the course of, for example, "forcibly assault[ing]" Officer Rathbun – that is, attempting or threatening to inflict injury upon the officer with an apparent present ability to do so – Webster used a deadly or dangerous weapon. 18 U.S.C. § 111(a)(1). Or, the government could have proved Webster's § 111(b) violation by showing that, in the course of forcibly "intimidat[ing]" Officer Rathbun, Webster used a deadly or dangerous weapon. *Id.* Because the evidence established that Webster repeatedly swung his flagpole (a deadly or dangerous weapon) at Officer Rathbun (thus either, at a minimum, assaulting or intimidating him) as Rathbun manned the restricted-area barricade, the government proved that Webster committed a § 111(b) offense, even though his flagpole never made physical contact with Rathbun.

As Webster concedes (at 55), he did not object to the court's instructions, so his claim is reviewed only for plain error. *See United States v. Sayan*, 968 F.2d 55, 59 (D.C. Cir. 1992). He cannot meet that standard. Even assuming arguendo that the first two prongs of the test are met, Webster is mistaken when he asserts (at 44) the additional element prejudiced him because "the jury was then susceptible to finding that [he] violated § 111(b) only in the events that happened after he no longer possessed the flagpole," i.e., when he made physical contact with Officer Rathbun by tackling him and trying to remove the officer's gas mask. If the jury made such a finding, Webster further asserts (at 46-47), it constructively amended his indictment, which identified Webster's weapon as his flagpole, not his "hands and body" or Officer Rathbun's "helmet and chinstrap."

At most, however, such a finding would constitute a variance. *See United States v. Mangieri*, 694 F.2d 1270, 1277 (D.C. Cir. 1982) (variance occurs when indictment's "charging terms are left unaltered" but evidence "proves facts materially different from those charged"). But Webster hasn't even shown a variance necessarily occurred, which is his plain-error burden. The government only ever argued that Webster's

flagpole was the deadly or dangerous weapon.[38] Accordingly, if, as Webster posits, the jury understood the § 111(b) instructions to require that Webster made physical contact with Officer Rathbun *while* Webster was using a deadly or dangerous weapon, the jury must have found the evidence satisfied the *alternative* prong of the fifth – and superfluous – element, *e.g.*, Webster committed his flagpole assault "with the intent to commit another felony" (the civil-disorder offense) (4/29/22-PM-21). *See United States v. Tucker*, 12 F.4th 804, 826 (D.C. Cir. 2021) ("[w]e presume that juries follow the court's instructions"). Webster has thus failed to show he was prejudiced, much less substantially prejudiced, by the erroneous instruction. *Cf. Musacchio v. United States*, 577 U.S. 237, 243 (2016) (any sufficiency challenge must be measured by correct elements, not the "erroneously heightened command in the jury instructions").

---

[38] In its opening statement, the government asserted Webster "used his metal flagpole as a deadly and dangerous weapon to violently attack Officer Rathbun" (4/26/22-AM-32). Similarly, in its closing argument, the government maintained that Webster "clearly assaulted Officer Rathbun with a deadly or dangerous weapon": "Officer Rathbun told you a metal pole in the hands of a hostile person is a weapon" (4/29/22-PM-54). Finally, in its rebuttal, the government argued Webster "use[d] a weapon, a metal pole to smash at him, like a bat, and *then* tackles him to the ground and tries to rip off his gear" (*id.* at 92 (emphasis added)).

## IV. The District Court's Below-Guidelines Sentence Is Procedurally Correct and Substantively Reasonable.

Webster contends (at 48-52) the district court erred in enhancing his sentence, and (at 52-57) that the court "abused its discretion when sentencing [him] disparately from similarly situated defendants." Neither claim has merit.

### A. Standard of Review

This Court reviews a sentencing challenge under a two-step analysis. *United States v. Warren*, 700 F.3d 528, 531 (D.C. Cir. 2012). First, this Court verifies that the district court "committed no significant procedural error," *Gall v. United States*, 552 U.S. 38, 51 (2007), which "includes failing properly to calculate the guideline range," *United States v. Washington*, 670 F.3d 1321, 1326 (D.C. Cir. 2012). Upon appeal of sentencing enhancements such as Webster's body-armor enhancement, "[p]urely legal questions are reviewed *de novo*; factual findings are to be affirmed unless clearly erroneous; and [this Court is] to give due deference to the district court's application of the guidelines to facts." *United States v. Bikundi*, 926 F.3d 761, 796-97 (D.C. Cir. 2019) (citation omitted). "Due deference 'presumably falls somewhere between *de novo*

and clearly erroneous.'" *Id.* at 797 (citation omitted). Second, this Court assesses a sentence's substantive reasonableness, which "is the catch-all criterion under which the reviewing court monitors (deferentially – for abuse of discretion) whether the district court has given reasonable weight to all the factors required to be considered." *United States v. Russell*, 600 F.3d 631, 633 (D.C. Cir. 2010).

## B. The District Court Properly Applied the Body-Armor Enhancement.

Webster asserts (at 48-51) the court incorrectly enhanced his sentence four levels pursuant to U.S.S.G. § 3B1.5(2)(B), which applies if a defendant is convicted of a "crime of violence" – here, Webster does not contest his § 111(b) offense qualifies – and he "used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense." "'Use' means," among other things, "active employment in a manner to protect the person from gunfire" but does not "mean mere possession." U.S.S.G. § 3B1.5(2)(B), cmt. (n.1).

The court properly applied the body-armor enhancement, concluding Webster wore his body armor during the commission of his armed assault on Officer Rathbun (see 9/1/22:12-16). As the court

correctly recognized, Webster admitted at trial that he wore his body armor "for his own safety" (*id.* at 15; see note 5 supra). Further, the court reasonably inferred, as a "former police officer" Webster "would have known" the officers guarding the Capitol had guns and "that charging at [them], as he ultimately did, attacking those police officers, could bring gunfire" (9/1/22:15).[39] Because Webster felt protected from such potential gunfire by his body armor, the court appropriately concluded, it "contribute[d] to the offense in the sense that it emboldened [him] to behave the way that he did" and the enhancement applied (*id.*). *See United States v. Johnson*, 913 F.3d 793, 803 (9th Cir.) ("Wearing body armor is the precise means by which a person 'employ[s] [the body armor] in a manner to protect the person from gunfire.' Accordingly, Johnson 'used' the body armor within the meaning of the guidelines simply by wearing it." (quoting U.S.S.G. commentary)), *judgment vacated on other grds*, 140 S. Ct. 440 (2019).

---

[39] Indeed, Webster expressly acknowledged this possibility at trial, claiming that he put his hands on Officer Rathbun's gas mask because he did not want Rathbun to think Webster was reaching for the officer's gun (4/28/22-AM-149).

Webster offers (at 49) alternative reasons for his body armor, suggesting he used it "for warmth and possible protection in the crowd" (citing 4/28/22-AM-98-99, 114). The court was not required to credit these reasons (for example, Webster did not assault other crowd members, but an armed officer), but even assuming their veracity, the "ability of body armor to serve dual purposes does not make § 3B1.5 inapplicable where the facts show one purpose could be to protect the wearer from gunfire." *United States v. Barrett*, 552 F.3d 724, 728 (8th Cir. 2009). Because one of Webster's purposes was to protect himself from the possibility that an armed police officer (such as Officer Rathbun) might use his gun in self-defense when a protestor (such as Webster) first swung a metal pole at him and then tackled him, the court's application of § 3B1.5(2)(B) is entitled to "due deference." *Bikundi*, 926 F.3d at 797.

## C. The District Court Properly Weighed All the § 3553 Factors, Including The Need To Avoid Unwarranted Sentencing Disparities.

Finally, Webster asserts (at 52-58), his below-Guidelines, 120-month sentence was "unreasonable and disparate to other similar January 6 defendants." This claim, too, fails.

As the record amply demonstrates, the court "was mindful of its obligation, pursuant to 18 U.S.C. § 3553(a)(6), to avoid unwarranted sentencing disparities among similarly situated defendants." *United States v. Ayers*, 795 F.3d 168, 177 (D.C. Cir. 2015). Though Webster's memorandum did not identify *any* purportedly similarly situated January 6 defendant, before Webster's sentencing hearing Judge Mehta reviewed four other January 6 cases. Further, at Webster's sentencing itself, the court closely questioned the government about these other cases, including the *Ponder* case, which involved a defendant who – like Webster – had wielded a flagpole against a police officer, see note 11 supra. Indeed, due in part to the court's careful consideration of these other January 6 cases and "to avoid unwarranted disparities," it varied from the 210-240 Guidelines range and sentenced Webster to 120 months (9/1/22:66). The court, however, still believed Webster deserved a "stiff[er]" sentence than the other four January 6 defendants because, unlike Webster, two of these defendants (Reffitt and Robertson) never "touched a police officer" and the other two (Ponder and Palmer) "didn't hurt" anyone (*id.* at 62). Plainly, the court "adequately considered the need to avoid unwarranted sentencing disparities and did not abuse its

discretion when concluding that [Webster] was differently situated" from other January 6 defendants, *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018), though still deserving of a variance. "Indeed, it is 'hard to imagine' how a sentence '*below* the range [this Court] ordinarily view[s] as reasonable' could be unreasonably high." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 208 (D.C. Cir. 2013) (citation omitted).

Despite the court's scrupulous attention to the § 3553(a)(6) factor and its decision to vary downward partly to account for the possibility of unwarranted disparities, Webster cites (at 53-56) ten allegedly "similar" January 6 cases that, he maintains, demonstrate the unreasonableness of his sentence. But, as Webster himself notes (at 54-55), seven of these ten defendants pleaded guilty,[40] which, in and of itself, "provides a perfectly valid basis for a sentencing disparity." *Lopesierra-Gutierrez*, 708 F.3d at 208; *see also United States v. Otunyo*, 63 F.4th 948, 960 (D.C.

---

[40] *See United States v. Richardson*, No. 21-CR-721; *United States v. Khater*, No. 21-CR-222; *United States v. Head*, No. 21-CR-99; *United States v. Fairlamb*, No. 21-CR-120; *United States v. Rubenacker*, No. 21-CR-193; *United States v. Miller*, No. 21-CR-119; *United States v. Coffman*, No. 21-CR-614.

Cir. 2023); *United States v. Williams*, 980 F.2d 1463, 1467 (D.C. Cir. 1992). Moreover, of the three remaining cases, the court considered two (*Reffitt* and *Robertson*) and reasonably concluded neither was like Webster's because those defendants did not "touch[ ] a police officer" (9/1/22:62). Finally, even assuming Webster's final January 6 case, *United States v. McCaughey*, No. 21-CR-40, is relevant (in fact, it *post-dated* his sentencing, as Webster concedes (at 54)), McCaughey's conduct was not similar to his because, among other things, McCaughey did not wear body armor, an enhancement that added 72 months to Webster's Guidelines range (see 9/1/22:17).

# CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
BRIAN P. KELLY
HAVA MIRELL
Assistant United States Attorneys

/s/
DAVID B. GOODHAND
D.C. Bar #438844
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
david.goodhand2@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 12,989 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
DAVID B. GOODHAND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Elizabeth A. Brandenburg, Esq., elizabeth@msheinlaw.com, on this 11th day of October, 2023.

/s/
DAVID B. GOODHAND
Assistant United States Attorney