In The

# United States Court Of Appeals
## For The D.C. Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## THOMAS WEBSTER,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————

## PUBLIC JOINT APPENDIX
### Volume I of VI - (Pages: 1 - 562)
### Sealed Material in Separate Supplement

————————

Elizabeth A. Brandenburg
Marcia G. Shein
LAW FIRM OF SHEIN,
  BRANDENBURG & SCHROPE
2392 North Decatur Road
Decatur, GA  30033
(404) 633-3797

David B. Goodhand
Chrisellen R. Kolb
Nicholas P. Coleman
U.S. ATTORNEY'S OFFICE
  (USA) APPELLATE DIVISION
601 D Street, NW
Room 8104
Washington, DC  20530
(202) 252-6829

*Counsel for Appellant*

*Counsel for Appellee*

# TABLE OF CONTENTS
## Joint Appendix - Volume I of VI

Page:

Docket Entries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendant's Motion to Change of Venue,
With Attachment,
 filed February 9, 2022 [DE49]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

 **Attachment:**

 Letter from Harrison Hickman to
 Ann Mason Rigby and Elizabeth A. Mullin,
 With Attached Appendix,
  dated February 4, 2022 [DE49-1]. . . . . . . . . . . . . . . . . . . . . . . . . . 30

Government's Notice of Appearance
 filed February 11, 2022 [DE50]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Government's Opposition to Defendant's Motion to Transfer Venue
 filed February 23, 2022 [DE52]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Government's Motion in *Limine* to Preclude or Limit Cross
Examination of Officer Noah Rathbun and Exclude Evidence,
With Attached Motion to Seal,
 filed March 14, 2022 [DE59]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Joint Pretrial Statement
 filed April 8, 2022 [DE74]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

**Order**
     **filed April 13, 2022 [DE75]**.................................... 158

**Second Superseding Indictment**
     **filed April 13, 2022 [DE76]**.................................... 161

**Order**
     **filed April 18, 2022 [DE78]**.................................... 165

**Transcript of Pretrial Conference Proceedings Before**
**The Honorable Amit P. Mehta**
     **on April 21, 2022.** .......................................... 168

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 1 - Morning Session]**
     **on April 25, 2022.** .......................................... 238

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 1 - Afternoon Session]**
     **on April 25, 2022.** .......................................... 336

# TABLE OF CONTENTS
## Joint Appendix - Volume II of VI

**Page:**

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 2 - Morning Session]**
　　　on April 26, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 563

**Testimony of <u>Carneysha Mendoza</u>:**

**Direct Examination by Ms. Nielsen.. . . . . . . . . . . . . . . . . . . . . . . . . . . 607**
**Cross-Examination by Mr. Monroe. . . . . . . . . . . . . . . . . . . . . . . . . . . 665**
**Redirect Examination by Ms. Nielsen.. . . . . . . . . . . . . . . . . . . . . . . . 681**

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 2 - Afternoon Session]**
　　　on April 26, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 697

**Testimony of <u>Mark Gazelle</u>:**

**Direct Examination by Ms. Nielsen.. . . . . . . . . . . . . . . . . . . . . . . . . . . 702**
**Cross-Examination by Mr. Monroe. . . . . . . . . . . . . . . . . . . . . . . . . . . 724**

**Testimony of <u>Paul Wade</u>:**

**Direct Examination by Ms. Nielsen.. . . . . . . . . . . . . . . . . . . . . . . . . . . 727**
**Cross-Examination by Mr. Monroe. . . . . . . . . . . . . . . . . . . . . . . . . . . 746**

Transcript of Jury Selection Proceedings Before
The Honorable Amit P. Mehta [Day 2 - Afternoon Session]
on April 26, 2022, Continued:

Testimony of <u>Jonathan Lauderdale</u>:

Direct Examination by Mr. Kelly............................... 751
Cross-Examination by Mr. Monroe........................... 780
Redirect Examination by Mr. Kelly........................... 793

Testimony of <u>Joanna Burger</u> :

Direct Examination by Ms. Mirell............................. 796
Cross-Examination by Mr. Monroe........................... 814

Transcript of Jury Selection Proceedings Before
The Honorable Amit P. Mehta [Day 3 - Morning Session]
on April 27, 2022. ......................................... 820

Testimony of <u>Noah Rathbun</u>:

Direct Examination by Mr. Kelly............................... 827
Cross-Examination by Mr. Monroe........................... 882
Redirect Examination by Mr. Kelly........................... 917

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 3 - Afternoon Session]**

on April 27, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 925

**Testimony of <u>Patricia Norden</u>:**

**Direct Examination by Ms. Nielsen.. . . . . . . . . . . . . . . . . . . . . . . . 927**
**Cross-Examination by Mr. Monroe. . . . . . . . . . . . . . . . . . . . . . . . 944**

**Testimony of <u>Virginia Donnelly</u>:**

**Direct Examination by Ms. Mirell. . . . . . . . . . . . . . . . . . . . . . . . . . 946**

**Testimony of <u>Edgar Tippett</u>:**

**Direct Examination by Mr. Kelly. . . . . . . . . . . . . . . . . . . . . . . . . . . 961**

**Testimony of <u>Riley Palmertree</u>:**

**Direct Examination by Ms. Mirell. . . . . . . . . . . . . . . . . . . . . . . . . . 972**

# TABLE OF CONTENTS
## Joint Appendix - Volume III of VI

**Page:**

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 4 - Morning Session]**
      on April 28, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1023

   **Testimony of <u>Riley Palmertree</u>:**

   **Direct Examination by Ms. Mirell.** . . . . . . . . . . . . . . . . . . . . . . . 1033
   **Cross-Examination by Mr. Monroe.** . . . . . . . . . . . . . . . . . . . . . . 1058
   **Redirect Examination by Ms. Mirell.** . . . . . . . . . . . . . . . . . . . . . 1086

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 4 - Afternoon Session]**
      on April 28, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1177

   **Testimony of <u>Thomas Webster</u>:**

   **Direct Examination by Mr. Monroe (continued).** . . . . . . . . . . . . . 1179
   **Cross-Examination by Ms. Nielsen.** . . . . . . . . . . . . . . . . . . . . . . 1208

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 5 - Morning Session]**

on April 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1252

**Testimony of <u>Thomas Webster</u>:**

**Cross-Examination by Ms. Nielsen (continued). . . . . . . . . . . . . . 1257**
**Redirect Examination by Mr. Monroe. . . . . . . . . . . . . . . . . . . . . 1260**

**Testimony of <u>Laura Moritz</u>:**

**Direct Examination by Mr. Monroe.. . . . . . . . . . . . . . . . . . . . . . . 1263**
**Cross-Examination by Ms. Mirell. . . . . . . . . . . . . . . . . . . . . . . . 1267**

**Testimony of <u>Brian Gallo</u>:**

**Direct Examination by Mr. Monroe.. . . . . . . . . . . . . . . . . . . . . . . 1268**
**Cross-Examination by Ms. Mirell. . . . . . . . . . . . . . . . . . . . . . . . 1270**

**Testimony of <u>Frank Sialiano</u>:**

**Direct Examination by Mr. Monroe.. . . . . . . . . . . . . . . . . . . . . . . 1272**
**Cross-Examination by Ms. Mirell. . . . . . . . . . . . . . . . . . . . . . . . 1275**

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 5 - Afternoon Session]**
      on April 29, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1321

**Transcript of Jury Selection Proceedings Before**
**The Honorable Amit P. Mehta [Day 6 - Morning Session]**
      on May 2, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1428

**Government's Opposition to Defendant's**
**Motion for Judgment of Acquittal**
      filed June 27, 2022 [DE97]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1440

**Government's Sentencing Memorandum,**
**With Exhibits,**
      filed August 24, 2022 [DE104]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1451

      <u>Exhibits</u>:

    F.     Excerpt of Transcript [104-1]. . . . . . . . . . . . . . . . . . . . . . . . . 1498

    G.    Letter from Valerie L. Hasberry
           dated May 26, 2022 [104-1]. . . . . . . . . . . . . . . . . . . . . . 1500

    H.    Letter from Catherine L. Szpindor
           dated May 25, 2022 [104-1]. . . . . . . . . . . . . . . . . . . . . . 1502

    I.      Letter from Jennifer Krafchik
           dated May 25, 2022 [104-1]. . . . . . . . . . . . . . . . . . . . . . 1504

# TABLE OF CONTENTS
## Joint Appendix - Volume IV of VI

Page:

Sentencing Memorandum and Motion for Downward Variants,
With Exhibits,

    filed August 25, 2022 [DE105]................................. 1506

Exhibits:

A.    Transcript of Sentencing Before
    The Honorable Amit P. Mehta
    *US v. Lolos*
        on November 19, 2021 [DE105-1].................. 1517

B.    Marine Corps Service Records [DE105-2]. .............. 1595

C.    Various Certificates and
    Performance Evaluations[DE105-3]..................... 1606

D.    Letter from Mayor Rudolph Giuliani
        dated May 15, 1997 [DE105-4]..................... 1699

E.    Psychiatric Report
        dated August 24, 2022 [DE105-5]. .................. 1702

F.    Various Character Reference Letters [DE105-6]. ......... 1705

Minute Order
    filed August 30, 2022....................................... 1731

**Government's Response to Court's Minute Order,**
**With Exhibits,**

     filed August 31, 2022 [DE106]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1732

    <u>**Exhibits:**</u>

    A.    Photo of Interior Nametag of
            Plate Carrier "Second Chance," Blue

               dated March 24, 2022 [DE106-1]. . . . . . . . . . . . . . . . . . 1737

    B.    Web Search History [DE106-2]. . . . . . . . . . . . . . . . . . . . . . . . 1739

    C.    Text Message History [DE106-3]. . . . . . . . . . . . . . . . . . . . . . 1849

**Transcript of Sentencing Proceedings Before**
**The Honorable Amit P. Mehta**

     on September 1, 2022. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1851

**Judgment in a Criminal Case**

     filed September 9, 2022 [DE110]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1919

**Defendant's Notice of Appeal**

     filed September 13, 2022 [DE109]. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1927

**Order**

     filed August 2, 2023 [DE131]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1929

# TABLE OF CONTENTS
## Joint Appendix - Volume V of VI - Exhibits

Page:

**Government's Exhibits:**

**200.1.**   USCP Compilation Video (13 min.)
             Digital Media..................................... Disc

**204.**     N.R. BWC Footage 1.6.21 (14:28:18 to 14:29:55)
             Digital Media..................................... Disc

**205.**     USCP Surveillance Video 0944 (2:28:17 to 2:29:55)
             Digital Media..................................... Disc

**208.**     Send More Patriots Video
             Digital Media..................................... Disc

**210.**     Webster at Lower West Tunnel Video
             Digital Media..................................... Disc

**213.**     Patriots at the Capitol 1-6-21 Slow Motion
             Digital Media..................................... Disc

**217.**     USCP Surveillance Video 0944 Tracking
             Digital Media..................................... Disc

**307.**     Photo of Webster at Washington Monument. . . . . . . . . . . 1930

**601.1.**   Photo of Capitol (with Perimeter). . . . . . . . . . . . . . . . . . . . 1932

**604.**     Photo of N.R. Injuries. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1933

**<u>Government's Exhibits</u>, Continued:**

605.      **Photo of N.R. Injuries.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1934**

606.      **Photo of N.R. Injuries.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1935**

608.      **Photo of N.R. Injuries.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1936**

610.      **Photo of N.R. Injuries.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1937**

702.      **Stipulation re Certification of Electoral College.** . . . . . . . . **1938**

APPEAL,CAT B,CLOSED

## U.S. District Court
### District of Columbia (Washington, DC)
### CRIMINAL DOCKET FOR CASE #: 1:21-cr-00208-APM-1

Case title: USA v. WEBSTER

Date Filed: 03/12/2021

Magistrate judge case number:  1:21-mj-00244-GMH

---

Assigned to: Judge Amit P. Mehta

Appeals court case number: 22-3064

**Defendant (1)**

**THOMAS WEBSTER**
represented by **James E. Monroe**
DUPEE & MONROE,, P.C.
211 Main Street
PO Box 470
Goshen, NY 10924
845-294-8900
Fax: 845-294-3619
Email: marina@dupeemonroelaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jon C. Dupee , Jr**
DUPEE MONROE PC
211 Main Street, P.O. Box 470
Goshen, NY 10924
845-294-8900
Fax: 845-294-3619
Email: heather@dupeemonroelaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jonathan Seth Zucker**
LAW OFFICES OF JONATHAN ZUCKER
37 Florida Avenue, NE
Suite 200
Washington, DC 20002
(202) 624-0784
Fax: (202) 609-9653
Email: jonathanzuckerlaw@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

18 U.S.C. 111(a)(1) and (b);
ASSAULTING/RESISTING/IMPEDING
OFFICERS/EMPLOYEES; Assaulting, Resisting, or
Impeding Certain Officers Using a Dangerous
Weapon
(1)

**Disposition**

Dismissed at Sentencing.

| | |
|---|---|
| 18:111(a)(1) and (b); ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon<br>(1s) | Dismissed at Sentencing. |
| 18 U.S.C. 111(a)(1) and (b); ASSAULTING/RESISTING/IMPEDING OFFICERS/EMPLOYEES; Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon<br>(1ss) | Sentenced to one hundred twenty (120) months of incarceration, followed by thirty-six (36) months of supervised release. These terms shall run concurrently with the terms imposed as to counts 2ss-6ss. Special assessment imposed on this count in the amount of $100. |
| 18 U.S.C. 231(a)(3); CIVIL DISORDER; Civil Disorder<br>(2) | Dismissed at Sentencing. |
| 18:231(a)(3); CIVIL DISORDER; Civil Disorder<br>(2s) | Dismissed at Sentencing. |
| 18 U.S.C. 231(a)(3); CIVIL DISORDER; Civil Disorder<br>(2ss) | Sentenced to sixty (60) months of incarceration, followed by thirty-six (36) months of supervised release. These terms shall run concurrently with the terms imposed as to counts 1ss, 3ss, 4ss, 5ss, and 6ss. Special assessment imposed on this count in the amount of $100. |
| 18 U.S.C. 1752(a)(1) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon<br>(3) | Dismissed at Sentencing. |
| 18:1752(a)(1) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon<br>(3s) | Dismissed at Sentencing. |
| 18 U.S.C. 1752(a)(1) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon<br>(3ss) | Sentenced to one hundred twenty (120) months of incarceration, followed by thirty-six (36) months of supervised release. These terms shall run concurrently with the terms imposed as to counts 1ss, 2ss, 4ss, 5ss, and 6ss. Special assessment imposed on this count in the amount of $100. |
| 18 U.S.C. 1752(a)(2) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon<br>(4) | Dismissed at Sentencing. |
| 18:1752(a)(2) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon<br>(4s) | Dismissed at Sentencing. |
| 18 U.S.C. 1752(a)(2) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon<br>(4ss) | Sentenced to one hundred twenty (120) months of incarceration, followed by thirty-six (36) months of supervised release. These terms shall run concurrently with the terms imposed as to counts 1ss, 2ss, 3ss, 5ss, and 6ss. Special assessment imposed on this count in the amount of $100. |
| 18 U.S.C. 1752(a)(4) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Engaging in Physical Violence in a Restricted Building or Grounds, with a Deadly or Dangerous Weapon<br>(5) | Dismissed at Sentencing. |

| | |
|---|---|
| 18:1752(a)(4) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (5s) | Dismissed at Sentencing. |
| 18 U.S.C. 1752(a)(4) and (b)(1)(A); TEMPORARY RESIDENCE OF THE PRESIDENT; Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (5ss) | Sentenced to one hundred twenty (120) months of incarceration, followed by thirty-six (36) months of supervised release. These terms shall run concurrently with the terms imposed as to counts 1ss, 2ss, 3ss, 4ss, and 6ss. Special assessment imposed on this count in the amount of $100. |
| 40 U.S.C. 5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct in a Capitol Building (6) | Dismissed at Sentencing. |
| 40:5104(e)(2)(D); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Disorderly Conduct Within the Capitol Grounds or Buildings (6s) | Dismissed at Sentencing. |
| 40 U.S.C. 5104(e)(2)(F); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Act of Physical Violence in a Capitol Grounds or Buildings (6ss) | Sentenced to six (6) months of incarceration. This term shall run concurrently with the terms imposed as to counts 1ss-5ss. Special assessment imposed on this count in the amount of $10. |
| 40 U.S.C. 5104(e)(2)(F); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Act of Physical Violence Within the Capitol Grounds or Buildings (7) | Dismissed at Sentencing. |
| 40:5104(e)(2)(F); VIOLENT ENTRY AND DISORDERLY CONDUCT ON CAPITOL GROUNDS; Act of Physical Violence Within the Capitol Grounds or Buildings (7s) | Dismissed at Sentencing. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| COMPLAINT in Violation of 18:111(a)(1), (b), 18:231(a)(3), 18:1752(a)(1), (b)(1)(A), 18:1752(a)(2), (b)(1)(A), 18:1752(a)(4), (b)(1)(A) and 40:5104(e)(2)(D), (F) | |

| | | |
|---|---|---|
| **Interested Party** | | |
| **PRESS COALITION** | represented by | **Charles D. Tobin** |
| | | BALLARD SPAHR LLP |
| | | 1909 K Street, NW |
| | | 12th Floor |
| | | Washington, DC 20006 |

202-661-2218
Fax: 202-661-2299
Email: tobinc@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Lauren Russell**
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
202-661-2200
Fax: 202-661-2299
Email: russelll@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Maxwell S. Mishkin**
BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
(202) 508-1140
Fax: (202) 661-2299
Email: mishkinm@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Plaintiff**
**USA**

represented by **Brian P. Kelly**
U.S. ATTORNEY'S OFFICE
555 Fourth Street NW
Suite 3816
Washington, DC 20530
(202) 252-7503
Email: brian.kelly3@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Hava Arin Levenson Mirell**
U.S. ATTORNEY'S OFFICE
312 N. Spring St.
Suite 1200
Los Angeles, CA 90012
213-894-0717
Email: hava.mirell@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Katherine Nielsen**
DOJ-CRM
Fraud Section
1400 New York Ave., NW
Washington, DC 20530
202-355-5736
Email: katherine.nielsen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/19/2021 | 1 | SEALED COMPLAINT as to THOMAS WEBSTER (1). (Attachments: # 1 Statement of Facts) (zstd) [1:21-mj-00244-GMH] (Entered: 02/22/2021) |
| 02/19/2021 | 3 | MOTION to Seal Case by USA as to THOMAS WEBSTER. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21-mj-00244-GMH] (Entered: 02/22/2021) |
| 02/19/2021 | 4 | ORDER granting 3 Motion to Seal Case as to THOMAS WEBSTER (1). Signed by Magistrate Judge G. Michael Harvey on 02/19/2021. (zstd) [1:21-mj-00244-GMH] (Entered: 02/22/2021) |
| 02/22/2021 | | Case unsealed as to THOMAS WEBSTER (bb) [1:21-mj-00244-GMH] (Entered: 02/24/2021) |
| 02/22/2021 | | Arrest of THOMAS WEBSTER in U.S. District Court for the Southern District of New York (White Plains). (zltp) [1:21-mj-00244-GMH] (Entered: 02/25/2021) |
| 02/23/2021 | 5 | Rule 5(c)(3) Documents Received as to THOMAS WEBSTER from U.S. District Court for the Southern District of New York (White Plains) Case Number 7:21-mj-02050-UA (zltp) [1:21-mj-00244-GMH] (Entered: 02/25/2021) |
| 03/12/2021 | 6 | INDICTMENT as to THOMAS WEBSTER (1) count(s) 1, 2, 3, 4, 5, 6, 7. (zltp) (Main Document 6 replaced on 3/16/2021) (zltp). (Entered: 03/16/2021) |
| 03/24/2021 | 8 | MOTION for Leave to Appear Pro Hac Vice Jon C. Dupree Filing fee $ 100, receipt number ADCDC-8325909. Fee Status: Fee Paid. by THOMAS WEBSTER. (Zucker, Jonathan) (Entered: 03/24/2021) |
| 03/24/2021 | 9 | MOTION for Leave to Appear Pro Hac Vice James E. Monroe Filing fee $ 100, receipt number ADCDC-8325977. Fee Status: Fee Paid. by THOMAS WEBSTER. (Zucker, Jonathan) (Entered: 03/24/2021) |
| 04/01/2021 | | MINUTE ORDER as to THOMAS WEBSTER (1). The Court was advised on March 31, 2021 that THOMAS WEBSTER, who is currently detained, has been transported to the local jurisdiction. Upon review of the docket in this jurisdiction, the docket in the jurisdiction of arrest, and after consultation with counsel where necessary, the Court has confirmed that THOMAS WEBSTER: has had a full Rule 5 initial appearance in the jurisdiction of arrest; has retained counsel currently seeking admission pro hac vice; has been ordered held without bond pending trial; and has been charged by Indictment. As such, there are no pending matters necessitating action by a magistrate judge. The parties are directed to contact the assigned District Judge to schedule a status hearing and arraignment, if one has not yet been set. The parties are instructed to address any requests to toll the Speedy Trial Act to the assigned District Judge. Signed by Magistrate Judge G. Michael Harvey on 4/1/2021. (zpt) (Entered: 04/01/2021) |
| 04/05/2021 | | MINUTE ORDER granting 8 Motion for Leave to Appear Pro Hac Vice. Attorney Jon C. Dupree, Jr. is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a). Click for Instructions.** Signed by Judge Amit P. Mehta on 4/5/2021. (lcapm3) (Entered: 04/05/2021) |
| 04/05/2021 | | MINUTE ORDER granting 9 Motion for Leave to Appear Pro Hac Vice. Attorney James E. Monroe is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a). Click for Instructions.** Signed by Judge Amit P. Mehta on 4/5/2021. (lcapm3) (Entered: 04/05/2021) |
| 04/05/2021 | 10 | NOTICE *of Filing Discovery Correspondence* by USA as to THOMAS WEBSTER (Attachments: # 1 Discovery Letter)(Mirell, Hava) (Entered: 04/05/2021) |
| 04/07/2021 | | NOTICE OF HEARING as to THOMAS WEBSTER: Arraignment set for 4/9/2021 at 9:00 AM via teleconference before Judge Amit P. Mehta. The courtroom deputy has circulated connection information to counsel. Members of the public or media may access the hearing via teleconference by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 04/07/2021) |
| 04/08/2021 | 11 | Unopposed MOTION for Protective Order by USA as to THOMAS WEBSTER. (Attachments: # 1 Text of Proposed Order (Protective Order))(Mirell, Hava) (Entered: 04/08/2021) |
| 04/09/2021 | 12 | ORDER granting 11 Unopposed Motion for Protective Order. See attached Order for further details. Signed by Judge Amit P. Mehta on 4/9/2021. (lcapm3) (Entered: 04/09/2021) |
| 04/09/2021 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Arraignment as to THOMAS WEBSTER held on 4/9/2021 via videoconference. Plea of Not Guilty entered as to Counts 1-7. In the interests of justice (XT), and for the reasons stated on the record, the time from 4/10/2021 through and including 6/7/2021 shall be excluded in computing the date for speedy trial in this case. Status Conference set for 6/7/2021 at 11:00 AM via videoconference before Judge Amit P. Mehta. The courtroom deputy will circulate connection information to counsel. Members of the public or media may access the hearing via teleconference by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. Bond Status of Defendant: remains committed. Court Reporter: William Zaremba. Defense Attorney: James Monroe. US Attorneys: Hava Mirell and Brian Kelly. (zjd) |

| | | Modified to correctly reflect that the defendant entered a plea of "not guilty" on all counts on 4/27/2021 (zjd). (Entered: 04/14/2021) |
|---|---|---|
| 04/12/2021 | 14 | SUBPOENA Issued. Signed by Judge Amit P. Mehta on 4/12/2021. (zjd) (Entered: 04/14/2021) |
| 04/13/2021 | 13 | NOTICE OF ATTORNEY APPEARANCE: Jon C. Dupee, Jr appearing for THOMAS WEBSTER (Dupee, Jon) (Entered: 04/13/2021) |
| 04/28/2021 | 15 | NOTICE OF ATTORNEY APPEARANCE: James E. Monroe appearing for THOMAS WEBSTER (Monroe, James) (Entered: 04/28/2021) |
| 05/03/2021 | 16 | NOTICE *of Filing Discovery Correspondence* by USA as to THOMAS WEBSTER (Attachments: # 1 Discovery Letter)(Mirell, Hava) (Entered: 05/03/2021) |
| 05/10/2021 | 17 | PETITION FOR A WRIT OF HABEAS CORPUSby THOMAS WEBSTER. "Let This be Filed" By Judge Amit P. Mehta on 5/10/2021. (zltp) (Main Document 17 replaced on 5/10/2021) (zltp). (Additional attachment(s) added on 5/10/2021: # 1 Envelope) (zltp). (Entered: 05/10/2021) |
| 05/10/2021 | | MINUTE ORDER denying 17 Motion for Writ as to THOMAS WEBSTER (1). Petitioner Mark Marvin lacks "next friend" standing to pursue Petitioner's release. To establish such standing, a "next friend" petitioner "must provide an adequate explanationsuch as inaccessibility, mental incompetence, or other disabilitywhy the real party in interest cannot appear on his own behalf to prosecute the action." Whitmore v. Arkansas, 495 U.S. 149, 163 (1990). Here, Petitioner has failed to make such showing. In fact, Defendant is represented by counsel and therefore capable of prosecuting the action on his own behalf. The Petition is therefore denied. Signed by Judge Amit P. Mehta on 5/10/2021. (lcapm3) (Entered: 05/10/2021) |
| 05/11/2021 | 18 | First MOTION for Sanctions *for Contempt against N.Y.P.D. & Lt. Richard Mantellino* by THOMAS WEBSTER. (Attachments: # 1 Affidavit Affidavit of James E. Monroe, Esq., # 2 Exhibit Subpoena, # 3 Exhibit Proof of Service)(Monroe, James) (Entered: 05/11/2021) |
| 05/11/2021 | 19 | RESPONSE by THOMAS WEBSTER re 17 MOTION for Writ *for Habeas Corpus* (Monroe, James) (Entered: 05/11/2021) |
| 05/24/2021 | 20 | SUPPLEMENT by THOMAS WEBSTER re 18 First MOTION for Sanctions *for Contempt against N.Y.P.D. & Lt. Richard Mantellino Letter requesting execution* (Monroe, James) (Entered: 05/24/2021) |
| 05/24/2021 | 21 | VACATED PURSUANT TO MINUTE ORDER FILED 5/27/2021.....ORDER to Show Cause for Contempt of Federal Subpoena. See attached Order for details. Signed by Judge Amit P. Mehta on 5/24/2021. (lcapm3) Modified on 6/3/2021 (znmw). (Entered: 05/24/2021) |
| 05/26/2021 | 22 | SUPPLEMENT by THOMAS WEBSTER re 18 First MOTION for Sanctions *for Contempt against N.Y.P.D. & Lt. Richard Mantellino Withdrawing Motion* (Monroe, James) (Entered: 05/26/2021) |
| 05/27/2021 | | MINUTE ORDER In view of the NYPD's production of records, the 21 Order to Show Cause entered on May 24, 2021, is hereby vacated. Signed by Judge Amit P. Mehta on 5/27/2021. (lcapm3) (Entered: 05/27/2021) |
| 06/07/2021 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to THOMAS WEBSTER held via videoconference on 6/7/2021. Defendant's Oral Motion for Speedy Trial Waiver was heard and granted. In the interests of justice, and for the reasons stated on the record, the time from 6/8/2021 through and including 6/29/2021 shall be excluded in computing the date for speedy trial in this case. Defendant's Motion for Bond Review due by 6/16/2021. Opposition due by 6/23/2021. Reply due by 5:00 PM on 6/28/2021. Bond Hearing set for 6/29/2021 2:00 PM via videoconference before Judge Amit P. Mehta. The courtroom deputy will circulate connection information to counsel. Members of the public or media may access the hearing via teleconference by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. Bond Status of Defendant: remains committed; Court Reporter: William Zaremba; Defense Attorney: James Monroe; US Attorneys: Hava Mirell and Brian Kelly. (zjd) (Entered: 06/07/2021) |
| 06/10/2021 | | NOTICE OF ERROR re 22 Supplement to any document; emailed to info@dupeemonroelaw, cc'd 7 associated attorneys -- The PDF file you docketed contained errors: 1. Incorrect format (letter); In future, all documents must be in pleading format in accordance with Local Rules. (znmw, ) (Entered: 06/10/2021) |
| 06/16/2021 | 23 | STIPULATION *Letter Requesting Adjournment* (Monroe, James) (Entered: 06/16/2021) |
| 06/16/2021 | | MINUTE ORDER granting consent request to amend briefing schedule. Defendant's Motion for Bond Review is now due by June 18, 2021. The United States' opposition is now due by June 24, 2021. Signed by Judge Amit P. Mehta on 6/16/2021. (lcapm3) (Entered: 06/16/2021) |
| 06/17/2021 | 24 | First MOTION for Release from Custody by THOMAS WEBSTER. (Attachments: # 1 Exhibit Hearing Transcript Magistrate Judge Krauser, # 2 Exhibit Webster Marine Corps Records, # 3 Exhibit N.Y.P.D. Records, # 4 Exhibit Letter to Mayor Giuliani, # 5 Exhibit Webster Interview withFBI, # 6 Exhibit FBI Report, # 7 Exhibit Flagpole exemplar, # 8 Exhibit Government's Body Cam video, # 9 Exhibit Government Statement of Facts, # 10 Exhibit Public source video, # 11 Exhibit YouTube video, # 12 Exhibit Criminal Complaint, # 13 Exhibit Receipt of |

| | | Personal Property, # 14 Exhibit Pretrial Services Report, # 15 Exhibit Character Letters, # 16 Certificate of Service)(Monroe, James) (Entered: 06/17/2021) |
|---|---|---|
| 06/23/2021 | 25 | MOTION for Leave to File *Redacted exhibits* by THOMAS WEBSTER. (Monroe, James) (Entered: 06/23/2021) |
| 06/24/2021 | | MINUTE ORDER granting Defendant's 25 Motion for Leave to File Redacted Exhibits. Defense counsel shall notify chambers of which exhibits to his motion contain personal identifiable information and thereafter file redacted exhibits on the record. Signed by Judge Amit P. Mehta on 6/24/2021. (lcapm3) (Entered: 06/24/2021) |
| 06/24/2021 | | NOTICE OF ERROR re 25 Motion for Leave to File ; emailed to info@dupeemonroelaw.com, cc'd 8 associated attorneys -- The PDF file you docketed contained errors: 1. Incorrect format/letter; In future all documents must be in proper pleading format in accordance with Local Rules. (znmw, ) (Entered: 06/24/2021) |
| 06/24/2021 | 26 | Memorandum in Opposition by USA as to THOMAS WEBSTER re 24 First MOTION for Release from Custody (Mirell, Hava) (Entered: 06/24/2021) |
| 06/28/2021 | | NOTICE OF HEARING as to THOMAS WEBSTER: Bond Hearing reset to 6/29/2021 at 1:00 PM via videoconference before Judge Amit P. Mehta. The courtroom deputy has circulated connection information to counsel. Members of the public may access the hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 06/28/2021) |
| 06/28/2021 | 27 | First MOTION for Release from Custody *Defendant's Reply* by THOMAS WEBSTER. (Attachments: # 1 Exhibit Photograph of Punch, # 2 Exhibit Pistol Permit, # 3 Exhibit Letter to Warden)(Monroe, James) (Entered: 06/28/2021) |
| 06/29/2021 | 28 | NOTICE *of Filing of Exhibit Pursuant to Rule 49* by USA as to THOMAS WEBSTER (Mirell, Hava) (Entered: 06/29/2021) |
| 06/29/2021 | | Minute Entry for proceedings held before Judge Amit P. Mehta:Bond Hearing as to THOMAS WEBSTER held via video conference on 6/29/2021. For the reasons stated on the record, the Court grants 24 MOTION for Release from Custody. In the interests of justice, and for the reasons stated on the record, the time from 6/30/2021 through and including 8/31/2021 shall be excluded in computing the date for speedy trial in this case. Status Conference set for 8/31/2021 at 2:00 PM via videoconference before Judge Amit P. Mehta. The courtroom deputy will circulate connection information to counsel. Members of the public may access the hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. Bond Status of Defendant: placed in High Intensity Supervision Program (HISP); Court Reporter: William Zaremba; Defense Attorney: James Monroe; US Attorneys: Hava Mirell and Brian Kelly; Probation Officer: Masharia Holman. (zjd) Modified bond status on 9/14/2021 (zjd). (Entered: 06/30/2021) |
| 06/30/2021 | 29 | ORDER Setting Conditions for High Intensity Supervision Program as to THOMAS WEBSTER. Signed by Judge Amit P. Mehta on 6/30/2021. (Attachment: # 1 Appearance Bond) (zjd) (Entered: 06/30/2021) |
| 07/14/2021 | 30 | Unopposed MOTION for Disclosure *of Items Protected by Federal Rule of Criminal Procedure 6(e) and Sealed Materials* by USA as to THOMAS WEBSTER. (Attachments: # 1 Text of Proposed Order)(Mirell, Hava) (Entered: 07/14/2021) |
| 07/15/2021 | 31 | ORDER granting 30 Motion for Disclosure of Items Protected by Federal Rule of Criminal Procedure 6(e) and Sealed Materials. See attached Order for details. Signed by Judge Amit P. Mehta on 7/15/2021. (lcapm3) (Entered: 07/15/2021) |
| 07/29/2021 | 32 | TRANSCRIPT OF BOND HEARING VIA ZOOM PROCEEDINGS in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on June 29, 2021; Page Numbers: 1-36. Date of Issuance: July 29, 2021. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form.<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/19/2021. Redacted Transcript Deadline set for 8/29/2021. Release of Transcript Restriction set for 10/27/2021.(wz) (Entered: 07/29/2021) |
| 08/30/2021 | | MINUTE ORDER vacating the Status Conference scheduled for August 31, 2021. A Status Conference is set for September 14, 2021, at 10:30 AM via videoconference before Judge Amit P. Mehta. The courtroom deputy will circulate connection information to counsel. Members of the public may access the hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. In the interests of justice, to secure the |

| | | |
|---|---|---|
| | | availability of defense counsel, the time from 8/31/2021 through and including 9/14/2021 shall be excluded in computing the date for speedy trial in this case. Signed by Judge Amit P. Mehta on 8/30/2021. (lcapm3) (Entered: 08/30/2021) |
| 09/14/2021 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to THOMAS WEBSTER held via videoconference on 9/14/2021. In the interests of justice, and for the reasons stated on the record, the time from 9/15/2021 through and including 10/8/2021 shall be excluded in computing the date for speedy trial in this case. Status Conference set for 10/8/2021 at 9:15 AM via videoconference before Judge Amit P. Mehta. he courtroom deputy will circulate connection information to counsel. Members of the public may access the hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. Bond Status of Defendant: remains on PR/HISP; Court Reporter: William Zaremba; Defense Attorney: James Monroe; US Attorneys: Hava Mirell and Brian Kelly. (zjd) (Entered: 09/14/2021) |
| 09/28/2021 | [35](#) | NOTICE *of Filing Discovery Memoranda* by USA as to THOMAS WEBSTER (Attachments: # [1](#) Memorandum Regarding Status of Discovery as of 7/12/2021, # [2](#) Exh. A to 7/12/2021 Discovery Memorandum, # [3](#) Memorandum Regarding Status of Discovery as of 8/23/2021, # [4](#) Memorandum Regarding Status of Discovery as of 9/14/2021)(Mirell, Hava) (Entered: 09/28/2021) |
| 09/28/2021 | [36](#) | NOTICE *of Filing Discovery Correspondence* by USA as to THOMAS WEBSTER (Attachments: # [1](#) Discovery Letter)(Mirell, Hava) (Entered: 09/28/2021) |
| 10/08/2021 | | MINUTE ORDER: Defendant is to continue mental health services as directed by the Southern District of New York (SDNY) and he is to sign any necessary releases of information that would allow SDNY to monitor progress. Signed by Judge Amit P. Mehta on 10/08/2021. (lcapm3) (Entered: 10/08/2021) |
| 10/08/2021 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to THOMAS WEBSTER held via videoconference on 10/8/2021. In the interests of justice, and for the reasons stated on the record, the time from 10/9/2021 through and including 12/2/2021 shall be excluded in computing the date for speedy trial in this case. Status Conference set for 12/2/2021 at 10:30 AM via videoconference before Judge Amit P. Mehta. The courtroom deputy will circulate connection information to counsel. Members of the public may access the hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747.Bond Status of Defendant: remains on PR/HISP; Court Reporter: William Zaremba; Defense Attorney: James Monroe; US Attorney: Brian Kelly. (zjd) (Entered: 11/17/2021) |
| 10/24/2021 | [38](#) | NOTICE *of Filing Discovery Memorandum* by USA as to THOMAS WEBSTER (Attachments: # [1](#) Memorandum Regarding Status of Discovery as of 10/21/2021)(Mirell, Hava) (Entered: 10/24/2021) |
| 11/10/2021 | [39](#) | SUPERSEDING INDICTMENT as to THOMAS WEBSTER (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s. (zstd) (Entered: 11/16/2021) |
| 11/17/2021 | | NOTICE OF HEARING as to THOMAS WEBSTER: Arraignment and Status Conference set for 12/2/2021 at 11:30 AM via videoconference before Judge Amit P. Mehta. The Status Conference originally scheduled for 12/2/2021 at 10:30 AM is hereby vacated. The courtroom deputy has circulated connection information to counsel. Members of the public may access the hearing by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 11/17/2021) |
| 11/24/2021 | [41](#) | NOTICE *of Filing Discovery Memorandum* by USA as to THOMAS WEBSTER (Attachments: # [1](#) Memorandum Regarding Status of Discovery as of November 5, 2021)(Mirell, Hava) (Entered: 11/24/2021) |
| 12/02/2021 | [43](#) | NOTICE *of Affirmative Defenses* by THOMAS WEBSTER (Monroe, James) (Entered: 12/02/2021) |
| 12/02/2021 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Arraignment as to THOMAS WEBSTER held via videoconference on 12/2/2021. Plea of Not Guilty entered on Count 1s-7s. In the interests of justice, and for the reasons stated on the record, the time from 12/3/2021 through and including 1/28/2022 shall be excluded in computing the date for speedy trial in this case. Status Conference set for 1/28/2022 at 9:30 AM in Telephonic/VTC before Judge Amit P. Mehta. Judge Mehta's courtroom deputy will circulate connection information to counsel. Members of the public or media may access the hearing via teleconference by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. Pretrial Conference set for 3/28/2022 at 3:00 PM in Courtroom 10 before Judge Amit P. Mehta. Jury Trial set for 4/4/2022 at 9:30 AM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on PR/HISP; Court Reporter: William Zaremba; Defense Attorney: James Monroe; US Attorneys: Hava Mirell and Brian Kelly. (zjd) (Entered: 12/02/2021) |
| 12/08/2021 | [44](#) | PRETRIAL ORDER as to THOMAS WEBSTER. Trial is set to commence in this matter on April 4, 2022, at 9:30 a.m., in Courtroom 10. The following deadlines shall govern this matter: (1) The parties shall file any motion pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A)-(D) on or before January 31, 2022; oppositions shall be filed on or before February 7, 2022; and replies shall be filed on or before February 14, 2022. (2) The United States shall notify Defendant of its intention to introduce any Rule 404(b) evidence not already disclosed on or before March 7, 2022. (3) Motions in limine, if any, shall be filed on or before March 14, 2022; oppositions, if any, shall be filed on or before March 21, 2022; and replies, if any, shall be filed on or before March 28, 2022. (4) The United States is directed to make grand jury and Jencks Act disclosures as to each of its witnesses on or |

| | | |
|---|---|---|
| | | before March 28, 2022. Any *Brady* material not already disclosed also shall be disclosed by this date. (5) On or before March 21, 2022, counsel shall file a Joint Pretrial Statement. (6) Counsel shall appear in person on February 16, 2022, at 1:00 p.m. in Courtroom 10, for a hearing on Rule 12 pretrial motions. (7) Counsel shall appear on March 28, 2022, at 11:30 p.m. in Courtroom 10, for a final Pretrial Conference. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 12/08/2021. (lcapm3) (Entered: 12/08/2021) |
| 01/28/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to THOMAS WEBSTER held via videoconference on 1/28/2022. In the interest of justice, the time from 1/29/2022 through and including 3/28/2022 shall be excluded in computing the date for speedy trial in this case. Bond Status of Defendant: remains on PR/HISP; Court Reporter: William Zaremba; Defense Attorney: James Monroe; US Attorneys: Hava Mirell and Brian Kelly. (zjd) (Entered: 01/28/2022) |
| 01/28/2022 | 46 | AMENDED PRETRIAL ORDER as to THOMAS WEBSTER. Trial is set to commence in this matter on April 4, 2022, at 9:30 a.m., in Courtroom 10. The following deadlines shall govern this matter: (1) The parties shall file any motion pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A)-(D) on or before February 9, 2022; oppositions shall be filed on or before February 23, 2022; and replies shall be filed on or before March 2, 2022. (2) The United States shall make any required expert disclosures pursuant to Rule 16(a)(1)(G) by February 28, 2022. Defendant shall make any reciprocal expert disclosures by March 14, 2022. (3) The United States shall notify Defendant of its intention to introduce any Rule 404(b) evidence not already disclosed on or before March 7, 2022. (4) Motions in limine, if any, shall be filed on or before March 14, 2022; oppositions, if any, shall be filed on or before March 21, 2022; and replies, if any, shall be filed on or before March 28, 2022. If the United States wishes to file a motion in limine regarding any defense experts, it may file a motion by March 21, 2022, with any opposition filed by March 28, 2022. (5) Defendant shall satisfy his reciprocal discovery obligations, if any, under Rule 16(b) by March 21, 2022. Any resulting motion in limine shall be filed by March 25, 2022, and any opposition to such motion shall be filed by March 28, 2022. (6) The United States is directed to make grand jury and Jencks Act disclosures as to each of its witnesses on or before March 28, 2022. Any *Brady* material not already disclosed also shall be disclosed by this date. (7) On or before March 21, 2022, counsel shall file a Joint Pretrial Statement. (8) The previously scheduled hearing on Rule 12 pretrial motions is vacated, and the court will schedule a new hearing, if necessary. (9) Counsel shall appear on March 28, 2022, at 11:30 a.m. in Courtroom 10, for a final Pretrial Conference. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 01/28/2022. (lcapm3) (Entered: 01/28/2022) |
| 02/09/2022 | 47 | ENTERED IN ERROR.....First MOTION for Extension of Time to File *12(b) Motions* by THOMAS WEBSTER. (Monroe, James) Modified on 2/9/2022 (zltp). (Entered: 02/09/2022) |
| 02/09/2022 | | NOTICE OF CORRECTED DOCKET ENTRY: as to THOMAS WEBSTER re 47 First MOTION for Extension of Time to File *12(b) Motions* was entered in error, due to the incorrect format of document filed that is not compliant with our court's local rules, and counsel is instructed to refile said pleading. (zltp) (Entered: 02/09/2022) |
| 02/09/2022 | 48 | Proposed Pretrial Order by THOMAS WEBSTER. (Monroe, James) Modified text to reflect document title on 3/17/2022 (zltp). (Entered: 02/09/2022) |
| 02/09/2022 | 49 | First MOTION to Change Venue by THOMAS WEBSTER. (Attachments: # 1 Exhibit Select Litigation Report on Jury Data)(Monroe, James) (Entered: 02/09/2022) |
| 02/11/2022 | 50 | NOTICE OF ATTORNEY APPEARANCE Katherine Nielsen appearing for USA. (Nielsen, Katherine) (Entered: 02/11/2022) |
| 02/11/2022 | 51 | NOTICE *United States' Memorandum Regarding Status of Discovery as of February 9, 2022* by USA as to THOMAS WEBSTER (Nielsen, Katherine) (Entered: 02/11/2022) |
| 02/23/2022 | 52 | Memorandum in Opposition by USA as to THOMAS WEBSTER re 49 First MOTION to Change Venue (Mirell, Hava) (Entered: 02/23/2022) |
| 02/25/2022 | 53 | ENTERED IN ERROR.....NOTICE *of Filing Discovery Memorandum* by USA as to THOMAS WEBSTER (Attachments: # 1 Memorandum Regarding Status of Discovery as of February 9, 2022)(Mirell, Hava) Modified on 3/1/2022 (zltp). (Entered: 02/25/2022) |
| 02/25/2022 | | NOTICE OF CORRECTED DOCKET ENTRY: as to THOMAS WEBSTER re 53 Notice (Other) was entered in error as a duplicate of docket entry 51 .(zltp) (Entered: 03/01/2022) |
| 03/01/2022 | 54 | REPLY in Support by THOMAS WEBSTER re 49 First MOTION to Change Venue (Monroe, James) (Entered: 03/01/2022) |
| 03/03/2022 | 55 | SECOND AMENDED PRETRIAL ORDER as to THOMAS WEBSTER. Trial is set to commence in this matter on April 25, 2022, at 9:30 a.m., in Courtroom 10. The First Amended Pretrial Order will govern all dates in this matter except the following: (1) On or before April 8, 2022, counsel shall file a Joint Pretrial Statement, and (2) Counsel shall appear on April 21, 2022, at 2:00 p.m. in Courtroom 10, for a final Pretrial Conference. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 03/03/2022. (lcapm3) (Entered: 03/03/2022) |

| 03/14/2022 | 56 | MOTION in Limine *to Limit Cross-Examination of Secret Service Agency Witnesses* by USA as to THOMAS WEBSTER. (Nielsen, Katherine) (Entered: 03/14/2022) |
|---|---|---|
| 03/14/2022 | 57 | MOTION in Limine *to Exclude Improper Character Evidence* by USA as to THOMAS WEBSTER. (Mirell, Hava) (Entered: 03/14/2022) |
| 03/14/2022 | 58 | MOTION in Limine *to Exclude Evidence Pertaining to an Unidentified Female Rioter* by USA as to THOMAS WEBSTER. (Nielsen, Katherine) (Entered: 03/14/2022) |
| 03/14/2022 | 60 | MOTION in Limine *to Preclude Claims of Self-Defense, Necessity, Justification, and Duress, and to Exclude Evidence in Support Thereof* by USA as to THOMAS WEBSTER. (Mirell, Hava) (Entered: 03/14/2022) |
| 03/14/2022 | 61 | NOTICE *of Filing of Exhibit Pursuant to Local Criminal Rule 49* by USA as to THOMAS WEBSTER (Mirell, Hava) (Entered: 03/14/2022) |
| 03/17/2022 | 62 | MOTION for Extension of Time to File Response/Reply by THOMAS WEBSTER. (Attachments: # 1 Affidavit, # 2 Certificate of Service)(Monroe, James) (Entered: 03/17/2022) |
| 03/18/2022 | | MINUTE ORDER granting Defendant's 62 Consent Motion for Extension of Time. Defendant may now respond to the Government's Pre-trial Motions by March 25, 2022 and the Government shall reply by April 1, 2022. Signed by Judge Amit P. Mehta on 03/17/2022. (lcapm3) (Entered: 03/18/2022) |
| 03/25/2022 | 63 | RESPONSE by THOMAS WEBSTER re 58 MOTION in Limine *to Exclude Evidence Pertaining to an Unidentified Female Rioter* (Monroe, James) (Entered: 03/25/2022) |
| 03/25/2022 | 64 | RESPONSE by THOMAS WEBSTER re 56 MOTION in Limine *to Limit Cross-Examination of Secret Service Agency Witnesses* (Monroe, James) (Entered: 03/25/2022) |
| 03/25/2022 | 65 | RESPONSE by THOMAS WEBSTER re 57 MOTION in Limine *to Exclude Improper Character Evidence* (Monroe, James) (Entered: 03/25/2022) |
| 03/25/2022 | 68 | RESPONSE by THOMAS WEBSTER re 60 MOTION in Limine *to Preclude Claims of Self-Defense, Necessity, Justification, and Duress, and to Exclude Evidence in Support Thereof* (Monroe, James) (Entered: 03/25/2022) |
| 04/01/2022 | 69 | THIRD AMENDED PRETRIAL ORDER as to THOMAS WEBSTER. This Order amends the instructions for the Joint Pretrial Statement contained in the 55 Second Amended Pretrial Order as follows: the parties shall submit a proposed list of voir dire questions to pose to prospective jurors. Signed by Judge Amit P. Mehta on 4/1/2022. (lcapm2) (Entered: 04/01/2022) |
| 04/01/2022 | 70 | REPLY in Support by USA as to THOMAS WEBSTER re 56 MOTION in Limine *to Limit Cross-Examination of Secret Service Agency Witnesses* (Nielsen, Katherine) (Entered: 04/01/2022) |
| 04/01/2022 | 72 | REPLY in Support by USA as to THOMAS WEBSTER re 57 MOTION in Limine *to Exclude Improper Character Evidence* (Mirell, Hava) (Entered: 04/01/2022) |
| 04/01/2022 | 73 | REPLY in Support by USA as to THOMAS WEBSTER re 60 MOTION in Limine *to Preclude Claims of Self-Defense, Necessity, Justification, and Duress, and to Exclude Evidence in Support Thereof* (Mirell, Hava) (Entered: 04/01/2022) |
| 04/08/2022 | 74 | PRETRIAL MEMORANDUM *Joint Pretrial Statement* by USA as to THOMAS WEBSTER (Nielsen, Katherine) (Entered: 04/08/2022) |
| 04/10/2022 | | MINUTE ORDER as to THOMAS WEBSTER. Defendant's request for a continuance, made in his 66 Opposition to the Government's 59 Motion in Limine, is denied. Signed by Judge Amit P. Mehta on 4/10/2022. (lcapm2) (Entered: 04/10/2022) |
| 04/13/2022 | 75 | ORDER as to THOMAS WEBSTER. The court orders the following with respect to the pending motions in limine: (1) the United States' 56 Motion in Limine to Limit Cross-Examination of Secret Service Agency Witnesses is granted in part and denied in part; (2) the United States' 57 Motion in Limine to Exclude Improper Character Evidence is granted; (3) the United States' 58 Motion in Limine to Exclude Evidence Pertaining to an Unidentified Female Rioter is granted; (4) the United States' 59 Sealed Motion in Limine to Preclude or Limit Cross-Examination of Officer N.R. and Exclude Evidence is granted, except as to potential bias cross-examination; and (5) the United States' 60 Motion in Limine to Preclude Claims of Self-Defense, Necessity, Justification, and Duress, and to Exclude Evidence in Support Thereof is granted as to necessity, justification, and duress but denied without prejudice as to self-defense. See attached Order for additional details. Signed by Judge Amit P. Mehta on 4/13/2022. (lcapm2) (Entered: 04/13/2022) |
| 04/13/2022 | 76 | SECOND SUPERSEDING INDICTMENT as to THOMAS WEBSTER (1) count(s) 1ss, 2ss, 3ss, 4ss, 5ss, 6ss. (zltp) (Entered: 04/14/2022) |
| 04/18/2022 | 78 | ORDER denying Defendant's 49 Motion for Change of Venue as to THOMAS WEBSTER. See attached Order for details. Signed by Judge Amit P. Mehta on 4/18/2022. (lcapm2) (Entered: 04/18/2022) |

| 04/21/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Pretrial Conference as to THOMAS WEBSTER held on 4/21/2022. Plea of Not Guilty entered as to Counts 1-6 of the 76 Superseding Indictment. Jury Selection set for 4/25/2022 at 9:30 AM in Ceremonial Courtroom 20 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorney: James Monroe; US Attorneys: Brian Kelly, Hava Mirell, and Katherine Nielsen. (zjd) (Entered: 04/21/2022) |
| 04/22/2022 | 81 | Application for Access to Trial Exhibits by PRESS COALITION as to THOMAS WEBSTER. (zltp) Modified filed date on 4/26/2022 (zltp). (Entered: 04/26/2022) |
| 04/25/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Selection as to THOMAS WEBSTER held on 4/25/2022. Panel of twelve (12) jurors and two (2) alternates selected but not sworn. Jury Trial set for 4/26/2022 at 9:30 AM in Courtroom 10 before Judge Amit P. Mehta. Members of the public and media may observe proceedings in-person in Courtroom 10. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: James Monroe and Walter Machnicki; US Attorneys: Brian Kelly, Hava Mirell, and Katherine Nielsen. (zjd) (Entered: 04/25/2022) |
| 04/26/2022 | | MINUTE ORDER: The Court having impaneled the jury in this action, it is hereby ORDERED that during trial and deliberations all meals for said jury shall be paid by the Clerk of the Court for the U.S. District Court for the District of Columbia. Approved by Judge Amit P. Mehta on 4/26/2022. (zjd) (Entered: 04/26/2022) |
| 04/26/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Trial as to THOMAS WEBSTER resumed and held on 4/26/2022. Panel of twelve (12) jurors and two (2) alternates was sworn. Jury Trial shall resume on 4/27/2022 at 9:00 AM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba (A.M.) and Sara Wick (P.M.); Defense Attorneys: James Monroe and Walter Machnicki; US Attorneys: Brian Kelly, Hava Mirell, and Katherine Nielsen; Government Witnesses: Cpt. Carneysha Mendoza, Mark Gazelle, Paul Wade, Jonathan Lauderdale, and Joanna Burger. (zjd) (Entered: 04/26/2022) |
| 04/26/2022 | 82 | NOTICE *Related to Public Release of Trial Exhibits* by USA as to THOMAS WEBSTER (Nielsen, Katherine) (Entered: 04/26/2022) |
| 04/27/2022 | | MINUTE ORDER granting the Press Coalition's 81 Application for Access to Trial Exhibits as to THOMAS WEBSTER. The United States shall provide same-day access to admitted exhibits, or within a reasonable time thereafter. Signed by Judge Amit P. Mehta on 4/27/2022. (lcapm2) (Entered: 04/27/2022) |
| 04/27/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Trial as to THOMAS WEBSTER resumed and held on 4/27/2022. Same panel of twelve (12) jurors and two (2) alternates. Jury Trial shall resume on 4/28/2022 at 9:00 AM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporters: William Zaremba (A.M.) and Janice Dickman (P.M.); Defense Attorneys: James Monroe and Walter Machnicki; US Attorneys: Brian Kelly, Hava Mirell, and Katherine Nielsen; Government Witnesses: Noah Rathbun, Patricia Norden, Virginia Donnelly, Edgar Tippett, Riley Palmertree. (zjd) (Entered: 04/27/2022) |
| 04/28/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Trial as to THOMAS WEBSTER resumed and held on 4/28/2022. Same panel of twelve (12) jurors and two (2) alternates. Defendant's Oral Motion for Directed Verdict heard and denied, for the reasons stated on the record. Jury Trial shall resume on 4/29/2022 at 9:30 AM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporters: William Zaremba (A.M.) and Sara Wick (P.M.); Defense Attorneys: James Monroe and Walter Machnicki; US Attorneys: Brian Kelly, Hava Mirell, and Katherine Nielsen; Government Witness: Riley Palmertree; Defense Witness: Thomas Webster. (zjd) (Entered: 04/28/2022) |
| 04/28/2022 | 83 | Proposed Jury Instructions by USA as to THOMAS WEBSTER (Mirell, Hava) (Entered: 04/28/2022) |
| 04/29/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Trial as to THOMAS WEBSTER resumed and held on 4/29/2022. Same panel of twelve (12) jurors and two (2) alternates. Closing arguments heard and concluded. Alternate jurors excused. Jury Deliberation held and continued to 5/2/2022 at 9:30 AM. Bond Status of Defendant: remains on personal recognizance; Court Reporters: William Zaremba (A.M.) and Janice Dickman (P.M.); Defense Attorneys: James Monroe and Walter Machnicki; US Attorneys: Brian Kelly, Hava Mirell, and Katherine Nielsen; Defense Witnesses: Thomas Webster (cont.), L.M., B.G., and F.S. (zjd) (Entered: 05/01/2022) |
| 05/02/2022 | | MINUTE ORDER setting deadlines for sentencing memoranda for Defendant THOMAS WEBSTER: This case is hereby referred to the Probation Office for a Presentence Investigation as to THOMAS WEBSTER. The Final Presentence Investigation Report shall be due on or before August 17, 2022. The Parties' Sentencing Memoranda shall be due on or before August 24, 2022. Replies, if any, shall be due on or before August 29, 2022. Reply briefs shall be limited to five pages. Sentencing for THOMAS WEBSTER is set for September 2, 2022, at 2:00 p.m. Signed by Judge Amit P. Mehta on 5/2/2022. (lcapm2) (Entered: 05/02/2022) |
| 05/02/2022 | | MINUTE ORDER setting schedule for post-trial motions as to THOMAS WEBSTER. Defendant shall file his motion by June 2, 2022. The United States shall respond by June 23, 2022. Defendant shall file his reply by July 8, 2022. Signed by Judge Amit P. Mehta on 5/2/2022. (lcapm2) (Entered: 05/02/2022) |

| 05/02/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Deliberation as to THOMAS WEBSTER resumed and concluded on 5/2/2022. Same panel of twelve (12) jurors. Jury verdict of GUILTY as to Counts 1-6 of the 76 Second Superseding Indictment. Jury panel discharged. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: James Monroe and Walter Machnicki; US Attorneys: Brian Kelly, Hava Mirell, and Katherine Nielsen. (zjd) (Entered: 05/02/2022) |
| 05/02/2022 | 84 | Jury Note as to THOMAS WEBSTER. (zjd) (Entered: 05/02/2022) |
| 05/02/2022 | 85 | **Signature Page of Foreperson** as to THOMAS WEBSTER in Jury Note. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zjd) (Entered: 05/02/2022) |
| 05/02/2022 | 86 | JURY VERDICT as to THOMAS WEBSTER. (zjd) (Entered: 05/02/2022) |
| 05/02/2022 | 87 | **Signature Page of Foreperson** as to THOMAS WEBSTER in Jury Verdict. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zjd) (Entered: 05/02/2022) |
| 05/02/2022 | 88 | ATTORNEYS' ACKNOWLEDGMENT OF TRIAL EXHIBITS AND EXHIBIT LIST as to THOMAS WEBSTER. (zjd) (Entered: 05/02/2022) |
| 05/02/2022 | 89 | EXHIBIT LIST by USA as to THOMAS WEBSTER. (zjd) (Entered: 05/02/2022) |
| 05/02/2022 | 90 | EXHIBIT LIST by THOMAS WEBSTER. This exhibit list was prepared by Judge Mehta's courtroom deputy. (zjd) (Entered: 05/02/2022) |
| 06/02/2022 | 91 | First MOTION for Extension of Time to File *Judgment of Acquittal* by THOMAS WEBSTER. (Monroe, James) (Entered: 06/02/2022) |
| 06/03/2022 | | MINUTE ORDER granting 91 Defendant's Consent Motion for Extension of Time as to THOMAS WEBSTER. Defendant's deadline is extended to June 6, 2022. The United States shall respond by June 27, 2022, and Defendant shall file his reply by July 11, 2022. Signed by Judge Amit P. Mehta on 6/3/2022. (lcapm2) (Entered: 06/03/2022) |
| 06/06/2022 | 92 | First MOTION for Judgment NOV by THOMAS WEBSTER. (Monroe, James) (Entered: 06/06/2022) |
| 06/27/2022 | 97 | Memorandum in Opposition by USA as to THOMAS WEBSTER re 92 First MOTION for Judgment NOV (Mirell, Hava) (Entered: 06/27/2022) |
| 08/01/2022 | 99 | MEMORANDUM OPINION & ORDER denying Defendant Webster's 92 Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29(c). Please see attached Memorandum Opinion and Order for further details. Signed by Judge Amit P. Mehta on 08/01/2022. (lcapm3) (Entered: 08/01/2022) |
| 08/02/2022 | 100 | Draft Jury Instructions. (lcapm3) (Entered: 08/02/2022) |
| 08/02/2022 | 101 | Final Jury Instructions. (lcapm3) (Entered: 08/02/2022) |
| 08/24/2022 | 104 | SENTENCING MEMORANDUM by USA as to THOMAS WEBSTER (Attachments: # 1 Sentencing Exhibits F - I)(Mirell, Hava) (Entered: 08/24/2022) |
| 08/25/2022 | | NOTICE OF HEARING as to THOMAS WEBSTER: Sentencing shall now take place on 9/1/2022 at 2:00 PM in Courtroom 10 before Judge Amit P. Mehta. (zjd) (Entered: 08/25/2022) |
| 08/25/2022 | 105 | SENTENCING MEMORANDUM by THOMAS WEBSTER (Attachments: # 1 Exhibit Lolos Sentencing Transcript, # 2 Exhibit Defendant's Marine Corps Records, # 3 Exhibit Defendant's NYPD Records, # 4 Exhibit Letter from Gun Hill Housing, # 5 Exhibit Dr. Gorovoy's Report, # 6 Exhibit Character Letters)(Monroe, James) (Entered: 08/25/2022) |
| 08/30/2022 | | MINUTE ORDER. The court requests that the parties submit short briefs (less than five pages) by August 31, 2022, at 2:00 p.m., which address the applicability of the recommended four-level enhancement for "use of body armor" under U.S.S.G. § 3B1.5(2)(B). That guideline provision specifically defines "use" to mean, as relevant here, "active employment in a manner to protect the person from gunfire." The court has not found a case from this Circuit applying or interpreting the provision. Other Circuits have found the provision to apply but largely in the scenario in which the underlying offense was for drug trafficking or robbery during which the defendant or a co-conspirator possessed a firearm. See United States v. Gahagen, 44 F.4th 99 (2d Cir. 2022) (armed bank robbery); United States v. Jean-Charles, 696 F. App'x 405, 411 (11th Cir. 2017) (Hobbs Act robbery); United States v. Cervantes, 706 F.3d 603, 621 (5th Cir. 2013) (home invasion with firearm); United States v. Matthew, 451 F. App'x 296, 296 (4th Cir. 2011) (drug trafficking with firearm); United States v. Shamah, 624 F.3d 449, 459 (7th Cir. 2010) (robbery with firearm); United States v. Barrett, 552 F.3d 724, 727 (8th Cir. 2009) (drug trafficking with firearm); United States v. Chambers, 268 F. App'x 707, 712 (10th Cir. 2008) (drug trafficking with firearm); United States v. Douglas, 242 F. App'x 324, 330 (6th Cir. 2007) (drug trafficking with firearm). The court invites |

| | | |
|---|---|---|
| | | the parties to identify a comparable case to this one in which the body armor enhancement was applied or not applied to argue why it should or should not apply in this case. Additionally, the court provides notice that, in considering the possible sentence, the court has reviewed sentencing materials in (1) United States v. Reffitt, 21-cr-32 (DLF); (2) United States v. Robertson, 21-cr-34 (CRC); (3) United States v. Palmer, 21-cr-328 (CRC); and (4) United States v. Ponder, 21-cr-259 (TSC), including offense levels, guidelines ranges, and summaries of offense conduct. The court notes that on January 6th Reffitt was wearing a "plate carrier vest laden with armored plates that could stop a rifle round" and in possession of a handgun, but it appears the government did not request a body-armor enhancement and the probation office did not recommend one. U.S. v. Reffitt, Gov't Sentencing Mem., ECF No. 158, at 6. Signed by Judge Amit P. Mehta on 8/30/2022. (lcapm2) Modified due date on 8/30/2022 (zjd). (Entered: 08/30/2022) |
| 08/30/2022 | | Set/Reset Deadlines as to THOMAS WEBSTER: Briefs due by 8/31/2022 at 2:00 PM. (zjd) (Entered: 08/30/2022) |
| 08/31/2022 | 106 | RESPONSE TO ORDER OF THE COURT by USA as to THOMAS WEBSTER re Order,,,,,,,,,, (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Mirell, Hava) (Entered: 08/31/2022) |
| 08/31/2022 | 107 | RESPONSE TO ORDER OF THE COURT by THOMAS WEBSTER re Order,,,,,,,,,, (Monroe, James) (Entered: 08/31/2022) |
| 09/01/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Sentencing held on 9/1/2022 as to THOMAS WEBSTER. The Defendant is sentenced to concurrent terms of 120 months (10 years) on each of Counts 1, 3, 4, and 5 of the 76 Second Superseding Indictment, 60 months (5 years) on Count 2 of the 76 Second Superseding Indictment, and 6 months on Count 6 of the 76 Second Superseding Indictment. The Defendant is further sentenced to serve a 36 month (3 year) term of supervised release as to each of Counts 1 through 5, with all such terms to run concurrently. Bond Status of Defendant: ordered to self-surrender; Court Reporter: William Zaremba; Defense Attorney: James Monroe; US Attorney: Brian Kelly; Probation Officer: Crystal Lustig. (zjd) (Entered: 09/01/2022) |
| 09/09/2022 | 110 | JUDGMENT as to THOMAS WEBSTER. Statement of Reasons Not Included. Signed by Judge Amit P. Mehta on 9/9/2022. (zltp) (Entered: 09/14/2022) |
| 09/09/2022 | 111 | STATEMENT OF REASONS as to THOMAS WEBSTER. re 110 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Amit P. Mehta on 9/9/2022. (zltp) (Entered: 09/14/2022) |
| 09/13/2022 | 109 | NOTICE OF APPEAL - Final Judgment by THOMAS WEBSTER Filing fee $ 505, receipt number ADCDC-9513504. Fee Status: Fee Paid. Parties have been notified. (Monroe, James) (Entered: 09/13/2022) |
| 09/14/2022 | 112 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid as to THOMAS WEBSTER re 109 Notice of Appeal - Final Judgment. (zltp) (Entered: 09/14/2022) |
| 09/15/2022 | | USCA Case Number as to THOMAS WEBSTER 22-3064 for 109 Notice of Appeal - Final Judgment filed by THOMAS WEBSTER. (zltp) (Entered: 09/16/2022) |
| 09/19/2022 | 113 | TRANSCRIPT OF JURY TRIAL SELECTION PROCEEDINGS - MORNING SESSION in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 25, 2022; Page Numbers: 1-111. Date of Issuance: September 19, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthou se at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/10/2022. Redacted Transcript Deadline set for 10/20/2022. Release of Transcript Restriction set for 12/18/2022.(wz) (Entered: 09/19/2022) |
| 09/19/2022 | 114 | TRANSCRIPT OF JURY SELECTION PROCEEDINGS - AFTERNOON SESSION in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 25, 2022; Page Numbers: 1-255. Date of Issuance: September 19, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse a t a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/10/2022. Redacted Transcript Deadline set for 10/20/2022. Release of Transcript Restriction set for 12/18/2022.(wz) (Entered: 09/19/2022) |
| 09/19/2022 | [115](#) | TRANSCRIPT OF JURY TRIAL PROCEEDINGS - MORNING SESSION in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 26, 2022; Page Numbers: 1-153. Date of Issuance: September 19, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the [Transcript Order Form](#)<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a pu blic terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/10/2022. Redacted Transcript Deadline set for 10/20/2022. Release of Transcript Restriction set for 12/18/2022.(wz) (Entered: 09/19/2022) |
| 09/20/2022 | [116](#) | TRANSCRIPT OF JURY TRIAL, AFTERNOON SESSION, in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on 04/28/2022. Page Numbers: 1-75. Date of Issuance: 09/20/2022. Court Reporter: Sara Wick, telephone number 202-354-3284. Transcripts may be ordered by submitting the [Transcript Order Form](#)<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/11/2022. Redacted Transcript Deadline set for 10/21/2022. Release of Transcript Restriction set for 12/19/2022.(Wick, Sara) (Entered: 09/20/2022) |
| 09/20/2022 | [117](#) | TRANSCRIPT OF JURY TRIAL PROCEEDINGS - MORNING SESSION in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 27, 2022; Page Numbers: 1-119. Date of Issuance: September 20, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the [Transcript Order Form](#)<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a pu blic terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/11/2022. Redacted Transcript Deadline set for 10/21/2022. Release of Transcript Restriction set for 12/19/2022.(wz) (Entered: 09/20/2022) |
| 09/20/2022 | [118](#) | TRANSCRIPT OF JURY TRIAL PROCEEDINGS - MORNING SESSION in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 28, 2022; Page Numbers: 1-177. Date of Issuance: September 20, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the [Transcript Order Form](#)<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a pu blic terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the |

| | | |
|---|---|---|
| | | transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/11/2022. Redacted Transcript Deadline set for 10/21/2022. Release of Transcript Restriction set for 12/19/2022.(wz) (Entered: 09/20/2022) |
| 09/20/2022 | [119] | TRANSCRIPT OF JURY TRIAL PROCEEDINGS - MORNING SESSION in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 29, 2022; Page Numbers: 1-79. Date of Issuance: September 20, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a pub lic terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/11/2022. Redacted Transcript Deadline set for 10/21/2022. Release of Transcript Restriction set for 12/19/2022.(wz) (Entered: 09/20/2022) |
| 09/20/2022 | [120] | TRANSCRIPT OF PROCEEDINGS in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 27, 2022 - Afternoon Session; Page Numbers: 1-98. Date of Issuance: September 20, 2022. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purcha sed from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/11/2022. Redacted Transcript Deadline set for 10/21/2022. Release of Transcript Restriction set for 12/19/2022.(Dickman, Janice) (Entered: 09/20/2022) |
| 09/20/2022 | [121] | TRANSCRIPT OF PROCEEDINGS in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 29, 2022 - Afternoon Session; Page Numbers: 1-107. Date of Issuance: September 20, 2022. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purch ased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/11/2022. Redacted Transcript Deadline set for 10/21/2022. Release of Transcript Restriction set for 12/19/2022.(Dickman, Janice) (Entered: 09/20/2022) |
| 09/22/2022 | [122] | TRANSCRIPT OF JURY TRIAL, AFTERNOON SESSION, in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on 04/26/2022. Page Numbers: 1-123. Date of Issuance: 09/22/2022. Court Reporter: Sara Wick, telephone number 202-354-3284. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | |
|---|---|---|
| | | Redaction Request due 10/13/2022. Redacted Transcript Deadline set for 10/23/2022. Release of Transcript Restriction set for 12/21/2022.(Wick, Sara) (Entered: 09/22/2022) |
| 09/22/2022 | [123](#) | TRANSCRIPT OF JURY VERDICT PROCEEDINGS in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on May 2, 2022; Page Numbers: 1-15. Date of Issuance: September 22, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 10/13/2022. Redacted Transcript Deadline set for 10/23/2022. Release of Transcript Restriction set for 12/21/2022.(wz) (Entered: 09/22/2022) |
| 09/22/2022 | [124](#) | TRANSCRIPT OF SENTENCING PROCEEDINGS in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on September 1, 2022; Page Numbers: 1-82. Date of Issuance: September 22, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 10/13/2022. Redacted Transcript Deadline set for 10/23/2022. Release of Transcript Restriction set for 12/21/2022.(wz) (Entered: 09/22/2022) |
| 10/26/2022 | [125](#) | LEAVE TO FILE DENIED due to lack of standing- Mark Marvin; Second Amended Petition for Writ of Habeas Corpus as to THOMAS WEBSTER This document is unavailable as the Court denied its filing. Signed by Judge Amit P. Mehta on 10/26/2022. (zltp) (Entered: 11/03/2022) |
| 02/28/2023 | [126](#) | TRANSCRIPT OF PRETRIAL CONFERENCE PROCEEDINGS in case as to THOMAS WEBSTER before Judge Amit P. Mehta held on April 21, 2022; Page Numbers: 1-80. Date of Issuance: February 28, 2023. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/21/2023. Redacted Transcript Deadline set for 3/31/2023. Release of Transcript Restriction set for 5/29/2023.(wz) (Entered: 02/28/2023) |
| 03/16/2023 | [127](#) | MOTION for Disclosure *Defendants transcript* by THOMAS WEBSTER. (Monroe, James) (Entered: 03/16/2023) |
| 03/17/2023 | [128](#) | ORDER granting [127](#) Motion for Disclosure as to THOMAS WEBSTER. The Pretrial Conference hearing transcript dated April 21, 2022 shall be made available to appellate counsel of record, Elizabeth A. Brandenburg. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 03/17/2023. (lcapm1) (Entered: 03/17/2023) |
| 08/01/2023 | [130](#) | SEALED MOTION To Unseal filed by USA as to THOMAS WEBSTER. (This document is SEALED and only available to authorized persons.) (Attachments: # [1](#) Text of Proposed Order)(Kelly, Brian) (Entered: 08/01/2023) |

| 08/02/2023 | 131 | ORDER granting 130 Sealed Motion. The (1) Government's Motion In Limine To Preclude Or Limit Cross Examination Of Officer Noah Rathbun And Exclude Evidence (ECF # 59); (2) Defendant's Opposition (ECF # 66); (3) Government's Reply (ECF # 71); and (4) transcript of the April 21, 2022, pretrial conference (ECF # 126), are unsealed. In addition, the Clerk of Court shall unseal the government's motion, ECF No. 130. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 08/02/2023. (lcapm1) (Entered: 08/02/2023) |

## PACER Service Center

### Transaction Receipt

11/02/2023 10:56:39

| PACER Login: | eabrand83 | Client Code: | Webster |
| --- | --- | --- | --- |
| Description: | Docket Report | Search Criteria: | 1:21-cr-00208-APM |
| Billable Pages: | 27 | Cost: | 2.70 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 21-cr-208 (APM) |
| Plaintiff, | ) | |
| | ) | |
| | ) | **MOTION FOR CHANGE** |
| v. | ) | **OF VENUE** |
| | ) | |
| THOMAS WEBSTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Motion**

COMES NOW the defendant, Thomas Webster (hereinafter "Webster"), by and through

his attorneys, Dupee & Monroe, P.C., and respectfully moves this Honorable Court for change of

venue as required by the Fifth and Sixth Amendments of the U.S. Constitution and Federal Rules

of Criminal Procedure 12(b)(3)(A)(i) & 21(a) .

**Background**

Webster is a resident of Orange County, New York which is located within the

jurisdiction of the United States District Court for the Southern District of New York. This case

arises from the events that transpired at the United States Capitol on January 6, 2021. Webster

voluntarily surrendered himself to the FBI on February 22, 2021. Defendant was indicted by a

Federal Grand Jury on March 16, 2021 charging him with: 18 U.S.C. §111(a)(1)(b); 18 U.S.C.

§231(a)(3); 18 U.S.C. §1752(a)(1) and (b)(1)(A); 18 U.S.C. §1752(a)(2) and (b)(1)(A); 18

U.S.C. §1752(a)(4) and (b)(1)(A); 40 U.S.C. §5104(e)(2)(D); and 40 U.S.C §5104(e)(2)(F). *See,*

ECF Dkt. No. 6. A superseding indictment charging defendant with the instant offenses was filed

by the Government on November 16, 2021. *See,* ECF Dkt. No. 39. This case is scheduled for a

Jury Trial on April 4, 2022. The Government alleges that Webster illegally entered the Capitol

grounds on January 6th when the United States Congress had convened to certify the vote count

of the Electoral College of the 2020 Presidential Election. The Government contends defendant

committed acts of assault against Metropolitan Police Department Officer N. R. The Government

does not allege that Webster entered the Capitol at any point in time or caused the destruction of

public property.

**Argument**

The Fifth and Sixth Amendments guarantee Webster's right to a Trial by an impartial

Jury. *See,* U.S.Const. Amends.V&VI; *See, also, Skilling v. United States*, 561 U.S. 358, 378

(2010) F.R.C.P. 21(a) provides that "[u]pon defendant's motion, the court must transfer the

proceeding against that defendant to another district if the court is satisfied that prejudice against

defendant exists in the transferring district that is so great that the defendant cannot obtain a fair

and impartial trial there." As the moving party, Webster carries the burden of proof to show a

reasonable likelihood of prejudice. Following the analysis offered by the Supreme Court in

*Skilling,* defendant must demonstrate either *presumed* or *actual* prejudice. Presumed prejudice

refers to the conditions that existed before trial in the subject district. In this regard, the court

typically considers whether there was a barrage of inflammatory publicity; whether news

accounts were factual or opinionated; whether those news accounts included material that would

not be admissible; the size of the overall jury pool; and the availability of judicial tools to

mitigate the prejudicial effect of such publicity. *See, Skilling, supra.*

Actual prejudice focuses on whether the opinions expressed by potential jurors in the

course of jury selection demonstrate impermissible bias. Historically, the D.C. Circuit has

**-19-**

deferred to *voir dire* as a sufficient tool to protect a defendant's right to a fair trial. *See, Jones v. Gash*, 404 F. 2d 1231, 1238 (D.C.Cir. 1967)("[t]he ultimate question" on the motion to transfer venue based upon prejudicial pretrial publicity "is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the *voir dire*. examination."); *United States v. Haldeman,* 559 F 2d 31, 63 (D.C.Cir. 1976)(*en banc*)(*per curiam*)("[I]f an impartial jury actually cannot be selected, that fact should become evident at the *voir dire*. The defendant will then be entitled to any actions necessary to assure that [they] receive a fair trial.") *See, also, United States v. Bochene*, 2022 WL 123893 at *2-3(D.D.C. 2022).

It is only in "extreme circumstances" that the Court may presume prejudice before *voir dire. Haldeman*, *supra,* 559 F. 2d at 60. Such circumstances might arise, for example, where "the population of Washington, D.C. [is] so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that due process requires "a change of venue prior to attempting selection of a jury." *Id.* at 62 Based upon the empirical evidence imparted below, such "extreme circumstances" exist here.

It has been recognized that the open hostility evidenced by a particular community can be so severe to give rise to a presumption of juror prejudice. *See, Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed and actual juror bias). The bias or prejudice of even a single juror is enough to violate defendant's Fifth & Sixth Amendment guarantee to an impartial jury. *United States v. Gonzalez*, 214 F. 3d 1109, 1111-12 (9th Cir. 2000); *See, United States v. Martinez – Salazar,* 120 S. Ct. 774, 782 (2000) ("nor did the District Court's ruling result in the seating of any juror who should have been dismissed for cause as we have recognized, that circumstance would require reversal.") The presumption of prejudice overrides a

prospective juror's protestations of impartiality. *Murphy v. Florida*, 421 U.S. 794, 802 (1975) ("[e]ven this indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see, also, Sheppard v. Maxwell*, 384 U.S. 333, 349-50 (1966); *Irvan v. Dowd*, 366 U.S. 717, 728 (1961). Based upon the recited precedent, *voir dire* process is incapable of protecting Webster's Constitutional rights.

### A. The size and characteristics of the District of Columbia jury pool

The District of Columbia's population is under 700,000.[1] Approximately 200,000 Federal employees/retirees reside within the District of Columbia. *Id.* With a total population of approximately 690,000, any given member of the jury pool will be closely connected to the Federal Government. As of 2019, there were approximately 200,000 Federal employees - - including postal workers - - living and working in the District. As reported in the Human Capital Strategic Plan, dated 2021, 2,250 individuals were employed by the U.S. Capitol police force. Nearly 15,000 individuals are directly employed by Congress.[2] Taken together, these numbers account for nearly a third of all jobs existing in the District – not to mention the multitude of friends and family members who are connected to these federal employees.

The characteristics of the District of Columbia's jury pool is further exemplified by the survey conducted by Select Litigation, LLC on behalf of the Federal Public Defender's Office

---

[1] *See,* 2020 census date shows D.C.'s population growth nearly tripled compared to previous decade, D.C.gov (Apr.26, 2021) (D.C. population recorded by census as 689,545), as of 2017, the U.S. Office of Personnel Management reported that there were 600,000 Federal Civil workers and retirees in the greater D.C. area - - excluding postal employees, Federal Bureau of Investigation Workers, and staff associated with several Federal commissions. Federal Civilian Employment OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analays-documentation/federal-employment-reports/publication/federal-civilian-employment/.

[2] Vital Statistics on Congress, Brookings Institute (July 11, 2013). This would be in addition to the approximately 2,250 Capitol police personnel assigned to protect the Capitol. As reported in the Human Capital Strategic Plan, as early as 2021, 2,250 individuals are employed by the U.S. Capitol police force. Human Capital Strategic Plan 2021-2025, U.S. Capitol Police (2020) to compliment the U.S. Capitol Police Force there are 4,400 individuals employed by the Metropolitan Police Force and approximately 2,700 active members of the D.C. National Guard. Metropolitan Police Force annual report 2020 DC.gov (2020)

with the Eastern District of Virginia. Exhibit "A"[3] The survey (Exhibit "A") polled 400 potential

District of Columbia residents and 400 residents of the Northern District of Georgia. As a part of

this survey, the media research firm New Exposure analyzed the January 6th news coverage. *See,*

Exhibit "A" at Appendix B. The results of this polling establish that the prospective jurors

possess a "decidedly negative impression of individuals arrested in conjunction with the

activities of January 6, 2021." Exhibit "A" at Pg. 2. More importantly, the enclosed data

conclusively establishes that such individuals are pre-oriented - - without having heard any

evidence - - to be "inclined to vote "guilty" if called to serve as a juror. *Id.* Specifically, the

attitudes of prospective jurors in this District are decidedly more hostile toward defendants than

adults nationwide or prospective jurors in a demographically comparable jurisdiction. Based on

these simple calculations the residents of the District of Columbia overwhelmingly have

significant and unique connections with individuals or institutions that are/were directly

impacted January 6th. Such intimate relationships are/were unique to the District of Columbia as

the central location for the operation of our Federal Government. As a result of these intimate

connections, District residents see themselves as victims of the events which transpired on

January 6th.

As to this point, the polling data evidences that prospective jurors have pre-judged

January 6th defendants as follows:

- Have unfavorable opinions of those arrested for participating in January 6th demonstration (84%); and
- Would categorize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, and 54% respectively). Exhibit "A" ¶¶ 9,14

---

[3] The Federal Public Defender's Office has graciously consented to defendant's use of Select Litigation's polling data for purposes of this motion.

Such data confirms that most of the jurors are predisposed to find Webster guilty, and will likely consider him as posing a danger to the community, notwithstanding the strength or weakness of the evidence presented at trial. The empirical evidence also reveals that the prospective jury pool:

- Would categorize these individuals as "criminals" (62%); and
- Have already formed the opinion that these individuals are "guilty" of the charges brought against them (71%).

More than half of the District of Columbia residents admitted in this survey that they are likely to vote "guilty" if they find themselves on a jury in one of the January 6th cases (52%). Exhibit "A" at ¶11. Ironically, although 67% of the potential jurors polled believed that they themselves would receive a fair trial if they were a defendant in a January 6th case, 76% of those surveyed had already decided that the January 6th defendants are guilty. *Id.* at ¶12. This polling data also makes another obvious point - - that former President Donald Trump is/was inextricably connected with the events of January 6th. Of the individuals questioned, 84% believed that the January 6th defendants were:

- Trying to overturn the election and keep Donald Trump in power (84%);
- Insurrectionists (76%);
- Trying to overthrow the US Government (72%); and
- A protest that went too far (69%)

As of December 31, 2021, there were 524,088 registered voters in the District of Columbia.[4] The vast majority of these voters - - 400,552 - - are registered Democrats. This one-sided political dynamic - - unique to the District of Columbia - - is painfully obvious by the 2016 presidential election results between Hillary Clinton and former President Donald Trump where

---

[4] D.C. Board of elections monthly report of voter registrations statistics city wide registration summary as of December 31, 2021.

an overwhelming majority of District of Columbia voters (i.e. 92.8%) supported presidential

contender Hillary Clinton over Donald Trump, who received a scarce 4.1% of the votes. [5]  In the

most recent election in 2020, then-President Donald Trump fared only slightly better in the eyes

of District voters by garnering a mere 5.4% of the votes compared to the overwhelming majority

of votes (i.e. 92.1%) casted in favor of President Joe Biden[6]. Given the lopsided political makeup

of the District, it is impossible to panel a jury that is not entirely comprised of people

preordained to find Webster - - a presumed Trump supporter - - guilty. Although significantly

more populous than the prospective jury pool in *Rideau v. Louisiana*, 373 U.S. 723, 726-27

(1963), Webster submits that the impact of the events of January 6th were felt by a larger

proportion of District residents who have universally concluded that the January 6th defendants

are guilty as charged.


### B.  Nature and Volume of the National Local Media

Where the enormity of the publicity given to the January 6th protest has "inflamed

passions in the host community" and "permeate[d] the trial setting . . [such] that a defendant

cannot possibly receive an impartial trial," the District Court must accept the presumption of

prejudice and transfer Webster's case to a venue where defendant can receive a fair trial. *See,*

*Estes v. Texas*, 381 U.S. 532 (1964); *Sheppard v. Maxwell,* 384 U.S. 333, 362 (1966); *United*

*States v. Quiles - Olivo,*684 F. 3d 172, 177 (1st Cir. 2012). In *Skilling*, 561 U.S. at 378-9, the

Supreme Court rejected the defendant's claims on both presumed and actual prejudice. With

regard to presumed prejudice, the Court held that even pervasive adverse pretrial publicity does

not inevitably lead to an unfair trial. News stories about Enron and Skilling, while not unbiased,

---

[5] www.washingtonpost.com/2016-election-results/primary//

[6] www.washingtonpost.com/2020-election-results/primary//

did not contain any confessions or present the kind of vivid and unforgettable information likely to produce prejudice. The Court observed that at trial, Skilling, had actually been acquitted of a number of insider trading counts. The Court also noted that four years had lapsed between Enron's bankruptcy and Skilling's trial.

Unlike Skilling, much of the evidence being used by the Government to prosecute the January 6th defendants - - including Webster - - comprises of video evidence. As for Webster's pending charges, the media, Congress, and the Government have all taken turns contributing to the public narrative as to their collective perception of the defendant's guilt. The Government likened the actions of Webster on January 6th to "a junkyard dog".[7] The local District of Columbia news media has taken a special interest spinning their views of Webster's case - - inviting the public to track the progress of defendant's prosecution. Interestingly enough, neither the Government nor the media have covered Officer N.R's use of excessive force by repeatedly throwing a female protester to the ground or punching Webster in the face with a closed fist - - prompting defendant to use self-defense.[8] A Google search using the terms "Thomas Webster Capitol" derives 4,690,000 search results. Approximately a week after Webster was indicted, former acting U.S. Attorney Michael Sherwin gave a lengthy interview to 60 Minutes suggesting that some of the January 6th defendants could face the rarely used sedition charges. Recognizing the Constitutional dangers posed by such Governmental misconduct, this Court correctly noted at a subsequent hearing:

> "No matter how much attention this matter gets, let me be clear that these
> defendants are entitled to a fair trial, not one that is conducted in the media . . .

---

[7] www.newyorktimes.com/2021/02/23/nyregion/nypd-officers-arrested-capitol-riot.htttml.  The media has repeatedly dubbed defendant as the "eye gouger" in a case where there were no allegations being made by the Government or no proof offered in the video evidence of defendant gouging Officer N.R. eyes. www.huffpost.com/entry/former-nypd-cops-arrested-for-capitol-riot_n_6036722cc5b6dfb6a735ba6c.

[8] https://youtu.be/VmJRQUYjlY4 at 0:26.

they are also entitled to defend against the charges that are currently brought against them, not speculation about what might or might not be coming."[9]

Customarily, "something more" than intense media attention or gruesome reporting is required to establish prejudice. *See, Murphy, supra,* 421 U.S. at 799 (1975) ("in those cases the influence of the news media either in the community at large, or in the courtroom itself, pervaded the proceedings"). To date, approximately 769 American citizens have been charged by the Government with crimes connected with the January 6th protest.[10] Given the large number of arrests associated with January 6th together with the media coverage that has followed, the citizens of the District of Columbia have been inundated with unrelenting information and news about and concerning the events occurring at the Capitol on January 6th. By comparison in *Skilling*, the defendant relied on hundreds of media reports about the Enron scandal in his motion for a transfer of venue. *Skilling, supra,* 561 U.S. at 358. Skilling argued that as the former Capital Chief Executive Officer, such articles implicated him by proxy, if not directly. *See Id.* The Court disagreed, referencing its early opinions concerning the modern ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See, Id* at 382. Just in the past year, District of Columbia newspapers have published at least five hundred articles about January 6th and local news syndicates have broadcasted over seven thousand news stories covering these events. Exhibit "A" at App.B-7[print data] & App.B-1(broadcast data). This coverage is substantially more expansive than the media attention encountered by the defendant Skilling. *See, Skilling, supra,* 561 U.S. at 428-30. The empirical evidence (Exhibit "A") establishes that District of Columbia residents have been inundated with

---

[9] Judge criticizes DOJ for talking about Capitol riot conspiracy case in the press
www.npr.org/2021/03/23/980511734/judge-criticizes-doj-for-talking-about-Capitol-riot-conspiracy-case-in-the-press

[10] 769 people have been charged in the Capitol insurrection so far. This surgical table shows them all. www.insider.com/all-the-us-capitol-pro-trump-riot-arrest-charges-deems-2021-1

news coverage about January 6th. See, Exhibit "A" ¶30 & App. B-1 & B2. With the advent of Facebook, Twitter and national news media outlets, the influence of local newspapers in America continues to decline. Notwithstanding these current realities, the news coverage in the District of Columbia has been unrelenting. Given the intense concentration of local media coverage of the January 6th protest, it is impossible for a prospective juror from this District to be truly fair and impartial.

### C. The Timing of the Proceedings

The Court in *Skilling* empanelled a jury four years after defendant was arrested. *Skilling, supra,* 561 U.S. at 383. Given the length of time involved there, the media attention concerning the Enron case all but disappeared. *Id*. Literally millions of news articles about the events which occurred on January 6th have circulated over the short span of the past approximately 13 months. Congress itself has assisted in keeping the January 6th protest as a feature story in the media by the assembly of a House Select Committee to investigate the events of January 6th.[11] As we move towards Webster's April 4th trial, there is absolutely no reason to believe that the media coverage will diminish.  It stands to reason that as additional individuals are arrested and/or brought to trial, the public interest and media attention will only intensify.

### Conclusion

WHEREFORE, the defendant respectfully requests that this Court grant a change in venue pursuant to FRCP 21(a) and transfer the trial from the District of Columbia.

---

[11] Dan Burman, the latest in the Jan. 6th Investigation, CNN (Nov. 28, 2021), https://www.cnn.com/2021/11/28/politics/January-6-investigation/index.html

Dated: Goshen, New York
       February 9, 2022

Yours, etc.,

DUPEE & MONROE, P.C.
Attorneys for Defendant

BY:

       JAMES E. MONROE, ESQ.
Office & P.O. Address
211 Main Street, Box 470
Goshen, New York 10924
Phone: 845-294-8900
Fax: 845-294-3619
Email: jim@dupeemonroelaw.com

CERTIFICATE OF SERVICE

     I hereby certify that on February 9, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to: Hava Mirell, Assistant United States Attorney.

JAMES E. MONROE, ESQ.



February 4, 2022

Ms. Ann Mason Rigby
Ms. Elizabeth A. Mullin
Assistant Federal Public Defenders
Federal Public Defender's Office for the Eastern District of Virginia
1650 King Street, Suite 500
Alexandria, VA 22314

Dear Ms. Rigby and Ms. Mullin,

As you know, the Federal Public Defenders' Office for the District of Columbia commissioned Select Litigation, LLC, of Washington, D.C., to assess the federal jury pool in the District of Columbia on behalf of the many indigent clients indicted for activities arising out of the January 6, 2021, demonstrations at the U.S. Capitol building who are represented by either Assistant Federal Public Defenders or other counsel appointed pursuant to the Criminal Justice Act. To that end, Select Litigation conducted two public opinion polls, one among jury-eligible citizens of the District of Columbia, and one among jury-eligible citizens of the Atlanta Division of the Northern District in Georgia. Select Litigation also retained the services of a leading media research firm, News Exposure, to analyze news coverage related to the January 6, 2021, demonstrations. For ease of reference, I have numbered the paragraphs of this letter reporting on our results and the results of News Exposure's media study.

<strong>Jury Pool Analysis</strong>

1.      The samples for the polls were drawn from current lists including both landlines and cellular devices, and the sampling was done in a manner to ensure that every jury-eligible citizen on the lists from each of the two jurisdictions would have an equal probability of being included in the final sample. Interviewing for the polls was conducted by professional interviewers by telephone January 9-14, 2022. Respondents were interviewed on both landlines and mobile devices. The total sample size was 800 respondents comprised of 400 interviews in each jurisdiction. The wording and ordering of the substantive questions were identical in both jurisdiction, and copies of the questionnaires are included as an addendum to this letter.

2.      All polls are subject to errors related to interviewing a sample of a universe rather than the entire population. The margin of estimation or sample error for a sample size of 400 is 4.9 percentage points at the 95% confidence interval. This means that in 95 out of 100 cases, the responses in these polls should be within plus or minus 4.9 percentage points of the responses that would have been obtained interviewing the entire population in each jurisdiction. The sampling error for

subgroups contained in these samples would be larger.  Small adjustments were made to the interviews collected to ensure that the samples are reflective of the best available information about the composition of the populations in these jurisdictions. In this and other respects, the methods used in conducting these polls were according to or exceed professional standards for public opinion research.

3.     In preparation for this research, Select Litigation reviewed numerous polls conducted about the events of January 6.  In these polls, Select Litigation included one question taken from a national poll conducted by CBS News/YouGov was included so we could compare results from these two jurisdictions with results for adults nationwide.  The CBS News/YouGov poll was conducted December 27-31, 2021, with 2,063 adults.  The margin of sampling or estimation error with this size is 2.3 percentage points, plus or minus.  The results of the poll are reviewed at https://www.cbsnews.com/news/january-6-opinion-poll-2022/, and a descriptions of its methodology can be found at the bottom of the document located at this link: https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgvFtId9Cgsq_/view.

4.     I was the project manager for this research by Select Litigation.  Over the past four decades, I have conducted over 3000 public opinion polls.  I am a political scientist by training, having earned a degree with departmental honors at Guilford College, an M.A. from the University of Nebraska, completed doctoral course work and comprehensive exams at Tulane University, and did advanced study in opinion research and statistics at the University of Michigan.

### Key Findings of Jury Pool Analysis

5.     Prospective jurors in the District of Columbia have decidedly negative impressions of individuals arrested in conjunction with the activities of January 6, 2021.  Their bias against the defendants is evident in numerous results and is reflected in a significant prejudgment of the case: a clear majority admit they would be inclined to vote "guilty" if they were serving on a jury at the defendants' trial.  The attitudes of prospective jurors in the District of Columbia are decidedly more hostile toward the defendants than adults nationwide or prospective jurors in a demographically comparable federal court division.

6.     The first part of this document describes the findings from the poll of jury-eligible citizens of the District of Columbia.  The next section compares the views of the District of Columbia jury pool with the jury-eligible citizens in the Atlanta Division of the Northern District of Georgia.  A final section reviews the findings of a study of the media coverage of the events of January 6.

### The District of Columbia Jury Pool

7.     Essentially every jury-eligible individual in the District of Columbia (99%) is aware of the demonstrations that took place at the Capitol on January 6, 2021.  Awareness that "several hundred people were arrested on charges related to those demonstrations" is almost as high (93% aware).  *See* Appendix A, Q1, Q3.

2

8.   Most jury-eligible District of Columbia citizens (80%) express confidence that the current defendants will receive a "fair trial" in the District of Columbia. Fewer than this (67%) believe that they themselves would receive a fair trial if they were defendants in the case.   Other responses undermine the notion that these expressions of confidence in a fair trial are an accurate reflection of what would occur. *See Appendix A*, Q7, Q6.

9.   The vast majority (84%) have an unfavorable opinion of the "people arrested for participating in the events at the Capitol on January 6." Only 6% have a favorable view of those arrested; another 4% volunteer that their opinion is mixed, and 6% do not offer an opinion of those arrested.   *See Appendix A*, Q2.

10.   An overwhelming majority of the District of Columbia jury pool have a prejudgment about the case.   When asked whether they think the "people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them," 71% say "guilty" and 3% say "not guilty."   About one of every six volunteer that "it depends," while only 10% offer no opinion as to the guilt of those arrested. *See Appendix A,* Q4.

11.   This perception of guilt goes beyond a simple, loosely held opinion.   For example, from early in life, most every American is exposed to the monition that, if they serve as jurors, they must treat defendants as "innocent until proven guilty." Despite this, a majority of jury-eligible residents of the District of Columbia (52%) admit in this anonymous interview that if they were "on a jury for a defendant charged with crimes for his or her activities on January 6th," they would be more likely to vote the defendant "guilty."   Only 2% say they would be more likely to vote "not guilty."   About a third of the jury pool volunteer that "it depends" on how they would vote, and 13% offer no opinion. *See Appendix A*, Q5.

12.   The prejudgment revealed in responses to these two questions are in sharp contrast to the expressions of confidence in a "fair trial."   It is of particular interest that 76% of those who stated that they believe the defendants will receive a fair trial think the defendants are guilty, and 56% of them say they would vote "guilty" if they were on a jury.

13.   Almost all prospective jurors in District of Columbia remember being exposed to media coverage of January 6th (over 90% have seen, read, or heard some). Most of them say the media coverage implied that the defendants are guilty of "the charges brought against them."   Only 4% say the coverage suggests they are not guilty, and 17% say the media coverage had been mixed. *See Appendix A,* Q8, Q9.

14.   These opinions of the defendants among prospective District of Columbia jurors are buttressed by strong underlying beliefs about the defendants' associations, beliefs, actions, and motivations.   First, large majorities accept, and few prospective jurors reject, negative descriptions of the defendants.   Seven of every ten (70%) would describe the defendants as "conspiracy theorists," 62% would describe them as "criminals," 58% would describe them as "white supremacists," and 54% would describe them as "members of a violent right-wing organization."   No more

3

than 30% say they would not use any one of these terms to describe the defendants. *See Appendix A,* Q10.

15.  Second, many potential jurors reveal preconceived notions about the intent of at least those defendants who "forced their way into the U.S. Capitol," to use the terminology used in the CBS News/YouGov poll of December 27-30, 2021. More than eight of every ten (85%) think "trying to overturn the election and keep Donald Trump in power" would describe these defendants' actions; only 9% believe that would not be a valid description.  Three-quarters (76%) believe that the term "insurrection" would describe their actions on January 6, and 72% believe "trying to overthrow the US government" would be an apt description.  About two-thirds (69%) think "a protest that went too far" describes their actions.  On the other hand, alternative positive descriptions are roundly rejected.  Only 13% think that "patriotism" and only 10% think that "defending freedom" would describe their actions.  *See Appendix A,* Q11.

16.  Responses to this question raise additional questions about the extent to which prejudgments about the defendants undermine widespread expression of confidence that defendants will receive a "fair trial."  That is, overwhelming majorities of those in the District of Columbia jury pool who say that they believe the defendants will receive a fair trial also reveal existing judgments about the motivations and intentions of the defendants.  That is, 78% of them believe the term "trying to overthrow the government to keep Donald Trump in power" would describe them; and 82% believe the term "insurrection" is an apt description for their actions.  By contrast, only 10% believe "patriotism" would describe them, and only 6% think "defending freedom" would.

17.  Note that we used the same question wording as the national CBS News/YouGov December 27-30, 2021, poll to facilitate comparisons between the two juror pools we analyzed with adults nationwide.  We used this question wording despite the fact that the CBS News/YouGov question wording is leading and includes language characterizing the defendants that the defendants do not accept as accurate, i.e., "the people who forced their way into the U.S. Capitol."

18.  As the following table demonstrates, prospective jurors in the District of Columbia are more likely than adults nationwide, by a statistically significant margin, to believe that the January 6 defendants were trying to overturn the election and keep Donald Trump in power, were involved in an "insurrection," and were "trying to overthrow the U.S. government."  And they are less likely to believe that the defendants' actions would be described as "patriotism" or "defending freedom."

| Comparison of Beliefs among Adults Nationwide and Jury-eligible Citizens of DC | | | | |
|---|---|---|---|---|
| Do you believe this term would or would not describe the actions of on January 6?* | | | | |
| | | USA | DC | *Difference* |
| Trying to overturn the election and keep | Would | 63% | 85% | *+22* |
| Donald Trump in Power | Would not | 37 | 9 | *- 28* |

4

| Insurrection | Would | 55% | 76% | *+21* |
|---|---|---|---|---|
| | Would not | 45 | 13 | *- 32* |
| Trying to overthrow the US government | Would | 54% | 72% | *+18* |
| | Would not | 46 | 20 | *- 26* |
| A protest that went too far | Would | 76% | 69% | *- 7* |
| | Would not | 24 | 24 | *+ 0* |
| Patriotism | Would | 26% | 13% | *- 13* |
| | Would not | 74 | 81 | *+ 7* |
| Defending freedom | Would | 28% | 10% | *- 18* |
| | Would not | 72 | 86 | *+14* |

*\* The wording of the CBS/YouGov poll question was as follows: "Thinking about the people who forced their way into the U.S. Capitol on January 6, 2021. Would you describe their actions as …?" The question on the telephone polls reported here was worded as follows: "Thinking about the people who forced their way into the U.S. Capitol on January 6, 2021, tell me whether you would or would not describe their actions in the following ways. Here's the first description: [READ ITEM] Would you describe or would you not describe the actions of the people who forced their way into the U.S. Capitol on January 6, 2021, in that way?*

*The fact that the CBS News/YouGov poll was administered on-line and the polls reported here were conducted via telephone accounts for the slight difference in wording. In addition, the fact that the CBS News/YouGov poll did not permit answers other than "yes" and "no" is the reason the responses to those questions all add to 100%. The telephone polls that we conducted included space for the interviewers to note when respondent answers were something other than the offered answers, in particular, "it depends," or some indication of "mixed," and a refusal or reluctance to venture any response ("don't know"). As a result, the DC responses reported here do not add up to 100%.*

## Comparison of Jury-Eligible Citizens in the District of Columbia and in the Atlanta Division

19.     The comparison of results for a comparable question asked nationwide and in the District of Columbia illustrates that prospective jurors in the District of Columbia differ from adults nationwide in their views of the defendants. We also compared the opinions of prospective jurors in the District of Columbia about the defendants with those of prospective jurors in another federal court division.

20.     The selection of the additional district in which to poll was based on numerous considerations and research into other divisions of the federal court system. From study and prior experience, we know that most urban areas in the United States have relatively similar distributions of gender, age, and other demographic measures of their populations. One of the biggest differences among the

5

divisions is the racial composition. In that regard, the division with the closest approximation of the racial composition of the District of Columbia is the Atlanta division of the Northern District of Georgia. The following table shows the racial composition of twelve divisions.

| Comparison of the Racial Composition of Various Federal Court Divisions | | | |
|---|---|---|---|
| | White | Black | Hispanic |
| District of the District of Columbia | 41% | 39% | 11% |
| Atlanta Division of Northern District of Georgia | 40% | 38% | 12% |
| | | | |
| Northern Division of Middle District of Alabama | 55% | 37% | 3% |
| Norfolk Division of the Eastern District of Virginia | 55% | 29% | 7% |
| Eastern District of Louisiana | 55% | 29% | 9% |
| District of Delaware | 62% | 21% | 9% |
| Middle District of North Carolina | 62% | 21% | 9% |
| Southern Division of Eastern District of Michigan | 69% | 18% | 4% |
| Eastern Division of the Eastern District of Missouri | 73% | 17% | 3% |
| Eastern District of Pennsylvania | 65% | 16% | 10% |
| Eastern Division of the Northern District of Illinois | 52% | 16% | 22% |
| Southern District of New York | 43% | 16% | 30% |

21.     This is not to say that the Atlanta Division is the same as the District of Columbia in every regard. Adults in the District of Columbia have higher levels of formal education than in other divisions (64% of adults in the District of Columbia have an associate degree or higher). The comparable number in the Atlanta Division is 51%. While the level of formal education is lower in Atlanta, it is higher than any other division examined other than the Southern District of New York which also has 51% with associate degrees or higher.

22.     Another obvious contrast is the percentage of vote won by the candidates in the 2020 Presidential election. Trump won about 5% (to Biden's 92%) in the District of Columbia, while the split in the counties of the Atlanta Division was 65%-33% for Biden. In fact, no other federal court division had a Presidential vote as lopsided as the District of Columbia in 2020; the closest one in the divisions examined here was SDNY (Biden 72%-Trump 26%). But since formal education and political leanings traditionally are not factors to consider in selecting venue, the decision was to use the Atlanta Division because the similarity of the two districts on a variety of demographic measures, including the race/ethnic composition of the two populations.

23.     A poll with identical questions was conducted in the Atlanta Division over the same days as the poll in the District of Columbia discussed above. With one exception, prospective jurors in the District of Columbia have more negative views of the defendants by a statistically significant margin on each of these questions as these examples show.

6

| Comparison of opinions among prospective jurors in DC and Atlanta Division | | | DC | GA | Difference |
|---|---|---|---|---|---|
| Q2. Opinion of the people | | Favorable | 6% | 18% | -12 |
| arrested for participating in the | | Unfavorable | 84 | 54 | +30 |
| events at the U.S. Capitol on | Volunteered | (Mixed) | 4 | 16 | -12 |
| January 6 | Volunteered | (Don't know/refused) | 6 | 12 | -6 |
| Q4. Opinion of whether people | | Guilty | 71% | 54% | +17 |
| arrested for Jan 6 activities are | | Not guilty | 3 | 10 | -7 |
| guilty or not guilty of the | Volunteered | (Depends) | 16 | 19 | -3 |
| charges brought against them | Volunteered | (Don't know/refused) | 10 | 17 | -7 |
| Q5. How are you more likely to | | Guilty | 52% | 45% | +7 |
| vote if on a jury for a | | Not guilty | 2 | 9 | -7 |
| defendant charged with crimes | Volunteered | (Depends) | 33 | 37 | -4 |
| for his or her activities on | Volunteered | (Don't know/refused) | 13 | 8 | +5 |
| January 6th | | | | | |

24. The difference in underlying opinions of prospective jurors in the District of Columbia is even more evident on questions about descriptions of the defendants than it is on the questions for which there is an obvious socially acceptable response. Jury-eligible citizens of the District of Columbia are more likely by a statistically significant margin than their counterparts in the Atlanta division to believe the terms "conspiracy theorists," "criminals," "white supremacists," and "members of a violent right-wing organization" describe most of the January 6 defendants.

| Comparison of Beliefs about January 6 defendants in DC and Atlanta Division | | | | |
|---|---|---|---|---|
| Q10. Would you or would you not describe most of the people who were arrested for their involvement in the events on January 6th at the U.S. Capitol building using this description? | | | | |
| | | DC | GA | Difference |
| Conspiracy theorists | Would | 70% | 52% | +18 |
| | Would not | 15 | 32 | - 17 |
| Criminals | Would | 62% | 48% | +14 |
| | Would not | 28 | 35 | - 7 |
| White supremacists | Would | 58% | 40% | +18 |
| | Would not | 25 | 41 | - 16 |
| Members of a violent right-wing | Would | 54% | 39% | +15 |
| organization | Would not | 29 | 41 | - 12 |
| NOTE: The results do not add to 100% because some respondents answered in ways not included in the question, most frequently "it depends," "mixed," or offered no opinion. | | | | |

7

25.     Prospective jurors in the District of Columbia also are more likely to have formed the opinion that the defendants had specific intent on January 6 than their counterparts in Georgia with one exception.   The similarity between the opinions of the Georgia respondents and adults nationwide is additional evidence that the District of Columbia is an outlier in these matters.

| Comparison of Beliefs among Jury-eligible Citizens in DC & Atlanta Division, & Adults Nationwide | | | | |
|---|---|---|---|---|
| Q11. Do you believe this term would or would not describe actions on January 6?* | | | | |
| | | USA | DC | GA |
| Trying to overturn the election and keep Donald Trump in Power | Would | 63% | 84% | 68% |
| | Would not | 37 | 9 | 19 |
| Insurrection | Would | 55% | 76% | 55% |
| | Would not | 45 | 13 | 27 |
| Trying to overthrow the US government | Would | 54% | 72% | 57% |
| | Would not | 46 | 20 | 33 |
| A protest that went too far | Would | 76% | 69% | 70% |
| | Would not | 24 | 24 | 21 |
| Patriotism | Would | 26% | 13% | 25% |
| | Would not | 74 | 81 | 63 |
| Defending freedom | Would | 28% | 10% | 21% |
| | Would not | 72 | 86 | 70 |

*See the note on the comparable table above for the wording of the questions and pertinent information about the responses on the nationwide poll and the telephone polls reported here.*

26.     In sum, these polls demonstrate that jury-eligible citizens in the District of Columbia are decidedly more biased against the January 6 defendants than either their counterparts in the Atlanta Division of the Northern District of Georgia or adults nationwide. This bias and their clear prejudgment about the case raise significant questions about the viability of obtaining a fair trial in the District of Columbia.

## Comparison of Media Coverage in Two Markets

27.     Data generated by a leading media research firm, News Exposure show that stories about and mentions of the January 6 incident were more common by District of Columbia media outlets than by comparable outlets in Atlanta in print, broadcast, and internet. *See Appendix B.* News Exposure's findings and conclusions are summarized below.   Their report can be found in Appendix B and at this link: https://docs.google.com/spreadsheets/d/1-gGzNFhGmQPZAiRkoZjzTO8uqiq9Zve2I4L15mddpqU/edit?usp=sharing

8

   28.   **Print stories**.  During the first year after the events of January 6, 2021,
the dominant newspaper in the District of Columbia (the Washington Post) ran
roughly twice as many stories totally or mostly dedicated to the January 6 matter as
the dominant newspaper in Atlanta (the Atlanta Journal-Constitution).   The
following table shows the distribution of stories on the demonstration and its
aftermath in each publication beginning January 6, 2021.  With a few exceptions
(April, May, and October 2021), the Washington Post published more stories on the
matter than the Atlanta Journal-Constitution. During the most recent three months,
the Post published 57 stories to 9 in the Journal-Constitution.

| Number of Stories in Two Newspapers | | |
|---|---|---|
| | Atlanta Journal-Constitution | Washington Post |
| Jan 2021 | 15 | 28 |
| Feb 2021 | 9 | 19 |
| Mar 2021 | 11 | 10 |
| Apr 2021 | 7 | 5 |
| May 2021 | 3 | 3 |
| Jun 2021 | 9 | 30 |
| Jul 2021 | 11 | 26 |
| Aug 2021 | 8 | 10 |
| Sep 2021 | 7 | 15 |
| Oct 2021 | 10 | 7 |
| Nov 2021 | 4 | 19 |
| Dec 2021 | 2 | 18 |
| Jan 2022 | 3 | 20 |
| **Totals** | **99** | **210** |

   29.   **Web coverage.** Disparity between media coverage in the two markets
was perhaps greatest on the internet.  As this table shows, the number of hits from
internet sites based in the District of Columbia area was four times higher than the
comparable number of hits from sites based in the Atlanta area.

| Number of Web Hits in Two Markets | | |
|---|---|---|
| | Atlanta | Washington |
| Jan 2021 | 286 | 8,428 |
| Feb 2021 | 2,016 | 3,570 |
| Mar 2021 | 771 | 2,170 |
| Apr 2021 | 522 | 1,724 |
| May 2021 | 747 | 2,450 |
| Jun 2021 | 659 | 2,562 |
| Jul 2021 | 549 | 2,428 |
| Aug 2021 | 360 | 1,131 |
| Sep 2021 | 486 | 1,441 |
| Oct 2021 | 471 | 1,805 |
| Nov 2021 | 349 | 1,814 |
| Dec 2021 | 389 | 1,873 |
| Jan 2022 | 507 | 1,951 |
| **Totals** | **8,112** | **33,347** |

9

-38-

30.   Other common ways of reporting internet broadcasting (e.g. impressions, ad value) show even larger disparities between the District of Columbia and Atlanta.   Those are not reported here because controversies over the methodologies could distract from the simple and incontrovertible conclusion that District of Columbia-based sites provided many more hits on the internet than their counterparts in Atlanta.

31.   **Broadcast coverage**.   The findings are similar with respect to the number of stories broadcast on the local programming of the network television affiliates of ABC, CBS, Fox, and NBC in each market that included significant mention of the events of January 6, 2021, and its aftermath. The comparison is shown in the following table.   It is worth mentioning that the larger number of mentions on broadcast news compared to print is in part because of the multiple news broadcasts that appear each day on each outlet.

| Number of Hits on Local Broadcasts | | |
|---|---|---|
| | Atlanta | Washington |
| Jan 2021 | 1,090 | 1,250 |
| Feb 2021 | 369 | 874 |
| Mar 2021 | 394 | 616 |
| Apr 2021 | 202 | 523 |
| May 2021 | 305 | 549 |
| Jun 2021 | 195 | 388 |
| Jul 2021 | 234 | 561 |
| Aug 2021 | 92 | 356 |
| Sep 2021 | 226 | 533 |
| Oct 2021 | 135 | 423 |
| Nov 2021 | 173 | 473 |
| Dec 2021 | 290 | 444 |
| Jan 2022 | 300 | 310 |
| **Totals** | **4.005** | **7,300** |

32.   In addition to the simple difference in the number of hits on the local broadcasts of the network affiliates, the table shows the persistence of the coverage in the District of Columbia market as compared to the Atlanta market.   The fewest number of hits on the news broadcast by the District of Columbia affiliates in 2021 was 356 in August of last year.   The number of hits during the lowest month in the District of Columbia exceeded the comparable mentions in nine of the twelve months on comparable broadcasts in Atlanta.

33.   This disparity of media exposure might help explain the differences in the views of jury-eligible citizens in the District of Columbia and the views of their counterparts in a comparable division and among adults nationwide.

10

Sincerely yours,

s/

Harrison Hickman
Select Litigation, LLC
5301 Wisconsin Ave, NW, Suite 330
Washington, DC 20015

# Appendix A
# Select Litigation Results



Copyright 2022                                   January 9 - 13, 2022                                    400/400 Interviews
District of Columbia and Atlanta Division of Northern District of Georgia        SL 3582-3        Margin of Error: +/- 4.9/4.9

Hello, my name is _____ from **[PHONEBANK]**, a national research firm.

**[IF LANDLINE]** We're conducting a survey in **(Washington, D.C./Georgia)** to get people's opinions on important local issues. This number was selected at random and according to the research procedure, I would like to speak to the youngest **(ALTERNATE: MAN/WOMAN)** at this address who is registered to vote.

**[IF CELL PHONE]** We're conducting a survey of cell phone users in **(Washington, D.C./Georgia)** to get people's opinions on important local issues. Since you are on a cell phone, I can call you back if you are driving or doing anything else that requires your full attention. Can you talk safely and privately now? **[IF YES, CONTINUE. IF NO, SCHEDULE CALLBACK]**

|  | D.C. | Atlanta |
|---|---|---|
| Number | 400 | 400 |
| Margin of error | +/- 4.9 | +/- 4.9 |

**RESUME ASKING ALL RESPONDENTS**

**QA.** To ensure we have a proper sample, would you please tell me the name of the county you live in? **[CODED]**

**QB.** Are you officially registered to vote in **(Washington, D.C./Georgia)**?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| Yes |  | 99% | 94% |
| No |  | 1 | 6 |
| VOL: | (Don't know) | - | - |

**ASK QC IF NOT REGISTERED TO VOTE OR DON'T KNOW [QB=2,3]**
**QC.** Do you currently have a driver's license with a **(Washington, D.C./Georgia)** address?

|  | D.C. | Atlanta |
|---|---|---|
| Yes | 1% | 6% |
| No/Don't know ─────────────▶ | TERMINATE | TERMINATE |
| Registered to vote | 99 | 94 |

**RESUME ASKING ALL RESPONDENTS**
**QD. [DC ONLY]** And to make sure we interview people in all parts of the city, please tell me the ZIP code at the address where you live. **[CODED]**

**QE.** In the last month, have you received a summons to appear for jury duty?

|  | D.C. | Atlanta |
|---|---|---|
| No | 100% | 100% |
| Yes/Don't know ─────────────▶ | TERMINATE | TERMINATE |

**QF.** Are you a member of federal, state, or local law enforcement?

|  | D.C. | Atlanta |
|---|---|---|
| No | 100% | 100% |
| Yes/Don't know ─────────────▶ | TERMINATE | TERMINATE |

**QG.** Are you an active-duty military member?

|  | D.C. | Atlanta |
|---|---|---|
| No | 100% | 100% |
| Yes/Don't know ─────────────▶ | TERMINATE | TERMINATE |

**QH.** Are you, or any of your immediate family members, congressional staff?

|  | D.C. | Atlanta |
|---|---|---|
| No | 100% | 100% |
| Yes/Don't know ─────────────▶ | TERMINATE | TERMINATE |

**QI.** Are you, or any of your immediate family members, employed by the Department of Justice, or **(D.C./state or local)** or federal courts?

|  | D.C. | Atlanta |
|---|---|---|
| No | 100% | 100% |
| Yes/Don't know ─────────────▶ | TERMINATE | TERMINATE |

**QJ.** Are you, or any of your immediate family members or close personal friends CURRENTLY employed by or have any affiliation with the media?

|  | D.C. | Atlanta |
|---|---|---|
| No | 100% | 100% |
| Yes/Don't know ─────────────▶ | TERMINATE | TERMINATE |

**Q1.** Are you aware or not aware of the demonstrations that took place at the Capitol on January 6, 2021?

|  |  | D.C. | Atlanta |
|---|---|---|---|
| Aware |  | 99% | 93% |
| Not aware |  | 1 | 7 |
| VOL: | (Refused) | - | - |

| Select Litigation | SL 3582-3 | District of Columbia and Atlanta Division of Northern District of Georgia | Page 2/4 |

**Q2.** Do you have an unfavorable or favorable opinion of the people arrested for participating in the events at the U.S. Capitol on January 6?

| | | D.C. | Atlanta |
|---|---|---|---|
| | Favorable | 6% | 18% |
| | Unfavorable | 84 | 54 |
| VOL: | (Mixed) | 4 | 16 |
| VOL: | (Don't know/Refused) | 6 | 12 |

**Q3.** Are you aware or not aware that several hundred people were arrested on charges related to those demonstrations?

| | | D.C. | Atlanta |
|---|---|---|---|
| | Aware | 93% | 87% |
| | Not aware | 6 | 13 |
| VOL: | (Refused) | 1 | * |

**Q4.** From what you have heard or read, do you think the people who were arrested for activities related to those demonstrations are guilty or not guilty of the charges brought against them?

| | | D.C. | Atlanta |
|---|---|---|---|
| | Guilty | 71% | 54% |
| | Not guilty | 3 | 10 |
| VOL: | (Depends) | 16 | 19 |
| VOL: | (Don't know/Refused) | 10 | 17 |

**Q5.** Assume you are on a jury for a defendant charged with crimes for his or her activities on January 6th. Are you more likely to vote that the person is guilty or not guilty of those charges?

| | | D.C. | Atlanta |
|---|---|---|---|
| | Guilty | 52% | 45% |
| | Not guilty | 2 | 9 |
| VOL: | (Depends) | 33 | 37 |
| VOL: | (Don't know/Refused) | 13 | 8 |

**Q6.** If you were a defendant charged with crimes for your activities on January 6th, do you think you would or would not get a fair trial in the District of Columbia?

| | | D.C. |
|---|---|---|
| | Would | 67% |
| | Would not | 21 |
| VOL: | (Depends) | 5 |
| VOL: | (Don't know/Refused) | 7 |

**Q7.** Do you think the defendants currently charged with crimes for their activities on January 6th will or will not get a fair trial in the District of Columbia?

| | | D.C. |
|---|---|---|
| | Will | 80% |
| | Will not | 10 |
| VOL: | (Depends) | 4 |
| VOL: | (Don't know/Refused) | 5 |

**Q8.** Since the demonstrations took place on January 6th, how much news coverage have you seen, heard, or read about the demonstrations at the Capitol, the investigations, arrests, and court proceeding of individuals involved in those demonstrations – a lot, quite a bit, some, not much, or none at all?

| | | D.C. | Atlanta |
|---|---|---|---|
| | A lot | 33% | 30% |
| | Quite a bit | 28 | 20 |
| | Some | 25 | 25 |
| | Not much | 9 | 18 |
| | None at all | 4 | 7 |
| VOL: | (Don't know/Refused) | * | * |

**Q9.** Has most of the media coverage you have seen, heard, or read suggested the defendants are likely guilty or are likely not guilty of the charges brought against them?

| | | D.C. | Atlanta |
|---|---|---|---|
| | Likely guilty | 63% | 61% |
| | Likely not guilty | 4 | 10 |
| VOL: | (Depends) | 17 | 14 |
| VOL: | (Don't know/Refused) | 16 | 16 |

**Q10.** I am going to read some descriptions of people. For each of these, tell me if you would or would not describe most of the people who were arrested for their involvement in the events on January 6th at the U.S. Capitol building using each description. Here's the first one: [READ ITEM] Would you describe, or would you not describe most of the people who were arrested for their actions on January 6th as [ITEM]?

SCRAMBLE

| | | Would | Would not | (Not sure/Don't know) | (Refused) |
|---|---|---|---|---|---|
| • Conspiracy theorists | Washington, D.C. | 70% | 15 | 13 | 2 |
| | Atlanta | 52% | 32 | 14 | 2 |
| • Criminals | Washington, D.C. | 62% | 28 | 7 | 2 |
| | Atlanta | 48% | 35 | 16 | 1 |
| • White supremacists | Washington, D.C. | 58% | 25 | 14 | 3 |
| | Atlanta | 40% | 41 | 17 | 1 |
| • Members of a violent right-wing organization | Washington, D.C. | 54% | 29 | 15 | 2 |
| | Atlanta | 39% | 41 | 18 | 2 |

| Select Litigation | SL 3582-3 | District of Columbia and Atlanta Division of Northern District of Georgia | Page 3/4 |

**Q11.** Thinking about the people who forced their way into the U.S. Capitol on January 6, 2021, tell me whether you would or would not describe their actions in the following ways. Here's the first description: **[READ ITEM]** Would you describe, or would you not describe the actions of the people who forced their way into the U.S. Capital on January 6, 2021, in that way?

| SCRAMBLE | | Would | Would not | (Not sure/Don't know) | (Refused) |
|---|---|---|---|---|---|
| • Trying to overturn the election and keep Donald Trump in power ... | Washington, D.C. | 85% | 9 | 4 | 2 |
| | Atlanta | 68% | 19 | 11 | 2 |
| • Insurrection ................................................................ | Washington, D.C. | 76% | 13 | 9 | 2 |
| | Atlanta | 55% | 27 | 15 | 3 |
| • Trying to overthrow the U.S government................................ | Washington, D.C. | 72% | 20 | 6 | 2 |
| | Atlanta | 57% | 33 | 9 | 1 |
| • A protest that went too far........................................... | Washington, D.C. | 69% | 24 | 5 | 2 |
| | Atlanta | 70% | 21 | 7 | 2 |
| • Patriotism.................................................................. | Washington, D.C. | 13% | 81 | 5 | 1 |
| | Atlanta | 25% | 63 | 12 | 1 |
| • Defending freedom....................................................... | Washington, D.C. | 10% | 86 | 3 | 2 |
| | Atlanta | 21% | 70 | 8 | 1 |

Now let's go to some final questions with a reminder that this survey is completely confidential.

**D100.** Gender.

| | D.C. | Atlanta |
|---|---|---|
| Male........................................... | 46% | 48% |
| Female ........................................ | 54 | 52 |

**D101.** What is your age?

| | | D.C. | Atlanta |
|---|---|---|---|
| | 18-24 .................................................. | 2% | 8% |
| | 25-29 .................................................. | 8 | 8 |
| | 30-34 .................................................. | 13 | 16 |
| | 35-39 .................................................. | 20 | 8 |
| | 40-44 .................................................. | 12 | 11 |
| | 45-49 .................................................. | 7 | 12 |
| | 50-54 .................................................. | 7 | 7 |
| | 55-59 .................................................. | 7 | 8 |
| | 60-64 .................................................. | 2 | 6 |
| | 65+ .................................................... | 20 | 14 |
| VOL: | (Refused)............................................ | 3 | 1 |

**D102.** What is the last grade you completed in school?

| | | D.C. | Atlanta |
|---|---|---|---|
| | Some grade school (1-8)................................ | * | 1% |
| | Some high school (9-11) ............................... | 5 | 3 |
| | Graduated high school ................................. | 8 | 14 |
| | Technical/Vocational ................................... | 2 | 6 |
| | Some college ........................................... | 13 | 18 |
| | Graduated college...................................... | 31 | 35 |
| | Graduate/Professional ................................. | 38 | 21 |
| VOL: | (Don't know/Refused)................................... | 4 | 2 |

**Q12.** And when it comes to politics, do you generally think of yourself as a Democrat, an Independent, or a Republican?

| | | D.C. | Atlanta |
|---|---|---|---|
| | Democrat................................................ | 59% | 36% |
| | Independent ............................................ | 29 | 29 |
| | Republican ............................................. | 4 | 20 |
| VOL: | (Other)................................................. | 3 | 4 |
| VOL: | (Don't know) ........................................... | 5 | 5 |

**ASK ONLY IF REGISTERED TO VOTE IN QB [QB=1]**
**Q13.** Regardless of how you feel about the parties, how are you registered to vote: as a Democrat, an Independent, or a Republican?

| | | D.C. |
|---|---|---|
| | Democrat................................................ | 69% |
| | Independent ............................................ | 18 |
| | Republican ............................................. | 4 |
| VOL: | (Other)................................................. | 2 |
| VOL: | (Don't know) ........................................... | 6 |
| | NOT REGISTERED ........................................ | 1 |

Select Litigation       SL 3582-3        District of Columbia and Atlanta Division of Northern District of Georgia        Page 4/4

**RESUME ASKING ALL RESPONDENTS**

D300. And just to make sure we have a representative sample of voters, could you please tell me your race? **[IF NECESSARY]** Well, most people consider themselves black or white?

|  |  | D.C. | Atlanta |
|---|---|---|---|
|  | Black | 44% | 41% |
|  | White | 43 | 41 |
| VOL: | (Other) | 8 | 14 |
| VOL: | (Don't know/Refused) | 4 | 4 |

D301. Do you consider yourself a Hispanic, Latino, or Spanish-speaking American?

|  |  | D.C. | Atlanta |
|---|---|---|---|
|  | Yes | 6% | 11% |
|  | No | 91 | 86 |
| VOL: | (Don't know/Refused) | 3 | 3 |

Thank you for taking the time to complete this interview.

# Appendix B
# Report Provided By
# News Exposure

## Index

B-1.    Broadcast Data Table
B-2.    Broadcast Data – Coverage Over Time
B-3.    Broadcast Data – Charts & Graphs (Impressions/Publicity Value)
B-4.    Web Data Table
B-5.    Web Data – Coverage Over Time
B-6.    Web Data – Charts & Graphs (Impressions/Publicity Value)
B-7.    Print Data Table
B-8.    Print Data – Coverage Over Time

# B-1: Broadcast Data Table

| January 6th Project - Broadcast | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Stories/Hits** | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
| Atlanta | 1,090 | 369 | 394 | 202 | 305 | 195 | 234 | 92 | 226 | 135 | 173 | 290 | 300 | **4,005** |
| D.C. | 1,260 | 874 | 616 | 523 | 549 | 388 | 561 | 356 | 533 | 423 | 473 | 444 | 310 | **7,300** |
| **Impressions** | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
| Atlanta | 53,433,525 | 19,245,682 | 17,361,862 | 9,849,990 | 13,709,287 | 9,424,368 | 10,810,099 | 3,325,521 | 10,413,013 | 4,525,155 | 6,224,636 | 11,516,021 | 11,352,754 | **181,191,913** |
| D.C. | 49,674,375 | 33,296,693 | 23,175,453 | 18,762,475 | 22,269,773 | 14,788,074 | 20,188,274 | 13,978,000 | 18,628,333 | 17,761,234 | 20,246,625 | 17,847,052 | 14,579,659 | **285,196,020** |
| **AD Value** | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
| Atlanta | 2,912,232 | 1,140,827 | 1,258,297 | 613,390 | 865,057 | 413,673 | 573,568 | 260,514 | 603,059 | 351,116 | 450,772 | 1,055,785 | 1,180,513 | **11,678,804** |
| D.C. | 3,839,977 | 1,859,177 | 1,402,766 | 1,299,534 | 1,469,772 | 1,203,665 | 1,365,284 | 760,834 | 1,082,430 | 985,874 | 1,421,944 | 1,567,187 | 1,245,426 | **19,504,270** |
| **PUB VALUE** | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
| Atlanta | 8,736,695 | 3,422,481 | 3,774,892 | 1,840,171 | 2,595,172 | 1,241,018 | 1,720,703 | 781,542 | 1,809,178 | 1,063,349 | 1,352,315 | 3,167,356 | 3,541,540 | **35,036,412** |
| D.C. | 11,519,931 | 5,577,530 | 4,208,298 | 3,899,803 | 4,409,315 | 3,610,996 | 4,095,852 | 2,282,503 | 3,247,290 | 2,957,622 | 4,285,832 | 4,701,561 | 3,736,277 | **54,776,533** |

# B-2. Broadcast Data – Coverage Over Time



# B-3: Broadcast Data – Charts & Graphs (Impressions/Publicity Value)



# B-4: Web Data Table

**January 6th Project - Web**

| Stories/Hits | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 1,090 | 369 | 394 | 202 | 305 | 195 | 234 | 92 | 226 | 135 | 173 | 290 | 300 | 4,005 |
| D.C. | 1,250 | 874 | 616 | 523 | 549 | 388 | 561 | 356 | 533 | 423 | 473 | 444 | 310 | 7,300 |

| Impressions | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 53,433,525 | 19,245,682 | 17,361,862 | 9,849,990 | 13,709,287 | 9,424,368 | 10,810,099 | 3,325,521 | 10,413,013 | 4,525,155 | 6,224,636 | 11,516,021 | 11,352,754 | 181,191,913 |
| D.C. | 49,674,375 | 33,296,693 | 23,175,453 | 18,762,475 | 22,269,773 | 14,788,074 | 20,188,274 | 13,978,000 | 18,628,333 | 17,761,234 | 20,246,625 | 17,847,052 | 14,579,659 | 285,196,020 |

| AD Value | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 2,912,232 | 1,140,827 | 1,258,297 | 613,390 | 865,057 | 413,673 | 573,568 | 260,514 | 603,059 | 351,116 | 450,772 | 1,055,785 | 1,180,513 | 11,678,804 |
| D.C. | 3,839,977 | 1,859,177 | 1,402,766 | 1,299,934 | 1,469,772 | 1,203,665 | 1,365,284 | 760,834 | 1,082,430 | 985,874 | 1,421,944 | 1,567,187 | 1,245,426 | 19,504,270 |

| PUB VALUE | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 8,736,695 | 3,422,481 | 3,774,892 | 1,840,171 | 2,595,172 | 1,241,018 | 1,720,703 | 781,542 | 1,809,178 | 1,053,349 | 1,352,315 | 3,167,356 | 3,541,540 | 35,036,412 |
| D.C. | 11,519,931 | 5,577,530 | 4,208,298 | 3,899,803 | 4,409,315 | 3,610,996 | 4,095,852 | 2,282,503 | 3,247,290 | 2,957,622 | 4,285,832 | 4,701,561 | 3,736,277 | 54,776,533 |

## B-5: Web Data _ Coverage Over Time



# B-6: Web Data – Charts & Graphs (Impressions/Publicity Value)

Case 1:21-cr-00208-APM   Document 49-1   Filed 02/09/22   Page 23 of 25



# B-7: Print Data Table

**January 6th Project - Print**

| Stories/Hits | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 65 | 35 | 41 | 9 | 10 | 18 | 24 | 20 | 29 | 26 | 10 | 9 | 7 | 303 |
| D.C. | 87 | 30 | 24 | 10 | 6 | 57 | 63 | 21 | 33 | 13 | 60 | 47 | 86 | 537 |

| Impressions | January | February | March | April | May | June | July | August | September | October | November | December | January 2022 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta | 7,476,150 | 4,186,644 | 1,943,799 | 897,138 | 598,092 | 598,092 | 299,046 | | | | | | 1,046,661 | 17,045,622 |
| D.C. | 15,600,600 | 6,500,250 | 5,400,300 | 3,500,000 | 2,600,000 | 13,500,000 | 15,600,000 | 6,700,150 | 7,900,500 | 4,250,000 | 14,900,500 | 11,750,100 | 14,600,500 | 122,802,900 |

# B-8. Print Data – Coverage Over Time



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No.  21-cr-208 (APM)** |
| | : | |
| **THOMAS WEBSTER,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>NOTICE OF APPEARANCE</u>

The United States of America, by and through its undersigned counsel, the United States

Attorney for the District of Columbia, herby informs the Court that Trial Attorney, Detailee

Katherine Nielsen is entering her appearance in this matter on behalf of the United States.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052


_____*/s/ Katherine Nielsen*_____
KATHERINE NIELSEN
Trial Attorney, Detailee
United States Attorney's Office
District of Columbia
D.C. Bar No. 491879
555 4th Street, N.W.
Washington, D.C.  20530
Telephone: (202) 355-5736
Email: Katherine.Nielsen@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 11th day of February, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

_____*/s/ Katherine Nielsen*_____
Katherine Nielsen
Trial Attorney, Detailee

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **CASE NO. 21-cr-208 (APM)** |
| **v.** | **:** | |
| | **:** | |
| **THOMAS WEBSTER,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO TRANSFER VENUE

Defendant Thomas Webster, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to another district. Webster fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

On January 6, 2021, Webster joined a group of rioters outside police barricades on the west side of the U.S. Capitol building. Webster yelled aggressively at police officers and repeatedly swung a metal flagpole toward Metropolitan Police Department Officer N.R. ECF No. 1-1, at 2-

1

**-57-**

5.  After Officer N.R. managed to wrest the flagpole away from Webster's grip, Webster charged through the metal barricade, tackled Officer N.R. to the ground, and tried to remove Officer N.R.'s face shield and gas mask.  *Id.* at 5-7.

Based on his actions on January 6, 2021, Webster was charged with assaulting, resisting, or impeding an officer or employee of the United States using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); obstructing, impeding, and interfering with a law enforcement officer during the commission of a civil disorder, in violation of 18 U.S.C. § 231(a)(3); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); disorderly conduct within the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(D); and committing an act of physical violence within the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).  ECF No. 6 (Indictment).

Webster now moves for a change of venue.  ECF No. 49.  He contends that prejudice should be presumed in this district for four primary reasons: (1) the number of federal employees living and working with the District of Columbia, (2) the political makeup of the District of Columbia jury pool; (3) the results of a survey conducted by Select Litigation, and (4) pretrial publicity surrounding the events of January 6.  Each of Webster's arguments is without merit, and his motion should be denied.

**ARGUMENT**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

I.    **The Number of Federal Employees Who Reside in the District of Columbia Does Not Support a Presumption of Prejudice.**

Webster argues that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family

members.  ECF No. 49, at 4.  But he does not explain how merely being "closely connected to the Federal Government" would render a person incapable of serving as an impartial juror.  *Id.* Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly affected.  Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture at the time.  And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote.  There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case.  *See United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government.  Webster states that, "[a]s of 2019, there were approximately 200,000 Federal employees . . . living and working in the District."  ECF No. 49, at 4.  But many federal employees who work in the District live outside the District and would not be part of the jury pool.  And the District has approximately 700,000 residents.  Thus, even if every federal employee was disqualified, the Court would be able to pick a jury in this District.

## II.    The District of Columbia's Political Makeup Does Not Support a Presumption of Prejudice.

Webster contends that he cannot obtain a fair trial in the District of Columbia because of the "lopsided political makeup of the District."  ECF No. 49, at 7.  The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change

was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."  *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here.  To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims.  But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire.  This Court should not presume that every member of a particular political party is biased simply because this case has a political connection.  Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895).  The same is true here.  The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing

its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried in the District. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020). Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone." 2020 WL 1892360, at *30-31. Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

**III. The Select Litigation Poll Does Not Support a Presumption of Prejudice.**

Webster also relies on a poll conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia. ECF No. 49-1. Select Litigation conducted a telephone poll of potential jurors in the District of Columbia and in the Atlanta Division of the Northern District of Georgia and contracted with a media research firm to analyze news media coverage of January 6 in both of those jurisdictions.

Contrary to Webster's contention, the Select Litigation poll does not support a presumption of prejudice in this District. For one thing, the poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C. The number

of respondents who had seen "[a] lot" of coverage in each jurisdiction differed only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin of error. ECF No. 49-1, at 1-2, 14. The number of respondents who had seen "[s]ome" coverage was exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of coverage was not significantly different (28% in D.C. versus 20% in Atlanta). *Id.* at 14. The total percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news coverage was 86% in Washington, D.C. and 75% in Atlanta. *Id.* at 14. This relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

Webster points out (ECF No. 49, at 6) that 71% of respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of the charges brought against them. *See* ECF No. 49-1, at 14. The survey failed, however, to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area. *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion."). The survey instead gave respondents a binary choice between "guilty or not guilty." ECF No. 49-1, at 14. Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused." *Id.* This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice. In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to

the 71% here.  *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part).  But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both "No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion."  *Id.* at 178 n.2.  The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know."  *Id.*  Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty."  *Id.*  Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty."  ECF No. 49-1, at 14 (Questions 3, 4).

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty."  Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty."  ECF No. 49-1, at 14.  In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused."  *Id.*  Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know."  This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

Webster points out (ECF No. 49, at 5) that, according to the Select Litigation poll, 84% of

D.C. respondents had an "unfavorable" view of "people arrested for participating in the events at the U.S. Capitol on January 6." ECF No. 49-1, at 14. Although that is higher than the 54% of Atlantans with unfavorable views, it is quite similar to the results of a nationwide CBS poll, which found that 83% of respondents "[s]omewhat disapprove" or "[s]trongly disapprove" of the "actions taken by the people who forced their way into the U.S. Capitol on January 6." *See* CBS News Poll, December 27-30, 2021, Question 2, https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view. Webster has not asked to be tried in Atlanta and has not, in fact, requested transfer to any specific venue. And, in any event, the fact that many D.C. residents have a generally "unfavorable" view of people "arrested" on January 6 does not mean that an impartial jury cannot be selected in this jurisdiction.

Webster also points out (ECF No. 49, at 6) that 62% of D.C. respondents (compared to 48% of Atlanta respondents) would describe "most of the people who were arrested for their involvement in the events on January 6th" as "criminals." ECF No. 49-1, at 14 (Question 10). The answers to this question likely reflect the commonly held view that most people arrested for crimes are in fact guilty of those crimes. But the fact that 62% of D.C. respondents expressed this off-the-cuff view about "most" of the 700-plus January 6th arrestees does not demonstrate that all of those respondents would be unable to impartially find the facts in a specific case after being properly instructed by the Court. Moreover, the question demonstrates that fully 28% of D.C. respondents would *not* describe those arrestees as criminals, and 9% were unsure or refused to answer. ECF No. 49-1, at 14. And the 14% difference between D.C. and Atlanta—which could easily be explained by demographic differences such as age and education levels (*see* ECF No. 49-1, at 15)—would not justify the conclusion that this is an "extreme case" in which a change of venue is required. *Skilling*, 561 U.S. at 381.

**-65-**

Nor should prejudice be presumed because a substantial numbers of respondents "would" describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the election and keep Donald Trump in power" (85%), engaging in "[i]nsurrection" (76%), or "[t]rying to overthrow the U.S. government" (72%). ECF No. 49, at 6; ECF No. 49-1, at 15. For one thing, the poll did not provide an "undecided" option but asked only whether respondents "would" or "would not" use those descriptions. *Id.* For another, the question did not define the offenses of "insurrection" or advocating the overthrow of government, *see* 18 U.S.C. §§ 2383, 2385, offenses with which no defendant has been charged in connection with January 6. And, most importantly, the poll did not answer the key question: whether a sufficient number of prospective jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of prejudice where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box"). In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C. *Skilling*, 561 U.S. at 382.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

IV.   **The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

Webster also contends that prejudice should be presumed based on pretrial publicity.  ECF No. 49, at 7-10.  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).   In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine

11

**-67-**

a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers

could not reasonably be expected to shut from sight." *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).  And contrary to Webster's contention, those factors do not support a presumption of prejudice in this case.

### A.      Size and characteristics of the community

Webster suggests that an impartial jury cannot be found in Washington, D.C. because its population is "under 700,000." ECF No. 49, at 4.  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

**B.      Nature of the pretrial publicity**

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Webster points out that his case has received significant media coverage and that he has been called the "eye gouger," even though the government has not alleged that he tried to gouge the victim police officer's eyes.  ECF No. 49, at 8-9 & n.7.  But even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice.  As in *Skilling* and *Haldeman*, the news coverage of Webster is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession."  *Id.*   Indeed, although the media characterizations of Webster would be inadmissible, the photos and videos of Webster that have been disseminated would be both admissible and highly relevant at trial.  *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial.  Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

Webster asserts that "it is impossible for a prospective juror from this District to be truly fair and impartial" because "District of Columbia residents have been inundated with news coverage about January 6th."  ECF No. 49, at 9-10.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a comparatively small

percentage of the news coverage of January 6 has focused on Webster himself.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 775 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest).  As the Select Litigation poll demonstrates, the number of potential jurors exposed to "[a] lot" of news coverage of January 6 differs only slightly between Washington, D.C. (33%) and Atlanta (30%).  ECF No. 49-1, at 14 (Question 8).  Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

## C.      Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial."  *Skilling*, 561 U.S. at 383.  In this case, 13 months have already elapsed since the events of January 6, and more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although Webster is correct that January 6 continues to be in the news, ECF No. 49, at 10, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, only a relatively small percentage of the recent stories have mentioned Webster

himself, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

### D.    The jury verdict

Because Webster has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors support Webster's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

### <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _____*/s/ Hava Mirell*
HAVA MIRELL
Assistant United States Attorney, Detailee
United States Attorney's Office
District of Columbia
CA Bar No. 311098
555 4th Street, N.W.
Washington, D.C. 20530
(213) 894-0717
Hava.Mirell@usdoj.gov

16

_____ /s/ Katherine Nielsen
KATHERINE NIELSEN
Trial Attorney, Detailee
United States Attorney's Office
District of Columbia
D.C. Bar No. 491879
555 4th Street, N.W.
Washington, D.C. 20530
(202) 355-5736
Katherine.Nielsen@usdoj.gov

_____ /s/ Brian P. Kelly
BRIAN P. KELLY
Assistant United States Attorney
United States Attorney's Office
District of Columbia
D.C. Bar No. 983689
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7503
Brian.Kelly3@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-208 (APM)** |
| **v.** | : | |
| | : | |
| **THOMAS WEBSTER,** | : | <u>**UNDER SEAL**</u> |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MOTION *IN LIMINE*
### TO PRECLUDE OR LIMIT CROSS EXAMINATION
### <u>OF OFFICER NOAH RAHTBUN AND EXCLUDE EVIDENCE</u>

The United States of America respectfully files this motion *in limine* for entry by this Court of an order precluding or limiting the cross examination of Metropolitan Police Department Officer Rathbun, who is expected to testify at trial as the victim in this case. The government also seeks to exclude evidence pertaining to a May 24, 2021, shooting incident involving Officer Rathbun, and a pending use of force investigation related to that incident. The government relies on the points and authorities summarized below and any arguments that may be made at a hearing on this matter.[1]

### <u>BACKGROUND</u>

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol

---

[1] The government conducts a search for potential *Giglio* information for law enforcement witnesses within approximately 14 days of the scheduled start of the trial. Accordingly, the government may seek to file a similar motion *in limine* closer to the trial date of April 25, 2022, should additional potential *Giglio* material be discovered, or should the status of any pending investigation change.

building. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

On January 6, 2021, at approximately 2:28 pm EST, defendant Thomas Webster ("Webster") joined a group of rioters outside police barricades on the west side of the U.S. Capitol building. Webster went straight to the barricades directly in front of Officer Rathbun, yelled aggressively at Officer Rathbun and other police officers, and repeatedly swung a metal flagpole at Officer Rathbun. ECF No. 1-1, at 2–5. After Officer Rathbun managed to wrest the flagpole away from Webster's grip, Webster charged through the metal barricade, tackled Officer Rathbun to the ground, and tried to remove Officer Rathbun's helmet and gas mask, choking him. *Id.* at 5–7.

Based on his actions on January 6, 2021, Webster was charged with assaulting, resisting, or impeding an officer or employee of the United States using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); obstructing, impeding, and interfering with a law enforcement officer during the commission of a civil disorder, in violation of 18 U.S.C. § 231(a)(3); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); disorderly conduct within the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(D); and committing an act of physical violence within the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). ECF No. 39 (Superseding Indictment).

2

At trial, the government anticipates calling Officer Rathbun to testify. As part of satisfying the government's obligations to disclose potential impeachment materials pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), the government has access to the Metropolitan Police Department ("MPD") "Personnel Performance Management System (PPMS)," which documents incidents of alleged and sustained misconduct by individual officers. Similarly, the United States Attorney's Office maintains its own records of potentially impeachable conduct against individual police officers across multiple police agencies that operate in the District of Columbia.

It is the policy of the United States Attorney's Office to generate a PPMS report for each MPD officer who may testify at trial, and to disclose to the defense all information related to incidents of alleged misconduct, whether or not they constitute impeachable material: (1) that were pending against an individual officer at the time of the charged offense up through the present, even if the allegations were resolved favorably prior to the officer's testimony; and (2) any sustained findings of misconduct, whenever committed, regardless of whether they may constitute impeachable material. The instant motion only addresses those incidents of misconduct for which there appears to be at least a colorable claim of impeachment value, or that the government anticipates the defense might intend to seek to use to impeach Officer Rathbun.[2]

---

[2] The government assumes the defense will not seek to admit evidence of or cross examine Officer Rathbun on the following incidents that are either now closed and were not sustained, or are closed and sustained, but do not bear on veracity. Should defense counsel indicate otherwise in a response to this motion, the government will address those assertions in any reply or supplementary brief: (1) Incident #21003520, involving a vehicle accident determined to be non-preventable; (2) Incidents #21002338 and #17002190, involving vehicle accidents determined to be preventable; (3) Incident #21001013, involving a citizen complaint that MPD officers refused to arrest an individual who had threatened the citizen, where the complaint was deemed to be unfounded; and (4) Incident #20003033, involving a citizen complaint that MPD officers were not wearing masks, where Officer Rathbun was exonerated.

## I. Pending Investigations.

### A.    Incident #21001259 – Use of Force

On May 24, 2021, Officer Rathbun responded to an active kidnapping situation where he discharged his service weapon after the alleged armed kidnapper pointed a rifle at him, resulting in the suspect's death.[3] The United States Attorney's Office reviews all police-involved fatalities to determine whether sufficient evidence exists to conclude that any officers violated either federal criminal civil rights laws or District of Columbia law. On November 29, 2021, the United States Attorney's Office formally declined to prosecute Officer Rathbun in connection with the incident. As is also standard practice in such cases, the Metropolitan Police Department opened an administrative investigation into Officer Rathbun's use of force. As of today, the administrative use of force investigation is ongoing.

## II. Sustained Incidents of Alleged Misconduct.

### A.    Incident #21003630 – Body-Worn Camera Policy

In connection with the aforementioned shooting incident, an investigation found that Officer Rathbun activated his body-worn camera ("BWC") late and after making contact with the suspect.[4]

---

[3] For further discussion of the facts of the incident, *see* https://www.justice.gov/usao-dc/pr/us-attorney-s-office-concludes-investigation-fatal-shooting-southeast-washington (last visited March 11, 2022).

[4] This administrative investigation was still pending when the government disclosed Officer Rathbun's PPMS report to the defense on February 17, 2022. The government performed a *Giglio* check for purposes of this motion and determined that the investigation was recently closed.

B.    Incident #18004618 – Body-Worn Camera Policy

The alleged incident occurred on November 21, 2018.  An investigation found that Officer Rathbun activated his BWC late when responding to a forced entry investigation and did not have a full two-minute buffer at the beginning of his BWC video.  Officer Rathbun was sanctioned with a PD-750, a disciplinary letter placed in his personnel file.

C.    Incident #18002844 – Use of Force

The alleged incident occurred on August 6, 2018.  The original investigation involved a use of force whereby Officer Rathbun and other MPD officers conducted a tactical takedown of a suspect after the suspect struck one of the officers.  The use of force was determined to be justified within departmental policy.  Officer Rathbun, however, was found to have used insolent language in violation of a general order instructing officers to refrain from harsh, violent, coarse, profane, sarcastic, or insolent language.  Officer Rathbun was sanctioned with corrective action, through education-based development and policy review.

## ARGUMENT

"The Sixth Amendment's Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'"  *Crawford v. Washington*, 541 U.S. 36, 42, 124 S. Ct. 1354 (2004).  The Sixth Amendment "guarantees a defendant the right to cross-examine the witnesses against him or her, and it is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'"  *United States v. Wilson*, 605 F.3d 985, 1003 (D.C. Cir. 2010) (citation omitted); *see also United States v. Young*, No. 12-CR-00042 (BAH), 2013 WL 12430555, at *2 (D.D.C. Apr. 22, 2013).  Probing the motivation of a witness for testifying is an important aspect of the right to confrontation.  *Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S. Ct. 1105 (1974) ("[T]he exposure of

5

a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.").

A defendant's right to conduct cross examination is not, however, unfettered. "Despite the guarantees of the Sixth Amendment's Confrontation [C]lause, 'the district court nonetheless has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses.'" *United States v. Watson*, 409 F.3d 458, 462-63 (D.C. Cir. 2005) (quoting *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004)). "'It must be cautious, however, particularly where a party is seeking to impeach a witness whose credibility could have an important influence on the outcome of the trial.'" *Id.* at 463 (quoting *Whitmore*, 359 F.3d at 615-16); *United States v. Hall*, 613 F.3d 249, 255 (D.C. Cir. 2010) ("This Sixth Amendment right, however, does not require a trial court to permit unlimited cross-examination by defense counsel, but rather requires the court to give a defendant a realistic opportunity to ferret out a potential source of bias.") (citations and internal quotation marks omitted). In deciding the boundaries of cross examination, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Del. v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431 (1986); *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); Fed. R. Evid. 611 ("The court should exercise reasonable control . . . so as to . . . avoid wasting time; and [] protect witnesses from harassment or undue embarrassment.").

6

I.  **Cross Examination of Officer Rathbun and/or the Introduction of Evidence Pertaining to the May 2021 Shooting Incident and Related Pending Use of Force Investigation Should be Prohibited Because the Shooting Incident and Related Investigation Do Not Implicate Officer Rathbun's Veracity, Are Not Relevant, and Are Unduly Prejudicial.**

A.  The May 2021 Shooting Incident and Related Use of Force Investigation are Inadmissible Under Rule 608.

Under Rule 608(b), specific instances of misconduct can be inquired into on cross examination of a witness for the purpose of attacking his credibility if those instances are probative of truthfulness or untruthfulness and are not remote in time. *See* Fed. R. Evid. 608, advisory committee notes. Questions about specific instances of misconduct that have no bearing on a witness's truthfulness, however, are not permitted under Rule 608. *United States v. McCallum,* 885 F. Supp. 2d 105, 110 (D.D.C. 2012); *see United States v. Powell,* 86 Fed. App'x. 612, 615 (4th Cir. 2004) (upholding the district court's refusal to permit defense counsel to cross examine a witness about witness's termination because nothing in witness's personnel file reflected upon the witness's veracity); *see also United States v. Beltran-Garcia,* 338 Fed. App'x 765, 768 (4th Cir. 2009) (upholding the district court's refusal to permit defense counsel to cross examine a witness about his resignation from a police department five years earlier after allegations of misconduct arising from improper arrest and illegal search were sustained against him, and finding that evidence was properly excluded because the misconduct occurred five years prior to the defendant's arrest, had no bearing on the officer's veracity, and was not relevant to the charges against the defendant).

The sole pending investigation involving Officer Rathbun stems from the discharge of his service weapon on May 24, 2021 in response to an active kidnapping involving an armed suspect who was allegedly pointing a rifle at the officer, resulting in the suspect's death. That investigation has not been sustained, nor does it have any bearing on Officer Rathbun's character for truthfulness

7

or untruthfulness. And even if it were to be sustained, as the D.C. Circuit has recognized, "[a]cts of violence . . . which may result from a short temper, a combative nature, extreme provocation, or other causes, generally have little or no direct bearing on honesty and veracity." *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967). This is indeed "a classic illustration of a case in which the prejudicial effect of impeachment far outweighs the probative relevance of the prior conviction to the issue of credibility." *Jones v. United States*, 402 F.2d 639, 643 (D.C. Cir. 1968) (citing *Brown v. United States*, 370 F.2d 242, 245 (D.C. Cir. 1966)) (internal quotations omitted); *see also United States v. Harris*, 551 F. App'x 699, 705–06 (4th Cir. 2014) (upholding trial court's decision to preclude defense cross-examination of police officer based upon disciplinary records showing excessive use of force as not bearing on truthfulness); *United States v. Seymour*, 472 F.3d 969, 970 (7th Cir. 2007) (same).

Ordinarily a witness may not be impeached as to credibility by producing extrinsic evidence of prior instances of misconduct short of conviction. *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C. Cir. 1976). In this case, there is no conviction or finding of misconduct, but merely an investigation into the alleged conduct that post-dates the offenses at issue in the instant case. Additionally, the facts of those allegations themselves do not implicate Officer Rathbun's character for truthfulness.[5]

B.  The May 2021 Shooting Incident and Related Use of Force Investigation are Inadmissible Under Rules 401 and 402.

Furthermore, the evidence relating to the May 2021 shooting incident and related use of force investigation is not relevant to the instant case, and therefore is also inadmissible under Fed. R. Evid. 402. Rule 402 states that "[a]ll relevant evidence is admissible," but "[i]rrelevant evidence is not." None of the evidence concerning the May 2021 shooting incident has a "tendency

---

[5] Possible testimonial bias is discussed *infra*.

to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401. Accordingly, since evidence relating to the shooting incident has no bearing on Officer Rathbun's credibility or bias, and is not otherwise relevant, it should be excluded. *See United States v. Bagcho*, 151 F. Supp. 3d 60, 72 (D.C. Cir. 2015) (holding that extrinsic evidence is not admissible to impeach a witness's general credibility); *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C. Cir. 1976) ("[A] witness may not be impeached as to credibility by producing extrinsic evidence of prior instances of misconduct short of conviction . . . This rule stands firm enough when the question is one of impeaching the credibility of the person as a witness."). Such evidence could include, *inter alia*, BWC from the May 2021 shooting incident, police reports related to the shooting incident, and notes and reports generated in connection with the related investigations.

C.    The May 2021 Shooting Incident and Related Use of Force Investigation are Inadmissible Under Rule 404.

To the extent the defense may claim that the shooting incident could somehow bolster its self-defense theory by demonstrating either Webster's fear of death or serious injury or Officer Rathbun's propensity for violence or excessive uses of force, any such argument fails because the May 2021 shooting incident occurred well after the events of January 6, 2021. Consequently, the yet-to-occur shooting could not possibly have had any impact on Webster's state of mind when he assaulted Officer N.R, and is therefore both irrelevant under Rule 401 and inadmissible under Rule 404(b). *See, e.g.*, *United States v. Jones*, 554 F. App'x 460, 466 (6th Cir. 2014) ("It is well-recognized that a defendant's knowledge of *prior* violent acts by an alleged aggressor-turned-victim is relevant to a defendant's alleged fear in a self-defense case." (citing *United States v. Burks,* 470 F.2d 432, 434–35 (D.C. Cir. 1972) (emphasis added)); *United States v. Gregg*, 451 F.3d 930, 935 (8th Cir. 2006) ("Evidence of specific instances of a victim's prior violent conduct

9

for purposes of proving a defendant's state of mind, however, is only admissible to the extent a defendant establishes knowledge of such prior violent conduct at the time of the conduct underlying the offense charged.").[6]

D. The May 2021 Shooting Incident and Related Use of Force Investigation are Inadmissible Under Rule 403.

Finally, the probative value, if any, of Officer Rathbun's involvement in a May 2021 fatal shooting of an armed suspect—an incident wholly unrelated to and distant from the events of January 6, 2021—is substantially outweighed by the dangers of confusing the issues, misleading the jury, and unfair prejudice. Under Rule 403, the Court may exclude even relevant evidence— which evidence of the shooting is not—"if its probative value is substantially outweighed by a danger . . . of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Consequently, the Court should preclude evidence of or cross examination about the shooting incident, which has no relevance to the instant assault case, because it will confuse the issues and unfairly prejudice the jurors against Officer Rathbun by potentially inflaming their passions and misleading them. *See Arsdall,* 475 U.S. at 679 (noting that a "trial court may impose reasonable limitations on cross examination, based upon concerns of harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant"); *United States v. Logan*, 998 F.2d 1025, 1029 (D.C. Cir. 1993) (indicating that the trial judge has a duty to ensure that both the prosecution and the defense are not placed at an unfair advantage). Allowing the defense to litigate the wholly-unrelated and irrelevant May 2021 shooting incident that remains under active

---

[6] As argued in detail in the government's Motion *In Limine* to Preclude Claims of Self-Defense, Necessity, Justification, and Duress and to Exclude Evidence in Support Thereof, the government does not believe that *any* alleged evidence of self-defense should be permitted.

administrative investigation would also confuse the jury about what is actually at issue in the instant case, by effectively creating a trial-within-a-trial.

**II.     If Cross Examination Concerning the Pending Investigation Is Not Prohibited, It Should Be Narrowly Limited to Possible Testimonial Bias.**

Courts have typically refused to permit cross examination of law enforcement witnesses regarding unsubstantiated claims of misconduct. *See United States v. McCallum*, 885 F. Supp. 2d 105, 117–18 (D.D.C. 2012) (holding that cross examination "'based on unproven allegations is impermissible.'") (quoting *United States v. Wilson*, 605 F.3d 985, 1005 (D.C. Cir. 2010)); *see also United States v. Taylor*, 417 F.3d 1176, 1178–81 (11th Cir. 2005) (denying cross examination of police officer based upon unproven citizen complaints for planting evidence, which had been determined to be unfounded by internal affairs department). Here, the use of force allegations regarding Officer Rathbun's May 2021 shooting incident have not been substantiated. To the contrary, the United States Attorney's Office has formally declined to prosecute Officer Rathbun, thereby mitigating the risk that Officer Rathbun would attempt to use his testimony to curry favor with the government. Though an administrative investigation into the May 2021 shooting incident is still pending, judges in this District have held that "the existence of . . . pending internal investigations far removed from the facts of the underlying case generally are not relevant to show bias." *United States v. Dorn*, Crim. No. 05-13 (CKK), 2006 U.S. Dist. LEXIS 102044, at *12 (D.D.C. Mar. 2, 2006). This is particularly so where, as here, the facts underlying the pending investigation have no bearing on the witness's character for truthfulness or untruthfulness and have no relation to the facts that will be presented at trial.

Even if this Court were to permit some cross examination into the pending investigation, it should be narrowly limited to the fact of the existence of the investigation (assuming it is still pending at the time of trial), rather than the subject matter of that investigation. *See, e.g., United*

11

*States v. Wilson*, 605 F.3d 985, 1006 (D.C. Cir. 2010) ("[I]t is difficult to understand how the subject matter, rather than the fact of the existence of the investigation, would have assisted in portraying [the witness] as biased."). Specifically, such questioning, if any, should be limited to: (1) whether Officer Rathbun is aware of the investigation; (2) whether he believes he is a subject or target of that investigation; and (3) the potential penalties or consequences he believes he would face as a result of the investigation, whether criminally or related to his employment. Beyond that, however, for the reasons discussed *supra*, the underlying facts of the May 2021 shooting incident and related use of force investigation have no bearing on Officer Rathbun's truthfulness, are not relevant, and would create a substantial risk of prejudice and confusion were the Court to permit a mini-trial into the unrelated shooting incident.

The case of *United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010), is particularly instructive on the permissible amount of cross examination of an officer facing investigation. In *Wilson*, the government disclosed the existence of an ongoing investigation into an officer witness during trial, indicating that the officer had been suspended by the Internal Affairs Division. The trial court held that the subject matter of the investigation was of limited relevance to the officer's credibility or bias, but directed the government to disclose the status of the officer to the defense. *Id.* at 1004. The D.C. Circuit held that, even if the defense had sought to impeach the officer on the subject matter of the investigation pursuant to Federal Rule of Evidence 608(b), "the district court would properly have ruled such cross-examination improper because the subject matter of the internal investigation . . . would not have been probative of [the officer's] truthfulness." *Id.* at 1005.[7] The existence of the investigation itself, rather than the subject matter of the investigation,

---

[7] Fed. R. Evid. 608(a) allows a party to attack the credibility of a witness through reputation and opinion evidence of his character for truthfulness. *See United States v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004). However, Rule 608(b) leaves the trial judge with broad discretion to limit

was what provided the potential motive to curry favor with the government. *Id.* at 1006. Furthermore, even assuming information about the subject matter of the investigation could be probative of bias, the Court found "the district court would properly have excluded cross-examination pursuant to Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice." *Id.* (citing Fed. R. Evid. 403) (internal quotations omitted). The Court agreed with the trial court's assessment that the "prejudice to this officer given the uncertainty of the [allegations] is quite high, the prejudice to [the officer's] career and [the officer's] credibility is quite high." *Id.* And "[t]hat risk of prejudice would have substantially outweighed the minimal probative value of the evidence." *Id.*

Such is the case here. The investigation into Officer Rathbun's conduct on May 24, 2021, is still ongoing. The government has and will continue to make disclosures, if they arise, regarding any sustained findings and/or impeachment material that bears on veracity. But the prejudice to Officer Rathbun and to the government's case is tremendous if cross examination is permitted and a mini-trial on the use of force is permitted in this case. *See United States v. Lewis*, 284 F. App'x 940, 942–43 (3d Cir. 2008) (affirming trial court's limitations on cross examination of officer regarding the facts surrounding prior use of force allegations).

Ultimately, even if the investigation were to conclude that Officer Rathbun's use of force was unjustified, the facts underpinning the investigation are irrelevant and do not help the jury to carefully weigh Officer Rathbun's credibility. Rather, the value to the defense is one of an

---

such questioning, such that prior instances of specific conduct "may" be inquired of "in the discretion of the court, if probative of *truthfulness or untruthfulness*." *United States v. Holt*, 486 F.3d 997, 1002 (7th Cir. 2007) (emphasis added) (limiting questioning of police officer to exclude such extrinsic evidence regarding prior suspension in order to prove officer's character for truthfulness); *see also United States v. Beltran-Garcia*, 338 F. App'x 765, 772 (10th Cir. 2009) (discussing Rule 608 and explaining that "[t]he restrictions in Rule 608 exist to prevent mini-trials on side issues that make it more difficult for the jury to render an impartial decision").

inflammatory nature—Officer Rathbun is alleged to be a bad or aggressive officer, so the jury should discount his testimony. This inference is patently impermissible. *See, e.g.*, *United States v. Beltran-Garcia*, 338 F. App'x 765, 772 (10th Cir. 2009) (trial court's exclusion of cross examination regarding prior misconduct appropriate under Rule 608 where "the details of the allegations, if admitted in the course of questioning, could improperly prejudice the jury against [the officer] based on his lack of judgment instead of his character for truthfulness").

**III.     The Sustained Violations Do Not Implicate Officer Rathbun's Veracity and Are Not Relevant**

The sustained findings of misconduct against Officer. N.R. consist of a late activation of his BWC when responding to the active armed kidnapping in the May 2021 shooting incident, a late activation of his BWC when responding to a forced entry investigation, and the use of insolent language when responding to a family disturbance during which officers executed a justified tactical takedown of a suspect who struck an officer. For the reasons discussed *supra*, evidence of or cross examination concerning those incidents or the related investigations should be excluded because they do not bear on Officer Rathbun's truthfulness or veracity, and are not relevant to the instant case.

The sustained finding concerning the allegation that Officer Rathbun activated his BWC late and after making contact with the kidnapping suspect is also irrelevant because in the instant case there is no allegation that Officer Rathbun failed to timely activate his BWC or that Webster's charged conduct was not captured. To the contrary, Officer Rathbun recorded nearly two-and-a-half hours of BWC footage on January 6, beginning with his arrival at the Capitol grounds at approximately 1:27 pm, a full hour before the events at issue in the instant case, and all the way through his leaving the Capitol at approximately 3:51 pm.

14

Finally, each incident involves conduct that is far removed in time from Officer Rathbun's involvement in this case. Accordingly, the defense should be precluded from introducing evidence of or cross examining Officer Rathbun regarding these sustained violations.

## CONCLUSION

WHEREFORE, the United States respectfully requests that the Court grant its Motion *In Limine* to Preclude or Limit Cross Examination of Officer Noah Rathbun and Exclude Evidence, regarding the May 2021 shooting incident, pending use of force investigation, and alleged misconduct discussed above, because the matters do not bear on truthfulness, are not relevant, and would result in undue prejudice, misleading and confusing the jury, and unnecessary delay.

As to the pending use of force investigation, if the Court is inclined to permit limited cross examination to explore potential testimonial bias, the United States respectfully requests an order limiting the scope of cross examination of Officer Rathbun to the fact of the existence of the investigation, whether or not he is aware of it, and what possible punishment could result from that investigation.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        /s/ Hava Mirell
HAVA MIRELL
Assistant United States Attorney, Detailee
United States Attorney's Office
District of Columbia
CA Bar No. 311098
555 4th Street, N.W.
Washington, D.C. 20530
(213) 894-0717
Hava.Mirell@usdoj.gov

           /s/ Katherine Nielsen
KATHERINE NIELSEN
Trial Attorney, Detailee
United States Attorney's Office
District of Columbia
D.C. Bar No. 491879
555 4th Street, N.W.
Washington, D.C. 20530
(202) 355-5736
Katherine.Nielsen@usdoj.gov

           /s/ Brian P. Kelly
BRIAN P. KELLY
Assistant United States Attorney
United States Attorney's Office
District of Columbia
D.C. Bar No. 983689
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7503
Brian.Kelly3@usdoj.gov

16

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-208 (APM)** |
| v. | : | |
| | : | |
| **THOMAS WEBSTER,** | : | <u>**UNDER SEAL**</u> |
| | : | |
| Defendant. | : | |

**MOTION TO SEAL GOVERNMENT'S MOTION *IN LIMINE***
**TO PRECLUDE OR LIMIT CROSS EXAMINATION**
<u>**OF OFFICER NOAH RAHTBUN AND EXCLUDE EVIDENCE**</u>

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully moves for an order to place and maintain under seal, until further Order of the Court, the Government's Motion *In Limine* to Preclude or Limit Cross Examination of Officer Noah Rathbun and Exclude Evidence ("the Motion"), this Motion to Seal and accompanying Proposed Order, any Order granting this Motion, and any Opposition and Reply briefs filed in relation to the Motion. In support thereof, the government states as follows:

1. The Motion identifies the victim in this case, Metropolitan Police Department ("MPD") Officer Noah Rathbun, and discusses his involvement in the fatal shooting of an armed suspect in May 2021, as well as the ongoing MPD Administrative Review of the shooting. The public identification of Officer Rathbun as being involved in the May 2021 shooting incident could compromise the integrity of the pending investigation into that matter and the jury trial in this case, currently scheduled to begin on April 25, 2022, and expose Officer Rathbun to unwarranted public scrutiny. The Motion also contains several references to items contained within Officer Rathbun's private personnel folder, which have been disclosed to the defense in order to satisfy the government's *Giglio* obligations, but for which there is no need for public disclosure or discussion.

1

2.     As stated in *Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1999), there is a presumption of access to Court proceedings.  But, this can be overridden if "'(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest.'"  *Id.* at 290 (quoting *Oregonian Pub. Co. v. United States Dist. Court*, 920 F.2d 1462, 1466 (9th Cir. 1990)).

3.     In this matter, the United States has a compelling interest in preserving the integrity of the upcoming jury trial.  Moreover, especially given the public interest in this case, the United States has a compelling interest in protecting the victim from exposure to unwarranted public scrutiny concerning matters that, as argued in the Motion, have no relevance to the charges against the defendant.

**WHEREFORE**, the United States respectfully requests that this Court issue an Order directing that the Clerk of the Court place and maintain under seal, until further Order of the Court, the Government's Motion *In Limine* to Preclude or Limit Cross Examination of Officer Noah Rathbun and Exclude Evidence ("the Motion"), this Motion to Seal and accompanying Proposed Order, any Order granting this Motion, and any Opposition and Reply briefs filed in relation to the Motion.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

2

By:      /s/ Hava Mirell
HAVA MIRELL
Assistant United States Attorney, Detailee
United States Attorney's Office
District of Columbia
CA Bar No. 311098
555 4th Street, N.W.
Washington, D.C. 20530
(213) 894-0717
Hava.Mirell@usdoj.gov


         /s/ Katherine Nielsen
KATHERINE NIELSEN
Trial Attorney, Detailee
United States Attorney's Office
District of Columbia
D.C. Bar No. 491879
555 4th Street, N.W.
Washington, D.C. 20530
(202) 355-5736
Katherine.Nielsen@usdoj.gov


         /s/ Brian P. Kelly
BRIAN P. KELLY
Assistant United States Attorney
United States Attorney's Office
District of Columbia
D.C. Bar No. 983689
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7503
Brian.Kelly3@usdoj.gov

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-208 (APM)** |
| v. | : | |
| | : | |
| **THOMAS WEBSTER,** | : | |
| | : | |
| Defendant. | : | |

## ORDER

This matter having come before the Court pursuant to the application of the United States to seal the Government's Motion *In Limine* to Preclude or Limit Cross Examination of Officer Noah Rathbun and Exclude Evidence, the Court finds that, because of such reasonable grounds to believe the disclosure will result in harm to the integrity of the upcoming jury trial in this case, subject the victim to unwarranted public scrutiny, and undermine a pending use of force investigation, the United States has established that a compelling governmental interest exists to justify the requested sealing.

IT IS THEREFORE ORDERED that the application is hereby GRANTED, and that the Government's Motion *In Limine* to Preclude or Limit Cross Examination of Officer Noah Rathbun and Exclude Evidence ("the Motion"), the accompanying Motion to Seal and Proposed Order, this Order, and any Opposition and Reply briefs filed in relation to the Motion, are sealed until further Order of the Court.

Date:

_____
AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 21-cr-208 (APM) |
| v. | : | |
| | : | |
| THOMAS WEBSTER, | : | |
| | : | |
| Defendant. | : | |

## JOINT PRETRIAL STATEMENT

Pursuant to the Court's Third Amended Pretrial Order, filed April 1, 2022 (ECF No. 69), the parties hereby jointly submit this pretrial statement.

## I.     Joint Statement of the Case

The government has charged the defendant, Mr. Thomas Webster, with seven crimes relating to Congress's meeting at the United States Capitol on January 6, 2021, to certify the Electoral College vote for president.

First, he is charged with assaulting, resisting, or impeding Officer N█ R█████, an officer of the Metropolitan Police Department of the District of Columbia, including while using a dangerous weapon, that is, a metal flagpole.  Second, he is charged with obstructing, impeding, or interfering with law enforcement officers during the commission of a civil disorder.  Third, he is charged with being unlawfully present on restricted Capitol grounds, including with a dangerous weapon.  Fourth, he is charged with engaging in disorderly and disruptive conduct on restricted Capitol grounds, including with a dangerous weapon.  Fifth, he is charged with engaging in physical violence on restricted Capitol grounds, including with a dangerous weapon.  Sixth, he is charged with engaging in disorderly conduct within the

1

Capitol grounds. And seventh, he is charged with committing an act of physical violence within the Capitol grounds.

Mr. Webster has pleaded not guilty to all charges.

**II.    Proposed Voir Dire Questions**

A.    Joint Proposed Voir Dire Questions

1.  [Read statement of the case.] Do you know or have you heard anything about this particular case or Mr. Webster?

2.  The government in this case is represented by Assistant United States Attorneys Hava Mirell and Brian Kelly, and Department of Justice Trial Attorney Katherine Nielsen. Also sitting with the government are FBI Special Agent Riley Palmertree and paralegal Kyle Clements. The defendant, Thomas Webster, is represented by James Monroe. Do you know any of these people?

3.  During the course of the trial, you may hear testimony from or about a number of people. The attorneys will now identify for you the names of people who may testify or about whom you may hear testimony. [Each side will introduce its witnesses by name and employment.] Do you know any of the people who have been introduced to you?

4.  Do you know or recognize any of the other potential jurors in the panel, the courtroom staff, or me?

5.  Do any of you live or work at or near the U.S. Capitol?

6.  Do you or someone you know have a direct or indirect connection to the events that occurred at the U.S. Capitol on January 6, 2021, including but not limited to having participated in or personally witnessed those events?

7. Have you closely or regularly followed the news about the events that took place at the U.S. Capitol on January 6, 2021, or the government's investigation of those events? If yes, from what sources—for example, what news programs, websites, or social media platforms—do you typically get that news?

8. Have you ever watched video of what happened at the U.S. Capitol on January 6, 2021 on the news or on the Internet? If yes, how many times have you seen videos of that event, in whole or in part, on TV or on the internet? (1 time, 2-3 times, 4-5 times, 6 or more times).

9. Have you ever watched video of this defendant from January 6, 2021 on the news or on the Internet? If yes, how many times have you seen videos of the defendant, in whole or in part, on TV or on the internet? (1 time, 2-3 times, 4-5 times, 6 or more times)

10. No matter what you have heard or seen about events at the U.S. Capitol on January 6, 2021, and no matter what opinions you may have formed, can you put all of that aside and decide this case only on the evidence you receive in court, follow the law, and decide the case in a fair and impartial manner?

11. Does anyone have such strong feelings or opinions about the events that took place at the U.S. Capitol on January 6, 2021, that it would make it difficult for you to serve as a fair and impartial juror in this case?

12. The testimony of a police officer should be treated the same as the testimony of any other witness, and the jury should not give either greater or lesser weight to the testimony of a witness simply because that witness is or was a police officer. Does anyone have such strong feelings or opinions about the police—either positive or

negative—that would make it difficult for you to treat the testimony of current or former police officers the same as for any other witness?

13. The next four questions relate to you, members of your immediate family, and close personal friends:

    a.  Does anyone in this group now work for, or previously worked for, any law enforcement agency?  This includes any police department in or outside the District, including the Metropolitan Police Department and New York City Police Department, and it includes special police officers, as well as prosecutors' offices, such as the U.S. Attorney's Office, or a State Attorney's Office.  It also includes federal law enforcement agencies like the Department of Justice, the FBI, the Secret Service, the Department of Homeland Security, the U.S. Capitol Police, and the U.S. Park Police.  And it includes any local police or sheriffs' departments.

    b.  Has any member of that group ever served in the Armed Forces?

    c.  Has any member of that group ever attended law school, worked as a lawyer, or worked in a law office?

    d.  Has any member of that group ever been arrested for, charged with, or convicted of a crime or been a victim of or witness to a crime?  If so, did you feel that you, or your family member or close friend, were treated fairly?

14. Have you, any member of your family, or close friend had any experiences with any law enforcement agency or the government that might cause you to favor or disfavor the government or law enforcement?

15. Under certain circumstances, the government can obtain authorization from a judge to search a premises or electronic media to obtain evidence including, but not limited to, emails, text messages, video recordings, letters, financial information and other materials or information. The Judge will instruct you that any evidence that is presented to you at trial was obtained legally and you can consider it. Is there any reason why you could not follow this instruction?

16. The government bears the burden of proving Mr. Webster guilty beyond a reasonable doubt, and he is presumed innocent unless and until the government meets that burden. This burden of proof never shifts to Mr. Webster, and he has no obligation to offer his own evidence. Would you have any difficulty with respecting this allocation of the burden of proof?

17. A defendant has a constitutional right not to testify, and if Mr. Webster decides not to testify, I will instruct you that you cannot hold his silence against him. Would you have any difficulty following that instruction?

18. Jurors are the sole judges of the facts, but they must follow the principles of law as I instruct. The jury may not follow some rules of law and ignore others. And even if the jury disagrees or dislikes a rule of law, or does not understand the reasons for some of the rules, it is the jury's duty to follow them. Is there any reason you would find it difficult to follow my legal instructions, whatever they may be?

19. To reach a verdict on a particular charge, every juror must agree on the verdict. That is, any verdict must be unanimous. In deliberations you must consider the opinions and points of your fellow jurors, but you must also follow your own conscience and

be personally satisfied with any verdict. Would you have difficulty expressing your

own opinions and thoughts about this case to your fellow jurors?

20. If you are selected as a juror in this case, I will instruct you to avoid all media coverage

relating to this case, including radio, television, podcasts, social media, and other

Internet sources. That is, you will be forbidden from reading any newspaper articles

about this case, listening to any radio or podcast stories about this case, or watching

any TV news about this case. You will also be forbidden from Googling this case, or

blogging, tweeting, reading, or posting comments about this case on social media sites

or anywhere else on the Internet. Do you have any reservations or concerns about your

ability or willingness to follow this instruction?

21. Today is Monday, April 25. The parties expect the presentation of evidence in this

case to conclude either at the end of this week or early next week. You will begin

deliberating after the close of evidence. Once you begin deliberating, I do not know

how long your deliberations will last. The jury will sit [Monday] through [Friday],

generally from [9:30] am to [4:30] pm. Knowing this schedule, do you have any urgent

or extremely important matter to attend to this week or next, such that serving as a

juror in this case would be an extreme hardship for you?

22. Do you have any religious, moral, or philosophical reason, or personal or political

beliefs, or is there any other reason not already mentioned, that you believe would

make it hard for you to be a fair and impartial juror in this case, or to sit in judgment of

another person?

B.    Defendant's Additional Proposed Voir Dire Questions

1.   Have you or any member of your family, or close friend ever participated in a
     public protest or demonstration?

     a.   The government objects to this proposed question.  The government
          does not believe the events of January 6 should be characterized as a
          "public protest" or "demonstration."  Moreover, whether a prospective
          juror has ever protested or demonstrated is irrelevant to this case, and
          does not go to potential bias.  The government also believes that any
          potential bias related to this question is adequately addressed through
          joint proposed question 22, above.

2.   Have you or any member of your family, or close friend ever been involved in a
     physical altercation with a member of law enforcement?

     a.   The government objects to this proposed question.  Any potential bias
          related to this question is better addressed through joint proposed
          questions 12 and 14, above.

3.   Have you or any member of your family, or close friend ever been required to
     defend yourself from an attack initiated by another individual?

     a.   The government objects to this proposed question for the same reasons
          as stated in its above objection to the defendant's proposed question
          number 2.

4.   Do you believe that you and/or the residents of the City of Washington D.C. were
     victims of the events which transpired at the U.S. Capitol on January 6, 2021?

    a. The government does not object to this proposed question, but believes that any potential bias related to this question is already adequately addressed through joint proposed questions 10, 11, and 22, above. If the Court asks this question, the government also proposes that the following language be included in between "were" and "victims": "personally."

5. Do you believe that all individuals present at the U.S. Capitol on January 6, 2021 are guilty of committing a crime?

    a. The government does not object to this proposed question, but believes that any potential bias related to this question is already adequately addressed through joint proposed questions 10, 11, 16, and 22, above. If the Court asks this question, the government also proposes that the following language be included at the end: ", regardless of their own personal actions that day?"

6. Would your opinion concerning former President Donald Trump or his supporters make it difficult for you to serve as a fair and impartial Juror in this case?

    a. The government objects to this proposed question. The government believes that any potential bias related to this question is better addressed through joint proposed questions 10, 11, and 22, above.

7. Do you belong to any Societies, Unions, Professional Associations, Political Action Organizations, Civic Clubs, Fraternities, Sororities, or other similar organizations?

    a. The government does not object to this proposed question.

C.    <u>Joint Proposed Background Questions</u>

    a. How long have you lived in the District of Columbia?

b. What is the highest level of school you completed?

c. What is your marital status?

d. Do you have children or step-children?  If so, how many, and what are their ages?

e. What is your current occupation?

    i. How long have you been at this job?

    ii. What is your current role at work?

    iii. Does your role include supervisory duties?

f. What is your spouse's occupation?

g. Are you able to read, speak, and understand the English language?

h. Do you have any trouble seeing or hearing?

i. Do you have trouble paying attention for long periods of time?

j. Do you take medication that makes it difficult for you to sit and focus for long periods of time?

k. Do you have any medical condition that would make it difficult for you to serve as a juror in this case?

l. Does jury service raise COVID-19 safety concerns for you?

m. Do you hold religious beliefs that prevent you from passing judgment on others?

n. Have you had an experience as a juror that would affect your ability to be a fair and impartial juror in this trial?

    i. When you served as a juror in a prior case, was it a criminal case or a civil case?

    ii. Did you reach a verdict?

iii.   Was there anything about your experience as a juror which would

make you not want to serve again?

o.   Have you been a party to a lawsuit or a witness who testified in court?  If so:

i.   What was the nature of the lawsuit?

ii.   What was your role in the case?

iii.   What was the result?

p.   What social media platforms do you use, how often do you use them, and what
do you use them for?

q.   How do you get your news? Please circle all that apply, and provide the
specific news source you use.

i.   Newspapers

ii.   TV

iii.   Radio

iv.   Social media

v.   Podcasts

r.   Do you use social media? If yes, what platform(s) do you use, and what do
you use them for?

s.    Have you ever filed a lawsuit, or had a lawsuit of any kind filed against you,
by anyone in court?
If the answer is yes, please indicate who brought the lawsuit, what it was about,
and the result of the lawsuit.

t.   Do you watch courtroom, law-related, or crime-related TV shows? If yes, what
do you watch?

10

u.  Do you have any opinions concerning the following which would affect
your ability to be a fair and impartial juror?

   i.  Criminal prosecutors (Yes/No)

   ii.  Criminal defense attorneys (Yes/No)

   iii.  Police officers (Yes/No)

   iv.  FBI agents (Yes/No)

   v.  The "federal government" in general (Yes/No)

If you answered "yes" to the questions above, please describe your opinions and
explain why they would interfere with your ability to be a fair and impartial
juror.

## III.   Joint Proposed Jury Instructions

Attached.

## IV.   Lists of Witnesses

Government's List of Expected Witnesses attached.

Defendant's Witness List attached.

## V.   Exhibit Lists

List of Government Exhibits attached.

Defendant's Exhibit List attached.

## VI.   Stipulations

Stipulations 701 and 705-708 attached.

**VII.    Proposed Verdict Form**

Attached.

Respectfully submitted,

For the Government:                                    For the Defendant:

MATTHEW M. GRAVES                        _____/s/_____
United States Attorney                          James E. Monroe
D.C. Bar No. 481052                             DUPEE & MONROE, P.C.
                                                          211 Main Street
By: _____/s/ Hava Mirell_____         PO Box 470
HAVA MIRELL                                    Goshen, NY 10924
Assistant United States Attorney, Detailee     845-294-8900
United States Attorney's Office               marina@dupeemonroelaw.com
District of Columbia
CA Bar No. 311098
555 4th Street, N.W.
Washington, D.C. 20530
(213) 894-0717
Hava.Mirell@usdoj.gov


_____/s/ Katherine Nielsen_____
KATHERINE NIELSEN
Trial Attorney, Detailee
United States Attorney's Office
District of Columbia
D.C. Bar No. 491879
555 4th Street, N.W.
Washington, D.C. 20530
(202) 355-5736
Katherine.Nielsen@usdoj.gov


_____/s/ Brian P. Kelly_____
BRIAN P. KELLY
Assistant United States Attorney
United States Attorney's Office
District of Columbia
D.C. Bar No. 983689
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7503
Brian.Kelly3@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 21-cr-208 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS WEBSTER,** | : | |
| | : | |
| Defendant. | : | |

**JOINT PROPOSED JURY INSTRUCTIONS**

Pursuant to the Court's April 1, 2022 Third Amended Pretrial Order, the parties hereby propose the following jury instructions, subject to issues that arise during trial.

The parties have no objection to the Pattern Criminal Jury Instructions for the District of Columbia, 2021 Release ("Redbook"), as appropriate based on the developments at trial.

**A.  Jointly Proposed Instructions**

1.  Definitions: Stipulation of Fact, Redbook 1.103(A)

2.  Furnishing the Jury with a Copy of the Instructions, Redbook 2.100

3.  Function of the Court, Redbook 2.101

4.  Function of the Jury, Redbook 2.102

5.  Jury's Recollection Controls, Redbook 2.103

6.  Evidence in the Case, Redbook 2.104

7.  Statements of Counsel, Redbook 2.105

8.  Indictment Not Evidence, Redbook 2.106

9.  Burden of Proof, Redbook 2.107

10.  Reasonable Doubt, Redbook 2.108

11.  Direct and Circumstantial Evidence, Redbook 2.109

1

12.   Nature of Charges Not to Be Considered, Redbook 2.110

13.   Number of Witnesses, Redbook 2.111

14.   Inadmissible and Stricken Evidence, Redbook 2.112

15.   Credibility of Witnesses, Redbook 2.200

16.   Police Officer's Testimony, Redbook 2.207

17.   Transcripts of Tape Recordings, Redbook 2.310

18.   Proof of State of Mind, Redbook 3.101

19.   Aiding and Abetting, Redbook 3.200

20.   Multiple Counts – One Defendant, Redbook 2.402

21.   <u>Count One:</u> Assaulting, Resisting, or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. § 111(a)(1), (b) [see proposal below]

22.   <u>Count Two:</u> Obstructing Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3) [see proposal below]

23.   <u>Count Three:</u> Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A) [see proposal below]

24.   <u>Count Four:</u> Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A) [see proposal below]

25.   <u>Count Five:</u> Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A) [see proposal below]

26.   <u>Count Six:</u> Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D) [see proposal below]

27.   <u>Count Seven:</u> Engaging in an Act of Physical Violence in the Capitol Grounds or Capitol Buildings, 40 U.S.C. § 5104(e)(2)(F) [see proposal below]

28.   Where Jury is to be Charged on a Lesser Included Offense of a Count in an Indictment, Redbook 2.401

2

29.    Unanimity—General, Redbook 2.405

30.    Verdict Form Explanation, Redbook 2.407

31.    Redacted Exhibits, Redbook 2.500

32.    Exhibits During Deliberations, Redbook 2.501

33.    Selection of Foreperson, Redbook 2.502

34.    Possible Punishment Not Relevant, Redbook 2.505

35.    Cautionary Instruction on Publicity, Communication, and Research, Redbook 2.508

36.    Communication Between Court and Jury During Jury's Deliberations, Redbook 2.509

37.    Attitude and Conduct of Jurors in Deliberations, Redbook 2.510

38.    Excusing Alternate Jurors, Redbook 2.511

**B. Jointly Proposed Instructions to be Used as Applicable or if Court Instructs on Self-Defense**

39.    Right of Defendant Not to Testify, Redbook 2.208 *or* Defendant as Witness, Redbook 2.209

40.    Character of Defendant, Redbook 2.213

41.    Evaluation of Prior Inconsistent Statement of a Witness, Redbook 2.216

42.    Evaluation of Prior Consistent Statement of a Witness, Redbook 2.217

43.    Statements of the Defendant – Substantive Evidence, Redbook 2.305

44.    Self-Defense – General Considerations, Redbook 9.500

45.    Self-Defense – Amount of Force Permissible, Redbook 9.501

46.    Self-Defense – Amount of Force Permissible Where Appearances are False, Redbook 9.502(A)

47.    Self-Defense – Where Defendant Might Have Been the Aggressor, Redbook 9.504(A)

**C. Disputed Instructions**

    48.    Defendant's Proposed Instruction – First Amendment [see proposal below]

    49.    Defendant's Proposed Instruction – Use of Force [see proposal below]

    50.    Defendant's Theory of the Case, Redbook 9.100 [see proposal below]

**Proposed Instruction No. 21**

**COUNT ONE: ASSAULTING, RESISTING, OR IMPEDING CERTAIN OFFICERS USING A DEADLY OR DANGEROUS WEAPON**

18 U.S.C. § 111(a)(1), (b)

Count One of the Indictment charges the defendant with forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with an officer and employee of the United States, and any person assisting such an officer and employee, while the officer is engaged in the performance of his official duties, while using a deadly or dangerous weapon, which is a violation of federal law.

<u>Elements</u>

In order to find the defendant guilty of this offense, you must find the following elements beyond a reasonable doubt:

1. First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer N.R., an officer from the Metropolitan Police Department.

2. Second, the defendant did such acts forcibly.

3. Third, the defendant did such acts intentionally.

4. Fourth, the person assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer or an employee of the United States who was then engaged in the performance of his official duties, or any person assisting such an officer or employee in the performance of that officer's duties.

5. Fifth, the defendant made physical contact with the officer or employee of the United States who was then engaged in the performance of his official duties, or any person assisting such an officer or employee in the performance of that officer's duties, or acted with the intent to commit another felony.

5

6.  Sixth, in doing such acts, the defendant used a deadly or dangerous weapon.

<u>Definitions</u>

The defendant acted "forcibly" if he used force, attempted to use force, or threatened to use force against the officer.  A threat to use force at some unspecified time in the future is not sufficient to establish that the defendant acted forcibly.[1]

The term "assault" means any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so.  A finding that one used force (or attempted or threatened to use it) isn't the same as a finding that he attempted or threatened to inflict injury.  In order to find that the defendant committed an "assault," you must find beyond a reasonable doubt that the defendant acted forcibly and that the defendant intended to inflict or intended to threaten injury.[2]

The terms "resist," "oppose," "impede," "intimidate," and "interfere with" carry their everyday, ordinary meanings.

You are instructed that Officer N.R. is an officer of the Metropolitan Police Department and that it was a part of the official duty of such officer to assist federal officers in protecting the U.S. Capitol complex on January 6, 2021 and detaining individuals who lacked authorization to enter the restricted area around the complex.  It is not necessary to show that the defendant knew the person being forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with was, at that time, assisting federal officers in carrying out an official duty so long as it is established beyond a reasonable doubt that the victim was, in fact, assisting a federal officer acting in the course of his duty and that the defendant intentionally forcibly assaulted, resisted,

---

[1]     Tenth Circuit Pattern Criminal Jury Instructions (2021), § 2.09.
[2]     *Id.*

opposed, impeded, intimidated, or interfered with that officer.[3]

  An object is a deadly or dangerous weapon if it is designed to be used, actually used, capable of being used, or threatened to be used in a manner likely to produce death or serious bodily harm.[4]

  For such a weapon to have been "used," the government must prove that the defendant not only possessed the weapon, but that the defendant intentionally displayed it in some manner while forcibly assaulting, resisting, opposing, impeding, intimidating or interfering with the federal officer.[5]

---

[3]   *United States v. Feola*, 420 U.S. 671, 684 (1975).
[4]   Assault With a Dangerous Weapon (definition of dangerous weapon), Redbook 4.101 (modified); *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002).
[5]   Tenth Circuit Pattern Criminal Jury Instructions (2021), § 2.09; *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002).

**Proposed Instruction No. 22**

**COUNT TWO: OBSTRUCTING OFFICERS DURING A CIVIL DISORDER**

18 U.S.C. § 231(a)(3)

Count Two of the Indictment charges the defendant with committing or attempting to commit an act to obstruct, impede, or interfere with law enforcement officers lawfully carrying out their official duties incident to a civil disorder, which is a violation of federal law.

<u>Elements</u>

In order to find the defendant guilty of this offense, you must find the following elements beyond a reasonable doubt:

1. First, the defendant knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

2. Second, at the time of the defendant's actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

3. Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

<u>Definitions</u>

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident.  In deciding whether the

defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.[6]

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.[7]

The term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia.  It also means commerce wholly within the District of Columbia.[8]

The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof.[9]

The term "department" includes executive departments.[10]  The Department of Homeland Security, which includes the United States Secret Service, is an executive department.[11]

The term "agency" includes any department, independent establishment, commission, administration, authority, board, or bureau of the United States.[12]

---

[6]     *See* Seventh Circuit Pattern Criminal Jury Instructions; *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005).

[7]     18 U.S.C. § 232(1).

[8]     Modified definition of 18 U.S.C. § 232(2) from jury instructions in *United States v. Pugh*, 20-cr-73 (S.D. Ala. May 19, 2021).

[9]     18 U.S.C. § 232(3).

[10]    18 U.S.C. § 6.

[11]    5 U.S.C. § 101.

[12]    18 U.S.C. § 6.

The term "law enforcement officer" means any officer or employee of the United States or the District of Columbia while engaged in the enforcement or prosecution of any criminal laws of the United States or the District of Columbia.[13]

For the U.S. Capitol Police and Metropolitan Police Department on January 6, 2021, the term "official duties," means policing the U.S. Capitol Building and Grounds, and enforcing federal law and D.C. law in those areas.

Attempt

In Count Two, the defendant is charged with attempt to commit the crime of obstructing officers during a civil disorder. An attempt to obstruct officers during a civil disorder is a federal crime even if the defendant did not actually complete the crime of obstructing officers during a civil disorder.

In order to find the defendant guilty of attempt to commit the crime of obstructing officers during a civil disorder, you must find that the government proved beyond a reasonable doubt each of the following elements:

1. First, that the defendant intended to commit the crime of obstructing officers during a civil disorder, as I have defined that offense above.

2. Second, that the defendant took a substantial step toward committing obstructing officers during a civil disorder, which strongly corroborates or confirms that the defendant intended to commit that crime.

With respect to the first element of attempt, you may not find the defendant guilty of attempt to commit obstructing officers during a civil disorder merely because he thought about it. You must find that the evidence proved beyond a reasonable doubt that the defendant's mental

---

[13]     18 U.S.C. § 232(7).

state passed beyond the stage of thinking about the crime to actually intending to commit it.

With respect to the substantial step element, you may not find the defendant guilty of attempt to commit obstructing officers during a civil disorder merely because he made some plans to or some preparation for committing that crime.  Instead, you must find that the defendant took some firm, clear, undeniable action to accomplish his intent to commit obstruction of an official proceeding.  However, the substantial step element does not require the government to prove that the defendant did everything except the last act necessary to complete the crime.[14]

---

[14]     Seventh Circuit Pattern Criminal Jury Instructions; Third Circuit Pattern Jury Instructions 7.01.

## Proposed Instruction No. 23

## COUNT THREE: ENTERING OR REMAINING IN A RESTRICTED BUILDING OR GROUNDS WITH A DEADLY OR DANGEROUS WEAPON[15]

### 18 U.S.C. § 1752(a)(1), (b)(1)(A)

Count Three of the Indictment charges the defendant with entering or remaining in a restricted building or grounds while using or carrying a deadly or dangerous weapon, which is a violation of federal law.

### Elements

In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant entered or remained in a restricted building or grounds without lawful authority to do so.

2. Second, that the defendant did so knowingly.

3. Third, that the defendant used or carried a deadly or dangerous weapon during and in relation to the offense.

### Definitions

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.[16]

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.[17]

---

[15]    18 U.S.C. §§ 1752, 3056; *United States v. Jabr*, 4 F.4th 97, 101 (D.C. Cir. 2021).
[16]    18 U.S.C. § 1752(c)(1).
[17]    18 U.S.C. §§ 1752(c)(2), 3056.

The term "knowingly" has the same meaning described in the instructions for Count Two.

The term "deadly or dangerous weapon" has the same meaning described in the instructions for Count One.

**Proposed Instruction No. 24**

**COUNT FOUR: DISORDERLY OR DISRUPTIVE CONDUCT IN A RESTRICTED BUILDING OR GROUNDS WITH A DEADLY OR DANGEROUS WEAPON[18]**

18 U.S.C. § 1752(a)(2), (b)(1)(A)

Count Four of the Indictment charges the defendant with disorderly or disruptive conduct in a restricted building or grounds while using or carrying a deadly or dangerous weapon, which is a violation of federal law.

<u>Elements</u>

In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

2. Second, that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions.

3. Third, that the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

4. Fourth, that the defendant used or carried a deadly or dangerous weapon during and in relation to the offense.

"Disorderly conduct" occurs when a person is unreasonably loud and disruptive under the circumstances, or interferes with another person by jostling against or unnecessarily crowding

---

[18]    18 U.S.C. § 1752.

14

**-119-**

that person.  "Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.[19]

The terms "restricted building or grounds," "knowingly," and "deadly or dangerous weapon" have the same meanings described in the instructions above.

---

[19]     Redbook 6.643.

15

**Proposed Instruction No. 25**

**COUNT FIVE: ENGAGING IN PHYSICAL VIOLENCE IN A RESTRICTED BUILDING OR GROUNDS WITH A DEADLY OR DANGEROUS WEAPON**

18 U.S.C. § 1752(a)(4), (b)(1)(A)

Count Five of the Indictment charges the defendant with knowingly engaging in any act of physical violence against a person or property in a restricted building or grounds while using or carrying a deadly or dangerous weapon, which is a violation of federal law.

<u>Elements</u>

In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant engaged in an act of physical violence against a person or property in, or in proximity to, a restricted building or grounds.

2. Second, that the defendant did so knowingly.

3. Third, that the defendant used or carried a deadly or dangerous weapon during and in relation to the offense.

<u>Definitions</u>

The term "act of physical violence" means any act involving an assault or other infliction of death or bodily harm on an individual, or damage to, or destruction of, real or personal property.[20]

The terms "restricted building and grounds," "knowingly," and "deadly or dangerous weapon" have the same meanings described in the instructions above.

---

[20]    40 U.S.C. § 5104(a)(1) (modified).

16

**Proposed Instruction No. 26**

**COUNT SIX: DISORDERLY CONDUCT IN A CAPITOL BUILDING OR GROUNDS**

40 U.S.C. § 5104(e)(2)(D)

Count Six of the Indictment charges the defendant with violent entry and disorderly and disruptive conduct in a Capitol Building or Grounds, which is a violation of federal law.

<u>Elements</u>

In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, that the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings or Grounds;

2. Second, that the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

3. Third, that the defendant acted willfully and knowingly.

<u>Definitions</u>

The term "United States Capitol Grounds" includes all squares, reservations, streets, roadways, walks, and other areas as defined on a map entitled "Map showing areas comprising United States Capitol Grounds," dated June 25, 1946, approved by the Architect of the Capitol, and recorded in the Office of the Surveyor of the District of Columba in book 127, page 8.[21] You are instructed that the West Terrace, including the Lower West Terrace, is part of the "United States Capitol Grounds."

The term "disorderly or disruptive conduct" has the same meaning described in the instructions for Count Four defining "disorderly conduct" and "disruptive conduct."

---

[21]    40 U.S.C. § 5102(a).

17

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating.[22]

The term "knowingly" has the same meaning described in the instructions for Count Two.

---

[22] *See United States v. Bryan*, 524 U.S. 184, 190 (1998).

**Proposed Instruction No. 27**

**COUNT SEVEN: ENGAGING IN AN ACT OF PHYSICAL VIOLENCE IN THE
CAPITOL GROUNDS OR CAPITOL BUILDINGS**

40 U.S.C. § 5104(e)(2)(F)

Count Seven of the Indictment charges the defendant with engaging in an act of physical

violence in the United States Capitol Grounds or any of the Capitol Buildings, which is a

violation of federal law.

<u>Elements</u>

In order to find the defendant guilty of this offense, you must find that the government

proved each of the following elements beyond a reasonable doubt:

1.  First, that the defendant engaged in an act of physical violence in the United

    States Capitol Grounds or any of the Capitol Buildings.

2.  Second, that the defendant acted willfully and knowingly.

<u>Definitions</u>

The term "act of physical violence" means any act involving an assault or other infliction

or threat of infliction of death or bodily harm on an individual, or damage to, or destruction of,

real or personal property.[23]

The terms "United States Capitol Grounds," "willfully," and "knowingly," have the same

meanings described in the instructions above.

---

[23]     40 U.S.C. § 5104(a)(1).

**Defendant's Proposed Instruction No. 48**

**FIRST AMENDMENT**

The First Amendment protects even profanity-laden speech directed at police officers. Police officers reasonably may be expected to exercise a higher degree of restraint than the average citizen and should be less likely to be provoked into misbehavior by such speech. While Officer N.R., no less than anyone else, may resent having obscene words and gestures directed at him, he may not exercise the awesome power at his disposal to punish defendant Thomas Webster for conduct that is not merely lawful, but protected by the First Amendment. *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003); *Houston v. Hill*, 482 U.S. 451, 461 (1987).

**Government's Objection to Defendant's Proposed Instruction No. 48**

The government objects to the Defendant's Proposed Instruction No. 48 because it lacks sufficient legal basis, is irrelevant, argumentative, and likely to mislead and/or confuse the jury. The charges in this case do not implicate the First Amendment, *see United States v. Caldwell*, No. 21-CR-28 (APM), 2021 WL 6062718, at *22 (D.D.C. Dec. 20, 2021) (concluding that certain conduct on January 6 did not amount to conduct protected by the First Amendment), nor do they require a determination about the reasonableness of victim Officer N.R.'s conduct or use of force on January 6, 2021.

The cases cited by the defendant in his proposed instruction are inapposite. *Payne* was an appeal from a grant of summary judgment in a Section 1983 case. One of the issues in *Payne* was whether an officer had probable cause to arrest the plaintiff for obstruction where the plaintiff was alleged to have engaged in obscenity-laced argument with the officer. *Payne*, 337 F.3d at 776-77. In dicta, the court observed that police officers "reasonably may be expected to exercise a higher degree of restraint than the average citizen and should be less likely to be

provoked into misbehavior by such speech." *Id.* at 776 (citing *City of Houston v. Hill*, 482 U.S. 451, 462 (1987)).  Ultimately, the court reversed because it found that the district court had failed to view the facts in the light most favorable to the plaintiff.

In *City of Houston*, the Supreme Court struck down as unconstitutionally overbroad a municipal ordinance that made it unlawful to interrupt a police officer in the performance of his duties.  The Court held that the ordinance was not narrowly tailored to prohibit only disorderly conduct or fighting words, and that it criminalized a substantial amount of constitutionally protected speech.  *City of Houston*, 482 U.S. at 465-67.  In dicta, the Court observed that even the fighting words exception might require a narrower application in cases involving words addressed to police officers because "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words."  *Id.* at 462 (internal quotation marks and citation omitted).

This case involves a physical assault of a police officer and does not implicate any of the First Amendment issues raised in *Payne* and *City of Houston*.

Insofar as the defendant is trying to argue that his profane words are insufficient to constitute aggression or provocation for purposes of self-defense, such argument would best be addressed through Redbook Instruction 9.504.  Instruction 9.504 provides, in relevant part: "Mere words without more by [name of defendant] . . . do not constitute [aggression] [or] [provocation]."  But the defendant is not entitled to any such instruction unless there is sufficient evidence to support a self-defense claim.  For the reasons set forth in the government's Motion *in Limine* to Preclude Claims of Self Defense, Necessity, Justification and Duress (ECF No. 60), the defendant has not proffered sufficient evidence to entitle him to argue self-defense at trial, much less to receive any self-defense jury instruction.

**Defendant's Proposed Instruction No. 49**

**USE OF FORCE**

Defendant Thomas Webster alleges that while directing obscene words at Officer N.R. , the officer punched defendant in the face.  In consideration whether or not Officer N.R. deprived the defendant Thomas Webster of his constitutional right not to be subjected to unreasonable and excessive force, you should determine whether the force used by Officer N.R. was necessary in the first place or was greater than the force that would appear reasonably necessary in an ordinary, reasonable, and prudent person.

A law enforcement officer is justified in the use of any force which he reasonably believes to be necessary to defend himself or another from bodily harm.

Provocation by mere insulting or threatening words will not excuse a physical assault by a law enforcement officer.  Mere words, without more, do not constitution provocation or aggression on the part of the person saying those words.  No law enforcement officer is entitled to use force against someone based on that person's verbal statements alone.

In determining whether the force used by Officer N.R. in this case was excessive or unwarranted, you should consider such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing defendant Thomas Webster harm. *United States v. Cobb*, 905 F.2d 784 (4th Cir. 1980).

**<u>Government's Objection to Defendant's Proposed Instruction No. 49</u>**

The government objects to the Defendant's Proposed Instruction No. 49 because it lacks sufficient legal basis, is irrelevant, argumentative, and likely to mislead and/or confuse the jury.

Most basically, the defendant is not likely to be able to elicit sufficient evidence at trial to support a self-defense instruction.  *See* ECF No. 60.  The reasonableness of the amount of force that Officer N.R. allegedly used against Webster is not an element of any of the charged offenses or anticipated affirmative defenses.  *See id.* at 12.  The issue for purposes of the defendant's anticipated self-defense claim is the reasonableness of his subjective belief that his use of force was necessary, not whether Officer N.R. acted unreasonably or contrary to proper training and procedures.  *Id.* (citing *United States v. Swint*, 2012 WL 3962704, at *2 (D. Ariz. Sept. 11, 2012)).

*Cobb* is inapposite.  In *Cobb*, the defendant officers were charged with, *inter alia*, depriving a citizen of his civil rights by willfully subjecting him to an excessive use of force, in violation of 18 U.S.C. § 242.  One of the elements under § 242 is whether a defendant used unreasonable and excessive force.  *Cobb*, 905 F.2d at 787.

Officer N.R. has not been charged with violating 18 U.S.C. § 242 and is not the defendant in this case. The reasonableness of the force that Officer N.R. is alleged to have used is not an element of any of the charged offenses or anticipated affirmative defenses.  In sum, Defendant's Proposed Instruction No. 49 confuses the issues, is likely to mislead the jury, and is irrelevant as a matter of law.

**Defendant's Proposed Instruction No. 50**

**DEFENDANT'S THEORY OF THE CASE**

The defendant requests that the Court read the following paragraph if the Court finds that there is sufficient evidence to support a jury instruction about the defendant's theory of the case:

Defendant emerged from the crowd angered by the injuries caused to protestors by law enforcement.  Defendant directed obscenities at Officer N.R. and his fellow officers.  Rather than deescalating the situation, Officer N.R. raised his hand and gestured towards defendant inviting him to engage in a fight.  Defendant responded to Officer N.R.'s provocation by grabbing the top portion of the police barrier and directed additional profanities at the officer.

In response to defendant, Thomas Webster's insulting words, Officer N.R. reached beyond the police barrier with his left arm and punched defendant in his face.  Reasonably believing that he was in danger of imminent serious bodily harm and being unable to retreat due to the large crowd, defendant used that amount of force he reasonably believed necessary to protect himself by tackling Officer N.R. to the ground.

**Government's Objection to Defendant's Proposed Instruction No. 50**

The defendant misunderstands the purpose of Redbook Instruction 9.100.  Instruction 9.100 is intended to serve as a note to explain to the Court and the parties when a defendant is entitled to a theory-of-defense instruction.  It is not an invitation for the Court to deliver a closing argument on the defendant's behalf.

Here, the defendant's theory of the case is that he was acting in self-defense.  Assuming that the defendant is allowed to argue self-defense at trial,[24] and assuming that there is sufficient

---

[24]     For the reasons set forth in the government's Motion *in Limine* to Preclude Claims of Self Defense, Necessity, Justification and Duress (ECF No. 60), the defendant should not be allowed to argue self-defense at trial and is not entitled to any self-defense instruction.  The government

evidence for a reasonable jury to find in the defendant's favor, then the Court should instruct the jury on the legal elements of self-defense, as set forth in Redbook Instructions 9.500, 9.501, 9.502 and 9.504.  The narrative provided by the defendant above is argumentative, prejudicial, and inappropriate for a theory-of-defense instruction.

---

joins in proposed jury instructions 44 through 47 only to the extent that the Court determines that the defendant will be allowed to argue self-defense at trial, and then only if the evidence at the conclusion of trial supports such an instruction.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No.: 21-cr-00208 (APM)** |
| **THOMAS WEBSTER,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

<u>**GOVERNMENT'S LIST OF EXPECTED WITNESSES**</u>

The Government hereby provides a list of witnesses that, as of this date, the government may call during its case-in-chief.   The government may determine that some of these witnesses are not necessary or it may determine that additional witnesses are necessary.   If the government determines that additional witnesses may be necessary, it will promptly inform the Court and the defense.   The potential witnesses are:

| Name | Title/Agency | Location |
|---|---|---|
| Carneysha Mendoza | United States Capitol Police Captain | D.C. Metropolitan Area |
| Mark Gazelle | United States Capitol Police Officer | D.C. Metropolitan Area |
| Joanna Burger | United States Capitol Police Officer | D.C. Metropolitan Area |
| Paul Wade | Assistant to the Special Agent in Charge, United States Secret Service | D.C. Metropolitan Area |
| Daniel Schwager | Counsel to the Secretary of the Senate, United States Senate | D.C. Metropolitan Area |
| Patricia Norden | Special Agent, Federal Bureau of Investigation | Hudson Valley, New York |
| Mike Callanan | Special Agent, Federal Bureau of Investigation | Hudson Valley, New York |

1

| Name | Title/Agency | Location |
|---|---|---|
| Virginia Donnelly | Special Agent, Federal Bureau of Investigation | Hudson Valley, New York |
| Riley Palmertree | Special Agent, Federal Bureau of Investigation | D.C. Metropolitan Area |
| N.R. | Officer, Metropolitan Police Department | D.C. Metropolitan Area |
| Ed Tippett | Safeway, District Manager | D.C. Metropolitan Area |
| Leif Hickling | Supervisory IT Specialist, U.S. Attorney's Office | D.C. Metropolitan Area |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cr-208 |
| | ) | |
| THOMAS WEBSTER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Defendant's Witness List**

1. Laura Mortiz – Character Witness

   ███████████████

2. Brian Gallo – Character Witness

   ███████████████

3. Frank Sialiano – Character Witness

   ███████████████

4. Jonathon Lauderdale
   Detective, Second District Criminal Investigations Division
   Metropolitan Police Department

   ███████████████

5. Special Agent Riley Martin Palmertree
   FBI Washington Field Office

   ███████████████

Dated: April 8, 2022

_____
JAMES E. MONROE, ESQ.
Attorney for Defendant

**-133-**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 21-cr-00208 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS WEBSTER,** | : | |
| | : | |
| **Defendant.** | : | |

**Government Exhibits**

| 100 SERIES – PHYSICAL EVIDENCE AND ARREST MATERIALS | | | | | |
|---|---|---|---|---|---|
| *Ex. No.* | *Description of Exhibit* | *Marked for I.D.* | *Received in Evidence* | *Witness* | *Ex. Sent to Jury (date/time)* |
| 100 | Samsung Cellphone (Model SMTG930V SN: R38H811SHNY) | | | | |
| 101 | Brown Caterpillar Work Boots | | | | |
| 102 | Brown Leather Belt | | | | |
| 103-104 | Blue Denim Jeans (x2) | | | | |
| 105 | Plate Carrier "Second Chance," Blue | | | | |
| 106 | FBI Request for Information re AFO 145 | | | | |
| 107 | AFO 145 Face Photo 1 | | | | |

1

| 108 | AFO 145 Face Photo 2 | | | | |
| 109 | AFO 145 Frontal Photo | | | | |
| 110 | AFO 145 Back Photo | | | | |
| 111 | #EyeGouger Still Shot | | | | |
| 112 | Webster Consent to Search Samsung Cellular Telephone | | | | |
| 113 | Thomas Webster Processing Photos 02.22.2022 | | | | |
| 114 | Thomas Webster Passport Image | | | | |

| 200 SERIES – VIDEO EVIDENCE | | | | | |
|---|---|---|---|---|---|
| *Ex. No.* | *Description of Exhibit* | *Marked for I.D.* | *Received in Evidence* | *Witness* | *Ex. Sent to Jury (date/time)* |
| 200 | USCP compilation video (entire incident) | | | | |
| 201 | USCP surveillance video 0944 Full (12:30:00 – 5:30:00 p.m.) | | | | |
| 201.1 | Still frame at 4:13:10 p.m. | | | | |
| 202 | USCP surveillance video (camera 0932 from 1:56 to | | | | |

2

| | | | | | |
|---|---|---|---|---|---|
| | 2:01 p.m.) (shows motorcade leaving plaza) | | | | |
| 203 | USCP surveillance video of Senate members staircase (at 2:25p.m.) | | | | |
| 204 | N.R. BWC footage 1.6.21 (14:28:18 to 14:29:55) | | | | |
| 204.1 | Still shot from N.R. BWC footage (14:28:24) | | | | |
| 204.2 | Still shot from N.R. BWC footage (14:28:36) | | | | |
| 204.3 | Still shot from N.R. BWC footage (14:28:37_1) | | | | |
| 204.4 | Still shot from N.R. BWC footage (14:28:37_2) | | | | |
| 204.5 | Still shot from N.R. BWC footage (14:28:37_3) | | | | |
| 204.6 | Still shot from N.R. BWC footage (14:28:38) | | | | |
| 204.7 | Still shot from N.R. BWC footage (14:28:39) | | | | |
| 204.8 | Still shot from N.R. BWC footage (14:28:41) | | | | |
| 204.9 | Still shot from N.R. BWC footage (14:28:52_1) | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 204.10 | Still shot from N.R. BWC footage (14:28:52_2) | | | | |
| 204.11 | Still shot from N.R. BWC footage (14:29:02) | | | | |
| 204.12 | Transcript of N.R. BWC footage 1.6.21 (14:28:18 to 14:29:55) | | | | |
| 205 | USCP surveillance video 0944 (2:28:17 to 2:29:55) | | | | |
| 206 | Taylor video 1.6.21 | | | | |
| 206.1 | Still shot from Taylor video 1.6.21 | | | | |
| 207 | Patriots at the Capitol 1-6-21 | | | | |
| 208 | Send More Patriots video | | | | |
| 208.1 | Transcript of Send More Patriots video | | | | |
| 209 | Webster with second officer after breaching video | | | | |
| 210 | Webster at Lower West Tunnel video | | | | |
| 211 | N.R. BWC footage 1.6.21 Slow Motion (14:28:18 to 14:29:14) | | | | |

| Ex. No. | Description of Exhibit | Marked for I.D. | Received in Evidence | Witness | Ex. Sent to Jury (date/time) |
|---|---|---|---|---|---|
| 212 | USCP surveillance video 0944 Time Lapse (12:55:14 – 14:59:59) | | | | |
| 213 | Patriots at the Capitol 1-6-21 Slow Motion | | | | |
| 214 | Patriots at the Capitol 1-6-21 Tracking | | | | |
| 215 | Side-by-side of N.R. BWC footage 1.6.21 and Patriots at the Capitol 1-6-21 Slow Motion | | | | |
| 216 | Side-by-side of N.R. BWC footage 1.6.21 and Patriots at the Capitol 1-6-21 | | | | |
| 217 | USCP surveillance video 0944 Tracking | | | | |
| 218 | Taylor video 1.6.21 Tracking | | | | |
| **300 SERIES - EVIDENCE RECOVERED FROM CELLPHONE** | | | | | |
| Ex. No. | Description of Exhibit | Marked for I.D. | Received in Evidence | Witness | Ex. Sent to Jury (date/time) |
| 300 | Cellebrite Summary | | | | |
| 301 | 11/4/20 Text Messages to "Brian and Stacey" and "Maura" | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 302 | 11/6/20 Text Messages to "Brian and Stacey" and "Michelle" | | | | |
| 303 | 12/3/20 Text Message to "Brian and Stacey" (Guide to Your Jan 6th Trip) | | | | |
| 304 | 1/6/21 Text Conversation with "Frank S Home" | | | | |
| 305 | Photo of MRE & Metadata | | | | |
| 306 | Photo of Backpack & Metadata | | | | |
| 307 | Photo of Marine Flag at Washington Monument | | | | |
| 308 | Photo at base of Capitol | | | | |
| 309 | Photo near Lower West Tunnel | | | | |
| 310 | "stop the steal rally" search history (12/4/20) | | | | |
| 311 | Bulletproof vests search history (12/10/20) | | | | |
| 312 | Guide to Jan 6 Trip search history (12/30/20) | | | | |
| 313 | Stop the Steal search history (12/29/20) | | | | |

| 314 | Facial recognition article search history (1/6/21) | | | | |
|---|---|---|---|---|---|
| 315 | DOJ launches tracker search history (1/15/21) | | | | |
| 316 | Capitol rioters included ex-military and cops search history (1/15/21) | | | | |

**400 SERIES – DOCUMENTS AND RECORDS**

| Ex. No. | Description of Exhibit | Marked for I.D. | Received in Evidence | Witness | Ex. Sent to Jury (date/time) |
|---|---|---|---|---|---|
| 400 | Secret Service Head of State Notification Worksheet | | | | |
| 402 | Mayor Bowser Curfew Order (Mayor's Order 2021-002) | | | | |
| 403 | Safeway DC Closure Email | | | | |
| 404 | Safeway Mid-Atlantic Daily Sales Report 1.5.21 -1.7.21 Redacted | | | | |
| 405 | Safeway Warehouse Shipments PA to DC | | | | |
| 406 | Safeway Business Records Certification | | | | |
| 407 | License Plate Reader Report | | | | |

7

**-140-**

| 408 | Map of Capitol Grounds, June 25, 1946, Office of the Surveyor of the District of Columba, book 127, page 8 | | | | |

| 500 SERIES – LEGAL AND CONGRESSIONAL RECORDS | | | | | |
|---|---|---|---|---|---|
| *Ex. No.* | *Description of Exhibit* | *Marked for I.D.* | *Received in Evidence* | *Witness* | *Ex. Sent to Jury (date/time)* |
| 500 | U.S. Constitution – 12th Amd. (Highlighted) | | | | |
| 501.15 | 3 U.S. Code § 15. (Highlighted) | | | | |
| 501.16 | 3 U.S. Code § 16. (Highlighted) | | | | |
| 501.17 | 3 U.S. Code § 17. (Highlighted) | | | | |
| 501.18 | 3 U.S. Code § 18. (Highlighted) | | | | |
| 502 | Congressional Record - Senate | | | | |
| 503 | Congressional Record - House | | | | |
| 504 | Senate Concurrent Resolution 1 (Jan. 3, 2021) | | | | |
| 505 | Screenshots from Senate chamber video at 1:39pm, | | | | |

| Ex. No. | Description of Exhibit | Marked for I.D. | Received in Evidence | Witness | Ex. Sent to Jury (date/time) |
|---|---|---|---|---|---|
| | 1:48pm, 1:54pm, 2:00pm, 2:05pm, 2:10pm | | | | |
| 506 | Screenshots from House chamber video at 1:43pm, 1:48pm, 1:54pm, 1:59pm, 2:04pm, 2:10pm, 2:14pm | | | | |
| 507 | Video Montage – including Congressional Record (vol. 167, No. 4) at S13, S14, S18, H75, H76, H84, H85 and video footage from House and Senate | | | | |
| 508 | Certificate of Authenticity - Senate | | | | |
| 509 | Certificate of Authenticity - House | | | | |
| **600 SERIES – OTHER** | | | | | |
| _Ex. No._ | _Description of Exhibit_ | _Marked for I.D._ | _Received in Evidence_ | _Witness_ | _Ex. Sent to Jury (date/time)_ |
| 600 | BLANK | | | | |
| 601 | Photo of Capitol | | | | |
| 601.1 | Photos of Capitol (with perimeter) | | | | |
| 601.2 | Photos of Capitol (with signs) | | | | |
| 601.3 | Photo of sign on rack | | | | |

9

**-142-**

| 601.4 | Photo of sign itself | | | | |
|---|---|---|---|---|---|
| 602 | Diagram of Capitol | | | | |
| 603 | 3D Model of Capitol | | | | |
| 604 | Photo of N.R. injuries | | | | |
| 605 | Photo of N.R. injuries | | | | |
| 606 | Photo of N.R. injuries | | | | |
| 607 | Photo of N.R. injuries | | | | |
| 608 | Photo of N.R. injuries | | | | |
| 609 | Photo of N.R. injuries | | | | |
| 610 | Photo of N.R. injuries | | | | |
| 611 | Twitter Pic 1 (Assault) | | | | |
| 612 | Twitter Pic 2 (Assault) | | | | |
| 613 | Photo of plate carrier "Second Chance," Blue (3/24/22) | | | | |
| 614 | Photo of interior nametag of plate carrier "Second Chance," Blue (3/24/22) | | | | |

| 700 SERIES – STIPULATIONS | | | | | |
|---|---|---|---|---|---|
| Ex. No. | Description of Exhibit | Marked for I.D. | Received in Evidence | Witness | Ex. Sent to Jury (date/time) |
| 700 | BLANK | | | | |
| 701 | Stipulation re USCP videos | | | | |
| 702 | BLANK | | | | |
| 703 | BLANK | | | | |
| 704 | BLANK | | | | |
| 705 | Stipulation re USCP and MPD | | | | |
| 706 | Stipulation re West Terrace | | | | |
| 707 | Stipulation re License Plate Reader | | | | |
| 708 | Stipulation re Videos | | | | |

11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 21-cr-208 |
| | ) |
| THOMAS WEBSTER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**Defendant's Exhibit List**

1. MPD Injury or Illness Report, Dated 01/07/21

2. Detective Jonathan Lauderdale Report, Dated 01/09/21

3. Detective Jonathan Lauderdale Report, Dated 01/11/21

4. Detective Jonathan Lauderdale Report, Dated 01/14/21

5. Detective Jonathan Lauderdale Report, Dated 01/26/21

6. Detective Jonathan Lauderdale Report, Dated 01/27/21

7. MPD Appendix of Case Notes

8. MPD Case History

9. Interview Report of Officer N.R. by Special Agent Riley Palmertree, Dated 02/17/21

10. Hand Written Notes of Officer N.R.'s Interview

11. Officer N.R.'s Statement

12. Officer N.R.'s Cellphone Text Messages

13. Officer N.R.'s Disciplinary Records

14. Defendant's DD-214 Certificate of Release or Discharge from Active Duty

**-145-**

15. Defendant's Personnel Records, United States Marine Corps

16. Defendant's Personnel Records, New York City Police Department

17. YouTube Video Entitled "Patriots At the Capitol"

18. Still Photo  00037

19. Still Photo  00038

20. Still Photo  00039

21. Still Photo  00040

22. Still Photo  00041

23. Still Photo  00042

24. Synchronized Still Photos  00230

25. Synchronized Still Photos  00231

26. Synchronized Still Photos  00232

27. Synchronized Still Photos  00233

28. Synchronized Still Photos  00234

29. Synchronized Still Photos  00277

30. Synchronized Still Photos  00278

31. Synchronized Still Photos  00279

32. Synchronized Still Photos  00280

33. Synchronized Still Photos  00281

34. Synchronized Still Photos  00282

35. Synchronized Still Photos  00283

36. Synchronized Still Photos  00284

37. Synchronized Still Photos  00285

38. Synchronized Still Photos  00286

39. Synchronized Still Photos  00287

40. Synchronized Still Photos  00288

41. Synchronized Still Photos  00289

42. Synchronized Still Photos  00290

43. Enhanced Video of Officer N.R. Punching Defendant

44. Memorandum of Agreement Between the United States Department of Justice, District of

   Columbia and the District of Columbia Metropolitan Police Department, Dated June 13,

   2001

45. MPD General Order Series 901, Number 07, Dated 11/03/17

46. New York City Police Department training Practices and Procedure Guidelines - Use of

   Force

47. New York City Police Department Police Academy - Use of Force Training Curriculum


Dated: April 8, 2022

                                        _____
                                        JAMES E. MONROE, ESQ.
                                        Attorney for Defendant

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 21-cr-208 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS WEBSTER,** | : | |
| | : | |
| **Defendant.** | : | |

### EXHIBIT 701

### STIPULATION

The United States and Defendant Thomas Webster agree and stipulate to the following:

The United States Capitol Police (USCP) operate and maintain closed-circuit video monitoring and recording equipment that captures locations inside and outside of the U.S. Capitol building and on the Capitol grounds. The video equipment timestamps each recording with the date and time at which the footage is captured. The USCP-controlled video equipment was in good working order on January 6, 2021, and video footage recovered from the cameras and equipment with the timestamp of January 6, 2021 is footage from January 6, 2021. The events depicted in the video footage are a fair and accurate depiction of the events at the U.S. Capitol on January 6, 2021, the timestamps on the recordings are accurate, and the video footage was not altered or edited in any way. The video footage is authentic in that it is what it purports to be.

FOR THE DEFENDANT                           FOR THE UNITED STATES


_____          _____
James E. Monroe                                        Katherine Nielsen
Counsel for Thomas Webster                    Hava Mirell
                                                                Brian P. Kelly
                                                                Assistant United States Attorneys

1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 21-cr-208 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS WEBSTER,** | : | |
| | : | |
| **Defendant.** | : | |

**EXHIBIT 705**

**STIPULATION**

The United States and Defendant Thomas Webster agree and stipulate to the following:

On January 6, 2021, officers from the United States Capitol Police (USCP) on the U.S. Capitol Grounds and in the U.S. Capitol building were engaged in their official duties as officers or employees of the United States or of any agency in any branch of the United States Government, as those terms are used in Title 18, United States Code, Section 1114.

On January 6, 2021, officers from the Washington, D.C., Metropolitan Police Department (MPD) on the U.S. Capitol Grounds and in the U.S. Capitol building were assisting officers from the USCP who were engaged in their official duties as officers or employee of the United States or of any agency in any branch of the United States Government, as those terms are used in Title 18, United States Code, Section 1114.

FOR THE DEFENDANT                    FOR THE UNITED STATES

_____              _____
James E. Monroe                      Katherine Nielsen
Counsel for Thomas Webster           Hava Mirell
                                     Brian P. Kelly
                                     Assistant United States Attorneys

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Crim. No. 21-cr-208 (APM)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **THOMAS WEBSTER,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**<u>EXHIBIT 706</u>**

**<u>STIPULATION</u>**

The United States and Defendant Thomas Webster agree and stipulate to the following:

1.      The West Terrace, including the Lower West Terrace, is part of the "United States

Capitol Grounds" for purposes of 40 U.S.C. § 5104.


FOR THE DEFENDANT                          FOR THE UNITED STATES


_____            _____
James E. Monroe                            Katherine Nielsen
Counsel for Thomas Webster                 Hava Mirell
                                           Brian P. Kelly
                                           Assistant United States Attorneys

1
**-150-**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 21-cr-208 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS WEBSTER,** | : | |
| | : | |
| **Defendant.** | : | |

**EXHIBIT 707**

**STIPULATION**

The United States and Defendant Thomas Webster agree and stipulate to the following:

1.      On or about January 5, 2021, a gray-colored 2004 Honda CR-V, New York State license plate number HVU 2139, was registered to Defendant Webster.

2.      A license plate reader is a camera that is pointed at a roadway and is specifically designed to read license plate numbers. Information from a license plate reader is collected, including photographs of the license plate and car, date and time information from when the picture was taken, and GPS location information from when the picture was taken, and transmitted to servers owner by the District of Columbia Metropolitan Police Department. The information is searchable, including by license plate number.

3.      On February 17, 2021, Deputy U.S. Marshal Gregory Conner queried the license plate reader servers for license plate number HVU 2139. He also queried the servers for other license plate numbers similar to HVU 2139, including HVU 273. According to the servers, on January 5, 2021, at 4:32:30 a.m. (UTC -05:00), New York State license plate number HVU 2139 was photographed entering the District of Columbia from Maryland while driving southbound on Highway 295.

4.      License plate reader information is maintained by the Metropolitan Police Department in the regular course of business, and is regularly checked for accuracy. The report appended to this

1

stipulation is an authentic, true, and correct copy of a printout of the above-described information for

New York State license plate number HVU 2139.


FOR THE DEFENDANT                        FOR THE UNITED STATES


_____          _____
James E. Monroe                          Katherine Nielsen
Counsel for Thomas Webster               Hava Mirell
                                         Brian P. Kelly
                                         Assistant United States Attorneys



ID: d6c70c4e-bce6-4ad0-9e14-e522f30e8df2                timothy.writt  2/17/2021 8:31:32 AM UTC-05:00

| License Plate Number: | HVU273 |
|---|---|

| Read Info | |
|---|---|
| Plate | HVU273 |
| Date/Time | 1/5/2021 4:32:30 AM UTC-05:00 |
| GPS | (38.909822, -76.935704) Error Radius: 0.00m |
| Speed | |
| Reader | 6D 295 s\b Eastern Av NE |
| Reader Notes | |
| User | |
| Camera | Center |
| Domain | Fixed Sites |
| Make | |
| Model | |
| Color | |
| Color 2 | |
| Type | |
| Tax Class | |
| MMC Plate | Plate not in MMC List |

| Nearest Address | Kenilworth Avenue Northeast, Washington, , District of Columbia, |
|---|---|
| Nearest Cross Street | |



ID: d6c70c4e-bce6-4ad0-9e14-e522f30e8df2                    timothy.writt   2/17/2021 8:31:32 AM UTC-05:00

**License Plate Number:**          **HVU273**





**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 21-cr-208 (APM)** |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS WEBSTER,** | : | |
| | : | |
| **Defendant.** | : | |

**EXHIBIT 708**

**STIPULATION**

The United States and Defendant Thomas Webster agree and stipulate to the following:

The events depicted in the video footage for the following Government Exhibits are a fair and accurate depiction of the events at the U.S. Capitol on January 6, 2021 and the video footage was not altered or edited in any way. The video footage is authentic in that it is what it purports to be.

1. Exhibit 206

2. Exhibit 207

3. Exhibit 208

4. Exhibit 209 [from 16:50 to 22:40]

5. Exhibit 210

FOR THE DEFENDANT                    FOR THE UNITED STATES


_____        _____
James E. Monroe                       Katherine Nielsen
Counsel for Thomas Webster            Hava Mirell
                                      Brian P. Kelly
                                      Assistant United States Attorneys

1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 21-cr-208 (APM)** |
| | **:** | |
| **THOMAS WEBSTER,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## <u>VERDICT FORM</u>

**Count One:** **Assaulting, Resisting, or Impeding Certain Officers Using a Deadly or Dangerous Weapon**

_____               _____
Guilty                                    Not Guilty

**Count Two:** **Obstructing Officers During a Civil Disorder**

_____               _____
Guilty                                    Not Guilty

**Count Three:** **Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**

_____               _____
Guilty                                    Not Guilty

**Count Four:** **Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**

_____               _____
Guilty                                    Not Guilty

**Count Five:** **Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**

_____               _____
Guilty                                    Not Guilty

**Count Six:     Disorderly Conduct in a Capitol Building or Grounds**

_____                    _____
Guilty                             Not Guilty

**Count Seven: Engaging in an Act of Physical Violence in the Capitol Grounds or Capitol
            Buildings**

_____                      _____
Guilty                             Not Guilty

Dated this _____ day of _____, 2022

                              _____
                              FOREPERSON

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Case No. 21-cr-208 (APM)** |
| | ) | |
| THOMAS WEBSTER, | ) | |
| | ) | |
| Defendant. | ) | |

_____ )

## **ORDER**

The court rules as follows with respect to the pending motions *in limine*:

1.      The United States' Motion in Limine to Limit Cross-Examination of Secret Service Agency Witnesses, ECF No. 56 [hereinafter SSA Mot.], is granted in part and denied in part.  As conceded by the government, Defendant Thomas Webster may cross-examine Secret Service Agency ("SSA") witnesses about the location of Vice President Pence on January 6, 2021, at the times relevant to the offenses with which Defendant is charged.  Gov't Reply in Supp. of Its SSA Mot., ECF No. 70, at 1–2.  Defendant has not opposed the portion of the government's motion seeking to preclude cross-examination of SSA witnesses in two respects: (1) the SSA's protocols related to the locations where protectees or their motorcades are taken during emergencies and (2) details about the SSA's VIP-protection operations.  *See generally* Def.'s Opp'n to SSA Mot., ECF No. 64.  Defendant shall be precluded from cross-examining SSA witnesses as to those two topics, absent his making a pretrial proffer as to the need for such examination.

2.      The United States' Motion *in Limine* to Exclude Improper Character Evidence, ECF No. 57, is hereby granted.  Defendant shall not be permitted to offer specific prior acts of peacefulness or nonviolence, as those character traits are not an element of any offense charged

**-158-**

nor any defense.  *See* Fed. R. Evid. 405(b).  Defendant may introduce evidence as to character only "by testimony about [his] reputation or by testimony in the form of an opinion."  Fed. R. Evid. 405(a).  Defendant shall not be permitted to offer extrinsic evidence of prior professional commendations.  *See United States v. Washington*, 106 F.3d 983, 999–1000 (D.C. Cir. 1997); *United States v. Irving*, No. 07-cr-107 (PLF), 2008 WL 163653, at *1 (D.D.C. Jan. 18, 2008).  The court will evaluate the permissible extent of evidence concerning prior professional commendations if Defendant elects to testify.

3.      The United States' Motion *in Limine* to Exclude Evidence Pertaining to an Unidentified Female Rioter, ECF No. 58 [hereinafter Rioter Mot.], is granted as conceded, Def.'s Opp'n to Rioter Mot., ECF No. 63, at 2.

4.      The United States' Motion *in Limine* to Preclude or Limit Cross-Examination of Officer N.R. and Exclude Evidence, ECF No. 59 (sealed), is granted, except as to potential bias cross-examination.  *See United States v. Wilson*, 605 F.3d 985, 1006 (D.C. Cir. 2010) (recognizing propriety of bias cross-examination regarding an ongoing internal investigation against a testifying officer but observing that the investigation's subject matter would not have "assisted in portraying [the officer] as biased").  The court will discuss with the parties the scope of such cross-examination at the pretrial conference.

5.      The United States' Motion *in Limine* to Preclude Claims of Self-Defense, Necessity, Justification, and Duress, and to Exclude Evidence in Support Thereof, ECF No. 60 [hereinafter Defenses Mot.], is granted as conceded as to the defenses of necessity, justification, and duress, *see* Def.'s Opp'n to Defenses Mot., ECF No. 68, at 8 n.2, but denied without prejudice as to self-defense.

The government asks the court to preclude pretrial a defense of self-defense "as a matter of law." Defenses Mot. at 13. But whether self-defense is available pretrial "as a matter of law" is not the correct inquiry. The question is whether Defendant would be entitled to a self-defense instruction at the close of the case.

> [A]n accused is entitled to a[] [defense] instruction . . . if there is any evidence fairly tending to bear upon the issue . . . , however weak, and that the court may not intrude on the province of the jury which may find credibility in testimony that the judge may consider completely overborne by the 'simply overwhelming' evidence of the prosecutor.

*Belton v. United States*, 382 F.2d 150, 155 (D.C. Cir. 1967) (internal quotation marks omitted). The court cannot, at this stage, determine whether the evidence presented at trial, whether weakly or otherwise, will "bear upon the issue" of self-defense. Not all the evidence is before the court, including, perhaps most critically, Defendant's own potential testimony. The court will not, at this stage, foreclose a self-defense defense based solely on the government's view of the evidence.

_____

Amit P. Mehta

United States District Court Judge

Date:  April 13, 2022

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on February 14, 2022**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-CR-208 (APM)** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | **18 U.S.C. § 111(a)(1) and (b)** |
| **THOMAS WEBSTER,** | : | **(Assaulting, Resisting, or Impeding** |
| | : | **Certain Officers Using a Dangerous** |
| **Defendant.** | : | **Weapon)** |
| | : | **18 U.S.C. § 231(a)(3)** |
| | : | **(Civil Disorder)** |
| | : | **18 U.S.C. § 1752(a)(1) and (b)(1)(A)** |
| | : | **(Entering and Remaining in a Restricted** |
| | : | **Building or Grounds with a Deadly or** |
| | : | **Dangerous Weapon)** |
| | : | **18 U.S.C. § 1752(a)(2) and (b)(1)(A)** |
| | : | **(Disorderly and Disruptive Conduct in a** |
| | : | **Restricted Building or Grounds with a** |
| | : | **Deadly or Dangerous Weapon)** |
| | : | **18 U.S.C. § 1752(a)(4) and (b)(1)(A)** |
| | : | **(Engaging in Physical Violence in a** |
| | : | **Restricted Building or Grounds with a** |
| | : | **Deadly or Dangerous Weapon)** |
| | : | **40 U.S.C. § 5104(e)(2)(F)** |
| | : | **(Act of Physical Violence Within the** |
| | : | **Capitol Grounds or Buildings)** |
| | : | |
| | : | |
| | : | |

**I N D I C T M E N T**

The Grand Jury charges that:

## COUNT ONE

On or about January 6, 2021, within the District of Columbia, **THOMAS WEBSTER**, using a deadly or dangerous weapon, that is, a metal flagpole, did forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of the United States, and of any branch of the United States Government (including any member of the uniformed services), and any person assisting such an officer and employee, that is, Officer N.R., an officer from the Metropolitan Police Department, while such officer or employee was engaged in or on account of the performance of official duties, and where the acts in violation of this section involve physical contact with the victim and the intent to commit another felony.

(**Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon**, in violation of Title 18, United States Code, Sections 111(a)(1) and (b))

## COUNT TWO

On or about January 6, 2021, within the District of Columbia, **THOMAS WEBSTER**, committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer, that is, Officer N.R., an officer from the Metropolitan Police Department, lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.

(**Civil Disorder**, in violation of Title 18, United States Code, Section 231(a)(3))

## COUNT THREE

On or about January 6, 2021, within the District of Columbia, **THOMAS WEBSTER**, did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, without lawful authority to do so, and, during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a metal flagpole.

> **(Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**, in violation of Title 18, United States Code, Section 1752(a)(1) and (b)(1)(A))

## COUNT FOUR

On or about January 6, 2021, within the District of Columbia, **THOMAS WEBSTER**, did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions, and, during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a metal flagpole.

> **(Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**, in violation of Title 18, United States Code, Section 1752(a)(2) and (b)(1)(A))

## COUNT FIVE

On or about January 6, 2021, within the District of Columbia, **THOMAS WEBSTER**, did knowingly engage in any act of physical violence against any person and property in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, and, during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, a metal flagpole.

> (**Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**, in violation of Title 18, United States Code, Section 1752(a)(4) and (b)(1)(A))

## COUNT SIX

On or about January 6, 2021, within the District of Columbia, **THOMAS WEBSTER**, willfully and knowingly engaged in an act of physical violence within the United States Capitol Grounds and in any of the Capitol Buildings.

> (**Act of Physical Violence in the Capitol Grounds or Buildings**, in violation of Title 40, United States Code, Section 5104(e)(2)(F))

A TRUE BILL:


FOREPERSON.


*Matthew M. Graves/akl*

Attorney of the United States in
and for the District of Columbia.

4

**-164-**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 21-cr-208 (APM) |
| | ) |
| THOMAS WEBSTER, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER

Defendant Thomas Webster's Motion for Change of Venue, ECF No. 49 [hereinafter Def.'s Mot.], is hereby denied without prejudice.

Defendant has not shown that this is an "extreme case" in which juror prejudice can be presumed. *Skilling v. United States*, 561 U.S. 358, 381 (2010); *United States v. Bochene*, No. 21-cr-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (holding that a January 6 defendant had failed to establish the "extreme circumstances" required for mandatory venue transfer under Federal Rule of Criminal Procedure 21(a)). First, the "size and characteristics" of the District of Columbia do not warrant such a presumption. *Skilling*, 561 U.S. at 382. Second, news stories of the events of January 6th and, specifically those involving Defendant, contain "no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, more than 15 months have passed since the events of January 6th, resulting in at least some reduced "decibel level of media attention." *Id.* at 383; *cf. Rideau v. Louisiana*, 373 U.S. 723, 724 (1963). And, finally, at least two other January 6 cases have proceeded to jury trials, in which voir dire has been successful in identifying unbiased jurors. *Cf. Skilling*, 561 U.S. at 384 ("Although the widespread community impact necessitated careful

**-165-**

identification and inspection of prospective jurors' connections to Enron, the extensive screening questionnaire and followup *voir dire* were well suited to that task.").

In addition, the survey evidence that Defendant has presented does not establish a presumption of juror prejudice.  As the government points out, the survey does not point to considerably greater media exposure in this District compared to the Northern District of Georgia; nationwide surveys point to equally unfavorable views of January 6 defendants as those purportedly held by District residents; and the survey results indicate that nearly half of those District resident polled would keep an open mind in the context of a specific case.  *See* Gov't Opp'n to Def.'s Mot., ECF No. 52, at 6–9.

In the end, the appropriate way to identify a biased juror pool is through *voir dire*. *See United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) ("And if an impartial jury actually cannot be selected, that fact should become evident at the voir dire.").  Defendant nevertheless contends that the "*voir dire* process is incapable of protecting [his] Constitutional rights." Def.'s Mot. at 4.  But, as the court observed in *Bochene*, "there is no reason to believe that members of the jury venire will even know who [Defendant] is or what he allegedly did on January 6, much less that a significant number of the members of the venire will lack the capacity to evaluate the case against Defendant based solely on the facts of his case." 2022 WL 123893, at *2 (emphasis omitted).  "Nor, more generally, is there reason to believe that the *voir dire* process will prove ineffective in identifying any members of the venire who lack the requisite impartiality to serve on a jury." *Id.*  Should *voir dire* prove to be ineffective in identifying a fair jury, Defendant may renew his motion.

For the foregoing reasons, Defendant's Motion for Change of Venue, ECF No. 29, is denied.

Date:  April 18, 2022

Amit P. Mehta
United States District Court Judge

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )    CR No. 21-208
                                   )    Washington, D.C.
          vs.                      )    April 21, 2022
                                   )    2:04 p.m.
THOMAS WEBSTER,                    )
                                   )
          Defendant.               )
_____)
```

```
        TRANSCRIPT OF PRETRIAL CONFERENCE PROCEEDINGS
           BEFORE THE HONORABLE AMIT P. MEHTA
              UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For the Government:            Brian P. Kelly
                               U.S. ATTORNEY'S OFFICE
                               555 Fourth Street NW
                               Suite 3816
                               Washington, D.C. 20530
                               (202) 252-7503
                               Email: brian.kelly3@usdoj.gov

                               Hava Arin Levenson Mirell
                               U.S. ATTORNEY'S OFFICE
                               312 N. Spring St.
                               Suite 1200
                               Los Angeles, CA 90012
                               (213) 894-0717
                               Email: hava.mirell@usdoj.gov

                               Katherine Nielsen
                               DOJ-CRM
                               Fraud Section
                               1400 New York Ave., NW
                               Washington, D.C. 20530
                               (202) 355-5736
                               Email:
                               katherine.nielsen@usdoj.gov

APPEARANCES CONTINUED:

For the Defendant:               James E. Monroe
                                 DUPEE & MONROE, P.C.
                                 211 Main Street
                                 PO Box 470
                                 Goshen, NY 10924
                                 (845) 294-8900
                                 Email:
                                 marina@dupeemonroelaw.com

Court Reporter:                  William P. Zaremba
                                 Registered Merit Reporter
                                 Certified Realtime Reporter
                                 Official Court Reporter
                                 E. Barrett Prettyman CH
                                 333 Constitution Avenue, NW
                                 Washington, D.C. 20001
                                 (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

P R O C E E D I N G S

1

2          COURTROOM DEPUTY:  All rise.  The Honorable

3   Amit P. Mehta presiding.

4          THE COURT:  Good afternoon, everyone.  Please be

5   seated.

6          COURTROOM DEPUTY:  Good afternoon, Your Honor.

7   This is Criminal Case No. 21-208, United States of America

8   versus Thomas Webster.

9          Brian Kelly, Hava Mirell, and Katherine Nielsen

10   for the government.

11          James Monroe for the defense.

12          The defendant's appearing in person for these

13   proceedings.

14          THE COURT:  Okay.  Counsel, good afternoon.

15          Mr. Webster, good afternoon to you.

16          THE DEFENDANT:  Good afternoon, Your Honor.

17          THE COURT:  Welcome, everyone.  This is the first

18   time we've all been in person together.  It's nice to be

19   with you.

20          Okay.  So we're here for our pretrial conference.

21   Let me just sort of go through what I want to go over today,

22   certainly not to the exclusion or preclusion of any issues

23   anybody wants to raise.

24          But I think we need to arraign Mr. Webster on the

25   superseding indictment.  I want to just confirm that I've

1    resolved any motions in limine, just confirmation of

2    disclosure of grand jury, *Jencks*, et cetera, and then I want

3    to go through the Joint Pretrial, including, most sort of

4    pertinently, the voir dire question, which I've sort of

5    looked at carefully.  And just go from there.  And

6    ultimately just wind up with just talking about courtroom

7    logistics and the like, okay?

8                    MR. MONROE:  Judge, do you mind if I sit next to

9    Mr. Webster?  He's having a hard time hearing me.

10                    THE COURT:  As long as the marshal is okay with

11   it, I'm fine with it.

12                    U.S. MARSHAL:  It's fine, Your Honor.

13                    THE COURT:  Just so you all know, the hope is to

14   have all this Plexiglass down by Monday, but more on that to

15   come.

16                    Okay.  So why don't we first have Mr. Webster

17   arraigned on the superseding indictment.

18                    So, Mr. Webster, I'll just ask you to stand.

19   Actually, you don't even need to stand, you can have a seat.

20   And I'll just ask the Courtroom Deputy to proceed with the

21   arraignment and then I'll turn to Mr. Webster's counsel.

22                    COURTROOM DEPUTY:  And, Mr. Webster, you can have

23   a seat.

24                    Mr. Webster --

25                    THE COURT:  By the way, let me just interrupt.

**-171-**

1    Is there -- if we gave him a headset, would that help?

2           MR. MONROE:  I want him to be able to hear me just

3    so I can explain to him what the Court and the government's

4    speaking about.

5           THE COURT:  Okay.  Is he having trouble hearing

6    me?

7           THE DEFENDANT:  It's a little bit of an echo in

8    here.  I have a disability with hearing.

9           THE COURT:  Okay.

10          Well, why don't we just give you at least one of

11   these headsets that if at any point if you feel like you

12   need it, that would be helpful.  All of us are speaking into

13   microphones that would be amplified through that headset.

14          MR. MONROE:  Without interrupting the Court,

15   I wanted to talk to him quietly if he wanted to ask me any

16   questions.

17          THE COURT:  Sure.  No problem.

18          COURTROOM DEPUTY:  Mr. Webster, in Criminal Case

19   No. 21-208, you've been charged with the following:

20          Count 1, assaulting, resisting, or impeding

21   certain officers using a dangerous weapon, in violation of

22   Title 18 United States Code Sections 111(a)(1) and (b);

23          Count 2, civil disorder, in violation of Title 18

24   united States Code Section 231(a)(3);

25          Count 3, entering and remaining in a restricted

1    building or grounds with a deadly or dangerous weapon, in

2    violation of Title 18 United States Code Section 1752(a)(1)

3    and (b)(1)(A);

4            Count 4, disorderly and disruptive conduct in a

5    restricted building or grounds with a deadly or dangerous

6    weapon, in violation of Title 18 United States Code Section

7    1752(a)(2) and (b)(1)(A);

8            Count 5, engaging in physical violence in a

9    restricted building or grounds with a deadly or dangerous

10   weapon, in violation of Title 18 United States Code Section

11   1752(a)(4) and (b)(1)(A);

12           And to Count 6, active physical violence in a

13   Capitol Grounds or buildings, in violation of Title 40

14   United States Code Section 5104(e)(2)(F).

15           Do you wish to waive formal reading of the

16   superseding indictment, and how do you wish to plead?

17           MR. MONROE:  We would waive a formal reading of

18   the indictment, Your Honor, and enter a plea of not guilty

19   as to the same.

20           THE COURT:  Okay.  Thank you, Mr. Monroe.

21           So the record will reflect not-guilty pleas as to

22   each of the six counts of the superseding indictment.

23           Let me just confirm so that it's on the record.

24   As I understand the changes that have been made from the

25   preceding indictment, they're sort of -- they fall into two

1    categories; Count 6 of the prior indictment has been

2    dropped.  So what was originally Count 7 has moved up to

3    Count 6.  And then there's just some tweaking of the

4    language in Count 3 and Count 1; is that right?

5          MS. MIRELL:  That is correct, Your Honor.

6          THE COURT:  Okay.

7          And so let me just confirm then with Mr. Monroe

8    that there's no objection to proceeding with the trial as

9    scheduled in light of the new indictment?

10         MR. MONROE:  No objection, Your Honor.

11         THE COURT:  Okay.  All right.

12         Okay.  So let's just go down this list of things

13    I'd like to discuss and then obviously at any point if

14    anybody wants to raise anything, please do.

15         So I think I'm correct in saying that all the

16    outstanding motions in limines, as well as the motion to

17    transfer, I've resolved all of that, right, there's nothing

18    left to be resolved pretrial?

19         MS. MIRELL:  Correct, Your Honor.

20         THE COURT:  Okay.

21         And I want to just confirm that I think today may

22    be even the due date or perhaps it has already passed, that

23    *Jencks*, grand jury, and *Brady* disclosures have all been

24    made?

25         MS. MIRELL:  Yes, Your Honor, except for the grand

1   jury transcript from the most recent superseding indictment,

2   which is still being prepared.  We have disclosed the grand

3   jury and *Jencks*.

4         THE COURT:  Ms. Mirell, I'm going to ask you to

5   come up to the microphone, because not only am I having

6   trouble hearing, but the court reporter needs you to be in

7   the mic too.

8         MS. MIRELL:  My apologies, Your Honor.  Would you

9   like me to keep the mask on as well?

10        THE COURT:  You can take it off if you're

11   addressing me, that's fine.  Either way.  Whatever you're

12   comfortable with.

13        MS. MIRELL:  Yes, we have disclosed the grand jury

14   materials, except for the most recent superseding

15   indictment, because that transcript is still being prepared.

16        THE COURT:  Okay.

17        MS. MIRELL:  We have disclosed the *Jencks* for the

18   witnesses that we have noticed, and we will continue to

19   disclose any additional *Jencks* if it becomes available to

20   us.

21        THE COURT:  Okay.

22        And I'm not asking you to divulge substance, but

23   is it fair -- well, is there reason to think that any of the

24   testimony that supports the new superseding indictment is

25   materially different than what supported the prior

1    indictment?

2            MS. MIRELL:  No, Your Honor.

3            THE COURT:  All right.

4            So obviously you'll get that, Mr. Monroe.  I'm not

5    privy to what it says, but the presumption here is that it

6    doesn't say anything more than what you've already gotten.

7    If for some reason you think that turns out not to be

8    correct, you'll just have to let me know, okay?

9            MR. MONROE:  Yes, sir.

10           THE COURT:  All right.

11           Let's talk then about the Joint Pretrial Statement

12   and its contents.  Thank you, all, for putting that

13   together.

14           Your joint statement of the case, perfectly okay

15   with me.  I know we'll have to tweak that to state 6 instead

16   of 7, where appropriate, and we'll take care of that.

17           Let's talk about instructions -- excuse me, the

18   voir dire questions.

19           So let me first just back up.  I don't think any

20   of you have been before me for trial and so may not know

21   exactly how I conduct voir dire, and, frankly, Mr. Monroe

22   may not be familiar with how voir dire is conducted

23   generally in this court.

24           But the voir dire will be conducted by my reading

25   the questions that we all agree upon.

1    The jurors will have in hand a notecard.  That

2 notecard is designed for them to write down the question

3 numbers to which they answer yes.

4    So, for example, question 4 very simply is,

5 do you recognize any of the other potential jurors in the

6 panel, courtroom staff, or me?  If somebody thinks the

7 answer to that question is yes, they would write down the

8 No. 4.  If they don't think -- if the answer is no, they

9 don't need to write that down.

10    So all of the voir dire questions that I need to

11 ask consistent with that process need to have, one, a

12 yes-or-no response and a response that, when affirmative, is

13 something I need to follow up on.

14    There's one question in particular that either is

15 going to have to be reworded or dropped for that very

16 problem, because I think if somebody says yes -- excuse me,

17 if somebody says no, it wouldn't be captured in the way that

18 I've suggested, but we'll get to that in a moment.  And we

19 can talk more details about how voir dire will proceed, but

20 I just wanted to give that backdrop.

21    So I am fine with questions 1 through 5.  I just

22 want make sure that the parties essentially want me to, on

23 question 1, read the statement of the case that has been

24 jointly agreed upon or whether -- I will also do an

25 instruction of the jury before openings, and that's

1  typically where I give the more fulsome description of the

2  case.  But I'm happy to give the more fulsome description of

3  the case both in connection with question 1 and in

4  connection with the pretrial instructions.

5       MR. MONROE:  I'm sorry, I was looking for my voir

6  dire questions, Judge.

7       Could you ask me the question, sir?

8       THE COURT:  So the question was about question 1.

9  You all have said, you know, I should read the statement of

10 the case.  The statement of the case is what you have

11 presented on page 1 and 2.

12      My question was, I give a description of the case

13 both in connection with voir dire and as part of my pretrial

14 instructions before opening.

15      MR. MONROE:  Yes, sir.

16      THE COURT:  And often -- it is often the case that

17 the more detailed instruction of the case comes during the

18 pretrial instructions, as opposed to in question 1.

19      Now, I'm happy to do that differently here; I can

20 just read this joint statement of the case as part of

21 question 1 and just repeat it during the pretrial

22 instructions, if everybody is comfortable with that?

23      MS. MIRELL:  We're comfortable with the Court's

24 ordinary practice.

25      MR. MONROE:  Your Honor, that would be fine by the

1 | defense.

2 | THE COURT: Okay.

3 | Well, then we'll need to come up with something

4 | that is a little bit abbreviated. And I'll draft something

5 | up and circulate it to everybody for your consideration,

6 | okay?

7 | All right. So the next issue I have concerned

8 | question 6 that you all have proposed, this is on page 2.

9 | It reads: Do you or someone you know have a direct or

10 | indirect connection to the events, et cetera?

11 | I wasn't quite sure what "direct or indirect"

12 | meant. It sort of left me asking the question: How does

13 | one distinguish between the two? And if I couldn't figure

14 | that out, I'm not sure the average juror would understand

15 | the distinction.

16 | So I'm not quite sure what you all are trying to

17 | get at and so whether we ought to sort of refashion those

18 | terms or just drop them altogether.

19 | MR. KELLY: Your Honor, speaking for the

20 | government, I think since "direct or indirect," as you note,

21 | is somewhat nebulous, perhaps we could phrase the question

22 | just more directly, which is: Did you or someone you know

23 | personally participate in or personally witness the events

24 | that occurred at the U.S. Capitol on January 6th, 2021?

25 | I think that more cuts to the chase of what it is we're

1    concerned about.

2          THE COURT:  So it would say -- and, Mr. Monroe,

3    you tell me if you're okay with this:  Do you or someone you

4    know -- do you or someone you know personally witness the

5    events that occurred at the U.S. Capitol on January 6th,

6    2001 [sic]?

7          Now, that is still a little vague in the following

8    sense, that a lot of people might think, yeah, I witnessed

9    it because I saw it on TV.

10         MR. MONROE:  I was thinking, Judge, we can just

11   drop out the term "or indirect" and just leave the rest of

12   the way it reads.  This way we can identify those people who

13   may have either participated on the events of January 6th,

14   either as a civilian or as part of the government present,

15   or may have been out and about -- I was out there today,

16   it's a gorgeous day out there today.  There's a huge lawn

17   area; they could have stood back pretty far, even as far

18   back as Madison and seen everything go down without even

19   being part of it.  So that's why we wanted to capture and

20   identify any of the potential jurors who had that

21   experience.

22         I think the question gets clouded when we ask "or

23   indirect."  So if you were there and you know someone that

24   was there, I think it's fair for us to know what that

25   experience includes.

1        THE COURT:  How about this:  Were you or someone

2  you know a participant in or a physically present witness to

3  the events that occurred at the U.S. Capitol on January 6th,

4  2021?

5        MR. MONROE:  That's perfect, Judge.

6        THE COURT:  Okay.  I have it "physically" because

7  I don't want somebody to think, yeah, I saw it on TV and

8  therefore I was a witness.

9        MR. MONROE:  Yeah.

10       MS. MIRELL:  The government agrees.

11       THE COURT:  So we'll change 6 to that.

12       Questions 7 and 8, I will ask the first part of

13  the question but not the second.  So, in other words, I'll

14  ask in question 7, have you closely or regularly followed

15  the news about the events that took place at the U.S.

16  Capitol or the government's investigation of those events?

17  If the answer is yes, I'll then follow up in the individual

18  voir dire with the proposed follow-up question.  And the

19  same will be true for question 8, okay?

20       Question 9, I think we should -- and the same

21  thing is true here.  I'm not going to ask that second

22  question in question 9.  And I think we need to add the

23  following language:  Have you ever watched video of this

24  defendant from January 6th, 2021, on the news or on the

25  Internet, or read a news story about this defendant?

1          And I think we can just leave it there.  I mean, I

2     could elaborate some more, but I think that probably

3     captures it.

4          I didn't see the question that captured where

5     anybody had read about the story, as opposed to just viewing

6     the video of it, and so that's why I'm suggesting that.

7     Everybody okay with that?

8          MS. MIRELL:  Yes from the government.

9          THE COURT:  Okay.

10          All right.  So this the question that I was

11     alluding to earlier that sort of flips the answers.  The

12     question is:  No matter what you've heard or seen about the

13     events, et cetera, et cetera, and no matter what opinions

14     you may have formed, can you put all of that aside and

15     decide the case, et cetera?

16          If somebody says "yes," that's not somebody I want

17     to follow up with questions regarding, right?  It's the

18     people who say "no" that we need to identify.  So my usual

19     instructions wouldn't work for this question.

20          So we either need to rephrase it or I might

21     suggest just drop it altogether, because I feel like

22     everything else, all the other questions that we will ask,

23     will get to the heart of the same question in just smaller

24     bites.  So it might save us a little bit of time trying to

25     reword this.  I was trying to figure out how to reword it to

1  get the "yes" answer, and I found it a little bit difficult.

2          MR. MONROE:  So what we're trying to capture by

3  that question, and Your Honor had your thumb on it, we want

4  that visceral response to, you know, based on everything in

5  your totality of your experience, everything you've heard,

6  can you still be fair and impartial, right?  If that

7  question is seen in all types of cases and it loads up a

8  potential juror to respond viscerally.  So I'd like to leave

9  a question like that present.

10          THE COURT:  I mean, question 11, I think, gets to

11  the heart of the same thing.  You know, do you have such

12  strong feelings or opinions about the events that took place

13  that would make it difficult for you to serve as a fair and

14  impartial juror in the case?  And if somebody writes down

15  "yes" or if somebody responds "yes," that's a signal for us

16  to follow up.  So I think the same objective will be

17  achieved in question 11.  Is that okay with you, Mr. Monroe?

18          MR. MONROE:  Yes, Judge.

19          THE COURT:  So we'll cross out 10.  I'll cross out

20  10.

21          I am going to add, after question 11, one of the

22  questions that Mr. Monroe has proposed concerning feelings

23  about President Trump and his supporters, I think that's a

24  fair question to ask.  And so that question will be slightly

25  worded differently than what you've suggested, but it will

1  be as follows.

2           MR. MONROE:  Could you repeat the question, Judge?

3           THE COURT:  So I'm going to add after what's

4  currently question 11 --

5           MR. MONROE:  Yeah.

6           THE COURT:  -- I'm going add a question that's not

7  on your agreed-upon list.

8           MR. MONROE:  Okay.

9           THE COURT:  And I'm going to insert, after

10  question 11, one of the questions that you've proposed,

11  Mr. Monroe, and that's on page 8 concerning opinions of

12  former President Trump and his supporters, okay?

13           And I'm going to word that question as follows

14  so it's consistent with question 11:  Do you have such

15  strong feelings about former President Trump or his

16  supporters, positive or negative, that would make it

17  difficult for you to serve as a fair and impartial juror in

18  this case?  Okay?

19           MR. MONROE:  That's perfect, Judge.

20           THE COURT:  Okay.

21           I mean, I don't want to assume that a District

22  resident will only have feelings in one way or the other --

23  only in one direction, which is why I included the positive

24  or negative, so we'll include that.

25           All right.  The next question I had concerned 13B,

1  which is, has any member of that group ever served in the

2  Armed Forces?  I'm not sure why we need to ask that

3  question.  And I fear that it will also elicit a lot of

4  "yes" responses.  And, frankly, I'm not quite sure, if it

5  does, when it does elicit a "yes" response, what the

6  follow-up is to be to that question; in other words, how

7  does that question at all try to weed out bias.

8          MS. MIRELL:  I believe the defendant requested

9  that question.

10          THE COURT:  Okay.

11          MR. MONROE:  The jury will hear that both the

12  government's main witness, Officer N.R., and Tom Webster

13  were both in the service.

14          So I wanted to hear if any of the jurors

15  themselves had the same military experience and could relate

16  to either N.R. or Mr. Webster, and being able to make a

17  calculated decision whether this is, perhaps, a juror we may

18  want to challenge.

19          I will add, this, too, sir, that when you're in

20  the Armed Forces, it's a little bit of a team mentality.

21          THE COURT:  I guess the question is, what am I

22  supposed to do with that?  So if somebody says "yes," 13B,

23  they say "yes" or if they say "no," what am I supposed to do

24  in terms of following up to kind of get to the kind of bias

25  that either side may be looking to?

1    MR. MONROE:  Just simply, what branch of service

2  did you serve in?

3    THE COURT:  But that doesn't tell me anything

4  about whether this person is suitable to serve or not.

5    MR. MONROE:  There's a lot of jurors who you could

6  identify without them telling you, if they told you about

7  their backgrounds a little bit, that they may have parallel

8  experience with either the main witness for the government

9  or Mr. Webster.  Here we're asking whether or not a

10  prospective juror may have been in the Navy or the Marine

11  Corps or the Army or perhaps the Marine Corps.  That's all

12  we're really trying to get to.

13    THE COURT:  Okay.  I mean, I'll ask it.  I mean --

14    MR. MONROE:  And you could really skinny it down,

15  Judge, and say, did you have an opportunity to serve this

16  country either in the United States Navy or Marine Corps?

17  Because those are the two branch of services that are

18  relevant.

19    THE COURT:  It's not relevant -- look, I mean,

20  unless you're going to tell me something about your defense

21  here and what, perhaps, your client's anticipated testimony

22  is going to be, I guess I'm not sure how military service is

23  at all relevant and particularly how military service in a

24  particular branch -- now, you know, if the officer is going

25  to be asked, can you tell us about what you did before you

**-186-**

1   became a police officer and he says, I was in the service

2   for X years or your client testifies and says the same

3   thing, okay.

4           MR. MONROE:  Well, it appears, for Officer N.R.,

5   in his -- one of the statements that were prepared in a

6   submission to this Court, that he was in the Navy, Navy

7   Corpsman, how surprised he was that Mr. Webster, who was

8   holding a Marine Corps flag, behaved the way he did.

9           THE COURT:  I mean, maybe he said that in a

10  statement, but I'm not sure why that would at all be

11  relevant at trial.  In other words, if the government tried

12  to elicit his personal view of whether Mr. Webster's

13  reaction was surprising or get his opinion about it, I don't

14  know that that's even relevant.

15          MR. MONROE:  We're just trying to assess whether a

16  particular --

17          THE COURT:  Here, I know what you're trying to

18  assess, which is that you'd like to figure out if somebody's

19  got, you know, armed services background.

20          It's sort of a wash in this case because both

21  sides, you know -- the victim here has armed services

22  background, your client has armed services background, and

23  you're looking for people that you think might be able to

24  relate to your client more than the government.  I get it.

25          So I'll ask the question, but I'm not going to

**-187-**

1  follow up on it in any other way than to just, can you tell

2  us which branch and that's it, all right?  So this will

3  essentially function as a background kind of question.

4  That's all.

5          MR. MONROE:  I'd like to stand by the request and

6  just offer my respectful exception.

7          THE COURT:  I'm sorry?

8          MR. MONROE:  I'd like to stand by the request and

9  offer the Court my respectful exception, please.

10         THE COURT:  Yeah, like I said, I'll leave it in

11 there, but I'm not going to -- typically what, as you'll

12 see, a lot of these questions are designed to elicit an

13 answer that I can then follow up with questions that

14 are designed to determine whether the person can serve as a

15 fair and impartial juror.

16         So, you know, for example, the police officer

17 question is a valid one, because, you know, you're going to

18 hear police testimony in this case, is there anything about

19 the relationship with your family member that might make you

20 think you can't be fair and impartial in this case.  I mean,

21 I don't know that that's the same thing here with respect to

22 Armed Forces.  But in any event, I'll ask the question and

23 limit any follow-up.

24         Question 13 -- all right.  There's also been a

25 question requested, I think, by Mr. Monroe asking whether

1     any member of the group -- I think it was a question he

2     tried to get at about whether anybody's been involved in a

3     physical altercation with a police officer before.  I think

4     that's a question that you tried to get to, Mr. Monroe; is

5     that right?

6           MR. MONROE:  Yes, sir.

7           THE COURT:  All right.

8           So I'm going to include as 13E, has any member of

9     that group ever been involved in a physical altercation with

10    a member of law enforcement, okay?

11          All right.  Question 14 I'm going take out because

12    I think it's redundant of question 12 and what we're going

13    to get out of people in question 13A.  I don't think we need

14    to ask that question again, okay?

15          I don't understand the reason we need question 15.

16    This asks, you know, about obtaining evidence by search

17    warrant.

18          MS. MIRELL:  Your Honor, the government is fine

19    with removing this question.

20          THE COURT:  Mr. Monroe, any objection to removing

21    it?

22          MR. MONROE:  No, Judge.

23          THE COURT:  Just so you all know, my practice with

24    respect to this is, because it's hard to avoid the

25    testimony, you know, "How did you get his phone records?"

1  "Well, we got a warrant."

2       So my practice is just to give a limiting

3  instruction to the jury when that evidence is introduced to

4  say, look, you are to draw no inference from the fact that a

5  judge issued a warrant.  That information is just being

6  given to you to tell you how the information was obtained

7  and nothing more than that.  And I repeat that same

8  instruction as part of my closing instructions, okay?

9       All right.  16, I think, just needs to be modified

10  a little bit.  The final question needs to say, just so it's

11  parallel with the prior sentences:  Would you have any

12  difficulty presuming Mr. Webster to be innocent or this

13  allocation of the burden of proof, okay?  Everybody okay

14  with that addition?

15       MS. MIRELL:  Yes, Your Honor, from the government.

16       THE COURT:  Okay.

17       MR. MONROE:  Yes, Judge.

18       THE COURT:  So that is my -- I'm okay with

19  everything else that you all have proposed, and I'll give

20  those.

21       The remaining questions that Mr. Monroe and

22  Mr. Webster have proposed that I have not and will not be

23  incorporating into the voir dire are questions 1, 3, 4, 5,

24  and 7.  I think they're either just -- you know, they're

25  questions that are essentially redundant of what we're

1  already going to be asking of these jurors or questions that

2  really aren't designed to elicit anything that's terribly

3  useful.

4       And, you know, I also don't want to -- so that's

5  it; in other words, I'm going to drop those.  I think the

6  information you're trying to elicit from those questions is

7  going to come from what is now, I think, at least 20 voir

8  dire questions that's going to ask a whole host of

9  information about people's predisposition to their views

10 about the events of January the 6th, okay?

11      All right.  Then there is what you all have put on

12 questions 8 -- I mean, pages 8 and 9 and 10 and 11.  And I

13 wasn't sure what you wanted me to do with this.  And it

14 looks like -- or it feels like you want to have some

15 questionnaire completed by prospective jurors that you can

16 look at while you're assessing the juror, which I'm not sure

17 I was prepared to do in this case and will certainly add to

18 the time of jury selection, both in terms of the time it's

19 going to take for them to complete any such questionnaire

20 and the fact it might elicit more questions than the voir

21 dire questions do and not necessarily for reasons that are

22 relevant.  And some of these are, I think, sort of

23 redundant.  So in any event...

24      MR. KELLY:  Your Honor, I think the parties, or at

25 least the government, had envisioned this as somewhat of a

1    background questionnaire.

2          I think Your Honor's suspicion was correct.  We're

3    fine not doing something like that in this case.  There is

4    some information, though, that would have been encompassed

5    within this questionnaire that we think would -- perhaps we

6    could fashion one or two additional voir dire questions just

7    for things such as, you know, trouble seeing or hearing,

8    medical problems, ability to read and speak English, those

9    sorts of things that we may want to suss out if any

10   prospective member is going to self-identify some issue that

11   wouldn't necessarily be readily apparent to the parties or

12   Your Honor that would make them serving on a jury difficult

13   for reasons other than potential bias.

14         THE COURT:  I mean, I can tell you that we've got

15   sort of the catch-all question that's currently 22.

16         And, you know, I find that it's pretty

17   self-evident, once we get into the individual voir dire,

18   whether somebody has any of the issues that you're seeking

19   to spot, whether it's inability to hear, difficulty with

20   English; I don't think I've ever had anybody have that

21   issue.  So, you know, I'm not -- I mean, if you all want to

22   come up with something, but I'm not sure I want to answer

23   some initial question that, here are the ten things that we

24   think might make it difficult for you to be a juror, tell us

25   which category you fall in.

1          I am reminded, however, that I think -- you know,

2     I've now been asking a standard COVID question, which

3     I don't think there is one in your proposed instructions, or

4     maybe I missed it, but it's essentially a question that

5     says, look, does anybody have such strong feelings or

6     concerns about COVID-19 that would make it -- that they

7     think would make it difficult for them to serve.

8          MR. MONROE:  Page 9, sir, letter L.

9          THE COURT:  Yeah, right, that's what I'm saying.

10    I will take sort of that one.  And I'm reminded that I'll

11    insert my sort of standard question about COVID concerns

12    into the proposed voir dire, okay?

13         So, Mr. Monroe, are you okay with sort of

14    jettisoning what this otherwise -- what looks like what was

15    considered to be a juror questionnaire?

16         MR. MONROE:  I completely understand what the

17    government was trying to achieve here.  I agree with their

18    position that there should be some inquiry as whatever

19    direct or broad the Court thinks is proper to make sure that

20    the folks that are selected who do understand English and

21    not suffering from a disability keep them to follow along

22    with the testimony.  And I wouldn't want it to be too broad,

23    Judge, where someone wouldn't be comfortable telling us

24    maybe that --

25         THE COURT:  I can tell you, Mr. Webster [sic], in

**-193-**

1  my entire time on this bench, I've never had a juror shy

2  away from telling me that here's the reason I can't serve.

3      MR. MONROE:  Yes.

4      THE COURT:  People are actually usually more than

5  happy to explain what their problem is --

6      MR. MONROE:  Understood.

7      THE COURT:  -- that they think is going to get

8  them out of jury service.

9      And, you know, I promise you we will catch it,

10  because we will be doing an individual voir dire of

11  everybody regardless of whether they answer any of these

12  questions "yes."  And given the nature of this case and

13  given the nature of these questions, I've got to believe

14  we're not going to have very few blank cards of prospective

15  jurors, okay?

16      MR. KELLY:  Your Honor, just a last note from the

17  government on this.  I think we're fine with deferring to

18  Your Honor.

19      Just one final possible suggestion for you to

20  consider would be in the catch-all question, currently 22,

21  where it says, do you have any religious, moral, or

22  philosophical reason, somewhere in there add, you know,

23  do you have any medical or religious, moral, or -- it's just

24  a possibility just to address the concerns.

25      THE COURT:  I could put "any medical reason."

**-194-**

1          Well, the problem is, that doesn't work, because

2    the ultimate question is, all those clauses are a predicate

3    to the question of being a fair and impartial juror.

4          MR. KELLY:  That's correct, Your Honor, just --

5    withdrawn.  I think the government is happy to defer to

6    Your Honor on this.

7          THE COURT:  Okay.  So I'll just leave it as is.

8          So those are the voir dire questions, the

9    background questions.

10          All right.  So I just want to turn then to

11    exhibits and witnesses.  Are there any sort of objections to

12    exhibits that -- or witnesses that anyone thinks can be

13    resolved now?  You know, trials are obviously fluid, and

14    maybe you all are still thinking through order and

15    presentation of your evidence, but if there's something that

16    needs to be taken up pretrial, we can do that now.

17          MS. MIRELL:  Yes, Your Honor.

18          We have several objections to the defendant's

19    witness list that can be addressed, we believe, now.

20          THE COURT:  Okay.

21          MS. MIRELL:  We'll start with the exhibits that

22    are subject to or excluded under this Court's order.

23          THE COURT:  Well, hang on.  I thought I heard you

24    say "witness list."  So are we talking witnesses or

25    exhibits?

```
 1              MR. KELLY:  I misspoke; I'm starting with the
 2    exhibit list.
 3              THE COURT:  Okay.
 4              MS. MIRELL:  And focusing only on what the
 5    government understands to be excluded by this Court's order
 6    at ECF 75, I believe Exhibit 13, which is Officer N.R.'s
 7    disciplinary records --
 8              THE COURT:  Uh-huh.
 9              MS. MIRELL:  -- the printout of his disciplinary
10    records, we believe is not admissible in this case, subject
11    to your Court's order.
12              THE COURT:  So let me just say this.
13              And, Mr. Monroe, you tell me if I'm wrong.
14              I guess I assumed, at least with respect to the
15    defendant's exhibit list, that some of this was put on there
16    in anticipation of potential impeachment.
17              MR. MONROE:  Yes, Your Honor.
18              THE COURT:  Just so you've got a number.
19              MR. MONROE:  It would not be admissible, as the
20    government suggested.
21              THE COURT:  I mean, there's a number of these, for
22    example, all the police --
23              MR. MONROE:  All subject to cross --
24              THE COURT REPORTER:  I can't hear you.
25              THE COURT:  That's okay.
```

1          Mr. Monroe, I've got to advise you to let me

2    finish and then -- so you can then start so we're not

3    talking over one another.

4          So in any event, I was just saying that, for

5    example, the first six exhibits are identified as police

6    reports, and I assumed -- and other police reports, and

7    that's obviously not coming in, and I just assumed it was

8    there for -- as a placeholder.

9          MR. MONROE:  Judge, my apologies.

10         Usually I'm excellent about being patient and not

11   to overtalk the judge.  And you'll see, I try to keep a high

12   level of decorum, probably more so than most attorneys

13   appear before the Court, but I apologize for that.

14         THE COURT:  That's okay.

15         MR. MONROE:  It will not happen again.

16         But the exhibit list, as I prepare them in this

17   case and in the past, some of them, I know straight out are

18   not going to be admissible.

19         But I can't anticipate what a witness is going to

20   testify to.  I may take it out to cross-examine a witness,

21   and that's already been marked for that purpose.  So I have

22   it available to me and I can impeach him on those subjects

23   where they may have not testified consistently with what's

24   reflected in the reports.

25         THE COURT:  Okay.

1          And the other -- and, Ms. Mirell, I don't mean to

2   pre-empt your arguments, but, I mean, the other two that

3   sort of caught my eye were Mr. Webster's personnel records

4   from the military and the NYPD.  You know, I'm not sure

5   what, A, they consist of, and, B, what you're contemplating

6   doing with those.

7          You know, if the potential intention is that he's

8   going to testify and he's going to, as part of his

9   background, say he achieved the following things, you know,

10  I think in my order I said we'd talk about that a little bit

11  in terms of what the law of the scope of that is.

12         I mean, do you think -- and maybe the government

13  will disagree, but, you know, if he's going to testify, he

14  can provide some background and what rank did you achieve in

15  the Marine Corps, did you earn any service awards, okay.

16  Same thing with NYPD, "Did you earn any recognitions?"

17  "Yes, I did."  But I don't know that we then need the

18  documents to sort of back that up.

19         MR. MONROE:  Yeah.

20         Judge, I'll say that the Court's already visited

21  these documents in the past in other contexts.  But

22  Mr. Webster is a man of exceptional character.  He's lived a

23  truly outstanding life, and a lot of these achievements have

24  been documented.

25         I know, from a trial standpoint, they wouldn't be

1  admissible.  But, again, I mark them as exhibits.  Sometimes

2  as I'm going through the gentleman's good background, I may

3  need to look at a few things and remind myself what types of

4  questions to ask this man so that he can explain to the jury

5  the outstanding character that he possesses.

6              So I mean, many times --

7              THE COURT:  Let me just interrupt you.

8              I mean, look, if what you've done is just to put

9  these in as a placeholder, that's fine for now.  But if --

10  and we'll have some time to think about this and you'll have

11  time to think about this.  But if the intention is to admit

12  any of these records, either independently or through your

13  client's testimony, we should have a discussion about that

14  before you try to introduce them, okay?

15             MR. MONROE:  Yes.

16             And I also am familiar with the certification

17  process that would come along with some of these public

18  records.

19             As I stand here today, Judge, I have no intention

20  to offer them as exhibits at trial.  But certainly the jury

21  is going to hear from Mr. Webster himself the testimony of

22  these accomplishments as to speak to this gentleman's good

23  character.

24             THE COURT:  Okay.

25             You know, there's sort of black letter of trial

1  and then there's kind of the understanding of how trial

2  works.

3          And, you know, I think, Mr. Monroe, perhaps --

4  I'm not overstating, you certainly do understand, I hope,

5  that, for example, you can't argue to the jury that you

6  can -- that this is a person of good character because of

7  his achievements in the Marines, et cetera.

8          I mean, the question here is one of, as

9  I understand, of self-defense.  And, you know, character

10  testimony is relevant, but it's about opinion testimony from

11  other witnesses.  I don't know that somebody can bolster

12  their own character, but...

13          MR. MONROE:  So -- and let's talk about, for

14  example, and it occurs to me as you speak about the police

15  records.

16          We know on the self-defense issue, we can't elicit

17  testimony about the victim's propensities unless the

18  defendant himself knew about the victim.  Let's say the

19  victim was the neighborhood bully --

20          THE COURT:  Right.

21          MR. MONROE:  -- and he was familiar with the

22  bully.  And finally after the fifth or sixth time said,

23  "That's it, I'm not going to get beat get up again by the

24  neighborhood bully and that's why I defended myself."

25          But Mr. Webster here, he's going to be able to

1 testify about his former time and training as a police

2 officer in this very context, and what he, as a defendant,

3 would have anticipated in his own training as to what N.R.'s

4 conduct would have been.

5 So in that context, Judge, we are taking the

6 position that Mr. Webster's training, and maybe even some of

7 his records that speak to this, is relevant as to what this

8 gentleman, in his unique position as a retired police

9 officer, would have anticipated, such as this, Judge.

10 Part of NYPD training, and I've attached it as one

11 of my exhibits in the back, talks about how to conduct

12 yourself as an officer when you're at a post.

13 THE COURT: All right. So let me interrupt you,

14 and I'm sure the government has some thoughts on it, but let

15 me say this:

16 It's a fine line we're going to have to walk here,

17 okay, in the following sense. You know, a self-defense

18 defense obviously involves as part of it the person's

19 perception and the reasonableness of that perception.

20 That said, I'm not going to allow the NYPD

21 guidelines to be brought in as some sort of expert standard

22 of care evidence here, and it's not going to be used that

23 way.

24 To the extent that Mr. Webster might say, look,

25 I was surprised by what he did, given my training. What was

1  your training?  Well, we were told X, Y, and Z.  Okay, maybe

2  I'll allow some of that.

3       But you're not then going to put in the NYPD's

4  training manual to corroborate his testimony or to get

5  through the back door some sort of national or local

6  standards of care when you haven't designated an expert.

7       MR. MONROE:  Well, here, we have a fact witness --

8       THE COURT:  Understood.

9       MR. MONROE:  -- and his experience in this context

10  is unique to him as a former police officer.

11       THE COURT:  No.  I understand all that.  But you

12  don't need to put in the training manual or the training

13  protocols to do that.

14       And, frankly, what it ends up doing or the risk

15  here is it confused the jury and the jury is then supposed

16  to kind of take that protocol and training manual and sort

17  of assess it against what the officer did here.  And I'm not

18  going to allow that, because that really does sort of become

19  expert testimony.  I don't know, neither side has really

20  designated a use-of-force expert.

21       MR. MONROE:  Or to assess what someone in Tom's

22  experience, his reasonable anticipation of how the officers

23  would have conducted in this context.

24       Judge, I totally understand the Court's position.

25  I'm going to stand by --

1          THE COURT:  I'll leave it at this, which is,

2   I'm not going to let it through direct.  If there's

3   cross-examination that potentially opens the door to that

4   kind of thing on redirect, I'll consider it.

5          But, you know, if, for example, the government

6   says, well, that's not true, is it, that the NYPD protocols

7   didn't say X, didn't say Y, and it turns out they actually

8   did say X or Y.  Maybe then on redirect you could bring it

9   in, but certainly not on direct examination.

10          MR. MONROE:  Yeah.

11          Well, Judge, I would offer my most respectful

12   exception.  We stand by it, sir.

13          THE COURT:  All right.

14          Sorry, Ms. Mirell, I sort of hijacked your

15   instructions.

16          MS. MIRELL:  You were much more eloquent than I

17   would have been.

18          In that same vein, though, I do want to highlight

19   Defense Exhibit 45.  Perhaps I don't understand the purpose

20   of Defense Exhibit 45 and how he intends to elicit it or

21   whether he intends to introduce it.

22          THE COURT:  I don't know, Mr. Monroe.  I mean --

23          MR. MONROE:  So this is a public source document,

24   Judge.

25          THE COURT:  It's a what?

1          MR. MONROE:  It's something that was found

2    publicly.

3          THE COURT:  Yeah.  Right.  Right.

4          MR. MONROE:  So issues of excessive force is not

5    new to D.C. or the MPD or the DOJ, and this is something

6    they've been dealing with.

7          THE COURT:  Look, I guess the bottom line is this.

8    I don't know what you're going to use it for.  I think it is

9    appropriate if, for example, part of the theory of your

10   defense is that Officer N.R. acted inconsistently with an

11   MPD general order, then, I don't know that the government

12   would disagree with this, but you could, in the cross,

13   examine him about that and potentially even use the general

14   order to demonstrate that his actions were inconsistent that

15   day.

16          I don't know if that's going to happen or not or

17   that's your intention.  But my view is at this point I just

18   kind of have to wait and see what you intend to do with the

19   document.

20          And does the government have a different view of

21   how that document can be used?

22          MS. MIRELL:  Well, I think the defendant has

23   also -- that would be the purpose of Exhibit 46, as

24   I understand it.

25          But Exhibit 45, the memorandum of agreement that

1  went into place even 15 years before this officer ever

2  joined the force and doesn't actually dictate the policy

3  that was applicable during January 6th, 2021.

4       THE COURT:  Hold on.

5       You said 45.  So I was focused on the MPD general

6  order series 901, but it sounds like you're talking about

7  44.

8       MS. MIRELL:  I may have misnumbered in my

9  spreadsheet.  My apologies, Your Honor.

10       MR. MONROE:  Judge, I think what she is speaking

11  about initially is 45 in defendant's list.  You can look at

12  my binder, sir.

13       THE COURT:  Maybe you all have updated something.

14  But I'm looking at ECF 74.  This is what was printed out

15  from.

16       MS. MIRELL:  I believe the defendant sent a

17  modified exhibit list; it may not be before Your Honor.  But

18  I think if you look at the exhibits in the binder,

19  Exhibit 45, the white binder.

20       THE COURT:  Okay.  All right.  This was originally

21  designated as 44, I think.  But okay.  Go ahead.

22       MS. MIRELL:  So government doesn't see the

23  relevance of this document at all.

24       THE COURT:  Was this something that the MPD

25  entered into as part of a consent decree with the MPD;

1  is that correct?

2       MS. MIRELL:  My understanding, yes, the

3  equivalent -- or similar to a consent decree.

4       THE COURT:  Right.

5       I mean, I don't know what -- what are your

6  intentions with this, Mr. Monroe?

7       MR. MONROE:  Well, without giving up too much of

8  my defense strategy --

9       THE COURT:  Yeah, I understand.

10       MR. MONROE:  I don't know what the officer is

11  going to testify.  He's left out some big portions of what

12  transpired here.

13       But I will tell you this, Judge:  A lot of the

14  defense case is going to be not what documents were prepared

15  by this officer but what he didn't prepare.  And one of the

16  things he's supposed to prepare when there's actually a use

17  of force perpetrated by him on a civilian is he's got to

18  prepare a use-of-force report.  That's one of the hallmark

19  issues that were ruled upon between the Department of

20  Justice and the MPD.

21       However, I'll say this to you in all fairness to

22  the government, that same requirement also appears in their

23  guidelines.

24       THE COURT:  Right.

25       MR. MONROE:  So it's in both.

```
 1          But -- and I hate to just keep laying out cards
 2   and cards, because I don't want to tip the government too
 3   much off about that.
 4          THE COURT:  No, that's fine.  I'm not asking you
 5   to do that.
 6          MR. MONROE:  But it's for impeachment purposes,
 7   Judge.
 8          THE COURT:  No, that's fine.
 9          I guess what I said earlier, I'll just reemphasize
10   it, which is, I think it's fair for defense counsel to
11   pursue the officer's familiarity with general orders.  And
12   if there is a reason to cross-examine him with the general
13   order, you can do that.
14          I mean, if, for example, he's asked, you know,
15   isn't it true that if you use force, you're supposed to
16   complete a form.  And if he says no, then you can use a
17   general -- use the MPD general order to cross-examine him.
18   But if he says yes, there's no real point, okay?
19          MS. MIRELL:  May I just confer with my colleagues
20   to make sure we have nothing else to raise?
21          THE COURT:  Sure.
22          (Government counsel conferred off the record.)
23          MS. MIRELL:  I don't think we have any further
24   objections to the exhibits at this time, but we reserve our
25   right to object at trial.
```

1           THE COURT:  All right.  Sure.

2           Mr. Monroe, do you have any particular exhibits or

3     witnesses you want to raise at this point?

4           MR. MONROE:  So I did give the government my

5     witness list.  It's mainly three character witnesses.  And

6     they will be brief.  I'm big on not belaboring the point

7     with the jury.  I make my couple points, sit down.  I'm very

8     systematic that way.

9           I did ask the government if they would produce two

10    of their investigators; one is a special agent, and the

11    other one is a detective from MPD.

12          I have to say, the government has been excellent

13    to deal with.  One of the detectives from MPD has some

14    availability issues.  I did tell the government that if -- I

15    mean, I don't know how long their case is going to take.

16    But if it conflicts with the case, I will take that witness

17    out of order, if I'm allowed to question him on direct just

18    to accommodate his scheduling.  But the government has

19    agreed to produce those two additional witnesses.  They're

20    not going to force me to chase these people around with

21    subpoenas for that purpose.

22          MS. MIRELL:  And, Your Honor, on that note,

23    I think the witness that defense counsel is referring to is

24    Detective Lauderdale.

25          The government, as of today, has decided, and we

1    haven't had an opportunity to confer with defense counsel,

2    we will likely call Detective Lauderdale in our

3    case-in-chief.  And we would probably intend to do so on

4    Thursday, given that witness's availability.  So defendant

5    will have an opportunity to cross-examine.  And we will

6    provide relevant *Jencks* once we receive.

7                THE COURT:  Okay.

8                MR. MONROE:  I'm sure that's plenty.  I just -- if

9    something changes, I just want to reserve having him in my

10   case-in-chief if that's -- but I don't see why it would be.

11   For that witness I don't have a lot of questions, but I have

12   some important ones to ask him.

13               THE COURT:  Okay.

14               MS. MIRELL:  As for the character witnesses, the

15   government is not going to object now, but we may reserve

16   objection if they're cumulative, for example, during trial.

17               THE COURT:  Okay.

18               You know, there's three listed here.  That's not

19   an outrageous number.  So we'll see where that goes, but,

20   you know, just the present number doesn't trouble me.

21               Okay.  All right.  We've talked about exhibits,

22   witnesses.

23               Just to put everybody on notice, I will ask each

24   side to have an exhibit list ready to send back to the jury

25   of the exhibits that you have had admitted.

1       And so what that means is that, A, you ought to be

2  prepared to -- ought to be ready to prepare such a list;

3  and, two, that that list exhibit -- the description of the

4  exhibit is fairly neutral, and that one that won't draw an

5  exhibit.  I looked through the exhibit list; I think, for

6  the most part, they're neutral.

7       The reason I do this is because I've had jurors

8  say, look, it would be nice to have had the list so we can

9  identify what the exhibits are and find things.  I don't

10  think that's going to be as big of an issue here in this

11  case since the evidentiary record is fairly limited, but

12  I'll just give everybody a heads-up as to that practice,

13  okay?

14       All right.  The last thing I wanted to raise

15  was -- and maybe we don't need to do this now, but one of

16  the motions concerned cross-examination of officer N.R.

17  about sort of the ongoing administrative issues.  I don't

18  know whether there's any factual update as to that, and we

19  are on the public record, and to the extent we need to go

20  off, we can do that, but if you can be mindful of that.

21       MR. KELLY:  Yes, Your Honor.

22       Just being vague, I think the most recent

23  information the government has was included in our reply

24  brief, which was the most recent update where there is still

25  one final piece to the government's understanding of that

1    administrative investigation that is ongoing.

2           THE COURT:  Okay.

3           MR. KELLY:  It is actually possible, given the

4    timeline here, that sometime between now and next week, that

5    the final piece will be concluded.  We don't, sitting here

6    today, though, as of our most recent update this week, have

7    any further updates.

8           It does appear to still be open.

9           THE COURT:  Okay.

10          MR. KELLY:  But, of course, we will notify the

11    Court and defense counsel if that changes somehow in the

12    next several days.

13          THE COURT:  Okay.

14          Mr. Monroe.

15          MR. MONROE:  You know, Judge, on the day that I

16    got your short order in response to my mentioning of a

17    continuance, I was just about finishing a motion on that

18    point.  But I figured why belabor the Court with a motion

19    that the Court has already given some thought to and

20    considered.

21          But I just put this out to Your Honor from an

22    evidentiary standpoint:  N.R. is the government's key

23    witness.  What I expect the jury is going to hear is that

24    N.R. -- and I can speak with this on the record, or does the

25    government prefer I --

1          MR. KELLY:  If it's going to the substance of the

2    investigation, Your Honor, we would ask to go off the

3    record.

4          MR. MONROE:  That there was a serious issue of use

5    of force that the Department of Justice --

6          MR. KELLY:  Your Honor --

7          THE COURT:  Hang on.

8          MR. MONROE:  -- clears him --

9          THE COURT:  Hang.  We are slipping into it.

10         MR. MONROE:  Yeah.

11         THE COURT:  Let's save this till the end.  We can

12   go off the record and have a longer conversation about that,

13   okay?

14         MR. MONROE:  Yes, sir.

15         THE COURT:  All right.  So we'll just put a pin on

16   that for a moment.

17         Okay.  All right.  You all have entered into some

18   stipulations, which is always welcomed.

19         The only thing I would note is that the

20   stipulations refer to U.S. Code Sections which often is

21   fairly Greek to jurors.  I would urge you to say something

22   in these stipulations that matches it up with the particular

23   count, because otherwise -- I mean, I know that presently

24   the jury instructions have the code section up top.  But to

25   make this a little easier for the jurors to be able to

1   understand what stipulation is associated with which count,

2   I'd ask you to just make that amendment, okay?

3           All right.  Jury instructions.  You know, I don't

4   plan to go over them in any great detail today.  I usually

5   have a charge conference during trial.  But is there any

6   particular instruction that either side thinks we need to

7   deal with in advance of trial that we should take up?

8           MS. MIRELL:  Would the Court like the parties to

9   prepare the charges on the lesser included offenses?

10          THE COURT:  Prepare the charges -- I'm not sure

11  what you mean.

12          MS. MIRELL:  So, for example, Count 1, the 111

13  count, would the Court like the parties to prepare a charge

14  for Count 111(a), as opposed to with a the (b) enhancements?

15  Because as currently drafted, it has the elements.

16          THE COURT:  Hang on one second.  Let me just go to

17  it.

18          Okay.

19          MS. MIRELL:  So, for example, Count 1 lists six

20  elements.  If we were to include the lesser included offense

21  of just the 111(a) we would not have, for example, element

22  6.

23          THE COURT:  Oh, I see what you're saying.

24          MS. MIRELL:  Yeah.

25          THE COURT:  Look, I mean, the answer to that

1  question is, it depends on whether you're asking for it.

2          MS. MIRELL:  Yeah.

3          THE COURT:  You know, if there's both, A, a

4  request, and, B, a basis.

5          And if that's the government's request, then both

6  the instructions ought to reflect that and the verdict form

7  should reflect it.

8          MS. MIRELL:  Okay.

9          THE COURT:  So if, for example, the government

10  will say to the jury, look, even if you don't think he used

11  a dangerous weapon in assaulting or resisting, then you, you

12  know, you can still find him and should find him guilty

13  without a weapon, that's fine, I'm okay with that; we just

14  need to make sure that's clear in both the instructions and

15  the verdict form.

16          MS. MIRELL:  In that case, we will likely submit

17  revised jury instructions --

18          THE COURT:  Yeah --

19          MS. MIRELL:  -- to reflect that.

20          THE COURT:  -- the Red Book has sort of standard

21  language about lesser includeds and how to go about dealing

22  with that.

23          And, you know, Mr. Monroe, you ought to have with

24  you -- we ought to get you a copy of what's called our

25  "Red Book" colloquially, which is the sort of standard jury

1    instructions that get used in D.C.

2              MR. MONROE:  Yeah, I bought it, Judge.

3              THE COURT:  You bought it.  All right.  Great.

4              MR. MONROE:  Yeah, I wanted to fit right in with

5    the Red Book.

6              THE COURT:  You're ahead of me then.  All right.

7    Terrific.

8              So anyway, yes.  I mean, in terms of lesser

9    includeds, we can deal with that.  But if there's anything

10   else, speak now or you can wait until we get to the charge

11   conference.

12             Okay.  Let's talk then about trial process and

13   COVID protocols.

14             So our voir dire will be conducted not here but in

15   the Ceremonial Courtroom up on the sixth floor.  We have

16   called 70 jurors, which is 25 to 30 more than we usually

17   call, given the nature of the case.

18             I use what I referred to earlier as the notecard

19   method; that is, each juror receives a notecard.  The list

20   of voir dire questions is read off to them.  If they answer

21   "yes" to any of them, they write that number down on the

22   card.  If the answer is "no," they need not write anything

23   down.

24             The individual voir dire, which will be done of

25   every single juror, will be done in courtroom 16; it won't

1　be done in the Ceremonial.  So once the question, initial

2　round of voir dire questioning is done, we'll have to move

3　to a different courtroom.  We'll empty the courtroom and

4　then head over there.  And we may not even need to do that

5　in this case, but we'll figure that out logistically.  And

6　so we'll do that in 16.

7　　　　16 will be open to the public, but you all ought

8　to bear that in mind in terms of any follow-up questions you

9　have and also being sensitive to the juror's answers.  The

10　juror will have a phone available if they want to just speak

11　off the public record on a sensitive topic, so we'll make

12　that available to them.

13　　　　I will do the voir dire follow-up primarily.  So,

14　you know, I'll go through a list of questions that they

15　answered "yes" and sort of suss out why they answered "yes"

16　and how it may impact their ability to be fair and

17　impartial.

18　　　　I do allow, you know, follow-up questions from

19　counsel, but please keep it limited; otherwise, you know,

20　we'll be here not only all day but maybe all second day, and

21　I really would like to avoid that, okay?

22　　　　If you believe a juror should be stricken for

23　cause, okay, please let me know.  The way this will sort of

24　logistically work is the juror will walk out of the room and

25　then another juror will come in.  Between those two things

1   happening, the juror walking out and the other juror coming

2   in, please make your for-cause strike at that point, okay?

3   That way we can talk about it before the next juror comes

4   in.  And if I grant the for-cause strike, our instruction is

5   to dismiss that juror for the day.  So we reduce the number

6   of people in the courthouse, okay?

7          As I said, the voir dire will be public and there

8   may be media in the individual voir dire room.  Just bear

9   that in mind.

10          All right.  Peremptories and sort of final jury

11  selection.

12          I qualify 34 jurors.  So we'll seat 14; 12 are

13  deliberating, two alternates.  The defense gets ten strikes;

14  the government gets six.  Each side gets a strike for the

15  alternate, and I just qualify two more for good cause to be

16  on the safe side.  Depending upon timing of the day, we'll

17  either do that in the Ceremonial Courtroom or in the smaller

18  courtroom, depending upon how many people we have left.

19          The way I do the strikes is you'll each have a

20  sheet of paper.  You will write down your strikes on that

21  sheet of paper.  It asks for jury number and race and sex

22  that you should mark down for each juror for purposes of

23  *Batson* challenges.

24          You write down your strikes, you exchange papers

25  so you know what side -- what each side is striking, who

1    each side is striking, and then they get handed up to me.

2    If there's an overlap in strikes, okay, you don't get an

3    extra strike for that, and so that's how we'll do it.

4          You can strike either into the box or into the

5    panel, meaning, you know, the first 14 qualified are

6    presumptively the first 14 who are going to be the jury.

7    But you can either strike those folks or anybody else who

8    might be coming in from the panel to replace a stricken

9    juror.  Any question about that?  Okay.

10          All right.  You have one strike -- we'll have two

11    alternates, so I'll ask each side to pick a number between 1

12    and 14.

13          Ms. Mirell?

14          MS. MIRELL:  7.

15          THE COURT:  And Mr. Monroe?

16          MR. MONROE:  5.

17          THE COURT:  Okay.

18          All right.  So jurors 5 and 7 -- or seat numbers

19    5 and 7 will be our alternates.  Obviously, you know, the

20    first row is 1 through 7, closest to my -- closest to the

21    bench.  The second row is 8 through 14.  We are going to

22    seat jurors in the box, which is not something I've done

23    during COVID times, but we're going to switch to that usual

24    practice.  So as I said, first alternate, seat 5; second

25    alternate, seat 7.

1    When we're doing the strikes, I will put a pause

2   on -- there will be a break between your strikes for

3   deliberating jurors and alternate jurors, just because

4   I think, given the number of strikes, et cetera, it may be

5   difficult to picture who the next alternate could be coming

6   back in, so we'll have a pause and you can use your last

7   strike on our alternate if you want, okay?

8    As I said, we're going to use the box.  We will

9   have masking requirements for everybody in the courtroom;

10  for jurors, for counsel, for anybody from the public who is

11  here, courtroom staff, myself included.

12   The only exceptions for that are counsel who is

13  either opening or closing, asking questions, and the

14  witness.  If the witness is uncomfortable testifying without

15  a mask on, we will provide that witness a clear mask so the

16  witness's face can be seen, okay?  Any questions about that?

17   All right.  At each of your tables you will see a

18  telephone.  That is what you should use to speak to me for

19  essentially what we used to call bench conferences and do

20  bench conference, will now be done via the closed -- the

21  telephone here so there won't be any marching up to the

22  bench.  If there's an objection, if I ask for further

23  argument on that objection, we'll do it over the telephones,

24  okay?

25   The jury will have a separate room, separate

1    courtroom for their breaks and for their deliberations; they

2    won't be going back to the jury room, because it's just too

3    small.

4         Final sort of miscellaneous trial practice is that

5    you ought to be aware of that I have -- my jurors can take

6    notes, but I don't allow them to ask questions.  The rule on

7    witnesses does apply, with the exception, obviously, of the

8    defendant.  And I don't know whether the government wishes

9    to have any case agent or an officer here who also may be

10   testifying.

11        MS. MIRELL:  The government will have its case

12   agent.

13        THE COURT:  Okay.  And will that case agent also

14   be a testifying witness?

15        MS. MIRELL:  Yes, Your Honor.

16        THE COURT:  All right.  I'm okay with that, and I

17   do allow a case agent to be at the table.

18        I have a 24-hour rule to give notice on who --

19   which witnesses will be called the next day.  So, you know,

20   the government ought to make sure Mr. Monroe has notice of

21   the witnesses it plans to call on Tuesday by Monday and so

22   on.

23        I expect jury selection is going to take all day

24   Monday, so I don't think anybody should expect to be opening

25   on Monday, okay?  And even if by some miracle we get through

1  it quicker than I expect, I'm not going to ask anybody to

2  open on Monday; we'll open first thing Tuesday morning.

3  Trial schedule, just so you all know it, is trial

4  day will start at 9:30, goes till 12:30, we'll have an hour

5  for lunch, and that's -- and then we'll go as close to 5:00

6  as we can.

7  Unfortunately, just because of a variety of

8  reasons, I am going to have to actually stop at 4:00 p.m. on

9  Wednesday, Thursday, and Friday either to deal with sort of

10 administrative matters I have or another case.  So just bear

11 that in mind.  Unfortunately, we'll have one less hour of

12 testimony on Wednesday, Thursday, Friday.  If we spill into

13 next Monday, you know, we'll be -- there won't be any

14 limitations.

15 Okay.  Last thing and then I'll open up to both

16 sides to see if you have anything you want to add, and that

17 is just, at least right now, estimated length of openings?

18 MS. MIRELL:  For the government, 10 to 15 minutes.

19 THE COURT:  Okay.

20 Mr. Monroe.

21 MR. MONROE:  That would be the same, Judge.  We

22 have about 10, 15 minutes.

23 THE COURT:  Great.

24 And if either side intends to display any exhibits

25 during your openings, please make sure the other side is

1  aware of that and has no objections to it.  I don't want to

2  deal with evidentiary objections during openings, okay?

3      All right.  That's my list.  Do you all have

4  anything on your list that you want to talk about before we

5  adjourn or any questions about process, et cetera?

6      MS. NIELSEN:  That was what I wanted to ask

7  Your Honor.  Kate Nielsen.

8      So this is obviously the first time that we've all

9  practiced in our court and I wanted to verify whether or not

10  Your Honor would like to have binders of printed exhibits, a

11  thumb drive of electronic exhibits.

12      THE COURT:  It looks like we have them, we've got

13  printed exhibits.  I personally don't need them.

14      The one thing I forgot to say is, you all ought

15  to, if you have not already, make an appointment, it's

16  already Thursday, but meet with John Cramer, who is our IT

17  person for the Court, and I don't know whether everybody's

18  done that, just to make sure you know your way around the

19  courtroom, the electronics and how to use them.

20      So I don't need any hard copies.  I mean, I guess

21  it's useful just in case there's a reason to have one, but

22  I can read on the screen just as well as anybody else can.

23      MS. NIELSEN:  Perfect.

24      THE COURT:  But then in terms of the exhibits that

25  go back to the jury, talk to Mr. Douyon, because we do have

1   the capacity to have them electronically and for the jury to

2   pull exhibits up electronically.  So we don't necessarily

3   need to have hard-copy exhibits back there, but I'll leave

4   it to you all to sort that out with him.

5          MS. NIELSEN:  Okay.  Thank you, Your Honor.

6   We will do that.

7          Also, I think both sides have updated exhibit

8   lists, and we obviously will have a new witness on our

9   witness list.  Would you like us to provide updated lists

10  next week?

11         THE COURT:  We don't need a new witness list, but

12  I would like to have the most up to date, and Mr. Douyon

13  should have, a most up-to-date exhibit list.

14         MS. NIELSEN:  We have already exchanged with

15  Mr. Monroe.

16         THE COURT:  Just get us -- I'd like to have a copy

17  and Mr. Douyon should have a copy.

18         MS. NIELSEN:  Can we provide that next week in

19  case there are additional stipulations that we've talked

20  about?

21         THE COURT:  Yeah, if you can just get it to us

22  Monday.

23         MS. NIELSEN:  Monday?  Perfect.

24         All right.  I think those are mainly my

25  housekeeping questions, except I believe our office wanted

1  to know if the public line would be available during the

2  trial?

3           THE COURT:  No.

4           Well, put it differently:  The courtroom will be

5  open.

6           MS. NIELSEN:  Oh, the courtroom will be open.

7           THE COURT:  So it's not my intention to pipe in

8  the public line.

9           But the courtroom will be open, so this will, as

10 required, be a public proceeding.

11          MS. NIELSEN:  Perfect.  Those were my questions.

12 Thank you so much, Your Honor.

13          THE COURT:  Okay.

14          Mr. Monroe, anything you'd like to raise or ask?

15          MR. MONROE:  No, Judge.

16          I did provide your clerk with our binder with

17 defendant's exhibits, and I also provided a binder also for

18 the government.  I have a hard copy.

19          I was served last night with additional discovery,

20 and in there was some handwritten notes from an interview of

21 Officer N.R.  So I anticipate adding that as a Defendant's

22 I'm sorry, court reporter, I'm trying to keep my mouth in

23 front of the microphone -- Exhibit 50.  Again, it wouldn't

24 be something we would be looking to put into evidence, but,

25 if needed, we would use it to cross-examine the officer as

1  an additional inconsistent statement as to the events that

2  transpired on January the 6th.

3         THE COURT:  Okay.

4         All right.  Well, that's fine.  As I said, just as

5  long as I have the updated lists, and I understand there may

6  be additions, modifications during trial, that's fine, we

7  can -- we'll adjust.

8         Okay.  Anything else anybody wants to raise before

9  we adjourn?

10         MR. MONROE:  I was cut off.  And I was being as

11  diplomatic as I could, I didn't want to impede upon the

12  government's interest in keeping that part of the case

13  sealed.

14         THE COURT:  We've got to deal with that.  Yes, I

15  forgot about that.  Thank you for reminding me.  Sorry about

16  that.  Yeah, we'll take care of that in a moment.

17         Anything else?  Okay.

18         All right.  So at this point, I'm going to ask the

19  courtroom to be cleared so we can deal with an in-camera

20  matter.  And we do have the public line on right now;

21  that'll be disconnected as well, and this portion of the

22  transcript will be placed under seal.

23         (Sealed proceedings)

24         THE COURT:  Okay.  So we're now off the public

25  record to discuss the issue of Officer N.R.'s ongoing

1   use-of-force investigation and administrative proceedings.

2           So, Mr. Monroe, you wanted to make some

3   observations or be heard.

4           MR. MONROE:  Judge, without any hyperbole, just as

5   plainly as I can state it, this young officer, he's got

6   about five years' experience with MPD.  He was in a serious

7   shooting.

8           Whether it was justified or not, that is not

9   something that I'm looking to address here today.  The

10  incident was investigated as a part of protocol by the

11  Department of Justice.

12          You had January 6th, I think this was maybe four

13  months later the officer was involved in this shooting.

14  About five or six months after the shooting, as I get my

15  months correct, after the Department of Justice completes

16  their investigation, they clear him of any wrongdoing.

17          From the Defense Bar, the pause and the concern

18  is, well, if N.R. was already an important witness of the

19  government and now they're investigating him as to some

20  potential serious wrongdoing, does his role as an important

21  witness for them come into play in their ultimate decision

22  in clearing him in a separate incident five or six months

23  later?  And I'm not casting any aspersions on the DOJ;

24  I'm just sharing with you the defense perspective of the

25  analysis.

1        But the story doesn't end there, because,

2   independent of the Department of Justice clearing him,

3   I think it was October or November, the administrative arm

4   of the investigation remained open without any explanation.

5        In fact, if you listen to my colleague, Mr. Kelly,

6   he tells us today it still remains open.  Now, it may just

7   be for some benign administrative issue, but let me -- and

8   this is the points I was going to make in my motion for

9   continuance.

10       If it turned out that the Department on their own

11  found that the officer -- maybe there wasn't anything about

12  the shooting that was bad but maybe this officer engaged in

13  some misconduct in concealing and not fully disclosing what

14  happened here and they make that conclusion and they found

15  that he acted dishonestly, well, we know from the

16  evidentiary standpoint, Mr. Webster would be allowed to

17  vigorously cross-examine him on that point.

18       But what if it went even further?  What if this

19  young officer -- because in this case, Judge, we're

20  accusing -- we're going to be accusing him of withholding

21  information about what went down on January 6th; in

22  particular, the fact that he punched Tom Webster and

23  instigated this whole incident.  But what if he acted the

24  same way in this shooting case and withheld some information

25  that the MPD thought it was important and they terminate

```
1   him?
2          Now, I thought, as I'm putting pen to paper, and
3   this is before -- and I have to apologize to the Court,
4   because I wasn't inviting the Court to respond to that one
5   sentence from counsel, maybe the Court should consider a
6   continuance, I really was going to put it out in a formal
7   motion and say, hey, maybe we should pause this case to see
8   how Officer N.R.'s administrative troubles pan out
9   because --
10         THE COURT:  So if I can just interrupt you,
11  Mr. Monroe.
12         Look, I'm not going to do that.  I mean, you know,
13  this matter has been pending for some time.  I've been given
14  no assurance one way or the other what's going to happen
15  with this case administratively, when it will resolve
16  administratively.  And if we're going to -- and, you know,
17  I'm just not going to have my trial docket dictated by the
18  pace of the MPD.  And what I will tell you is this:  If we
19  don't try this case next week, Mr. Webster is going to be
20  waiting for a very long time to have a trial, at least
21  before this judge.
22         So, you know, I just -- I understand what you're
23  saying, I understand your position, but, you know, that's
24  life, and that's, you know, that can always be the case.
25  You take that argument to its natural conclusion and there
```

1   can always be bad stuff that happens to a witness

2   potentially if you wait long enough, and that could be the

3   basis for cross-examination.  But we try the cases in the

4   time they're tried, and what's available to you is what's

5   available to you when the case is tried.

6           MR. MONROE:  Here's the other thing that occurs to

7   me, Judge.  And, again, I'm not casting any aspersions to

8   the Department of Justice.  But they've been very assertive

9   in making sure that their relationship with N.R. and them

10  having conduct -- cleared him in a separate shooting and his

11  role in this case not be made part of public consumption.

12  And I don't advocate in the public.  I don't advocate --

13  since I represent -- hired on to represent Mr. Webster, I've

14  been asked repeatedly to speak to the press, and I just

15  won't do it.

16          But as an officer of the court, I'm not sure

17  whether the Court should be concerned about not making sure

18  the public is aware of the full role of the Department of

19  Justice as it pertains to this officer.

20          And I'll just leave it at that, Judge, because

21  I don't -- I think the public needs to know, just like the

22  jury in this case would know, that there may have been a

23  process in play where the Department of Justice cleared this

24  officer because of his role in this case, and, again,

25  speculation --

1          THE COURT:  Well, let's, again, pause for a

2   moment.  I'm not quite sure what exactly you're proposing.

3          If what you're proposing is that the

4   cross-examination entail the substance and the nature of the

5   investigation into excessive force, there was a shooting,

6   the answer is, you're not going to be able to get into that,

7   okay?  That is just -- that is highly prejudicial, it's

8   imflammatory, and has the likelihood of, as I said, of

9   inflaming the jury, especially because I have no idea about

10  the facts of that shooting, so far I know it's justified.

11  You know, anyway, that's not going to happen.

12         If what you are proposing, on the other hand, is

13  as I suggested in my order, a prejudiced cross-examination,

14  then I said that's permitted, the government, has, I think,

15  rightly in its motion conceded that there can be some cross

16  on that front.  And I'll just have to wait to see what

17  you're going to do.

18         I mean, the fact of a pending investigation,

19  although it's not with respect to the DOJ anymore, they've

20  closed, that's certainly fair game.  I don't know whether

21  you're going to go -- want to go further than that.  And,

22  you know, maybe you want to preview it to me in camera ex

23  parte.

24         MR. MONROE:  I'd rather do that, Judge, because

25  I want to make sure that, on that topic, both the Court and

1 the defense have an understanding as to what the Rules of

2 Evidence in this context are going to permit in terms of the

3 questions.

4       THE COURT:  Well, I guess -- you know, maybe I

5 spoke too soon, but, I mean, I want to be careful, because

6 the government certainly has a -- they may want to object to

7 the scope of the examination, so I probably spoke too soon

8 in inviting an ex-parte proffer.  And maybe you ought to

9 just wait until before he testifies --

10       MR. MONROE:  Yes, sir.

11       THE COURT:  -- to time -- I don't know whether --

12 is the government going to call him on Tuesday?

13       MR. KELLY:  That's definitely a possibility,

14 Your Honor, Tuesday or Wednesday.  We're still working out

15 the order of our witnesses.

16       THE COURT:  Okay.

17       So, look, we ought to probably have a discussion

18 about that.  And if you want to do it now, we can have it

19 now, or we can, you know, carve out a little time.

20       MR. MONROE:  I'm going to follow the latitude the

21 Court will give me on cross-examining the witness on this

22 issue.  And I don't want to -- I'm not interested in going

23 further.

24       THE COURT:  I know you'll follow it, because you

25 don't have a choice.

1          MR. MONROE:  Yes, sir.

2          THE COURT:  The question is how much latitude

3  I'm going to give you, and that is dependent on how much

4  latitude you want and what you're proposing.

5          I mean, if you're suggesting you just -- we wait

6  and see what the cross-examination is, I guess we could do

7  that.  But I'm also concerned that, given the inflammatory

8  nature of it, I don't want a question getting out there on

9  the record, only to have it stricken but it's out there.

10 Once it's out there, it's out there.

11         MR. MONROE:  Well, I think the general -- the

12 question that comes to mind, Judge, and ask an officer in

13 this situation is, isn't it true, sir, that there's a

14 pending investigation against you regarding your use of

15 force as a police officer, and it entails a yes or no.  If

16 he says "yes," then that's the end of the inquiry.

17         THE COURT:  So I guess -- I don't disagree with

18 that, except for I don't know that you get to ask him what

19 nature of the investigation is; in other words --

20         MR. MONROE:  No, you're right.  If he says "yes,"

21 then --

22         THE COURT:  No.  But I mean, you suggested you'd

23 ask him that the nature of the investigation is to as his

24 use of force.

25         MR. MONROE:  Yeah, no, I think we're in agreement.

1          THE COURT:  Okay.

2          MR. MONROE:  I think if he says yes, I think that

3  really ends the inquiry.  If he says no, then I get to go

4  further, but then I get to --

5          THE COURT:  No.  Let's be clear.

6          I heard you suggesting you want to ask him,

7  there's a pending use-of-force investigation.

8          MR. MONROE:  Yes, sir.

9          THE COURT:  My point is a different one, which is

10  that, you can ask him is there a pending investigation but

11  not characterize it as a use-of-force investigation.

12          MR. MONROE:  Well, I would offer my exception to

13  that.

14          I think it speaks to this officer and in context

15  of the facts in this case.

16          But I'll just offer my respectful exception and

17  tailor my question in advance.

18          THE COURT:  It is the same issue I was concerned

19  about with respect to saying this is investigating into

20  proper use of deadly force.

21          It is going to cause the jury to speculate what

22  the nature of the excessive force is.  And I don't want them

23  to do that, nor should they do that.

24          And it puts the government in the position of then

25  saying, well, Judge, that's now been -- the cat's been out

1    of the bag there, we should be able to rehabilitate this

2    witness by presenting evidence that the conclusion was he

3    didn't use excessive force, and I don't want to go down that

4    road, okay?

5            MR. MONROE:  Understood.

6            And then --

7            THE COURT:  So the existence of the investigation

8    is okay.

9            And, you know -- and I don't know whether you're

10   going follow up with that in terms of bias, et cetera, but

11   I think that's about it.  And if there's more, you'll let me

12   know, though.

13           MR. MONROE:  And, you know, it does occur to me,

14   it brings me back to that argument about the request for

15   continuances because -- and I understand the Court's

16   position, how far it would take Mr. Webster's case away, but

17   not having the information of how that -- let's just say

18   this -- it turns out that there's a good reason why MPD

19   hasn't finished their investigation because they felt this

20   guy did something wrong maybe not related to the shooting

21   but in reporting, if this officer testified after that

22   investigation comes down that he was untruthful, someone in

23   Mr. Webster's position is --

24           THE COURT:  Well, let me ask you this, Mr. Monroe:

25   Do you have any reason to believe that that is a possible

1    outcome of the investigation?

2           MR. MONROE:  I have no information one way or the

3    other.

4           THE COURT:  So then we're just speculating.

5           MR. MONROE:  Yes, sir.

6           THE COURT:  And speculation is not going to get

7    you a continuance.  If you had some basis to think that that

8    might be an outcome, then okay, we might be in a different

9    ballpark.  But to just say, well, anything could happen,

10   well...

11          MR. MONROE:  Right.

12          THE COURT:  That's right, anything could happen

13   and they could clear him.  And in that case, you don't get

14   any cross-examination so -- on the issue.

15          MR. MONROE:  I understand the Court's position.

16          THE COURT:  Okay.

17          And I don't know if you heard my last point, which

18   is that, by the same token, if you wait, you may be robbed

19   of that line of cross-examination, right?

20          MR. MONROE:  Oh, precisely.  Yes.

21          THE COURT:  So I'm not sure a continuance

22   necessarily inures to your benefit.

23          Okay.  All right.  So I think that takes care of

24   that issue.  And we will see everybody Monday morning.

25   We'll get started at 9:30.

1          Just, again, please be prompt.  I do tell jurors

2    that once they're seated, we will be mindful of their time,

3    and I just ask the lawyers to be mindful of that as well,

4    okay?

5          Thank you, all.  Do not wait for me.

6          COURTROOM DEPUTY:  This Court stands in recess.

7          THE COURT:  One last thing.

8          We will revise the -- do we have a Word copy of

9    the voir dire?

10          Did you all send us a Word copy of the voir dire,

11   Word version?

12          MS. NIELSEN:  Only the jury instructions.

13          THE COURT:  Okay.

14          Could whoever has that final just send it to

15   chambers, the Word, so we can mess with it and edit it as we

16   talked about?

17          MS. NIELSEN:  Yes.

18          THE COURT:  Thank you.  Then we'll circulate it

19   for everybody to review.

20          (Proceedings concluded at 3:32 p.m.)

21

22

23

24

25

# C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__February 25, 2023____ 

William P. Zaremba, RMR, CRR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                )
                                         )
          Plaintiff,                     )
                                         )        CR No. 21-208
                                         )        Washington, D.C.
          vs.                            )        April 25, 2022
                                         )        9:30 a.m.
THOMAS WEBSTER,                          )
                                         )        Day 1
          Defendant.                     )        Morning Session
_____)


          TRANSCRIPT OF JURY SELECTION PROCEEDINGS
        BEFORE THE HONORABLE AMIT P. MEHTA
            UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:            Brian P. Kelly
                               U.S. ATTORNEY'S OFFICE
                               555 Fourth Street NW
                               Suite 3816
                               Washington, D.C. 20530
                               (202) 252-7503
                               Email: brian.kelly3@usdoj.gov

                               Hava Arin Levenson Mirell
                               U.S. ATTORNEY'S OFFICE
                               312 N. Spring St.
                               Suite 1200
                               Los Angeles, CA 90012
                               (213) 894-0717
                               Email: hava.mirell@usdoj.gov

                               Katherine Nielsen
                               Fraud Section
                               1400 New York Ave., NW
                               Washington, D.C. 20530
                               (202) 355-5736
                               Email:
                               katherine.nielsen@usdoj.gov

APPEARANCES CONTINUED:

For the Defendant:                James E. Monroe
                                  Walter Machnicki
                                  DUPEE & MONROE, P.C.
                                  211 Main Street
                                  PO Box 470
                                  Goshen, NY 10924
                                  (845) 294-8900
                                  Email:
                                  marina@dupeemonroelaw.com

Court Reporter:                   William P. Zaremba
                                  Registered Merit Reporter
                                  Certified Realtime Reporter
                                  Official Court Reporter
                                  E. Barrett Prettyman CH
                                  333 Constitution Avenue, NW
                                  Washington, D.C. 20001
                                  (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S
 2           COURTROOM DEPUTY:  Criminal Case No. 21-208,
 3   United States of America versus Thomas Webster.
 4           Brian Kelly, Hava Mirell, and Katherine Nielsen
 5   for the government.
 6           James Monroe for the defense.
 7           The defendant is appearing in person for these
 8   proceedings.
 9           THE COURT:  Okay.  Counsel, good morning.
10           Mr. Webster, good morning to you, sir.
11           THE DEFENDANT:  Good morning.
12           MR. MONROE:  I want to introduce, Judge, my
13   associate, Walter Machnicki.
14           Good morning, Judge.  I just wanted to introduce
15   my associate, Walter Machnicki.
16           THE COURT:  Walter --
17           MR. MONROE:  Machnicki.
18           THE COURT:  All right.  Mr. Machnicki, welcome.
19   You can have a seat.  Can you just spell the last name?
20           MR. MACHNICKI:  Yes, Your Honor.  It's M, as in
21   Mary, a-c-h-n, as in Nancy, i-c-k-i.  It's an honor to be
22   here, Judge.  Thank you.
23           THE COURT:  Okay.  Mr. Machnicki, welcome.
24           All right.  I just want to make sure I have your
25   name so I can introduce you along with Mr. Monroe.
```

         1            Okay.  So jurors are about ready.  Are there any

         2   preliminary matters?  Most importantly, we did circulate the

         3   voir dire revisions over the weekend, or maybe it was on

         4   Friday, and I want to confirm that everybody is okay with

         5   the final voir dire as it's been circulated.

         6            MS. NIELSEN:  Yes, Your Honor, the government is

         7   fine with it.

         8            THE COURT:  Defense.

         9            MR. MONROE:  The defense is as well.

        10            THE COURT:  Okay.  Terrific.  Anything else we

        11   need to talk about before we bring the jurors in?

        12            MS. NIELSEN:  Your Honor, there is one thing.  I

        13   don't know if the Court received the request from the press

        14   coalition regarding exhibits to be admitted on a delay

        15   basis.

        16            THE COURT:  You know, I haven't received it, but I

        17   certainly have no objection to it.  It's sort of more on you

        18   all than me, I guess, at some level.  You know, it's not

        19   anything I think we need to deal with today, let's put it

        20   that way, or at this present moment, given that we're not

        21   going to have any evidence.

        22            I just want to think about it a little bit.

        23            MS. NIELSEN:  That's fine, Your Honor.  I just

        24   wanted to bring it up, and if you want to deal with it

        25   tomorrow before we start, that's totally fine.

```
1              THE COURT:  You know, it's something I want to

2    talk to my colleagues about because I do have a concern

3    about -- anyway, we'll talk about it.

4              (Pause)

5              (Prospective jurors entered courtroom.)

6              COURTROOM DEPUTY:  Your Honor, this is Case No.

7    21-208 -- let me do that again, sorry.

8              Your Honor, this is Criminal Case No. 21-208,

9    United States of America versus Thomas Webster.

10             Brian Kelly, Hava Mirell, and Katherine Nielsen

11   for the government.

12             James Monroe for the defense.

13             The defendant is appearing in person for these

14   proceedings.

15             THE COURT:  Okay.  Ladies and gentlemen,

16   good morning to all of you and welcome.  It's nice to be

17   here with all of you.

18             My name is Judge Amit Mehta.  I am a judge here in

19   the U.S. District Court for the District of Columbia.  And

20   so welcome to all of you.  I appreciate you being here this

21   morning and being on time.

22             You are here today as a potential juror in the

23   case of United States versus Thomas Webster.  This is a

24   criminal case.  In a moment, I will provide you with some

25   additional details about the case, but before we get
```

1    started, I want to extend to you my gratitude for making

2    yourself available for jury service.  As you know, in our

3    system of justice, juries and jurors play a critical role.

4    Indeed, it is a fundamental element of our democracy to have

5    ordinary citizens serve as decision-makers in our courts of

6    law.  You are, therefore, performing an important duty today

7    so I want to thank you in advance for your service.

8         Now, before we get started, I want to address the

9    COVID protocols that we will be using during -- for today,

10   as well as if you are selected as juror.  We have in this

11   courthouse for the last year plus been using a number of

12   COVID protocols to ensure and promote everyone's safety and

13   health and well-being.  We have been holding trials and

14   having grand juries convene in this courthouse now since

15   last spring, and we have done it safely and effectively.  So

16   we've both been able to keep everybody safe and healthy, as

17   well as carry out our functions here in the courthouse.

18        As I said, we've instituted a number of protocols,

19   the first one of which is that we are here.  We are in this

20   Ceremonial Courtroom.  Those of you who have participated in

21   jury service in the past know that you usually come

22   initially into a smaller courtroom, in which you're sort of

23   packed shoulder to shoulder with everyone.  In order to

24   ensure that there's a little bit of social distancing here,

25   we've moved jury selection, the first part of the jury

1  selection into this courtroom.

2          You also -- those of you who have been in jury

3  service before will remember that after the initial

4  questions are asked by the judge, each person on the jury

5  panel comes up and the lawyers are surrounding that person

6  up here at the bench where we follow up with some questions.

7  That's usually how it's done.

8          That's not how we're going to do it today.  We're

9  actually going to -- once the initial questions are over,

10 we're going to individually bring you into a separate

11 courtroom, a separate courtroom in which you are not being

12 brought up to the bench but, rather, will sit in a jury box,

13 the lawyers will remain at their tables, and you'll be asked

14 follow-up questions by me from the bench in that manner.

15         The next thing is we're going to ask everybody to

16 maintain your masking for not only today but for the

17 duration of trial if you are selected as a juror.  And the

18 reason for that is twofold.  I know there have been a lot of

19 changes within the district and elsewhere in terms of

20 masking rules, but there are really sort of two reasons why

21 we're maintaining that masking policy in this district court

22 for at least for now.

23         The first is, you know, we are all members of the

24 public, we don't know who we are, all strangers for the most

25 part to one another, so we don't know what everybody's

1   health circumstances are, and so, you know, to ensure that

2   we are sensitive to folks who may have particular health

3   issues, maintaining masking is something we are going to do.

4         Secondly, and from my perspective why it's really

5   important, is that the last thing I want to have happen is

6   have a juror come down with COVID during the trial or have

7   any one of the lawyers come down with COVID during the

8   trial, because what that likely would mean is that we would

9   have to interrupt trial, and I don't want that to happen and

10   if you're selected for the jury, I don't think you'll want

11   to happen either.

12         And so for those two reasons I'm going to ask

13   everybody, please keep your masks on.  If you don't have

14   one, we can get you one.  And so -- I think there's a

15   gentleman in the front row, JC, who may need one.  And so

16   that's two.

17         The courtrooms that you will be in today, and if

18   you are selected as a juror afterwards, have all been tested

19   in terms of the airflow and the air quality.  They are

20   courtrooms in which the airflow is optimized in a way to

21   ensure that particles and the like are removed from the

22   courtroom as quickly as possible.  And so that is something

23   that is also a COVID rule or procedure.

24         The final thing that is different, if any of you

25   have actually been selected for jury service and

1  deliberated, you'll remember that typically your

2  deliberations and where you take breaks will be in a very

3  small windowless room in which there's not a lot of room to

4  maneuver.

5      That's not how we're going to do things for this

6  trial and not how we've been doing things for the last year

7  plus.  You will have a separate courtroom in which you will

8  take your breaks and you will do your deliberations in that

9  courtroom.  And so that'll give you plenty of room to

10  distance from one another.  It will be up to jurors who

11  ultimately get selected whether they want to remain masked

12  or not, we can talk about that once you all -- if you are

13  selected.

14      So those are going to be the COVID protocols that

15  will be in place both for today and if you get selected as a

16  juror.

17      So before we get started, does anybody have any

18  questions about COVID rules or anything of that nature

19  before we get going?

20      Okay.  Terrific.

21      And I should add one last thing, which is that not

22  only will you as jurors be masked and courtroom staff will

23  be masked, and I'll be masked except for when I'm speaking,

24  but our lawyers will be masked and our witnesses -- excuse

25  me, our lawyers will be masked, and the only exceptions in

1  the courtroom will be if a lawyer is asking questions and

2  the witness will be unmasked if the witness feels

3  comfortable being unmasked.  So those will be the only two

4  people that are unmasked in the courtroom at any particular

5  time if you are selected for jury service.  Okay?

6          All right.  So if there are no questions, let's

7  go ahead and proceed.  Before we get started, I'm going ask

8  everybody to stand and raise your right hand because I need

9  to please be sworn in.

10          COURTROOM DEPUTY:  Raise your right hands.

11          (Prospective Jurors sworn.)

12          PROSPECTIVE JURORS:  I do.

13          COURTROOM DEPUTY:  Thank you.

14          THE COURT:  All right.  Please be seated,

15  everyone.

16          Okay.  Let's get started.

17          The purpose of jury selection is to select a panel

18  of neutral jurors who will hear the evidence in this case

19  and who can be fair and impartial in their decision-making.

20  To help us to select a jury, I will be asking you a number

21  of questions this morning.  You all have been sworn.  What

22  that means is that you are now bound to answer my questions

23  truthfully.

24          Now, before I turn to those questions, let me

25  forewarn you will spend some time waiting this morning and

1  this afternoon.  I promise I will try to keep your waiting

2  to a minimum, but some amount of wait time is unavoidable.

3  While you are waiting during jury selection, just not only

4  just this morning but throughout the afternoon, please feel

5  free, if you wish, to talk quietly amongst yourselves, to

6  read a book, magazine, or whatever you have brought with

7  you.  The courtroom and the courthouse is WiFi enabled so

8  you should feel free to use your phones or other mobile

9  devices to read or surf the Internet, check emails, and the

10  like.  I would ask, however, that while you are in the

11  courtroom, please place all of your devices on silent mode.

12        Now, this is really important.  While you may use

13  your mobile devices, you should not at any point during the

14  jury selection process -- and this will be true afterwards

15  if you are selected -- communicate with anybody about this

16  case or do any online research about the case or the

17  parties.  That means do not email, tweet, text, or Snapchat

18  a friend or family member or all of your followers about

19  this case.  Don't post on Facebook or Instagram.  Don't go

20  online and start doing research about the case or the

21  parties.

22        A juror who violates these restrictions

23  jeopardizes the jury selection process and possibly the

24  trial itself, which could require the entire trial process

25  to start over.

1        Now, the questions I am about to ask you may touch

2   on matters that are personal to you.  Rest assured, it is

3   not my intention or desire, nor is it the intention or

4   desire of the lawyers, to invade your privacy or embarrass

5   you.  Our only wish is to select the fairest, most impartial

6   jury possible so that the parties can be assured that the

7   jurors selected will not be biased or pre-judge the case and

8   will return a verdict based solely on the law and the

9   evidence that is presented.

10       Now, each of you should have a notecard and a

11  writing instrument.  Does everybody have a notecard and a

12  writing instrument?  If you do not, please raise your hand.

13  Okay, everybody has a notecard and writing instrument.

14       All right.  I am about to read to you 21

15  questions, 21 questions.  You will be able to answer each

16  question with a yes or no.  Now, this is important.  If your

17  answer to a question is yes, write down the number of that

18  question on your notecard.  If your answer to the question

19  is no, you don't need to write anything on the notecard.

20       So, for example, if I ask you question 3 and your

21  answer to question 3 happens to be yes, write down 3 on your

22  notecard.  If the answer to question 3 happens to be no, you

23  need not write anything on your notecard.  Okay?

24       Now, after I've gone through all 21 questions,

25  I will call each one of you individually into the other

1   courtroom for follow-up to the questions to which you have

2   answered yes.  I am likely to ask you some follow-up

3   questions and the lawyers may ask you some limited follow-up

4   questions.

5          We will use a husher in the other courtroom, which

6   sounds like this, if you wish to have any of your responses

7   made in private, okay, because otherwise we are on the

8   public record.  If there's something particularly sensitive

9   that you would like to let us know in response to the

10  questions, you can simply ask, we'll put that husher on, and

11  there will be a phone near you that you can pick up and

12  speak into privately with myself and the lawyers, okay?

13  We will continue that process until we have a qualified

14  number of jurors.

15         Now, for your own timing purposes, I expect this

16  process is likely to last all day, okay?  This process in

17  this courtroom, and in this courtroom is likely to last

18  about 15, 20 minutes, not much longer than that.  But the

19  process when we move into the other courtroom and

20  individually question people in order to qualify a slate of

21  jurors is likely to take most of the day and certainly past

22  lunch.  So I just want all of you to be on -- have a sense

23  of what today is going to look like.  And, as I said, during

24  the course of the day, you can communicate with one another,

25  others, use your phone, et cetera, read.  Again, a remainder

1   not to communicate with anyone, including your fellow

2   jurors, about the case, and also no independent research

3   online about the parties or the subject matter of the case

4   as we move forward, okay?  So with all of that, let us get

5   started.  And so I am going to begin asking you the first of

6   these 21 questions.

7           Question 1 is as follows.  This case is titled

8   United States versus Thomas Webster.  Mr. Webster is accused

9   of assaulting a Metropolitan Police Department officer with

10  a dangerous weapon on January the 6th of 2021 at the U.S.

11  Capitol building.  Mr. Webster maintains his innocence.

12          The question is as follows:  Do you know or have

13  you heard anything about this particular case or

14  Mr. Webster?

15          Now, when I ask that question, it's not about

16  January 6th in general.  We'll ask you some more questions

17  about that when we get into the other room.  This is a

18  question about whether you know anything about this case and

19  the case that is brought against Mr. Webster.  So let me

20  just read this one more time.

21          Question 1:  This case is entitled United States

22  versus Thomas Webster.  Mr. Webster is accused of assaulting

23  a Metropolitan Police Department officer with a dangerous

24  weapon on January the 6th of 2021 at the U.S. Capitol

25  building.  Mr. Webster maintains his innocence.  Do you know

1   or have you heard anything about this particular case or

2   Mr. Webster?  That is question 1.  Again, if the answer is

3   yes, you write down 1.  If the answer is no, you need not

4   write down anything on your card.

5          Question 2 is as follows.  And I'll ask government

6   counsel to stand up, and you can lower your mask so

7   everybody can see you face.  The government in this case is

8   represented by the Assistant United States Attorneys, Hava

9   Mirell and Brian Kelly and Department of Justice trial

10  attorney Katherine Nielsen.  Also sitting with the

11  government are FBI Special Agent Riley Palmertree and

12  paralegal Kyle Clements.

13         Now, the defendant in this case is Thomas Webster.

14  Mr. Webster, I'll ask you to stand and just turn to the

15  jury.

16         Mr. Webster is represented by James Monroe and

17  Walter Machnicki.

18         All right.  Question 2 is as follows:  Do you know

19  any of these people?  Question 2 is:  Do you know any of the

20  people that have just been introduced to you?

21         All right.  Gentlemen, you can have a seat.

22         Question 3.  Now, during the course of trial, you

23  may hear testimony from a number of people.  I am now going

24  to ask each side to stand up and introduce to you the names

25  of the people who may testify or the names of the people

1   that you might hear about during the course of trial.

2          I'm going ask all of you to pay attention to those

3   names because at the end of the names being listed, I am

4   going to ask you whether you know or recognize any of the

5   people that have been introduced to you.  So question 3 is:

6   Do you know or recognize any of the people who have been

7   introduced to you?

8          So first let me turn to the government, Mr. Kelly.

9          MR. KELLY:  The witnesses for the government you

10  may hear from in this trial are Carneysha Mendoza, a captain

11  with the United States Capitol Police; Mark Gazelle, an

12  officer with the United States Capitol Police; Joanna

13  Burger, an officer with the United States Capitol Police;

14  Paul Wade, assistant to the Special Agent in Charge with the

15  United States Secret Service; Patricia Norden, Special Agent

16  with the Federal Bureau of Investigation; Virginia Donnelly,

17  a Special Agent with the Federal Bureau of Investigation;

18  Riley Palmertree, a Special Agent with the Federal Bureau of

19  Investigation; Noah Rathbun, an officer with the

20  Metropolitan Police Department; Jonathan Lauderdale, a

21  detective with the Metropolitan Police Department; and Ed

22  Tippett, district manager at a Safeway.

23         THE COURT:  Okay.  So question 3 again, you just

24  heard the names of witnesses or potential people you'll hear

25  about from the government.  Do you know or do you recognize

1  any of the people who have just been introduced to you?

2       All right.  I'll turn now to Mr. Monroe.

3       MR. MONROE:  Good morning, ladies and gentlemen.

4  You may hear a witness presented on behalf of the defense, a

5  character witness named Laura Moritz; a character witness

6  named Brian Gallo; a character witness named Frank Sialiano.

7       THE COURT:  Thank you, Counsel.

8       Again, the same question.  Question 3 is, have you

9  heard or did you recognize any of the names that have just

10 been introduced to you?

11       All right.  Question 4 is as follows, and this is

12 going to require you to move your necks around a little bit.

13 The question is as follows:  Do you know or recognize any

14 other potential juror in the panel, the courtroom, or the

15 staff or me?  So just take a look around.  Hopefully you can

16 recognize each other through your masks.

17       All right.  Question 4, again:  Do you know or

18 recognize any of the other potential jurors in the panel,

19 the courtroom staff, or me?

20       Question 5 is:  Do any of you live or work at or

21 near the U.S. Capitol?  Question 5 is:  Do any of you live

22 or work at or near the U.S. Capitol building?

23       Question 6 is as follows:  Were you or someone you

24 know a participant in or physically present as a witness to

25 the events that occurred at the U.S. Capitol on January the

1   6th of 2021?

2          Question 6 is as follows:  Were you or someone you

3   know a participant in or physically present as a witness to

4   the events that occurred at the U.S. Capitol on January the

5   6th of 2021?

6          Question 7 is as follows:  Have you closely or

7   regularly followed the news about the events that took place

8   at the U.S. Capitol on January 6th, 2021, or of the

9   government's investigation of those events?

10          Question 7 is, one more time:  Have you closely or

11   regularly followed the news about the events that took place

12   at the U.S. Capitol on January 6th of 2021 or the

13   government's investigation of those events?

14          All right.  Question 8 is as follows:  Have you

15   ever watched video of what happened at the U.S. Capitol on

16   January 6th, 2021, on the news, that is, television news, or

17   on the Internet?

18          Question 8:  Have you ever watched video of what

19   happened at the U.S. Capitol on January 6th, 2021, on the

20   news or on the Internet?

21          Question 9 is as follows:  Have you ever watched

22   video of this defendant, that is, Mr. Webster, from

23   January 6th of 2021, on the news or on the Internet or read

24   a news story about this defendant?

25          Question 9 again is:  Have you ever watched video

1    of this defendant from January 6th of 2021 on the news or on

2    the Internet or read a news story about this defendant?

3    　　　All right.  Question 10 is as follows:  Do you

4    have such strong feelings or opinions about the events that

5    took place at the U.S. Capitol on January 6th of 2021 such

6    that it would be difficult for you to serve as a fair and

7    impartial juror in this case?

8    　　　Question 10 again is:  Do you have such strong

9    feelings or opinions about the events that took place at the

10   U.S. Capitol on January 6th of 2021 that would make it

11   difficult for you to serve as a fair and impartial juror in

12   this case?

13   　　　All right.  Let's turn to question 11.

14   Do you have such strong feelings about former-President

15   Donald Trump or his supporters, positive or negative, that

16   would make it difficult for you to serve as a fair and

17   impartial juror in this case?

18   　　　Question 11 is:  Do you have such strong feelings

19   about former-President Donald Trump or his supporters,

20   positive or negative, that would make it difficult for you

21   to serve as a fair and impartial juror in this case?

22   　　　All right.  Question 12 is as follows:  The

23   testimony of a police officer should be treated the same as

24   the testimony of any other witness and the jury should not

25   give either greater or lesser weight to the testimony of a

1    witness simply because the witness is or was a police
2    officer.
3         The question is as follows, this is question 12.
4    Do you have such strong feelings or opinion about the
5    police, either positive or negative, that would make it
6    difficult for you to treat the testimony of current or
7    former police officers the same as for any other witness?
8         Let me read question 12 one more time:  The
9    testimony of a police officer should be treated the same as
10   the testimony of any other witness and the jury should not
11   give either greater or lesser weight to the testimony of a
12   witness simply because the witness is or was a police
13   officer.
14        Do you have such strong feelings or opinions about
15   the police, either positive or negative, that would make it
16   difficult for you to treat the testimony of current or
17   former police officers the same as for any other witness?
18        Okay.  Now, question 13 actually has five
19   subparts, okay?  So these questions, under question 13, and
20   they're going to be question 13A, B, C, D, and E, relate not
21   only to you but to members of your immediate family and
22   close, personal friends.  I'm going to refer to that
23   collective as the group, okay?
24        So question 13A is as follows.  Does anyone in the
25   group, you, members of your immediate family or close,

1  personal friends, any member of that group now work for or

2  previously work for any law enforcement agency?  That's

3  question 13A.

4          This includes any police department in or outside

5  the district, including the Metropolitan Police Department

6  and the New York City Police Department, and it includes

7  special police officers, as well as prosecutors offices,

8  such as the U.S. Attorney's Office or a state's attorneys

9  office.  It also includes federal law enforcement agencies

10  like the Department of Justice, the FBI, the Secret Service,

11  the Department of Homeland Security, the U.S. Capitol

12  Police, and the U.S. Park Police, and it includes any local

13  police or sheriff's departments.

14          Now, again, the question is 13A, question 13A is:

15  Does anyone in this group -- now work for or previously work

16  for any law enforcement agency?

17          So for this particular -- if the answer is yes,

18  write down 13A, not just 13, 13A, okay, and that'll be true

19  for all the other 13 question subparts.

20          All right.  Question 13B is:  Has any member of

21  that group ever served in the Armed Forces?

22          Question 13B, again, that relates to you, members

23  of your immediate family or close, personal friends, has any

24  member of that group ever served in the Armed Forces.  That

25  is 13B.  If the answer is yes, write down 13B.

1    13C is as follows:  Has any member of that group

2 ever attended law school, worked as a lawyer or worked in

3 law office?

4    Question 13C relates to, again, you, members of

5 your immediate family and close, personal friends.  Has any

6 member of that group ever attended law school, worked as a

7 lawyer or worked in a law office?

8    Question 13D is as follows:  Has any member of

9 that group ever been arrested for, charged with or convicted

10 of a crime or been a victim of or witness to a crime?

11    Question 13D is:  Has any member of that group

12 ever been arrested for, charged with, or convicted of a

13 crime or been a victim of or witness to a crime?

14    Question 13E, and this is the last of the 13

15 series questions is -- 13E is:  Has any member of that group

16 ever in been involved in a physical altercation with a

17 member of law enforcement?

18    Question 13E is:  Has any member of that group

19 ever been involved in a physical altercation with a member

20 of law enforcement?

21    Okay.  We're now going to move over to question

22 14.  Question 14 is as follows:  The government bears the

23 burden of proving Mr. Webster guilty beyond a reasonable

24 doubt and he is presumed innocent unless and until the

25 government meets that burden.  This burden of proof never

1  shifts to Mr. Webster and he has no obligation to offer his

2  own evidence.

3       Question 14 is as follows:  Would you have any

4  difficulty presuming Mr. Webster to be innocent or with this

5  allocation of the burden of proof?

6       Let me repeat 14 one more time:  The government

7  bears the burden of proving Mr. Webster guilty beyond a

8  reasonable doubt and he is presumed innocent unless and

9  until the government meets that burden.  This burden of

10 proof never shifts to Mr. Webster, and he has no obligation

11 to offer his own evidence.

12      Question 14 is:  Would you have any difficulty

13 presuming Mr. Webster to be innocent or with this allocation

14 of the burden of proof?

15      Question 15 is as follows:  A defendant has a

16 constitutional right not to testify, and if Mr. Webster

17 decides not to testify, I will instruct you that you cannot

18 hold his silence against him.

19      Question 15 is:  Would you have any difficulty

20 following that instruction?

21      Question 15 again:  A defendant has a

22 constitutional right not to testify, and if Mr. Webster

23 decides not to testify, I will instruct you that you cannot

24 hold his silence against him.  Would you have any difficulty

25 following that instruction?

1          Question 16 is as follows:  Jurors are the sole

2   judges of the facts, but they must follow the principles of

3   law as I instruct.  The jury may not follow some rules of

4   law and ignore others, and even if the jury disagrees or

5   dislikes a rule of law or does not understand the reasons

6   for some of the rules, it is not the jury's -- it is the

7   jury's duty to follow them; that is, the rules of law.

8          Question 16 is as follows:  Is there any reason

9   you would find it difficult to follow my legal instructions,

10  whatever they may be?

11         So Question 16 one more time:  Judges are --

12  excuse me.  Jurors are the sole judges of the facts, but

13  they must follow the principles of law as I instruct.  The

14  jury may not follow some rules of law and ignore others.

15  And even if the jury disagrees or dislikes a rule of law or

16  does not understand the reasons for some of the rules, it is

17  the jury's duty to follow them.

18         Question 16 is:  Is there any reason you would

19  find it difficult to follow my legal instructions, whatever

20  they may be?

21         Question 17 is as follows:  To reach a verdict on

22  a particular charge, every juror must agree on the verdict;

23  that is, any verdict must be unanimous.  In deliberations,

24  you must consider the opinions and points of your fellow

25  jurors, but you must also follow your own conscious and be

1  personally satisfied with any verdict.

2          Question 17 is as follows:  Would you have any

3  difficulty expressing your own opinions and thoughts about

4  this case to your fellow jurors?

5          Question 17 again is:  Would you have any

6  difficulty expressing your own opinions and thoughts about

7  this case to your fellow jurors?

8          Question 18.  Now, if you are selected as juror in

9  this case, this is very important, I will instruct you to

10  avoid all media coverage relating to this case.  That

11  includes radio, television, podcasts, social media or other

12  Internet sources; that is, you will be forbidden from

13  reading any newspaper articles about this case, listening to

14  any radio or podcast stories about this case or watching any

15  TV news about this case.  You also will be forbidden from

16  googling this case or blogging, tweeting, reading or posting

17  comments about this case on social media sites or anywhere

18  else on the Internet.

19          Question 18 is:  Do you have any reservations or

20  concerns about your ability or willingness to follow this

21  instruction?

22          Let me repeat 18 one more time.

23          If you are selected as a juror in this case,

24  I will instruct you to avoid all media coverage relating to

25  this case, including radio, television, podcasts, social

1    media and any other Internet source.  That is, you will be
2    forbidden from reading any newspaper articles about this
3    case, listening to any radio, or podcast stories about the
4    case or watching any TV news about the case.  You will also
5    be forbidden from googling or otherwise searching for the
6    case, or blogging, tweeting, reading or posting comments
7    about this case on social media sites or anywhere else on
8    the Internet.
9         Question 18:  Do you have any reservations or
10   concerns about your ability or willingness to follow this
11   instruction?
12        Okay.  Question 19.  We're getting close to the
13   end.  Today is Monday, April the 25th.  The parties expect
14   the presentation of evidence in this case to conclude either
15   at the end of this week or early next week.  You will begin
16   deliberating after the close of evidence.  Once you begin
17   deliberating, I do not know how long your deliberations will
18   last.  The jury will sit Monday through Friday, generally
19   from 9:30 to 5:00 p.m.
20        Question 19 is as follows:  Knowing this schedule,
21   do you have any urgent or extremely important matter to
22   attend to this week or next such that serving as a juror in
23   this case would be an extreme hardship for you?
24        Question 19 one more time:  Today is Monday,
25   April 25th.  The parties expect the presentation of evidence

1  in this case to conclude either at the end of this week or

2  early next week.  You will begin deliberating after the

3  close of evidence.  Once you begin deliberating, I do not

4  thought know how long your deliberations will last.  The

5  jury will sit Monday through Friday, generally from 9:30

6  a.m. to 5:00 p.m.

7       Knowing this schedule, do you have any urgent or

8  extremely important matter to attend to this week or next

9  such that serving as a juror in this case would be an

10  extreme hardship for you?

11       Question 20 is far as follows:  Do you have such

12  strong feels about the COVID-19 global pandemic and being in

13  a room with other jurors, attorneys, and witnesses such that

14  it would be difficult for you to participate in the trial?

15       Again, question 20 is:  Do you have such strong

16  feelings about the COVID-19 global pandemic and being in a

17  room with other jurors, attorneys, and witnesses such that

18  it would be difficult for you to participate in the trial?

19  That's question 20.

20       Question 21, the final question, is the -- what I

21  sort of call my catch-all question.  It is as follows:

22  Do you have any religious, moral or philosophical reason or

23  personal or political beliefs, or is there any other reason

24  not already mentioned that you believe would make it hard

25  for you to be a fair and impartial juror in this case or to

1    sit in judgment of another person?

2           Question 21:  Do you have any religious, moral, or

3    philosophical reason or personal or political beliefs, or

4    is there any other reason not already mentioned that you

5    believe would make it hard for you to be a fair and

6    impartial juror in this case or to sit in judgment of

7    another person?

8           Okay.  So we have now gone through the 21

9    questions, we have completed phase 1 of the jury selection

10   process.  What we will now do, as I said earlier, is we are

11   going to move to the other courtroom.

12          We will bring each of you individually into the

13   courtroom to follow up on the questions I have just asked

14   you, and we will continue that process up until the point we

15   have qualified the number of jurors we need to qualify.

16          As I said earlier, this process I expect will last

17   most of the day.  Again, a reminder as not to talk about the

18   case with anyone, and particularly, more importantly, no

19   Internet research now that you know a little bit about the

20   case and no communicating online or otherwise about the case

21   during the jury selection process.

22          Thank you very much, ladies and gentlemen.  Our

23   Courtroom Deputy will instruct you on where you need to go

24   next, and we will look forward to seeing each of you in the

25   other courtroom if not this morning, then this afternoon.

1    Thank you, everyone.

2              COURTROOM DEPUTY:  All rise.

3              THE COURT:  Don't wait for me, everyone.

4    Thank you.

5              COURTROOM DEPUTY:  This Court stands in recess.

6              (Recess from 10:20 a.m. to 10:29 a.m.)

7              THE COURT:  Counsel, we're going to seat the juror

8    in the jury box so everybody has a clear line of sight to

9    the juror while the juror is answering questions.

10             Just a reminder, please, if you wish to strike for

11   cause, please do so after the juror exits but before the

12   next juror comes in.  So please make your motion for a

13   for-cause strike during that time, all right?  Thanks.

14             Hi, ma'am, how are you?

15             PROSPECTIVE JUROR:  Good.  How are you?

16             THE COURT:  I'm going ask you to keep your voice

17   up, and if you'd like to take your mask off for present

18   purposes, you're welcome to do so.

19             You are juror 0864; is that correct?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Okay.

22             So you answered two questions yes.  You answered

23   Question 8 and Question 13C.  Let's start with Question 8,

24   which was:  Have you ever watched video of what happened at

25   the U.S. Capitol on January the 6th on the news or on the

1    Internet?  You answered that question yes.

2            Can you sort of estimate how many times total you

3    think you may have watched video of what happened on the

4    6th?

5            PROSPECTIVE JUROR:  Just in passing on the news,

6    maybe ten times when it kind of came on the news.

7            THE COURT:  Ten times or so.

8            PROSPECTIVE JUROR:  Probably.

9            THE COURT:  Do you think the fact that you've

10   watched that video the number of times that you have,

11   do you think that would cause you to think you might not be

12   able to be fair and impartial if you were selected in this

13   case?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Okay.

16           And have you developed feelings or thoughts or

17   strong views upon what you've observed or seen on video that

18   might make you think you couldn't be fair and impartial in

19   this case if you were selected?

20           PROSPECTIVE JUROR:  No, I think I could be fair.

21           THE COURT:  Okay.

22           Question 13C asks whether you or any member of the

23   group had attended law school or worked as a lawyer or

24   worked in a law office.  Can you tell us about that?

25           PROSPECTIVE JUROR:  My sister works at a law firm

1    and a friend of mine works at a law firm.  Neither are

2    lawyers, but they are employed there.

3              THE COURT:  That's okay.  I don't think it's you.

4    If you just bring up to.

5              So your sister is a lawyer.  Does she practice any

6    criminal work to your knowledge?

7              PROSPECTIVE JUROR:  Neither of them are lawyers.

8    They just are employed in a law firm.

9              THE COURT:  I'm sorry, okay.  I misunderstood.

10             So the firms that they are employed with,

11   do you know if those law firms practice criminal work?

12             PROSPECTIVE JUROR:  I don't know.

13             THE COURT:  All right.  Any follow-up question by

14   the government?

15             MR. KELLY:  No, Your Honor.

16             THE COURT:  From the defense?

17             MR. MONROE:  No, sir.  Thank you, Your Honor.

18             THE COURT:  Ma'am, thank you very much.

19             MR. MONROE:  Do you have a record of what juror

20   number that was?

21             THE COURT:  That was Juror 0486, first juror on

22   the list.

23             MR. MONROE:  Oh, very first one, got you.

24             THE COURT:  We're just going right down the line.

25             Hi, ma'am, you are juror 0482; is that right?

1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  Okay.  And if you'd like to put your

3  mask down or remove it for present purposes, feel free to do

4  that.

5            PROSPECTIVE JUROR:  Okay.

6            THE COURT:  Okay.  You answered five questions

7  yes, they are 8, 10, 11, 13B and 13D, so let's start with

8  Question 8 which asks, whether you have watched video of

9  what happened at the U.S. Capitol on January 6th on the news

10  or on the Internet.  And you answered that question yes.

11           You've also answered Question 10 about strong

12  feelings or opinions about the events that took place at the

13  U.S. Capitol, and you've answered Question 11 about strong

14  feelings about former-President Trump or his supporters.

15           So can you tell us a little bit about how much you

16  followed via video or news the events of January the 6th and

17  what your feelings are of the events of that day.

18           PROSPECTIVE JUROR:  At the time, I followed it

19  closely when it was happening, the day of and around the

20  time surrounding it.  Since then, I have not followed it as

21  closely.  So I would say my exposure to the media was mostly

22  around the time when it happened.

23           THE COURT:  Okay.

24           And you've answered 10 and 11, that you do have

25  these strong feelings.  Tell us about what those feelings

1  are and why you think they might not -- why they might

2  prevent you from being fair and impartial in this case.

3        PROSPECTIVE JUROR:  I think I have a belief that

4  the people who were protesting on that day were in the

5  wrong, and I also disagree with and dislike the former

6  President.

7        THE COURT:  Okay.

8        So everyone has their own political views about

9  the current President, the former President, and we all come

10  to a courtroom with that in mind.  And not surprising, given

11  the events of January the 6th, people may have formed some

12  general opinions about what happened that day; but the

13  question for you is whether you could put those feelings

14  aside and judge this defendant based upon the evidence

15  that's presented in this case and based upon the law as I

16  instruct you to?  Is that something you think you could do?

17        PROSPECTIVE JUROR:  Yes, I believe I can.

18        THE COURT:  Okay.

19        Question 13B asks whether any member of the group

20  has served in the Armed Forces; is that right?

21        PROSPECTIVE JUROR:  Yes.

22        THE COURT:  Can you tell us who in the group and

23  what branch of the Armed Services?

24        PROSPECTIVE JUROR:  My father was in the Army.

25        THE COURT:  In the Army.  Okay.

1          And can you just tell us how long he served.

2          PROSPECTIVE JUROR:  I don't know.  In the late

3  '70s, around Vietnam, but not in Vietnam.

4          THE COURT:  Okay.

5          Question 13D asked whether any member of the

6  group's been arrested for, charged with or convicted of a

7  crime or been a victim or a witness to a crime.  Can you

8  tell us about that?

9          PROSPECTIVE JUROR:  Yes.

10         My brother was convicted of a crime and my husband

11  has been the victim of a crime.

12         THE COURT:  Okay.

13         Let's start with your brother.  Can you tell us

14  what the nature of the crime was?

15         PROSPECTIVE JUROR:  He was convicted of robbery or

16  burglary.  I don't remember.

17         THE COURT:  Was that in the District of Columbia

18  or elsewhere?

19         PROSPECTIVE JUROR:  No, this was not in D.C.

20         THE COURT:  Okay.

21         And do you believe he was treated fairly by police

22  and the prosecution in that case?

23         PROSPECTIVE JUROR:  I don't know.  I was a child

24  at the time.

25         THE COURT:  Okay.

```
 1              Any feelings, either positively or negatively,
 2    about your brother's experience that might think -- that
 3    might cause you to think you couldn't be fair and impartial
 4    in this case?
 5              PROSPECTIVE JUROR:  No.
 6              THE COURT:  And then you said your husband,
 7    I believe you said, has been a victim of a crime.  Can you
 8    tell us about that was.
 9              PROSPECTIVE JUROR:  My husband was held at
10    gunpoint during a robbery.
11              THE COURT:  Was that in the District of Columbia
12    or elsewhere?
13              PROSPECTIVE JUROR:  No, not in D.C.
14              THE COURT:  And was a person arrested for that
15    crime?
16              PROSPECTIVE JUROR:  I don't know.
17              THE COURT:  And anything about your husband's
18    experience with law enforcement or prosecutors in that case
19    that might cause you to think you wouldn't be able to be
20    fair and impartial here.
21              PROSPECTIVE JUROR:  No.
22              THE COURT:  Any follow-up from the government?
23              MR. KELLY:  Yes, Your Honor.
24              I see here that --
25              THE COURT:  Government counsel, just make sure
```

1  you're speaking into the microphone.  You don't need to

2  stand.  You can sit.

3         MR. KELLY:  Yes, Your Honor.

4         I see here that you are a research psychologist

5  with the U.S. Department of Transportation.  What kind of

6  research do you do there?

7         PROSPECTIVE JUROR:  I do research on teen drivers.

8         MR. KELLY:  Teen drivers.

9         PROSPECTIVE JUROR:  People learning to drive.

10         MR. KELLY:  Nothing else.

11         THE COURT:  I would appreciate any knowledge you

12  may have.  My daughter is about to start.

13         PROSPECTIVE JUROR:  Good luck.

14         MR. MONROE:  Good morning.

15         I have to ask:  Let's assume that Mr. Webster is a

16  Trump supporter.  Does that, in your mind, put him at a

17  slight disadvantage in your ability to be fair and impartial

18  in this case?  I need to insist upon your honesty on this

19  point.

20         PROSPECTIVE JUROR:  I don't -- I'm not sure if

21  you're asking if I think a Trump supporter is more likely to

22  have committed a crime, I don't think the answer -- I would

23  say no.

24         MR. MONROE:  I'm driving at your own personal view

25  of the world and other people, other Americans.  I'll ask

1  you based upon that presumption, just alone, you don't know

2  anything about Mr. Webster other than that he's a Trump

3  supporter, does that put him -- without knowing more about

4  the case or hearing any evidence, does that put him at a

5  disadvantage in your mind personally as for you?

6          PROSPECTIVE JUROR:  Yes, I think so.

7          MR. MONROE:  Okay.

8          And those folks that were present at the

9  January 6th protest, what was your general opinion or

10  consensus of what occurred on that day?  I'm just asking

11  about your take on it.

12          PROSPECTIVE JUROR:  About what?

13          MR. MONROE:  Your personal take about what

14  happened on January 6th.  What's your opinion about it?

15          PROSPECTIVE JUROR:  That people who disagreed with

16  outcome of the election protested it and that some of those

17  protesters did things that were not lawful.

18          MR. MONROE:  That was not what?

19          PROSPECTIVE JUROR:  Lawful.

20          MR. MONROE:  Now, I'm going to ask you to assume

21  another point.  I want you to assume that Mr. Webster was at

22  the Capitol on January 6th.  Without having heard any

23  evidence from the government, does that place in your mind

24  the thought that he may have committed a crime?

25          PROSPECTIVE JUROR:  No.

1          MR. MONROE:  Okay.  Thanks so much for speaking

2    with me.

3          THE COURT:  Can I just follow up?  You said that

4    there may be some disadvantage, but I asked you earlier

5    whether you could sort of set aside your political views

6    about people who may have supported the former President and

7    judge the evidence against this defendant in this case

8    fairly and impartially.  Is that something you're confident

9    you could do?

10          PROSPECTIVE JUROR:  I think I can.  I'm basing

11    that on the fact that my job also involves evaluating

12    evidence in an impartial way.  So I think that I can do

13    that.

14          THE COURT:  Okay.  All right.  Thank you.

15          Okay.  Let's bring our next juror in.

16          MR. MONROE:  Oh, are you entertaining for cause or

17    can we hear from the government?

18          THE COURT:  I assume if nobody is standing up to

19    strike -- hang on.

20          MR. MONROE:  I was waiting for --

21          Brian, if you want to say anything.

22          MR. KELLY:  No.

23          MR. MONROE:  I rise to offer a challenge for

24    cause, Judge.

25          We all have our political beliefs, every one of

1   us, but I asked this prospective juror squarely whether if

2   she took it to the presumption that Mr. Webster was a Trump

3   supporter, whether he would be at a disadvantage having not

4   heard any evidence in the case, and her response with

5   complete clarity is yes. I don't think she's a juror that

6   should be sitting on this case and would give my client a

7   distinct disadvantage. I would for move for cause.

8   Thank you.

9        THE COURT: I'm going to deny the motion. I think

10   she was quite honest when she was pressed by you, but then

11   ultimately said, you know, she can set aside whatever her

12   political views are and assess the evidence honestly and

13   fairly as to this defendant. And so I think that's all we

14   can ask for jurors and I think that's what she said she's

15   capable of doing.

16        MR. MONROE: I would offer the Court my respectful

17   exception.

18        THE COURT: All right. Let's bring the next

19   juror.

20        PROSPECTIVE JUROR: Good morning.

21        THE COURT: Hi, ma'am. You are Juror 0453.

22        PROSPECTIVE JUROR: Yes.

23        THE COURT: Feel free to remove your mask if you

24   feel more comfortable doing that for present purposes.

25        PROSPECTIVE JUROR: Okay.

1    THE COURT:  So you've answered several questions

2  yes.  They include 7, 8, 10, 11, 15, 18, and 21.  So why

3  don't we start with 21, which was the catch-all question

4  about any religious, moral or philosophical reason or

5  personal beliefs.  Can you tell us about that?

6    PROSPECTIVE JUROR:  Really, just personal beliefs

7  that I watched the events and have followed along and

8  believe that it was a coup and mostly moral.

9    THE COURT:  All right.

10    So I taken it that is also sort of the response to

11  Question 7, 8.  Question 7 asked about following the news

12  regularly.  How often would you say you followed the news

13  about those events?

14    PROSPECTIVE JUROR:  I have followed along

15  generally.  I have not followed any particular individual's

16  stories, but I watched, you know, from that -- the whole day

17  and all the follow-up coverage.

18    THE COURT:  Right.

19    And have you watched videos of the events since

20  then.

21    PROSPECTIVE JUROR:  I have, yeah.

22    THE COURT:  And about how frequently would you say

23  that happened?

24    PROSPECTIVE JUROR:  I'm really just anytime it

25  came back up in a big way.

1          THE COURT:  Okay.

2          Is it something that you would say you've been

3   regularly seeking out or just something, if it happens to

4   come across in a news story?

5          PROSPECTIVE JUROR:  More if it happens to come

6   across.

7          THE COURT:  So let me just ask, you know, we all

8   have our political beliefs.  We all may have formed an

9   opinion about what occurred on January the 6th.  The

10  question here is not whether there was a coup or not, that's

11  really not what is before this Court.  What's before this

12  Court is whether the government can prove this defendant

13  guilty beyond a reasonable doubt with what he's accused of

14  on that date.

15         Would you be able to put aside whatever views you

16  formed of the events of that date and evaluate the evidence

17  as it relates to this defendant and give him a fair and

18  honest trial based upon the evidence presented in this case?

19         PROSPECTIVE JUROR:  Sure, I think so.  That

20  context is helpful to hear.

21         THE COURT:  Okay.

22         And if at the end of the evidence you concluded

23  that the government had not carried its burden beyond a

24  reasonable doubt, would you have any trouble in your mind

25  convicting Mr. -- excuse me, acquitting Mr. Webster merely

1  because he was present on January the 6th and because,

2  perhaps, he is a Trump supporter?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Do you have any doubt in your mind

5  about that?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  All right.

8          Let's turn to Question 15 and 18 just quickly.

9          This was about the right to testify.  You

10  indicated you would have difficulty with that instruction.

11          PROSPECTIVE JUROR:  I'm sorry, can you repeat

12  that?

13          THE COURT:  Sorry.  Question 15 was:  The

14  defendant has a constitutional right not to testify.  If

15  Mr. Webster decides not to testify, I'll instruct that that

16  decision could not be held against him.

17          PROSPECTIVE JUROR:  I'm sorry, I don't -- so if he

18  chose not to testify, I would not hold --

19          THE COURT:  Yeah.  So the question was as follows:

20  The defendant has a constitutional right not to testify and

21  if Mr. Webster decides not to testify, I will instruct you

22  that you cannot hold his silence against him.  And the

23  question was:  Would you have any difficulty following that

24  instruction?

25          PROSPECTIVE JUROR:  Okay.  Thank you.

1          I would just find it bizarre.

2          THE COURT:  Okay.

3          And then question 18 concerned media coverage of

4    the case.  You think you would have trouble avoiding media

5    coverage of this case if I instructed you to do that.

6          PROSPECTIVE JUROR:  My roommates are reporters for

7    Politico so that would be my only concern.

8          THE COURT:  Does your roommate cover January 6th

9    events?

10         PROSPECTIVE JUROR:  No, they cover elections,

11   but -- it seems tangential, but not directly January 6th

12   events.

13         THE COURT:  All right, ma'am.  Thank you very

14   much.

15         PROSPECTIVE JUROR:  Sure.  Thank you.

16         THE COURT:  You may be dismissed.  Thank you.

17         All right.  I'm going to strike Juror 0453 for

18   cause.  If I don't ask you all for any follow-up, it's

19   because I've concluded the juror's going to go for cause,

20   okay?

21         Hello, ma'am.  How are you?

22         PROSPECTIVE JUROR:  Good.

23         THE COURT:  You can lower or remove your mask for

24   present purposes if you feel comfortable doing so, okay.

25         PROSPECTIVE JUROR:  Okay.

1          THE COURT:  But you can also leave it on.

2          You answered four questions yes:  4, 12, 13D and

3     20.

4          Let's start with 20, which is the question about

5     COVID and the global pandemic and concerns about serving.

6          Can you tell us what your concerns are about

7     serving in light of the pandemic?

8          PROSPECTIVE JUROR:  My concerns are that -- I am

9     now about four months pregnant, and I have bad anxiety so,

10    like --

11         THE COURT:  That's okay.  Take your time.

12         Well, let me ask you this, ma'am.  I think I heard

13    you say you're four months pregnant.

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Congratulations.

16         PROSPECTIVE JUROR:  Thank you.

17         THE COURT:  And you have anxiety, is that what I

18    heard you say?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Do you think -- I described to you

21    earlier what steps we've taken in the courthouse to keep

22    everybody healthy, the steps that we will take if you are

23    selected as a juror.  Notwithstanding all of that, do you

24    think you would have difficulty paying attention to the

25    evidence that's presented in this case because of your

concerns about COVID?

PROSPECTIVE JUROR:  Not really.  Not really.

THE COURT:  Okay.  All right.

So then just, you know, you did answer question
20.  So I want make sure that if you were selected, your
concerns about COVID or your worries about COVID would --
that that would not prevent you from paying attention and
listening to the evidence and being able to be seated in a
jury box with other jurors and then being able to deliberate
with them after the end of the case.  Do you think your
concerns would cause any problem with doing that?

PROSPECTIVE JUROR:  My anxiety, yes.  Just because
I can get a little, like, nervous and hesitant.

THE COURT:  You can get nervous; is that right?

PROSPECTIVE JUROR:  Yes, and stuff like that.  And
then I'll start to, like, panic.

THE COURT:  I'm sorry, say that again.

PROSPECTIVE JUROR:  I'll start to, like, panic and
things.

THE COURT:  Do you think that's something that --
and I'm sorry to pry, I don't mean to do this, but I just
need to ask.  Is that something that could come on at any
time or is that something you think would be -- come about
because you would be sort of with other jurors in the
courtroom?

1          PROSPECTIVE JUROR:  So, yeah, it would come up at

2     any time, but -- yeah.

3          THE COURT:  All right.

4          Okay, ma'am, I'm going to excuse you now.

5     Thank you very much.

6          PROSPECTIVE JUROR:  Thank you.

7          THE COURT:  All right.  I'm going to strike 1464

8     for cause.  I just had no confidence, based upon her

9     difficulty in answering the questions, that she would be

10    able to remain focused on the evidence and serve through the

11    entirety.

12         All right.  I've got a juror who's coming in who's

13    misbehaving a little bit, so we're taking this person out of

14    order.  So just bear with me, everyone, okay?

15         Hi, ma'am.  How are you?

16         PROSPECTIVE JUROR:  Good morning.  Fine.

17         THE COURT:  Good morning.

18         You can take your mask down if you'd like and feel

19    comfortable doing that.

20         Can you tell us you're juror number, please?

21         PROSPECTIVE JUROR:  66.

22         THE COURT:  66?

23         So 00 --

24         PROSPECTIVE JUROR:  I'm sorry, 0216.

25         THE COURT:  0216.

1        Okay.

2        Ma'am, I understand you've expressed some concerns

3   about being here today and about serving as a juror; is that

4   right?

5        PROSPECTIVE JUROR:  Am I answering this with yes

6   or no?

7        THE COURT:  You can answer --

8        PROSPECTIVE JUROR:  Yes, only because I have

9   received a text while I was sitting in the courtroom that my

10  niece was across from me.

11       THE COURT:  In other words --

12       PROSPECTIVE JUROR:  I have a niece that evidently

13  that was in the courtroom with me at the time, at like,

14  8:52, she texts me.

15       THE COURT:  Oh, I see.

16       PROSPECTIVE JUROR:  And I was asking the lady how

17  was a way I can be excused because I just noticed that my

18  niece was in the courtroom.  And she got agitated.  She said

19  I got agitated, but that's all I was talking about.

20       THE COURT:  So you think your niece is a juror, is

21  that right, a potential juror.

22       PROSPECTIVE JUROR:  Yes.

23       THE COURT:  So, look, here's, you know, I'm going

24  to ask you to return to the courtroom and then we'll call

25  you back in a little bit later.  The fact that you are on

1  the panel right now with your niece doesn't necessarily

2  disqualify you, because there's no guarantee that either you

3  or she will be on the jury or both of you will be on the

4  jury.

5      PROSPECTIVE JUROR:  Well, is there any way that

6  I can just be excused besides that or I have to have another

7  reason, because my brother is in an ex -- I have a brother

8  that's a ex-Metropolitan Police officer, which is her

9  grandfather.

10     THE COURT:  I understand.  All right.  Well, look,

11 we'll go through those questions and your answers in a

12 little bit.  So I'm going to ask you to sort of go back and

13 re-take your seat.  I just wanted to hear whatever concerns

14 you had, because I'd learned of them.

15     PROSPECTIVE JUROR:  Another concern, I was asking,

16 could we leave the court building mainly just to smoke a

17 cigarette, and things of that nature.  She told me no but we

18 were able to do that earlier.  That's all I wanted to find

19 out.

20     THE COURT:  So I think when -- I'll defer to the

21 courtroom staff.  I think when we take a break, you may be

22 able to step outside and do that, but while court is in

23 session, we're going to ask you to stay in the courtroom and

24 avoid going outside.  Okay?

25     PROSPECTIVE JUROR:  Yes, sir.

 1          THE COURT:  So we'll be with you in a little bit.
 2     Thank you, ma'am.
 3          All right.  So that was 0216.  She's fairly far
 4     down our list.  She's Juror No. 66.  So...
 5          All right, ma'am, how are you?
 6          PROSPECTIVE JUROR:  I'm fine.  And yourself?
 7          THE COURT:  Good, thank you.
 8          You are juror 1132?
 9          PROSPECTIVE JUROR:  Yes.
10          THE COURT:  All right.
11          And feel free to pull down your mask or remove it
12     if you feel comfortable for present purposes.
13          All right.  You answered several of our questions
14     yes:  7, 8, 10, 11, 13A and B, as well as 19.  So why don't
15     we start with 19, which is the hardship question.  Can you
16     tell us what the hardship would be for serving as a juror,
17     both this week and perhaps a part of next week?
18          PROSPECTIVE JUROR:  My uncle passed last Thursday,
19     and we still making arrangements for his service, and I
20     don't know if it's going to be this week or next week.
21          THE COURT:  Okay.
22          And I'm sorry for your loss.
23          PROSPECTIVE JUROR:  Thank you.
24          THE COURT:  Is your uncle -- will the services be
25     local, or is that something you might have to travel out of

town for?

PROSPECTIVE JUROR:  They trying to decide whether they going to take him back to South Carolina or keep him here.

THE COURT:  Okay.

All right.  I'm going to excuse you, ma'am.  Thank you very much.

PROSPECTIVE JUROR:  All right.  Thank you.

THE COURT:  Okay.  Sir, you are juror 0087; is that right?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Okay.  You answered four questions yes:  Question 5, 7, 8, and 10.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  All right.

Let's start with Question 5, and that was whether you live or work at or near the U.S. Capitol.

And, by the way, if you'd like to take your mask down or remove it for present purposes, that's fine.

PROSPECTIVE JUROR:  All right.  Thank you.

THE COURT:  So can you tell us about whether -- first, whether you live or work near the Capitol.

PROSPECTIVE JUROR:  I live.

THE COURT:  And can you just approximate -- I don't need an exact address, but approximate how many

1  blocks away from the Capitol building?

2         PROSPECTIVE JUROR:  Probably, let me think about

3  that.  Probably about 12.

4         THE COURT:  12.  Okay.

5         PROSPECTIVE JUROR:  Maybe a little bit less.

6         THE COURT:  So 8 to 12.

7         PROSPECTIVE JUROR:  Just like -- yeah, less.

8         THE COURT:  So you were -- were you -- can I just

9  ask whether you -- that's where your home is, I take it?

10        PROSPECTIVE JUROR:  Yes, that's where I live,

11 yeah.

12        THE COURT:  Were you at your home and where you

13 live on January the 6th of 2021 when the events happened?

14        PROSPECTIVE JUROR:  No, I was in a different spot.

15        THE COURT:  You were in a different spot.

16        PROSPECTIVE JUROR:  Yeah, yeah.

17        Over in River Terrace.  Just the other direction

18 from where I was at.

19        THE COURT:  I see.

20        So you were still on Capitol Hill.

21        PROSPECTIVE JUROR:  Yeah.

22        THE COURT:  But just at a different address.

23        PROSPECTIVE JUROR:  Yes, sir.

24        THE COURT:  And were you actually at your house

25 that day when events --

```
 1              PROSPECTIVE JUROR:  I was at work.
 2              THE COURT:  Hang on one second.
 3              PROSPECTIVE JUROR:  Oh, sorry.
 4              THE COURT:  Because we have a court reporter, I
 5      need you to let me finish answering -- asking my questions
 6      before you answer so he can keep a clean record.
 7              But you said you were at work; is that right?
 8              PROSPECTIVE JUROR:  Yes, sir.
 9              THE COURT:  So is it fair to say that you didn't
10      witness firsthand any of the events of what happened?
11              PROSPECTIVE JUROR:  I did some when I got off
12      work.
13              THE COURT:  You did, okay.
14              PROSPECTIVE JUROR:  Yeah.
15              THE COURT:  Can you tell us what you witnessed
16      when you got off work?
17              PROSPECTIVE JUROR:  People fleeing the scene.
18              THE COURT:  I'm sorry?
19              PROSPECTIVE JUROR:  People fleeing the scene.
20              THE COURT:  Okay.  When you say "fleeing," what do
21      you mean?
22              PROSPECTIVE JUROR:  Walking very hurriedly away
23      from the Capitol.
24              THE COURT:  Okay.
25              And let me just ask you:  Now, you've also
```

1    answered Question 7 and 8.  Question 7 concerns close or

2    regular following the news about the events --

3              THE WITNESS:  Yeah.

4              THE COURT:  -- that took place at the Capitol.

5    Can you tell us sort of how frequently you followed the

6    events?

7              PROSPECTIVE JUROR:  Generally whatever comes up in

8    my newsfeed.  So, yeah, usually it would be something, you

9    know, maybe once a day, different articles.

10             THE COURT:  And can you tell us sort of the

11   typical sources from which your newsfeed pulls articles.

12             PROSPECTIVE JUROR:  Anywhere from CNN to Post, the

13   Times.  So, yeah, just --

14             THE COURT:  And, also, you've answered the

15   question about video and having seen and watched video of

16   the events of January the 6th.  Can you tell us sort of,

17   just generally speaking, how many times or how many numbers

18   of videos you think you may have seen.

19             PROSPECTIVE JUROR:  Over two dozen.

20             THE COURT:  Okay.

21             PROSPECTIVE JUROR:  Easily.

22             THE COURT:  And is that something -- either

23   whether it's news or videos, is that something you've

24   actively searched out or something that you've viewed or --

25   viewed if it happens to be embedded in a news story?

1    PROSPECTIVE JUROR:  Viewed if it was embedded in a
2  story.
3    THE COURT:  You answered Question 10, which is
4  about strong feelings or opinions about the events that took
5  place that would make it difficult for you to be fair and
6  impartial.  Can you tell us about that?
7    PROSPECTIVE JUROR:  Yeah, I mean, being in such
8  close proximity to it and understanding what happened that
9  day, angers me severely.
10    You know, I contract for the military, for the
11  wounded warriors, and for what they've served to protect and
12  then what happened that day, it upsets me greatly.
13    THE COURT:  Okay.
14    So, look, that's not an uncommon reaction, not
15  just for you but for people elsewhere; but, you know, the
16  events at large are not on trial here in this case.  What's
17  at issue in this case is the conduct of this defendant and
18  the question of whether the government can make its case
19  against this defendant.
20    Would you be able to set aside your feelings about
21  those events and honestly and dispassionately evaluate the
22  evidence in this case?
23    PROSPECTIVE JUROR:  In honesty, I could not
24  guarantee that it would not -- I would not be affected in
25  one way -- I mean, it would depend on, you know, if anything

1    triggered or something along those lines.

2              THE COURT:  What do you mean by that, triggered?

3              THE WITNESS:  Well, just, you know, if whatever

4    occurred and, again, what I have in my mind that I saw and

5    have seen, and I don't want to be -- I'm not 100 percent

6    sure that I could be, yeah.

7              THE COURT:  So let me ask the question a different

8    way, which is that if you sat as a juror and were convinced

9    that the government has not met its burden of proof beyond a

10   reasonable doubt, okay, would you have any difficulty

11   entering or acquitting this defendant if you felt the

12   government had not carried its proof beyond a reasonable

13   doubt?

14             PROSPECTIVE JUROR:  I could.  I mean, again, like

15   you said, if they prove their case or not prove their case.

16             THE COURT:  Okay.

17             And so to go back to what we were talking about

18   earlier, I mean, again, this is a case about the evidence

19   that's presented in this trial.  The question is in again,

20   can you leave aside what you've learned, how you may feel,

21   and your job as a juror would just be to evaluate the

22   evidence as it's presented in this case against this

23   defendant?

24             PROSPECTIVE JUROR:  Again, I don't want to say

25   that I could and be -- I don't want to put myself in a

1  position where it's like, you know, because I can't --

2  again, like I said, it's like, I can't say for 100 percent

3  certainty.

4          THE COURT:  Okay.  I appreciate it.  I'm going to

5  excuse you.  Thank you very much.

6          PROSPECTIVE JUROR:  All right.  Thank you very

7  much.

8          MR. MONROE:  Judge, I'm assuming that witness is

9  being excused for cause?

10          THE COURT:  Yes.  I'm sorry, I should put that on

11  the record.  Juror 0087 is excused for cause.

12          Hi, ma'am.  How are you?

13          PROSPECTIVE JUROR:  I'm good.  Thank you.

14          THE COURT:  All right.  I'm going to just ask you,

15  if you wish to take your mask off, you can, and I may just

16  ask you to hold that lapel mic in your hand and keep it up

17  to your mouth so we can hear you clearly.

18          PROSPECTIVE JUROR:  Okay.

19          THE COURT:  So you're Juror 0689; is that right?

20          PROSPECTIVE JUROR:  I'm sorry, what.

21          THE COURT:  You are juror -- I'm sorry, yeah,

22  Juror 0689.

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Okay.

25          All right.  So you've answered a number of these

1    questions yes.  Question 5, 6, 7, 8, 10, 13C, 13D, and 15.

2    So why don't we start with 5 and 6.  They are questions

3    about whether you live or work at or near the U.S. Capitol.

4    Can you tell us whether it's you work or live?

5              PROSPECTIVE JUROR:  Both.

6              THE COURT:  Both.

7              PROSPECTIVE JUROR:  Work, uh-huh.

8              THE COURT:  And can you tell us what capacity in

9    which you work?  Let me ask.  Do you work in a U.S. Capitol

10   building?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Can you tell us which building?

13             PROSPECTIVE JUROR:  Cannon.

14             THE COURT:  Cannon.  You don't need to identify

15   who you work for, but can you tell us in what capacity you

16   work for?

17             PROSPECTIVE JUROR:  I'm Deputy Chief of Staff for

18   a member of Congress.

19             THE COURT:  And were you at -- were you Deputy

20   Chief of Staff or working on the Hill back on January the

21   6th.

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Were you present on that day?

24             PROSPECTIVE JUROR:  I wasn't.  I was working

25   remotely.

```
1              THE COURT:  You were working remotely.

2              PROSPECTIVE JUROR:  Yeah.

3              THE COURT:  Do you know who people who were

4    present that day?

5              PROSPECTIVE JUROR:  Yes, oh, yes.

6              THE COURT:  And the person you worked for

7    presumably apparently at the time was there.

8              PROSPECTIVE JUROR:  Yeah, he was there.

9              THE COURT:  Let me just, and, you know, the fact

10   that you work on the Hill, you know people, you live near

11   the Hill, do you think you could be fair and impartial in

12   light of those experiences with respect to -- well, let me

13   back up.

14             Do you think you can be fair and impartial in this

15   case given your job and the fact that you know people who

16   were present on January the 6th?

17             PROSPECTIVE JUROR:  I think I could be fair and

18   impartial.  You know, I did answer yes on the -- whichever

19   the question was on would it be difficult for me to be.  And

20   so, yes, it would be difficult, but to answer your latest

21   question, Your Honor, that, yes, I believe I could.

22             THE COURT:  Okay.

23             So the member of Congress for whom you work, is

24   that person on the January 6th commission?

25             PROSPECTIVE JUROR:  No.
```

1          THE COURT:  And do you do any work relating to

2   January 6th in your capacity?

3          PROSPECTIVE JUROR:  I don't.

4          I don't -- maybe I should mention, I mean, I do

5   know another member of Congress I've worked closely with who

6   is on the January 6th commission.

7          THE COURT:  Okay.  And have you received any

8   information from that individual --

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  -- about the work of that committee.

11         PROSPECTIVE JUROR:  Nothing that's not public.

12         THE COURT:  Nothing that's not public.  Okay.

13         You've also indicated that you follow the news

14  closely about the events of January 6th.  When you say

15  closely, can you give us a sense of how frequently you read

16  news stories or watch video of those days -- of the events

17  of that day.

18         PROSPECTIVE JUROR:  It's mainly as a result of my

19  work that, you know, my boss has asked about it.  So, you

20  know, sometimes -- I don't cover the issue explicitly for

21  him, but I have a management role in the office, I supervise

22  people who do, I have provided talking points for him.

23  Yeah, that kind of thing.

24         THE COURT:  All right.

25         Okay.  Ma'am, I'm going to excuse you from jury

1  service on this matter.  Thank you very much.

2         PROSPECTIVE JUROR:  Thank you.

3         THE COURT:  Juror No. 0689 is excused for cause,

4  given her employment and knowledge of those events.

5         Hi, ma'am, how are you?

6         PROSPECTIVE JUROR:  Fine.  And you?

7         THE COURT:  Good.  You are juror 1153?

8         PROSPECTIVE JUROR:  Yes.

9         THE COURT:  Okay.  So if you'd like to take your

10  mask off for present purposes, feel free; otherwise,

11  do you have a microphone there in your hands?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Okay.  Hang on one second, all right?

14         Okay.  So, ma'am, you've answered three questions,

15  Question 11, Question 18, and Question 19.  Why don't we

16  start with Question 19 which was the question about what the

17  hardship would be, which is that you've indicated there

18  would be hardship from service.  Can you tell us what that

19  would be?

20         PROSPECTIVE JUROR:  I have --

21         I have three children that have birthdays coming

22  up, and I had planned on taking them out this Thursday, we

23  supposed to go out of town.  And I'm trying to celebrate

24  their birthdays.  One of their birthdays are today, and

25  I have to be in here and I could be trying to do things for

1    their birthday.

2           And then I have two more, May the 9th and May the

3    16th, and it would just be hard to be here and still try to

4    celebrate those kids' birthdays.

5           THE COURT:  Okay.  Can I just ask you to put the

6    microphone a little bit closer to your -- there you go.

7    I think I was just having some trouble hearing you.

8           So did I understand you correctly that you have

9    plans to be absent on Thursday with your children; is that

10   right?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  All right.  And then other than

13   Thursday, are there any other days?

14          PROSPECTIVE JUROR:  Well, Thursday, Friday, up

15   until Sunday.

16          THE COURT:  I'm sorry, Thursday and Friday you

17   plan to be away.

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Okay.  Any objection?

20          I'm going to excuse you, ma'am.  Thank you very

21   much.

22          PROSPECTIVE JUROR:  Thank you.

23          THE COURT:  Hi, ma'am.  How are you?

24          PROSPECTIVE JUROR:  Good.

25          THE COURT:  Feel free to remove your mask for

1   present purposes if you'd like.

2          You're juror 1554; is that right?

3          PROSPECTIVE JUROR:  That's correct.

4          THE COURT:  You answered several of these

5   questions yes.  Why don't we start -- let me just say that

6   5, 6, 7, 8, 10, 11, 12, 13D, 14, and -- 14.

7          So why don't we start with 5, which is, do you

8   live or work at or near the U.S. Capitol?

9          PROSPECTIVE JUROR:  Yes, I'm a lobbyist.

10  I'm former staff director of the Senate Appropriations

11  Committee.

12         THE COURT:  And you're currently a lobbyist which

13  means you're not presently an employee on the Hill?

14         PROSPECTIVE JUROR:  I am not, but I'm on the Hill

15  all the time.

16         THE COURT:  Okay.

17         Are your offices on the Hill, ma'am?

18         PROSPECTIVE JUROR:  Yes.  I'm at 101 Constitution,

19  down below Charlie Palmers.

20         THE COURT:  Okay.

21         And were you on the Hill or at work on January the

22  6th.

23         PROSPECTIVE JUROR:  I was at work.

24         THE COURT:  Physically at work as opposed to

25  remote?

1            PROSPECTIVE JUROR:  No.  I was at work.

2            THE COURT:  You were at work.  Okay.

3            And do you know people who were present on the

4    Hill on January the 6th?

5            PROSPECTIVE JUROR:  Yes, my former Senate

6    Appropriations colleagues.

7            THE COURT:  Okay.

8            And have you talked to them about those events.

9            PROSPECTIVE JUROR:  Oh, yes.

10           THE COURT:  And let me ask you:  Given what you've

11   heard from them, do you think you would have difficulty

12   being fair and impartial in this case?

13           PROSPECTIVE JUROR:  I would have a lot of

14   difficulty.

15           THE COURT:  Okay.

16           Even if you were instructed to put aside your

17   feelings and what you've learned from others?

18           PROSPECTIVE JUROR:  The Capitol Police protected

19   me for 45 years, and I really could not be impartial.

20           THE COURT:  Okay.

21           Any objection, Counsel?

22           MR. MONROE:  No objection.

23           THE COURT:  All right.  Ma'am, we'll excuse you.

24   Thank you very much.

25           PROSPECTIVE JUROR:  I have one question.  I'm

1   almost 74.  I thought I was exempt from serving on a jury.

2   I would like to be excused.

3           THE COURT:  You'll be excused.

4           PROSPECTIVE JUROR:  Thank you.

5           THE COURT:  Yes, you're excused for the day.

6   Thank you.

7           PROSPECTIVE JUROR:  Thank you.

8           THE COURT:  Okay.

9           Sir, how are you?

10          PROSPECTIVE JUROR:  I'm good.

11          THE COURT:  You're Juror 1429?

12          PROSPECTIVE JUROR:  That's correct.

13          THE COURT:  Feel free to take your mask off if you

14  feel comfortable doing so.

15          All right.  So you answered three questions:  7,

16  8, and 11.  Question 7 concerns whether you have closely or

17  regularly followed the news about the events that took place

18  on the Capitol.

19          Can you tell us how frequently you follow news

20  about the events of January the 6th?

21          PROSPECTIVE JUROR:  Probably in the beginning,

22  right afterwards, a lot.

23          I don't recall seeing any news stories in the last

24  couple of months, but up until the summer probably.

25          THE COURT:  Can you tell us, to the extent that

1  you've viewed news or read news about those events, the

2  sources of that information?

3        PROSPECTIVE JUROR:  *New York Times*, *Washington*

4  *Post*, and CNN probably.

5        THE COURT:  Okay.

6        Question 8 concerns having watched video of what

7  happened at the Capitol on January the 6th.  Can you tell

8  how many times you've watched videos of those events?

9        PROSPECTIVE JUROR:  The day of, when the news

10  reports were out.

11        THE COURT:  Okay.

12        PROSPECTIVE JUROR:  And after that, I didn't

13  really watch a whole lot of the video.

14        THE COURT:  So -- and then Question 11 concerns

15  your feelings about President Trump or his supporters that

16  would make it difficult for you to be fair and impartial in

17  this case.  Can you tell us about that a little bit?

18        PROSPECTIVE JUROR:  I certainly don't have a high

19  opinion of former-President Donald Trump, and by extension,

20  I don't think his supporters are particularly smart for

21  supporting him.

22        THE COURT:  Okay.

23        So, you know, look, we all have our political

24  views.  We all have feelings about the current President,

25  the former President.  Those are not the questions that are

before the Court in this case.  The question for you is

given what you know about the events of the 6th, given your

feelings, could you set all that aside and focus on the

evidence and the facts as they're presented in this case and

be fair and impartial to this defendant?

PROSPECTIVE JUROR:  I believe so, yes.

THE COURT:  And if you were convinced after

hearing that evidence that the government had not carried

its burden beyond a reasonable doubt, would you be able to

acquit this defendant?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Okay.

Any follow-up questions?

MR. KELLY:  Just one, Your Honor.  Good morning.

What do you do for a living?

PROSPECTIVE JUROR:  I work for Army Research

Laboratory.  I am a researcher for the Army.

MR. KELLY:  What kind of research do you do?

PROSPECTIVE JUROR:  Microelectronics.  So

designing the chips that go into effectively like a cell

phone.

MR. KELLY:  Thank you.

THE COURT:  Any follow-up?

MR. MONROE:  Good morning.

I represent the defendant, Mr. Webster.  I think

1  you've already heard the Court tell you into the government

2  has the burden of proof on all these issues they're going to

3  attempt to present to you.  But having not heard any

4  evidence, I want to ask you to presume something.

5           PROSPECTIVE JUROR:  Okay.

6           MR. MONROE:  I want you to presume that

7  Mr. Webster was at the Capitol on January the 6th and he was

8  someone who supported either the issues of that day or

9  former-President Trump.

10          Having not heard any evidence, has that put

11 Mr. Webster at a disadvantage, to the extent that you're

12 going to be one of the judges of the facts in this case?

13          PROSPECTIVE JUROR:  No.

14          MR. MONROE:  No?  Okay.

15          What is your -- what's your collective thoughts

16 about what took place on January the 6th?  What's your take

17 on things?

18          THE COURT:  Counsel, I think he's sort of answered

19 that a little bit.

20          MR. MONROE:  Okay.

21          That's all I have, sir.  Thank you.

22          THE COURT:  Thank you very much.  You may step

23 down, sir.

24          Hi, ma'am.  How are you?

25          PROSPECTIVE JUROR:  I'm good.  Thank you.

```
 1          THE COURT:  Feel free to remove your mask for
 2   present purposes if you feel comfortable doing so.
 3          You are Juror 0951?
 4          PROSPECTIVE JUROR:  Yes.
 5          THE COURT:  Okay.
 6          So you've answered four questions yes.  They are
 7   8, 10, 11, and 19.  Why don't we start with question 19,
 8   which was the hardship question.  Can you tell us what would
 9   cause a hardship for you if you were selected to serve?
10          PROSPECTIVE JUROR:  We found out yesterday that my
11   husband's younger brother died, and he's in Miami, Florida.
12   So we don't know what our schedule is for the next week or
13   two.  I don't know if my husband has to go to Miami to
14   gather his things.  And I have a 12-year-old child that
15   I have to take to and from school.
16          THE COURT:  Okay.  I'm sorry about the loss in
17   your family.
18          Any objections, Counsel?
19          MR. KELLY:  No, Your Honor.
20          THE COURT:  All right, ma'am, we'll excuse you.
21   Thank you very much.  My condolences.
22          Hi, ma'am.  How are you?
23          PROSPECTIVE JUROR:  I'm doing well, thank you.
24          THE COURT:  Feel free to take your mask off if
25   you'd like while we're questioning you.
```

1        You are Juror 0479; is that right?

2        PROSPECTIVE JUROR:  That's correct.

3        THE COURT:  Okay.

4        So you answered three questions yes:  7, 8, and

5   20.  Why don't we start with 20, and that concerns your

6   feelings about COVID and how that might affect your ability

7   to serve.

8        PROSPECTIVE JUROR:  Well, COVID is so frightening

9   and because of it I haven't been out of my house in over a

10  year.  And this is pretty much the first time I've been out

11  since the pandemic, but I knew I had to come in based on the

12  service I needed to do.

13       THE COURT:  Okay.

14       PROSPECTIVE JUROR:  But, yeah.

15       THE COURT:  I appreciate you coming down, and

16  I hope you're feeling comfortable.

17       So let me ask you, you know, look, we all have

18  various levels of concern, anxiety.  I described to you

19  earlier all the steps that we're taking in order to keep

20  people safe and protected.  Do you think that

21  notwithstanding those protections, that you would feel

22  uncomfortable serving?

23       PROSPECTIVE JUROR:  I will probably still be

24  anxious, but I will do the job I need to do if selected.

25       THE COURT:  Okay.

1    And you would be seated in that jury box, you
2  would remain masked, you would be in a courtroom with other
3  jurors and remain masked.  And that's something you think
4  you could do and pay attention to the evidence throughout
5  the case.
6        PROSPECTIVE JUROR:  I believe I can.
7        THE COURT:  Okay.  Terrific.
8        Let's turn to Question 7 and 8 then.  Question 7
9  and 8 sort of touch closely on the same question, and that
10  is how closely you followed the news about the events of
11  January the 6th and how many videos you've watched.  So why
12  don't we start with the news.  How often have you read news
13  stories about January the 6th?
14        PROSPECTIVE JUROR:  I saw it when it first
15  happened, and whenever anything came on the news about it,
16  I did see it.
17        Then I also have a news app that comes up on my
18  phone so, like, if anything about what happened on January
19  the 6th, you know, came across, I would skim through the
20  app, I would read some of it.
21        THE COURT:  Okay.
22        And can you just give us a sense of what sources
23  of news come across your news app.
24        PROSPECTIVE JUROR:  News Break.  It's a news app
25  that comes on my phone.

1          THE COURT:  Okay.  And then I guess it feeds

2     different news sources.  Can you tell us what sources are --

3          PROSPECTIVE JUROR:  It touches on a lot of

4     different topics.

5          THE COURT:  Is it an app that has sort of original

6     content, or does it pull from other publications?

7          PROSPECTIVE JUROR:  It pulls from other sources

8     like maybe the local network news and such.

9          THE COURT:  Okay.

10         PROSPECTIVE JUROR:  Yeah.

11         THE COURT:  And in terms of videos, how many

12    videos do you think you've seen of those events?

13         PROSPECTIVE JUROR:  I've seen a few.

14         THE COURT:  When you say a few, can you estimate?

15         PROSPECTIVE JUROR:  Less than 50, more than ten.

16         THE COURT:  All right.  Fair enough.

17         And so, look, you're like most citizens who have

18    read news or watched videos.  Could you put those, whatever

19    you've seen and read, aside and focus on the evidence as

20    it's presented in this case, ma'am?

21         PROSPECTIVE JUROR:  I most certainly can.

22         THE COURT:  Any reason to think you can't be fair

23    and impartial to this defendant?

24         PROSPECTIVE JUROR:  Not at all.

25         THE COURT:  And if you were convinced that the

1    government had not carried its burden beyond a reasonable

2    doubt, would you have any trouble acquitting this defendant?

3              PROSPECTIVE JUROR:  No, if I don't think that they

4    met the burden of proof, then, no, I would do what I have to

5    do as a juror.

6              THE COURT:  Okay.  Thank you, ma'am.

7              Any follow-up question from the government?

8              MR. KELLY:  Just one, Your Honor.  Good morning.

9              PROSPECTIVE JUROR:  Good morning.

10             MR. KELLY:  What do you do for a living?

11             PROSPECTIVE JUROR:  I am a customer service rep

12   for the D.C. Health COVID Call Center.

13             (Laughter)

14             MR. KELLY:  Perfect.  I think we all needed that.

15             And I assume that you've been teleworking as

16   you've been doing this?

17             PROSPECTIVE JUROR:  I'm sorry?

18             MR. KELLY:  You have been teleworking during the

19   pandemic?

20             PROSPECTIVE JUROR:  That is correct.

21             MR. KELLY:  Thank you.

22             THE COURT:  Mr. Monroe?

23             MR. MONROE:  Judge, I have no questions for her.

24             THE COURT:  Thank you very much, ma'am.

25             Mr. Douyon will show you out.

```
 1              Hi, ma'am.  How are you?
 2              PROSPECTIVE JUROR:  Okay.  I'm having a little
 3   trouble hearing everybody, but --
 4              THE COURT:  Okay.  Are you Juror 0419?
 5              PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  Okay.
 7              Can I just ask you, did you have any trouble
 8   hearing the questions that I asked you?
 9              PROSPECTIVE JUROR:  Yes, I did, because I was in
10   the back.
11              THE COURT:  I'm sorry, what was that?
12              PROSPECTIVE JUROR:  I was in the back, yes.
13              THE COURT:  You were in the back.
14              And I don't mean to intrude.  Is that because I
15   wasn't speaking loudly enough or because you may have some
16   hearing issues?
17              PROSPECTIVE JUROR:  I probably do have some
18   hearing difficulty, but with all the barriers and the masks,
19   it was difficult.
20              THE COURT:  Are you having trouble --
21              PROSPECTIVE JUROR:  Just your voice registers
22   difficult for me.
23              THE COURT:  Are you having difficulty hearing me
24   now?
25              PROSPECTIVE JUROR:  A little bit, but this is
```

1    better.

2                THE COURT:  Okay.

3                Would it aid you if you had headphones?

4                PROSPECTIVE JUROR:  I do have headphones.

5                THE COURT:  If we have headphones that would

6    assist you in being able to hear?

7                PROSPECTIVE JUROR:  I mean, I don't have

8    headphones -- I don't have hearing aids with me, if that's

9    what you're asking.

10               THE COURT:  No, no.  I'm asking you, if we

11   supplied you with headphones, so we have headphones that --

12               PROSPECTIVE JUROR:  If you supplied me --

13               THE COURT:  -- may assist you.

14               PROSPECTIVE JUROR:  Yes, that would help.

15               THE COURT:  I'm going to ask Mr. Douyon to provide

16   you those headphones now.

17               Okay.  How's that?

18               PROSPECTIVE JUROR:  Much better.

19               THE COURT:  Much better.  Good.  Okay.

20               So let me just ask you, ma'am:  If you were

21   selected as a juror and were wearing those headphones, would

22   you have any trouble being able to follow the testimony and

23   hear the evidence?

24               PROSPECTIVE JUROR:  No, I would not.

25               THE COURT:  Okay.

1              So then going back to the questions, so is it fair

2   to say that you were not -- did you hear everything I asked

3   you?

4              PROSPECTIVE JUROR:  I cannot say that I heard

5   every word.

6              THE COURT:  Okay.

7              Do you think you were able to answer all the

8   questions based upon what you did hear?

9              PROSPECTIVE JUROR:  I don't want to say that I

10  caught every word.  For example, Question 14, that was a

11  complicated question.  I wasn't sure I caught everything in

12  that question.

13             THE COURT:  Okay.

14             So the only question you answered yes was Question

15  8, and that concerned having watched videos of what happened

16  at the Capitol on January the 6th.

17             PROSPECTIVE JUROR:  Well, I actually answered a

18  few questions with yes.  That was one of them.

19             THE COURT:  Okay.  Because your card only has 8

20  written down on it.

21             PROSPECTIVE JUROR:  Is that No. 13?

22             THE COURT:  I'm sorry, is what No. 13?

23             PROSPECTIVE JUROR:  My juror number?

24             THE COURT:  You're Juror 0419?

25             PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Okay.

2          PROSPECTIVE JUROR:  The card -- on the card --

3          THE COURT:  You're in seat 13?

4          PROSPECTIVE JUROR:  I meant seat 13, yes.

5          THE COURT:  Okay.

6          So you thought you had answered more questions yes

7    than what's on the card?

8          PROSPECTIVE JUROR:  Yeah.

9          THE COURT:  Okay.

10          And but I've got a card that only says 8 on it.

11   That's the only number you wrote down.

12          PROSPECTIVE JUROR:  So what I thought the

13   instructions were, were to write down yes for any question

14   that you wanted to say yes and don't write down anything for

15   any other question.

16          THE COURT:  Right.

17          PROSPECTIVE JUROR:  And I answered -- I don't

18   know, a handful of questions -- or more than a handful,

19   about seven or eight questions yes.  So I'm not sure --

20   I don't know.

21          THE COURT:  And you're Juror 0419?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Let me just hand this card back up to

24   you and have you take a look at this card and tell me

25   whether that's the card that you had with you and wrote down

1    numbers on.

2              PROSPECTIVE JUROR:  That's not my card.

3              THE COURT:  That's not your card?

4              (Pause)

5              THE COURT:  All right.  Ma'am, sorry, that was a

6    bit of a mix-up by -- that we had here in terms of

7    questions.

8              All right.  So you did answer a number of

9    questions yes:  7, 8, 10, 11, 18, 19, and 20.  So why don't

10   we start at the back with 19 and 20.

11             So can you tell us, No. 19 was the hardship

12   question, that service would present a hardship for you.

13   Can you tell us what that hardship would be?

14             PROSPECTIVE JUROR:  Well, I think in terms of --

15   I have a pretty demanding job, so I don't know if that

16   qualifies as hardship.  I probably didn't hear all the words

17   in that question that you asked.

18             THE COURT:  Okay.

19             PROSPECTIVE JUROR:  But that would be something I

20   would say to answer my question.

21             THE COURT:  So the answer was that she said she

22   had a demanding job.  So can you tell us what kind of work

23   you do?

24             PROSPECTIVE JUROR:  So I work at the National

25   Institutes of Health.  I work in the immediate Office of

1   the -- Office of the Director of the National Institute of

2   Allergy and Infectious Diseases, that's Dr. Anthony Fauci.

3          THE COURT:  Okay.

4          And so is there anything in particular about the

5   work that is coming up in the next week or week and a half

6   that would make it an extreme hardship for you to serve?

7          PROSPECTIVE JUROR:  Well, my job is science

8   communications, so I'm basically a science writer.  And I am

9   helping doing some drafts of upcoming speeches that he is

10   going to be giving this spring, primarily for commencement.

11          THE COURT:  Okay.

12          All right.  Counsel, is there any objection from

13   either side?

14          MR. KELLY:  No, Your Honor.

15          THE COURT:  All right.  Ma'am, we're going excuse

16   you.  Thank you very much.

17          All right.  Juror 0419 will be stricken for cause.

18   She had clear difficulty hearing and following.

19          Hi, ma'am.  How are you?  Feel free to take your

20   mask down if you are comfortable doing so.

21          All right.  You are Juror 0518; is that right?

22          PROSPECTIVE JUROR:  Yes, sir.

23          THE COURT:  All right.  So you answered several

24   questions yes:  5, 6, 7, 8, 10, and then 13 A, B, C, and D.

25   So why don't we start with Question 5 which asks whether you

1    live or work at or near the Capitol building.

2              PROSPECTIVE JUROR:  I live at 8th and C,

3    Northeast.

4              THE COURT:  8th and C, Northeast?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Do you work at the Capitol?

7              PROSPECTIVE JUROR:  Not anymore.

8              THE COURT:  Did you work at the Capitol as of

9    January the 6th?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Do you know people that still work on

12   the Capitol?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  And did any of those people -- were

15   any of those people at work on January the 6th?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  And you've spoken with those folks?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  And can I -- let me ask:  Based upon

20   what you've been told and what they experienced, do you

21   think you could be fair and impartial to the defendant in

22   this case?

23             PROSPECTIVE JUROR:  I think it is a struggle.

24             THE COURT:  I'm sorry?

25             PROSPECTIVE JUROR:  I think it is a struggle.

```
 1              THE COURT:  A struggle.  Okay.

 2              So I appreciate that.  You know, look, the

 3     question here is, you know, we've all had varying degrees of

 4     association with what happened that day.

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  No, I'm sorry?

 7              PROSPECTIVE JUROR:  I can't do it.  One of my good

 8     friends is also an officer that was there.  I can't do it.

 9              THE COURT:  All right.  Fair enough.  I appreciate

10     your candor.

11              All right.  We'll excuse you.  Thank you very

12     much, ma'am.

13              Hi, sir.  How are you?

14              PROSPECTIVE JUROR:  Well, thank you.

15              THE COURT:  Feel free to remove your mask if

16     you're comfortable doing so.

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  You are Juror 0378?

19              PROSPECTIVE JUROR:  That's correct.

20              THE COURT:  And I have a card here that indicates

21     you answered one question yes; is that right?

22              PROSPECTIVE JUROR:  That's correct.

23              THE COURT:  All right.  That was Question 8.  Did

24     you have any trouble hearing or understanding any of the

25     other questions I asked?
```

1          PROSPECTIVE JUROR:  I don't believe so.  And the

2    only issue I had was what defines close to the Capitol.

3    I live more than a mile away.

4          THE COURT:  Okay.  Yeah, that's not close, at

5    least by our definition.

6          PROSPECTIVE JUROR:  That's sort of what I thought.

7          THE COURT:  So Question 8 concerned whether you've

8    watched videos of what happened at the U.S. Capitol on

9    January the 6th.  Can you tell us how many, approximately

10   how many such videos you may have seen?

11         PROSPECTIVE JUROR:  Only the videos that were

12   carried on the nightly news.

13         THE COURT:  Okay.

14         PROSPECTIVE JUROR:  So maybe over the course of

15   the days, maybe six or seven of those, you know, snippets

16   that were on the news.

17         THE COURT:  Okay.  Can you tell us -- you say the

18   nightly news.  Can you tell us what news you're referring

19   to?

20         PROSPECTIVE JUROR:  Let's see.  Well, the News

21   Hour, or whatever that is now on public television; CBS, and

22   perhaps CNN.

23         THE COURT:  Okay.

24         So the fact, sir, that you've watched some videos

25   about what transpired that day, the question in this case is

1   the evidence against this defendant and whether the

2   government can carry its burden with respect to this

3   defendant.  Would you be able to set aside what you've seen

4   and evaluate the evidence fairly and dispassionately with

5   respect to this defendant and this case?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  All right.

8              Any follow-up from the government?

9              MR. KELLY:  Just one, Your Honor.

10             Good morning, sir.

11             PROSPECTIVE JUROR:  Good morning.

12             MR. KELLY:  What do you do for a living?

13             PROSPECTIVE JUROR:  I work for the Federal

14   Government.

15             MR. KELLY:  And where do you work at the Federal

16   Government?

17             PROSPECTIVE JUROR:  CFPB.

18             THE COURT:  What do you do for them?

19             PROSPECTIVE JUROR:  I'm an executive there,

20   assistant director for small business lending.

21             MR. KELLY:  Are you an attorney by chance?

22             PROSPECTIVE JUROR:  No.

23             MR. KELLY:  Thank you.

24             THE COURT:  Counsel?

25             MR. MONROE:  I have no questions for this juror.

1          THE COURT:  All right, sir.  Thank you very much.

2          Hi, sir.  How are you?

3          PROSPECTIVE JUROR:  Good morning.

4          THE COURT:  You are Juror 1156.

5          PROSPECTIVE JUROR:  Correct.

6          THE COURT:  Feel free to remove your mask or pull

7     it down for present purposes if you'd like.

8          Okay.  So you've answered a number of these

9     questions yes:  7, 8, 10, 11, 13B and 13C, and then question

10    19.  So let's go to 19 first which is the hardship question.

11    Can you tell us what would cause a hardship if you were to

12    serve over the next week, week and a half or so.

13         PROSPECTIVE JUROR:  Yeah.  I'm transitioning jobs

14    so trying to close out everything in my current job before I

15    take a week vacation and start my new job.

16         THE COURT:  Can you tell us when you're scheduled

17    to complete work?

18         PROSPECTIVE JUROR:  Friday, May 6th.

19         THE COURT:  And if you were to serve -- and your

20    vacation begins May the 9th?

21         PROSPECTIVE JUROR:  May 7th to the 14th.

22         THE COURT:  Okay.

23         And the work that you need to transition, is that

24    something you think you could perform either sort of before

25    court hours and after court hours?

1              PROSPECTIVE JUROR:  Reasonably, sure.

2              THE COURT:  Okay.  Terrific.

3              And your plans for vacation, do they involve

4    purchase of airline ticket, hotel, or any prepaid travel

5    plans?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  You don't need to tell us where you're

8    going.

9              PROSPECTIVE JUROR:  I'm sitting on a beach for a

10   week.

11             THE COURT:  We will all join you.

12             Okay.  So, look, I think my expectation is that

13   the case should reach a conclusion by May the 6th.

14             PROSPECTIVE JUROR:  Sure.

15             THE COURT:  But we'll figure that out as we move

16   forward.

17             Question 7 and 8 concern your exposure to media

18   and videos about the events of January the 6th.  And then

19   Question 10 concerned strong feelings and opinions, and then

20   sort of Question 11.

21             Let's start with 7 and 8.  Can you just tell us

22   how frequently you read news about the events of January the

23   6th?

24             PROSPECTIVE JUROR:  I'm a pretty regular news

25   watcher, and there tends to be a lot of events around

1    January the 6th, you know, I live a mile from the Capitol,

2    so I was not present there, but certainly there were people

3    walking up and down my street that were there.  So it's

4    just -- it's not something that like comes up perhaps in

5    daily conversations with my friends but it's something

6    that --

7              THE COURT:  Right.

8              PROSPECTIVE JUROR:  You know, it's like I hear on

9    the news and it's on the news quite a bit.

10             THE COURT:  Sure.

11             And can you tell us the sources from which you

12   primarily get your news?

13             PROSPECTIVE JUROR:  I read Twitter a lot, but I

14   watch, you know, nightly news, I don't know.  TV, I guess.

15             THE COURT:  So the folks you follow on Twitter,

16   do you know whether any of them are sort of dedicated

17   reporters to the events of January the 6th?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Can you just identify who those

20   reporters might be?

21             PROSPECTIVE JUROR:  Scott McFarland.  I'm not sure

22   I'm saying his name right, but I think he's a correspondent

23   of some kind, but he tends tween -- I think, tweet lot

24   about -- I mean, I don't -- yeah, I don't know individual

25   names and cases, but I think I follow him on Twitter.

1         THE COURT:  Okay.

2         And then in terms of videos of what happened on

3    January the 6th, can you tell us just ballpark how many of

4    such videos you may have seen.

5         PROSPECTIVE JUROR:  Just kind of in the occurrence

6    of watching the news, I just certainly no way I can point

7    out names or faces or anything like that.

8         THE COURT:  Am I accurate in characterizing your

9    watching of videos as something that you may have seen if it

10   was embedded in a news story?

11        PROSPECTIVE JUROR:  Yeah.  I haven't exactly went

12   out and sought that.  It's probably embedded in a news

13   source, I think, would be appropriate.

14        THE COURT:  So Question 10 asks whether you have

15   such strong feelings or opinions about the events of January

16   the 6th.

17        So let me just say this.  You know, we've all --

18   everyone has been exposed to those events to some degree,

19   and undoubtedly formed some opinions about it, but the --

20   you know, the whole event is not on trial here.  The

21   question that's at issue in this case is the evidence

22   against this defendant and what he may or may not have done

23   that day.

24        Would you be able to set side what you've seen and

25   read and whatever views you may have formed and view the

1  evidence fairly and honestly against the defendant in this

2  case?

3          PROSPECTIVE JUROR:  Yeah, it's a hard question.

4  I mean, I think we've all been affected by it in some way.

5          THE COURT:  Sure.

6          PROSPECTIVE JUROR:  You know, so I -- yeah, I mean

7  -- you know, I think also given the line of work that I do,

8  my job is to make a decision -- help make decisions with

9  data presented to me.  I'm a data scientist.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR:  So that's something I do over

12  the course of a business day is to look at data and make

13  decisions based on that.

14          THE COURT:  Yeah.

15          So here's a question.  So, you know, say

16  hypothetically you were selected to serve, you did serve,

17  and at the end, you were convinced that the government had

18  not carried its burden of proof in this case.  Would you

19  have any trouble in acquitting the defendant if you

20  determine that the government had not carried its burden of

21  proof?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Okay.

24          Question 11 concerned your feelings of the former

25  President and his supporters.  Let me ask you, again, same

1    question that I've just been asking.  We all have feelings

2    about the current President, the former President, politics

3    and the policies, et cetera.

4              Would you be able to set that aside and any views

5    you may have, and, again, fairly and honestly view the

6    evidence in this case against this defendant?

7              PROSPECTIVE JUROR:  Yeah, I think that's

8    reasonable.  I mean, I'd say, you know, I voted for the

9    other guy, you know, the guy who won.  I was a contributor

10   to the campaign.

11             THE COURT:  Okay.

12             PROSPECTIVE JUROR:  So that's when I say strong

13   support, I feel like -- that's why I answered the question.

14             THE COURT:  Your support or lack of support for

15   the former President or current President, again, it's not

16   at issue.  What is at issue is whether you think you could

17   confidently say today that you would be able to set aside

18   your voting history, your political affiliation, and, again,

19   the question is, viewing the evidence in this case and

20   evaluating the evidence in this case against the legal

21   principles and standards?

22             PROSPECTIVE JUROR:  Yeah, I think that's

23   reasonable.

24             THE COURT:  Okay.

25             Why don't we just turn to Question 13B and 13C.

1          13B asked whether any member of the group had ever

2     served in the Armed Forces.  Can you tell us about that?

3          PROSPECTIVE JUROR:  Sure.  Both my grandfathers

4     were in the Army.

5          And I have a cousin who's currently in the Marines

6     and is actually stationed in Africa presently.

7          THE COURT:  Okay.

8          And just can you just tell us a little bit about

9     your grandfathers who were in the Army, some length of

10    service, rank they may have achieved?

11         PROSPECTIVE JUROR:  Well, they're -- one's

12    deceased, the other has just turned 94.  So this was a few

13    years ago.  And they were, I know, certainly he was

14    stationed in Japan for a while, long, long time ago.

15    I can't give you the exact years, but probably around when

16    he was around 22, which would be, 94 minus 22, is 72 years

17    ago.

18         THE COURT:  All right.  And then your cousin is

19    currently in the Marines.

20         PROSPECTIVE JUROR:  Currently serving -- I

21    actually don't know where.  I know he's somewhere in West

22    Africa, but that's all I know.

23         THE COURT:  Do you know approximately how long

24    he's been in the service?

25         PROSPECTIVE JUROR:  He's been -- he was ROTC and

1  has graduated from college in 2019.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR:  He has been in the service

4  since and has been stationed in West Africa since October.

5          THE COURT:  Okay.

6          All right.  Any follow-up from the government?

7          MR. KELLY:  Just briefly, Your Honor.

8          Good morning, still.

9          You said you're a data scientist.  Is that your

10 current job?

11         PROSPECTIVE JUROR:  Yes, and new job, just for --

12 I'm currently a government consultant but moving to a

13 private company.

14         MR. KELLY:  Okay.

15         Do you do consulting for any particular government

16 agencies?

17         PROSPECTIVE JUROR:  The Food and Drug

18 Administration.

19         MR. KELLY:  So that's your current position?

20         PROSPECTIVE JUROR:  Yep.

21         MR. KELLY:  Where are you transitioning to?

22         PROSPECTIVE JUROR:  Private company, outside the

23 government space.

24         MR. KELLY:  Are you going to be remaining in D.C.?

25         PROSPECTIVE JUROR:  My new job is remote, so I'll

1  be here for a while.

2          MR. KELLY:  Okay.  Very 2022 of you.

3          PROSPECTIVE JUROR:  Yes.

4          MR. KELLY:  Thank you.

5          THE COURT:  Any follow-up, Counsel?

6          MR. MONROE:  Yeah.

7          Good morning.

8          PROSPECTIVE JUROR:  Good morning.

9          MR. MONROE:  A couple of times the Judge asked you

10 questions dealing with your ability to be fair and

11 impartial.  I mean, we're adults here, so we know we have

12 friends or acquaintances that have a little bit more opinion

13 or a little bit more political vigor than others.

14          This is my concern.  I want to make sure that

15 every juror that sits is going to be fair and impartial,

16 rule on the facts as they see it.

17          Mr. Webster was -- I'm going to want you to assume

18 Mr. Webster was at the Capitol on January 6th and also

19 assume that he's either a Trump supporter or supported

20 President Trump positions on at least some of the bigger

21 issues, right.

22          PROSPECTIVE JUROR:  Sure.

23          MR. MONROE:  I understand that you infer that you

24 supported Biden.  You may have even been a contributor.

25          Just that sentiment alone, in your mind, we don't

1    know each other, but does that put my client at a

2    disadvantage?

3              PROSPECTIVE JUROR:  Yes.

4              MR. MONROE:  Does the government -- before the

5    government has the burden of proof as to all issues and

6    that -- you know, if you sat as a juror, you would start

7    here as to compile the evidence they are willing to present,

8    but you've not heard any evidence, I appreciate your

9    honestly, sitting here now --

10             PROSPECTIVE JUROR:  Now sure.

11             MR. MONROE:  -- my client is at a disadvantage in

12   your mind.

13             PROSPECTIVE JUROR:  Yeah, I would say so.  And

14   that's why I answered the question, I feel strongly about

15   the events.

16             MR. MONROE:  Sir, from the heart, I appreciate

17   your candor.

18             PROSPECTIVE JUROR:  Sure.

19             MR. MONROE:  That means a lot to me.  Thank you,

20   sir.

21             THE COURT:  So can I just ask you, when you say a

22   disadvantage, I mean, we talked about this earlier.

23   Regardless of his political affiliation and views, he's

24   presumed to be innocent.

25             PROSPECTIVE JUROR:  Sure.

```
 1              THE COURT:  And could you follow that presumption
 2    of law?
 3              PROSPECTIVE JUROR:  Yeah, I mean, I think so.
 4              You know, I understand the burden of proof is on
 5    the government to prove their case to explain to me what the
 6    law is.  I'm not a lawyer obviously.
 7              THE COURT:  Well, it would be my job to say what
 8    the law Is.  It would be your job to evaluate the evidence.
 9              PROSPECTIVE JUROR:  Clearly I'm not a lawyer.
10              THE COURT:  That's okay.  You've probably made
11    some good decisions in life.
12              PROSPECTIVE JUROR:  You know, but I have -- that's
13    why I answered the question affirmatively.  I have strong
14    feelings about the events of January the 6th, about the
15    folks who were there.  And so, yes, I understand the burden
16    of proof is on the government, but I think that's
17    different -- that's a different sort of sentiment than the
18    notion of a disadvantage.
19              THE COURT:  What do you mean by a disadvantage?
20              PROSPECTIVE JUROR:  You know, like, I still
21    presume the defendant to be innocent until the government
22    proves their case.  But, like, I don't start off with this
23    as like a clean slate, I guess.  I don't think of this as
24    like a zero-zero game to start.
25              THE COURT:  But, again, let me make sure
```

1     I understand, because this is really important.

2             PROSPECTIVE JUROR:  Sure.

3             THE COURT:  For purposes of being a juror, you do

4     have to start from the presumption that he is innocent.

5             PROSPECTIVE JUROR:  Okay.

6             THE COURT:  And whether you call that a zero-zero

7     game or however you want to characterize it, that has to be

8     the presumption from which you start.

9             PROSPECTIVE JUROR:  Sure.

10            THE COURT:  Do you think you could do that?

11            PROSPECTIVE JUROR:  I really, I honestly don't

12    think so.  You know, I just generally -- again, I have

13    strong feels about this.  I believe that folks who were

14    there did something wrong and, you know, in some cases, you

15    know, feel sorry that they led -- read news articles or to

16    believe that they should be there for those reasons.  So --

17            THE COURT:  But, look, at the end of the day,

18    do you have sort of general views but, again, the question

19    is --

20            PROSPECTIVE JUROR:  I have no specific views about

21    the defendant or, you know, his action that he may or may

22    not have taken.  I know nothing about the defendant.

23            THE COURT:  Right.

24            PROSPECTIVE JUROR:  You know, so I can set aside

25    my general views for -- to hearing evidence and

1  understanding what the law is.

2        THE COURT:  Okay.

3        So, again, you know, I don't mean to be redundant

4  but, again, the question is, again, putting aside -- you

5  know, we've developed some views, not surprisingly, many

6  people have; but the question for -- if you were selected as

7  juror, could you presume him to be innocent from the start

8  of the case?

9        PROSPECTIVE JUROR:  Sure, yeah.  I understand that

10  someone is innocent until proven guilty.

11        THE COURT:  Right.

12        And if the government failed in its burden of

13  proof, proving him guilty beyond a reasonable doubt,

14  is there any doubt in your mind that you would not be able

15  to vote in favor of acquitting him?

16        PROSPECTIVE JUROR:  Sure.

17        THE COURT:  That's something you could do?

18        PROSPECTIVE JUROR:  Yeah, you know, I understand

19  the burden of proof is on the government.  And I also am of

20  the mindset where if they have not met that burden of proof,

21  somebody shouldn't be convicted for something that the

22  government hasn't clearly proved that they've done.

23        THE COURT:  Okay.

24        PROSPECTIVE JUROR:  You know, again, I know

25  nothing about the specifics of the case.

1          THE COURT:  All right.  Thank you very much, sir.

2          PROSPECTIVE JUROR:  Sure.

3          THE COURT:  All right.  Is there a motion?

4          MR. MONROE:  Does the government have anything to

5   say?

6          THE COURT:  I don't think the government is making

7   a motion.  Do you have a motion?  You don't always have to

8   defer to them.

9          MR. MONROE:  I'm just being polite, Judge.

10         I think this juror nailed it head on.  He's not

11  going to accept the presumption of instance.  His strongly

12  held beliefs are such that, from the outset, my client is at

13  a distinct disadvantage.  That's not a juror who's going to

14  keep an open mind and put the government to their test.  The

15  government has a sizable advantage with this type of juror.

16  It's totally inappropriate that he be impaneled.  He should

17  be dismissed for cause with the thanks to the Court.

18         MR. KELLY:  Your Honor, you asked the juror any

19  number of times and any number of different ways if he can

20  accept the burden of proof, if he can presume the defendant

21  to be innocent at the outset of the case; if the government

22  doesn't meet its burden of proof, would he be able to vote

23  to acquit the defendant, he answered yes to all of those

24  questions, Your Honor, and he was consistent.

25         THE COURT:  Yeah, look, I think -- look, you've

1  been asking this question, Mr. Monroe, and I don't fault you

2  for asking it, but this question of, you know, would the

3  person be at a disadvantage, I mean, that's a fairly

4  non-specific question, and it's one that doesn't sort of

5  hone in on what the legal principles are and what the

6  presumptions are with respect to your client.  So

7  disadvantage can mean lots of things to lots of different

8  people and likely, if anything, elicits a general sentiment,

9  in my view, of what the person generally thinks about the

10  events of that day and, arguably, even the people that

11  participated in that day.  But when he was asked

12  specifically about the presumption of innocence on multiple

13  occasions and about would he vote to acquit, he said

14  unequivocally he would be able to do that.  And, in fact,

15  he said, look, I'm a data scientist, this is sort of what I

16  do.  So I'm not going to strike that individual for cause.

17          So all right.  We're sort of approaching the noon

18  hour, and I've got a 12:00.  So why don't we take a break

19  now.  We'll break for lunch till 1:00, and then we'll come

20  back at 1:00 to continue the voir dire.  I'll just ask

21  everybody to make sure you're back in the courtroom and

22  seated by 12:55 or so, and we'll continue on with the voir

23  dire.

24          Thanks very much, everyone.  Don't wait for me.

25          (Recess from 11:59 a.m. to 1:00 p.m.)

# C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Please note:  This hearing occurred during the COVID-19 pandemic and is therefore subject to the technological limitations of court reporting remotely.



Date:__May 2, 2022_____

William P. Zaremba, RMR, CRR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )   CR No. 21-208
                                    )   Washington, D.C.
        vs.                         )   April 25, 2022
                                    )   1:00 p.m.
THOMAS WEBSTER,                     )
                                    )   Day 1
          Defendant.                )   Afternoon Session
_____)


          TRANSCRIPT OF JURY SELECTION PROCEEDINGS
          BEFORE THE HONORABLE AMIT P. MEHTA
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:         Brian P. Kelly
                            U.S. ATTORNEY'S OFFICE
                            555 Fourth Street NW
                            Suite 3816
                            Washington, D.C. 20530
                            (202) 252-7503
                            Email: brian.kelly3@usdoj.gov

                            Hava Arin Levenson Mirell
                            U.S. ATTORNEY'S OFFICE
                            312 N. Spring St.
                            Suite 1200
                            Los Angeles, CA 90012
                            (213) 894-0717
                            Email: hava.mirell@usdoj.gov

                            Katherine Nielsen
                            Fraud Section
                            1400 New York Ave., NW
                            Washington, D.C. 20530
                            (202) 355-5736
                            Email:
                            katherine.nielsen@usdoj.gov

APPEARANCES CONTINUED:

For the Defendant:               James E. Monroe
                                 Walter Machnicki
                                 DUPEE & MONROE, P.C.
                                 211 Main Street
                                 PO Box 470
                                 Goshen, NY 10924
                                 (845) 294-8900
                                 Email:
                                 marina@dupeemonroelaw.com

Court Reporter:                  William P. Zaremba
                                 Registered Merit Reporter
                                 Certified Realtime Reporter
                                 Official Court Reporter
                                 E. Barrett Prettyman CH
                                 333 Constitution Avenue, NW
                                 Washington, D.C. 20001
                                 (202) 354-3249

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1              P R O C E E D I N G S

 2              COURTROOM DEPUTY:  All rise.  This Honorable Court

 3    is again in session.

 4              THE COURT:  Please be seated, everyone.

 5              Ms. Mirell, did you want to raise something before

 6    we get started?

 7              MR. MIRELL:  Yes, Your Honor.

 8              I just wanted to disclose for the record that I do

 9    recognize someone in the courtroom, I recognize your Law

10    Clerk, David Alpert, I went to high school with him.

11              THE COURT:  Yeah.

12              MR. MIRELL:  I've conferred with Mr. Monroe about

13    this.  I've been very careful not to talk to him about any

14    proceedings before Your Honor or this case, but I want to

15    make the record.

16              THE COURT:  Sure, I appreciate that.

17              We are aware of that.  And Mr. Alpert is not the

18    Law Clerk that's assigned to this case for that -- for one

19    of these reasons.

20              Before we -- Mr. Monroe, let me just ask, because

21    I don't -- I think the question that you've been asking,

22    I understand why you've been asking about disadvantaged, is

23    problematic for the reasons I've identified, it is a little

24    indefinite, and it's not clear to me what you mean by

25    "disadvantaged."
```

1    And so I think I'll just ask you, you know, to the

2  extent that you want to probe bias, keep it within the

3  confines of presumptions and burdens and the like; you know,

4  would you presume this person would have done something

5  wrong, et cetera, I think that's a little bit more precise

6  than just sort of disadvantaged, which I think is a little

7  bit indefinite.

8    MR. MONROE:  I'll adopt the Court's view.

9  Thank you.

10    THE COURT:  Thank you.  I appreciate that.

11    All right.  Let's bring in our next juror.

12    Hi, ma'am.  How are you?

13    PROSPECTIVE JUROR:  I'm okay.

14    THE COURT:  You are juror 1086?

15    PROSPECTIVE JUROR:  Yes.

16    THE COURT:  All right.  Feel free, by the way, to

17  remove your mask if you'd like during this questioning.

18    All right.  So you answered three questions yes,

19  questions 8, 11, and 9 -- excuse me, 8, 11, and 19.  So

20  let's start with 19 and that was the hardship question.  Can

21  you tell me what would cause a hardship if you were asked to

22  serve?

23    PROSPECTIVE JUROR:  Sure.

24    So I'm an elementary school principal at a public

25  charter here in D.C.  We started our PARCC testing today.

1   And they could manage without me, but I did want to include

2   that as something that would be a challenge if I were

3   selected.

4            THE COURT:  Okay.

5            Look, I appreciate that, and thank you for what

6   you're doing for our children, I have two school-age kids

7   myself.  But, you know, absent sort of extraordinary

8   work-related circumstances, I don't excuse people for that

9   reason.

10           PROSPECTIVE JUROR:  Sure.

11           THE COURT:  The other two questions you answered,

12  8 -- were 8 and 11.  8 concerns the video and whether you've

13  watched video of the events of January the 6th.  Can you

14  give us an estimate about how many different videos you may

15  have seen?

16           PROSPECTIVE JUROR:  Maybe only a handful.  I did

17  watch footage the day of January 6th via the news, and have

18  maybe seen a few others via social media --

19           THE COURT:  Okay.

20           PROSPECTIVE JUROR:  -- but none not really since

21  around the time that that happened.

22           THE COURT:  And if I understand you correctly,

23  that's not -- you're not seeking out -- I don't hear you to

24  say that you seek out news or videos of those day's events.

25           PROSPECTIVE JUROR:  That is correct.

1          THE COURT:  And then Question 11 concerned your

2   feelings about the former president and his supporters.

3          So let me just preface what I'll say before I ask

4   you to respond, which is, you know, look, everybody has

5   views, political views about the current President, the

6   former President, some are more strongly held than others.

7   But your views about the former President and even his

8   supporters really aren't what is on trial here.  What's on

9   trial is -- Mr. Webster's on trial for his conduct on that

10  day.  Could you set aside your views about the President and

11  give him a fair and impartial review of the evidence?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  And if you were convinced that

14  government had failed to meet its burden of showing him

15  guilty beyond a reasonable doubt, could you return a verdict

16  of not guilty?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Okay.

19          All right.  On behalf of the government, any

20  follow-up?

21          MR. KELLY:  Just one, Your Honor.

22          Good afternoon.

23          PROSPECTIVE JUROR:  Hi.

24          MR. KELLY:  You mentioned that you had seen some

25  videos, I think, you know, the day of and maybe a few since

1  then.  If you're able to, what are sort of some of the news

2  sources where you saw those videos, if you remember?

3        PROSPECTIVE JUROR:  Majority of them I saw on CNN.

4  And if there were any more that I saw, it would most likely

5  be through social media.  So maybe on Facebook or TikTok.

6        MR. KELLY:  Okay.  Thank you.

7        THE COURT:  Mr. Monroe.

8        MR. MONROE:  Could I ask you, what are your views

9  as to what transpired on January the 6th?  Could you share

10  that with us?

11       PROSPECTIVE JUROR:  I believe that what happened

12  was very scary, and I do not agree with the way in which the

13  people at the Capitol on January 6th conducted themselves.

14       MR. MONROE:  Would you view that a strongly held

15  belief?

16       PROSPECTIVE JUROR:  Fairly strong.

17       MR. MONROE:  Would those beliefs in any way

18  undermine the principle that Mr. Webster here who's on

19  trial, without the government having presented evidence

20  against him, enjoys the presumption of innocence?

21       PROSPECTIVE JUROR:  No.

22       MR. MONROE:  You're okay with that?

23       PROSPECTIVE JUROR:  Yes.

24       MR. MONROE:  Whatever views you have about what

25  happened on January 6th, you can set them aside and listen

1   to whatever evidence the government has as to this case?

2           PROSPECTIVE JUROR:  Yes.

3           MR. MONROE:  All right.  Thank you for speaking

4   with me.

5           THE COURT:  Thank you, Mr. Monroe.

6           Thank you very much, ma'am.  Mr. Douyon will show

7   you out of the courtroom.

8           COURTROOM DEPUTY:  Juror No. 0759.

9           THE COURT:  Hi, sir.  How are you?

10          PROSPECTIVE JUROR:  I'm sorry?

11          THE COURT:  I said, "How are you?"

12          PROSPECTIVE JUROR:  Doing well.  Thank you.

13          THE COURT:  Feel free to remove your mask if you

14  wish for present purposes.

15          You are juror 0799?

16          PROSPECTIVE JUROR:  Correct.

17          THE COURT:  All right.

18          You answered two questions yes, questions 8 and

19  11.

20          Question 8 concerns having watched video of what

21  happened on the Capitol on January the 6th.  Can you give us

22  a sense of how many such videos you may have seen over time?

23          PROSPECTIVE JUROR:  Well, I mean -- oh, gosh.

24          Well, I mean, I was watching it as it was

25  happening, I was watching the news live.  And I'm seeing,

1  you know, random snippets on the news after it happened.

2  I mean, I can't guesstimate.  I mean, I didn't -- I wasn't

3  on, like, YouTube searching videos, just stuff like the

4  news, like, CNN was constantly showing.

5          THE COURT:  Right.

6          So correct me if I am wrong, but it sounds like

7  what you're telling us is that you aren't actively -- have

8  not been actively seeking out --

9          PROSPECTIVE JUROR:  No, I have not.

10         THE COURT:  -- news or video, but, for example, if

11  a video is embedded in a news story, that may be something

12  you may have seen.

13         PROSPECTIVE JUROR:  I may have done it then, but

14  haven't looked at stuff in, like, a year.

15         THE COURT:  Okay.

16         So then you also answered Question 11, which

17  concerns your feelings of the former President and his

18  supporters.

19         So before I ask you my question, let me sort of --

20         PROSPECTIVE JUROR:  Just -- I wasn't a fan of

21  Trump.

22         THE COURT:  Okay.

23         PROSPECTIVE JUROR:  So his supporters, I mean, you

24  know, I've been in D.C. a while, some of them do get a

25  little chaotic, and they're not fun to be around when

1  they're being wild around the streets.  I mean, so...

2          THE COURT:  So a lot of folks have variously held

3  views about the current President, the former President,

4  some strong, not so strong.  Of course, that's not the

5  question here in this trial.  The question in this trial is

6  whether you can be fair and impartial notwithstanding your

7  political views --

8          PROSPECTIVE JUROR:  Right.

9          THE COURT:  -- about this defendant.  Do you think

10  you could do that?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  And if you were instructed -- and you

13  will be instructed that he is presumed to be innocent even

14  before the government presents a shred of evidence.  Is that

15  a presumption you could follow?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And if the government failed in its

18  burden to demonstrate his guilt beyond a reasonable doubt,

19  would you have any trouble finding the defendant not guilty?

20          PROSPECTIVE JUROR:  I would not.

21          THE COURT:  Any follow-up from the government?

22          MR. KELLY:  Just very briefly, Your Honor.

23          Good afternoon, sir.

24          What do you do for a living?

25          PROSPECTIVE JUROR:  Project management consultant

1    at the FAA.

2              MR. KELLY:  The FAA.

3              What is it that you do, I mean, just generally?

4              PROSPECTIVE JUROR:  Sure.

5              I do, like, data analysis on a computer, and I

6    track programs, like, for costs and schedule.

7              MR. KELLY:  Thank you.

8              THE COURT:  Mr. Monroe, anything further?

9              MR. KELLY:  No follow-up.

10             THE COURT:  Thank you.

11             Sir, thank you very much.  Mr. Douyon will show

12   you out of the courtroom.

13             PROSPECTIVE JUROR:  Thank you.

14             THE COURT:  All right.  Good afternoon, sir.  Feel

15   free to remove your mask if you'd like for present purposes.

16             You are juror 0950; is that right?

17             PROSPECTIVE JUROR:  That's correct.

18             THE COURT:  Okay.  So you answered a handful of

19   these questions yes, 6, 7, 8, 13B, and 13D.

20             PROSPECTIVE JUROR:  Correct.

21             THE COURT:  So let's start with 6, which asked

22   whether you or someone you know was either a participant in

23   or physically present as a witness to the events of January

24   6.  Can you tell us about that?

25             PROSPECTIVE JUROR:  Correct.

1            One of my colleagues was a reporter there that
2   day, like, just kind of rally and stuff beforehand but not
3   involved by any means.
4            THE COURT:  Okay.
5            So when you say your colleagues, I haven't looked
6   at what your occupation is, but you are a member of the
7   media?
8            PROSPECTIVE JUROR:  Yeah, I work for a radio
9   station.
10           THE COURT:  I'm sorry, who?
11           PROSPECTIVE JUROR:  A radio station.
12           THE COURT:  And is it a local radio station or a
13  national radio station?
14           PROSPECTIVE JUROR:  Local.
15           THE COURT:  Can you just identify the station?
16           PROSPECTIVE JUROR:  It's WAMU.
17           THE COURT:  Oh, all right.  Of course.
18           And as part of your work for WAMU, are you a
19  journalist for WAMU or some other capacity?
20           PROSPECTIVE JUROR:  Yes, I cover transportation.
21           THE COURT:  Okay.
22           And -- oh, I'm now putting it all together; I've
23  heard you on the radio more than once.
24           So your regular beat is transportation, but have
25  you done any news story or any news coverage concerning

1  January 6th?

2      PROSPECTIVE JUROR:  I wasn't here.  I was actually

3  coming back from the holiday, so I wasn't physically

4  covering anything.

5      I'm trying to remember.  I think I might have had

6  to call a Congress member later in that night for a story,

7  but I didn't do very much day-of coverage by any means.

8      THE COURT:  Okay.  How about since?

9      PROSPECTIVE JUROR:  I covered a little bit of the

10 fence discussion.  After January 6th, the neighborhood was

11 concerned about the fence.  And a lot of people use that

12 area for recreation or biking or walking through there.

13 So I think that's about the extent that I've kind of had any

14 ancillary coverage around January 6th.

15      THE COURT:  And so you've mentioned one colleague

16 who was there that day, covered the news that day.  Are

17 there other colleagues at WAMU who have sort of continued to

18 cover the events of January the 6th?

19      PROSPECTIVE JUROR:  No.  Since we're, like, the

20 local NPR station, a lot of national NPR, they're

21 congressional reporters, they're public safety, criminal

22 justice reporters.

23      THE COURT:  Right.

24      PROSPECTIVE JUROR:  But our focus is really on the

25 local community.  So what we focused on, you know, Capitol

1  Hill neighbors, staff maybe, that sort of thing, but not so

2  much the particular event but just kind of how it affected

3  other people in the District.

4            THE COURT:  Got you.

5            So given all of that, the fact that you are a

6  journalist, you know folks who have had -- may have done

7  some limited coverage of the events of January the 6th,

8  you've done yourself a little bit of coverage of the sort of

9  impacts of that day, do you think there's any reason that

10 you couldn't be fair and impartial if you were selected as a

11 juror in this case?

12            PROSPECTIVE JUROR:  No, I'm -- you know, I mean,

13 that's my job every day is to be impartial and balanced,

14 look at all the sides, that sort of thing, so I'm pretty

15 used to that, and I don't think it would affect my

16 decision-making in this case.

17            THE COURT:  Okay.

18            So Questions 7 and 8 concern news coverage and

19 viewing of videos of those events.  Can you just give us a

20 sense of how much news and video you've watched and how

21 closely you followed it over the past year plus?

22            PROSPECTIVE JUROR:  Yeah.  I mean, like day of,

23 I was actually at my girlfriend's parents' house down in

24 North Carolina, and so I was watching a lot of kind of the

25 TV coverage of it and that sort of thing as it played out.

1          Like I said, a few local impacts, that sort of

2     thing, but haven't really followed much of -- I mean, you

3     know, that day kind of had so many --

4          THE COURT:  Right.

5          PROSPECTIVE JUROR:  -- tentacles or whatever.

6     It's gotten a lot of -- so I followed it generally but not

7     blow-by-blow coverage by any means.

8          THE COURT:  Got it.

9          So anything about the news coverage or the videos

10    you've seen that might cause you to think you couldn't be

11    fair and impartial to this defendant?

12         PROSPECTIVE JUROR:  No, I don't think so.

13         THE COURT:  Okay.

14         Any doubt in you mind about that?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  All right.

17         So you also answered Question 13B and 13D yes.

18    So let's talk about the member of the group, friends, family

19    who have served in the Armed Forces.

20         PROSPECTIVE JUROR:  Yeah, my grandpa was a cook

21    during World War II.  One of my old roommates actually just

22    joined the Air Force as a physical therapist, but that's the

23    extent.

24         THE COURT:  Okay.

25         And then Question 13 asked whether any member of

1    the group has been arrested for, charged with, or convicted

2    of a crime or been a victim of or a witness to a crime.  Can

3    you tell us about that?

4                PROSPECTIVE JUROR:  Yeah.

5                I mean, I know multiple people that have witnessed

6    crimes and that sort of thing over time, but I don't know if

7    you want me to expand on that at all.

8                THE COURT:  Well, let me follow up.

9                You know, not surprisingly, you're a D.C.

10   resident --

11               PROSPECTIVE JUROR:  Right.

12               THE COURT:  -- and many of us has been one degree

13   of separation from such things.

14               Based upon your friends' experiences and the

15   things you've talked to them about, have you formed any

16   impressions about the D.C. MPD, for example?

17               PROSPECTIVE JUROR:  No, not particularly.

18               THE COURT:  Any impressions about the

19   U.S. Attorney's Office in this district?

20               PROSPECTIVE JUROR:  No.

21               THE COURT:  Anything about your friends'

22   experiences with having been victims of crimes that would

23   cause you to think you couldn't be fair and impartial in

24   this case?

25               PROSPECTIVE JUROR:  No.

1          And actually the one I was thinking of didn't even
2    happen here.
3          THE COURT:  Okay.
4          PROSPECTIVE JUROR:  So no.
5          THE COURT:  All right.
6          Any follow-up from the government?
7          MR. KELLY:  Briefly, Your Honor.
8          Good afternoon.
9          PROSPECTIVE JUROR:  Good afternoon.
10          MR. KELLY:  Could you just explain just a little
11    bit more the work that you did on covering the Capitol
12    fencing?
13          PROSPECTIVE JUROR:  Yeah.
14          So after -- and I'm trying to remember when this
15    was -- maybe in the months after, I can't remember how long
16    the fencing was up after January the 6th, but there was a
17    group formed, I can't remember the name of it off the top of
18    my head, but basically it was Capitol Hill neighbors that
19    were concerned that that fence would become kind of a
20    permanent part of the complex.  And so Delegate Eleanor
21    Holmes Norton had some hearings on it, so I covered some of
22    that, and interviewed some neighbors about what that would
23    mean for their day-to-day lives if that fence remained.
24          MR. KELLY:  And was that sort of neutral news
25    coverage, as opposed to you doing opinion piece work?

1          PROSPECTIVE JUROR:  Correct, yeah.

2          MR. KELLY:  And then the last question is, other

3    than NPR, I guess would be an obvious one, but you mentioned

4    that you had been following generally some of the media

5    coverage.  What are some of the general sources of news that

6    you followed?

7          PROSPECTIVE JUROR:  *Washington Post*, different TV,

8    CNN, different kind of just general national sources.

9          MR. KELLY:  Thank you very much.  Nothing further.

10         THE COURT:  Mr. Monroe.

11         MR. MONROE:  Good afternoon.

12         PROSPECTIVE JUROR:  Good afternoon.

13         MR. MONROE:  How far do you live from the Capitol?

14         PROSPECTIVE JUROR:  Currently, I live in Tacoma,

15   which is actually about four miles as the crow flies north.

16         MR. MONROE:  Journalists have unique relationships

17   with members of the community.

18         PROSPECTIVE JUROR:  Correct.

19         MR. MONROE:  Could you describe what professional

20   contacts, if any, you have with the Metropolitan Police

21   Department?

22         PROSPECTIVE JUROR:  I mean, I've had to cover

23   crimes before.

24         For instance, on Friday, there was a pretty big

25   shooting, I guess, Friday.  So, you know, I covered their

1    press conferences and that sort of stuff.  But I don't have

2    any personal relationships really with members of MPD.

3            MR. MONROE:  How about on the subject of

4    transportation, do you deal with MPD on those issues?

5            PROSPECTIVE JUROR:  Not too much.

6            Metro has their own transit police.  And I've

7    covered their initiatives and stuff in the past, but, again,

8    nothing, personal interactions, that sort of thing.

9            MR. MONROE:  What's your general view as to what

10   transpired on January 6th?  What's your take on it?

11           PROSPECTIVE JUROR:  I mean, it was an

12   unprecedented event.  Certainly was surprising and, I guess,

13   shocking.  I don't know if that's -- I guess I never

14   expected our Capitol to be intruded, I'm not sure what the

15   correct word is.  But, you know, unless you're part of a

16   tour group, there's not too often that you get to go in

17   there.  So I'd say that it was pretty unprecedented.

18           MR. MONROE:  Anything about your knowledge or

19   experience with what happened on January 6th?

20           PROSPECTIVE JUROR:  I'm sorry, I didn't hear you.

21           MR. MONROE:  Anything about your knowledge or

22   experience as to what happened on January 6th would

23   undermine that basic principle that Mr. Webster, before any

24   evidence has been presented by the government, he enjoys the

25   presumption of innocence?

1          PROSPECTIVE JUROR:  Correct.  I mean, facts have
2     to prove what's alleged happened, facts have to prove that.
3          MR. MONROE:  Thanks so much for speaking with me.
4          PROSPECTIVE JUROR:  Thank you.
5          THE COURT:  All right.  Thank you, sir.
6          Mr. Douyon will show out of the courtroom.
7          PROSPECTIVE JUROR:  Thank you.
8          MR. KELLY:  Your Honor, just briefly, I'm sorry
9     for -- before the next juror is brought in --
10          I apologize, Your Honor, my colleagues just raised
11     a good point, hence the delay, that the juror who was just
12     sitting there has knowledge of the fencing issue, I guess,
13     firsthand knowledge of the fencing issue at the Capitol,
14     which is going to be in evidence in this case.  I just
15     wanted to raise that as a possible problem, just him
16     bringing in specific prior knowledge about things that are
17     going to be presented by the government.
18          THE COURT:  Well, I didn't quite understand him to
19     say that.  I understood him to say what he covered was the
20     community's reaction to the fencing, not anything particular
21     about the fencing.
22          And so -- and beyond that, what he's said is that
23     his knowledge about the fencing isn't contemporaneous to the
24     6th, it's the community's reaction afterwards.
25          So I don't think he has any -- unless you have

1   reason to believe that there's going to be some pre-existing

2   knowledge based upon what he's described that's going to

3   affect his view of the evidence, I'm not inclined to be too

4   troubled by that.

5           MR. KELLY:  I don't think there was anything

6   further than that, Your Honor.

7           THE COURT:  Okay.

8           All right.

9           All right.  Let's bring in our next juror.

10          COURTROOM DEPUTY:  Juror No. 1343.

11          THE COURT:  Hi, ma'am.  How are you?

12          PROSPECTIVE JUROR:  Good.  Thanks.

13          THE COURT:  Feel free to remove your mask if you

14  wish.

15          You are juror 1343?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Okay.

18          You've answered three questions, starting with

19  Question 8, and then 13B and 13C.  So let's start with 8,

20  which asked whether you watched -- whether you've seen video

21  of what happened on the Capitol January 6th.

22          Can you give us just a ballpark sense of how many

23  such videos you may have seen in the last year plus?

24          PROSPECTIVE JUROR:  Oh.  I mean, I guess I saw

25  some of the news reports at the time, so that's what I was

1 specifically referring to.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR:  I don't know that I would say

4 in the last year that I've watched anything or thought about

5 it that much.  It was more just that awareness of the

6 initial kind of media reports that came out.

7          THE COURT:  Okay.

8          So is it fair to say that most of what you have

9 seen is sort on that day or shortly after?

10         PROSPECTIVE JUROR:  Yes, definitely.

11         THE COURT:  Anything about the fact that you've

12 seen those videos, do you think it would cause you to think

13 you couldn't be fair and impartial in this case?

14         PROSPECTIVE JUROR:  No, I don't think so.

15         THE COURT:  And any reason to think that you

16 couldn't be -- presume this defendant to be innocent and

17 hold the government to its burden of proof in this case?

18         PROSPECTIVE JUROR:  I don't think there's any

19 reason.

20         THE COURT:  And if you were to conclude that the

21 government had not met its burden of proof, any trouble --

22 any reason to think you would have trouble returning a

23 not-guilty verdict?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  All right.

1          Questions 13B and C asked whether any member of

2   the group had served in the Armed Forces.  Can you tell us

3   about that?

4          PROSPECTIVE JUROR:  So I understand that group

5   referred to family members.

6          THE COURT:  Yes.

7          PROSPECTIVE JUROR:  My husband, before we met, was

8   an Air Force JAG for about four or five years.

9          THE COURT:  Okay.

10         PROSPECTIVE JUROR:  And my -- his brother, my

11  brother-in-law, was a Green Beret for a period of time.

12         THE COURT:  Okay.

13         PROSPECTIVE JUROR:  And my brother's -- sorry.

14  My husband's sister's husband was in the Navy early on in

15  his career but not while I've known him.

16         THE COURT:  Okay.

17         Question 13C asked whether you know anybody -- or

18  any member of that group has attended law school.  You've

19  just mentioned your husband.  Is there anybody else other

20  than your husband?

21         PROSPECTIVE JUROR:  I couldn't remember if the

22  group involved me.

23         THE COURT:  Yes, that included you.

24         PROSPECTIVE JUROR:  It includes me.

25         As you can probably tell from my accent, I'm

1    Australian born.  I qualified as an attorney in Australia.

2    I practiced for a few years after I graduated.  I haven't

3    practiced for a long time; I work in policy now.  But I did

4    also do the New York Bar in 2006, 2007.

5              THE COURT:  Okay.

6              So have you done any criminal work?

7              PROSPECTIVE JUROR:  No.  I did corporate

8    commercial work, intellectual property.

9              THE COURT:  And your husband was in the JAG for a

10   period of time, although it was before you were married.

11   Did he do any criminal work as a JAG lawyer, to your

12   knowledge?

13             PROSPECTIVE JUROR:  I -- not to my knowledge.

14   He was in Kuwait and maybe Afghanistan.  So I think when

15   you're there, you kind of do a bit of everything.  But his

16   specialization is procurement and government contracts, so

17   that was primarily the law that he went in to practice and

18   what he practices now.

19             THE COURT:  Okay.

20             You're a lawyer, or at least trained as a lawyer,

21   your husband is a lawyer.  You may have learned some things

22   about the criminal law in the course of your education, what

23   have you.  Would you be able to put all of that aside and

24   follow the instructions as I give them to you, even if you

25   thought, for example, there was -- they were wrong?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  All right.  Any follow-up from the

3 government?

4          MR. KELLY:  Just a few questions, Your Honor.

5          Good afternoon.

6          And apologies if you'd sort of covered some of

7 this, I just want to make sure I've got it straight.

8          So did I hear that you graduated from law school

9 in Australia?

10          PROSPECTIVE JUROR:  Yes.

11          MR. KELLY:  So that's where your accent is from.

12 I probably should have been able to place it.

13          Around when did you move to the United States?

14          PROSPECTIVE JUROR:  So I moved here -- I've been

15 here about 20 years.  So I moved here as a Diplomat in

16 August of -- it's all fuzzy now -- 2004.

17          MR. KELLY:  Okay.

18          Where were you a Diplomat?

19          PROSPECTIVE JUROR:  I was based at the Australian

20 embassy in Washington, D.C.  I worked for the Australian

21 Foreign Service.

22          MR. KELLY:  Did you continue to do that for a

23 number of years after you moved here?

24          PROSPECTIVE JUROR:  No.

25          I did that for about three and a half years.

1   Then I met my husband while I was based on Washington, D.C.

2   We decided to get married.  And at that point, I left the

3   Foreign Service.  We decided to stay in America.  I became a

4   naturalized U.S. citizen.  And then, because I was staying

5   here, I kind of did the Bar Exam, because I figured I was

6   going to be looking for a job, but then I never practiced

7   and I never had a big interest in practicing.

8           MR. KELLY:  Okay.

9           So after you left the Foreign Service and moved

10  here, you haven't practiced law since then?

11          PROSPECTIVE JUROR:  No, no, I've worked in policy.

12          MR. KELLY:  And what is -- I guess just generally,

13  what do you do in a policy sense?

14          PROSPECTIVE JUROR:  So I work for a bureau of the

15  Department of Treasury called the Alcohol and Tobacco Tax

16  and Trade Bureau.  And my -- I've always worked on

17  international policy issues.  So my specialization is that

18  of international alcohol-related issues.  So I do a lot of

19  work on wine labeling and wine standards and talking to

20  foreign governments about their standards and our standards.

21          MR. KELLY:  And that's a policy, not a legal

22  issue?

23          THE COURT:  Counsel, can we --

24          PROSPECTIVE JUROR:  It's a policy job.  We have

25  counsel in the office, but I'm not -- I don't work with

1  counsel.

2  MR. KELLY:  My last question then is, moving on

3  from what you do, you mentioned that you had watched some

4  videos or some news coverage about what happened on

5  January 6th.  To the extent that you know, what are some of

6  the typical news sources that you would have seen that

7  coverage?

8  PROSPECTIVE JUROR:  Oh, where did I watch it?

9  MR. KELLY:  Yeah, like what news source did you

10  see the coverage?

11  PROSPECTIVE JUROR:  You know, I don't remember

12  specifically.  We don't have, like, cable TV.  So I think it

13  was just kind of what I saw on the Internet at the time.

14  It would have been major news, like local news channels.

15  MR. KELLY:  Any particular websites or anything

16  like that that you would have gone to?

17  PROSPECTIVE JUROR:  Nothing -- I don't recall

18  specifically, yeah.

19  MR. KELLY:  Thank you.

20  MR. MONROE:  Good afternoon.

21  PROSPECTIVE JUROR:  Hi.

22  MR. MONROE:  Your dealings with your current

23  position, do they bring you into contact with the

24  U.S. Attorney's Office or the Department of Justice?

25  PROSPECTIVE JUROR:  No.

1          MR. MONROE:  And how far away do you live from the

2     Capitol?

3          PROSPECTIVE JUROR:  Well, that's a good question.

4          I live in Mount Pleasant in Washington, D.C.,

5     Northwest.  So I honestly don't have -- a couple of miles --

6     I don't know how far.  Not close.  Not in the neighborhood.

7          MR. MONROE:  And we're now about more than a year

8     after January 6th.  Looking back, what's your take on what

9     transpired on January 6th?

10          PROSPECTIVE JUROR:  I guess I think it was

11     unfortunate.  You know, it was just unfortunate probably for

12     everyone involved.

13          MR. MONROE:  Thanks so much for speaking to me.

14          PROSPECTIVE JUROR:  Thank you.

15          THE COURT:  All right.  Thank you.  Mr. Douyon

16     will show you out of the courtroom.

17          Counsel, let's be mindful of follow-up questions

18     here; otherwise, we're going to be here all afternoon and

19     into tomorrow, which I'd rather avoid, particularly if a

20     juror has not raised some of the issues that some of the

21     other jurors have, okay?

22          MR. KELLY:  Yes, Your Honor.

23          MR. MONROE:  I'm a having a hard time figuring out

24     where --

25          THE COURT:  No, I wasn't addressing you.  I just

1  was making a general observation.

2           MR. MONROE:  I'm trying to keep myself tight.

3           THE COURT:  You're doing great.  You're doing just

4  fine, Mr. Monroe.

5           Hi, ma'am.  How are you?

6           PROSPECTIVE JUROR:  I'm doing well.  Thank you.

7           THE COURT:  Feel free to take your mask off if you

8  wish during this for this present purposes.

9           You're juror 0974?

10           PROSPECTIVE JUROR:  That's what the paper says.

11           THE COURT:  Okay.  I promise you won't be juror

12  0974 forever.

13           All right.  So I've got two sides of this card,

14  one in which you sort of listed all of the numbers, and then

15  a second side of the card has question 8, 10, 13A, B, and C.

16           PROSPECTIVE JUROR:  Correct.

17           I thought we were -- you'd said 21 questions, so I

18  started numbering 21, and I thought I was going to say yes,

19  no, yes, no.

20           THE COURT:  Okay.  Great.  So it's only 8, 10, and

21  13A through C that you answered yes?

22           PROSPECTIVE JUROR:  Correct.

23           THE COURT:  Okay.  Great.

24           So let's start with question 8 that concerns

25  watching video of what happened on January 6th.  Give us a

1  sense of how many such videos you may have seen over time?

2  PROSPECTIVE JUROR:  I think at the beginning I saw

3  news coverage.  And I can't think of anything I've seen this

4  last week.  Yeah, I don't know.

5  THE COURT:  I'm sorry, since, you said --

6  PROSPECTIVE JUROR:  So I can't think of anything

7  that I saw this last week.

8  So I think I saw a lot at the beginning just from

9  the news coverage, but, you know, I just watched CNN.

10  I can't even say how many I've seen.  Maybe --

11  I don't know.

12  THE COURT:  Yeah, so let me just ask you this:

13  It sounds like, and tell me if I'm wrong, you're not seeking

14  out news coverage or videos --

15  PROSPECTIVE JUROR:  No.

16  THE COURT:  -- of that day; but, rather, if a news

17  story presents itself, it's something you see.

18  PROSPECTIVE JUROR:  If it's on, like, *New York*

19  *Times* or something, I might see it.

20  THE COURT:  Right.  Okay.

21  And, you know, we all read the news, you've

22  learned some things about that day.  Could you set all of

23  that aside and focus on the evidence that's presented in

24  this case --

25  PROSPECTIVE JUROR:  Yes.

1    THE COURT: -- and judge the evidence and the

2  defendant based upon the evidence that's presented here?

3    PROSPECTIVE JUROR: Yes.

4    THE COURT: Okay.

5    Question 10 concerns strong feelings or opinions

6  about the events that took place that day. We've talked

7  about that a little bit.

8    Again, you know, everybody's -- well, I shouldn't

9  say everybody, but it's not surprising that people develop

10  views of that -- the events of that day. The question is

11  whether you could set aside those views and view the

12  evidence in this case against this defendant fairly and

13  honestly.

14    PROSPECTIVE JUROR: I mean, I'm not very

15  empathetic. I mean, I feel like I'm more empathetic towards

16  the police. I don't know if that makes me impartial or not.

17    THE COURT: Okay.

18    Well, again, let's -- I can understand that

19  sentiment, but let me ask it this way. You know, this

20  defendant, as you've heard, is accused of assaulting a

21  police officer that day.

22    PROSPECTIVE JUROR: Correct, yeah.

23    THE COURT: Could you presume him innocent of that

24  offense as you sit here today?

25    PROSPECTIVE JUROR: Yeah. I mean, I don't know

1  anything about the case, so I think I'd start with innocent

2  and then -- yeah.

3          THE COURT:  And if the government, in your view,

4  was unable to prove his guilt beyond a reasonable doubt,

5  would you have any difficulty in acquitting him?

6          PROSPECTIVE JUROR:  Say that again.

7          THE COURT:  If the government was unable to carry

8  its burden of proof and find him -- excuse me, prove him

9  guilty beyond a reasonable doubt, would you have any

10  difficulty in acquitting him?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Okay.

13          And so am I correct that you could -- you sort of

14  signaled some general empathy, but would you be able to set

15  that aside and review the evidence in the case objectively

16  and fairly?

17          PROSPECTIVE JUROR:  I could.

18          THE COURT:  Okay.

19          Let's turn to question 13A, B, and C.  13A asked

20  whether members of the group, either now work for or

21  previously worked for law enforcement.

22          PROSPECTIVE JUROR:  Yeah, I work in a job where my

23  friends and my colleagues are -- I can't remember the A.

24  Is it FBI or --

25          THE COURT:  Right.

```
1              PROSPECTIVE JUROR:  Yeah, I work with FBI
2    officers, special agents.
3              THE COURT:  I'm sorry, who?
4              PROSPECTIVE JUROR:  I work with FBI special agents
5    in my job.  You know, I consider them work friends.  I don't
6    know.
7              THE COURT:  Okay.  So can you tell us what kind of
8    work you do?
9              PROSPECTIVE JUROR:  Yeah, I'm an analyst.
10             THE COURT:  And are you employed by the FBI?
11             PROSPECTIVE JUROR:  I am not.
12             THE COURT:  So are you a contractor to the FBI?
13             PROSPECTIVE JUROR:  I am not.
14             THE COURT:  Okay.
15             PROSPECTIVE JUROR:  I work at a sister agency.
16             THE COURT:  You work at a sister agency.
17             Can you just tell us what that agency is?
18             PROSPECTIVE JUROR:  I kind of feel uncomfortable
19    doing so.
20             THE COURT:  All right.  So it's adjacent to law
21    enforcement, it sounds like.
22             PROSPECTIVE JUROR:  Uh-huh.
23             THE COURT:  Okay.
24             So as you heard, there are likely to be FBI agents
25    testifying in this case, also law enforcement agents.
```

1          One of the instructions I will give you is that a

2    law enforcement officer's testimony can't be given any

3    greater or lesser weight just because the person is in law

4    enforcement.

5          PROSPECTIVE JUROR:  Right.

6          THE COURT:  Any reason to think you couldn't

7    follow that instruction given your relationships with FBI

8    agents?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  And could you fairly and honestly

11    evaluate the testimony of an FBI agent?

12          PROSPECTIVE JUROR:  Yeah.

13          THE COURT:  And if you, for whatever reason,

14    disbelieve the testimony of an FBI agent, could you

15    comfortably find that person not to be credible?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Okay.

18          Any other folks in law enforcement other than

19    those you've identified?

20          PROSPECTIVE JUROR:  That's it.

21          THE COURT:  Okay.

22          Question 13B concerned whether any member of the

23    group has been a -- served in a branch of the Armed Forces.

24    Can you tell us about that?

25          PROSPECTIVE JUROR:  It's the same.  Through work.

```
1   I work with a lot of ex-military.  One of my good mentors is
2   ex-military.
3           THE COURT:  And your mentor, can you just tell us
4   what branch he or she was in?
5           PROSPECTIVE JUROR:  I do not know.
6           THE COURT:  Okay.
7           PROSPECTIVE JUROR:  Yeah.
8           THE COURT:  Question 13C concerns member of the
9   group who has attended law school, worked as a lawyer.
10          PROSPECTIVE JUROR:  Yeah, my husband is an
11  attorney.
12          THE COURT:  And can you tell us what kind of law?
13          PROSPECTIVE JUROR:  Antitrust.
14          THE COURT:  Antitrust.  Okay.
15          And has your cousin done any criminal work?
16          PROSPECTIVE JUROR:  It's my husband.
17          THE COURT:  Oh, your husband.  I'm sorry.
18  I thought you said your cousin.
19          Has your husband -- does he do criminal antitrust?
20          PROSPECTIVE JUROR:  I know he does some, like, pro
21  bono work, and I think it's been mainly immigration.
22          THE COURT:  Okay.
23          PROSPECTIVE JUROR:  But he might have done some
24  criminal; I don't know.
25          THE COURT:  So it sounds like you've been exposed
```

very little to the criminal law and -- substantively, it
sounds like.

PROSPECTIVE JUROR:  Correct.

THE COURT:  All right.

Any follow-up questions from the government?

MR. KELLY:  Just briefly, Your Honor.

You mentioned that your husband is an attorney.
Where does he work, if you're able to say?

PROSPECTIVE JUROR:  He works at Arnold & Porter.

MR. KELLY:  Oh, okay.  Thank you.

THE COURT:  Mr. Monroe.

MR. MONROE:  Good afternoon.  I represent the
defendant in this case.  Could you describe for me how often
you're in contact with members of the FBI in connection with
your job?

PROSPECTIVE JUROR:  Before COVID, I was in contact
with them daily.  After COVID, they now sit in a separate
office than us.

MR. MONROE:  And I mean -- when I say the word
"contact," I mean, interact with them either by electronic
means or face to face or otherwise.

PROSPECTIVE JUROR:  Oh, electronic means.  I mean,
I would say once a week.

MR. MONROE:  Okay.

And --

1          PROSPECTIVE JUROR:  But that -- I mean, after

2    COVID, it's more business because they don't sit in the same

3    office.  Before it was more, you know, what are you having

4    for lunch, I don't know how to -- yeah, it's more personal.

5          MR. MONROE:  I take it, at least in part of your

6    job as an analyst, you're relying upon information being

7    communicated to you from the FBI?

8          PROSPECTIVE JUROR:  Correct.

9          MR. MONROE:  Okay.

10         So here's my concern.  There's going to be at

11   least one FBI agent, if not more, who are going to testify

12   in this case.  Will those witnesses, based upon your job

13   experience, be given greater credence than, say, my client?

14         PROSPECTIVE JUROR:  I mean, I don't think so.

15   I just have to go on what they say, right?  And I think it's

16   your job to say whether what they're saying is correct or

17   not, right?

18         MR. MONROE:  Okay.

19         In your job, do you have dealings with the

20   Department of Justice or U.S. Attorney's Office?

21         PROSPECTIVE JUROR:  Directly, no.

22         MR. MONROE:  Given your position with the Federal

23   Government, do you see yourself more aligned with the

24   attorneys who are here representing the government as

25   opposed to myself who's representing the defendant?  This is

1  a personal question.

2         PROSPECTIVE JUROR:  I do.  I feel more aligned

3  with them.

4         MR. MONROE:  It's only natural.

5         PROSPECTIVE JUROR:  Yeah.

6         MR. MONROE:  With that in mind, that

7  personal-professional allegiance that you have, would that

8  keep you from being fair and impartial in this case, knowing

9  that you have a duty to be a fair arbiter of the facts and

10  everyone is entitled to a fair trial here?

11         PROSPECTIVE JUROR:  I don't know.

12         I mean, I don't want to -- honestly, I don't want

13  to be selected.  But I'm an analyst.  You know, I went

14  through lots of training on how not to be biased, you know.

15  I've worked with a lot of analytical tools.  Yes, I can do

16  it.  But do I have these feelings?  Yes, that's me.  I don't

17  know what else to do.

18         Am I more empathetic towards the police?  Yes,

19  because, you know, I have special police that protect me

20  every day I go to work.  They protect me when I'm overseas.

21         You know, do I feel more aligned with the

22  attorneys sitting before me?  Yes.  I mean, it's just who

23  I am.

24         MR. MONROE:  So is it --

25         THE COURT:  Let me just -- I mean, if I can

1  interrupt.

2          Look, we understand what your job is and who you

3  come into contact with work-wise.  And you either are an

4  employee of the -- I think you're an employee of the Federal

5  Government as opposed to a contractor.

6          PROSPECTIVE JUROR:  Uh-huh.

7          THE COURT:  But the question really is, can you

8  put all that aside and evaluate the evidence in this case as

9  it's being presented?  And if the government fails to meet

10  its burden of proof, can you honestly and fairly say you

11  would acquit this gentleman of the crimes with which he's

12  accused?

13          PROSPECTIVE JUROR:  Yeah.

14          THE COURT:  Okay.

15          Any follow-up, Mr. Monroe?

16          MR. MONROE:  Not at the moment, Judge.

17          THE COURT:  All right.  Thank you, ma'am.

18          Mr. Monroe.

19          MR. MONROE:  Judge, this is a very unique

20  situation.  I feel hamstrung to protect my client not

21  knowing the extent of this juror's relationship with the

22  Federal Government, the FBI, the U.S. Attorney's Office.

23          This is a deeply interrelated juror.  I can't even

24  inquire as to the level of trust and the reliance she has to

25  have on the FBI in her day-to-day life.  I think she has to

1    be excused for cause.

2         THE COURT:  That's okay.

3         Look, I'm not sure I agree with that

4    characterization.  I mean, she has said she works

5    essentially for an agency that's adjacent to the FBI.  It

6    sounds like, at least pre-COVID, she's physically in

7    proximity to FBI agents, she communicated with them

8    regularly prior to COVID, and does so occasionally now on a

9    week-to-week basis remotely.  So I thought she was candid

10   about that.  I don't think there's any doubt about where the

11   relationship --

12        MR. MONROE:  She wouldn't even tell us what

13   agency -- we don't even know who she works for.

14        THE COURT:  It's not unusual to have people in

15   this town come in and say, I don't want to tell you that

16   I work for the CIA or I work for the NSA.  It's not unusual.

17        But she described what her work is and she

18   described how she's interacted with the FBI.  And, you know,

19   she was repeatedly asked, could you presume him to be

20   innocent, could you acquit him if the government fails to

21   meet its burden of proof, and she said yes.

22        MR. MONROE:  Not to my line of questioning, she

23   didn't.

24        THE COURT:  Well, your line of questioning is,

25   would she have been -- was she "aligned" -- more or less

1   aligned with the government or with you, and that's -- you

2   know, I'm not sure that's exactly a fair question to ask

3   somebody who's a government employee.  I mean, I don't know

4   that anybody's aligned with a defense lawyer.  I was a

5   defense lawyer for a long time and nobody was aligned with

6   me.

7           MR. MONROE:  I guess when you're measuring whether

8   or not a juror who's not willing to disclose their

9   professional credentials and contacts with the FBI, it's

10  going to tell you.

11          THE COURT:  Well, you know, I'm going to not

12  strike her for cause.  As I said, I thought she was candid,

13  she explained fully what her relationship was with law

14  enforcement, repeatedly asked, you know, could you be fair,

15  could you be impartial?  She said yes.  Could she acquit the

16  defendant?  She said yes.  That's, at the end of the day,

17  what really matters here, is if a juror says I can acquit

18  this gentleman if the government fails to meet its burden,

19  that's what I'm looking for, and that's what we all should

20  be looking for.

21          All right.  Let's bring in the next juror.

22          Hi, sir.  How are you?

23          PROSPECTIVE JUROR:  Good.  Yourself?

24          THE COURT:  Good.  Thank you.

25          Feel free to remove your mask if you feel

1   comfortable doing so.

2          You're juror 1050?

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  Okay.

5          So you answered multiple questions yes, 5, 6, 7,

6   8, 13C and 21.

7          So why don't we start with 21, which is sort of

8   the catch-all question, which asked whether there was any

9   reason that you thought you would not be able to be fair and

10  impartial or sit in judgment?

11         PROSPECTIVE JUROR:  Sure.

12         So I think when you opened up the jury process

13  earlier today, you spoke about democracy and the consent of

14  the government.  I'm a U.S. citizen, I live in the District

15  of Columbia, and we don't have representation in the laws

16  that are being made.

17         THE COURT:  Can I ask you to move a little bit

18  closer to the microphone and keep your voice up because I'm

19  having trouble hearing you.

20         PROSPECTIVE JUROR:  Sure.  Let me know if you want

21  me to start over.

22         THE COURT:  No, that's okay, I heard the first

23  part, but -- did everybody else hear him, the first part?

24         MR. KELLY:  Yes, Judge.

25         THE COURT:  Okay.  Great.  Thank you.

1      PROSPECTIVE JUROR:  So as a U.S. citizen living in

2 the District of Columbia, I do not have any representation

3 in Congress.  So that consent of the government, principle

4 of government, where -- which the Revolution was fought on

5 and so forth, is somewhat fractured for residents of the

6 District of Columbia.

7      THE COURT:  Okay.

8      PROSPECTIVE JUROR:  We do have representation at

9 the Presidential level, but that only came through a

10 constitutional amendment.  So we do have some say in the

11 laws that are being passed but not complete.

12      So I think where that puts us -- a bit of an onus

13 on the residents to decide if they have the moral and

14 ethical quandary to pass judgment on the laws.

15      THE COURT:  Okay.

16      PROSPECTIVE JUROR:  And I think that becomes a

17 sliding scale, from my perspective.

18      Where now in this case if it's violence against a

19 police officer or violence against any other citizen or

20 non-citizen, I would have no problem passing judgment on

21 that.

22      THE COURT:  Okay.

23      PROSPECTIVE JUROR:  But I did fill out on my juror

24 form that I have every time before I've been called before

25 this court.  I did want to bring that up.  We can sort of

1    work through that a little bit.

2            THE COURT:  So, you know, a lot of residents in

3    the District are frustrated by the lack of representation in

4    Congress, and you share that view.

5            That said, none of that is really what's before me

6    and you if you were selected as a juror.  The question that

7    would be presented to you is, is the government of the

8    United States able to meet its burden to demonstrate that

9    this gentleman is guilty of the crimes for which he has been

10   charged.

11           So would you be able to evaluate the facts and

12   apply the law as I would instruct you to follow?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Okay.

15           And you would be able to pass judgment on this

16   defendant based upon the evidence and the law; is that

17   right?

18           PROSPECTIVE JUROR:  Correct.

19           THE COURT:  And if I were to instruct you --

20   I will instruct you that he is presumed to be innocent; that

21   is, he sits here innocent.  Is that a presumption you could

22   follow?

23           PROSPECTIVE JUROR:  Correct, yes.

24           THE COURT:  And if the government, for whatever

25   reason, was unable to meet its burden of proof and not prove

1    him guilty, would you have any difficulty acquitting him of

2    the charges?

3           PROSPECTIVE JUROR:  I would have no difficulty.

4    Sorry, there were a few double negatives in there.

5           THE COURT:  That's okay.  I appreciate that.

6           Okay.  So let's move back up the list.

7           Question 5 concerns whether you live or work at or

8    near the Capitol building.  Can you tell us about that?

9           PROSPECTIVE JUROR:  Sure.

10           So I live about a mile north of here.

11           THE COURT:  Okay.

12           PROSPECTIVE JUROR:  And so the events of

13    January 6th were relevant to where I live.

14           THE COURT:  Okay.

15           PROSPECTIVE JUROR:  But it was during the

16    pandemic, so I did stop work early that day.  But I was

17    working at home and we took some measures around the house

18    to make sure that if the violence spilled off of the Capitol

19    and into the city, we felt safe as a household.

20           THE COURT:  Okay.

21           So can you just tell us which neighborhood?

22           PROSPECTIVE JUROR:  Sure.  Mount Vernon.

23           THE COURT:  You live in Mount Vernon.  Okay.

24           So residents of the District who observed what

25    happened that day and were here that day had various

1    reactions and various proximity.  But could you leave that

2    to the side and judge the case on the facts as it's

3    presented and the evidence that's presented?

4              PROSPECTIVE JUROR:  I would be able to do that.

5              THE COURT:  So question 6 concerns whether you or

6    someone you know was a participant in or physically present

7    as a witness to the events of January 6th?

8              PROSPECTIVE JUROR:  Correct.

9              THE COURT:  And can you tell us who that is?

10             PROSPECTIVE JUROR:  Yes.

11             So one of the top performers on my team attended

12   the rally at the Ellipse that day.

13             THE COURT:  Okay.

14             PROSPECTIVE JUROR:  He reports to someone else who

15   reports to me.

16             THE COURT:  Okay.

17             PROSPECTIVE JUROR:  So I know this secondhand.

18   I believe he didn't go to the event at the Capitol but was

19   certainly at the event at the Ellipse.

20             THE COURT:  Okay.

21             Anything about your knowledge and your

22   relationship, to the extent you have one with this

23   subordinate, that you think might affect your view of this

24   case?

25             PROSPECTIVE JUROR:  No.

1          Like I said, he's one of my top performers.

2   Work-wise, I have a good relationship with him.

3          THE COURT:  Okay.

4          Have you formed any opinions about him, positive

5   or negative, based upon your knowledge that he attended that

6   rally?

7          PROSPECTIVE JUROR:  Maybe sightly negative.

8   But genuinely, I try to keep work and professional life

9   separate.

10          THE COURT:  All right.

11          Questions 7 and 8 are sort of related, asking

12   about media that you've been exposed to and videos that

13   you've been exposed to.

14          Can you just give us a sense of how many news

15   stories you think you may have read or seen about those --

16   about the events of that day?

17          PROSPECTIVE JUROR:  Between -- since January 6th

18   and as of yesterday, I guess?

19          THE COURT:  Yes.

20          PROSPECTIVE JUROR:  Probably a hundred or so.

21          THE COURT:  Okay.

22          Well, let me ask the question a different way,

23   which is, are you someone that seeks out stories about

24   January the 6th, or if such a story happens to be on your

25   newsfeed or on the Internet home page that you land on,

1  that's something you may read?

2      PROSPECTIVE JUROR:  Much more the latter there.

3      THE COURT:  Okay.

4      PROSPECTIVE JUROR:  If it comes up in a

5  newsfeed -- and, you know, it's been a big topic.

6      THE COURT:  And can you tell us some of the

7  sources from which you are getting your news about January

8  the 6th?

9      PROSPECTIVE JUROR:  Sure.

10      So the Apple News aggregation service.  So that

11  spans a lot of stuff from *Wall Street Journal*, *Washington*

12  *Post*, *BuzzFeed* news, I think, and others like that,

13  *Newsweek*.

14      THE COURT:  Okay.

15      PROSPECTIVE JUROR:  And I do go directly to

16  *Washington Post*.

17      THE COURT:  Okay.

18      All right.  So Question 13C asked whether any

19  member of that group had attended law school, worked as a

20  lawyer or worked in a law office.  Can you tell us about

21  that?

22      PROSPECTIVE JUROR:  Yeah, my sister graduated from

23  NYU law school.

24      THE COURT:  Is she a practicing lawyer?

25      PROSPECTIVE JUROR:  Yeah.  So she's a refugee

1    lawyer, working for the United Nations.

2              THE COURT:  All right.

3              Has she done any criminal work during her time as

4    a lawyer, do you know?

5              PROSPECTIVE JUROR:  I don't believe so.

6              THE COURT:  Okay.

7              All right.  Government counsel, any follow-up?

8              MR. KELLY:  Yes.

9              Good afternoon, sir.

10             You mentioned some feelings that you have about

11   the lack of representation in Congress for the District of

12   Columbia.

13             What feelings -- do you have any negative feelings

14   towards Congress or the members of Congress?

15             PROSPECTIVE JUROR:  Negative as in personal or?

16             MR. KELLY:  No, not as in personal, just as in

17   Congress as a body.

18             PROSPECTIVE JUROR:  Oh.  No.

19             I mean, I think we should be represented there.

20   As you can tell, I have a British accent.  I grew up in

21   London, but I am an American citizen.  So I do think the

22   American system of government is probably the best one in

23   the world, I just think that we should be represented there.

24             MR. KELLY:  And I don't want to put words in your

25   mouth.  I think you had also said if this case is about

1  whether or not the defendant assaulted an officer, you would

2  have no problem passing judgment one way or another on that.

3          This case does, obviously, though, involve events

4  that happened at the Capitol building on January 6th.

5  To the extent that evidence may come in about what was

6  happening at the Capitol that day, would you have any

7  feelings about any of that beyond just a potential assault

8  that occurred?

9          PROSPECTIVE JUROR:  I mean, I could put aside any

10  feelings, but not 100 percent sure where the question is

11  going.

12          But I mean, I would -- if selected, I would follow

13  the law as it is written and as instructed by the judge to

14  follow.

15          MR. KELLY:  Okay.  Thank you.

16          And then my last question is, you had mentioned a

17  couple times sort of what it is that you do, but I don't

18  think I actually caught what is it that you do for a living.

19          PROSPECTIVE JUROR:  I'm an IT professional for an

20  insurance company.

21          MR. KELLY:  Thank you very much.

22          THE COURT:  Mr. Monroe.

23          MR. MONROE:  Good afternoon, sir.

24          Have the events of January the 6th or the days and

25  weeks later, did they have any direct impact on you, sir?

1          PROSPECTIVE JUROR:  Can you define "direct

2   impact"?

3          MR. MONROE:  Yeah, they changed your bike route or

4   where you went shopping or your work schedule.

5          PROSPECTIVE JUROR:  No.  The most inconsequential

6   thing would be, we would drive by where the fence is gone

7   inactive.  But it didn't change any route that I took.

8          MR. MONROE:  The fence is down now, right?

9          PROSPECTIVE JUROR:  It is.

10          MR. MONROE:  Thanks for speaking with me.

11          THE COURT:  Thank you, sir.  Mr. Douyon will show

12   you out of the courtroom.  Thank you.

13          Hi, sir.  How are you?

14          PROSPECTIVE JUROR:  Well.  Thank you.

15          THE COURT:  Feel free to remove your mask if you

16   wish.

17          You are juror 0709; is that right?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Okay.

20          You answered, looks like, six of these questions

21   yes, 6, 7, 8, 13A, 13C, and 18.

22          Let's start with 18, which is the question about

23   an instruction to avoid any news stories or commentary on

24   social media about this case.  And I had said that you'll be

25   instructed not to do so, not to follow any such news or not

1    to seek it out.  Can you tell us why you answered that

2    question yes?

3             PROSPECTIVE JUROR:  I work for *ABC News* and I see

4    everything.

5             THE COURT:  Well, when you say you see

6    everything --

7             PROSPECTIVE JUROR:  Whenever there's a January 6th

8    story, I get a report on it in my email.  I could delete it,

9    but I still see subject lines and video links and

10   everything.

11            THE COURT:  All right.

12            So if you got an email about this case, it sounds

13   like you would have the ability to delete it before you ever

14   read a word about it; is that right?

15            PROSPECTIVE JUROR:  Yes.

16            THE COURT:  Now, can I just ask, are you a

17   journalist at *ABC News* or in some other capacity?

18            PROSPECTIVE JUROR:  Yes.  And I was at the Capitol

19   on January the 6th.

20            THE COURT:  So when you say you were "at the

21   Capitol on January 6th," can you elaborate on that?

22            PROSPECTIVE JUROR:  I was there, I saw Ashli

23   Babbitt get her chest pumped and blood coming out her.

24   I saw the guys, men and women, smashing the windows.  I was

25   there.  I was in the Capitol.

1          THE COURT:  You were in the Capitol.  Okay.

2          So let me ask the obvious question, which is,

3   given that you were there that day, given what you observed

4   that day, do you think you could be fair and impartial in

5   this case?

6          PROSPECTIVE JUROR:  I would do my best.

7          THE COURT:  Okay.

8          And could you -- well, let me ask you:  When you

9   say do your best, is there any doubt in your mind that you

10  would not be able to be fair and impartial?

11         PROSPECTIVE JUROR:  I hope not.

12         I mean, I am giving you the right answer that

13  I know is the right -- I don't --

14         THE COURT:  Look, here's the thing.  I don't want

15  you to give me the right answer.

16         PROSPECTIVE JUROR:  Yeah, I understand that.

17         Yes, I would try my best.

18         THE COURT:  Okay.

19         So here's the other question, which is, look, you

20  were a firsthand observer of the things that happened that

21  day.  Do you recognize this defendant?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  Do you know anything about what he is

24  accused of doing?

25         PROSPECTIVE JUROR:  I don't believe so.

1          THE COURT:  All right.

2          PROSPECTIVE JUROR:  It may have come across my

3   email, but there's so many that I don't know.

4          THE COURT:  Okay.

5          And if the evidence is presented that differs from

6   your recollection of the events that you observed from that

7   day, could you put aside that recollection and focus solely

8   on the evidence that's presented in this courtroom?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  And -- all right.

11          Let's move back into the top of the list, which

12   is, were you or someone you know -- this is Question 6 --

13   physically present, and that's you.  Anyone else?

14          PROSPECTIVE JUROR:  My best friend is the

15   spokesperson for Capitol Police.

16          THE COURT:  Spokesperson for Capitol Police.

17   Okay.

18          And was that person here on that -- was on the

19   Hill that day?

20          PROSPECTIVE JUROR:  Correct.

21          THE COURT:  Okay.

22          Question 7 and 8 concerns news events, video,

23   I think we've heard that already.

24          13A concerns whether you know anybody in law

25   enforcement.  You just mentioned your friend.  Anybody else?

```
 1              PROSPECTIVE JUROR:  My brother-in-law is a cop.

 2              THE COURT:  Okay.  Can you tell us where?

 3              PROSPECTIVE JUROR:  Outside of Philadelphia.

 4              THE COURT:  And how long has he been a police

 5     officer?

 6              PROSPECTIVE JUROR:  Ten years.

 7              THE COURT:  The charge in this case is assaulting

 8     a police officer.  Do you think the fact that your brother

 9     is a police officer might --

10              PROSPECTIVE JUROR:  Brother-in-law.

11              THE COURT:  -- brother-in-law, excuse me, might

12     impact your ability to be fair to this defendant?

13              PROSPECTIVE JUROR:  I don't think so, no.

14              THE COURT:  Then Question 13C is whether anybody

15     has attended law school?

16              PROSPECTIVE JUROR:  Yeah, my spouse is a lawyer.

17              THE COURT:  Your spouse is a lawyer.

18              And has your spouse done any criminal work?

19              PROSPECTIVE JUROR:  No.

20              THE COURT:  All right.

21              Any objection from either side?

22              MR. MONROE:  Yes, Your Honor.

23              THE COURT:  It's not what I'm asking.

24              Any objection from either side?

25              MR. KELLY:  No.
```

         THE COURT:  All right.

         Sir, we're going to excuse you from service.
Thank you very much.

         All right.  So I'm going to exclude juror 0709,
I mean -- for the obvious reasons, which is that he was on
the Capitol that day, observed firsthand the events.  And
given the fact that he is in effect a percipient witness of
those events, I don't think it's proper to have him sit as a
juror in this case.

         All right.  Let's bring in the next juror.

         COURTROOM DEPUTY:  Good afternoon.  Juror 0471.

         THE COURT:  Hi, sir.  How are you?

         PROSPECTIVE JUROR:  Good.  Thank you.

         THE COURT:  Feel free to remove your mask if you
wish.

         You're juror 0471?

         PROSPECTIVE JUROR:  Yes.

         THE COURT:  All right.

         You answered four questions yes, starting with
Question 4.  That was the question of whether you recognize
any other potential jurors on the panel, courtroom staff, or
me?

         PROSPECTIVE JUROR:  I recognized another potential
juror, the gentleman who was just in here, as a member of
the media who works at *ABC News*.

1          THE COURT:  Okay.

2          And do you know that person personally or just by

3    virtue of --

4          PROSPECTIVE JUROR:  No, just from knowing his

5    reporting.

6          THE COURT:  Okay.

7          Question 7 asked, have you -- 7 and 8 are

8    essentially the same but just different ways of asking how

9    closely you follow media and viewed video of the events of

10   the January 6th.  Can you give us a sense of how frequently

11   you read stories or view videos about the events of

12   January 6th?

13         PROSPECTIVE JUROR:  I would say I'm an avid

14   consumer of news and current events.  So when the events are

15   in the news, I consume that media.  I've seen documentaries

16   about -- that have been produced about January 6th, PBS

17   specials, that sort of thing.

18         THE COURT:  Okay.

19         Would you characterize yourself as somebody that

20   sort of seeks out news about January the 6th?

21         PROSPECTIVE JUROR:  Not specifically about that

22   event.

23         THE COURT:  And given you're a consumer of news,

24   as you've just described, you've watched some documentaries.

25   Is there anything about that coverage and that exposure that

1  would cause you to think you couldn't be fair and impartial

2  in this case?

3          PROSPECTIVE JUROR:  No, I don't think so.

4          THE COURT:  And could you presume this defendant

5  to be innocent as you are required to do if you were called

6  as a juror?

7          PROSPECTIVE JUROR:  Yeah, absolutely.

8          THE COURT:  And if the government had failed in

9  its burden of proof of proving him guilty beyond a

10  reasonable doubt, any concern that you would not be able to

11  find him not guilty?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Any concern at all about the fact that

14  you've been exposed in terms of news that would cause you to

15  have your views of this case colored either for the

16  government or favorably to the defendant?

17          PROSPECTIVE JUROR:  No, I think I would be able to

18  separate everything that I've seen and watched and heard

19  from the specifics of this case, the defendant, and the

20  facts as they're presented.

21          THE COURT:  Okay.  Terrific.

22          Question 13B asked whether any member of the group

23  has served in the Armed Forces.  Can you tell us about that?

24          PROSPECTIVE JUROR:  My sister-in-law is a member

25  of the United States Coast Guard.

```
 1              THE COURT:  And can you just tell us how long she
 2    served?
 3              PROSPECTIVE JUROR:  Oh, I don't know how long she
 4    served.
 5              As long as I've known her.  I went to her
 6    promotion ceremony at the headquarters of the U.S. Coast
 7    Guard last summer here in D.C.
 8              THE COURT:  Government counsel, any questions?
 9              MR. KELLY:  Just one, Your Honor.
10              What is it that you do for a living?
11              PROSPECTIVE JUROR:  I have a new career.  As of
12    about a month ago, I work at a financial services company
13    called Crypto.com in the cryptocurrency space.
14              MR. KELLY:  And what do you do for them, anything
15    news related or anything like that?
16              PROSPECTIVE JUROR:  I am director of digital
17    grassroots mobilization.
18              MR. KELLY:  Okay.
19              And what did you do --
20              PROSPECTIVE JUROR:  It's a government affairs
21    role.
22              MR. KELLY:  Do you work with different government
23    agencies in that role?
24              PROSPECTIVE JUROR:  The department is essentially
25    a lobbying department.
```

1          MR. KELLY:  Okay.

2          And what did you do before your current position?

3     You said it's recent.

4          PROSPECTIVE JUROR:  I worked at a political

5     advocacy group around immigration and criminal justice

6     reform.

7          MR. KELLY:  Was that here in D.C.?

8          PROSPECTIVE JUROR:  It was both here in D.C. and

9     in San Francisco.

10         MR. KELLY:  Okay.

11         THE COURT:  Sir, can I just follow up?

12         PROSPECTIVE JUROR:  Yeah.

13         THE COURT:  In terms of your professional work,

14    do you have or have you lobbied?

15         PROSPECTIVE JUROR:  I'm not a lobbyist.  I'm not

16    registered as a lobbyist.

17         THE COURT:  Do you know people that work on

18    Capitol Hill?

19         PROSPECTIVE JUROR:  I do have friends who work on

20    Capitol Hill, yes.

21         THE COURT:  And were any of those friends present

22    for the events of January the 6th?

23         PROSPECTIVE JUROR:  They were not present.

24         THE COURT:  They were not.  Okay.

25         Anything about the fact that you have friends and

1    acquaintances who work on the Hill cause you to think you

2    couldn't be fair and impartial in this case?

3                PROSPECTIVE JUROR:  Again, I think I could

4    separate that from the facts of this case.  But like a lot

5    of people in D.C., I have friends who work in the Congress

6    or work on the Hill.

7                THE COURT:  Okay.

8                MR. KELLY:  Just one follow-up, Your Honor.

9                What were some of the -- what was the criminal

10   justice reform that you were lobbying for?

11               PROSPECTIVE JUROR:  At the state level, changes to

12   bail reform laws.

13               MR. KELLY:  Was it just at the state level or

14   did you also do federal lobbying?

15               PROSPECTIVE JUROR:  No federal lobbying.  State

16   level.

17               MR. KELLY:  So it was bail reform, law reform.

18               PROSPECTIVE JUROR:  Bail reform in certain states:

19   New York, Oklahoma, Louisiana, Arizona.

20               MR. KELLY:  Okay.

21               Anything in the District of Columbia?

22               PROSPECTIVE JUROR:  Nothing in the District.

23               MR. KELLY:  Thank you.

24               THE COURT:  Mr. Monroe.

25               MR. MONROE:  Sir, how long have you lived here in

1    D.C.?

2              PROSPECTIVE JUROR:  I went to undergrad here.

3    I moved to San Francisco for seven years.  I returned to

4    live here in 2020.

5              MR. MONROE:  Where did you attend undergrad?

6    What school did you attend?

7              PROSPECTIVE JUROR:  American University.

8              MR. MONROE:  Okay.  Thank you so much.

9              THE COURT:  All right, sir.  Thank you very much

10   for your time.  Mr. Douyon will show you out of the

11   courtroom.

12             PROSPECTIVE JUROR:  Thank you.

13             THE COURT:  Hi, sir.  How are you?

14             PROSPECTIVE JUROR:  Excuse me?

15             THE COURT:  I said "Hi, sir.  How are you?"

16             PROSPECTIVE JUROR:  Oh, I'm fine.  And you?

17             THE COURT:  I'm good.  Thank you.

18             Feel free to remove your mask if you wish for

19   present purposes.

20             All right.  You are juror 0818; is that right?

21             PROSPECTIVE JUROR:  That's right.

22             THE COURT:  All right.

23             You answered six of our questions, starting with

24   Question 5 and then 7, 8, and then 13B, C, and D.

25             So let's start with 5.  That asked whether you

1  live or work at or near the U.S. Capitol.  Can you tell us

2  about that?

3           PROSPECTIVE JUROR:  I live at the corner of 6th

4  and D Street, Northeast, near Stanton Park.  It's about five

5  blocks from the Capitol.

6           THE COURT:  How long have you been a resident of

7  Capitol Hill?

8           PROSPECTIVE JUROR:  Oh, since the mid 80s.

9           THE COURT:  All right.

10           And were you present at your house on January the

11  6th?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Did you -- what if -- can you tell us

14  what, if anything, you observed of the events of that day?

15           PROSPECTIVE JUROR:  Well, I avoided going to the

16  Capitol.

17           It wasn't just on the -- because I live there.

18  I mean, this was on television, radio.  It was pretty hard

19  to avoid.

20           THE COURT:  Right.

21           PROSPECTIVE JUROR:  So I was aware of it, but I

22  didn't go to -- I stayed away from the Capitol.

23           THE COURT:  Okay.

24           Maybe my question should have been more precise;

25  sorry about that.

1      When I say "observe," separate from any television

2  or media that you were following that day, anything that you

3  observed from your home about the events of that day?

4      PROSPECTIVE JUROR:  Well, sirens, of course,

5  people walking.

6      THE COURT:  I'm sorry?

7      PROSPECTIVE JUROR:  Sirens, people walking back

8  and forth, you know.

9      You know, it's --

10     THE COURT:  Right.  Got you.  Okay.

11     So does the fact -- this is obviously a case that

12  involves the events of January the 6th, you live on the

13  Capitol, have been a resident of Capitol Hill for some time.

14  Anything about the fact of your residency there that would

15  cause you to think you couldn't be fair and impartial?

16     PROSPECTIVE JUROR:  No.  I like living on the

17  Hill.  I've enjoyed it.

18     I think demonstrations and so forth are part of

19  the ambience of the District.  So, you know, this was

20  exceptional, to say the least, but that's pretty common.

21  And police sirens -- I live on 6th Street, which is a busy

22  street, so we have regularly -- the police use it and

23  ambulances to go to the hospitals.

24     THE COURT:  Okay.

25     So Question 7 concerns -- and Question 8 is

1   related -- your exposure to news, media, and videos about

2   the events of January the 6th.  Can you just describe for us

3   what your exposure has been?

4           PROSPECTIVE JUROR:  Mostly newspapers.

5           I don't watch a lot of TV news, but I do -- I

6   listen to the radio and so forth.

7           And I have friends that have followed this in a

8   lot more detail than I have and they're regularly sending

9   me -- with the media of today, they're sending me snippets

10  of things that they find particularly interesting.

11          THE COURT:  Okay.

12          And --

13          PROSPECTIVE JUROR:  I haven't made -- this isn't

14  like a big deal -- it wasn't a big deal to me in terms of

15  the actual event, to be honest with you.  I wasn't one of

16  the people that were watching it 24/7 on the news.

17          THE COURT:  Okay.

18          So it sounds like you're not an active person --

19  you're not actively seeking out news and information about

20  January 6th?

21          PROSPECTIVE JUROR:  Well, that's not exactly

22  accurate.

23          I worked as a reporter for years; I'm semi-retired

24  now.  I do follow news.

25          This isn't something that I do.  I write on

environmental issues, and I write on energy issues and oil
and gas issues and climate change issues.  I follow those
things in painstaking detail.  I don't follow events like
this, except this was so big.

THE COURT:  Okay.

And the snippets that you described your friends
sending you, are they typically news articles, are they
video, both?

PROSPECTIVE JUROR:  Both.

Well, when you have some guy wearing horns and
running through the Capitol, it's pretty -- not too big of a
surprise that someone's not going to try to make a copy of
that and send it to everybody they know.

THE COURT:  Right.

PROSPECTIVE JUROR:  So that's the kind of thing
I'm talking about.

THE COURT:  Okay.

PROSPECTIVE JUROR:  If you live here and you live
six blocks from the Capitol, you have to be living
underground someplace to not realize what's going on, you
know.

THE COURT:  Right.

So the question is, your exposure through the
media, through what your friends have sent you, do you think
you could still be a fair and impartial juror

1  notwithstanding what you've read and seen about those

2  events?

3          PROSPECTIVE JUROR:  Yes.

4          It depends upon -- I don't know how this is going

5  to be defined, so I don't really know that.  You seem to say

6  if -- I thought your introduction you gave was really very

7  helpful, because I was wondering exactly what we were doing.

8          If we're talking about somebody attacking a

9  policeman, that's one thing.  If we're talking about

10  somebody attacking the government, that's another thing.

11          And I gather, it's the way you put it, I would

12  have no problems in asking whether someone attacked a police

13  officer and to find out -- to determine whether that took

14  place or not.  That's one thing.  It would be different if I

15  was going to be asked to say -- to try to understand the --

16  I'm sorry to run on like this --

17          THE COURT:  That's okay.

18          PROSPECTIVE JUROR:  -- but to run on and -- an

19  attack on the Federal Government --

20          THE COURT:  Okay.

21          PROSPECTIVE JUROR:  -- that's a bigger question.

22  And I don't think that's what we're supposed to be doing.

23  So I thought if it was limited to the police --

24          THE COURT:  So let me just be precise.

25          And this case does not involve any charge accusing

1   this defendant of attacking the Federal Government or

2   impeding the processes of Congress or the government writ

3   large.  And so given that, do you think you would have any

4   trouble standing as a juror in judgment in this case?

5           PROSPECTIVE JUROR:  No.

6           THE COURT:  All right.

7           Let me just ask a few more questions.

8           In terms of the law, this defendant, even though

9   he is accused of events arising out of January the 6th, he

10  is presumed innocent at this point and will remain that way

11  throughout the trial until the government proves his guilt

12  beyond a reasonable doubt.

13          Would you have any trouble presuming this

14  defendant to be innocent?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Any trouble putting the government to

17  its burden of proving his guilt beyond a reasonable doubt?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  And if you determined that the

20  government had failed to meet its burden of proof and had

21  not proven his guilt beyond a reasonable doubt, any

22  trouble -- any reason to believe you would not be able to

23  acquit this gentleman?

24          PROSPECTIVE JUROR:  No.  I think that's the

25  government's burden.

1          THE COURT:  Okay.

2          Let's just turn to questions 13B, C, and D.

3    Question 13B concerned whether you know anybody in the armed

4    services.

5          PROSPECTIVE JUROR:  Oh, a good friend of mine's

6    son is a lifeline Marine.  We get together every now and

7    then.  He doesn't live around here anymore, but we still see

8    each other every couple of years, and I know his son quite

9    well.

10         THE COURT:  Okay.

11         13C asked whether any member of the group had

12    attended law school, worked as a lawyer, or worked in a law

13    office.

14         PROSPECTIVE JUROR:  My wife's -- two of my wife's

15    brothers are lawyers.  One teaches law and the other one is

16    a straight-ahead property lawyer.  The one that teaches law

17    has done some interesting work and he's sort of a friend.

18         THE COURT:  Okay.

19         And can you tell us -- let's stay with the

20    professor that -- excuse me, the brother-in-law that's a

21    professor, it sounds like.  Is he involved in the criminal

22    law at all?  Does he write in the criminal law, teach in the

23    criminal law space?

24         PROSPECTIVE JUROR:  Kind of.  But he's sort of

25    semi-retired now.  He's like me, he's getting up there in

1   years.  He makes more money than I do, so he can afford to

2   really retire.  He's in Maryland and he teaches in the law

3   school, but he's kind on permanent leave.

4         THE COURT:  To the extent that you've had

5   conversations with him about the law, in particular, the

6   criminal law, the justice system, would you be able to set

7   all that aside and follow the rules as I give them to you?

8         PROSPECTIVE JUROR:  Yes.  He's a friend.  He's not

9   a --

10         THE COURT:  Okay.

11         And Question 13C asked whether any member of the

12   group's been arrested for, charged with, or convicted of a

13   crime or been a victim of or a witness to a crime.

14         PROSPECTIVE JUROR:  This is -- most of my friends

15   have lived in D.C. for a long time.

16         THE COURT:  Right.

17         PROSPECTIVE JUROR:  So I've been mugged one time,

18   stolen from a couple times.

19         One friend of mine actually got stabbed going to

20   mail a letter at night.  So we live in Capitol Hill -- I've

21   lived in Capitol Hill for a long time and it's gone through

22   a number of changes over the years.  Now it's kind of a

23   little groovy little place but in the old days it was a lot

24   tougher.

25         THE COURT:  So either you or your friends have

1   been -- had sort of direct contact with the Metropolitan

2   Police Department, it sounds like.  Do you have any views

3   about the Metropolitan Police Department that you think

4   could cause you to be fair -- not be fair and impartial?

5               PROSPECTIVE JUROR:  No, no.  It's a tough job;

6   I feel their pain.  I get mad at them sometimes, but I

7   really think they have incredibly difficult jobs.

8               THE COURT:  Okay.

9               What about the Prosecutor's Office for the

10  District of Columbia, U.S. Attorney's Office?

11              PROSPECTIVE JUROR:  It had nothing to do with

12  them.

13              THE COURT:  All right.

14              Government counsel, any questions, follow-up

15  questions?

16              MR. KELLY:  Yes, Your Honor.

17              Good afternoon, sir.

18              Before you said -- without putting words in your

19  mouth -- that if this case was about attacking the police,

20  that's one thing, but if it's about attacking the

21  government, it's another.  Could you just elaborate a little

22  bit on what you meant by that?

23              PROSPECTIVE JUROR:  I don't -- we're going through

24  a difficult time in this country in terms of challenging the

25  election.  All of those kind of things.  That's what I was

1   trying to get at.

2          I have a bias.  I believe in America, this is

3   ridiculous to have this conversation, I'm sort of yelling at

4   you, but I have a bias in favor of our government.  So I

5   care about that.  So I have -- so if that was what this

6   trial was about, I don't think -- it's not, but I would have

7   a harder time with that, is all I'm really trying to say,

8   versus -- the act of attacking a police officer is very --

9   that's a concrete thing that can be measured.  The other

10  thing becomes much more political.  That's all I was trying

11  to say.

12         MR. KELLY:  Thank you.

13         And that makes a lot of sense.  So thank you for

14  elaborating.

15         So my follow-up question is, if there were

16  evidence in this case that the alleged assault on a police

17  officer actually, in some way, did obstruct that officer or

18  other officers from performing their duties at the Capitol

19  that day, up to and including protecting the building,

20  protecting members of Congress, if that sort of evidence

21  came into the case, would that impact your ability to remain

22  fair and impartial and consider all the evidence as it came

23  in?

24         PROSPECTIVE JUROR:  I'm not sure I exactly

25  understand the question.

1    MR. KELLY:  I guess I'm saying -- so we --

2 Judge Mehta told you that this case does involve -- I think

3 the exact words he said was, an assault of an officer with a

4 dangerous weapon on January 6th, 2021, at the U.S. Capitol

5 building.

6        THE COURT:  Counsel, can I just interrupt?

7        Sir, I think what government counsel is trying to

8 get at is that there may be proof and evidence in this case

9 that the alleged assault actually interfered with the duties

10 of the officer in protecting members of Congress and

11 carrying out his duties that day.  With the evidence

12 described in that way, would that change your view about

13 your ability to --

14        PROSPECTIVE JUROR:  No.

15        If the question is going to be defined of

16 attacking an officer, that is something that I think I could

17 measure.  If it's going to be defined as whether he was

18 obstructing his duties in some -- I mean, I don't know --

19 I don't even know quite -- I don't know -- it's hard to talk

20 about something that we're not actually -- I don't know what

21 it is, you know.

22        THE COURT:  If I could --

23        You're right, it's hard to know.

24        On the other hand, I think what we're trying to

25 just get at is you've defined some category of case that you

1  think you would have difficulty sitting in judgment of.  And

2  what we're simply saying is that there may be evidence in

3  this case that the alleged conduct of the defendant did

4  interfere with somebody's duties on that day.

5          Do you think that that kind of evidence would pose

6  difficulty for you in sitting in judgment in this case?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  All right.

9          Anything further?

10         MR. KELLY:  Just moving on to just a couple of

11 brief follow-ups then.

12         You mentioned, sir, that you are a reporter; is

13 that right?

14         PROSPECTIVE JUROR:  Right.

15         MR. KELLY:  Was that here in D.C.?

16         PROSPECTIVE JUROR:  Huh?

17         MR. KELLY:  Was that here in D.C.

18         PROSPECTIVE JUROR:  I worked for a publication --

19 Bloomberg bought it -- called Bureau of National Affairs.

20 I was a daily reporter covering environmental issues in

21 Congress.  I did that for years and years.  You guys should

22 know it as lawyers.  But so I worked for them.

23         Then I worked for a chemical science magazine

24 covering environmental issues and climate change and also

25 chemical plants that blow up, that kind of issue.

1     MR. KELLY:  And, sir, you mentioned that you are

2 semi-retired-retired.  Do you still work as a journalist?

3     PROSPECTIVE JUROR:  Yeah, I write for them every

4 now and then, but I don't do it all the time.

5     MR. KELLY:  And is that the same general subject

6 area that you --

7     PROSPECTIVE JUROR:  Yeah -- no, no.  Now it's

8 pretty much limited to chemical industry activities.

9     MR. KELLY:  Okay.

10     And then the last question is, you had mentioned

11 that you have followed some of what happened on January 6th;

12 your friends send you things, I think.  If you know, what

13 are some of the sort of typical news sources that you would

14 be getting that information from about January 6th?

15     PROSPECTIVE JUROR:  Oh, I guess CNN, really.  They

16 seem to be covering it more than anybody else.

17     I really don't -- I don't value news -- television

18 news reporting a lot.  I worked as a reporter for a long

19 time and I know some of the things they're driving at so

20 I don't really watch it very often.

21     MR. KELLY:  Understood.

22     PROSPECTIVE JUROR:  I read the newspapers.

23 I'm old-fashioned.

24     THE COURT:  Mr. Monroe.

25     MR. MONROE:  I have no questions for the juror.

1   Thank you, Judge.

2          THE COURT:  All right.

3          Sir, thank you very much.  Mr. Douyon will show

4   you out of the courtroom.

5          Counsel, again, I'll ask you to sort of limit the

6   biographical questions and sort of the follow-up on the

7   biographical questions.  As I said, it's now 2:30 and we've

8   got a long way to go.  So let's bring in the next juror.

9          MR. KELLY:  Yes, Your Honor.

10         THE COURT:  Hi, ma'am.  How are you?

11         PROSPECTIVE JUROR:  Good.  Thank you.

12         THE COURT:  Feel free to remove your mask if you

13  wish.

14         You are juror 0267; is that right?

15         PROSPECTIVE JUROR:  Yes, sir.

16         THE COURT:  Okay.

17         You answered five questions, 7, 8, 13B, C, and D.

18         So let's start with 7 and 8, which are related

19  questions about your media and video exposure to the events

20  of January the 6th.

21         Could you just generally describe for us how much

22  news and video evidence -- or video you've seen of those

23  days -- of the events of that day, excuse me?

24         PROSPECTIVE JUROR:  The day of, I work from home

25  because of COVID, so I had the news on that day, and it was

1    on all day.  And then after that for a couple of weeks

2    following, I paid close attention to what took place.  And,

3    you know, just in everyday updates that are provided via the

4    news.

5              THE COURT:  Okay.

6              So is it fair to say that you're not somebody

7    who's actively seeking out news about January the 6th.

8              PROSPECTIVE JUROR:  Not actively, no.

9              THE COURT:  Okay.

10             PROSPECTIVE JUROR:  But I'm involved in -- I watch

11   a lot of news just to keep up to date in what's going on,

12   you know, in general.

13             THE COURT:  Okay.

14             So you, like many people, follow the news, current

15   events, and you've read and seen things about that day.

16   Could you put all of that aside and evaluate the facts of

17   this case that are presented in this courtroom and put

18   everything you've learned outside the courtroom to the side

19   and judge this case?

20             PROSPECTIVE JUROR:  Yes, sir.

21             THE COURT:  Okay.

22             Can you just tell us what kind of -- where you

23   consume your news from; in other words, what the sort of

24   primary media sources you get your news from?

25             PROSPECTIVE JUROR:  Typically, it's MSNBC.  That's

1  pretty much it, actually.

2        THE COURT:  Okay.

3        So let's turn to 13B, C, and D.  13B asked whether

4  any member of your family or close, personal friends have

5  served in the Armed Forces.

6        PROSPECTIVE JUROR:  My father was in the Air Force

7  in the early '70s.  He got out, I think, in '74.

8        THE COURT:  Okay.

9        And was he -- can you tell us, do you know how

10 long he served in the Air Force?

11        PROSPECTIVE JUROR:  Just four years.  He was a

12 surgery technician.

13        THE COURT:  Okay.

14        Question 13C concerns whether any member of the

15 group's attended law school, worked as a lawyer, or worked

16 in a law office.

17        PROSPECTIVE JUROR:  My mom was a real estate

18 paralegal, and I, in fact, did that, too, out of college.

19        THE COURT:  Have you had any exposure to the

20 criminal law?

21        PROSPECTIVE JUROR:  Not criminal, no.

22        THE COURT:  All right.

23        Question 13D asked whether any member of the group

24 has been arrested for, charged with, or convicted of a crime

25 or been a victim of a crime or a witness to a crime.

1          Can you elaborate on that?

2          PROSPECTIVE JUROR:  Yes, unfortunately, in front

3   of all these people, I did.

4          THE COURT:  I'm sorry, say that again.

5          PROSPECTIVE JUROR:  Well, I got -- when I was 18

6   years old, I actually got a DUI.

7          THE COURT:  Okay.  That's all right.

8          PROSPECTIVE JUROR:  Let everyone know in here.

9          THE COURT:  We all do a lot of things when we're

10  young.

11         PROSPECTIVE JUROR:  20-something years ago, but

12  still, yeah.

13         THE COURT:  Anything about that experience that

14  might cause you to think you couldn't be fair to the

15  government in this case?

16         PROSPECTIVE JUROR:  No, sir.

17         THE COURT:  All right.

18         Any follow-up from the government?

19         MR. KELLY:  No, Your Honor.

20         THE COURT:  Mr. Monroe.

21         MR. MONROE:  Good afternoon.

22         So I take it, at least during the earlier stages

23  following January 6th, you stayed with the coverage?

24         PROSPECTIVE JUROR:  Yes.

25         MR. MONROE:  Did you actually witness yourself any

1  of the events either during or after January the 6th, the

2  actual participants?

3          PROSPECTIVE JUROR:  Witness?

4          MR. MONROE:  Any of the people that showed up for

5  January 6th, either going to the event or leaving or

6  actually there at the Capitol?

7          PROSPECTIVE JUROR:  No.

8          In fact, I can't recall a single person that I've

9  seen.  You know, if I were to see them in person, I wouldn't

10  be able to pick them out of a lineup or...

11          Just more so paying attention to what happened to

12  the Capitol and, you know, just the crowd itself, not

13  necessarily individual people.

14          MR. MONROE:  Is this what you're sharing that you

15  saw on TV, as opposed to in person?

16          PROSPECTIVE JUROR:  I did not -- I wasn't here in

17  person.  I worked from home that day and I had the TV on all

18  day and watched what was going on while I was at home.

19          MR. MONROE:  And what's your view or opinion as to

20  what had transpired on January 6 now that we're more than a

21  year away from the event?

22          PROSPECTIVE JUROR:  Well, it was shocking.  It was

23  shocking to see just the people climbing the walls.  And

24  that's just something I'd never seen before, and I think the

25  majority of us would agree that that was just unexpected.

1    So I think, you know, a peaceful rally is one
2  thing, but, you know.
3    MR. MONROE:  Well, now that you know you're
4  sitting on a criminal trial where one of the individuals
5  there that day are accused of various crimes and taking into
6  account your own personal experience, do you think you could
7  be a fair and impartial juror and weigh in on the facts and
8  not show any bias or prejudice to one side or the other?
9    PROSPECTIVE JUROR:  So I do know that not everyone
10  was climbing the walls and, you know, breaking through the
11  glass, and I do know that not everyone was doing that.
12    So, yes, I think so.  You know, I would have to,
13  you know -- every individual's story, I would imagine, is
14  different, and what they experienced that day.
15    THE COURT:  Okay.
16    Ma'am, just so you're aware, I don't expect there
17  to be any evidence in this case of anyone climbing the
18  walls, particularly this defendant, or engaging in any
19  property destruction, correct?
20    MR. KELLY:  That's correct, Your Honor.
21    THE COURT:  Okay.
22    All right.  Thank you.  Mr. Douyon will show you
23  out of the door.  Thank you very much.
24    COURTROOM DEPUTY:  Good afternoon.  Juror No.
25  1115.

```
 1              THE COURT:  Hi, sir.  How are you?

 2              PROSPECTIVE JUROR:  Hi.

 3              THE COURT:  You are juror 1115; is that right?

 4              PROSPECTIVE JUROR:  Yep.

 5              THE COURT:  Feel free to remove your mask if you

 6    are comfortable doing so.

 7              All right.  You have answered, looks like, six

 8    questions yes, 5, 7, 8, 10, and 13B and C.

 9              Why don't we start with 5, which asked whether you

10    live or work at or near the U.S. Capitol.  Can you tell us

11    about that?

12              PROSPECTIVE JUROR:  Yeah, I work in Cap Gallery.

13    No.  Sorry.  That's wrong.  Gallery Place - Chinatown area.

14    So right near the museums over there.

15              THE COURT:  I'm sorry, right near what?

16              PROSPECTIVE JUROR:  The museums.

17              So not far from the mall, but not quite --

18              THE COURT:  Okay.

19              So you work near the arena; you work in Penn

20    Quarter?

21              PROSPECTIVE JUROR:  Exactly.  Yeah.

22              THE COURT:  And so do you work -- you don't work

23    on Capitol Hill, correct?

24              PROSPECTIVE JUROR:  No.

25              THE COURT:  And do you live on Capitol Hill?
```

1          PROSPECTIVE JUROR:  No.

2          So it's relative, yeah.

3          THE COURT:  It's all relative, and it's not a big

4    town.

5          Okay.  So Question 7 and 8 are related, they ask

6    about your media and video exposure to the events of January

7    the 6th.  Can you just generally tell us to what extent

8    you've been exposed to media and video coverage of those

9    events?

10          PROSPECTIVE JUROR:  Generally during the

11   work-at-home period, I always had, like, the news on TV.

12          THE COURT:  I'm sorry, can you speak up?

13          PROSPECTIVE JUROR:  Generally during the

14   work-at-home period, I had the news on.

15          THE COURT:  Okay.

16          And can you tell us what sources from which you're

17   getting your news?

18          PROSPECTIVE JUROR:  Specifically what networks?

19          THE COURT:  Yes.

20          PROSPECTIVE JUROR:  I mean, it was usually MSNBC.

21          THE COURT:  Okay.

22          And so would you consider yourself somebody who's

23   actively seeking out news about January the 6th or someone

24   who views it if it happens to be on the television when

25   you're watching the news?

1          PROSPECTIVE JUROR:  I mean, it was relevant

2     because of where I live and various other reasons.  So I was

3     ingesting the news and it had my interest, yeah.

4          THE COURT:  All right.

5          So, you know, there's been some amount of media

6     coverage about those events, but the question for you is,

7     could you set aside what you've learned through watching the

8     news or reading the news and evaluate the evidence that's

9     presented in this case fair and impartially?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Okay.

12          And this defendant is presumed to be innocent.

13     Is that a presumption you could apply in this case?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And if the government, which bears the

16     burden of proving his guilt, failed to prove him guilty

17     beyond a reasonable doubt, is there any doubt in your mind

18     that you would be able to acquit the defendant?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  And you answered Question 10, which

21     says you have strong feelings or opinions about the events

22     that took place on the 6th, so we've talked about that a

23     little bit.

24          So let me ask you:  Can you tell us what it is

25     that you are concerned about or what may have caused you to

1   answer yes to Question 10 in terms of your concern about

2   whether you have -- whether you could sit fairly,

3   impartially in light of your opinions about that day?

4           PROSPECTIVE JUROR:  I mean, I formed opinions

5   about what the events were and what was behind them --

6           THE COURT:  Okay.

7           PROSPECTIVE JUROR:  -- and what the sentiments

8   were.  So -- and I'm sure that was somewhat formed by the

9   media to some extent.

10          THE COURT:  Sure.

11          And can you tell us whether you think you've

12  formed opinions about the people that were there on January

13  the 6th?

14          PROSPECTIVE JUROR:  Yeah, I didn't really want

15  them in town.

16          THE COURT:  Okay.

17          But beyond that general sense --

18          PROSPECTIVE JUROR:  And just the sense that their

19  politics were different from mine and that it would be

20  people causing trouble in town.

21          THE COURT:  Okay.

22          PROSPECTIVE JUROR:  That was my impression.

23          Like, for example, we didn't go into work on that

24  day.  Those of us who were allowed in the office, we still

25  stayed at home because we heard that something might happen.

1      THE COURT:  And so the fact that it sounds like

2  you were sort of impacted somewhat, you weren't able to go

3  to work that day, for example, do you think you could set

4  these opinions aside -- and, again, the question in this

5  case is the evidence in this case and whether this defendant

6  committed the offenses that he's accused of.  And so could

7  you focus on that question and be fair and impartial and sit

8  in judgment on that question and putting aside everything

9  that you've learned and thought about otherwise?

10      PROSPECTIVE JUROR:  Yes.

11      THE COURT:  Okay.

12      Question 13B and C asked whether you or any member

13  of that group has served in the Armed Forces.  Can you tell

14  us about that?

15      PROSPECTIVE JUROR:  My brother is in the Air

16  Force.  Well, Air Guard for the Navy, I believe that's what

17  it's called.

18      THE COURT:  I'm sorry?

19      PROSPECTIVE JUROR:  The air unit was in the Navy

20  he worked for.  Yeah, sorry.

21      THE COURT:  Oh, okay.

22      PROSPECTIVE JUROR:  And we're not that close, so I

23  don't know all the details.  I mean, we're family, but

24  I don't -- yeah.  He's retired from that job already, so...

25      THE COURT:  And so Question 13C asked about

1    attendance at law school, working as a lawyer, or working in

2    a law office.  Can you tell me about that?

3            PROSPECTIVE JUROR:  My sister was a paralegal for

4    a number of years.

5            THE COURT:  And during her time --

6            PROSPECTIVE JUROR:  Sorry.

7            And my parents both, like, worked as, like,

8    accountants in law firms, but that's really the extent of

9    it.

10           THE COURT:  And any of your relatives, did they

11   work for lawyers who did criminal work, to your knowledge?

12           PROSPECTIVE JUROR:  I don't know.

13           THE COURT:  Okay.

14           Any follow-up from the government?

15           MR. KELLY:  No, Your Honor.

16           THE COURT:  Mr. Monroe.

17           MR. MONROE:  Good afternoon.

18           PROSPECTIVE JUROR:  Hi.

19           MR. MONROE:  Everyone walks in the room with their

20   own set of political beliefs and views.  Obviously you've

21   been following the news, you understand the very general

22   narrative of the events of January the 6th.

23           And I know that you indicated that the folks who

24   came to town, at least from your standpoint, weren't

25   particularly welcome.

1             But now that you're sitting as one of the

2  potential judges of the facts, I have to ask you, let's

3  assume that Mr. Webster here, who you're going to have to

4  preside and judge, is either a Trump supporter or supports

5  Trump's policies.  Knowing that, sir, does that, in your

6  mind, without having heard any evidence, prevent you from

7  being a fair and impartial decider of the facts in this

8  case?

9             PROSPECTIVE JUROR:  No.

10           MR. MONROE:  You could set those strongly held

11  political beliefs that you have and judge this man fairly,

12  even though maybe you may not agree on some major political

13  topics?

14           PROSPECTIVE JUROR:  Yes.

15           MR. MONROE:  Thank you for speaking with me.

16           THE COURT:  All right, sir.  Thank you very much.

17  Mr. Douyon will show you out of the courtroom.

18           COURTROOM DEPUTY:  Juror 0269.

19           THE COURT:  Hi, ma'am.  How are you?

20           PROSPECTIVE JUROR:  Good.  Thank you.

21           THE COURT:  You are free, if you wish, to take

22  your mask off.  For present purpose, you can do that.

23  You are juror 0269; is that right?

24           PROSPECTIVE JUROR:  That's correct.

25           THE COURT:  You answered five questions, 7, 8, and

1　then 13A, B, and C.

2　　　　　So let's start with 7 and 8 and those questions

3　sort of relate to your exposure to the news media and videos

4　of the events of January the 6th.  Can you tell us a little

5　bit about your exposure, ma'am?

6　　　　　PROSPECTIVE JUROR:  Probably like everyone in

7　America, I watched those events unfold on television and

8　followed them kind of closely thereafter.

9　　　　　I would say that I read several in-depth articles,

10　watched -- typically if I see a link relating to a

11　prosecution or something relating to those events, I would

12　follow that link.

13　　　　　THE COURT:  Okay.

14　　　　　PROSPECTIVE JUROR:  So up until probably, like,

15　November of last year, I followed it relatively close.

16　　　　　THE COURT:  And it sounds like it's sort of

17　trickled off since November; is that right?

18　　　　　PROSPECTIVE JUROR:  Yeah, primarily just because

19　I haven't had time to view it.

20　　　　　THE COURT:  Yeah, sure.

21　　　　　So can I just ask, sort of what are your primary

22　sources from which you get your news?

23　　　　　PROSPECTIVE JUROR:  Typically reading the

24　*Associated Press* or maybe the nightly news, reading

25　*The Washington Post*, the *New York Times*.  Kind of a wide

1  variety of print and digital media.

2          THE COURT:  So, you know, most all Americans have

3  been exposed to the events of January the 6th in varying

4  degrees.

5          The question, though, in this case, is with

6  respect -- is whether this defendant is guilty of committing

7  the offenses that he's charged with.

8          Do you think you could put aside what you've read

9  and what you've seen about that day and judge the evidence

10  and the defendant based upon only the evidence that's

11  presented in the courtroom?

12          PROSPECTIVE JUROR:  I believe that I could.

13          THE COURT:  Any reason to doubt that you would not

14  be able to do so?

15          PROSPECTIVE JUROR:  No, I don't believe so, not

16  that I can think of.

17          THE COURT:  Okay.

18          And this defendant, like every defendant, is

19  presumed innocent.  Is that a presumption you would have any

20  trouble applying?

21          PROSPECTIVE JUROR:  No, it is not.

22          THE COURT:  And the government bears the burden of

23  proving guilt beyond a reasonable doubt.  And if you were to

24  determine that the government had not carried its burden, do

25  you think you would have any trouble in returning a

1   not-guilty verdict?

2          PROSPECTIVE JUROR: I do not.

3          THE COURT: Okay.

4          Let's turn to questions 13A, B, and C. First

5   question concerns whether you or anybody you know is in law

6   enforcement. Can you tell us about that?

7          PROSPECTIVE JUROR: I have siblings that work for

8   the -- for Customs and Border Protection.

9          THE COURT: Okay.

10          And anything about the fact that your siblings are

11   in law enforcement, any reason to think that would cause you

12   to not be fair and impartial in this case?

13          PROSPECTIVE JUROR: I don't think so.

14          THE COURT: And then Question 13B asked about the

15   Armed Forces. Can you tell us about any family members or

16   close friends in the Armed Forces?

17          PROSPECTIVE JUROR: One of my siblings that works

18   for CBP was also in the military, in the Army.

19          THE COURT: Okay.

20          And 13C asked whether any member of the group has

21   attended law school, worked as a lawyer, or worked in a law

22   office.

23          PROSPECTIVE JUROR: I have a sister-in-law that's

24   an attorney.

25          THE COURT: Can you tell us what kind of work she

1    does?

2          PROSPECTIVE JUROR:  She works for government, for,

3    like, Social Security Administration.

4          THE COURT:  Okay.  So she works for Social

5    Security.  She's not a government prosecutor, to your

6    knowledge?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Okay.

9          All right.  Any follow-up from the government?

10         MR. KELLY:  No, Your Honor.

11         THE COURT:  Mr. Monroe.

12         MR. MONROE:  No inquiry, Judge.

13         Thank you, sir.

14         THE COURT:  Thank you, ma'am.  Mr. Douyon will

15   show out of the courtroom.

16         PROSPECTIVE JUROR:  Thank you.

17         THE COURT:  We're going to go through one more

18   juror and then we'll take a break, okay?  Give our court

19   reporter a rest and everyone else.

20         COUTROOM DEPUTY:  Juror No. 0245.  Please have a

21   seat.

22         THE COURT:  Hi, ma'am.  How are you?

23         PROSPECTIVE JUROR:  I'm good.  How are you doing?

24         THE COURT:  Good.  Thank you.

25         Feel free to take your mask off if you'd like for

1  present purposes.

2          You are juror 0245; is that right?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  So you've answered several questions

5  yes, 7, 8, 10, 11, 12, 13A, 17, and 21.

6          So let's start with 21, which is this catch-all

7  question that asked whether there were any reasons that it

8  would make it difficult for you to be fair and impartial or

9  sit in judgment of another person.  Can you tell us about

10  that?

11          PROSPECTIVE JUROR:  Well, I try to be very

12  open-minded with a lot of things.  So that's really it.

13  Nothing too big.

14          THE COURT:  Okay.

15          So if -- as you've said, you try to be

16  open-minded.  Can you tell us why you answered yes to

17  question 21?

18          PROSPECTIVE JUROR:  Because with the state of

19  things -- I mean, I'm only 22 years old.  So as young as

20  I am, I try to look at things from a different perspective,

21  especially being born and raised here in D.C.  I feel like a

22  lot of things directly affect me personally in the city.

23  So, you know, when it comes to cases like that, it's like,

24  I've got to, like, really think, you know, about me

25  personally.

1          THE COURT:  Well, when you say you need to think

2     about you personally, how do you mean?

3          PROSPECTIVE JUROR:  Well, because I feel like as a

4     Washingtonian, especially an African-American here, when it

5     comes to different cases and things that happen, especially

6     this case specifically, it just makes me feel like, well, I

7     mean, I've got to think as a whole.  Like, how would I feel

8     if I was in that position or X, Y, Z, how I would feel if I

9     was in that position.

10          THE COURT:  In what position, if you were charged

11     or what do you mean in that position?

12          PROSPECTIVE JUROR:  Like if I was a witness, if

13     I was there.  If, like, the day that it happened, I had to

14     leave home from work.  Like, I had to leave work to go home

15     early, I feel like that affected me, and that's very

16     unfortunate.

17          THE COURT:  So can you just tell us at the time

18     where you worked and sort of how close it was to Capitol

19     Hill?

20          PROSPECTIVE JUROR:  So I was at the Trader Joe's

21     in Eastern Market.

22          THE COURT:  Okay.  So you worked on Capitol Hill

23     that day?

24          PROSPECTIVE JUROR:  Uh-huh.

25          THE COURT:  And so you were sent home that day

1  early; is that right?

2      PROSPECTIVE JUROR:  Yes.

3      THE COURT:  And so let me just sort of step back

4  and ask:  You were working on the Hill that day.  And how

5  much of those events did you see either personally or when

6  you got home on TV?

7      PROSPECTIVE JUROR:  So I saw a little bit of it

8  and I think I got to work around 3:00, 4:00.  And then,

9  like, I think, like, 10, 15 minutes later, they said that we

10 had to go home early.  So I feel like it was a waste of my

11 time.  And then getting an Uber home because of Metro.  And

12 then, like, the city happening to -- what was it?  I believe

13 there was a curfew.  I just felt like, I mean, I wasted time

14 and money and that's not fair.

15     THE COURT:  Yeah.

16     So you've just described the impacts that that day

17 had on you personally.  Let me ask you:  Do you think, given

18 those impacts, do you think you could sit fairly and

19 impartially in this case as a juror?

20     PROSPECTIVE JUROR:  No.

21     THE COURT:  Okay.

22     And even if you were instructed that this

23 defendant is presumed innocent and the government bears the

24 burden of proving guilt beyond a reasonable doubt, would you

25 have difficulty being fair to this defendant?

1    PROSPECTIVE JUROR:  I feel like if -- with the

2  evidence given, if it is -- if he is innocent, then I will

3  say that he is innocent; I would try to separate myself from

4  that.  But at the same time, seeing the events, seeing it on

5  all social media and things like that, it would be hard for

6  me to believe that he is innocent, yeah.

7    THE COURT:  Okay.

8    So let me just follow up on that.  I mean, you've

9  said a couple of things.

10    Look, you've consumed news by social media and

11  otherwise about that day.  But this case is not just about

12  what happened that day generally, it's about this defendant

13  and whether he did the acts that he's accused of.

14    And so the question is whether you could set aside

15  what else you've learned and view the evidence fairly and

16  impartially as to this defendant.  Is that something you

17  think you could do?

18    PROSPECTIVE JUROR:  No.  I'm not even going to sit

19  here and lie and say yes.

20    THE COURT:  All right.  Well, we appreciate your

21  candor.

22    All right.  Ma'am, we're going to excuse you from

23  service.  Thank you for coming down today.

24    PROSPECTIVE JUROR:  Yeah.

25    THE COURT:  Okay.  So it's -- let's take about

1  15 minutes and we'll resume a little bit after 3:05 and

2  we'll keep going.  So we've made far better progress in this

3  first half of the afternoon; hopefully it will continue.

4  Thanks, everyone.

5          COURTROOM DEPUTY:  All rise.

6          Court stands in recess.

7          (Recess from 2:53 p.m. to 3:10 p.m.)

8          COURTROOM DEPUTY:  All rise.  The Honorable

9  Amit P. Mehta again presiding.

10         THE COURT:  Please be seated, everyone.

11         Okay.  Everybody ready to proceed?

12         Okay.  Let's bring in our next juror.

13         COURTROOM DEPUTY:  Juror No. 0178.

14         PROSPECTIVE JUROR:  Correct.

15         THE COURT:  Hi, ma'am.  Good afternoon.  How are

16  you?

17         PROSPECTIVE JUROR:  Good afternoon.

18         THE COURT:  Feel free to take your mask off if you

19  feel comfortable doing so.

20         PROSPECTIVE JUROR:  Okay.  Great.

21         THE COURT:  All right.  You are juror 0178;

22  is that correct?

23         PROSPECTIVE JUROR:  Yes, it is.

24         THE COURT:  All right.

25         So you have answered four questions, 1, 8, 13B,

1 | and 13C.

2 | So let's start out with 1, which asked whether you
3 | know or heard anything about this particular case or
4 | Mr. Webster.

5 | PROSPECTIVE JUROR: I think it must have been just
6 | this morning as I was getting dressed, I had my television
7 | on, I wasn't watching the news, just in the background, and
8 | I did hear that jury selection or something, trial, was
9 | starting for a case related to January 6th events.

10 | THE COURT: Okay.

11 | Did you hear, as part of that news story, anything
12 | more than what you've just described?

13 | PROSPECTIVE JUROR: No, I did not.

14 | THE COURT: Okay.

15 | So nothing about the evidence that's expected to
16 | be presented or anything like that?

17 | PROSPECTIVE JUROR: No.

18 | THE COURT: Okay.

19 | Question 8 concerns video that you have viewed
20 | of -- and seen of the events of January the 6th. Can you
21 | tell us, just generally, how much exposure you've had to
22 | media and video coverage of the events of January the 6th?

23 | PROSPECTIVE JUROR: Well, I guess like most of the
24 | country, I was kind of watching, absolutely watching what
25 | was happening, unfolding at the Capitol on that day, as much

1  as the country and the world was watching, and just amazed

2  at what was happening.

3       THE COURT:  Okay.

4       And since then, have you actively sought out news

5  stories and video of the events of that day?

6       PROSPECTIVE JUROR:  Maybe shortly afterward.  But

7  I mean, that was like a year ago.  So my interest in,

8  I guess, has kind of faded, and I certainly haven't followed

9  it subsequent in the last nine months or so.

10       THE COURT:  So to the extent that you were exposed

11  to news stories and video of the events of that day, would

12  you be able to set all of that aside and focus on the

13  evidence as it's presented in this case and be fair and

14  impartial to this defendant?

15       PROSPECTIVE JUROR:  Yes, absolutely.

16       THE COURT:  Okay.

17       Question 13B and C.  13B asked whether any member

18  of the group had served in the Armed Forces.  Can you tell

19  us which branch, ma'am?  I'm sorry, can you tell us who and

20  which branch?  Excuse me.

21       PROSPECTIVE JUROR:  Okay.

22       So my sister and my brother-in-law, her husband,

23  served in the military.  This is back, Vietnam era.

24       THE COURT:  Okay.

25       PROSPECTIVE JUROR:  And I have other, like,

1    cousins that were military.

2          But I don't think I have any relatives now --

3    I know I don't have any relatives now currently in the

4    military.

5          THE COURT:  And can you tell us which branches of

6    the military your relatives have served in?

7          PROSPECTIVE JUROR:  My sister and her husband were

8    Army.  Cousins, Air Force.  One was Navy.

9          THE COURT:  Okay.

10          And then Question 13C asked whether any member of

11    the group has attended law school, worked as a lawyer, or

12    worked in a law office.

13          PROSPECTIVE JUROR:  I live in Washington where

14    there are millions of attorneys, and I have a number of

15    friends that are lawyers, judges.  But not -- the only

16    person that's in my family, that's considered a family

17    member is, I have a cousin who's an attorney, but the others

18    are just friends.

19          THE COURT:  Okay.

20          And so among those friends of yours and your

21    cousin, do any of those folks practice in criminal law, to

22    your knowledge?

23          PROSPECTIVE JUROR:  No.  Most of them are Federal

24    Government lawyers or --

25          THE COURT:  Do you know whether any of them might

1  be prosecutors?

2          PROSPECTIVE JUROR:  No, no, none of them are

3  prosecutors.

4          THE COURT:  Okay.

5          Any follow-up from the government?

6          MR. KELLY:  No, Your Honor.

7          THE COURT:  Mr. Monroe.

8          MR. MONROE:  No, sir.  Thank you.

9          THE COURT:  Ma'am, thank you very much.

10  Mr. Douyon will show you out of the courtroom.

11          PROSPECTIVE JUROR:  Okay.  Thank you.

12          THE COURT:  Hi, ma'am.  How are you.

13          PROSPECTIVE JUROR:  Good.  How are you?

14          THE COURT:  Good.  Thank you.

15          You are juror 0571?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And feel free to take your mask off if

18  you'd like for present purposes.

19          You answered two questions yes, Question 8 and 19.

20          Why don't we jump to 19, which was the hardship

21  question.  And so can you tell us what it is that would

22  cause a hardship or what would cause you a hardship?

23          PROSPECTIVE JUROR:  It's not necessarily a

24  hardship.  I have a scheduled medical exam on Wednesday

25  morning at 8:15.

1          THE COURT:  This Wednesday?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  And do you have a sense of how long

4     that exam will last?

5          PROSPECTIVE JUROR:  Possibly two hours.

6          THE COURT:  Okay.

7          So you think you could be back at the courthouse

8     by -- if you were selected, by what time?

9          PROSPECTIVE JUROR:  I would say no later than

10    12:30, 1:00, just in case it runs over.

11         THE COURT:  Okay.

12         And sorry to ask but is this an examination that

13    could be rescheduled or -- if you were selected?

14         PROSPECTIVE JUROR:  It's a neurology exam for

15    carpal tunnel.  So it took me, like, two months to schedule

16    this.

17         THE COURT:  All right.

18         All right.  Well, let's move forward, and we'll

19    certainly note your medical appointment.  And if you're

20    selected, we'll figure out what we need to do, okay?

21         PROSPECTIVE JUROR:  Okay.

22         THE COURT:  Question 8 concerns video evidence

23    or -- I shouldn't say evidence -- videos of what you've

24    seen -- that you've seen of the events of January the 6th.

25    Can you give us a sense of sort of the quantity of video

1    that you've watched of that day?

2           PROSPECTIVE JUROR:  It was initially just like the

3    day of while everything was going on.

4           THE COURT:  Okay.

5           And since then, have you read or -- read news

6    stories about that day?

7           PROSPECTIVE JUROR:  Every now and then if

8    something popped up, but not following anything.

9           THE COURT:  All right.

10          So any doubt -- or let me ask this:  Given what

11   you've seen, read about, would you have any trouble putting

12   that to the side and evaluating the evidence in this case as

13   it's been presented?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Okay.

16          Any follow-up from the government?

17          MR. KELLY:  No, Your Honor.

18          MR. MONROE:  Good afternoon, Ms. ███.

19          How far do you live from the Capitol?

20          PROSPECTIVE JUROR:  I live about 10 to 15 minutes

21   away from here, so I'm up in Northwest.  I'm nowhere near

22   the Capitol.

23          MR. MONROE:  Anything about January 6th or its

24   events had any direct impact on you or your immediate

25   family?

1          PROSPECTIVE JUROR:  No.

2          MR. MONROE:  Thank you for speaking with me.

3          PROSPECTIVE JUROR:  You're welcome.

4          THE COURT:  Thank you, ma'am.

5          Mr. Douyon will show you out of the door.

6          PROSPECTIVE JUROR:  Thank you.

7          THE COURT:  So let's just -- we'll qualify her.

8    And if we find ourselves in the fortunate circumstance where

9    we've qualified enough, we can drop her, given her medical

10   appointment, okay?

11         MR. KELLY:  Yes, Your Honor.

12         COURTROOM DEPUTY:  Juror 1543.

13         THE COURT:  Ma'am, how are you?

14         PROSPECTIVE JUROR:  Doing well.  Thank you.

15         THE COURT:  Feel free to take your mask off if you

16   feel comfortable doing so.

17         You are juror 1543; is that correct?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  All right.

20         You answered one question yes and that was

21   Question 8.  So let me ask you about that.  That was the

22   question concerning your exposure to video evidence or -- I

23   keep saying video evidence -- video of the events of January

24   the 6th.  Can you tell us a little bit about that?

25         PROSPECTIVE JUROR:  Just referring to the fact I

**-439-**

1  saw it on the news.  I actually watched it when it occurred.

2  So kind of what's been in the media is what I have seen.

3          THE COURT:  Okay.

4          And would you consider yourself someone who has

5  actively followed news stories about January 6th?

6          PROSPECTIVE JUROR:  Not on an individual basis.

7  I mean, as I'm engaged and watching the news, staying

8  abreast of current events, I see it, but I'm not spending

9  personal time investigating or researching, no.

10          THE COURT:  Okay.

11          Any reason you think you couldn't put aside what

12  you've seen and learned through the media and evaluate the

13  evidence as it's presented in this case?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Any reason to doubt that you could be

16  fair and impartial to this defendant?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  All right.

19          Let me just make sure:  Did you hear all of the

20  questions I asked?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Okay.

23          Government counsel.

24          MR. KELLY:  Just very quickly, Your Honor.

25          What do you do for a living?

1        PROSPECTIVE JUROR:  Say it again.

2        MR. KELLY:  What do you do for a living?

3        PROSPECTIVE JUROR:  I'm a freelance grant writer.

4        MR. KELLY:  And where do you work?

5        PROSPECTIVE JUROR:  For myself, from home.

6        MR. KELLY:  Oh, okay.  Thank you.

7        Do you do grant writing for any particular company

8    or is it just freelancing?

9        PROSPECTIVE JUROR:  For various nonprofit

10   organizations.

11       MR. KELLY:  Understood.  Thank you.

12       THE COURT:  Mr. Monroe.

13       MR. MONROE:  We're now more than a year since

14   January 6th.  What's your view of what transpired on that

15   day?  What's your take on things?

16       PROSPECTIVE JUROR:  What's my view.

17       I thought it was an unfortunate incident.

18   Actually, as I said, as I was watching it unravel -- or as I

19   watched it happening, I couldn't believe I was seeing what

20   I was seeing.

21       But I don't know beyond that what to say.

22       MR. MONROE:  Whatever you feel is appropriate.

23       How long have you lived in D.C?

24       PROSPECTIVE JUROR:  Well, I'm a native

25   Washingtonian.  I spent some time in California, but I've

1   been home now for almost 30 years.

2            MR. MONROE:  So you've seen your fair share of

3   protests in town, right?

4            PROSPECTIVE JUROR:  Yes.

5            MR. MONROE:  How far do you live from the Capitol?

6            PROSPECTIVE JUROR:  I live east of the river.

7   So I live in the other side of town.

8            MR. MONROE:  So did any of the events of

9   January 6th have any direct impact on you?

10           PROSPECTIVE JUROR:  No, not living or working

11  there.  So not in that sense, no.

12           MR. MONROE:  All right.  Thanks so much for

13  talking to me.

14           PROSPECTIVE JUROR:  Sure.

15           THE COURT:  Thank, ma'am.  Mr. Douyon will show

16  you out of the courtroom.

17           Sir, how are you?

18           PROSPECTIVE JUROR:  Good.  How are you?

19           THE COURT:  Good.

20           You are juror 0235?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Okay.

23           Feel free to take your mask off if you feel

24  comfortable doing so.

25           So you answered -- you put down no questions on

1    the notecard; is that right?

2         PROSPECTIVE JUROR:  Correct.

3         THE COURT:  Did you have any difficulty hearing or

4    understanding any of the questions?

5         PROSPECTIVE JUROR:  No.

6         THE COURT:  So just to be clear, have you watched

7    any video ever of what happened on January the 6th?

8         PROSPECTIVE JUROR:  I mean, I, like, actively do

9    not watch the news.  So, like, I've heard through friends,

10   you know, about it, so I'm not like unaware of the incident

11   that took place --

12        THE COURT:  Right.

13        PROSPECTIVE JUROR:  -- but I don't watch, like,

14   any news sources at all, like, randomly.

15        THE COURT:  Okay.

16        And if you're not watching news sources, what

17   about reading news sources, do you read any news source?

18        PROSPECTIVE JUROR:  Not really.

19        THE COURT:  And have you formed any opinions one

20   way or another about the events of January 6th?

21        PROSPECTIVE JUROR:  Just that it was like a

22   disturbance, you know, based on what I've heard from friends

23   and stuff.

24        But, you know, I haven't looked into it myself,

25   and, again, I haven't watched any news source or read up

1    about it, so I don't have a strong opinion about it.

2          THE COURT:  Any reason to think you couldn't be

3    fair and impartial to either side in this case?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  All right.

6          Anything from the government?

7          MR. KELLY:  No, Your Honor.

8          THE COURT:  Mr. Monroe.

9          MR. MONROE:  Sir, I saw on the notes that you're a

10    teacher?

11          PROSPECTIVE JUROR:  Yes, sir.

12          MR. MONROE:  What's your subject?

13          PROSPECTIVE JUROR:  I teach elementary physical

14    education.

15          MR. MONROE:  All right.

16          PROSPECTIVE JUROR:  So the little guys, yeah.

17          MR. MONROE:  What's the grade group?

18          PROSPECTIVE JUROR:  Pre-K through fifth grade.

19          MR. MONROE:  All right.  Thanks for talking to me.

20          PROSPECTIVE JUROR:  Uh-huh.

21          THE COURT:  All right, sir.  Thank you very much.

22    Mr. Douyon will show you out of the courtroom.

23          COURTROOM DEPUTY:  Juror No. 0210.

24          THE COURT:  Ma'am, how are you?

25          PROSPECTIVE JUROR:  Fine.  Thanks.

```
 1            THE COURT:  Feel free to take your mask off if
 2   you'd like during the questioning here.
 3            You are juror 0210; is that right?
 4            PROSPECTIVE JUROR:  Yes.
 5            THE COURT:  Okay.
 6            You've answered, it looks like, three of the
 7   questions, so 5, 8, and 10.  So let's talk about question 5
 8   which asked whether you live, work at or near the U.S.
 9   Capitol.
10            PROSPECTIVE JUROR:  I live about nine blocks.
11   I live off of Pennsylvania Avenue.  So nine blocks from the
12   Capitol.  I used to work at the Senate and House.  I do not
13   right now.
14            THE COURT:  I may not have heard you.  So you
15   currently live how far away from the Capitol?
16            PROSPECTIVE JUROR:  About nine blocks.  So within
17   a mile.
18            THE COURT:  Is that on the east side or the west
19   side of the Capitol?
20            PROSPECTIVE JUROR:  It is east side.
21            THE COURT:  East side.  Okay.  So toward the
22   river.
23            PROSPECTIVE JUROR:  I'm in Capitol Hill.
24            THE COURT:  So were you at home?
25            PROSPECTIVE JUROR:  I was, yeah.  I heard
```

1    everything, yeah, all the sirens and things.

2            THE COURT:  Okay.

3            So just real quick, because we have a court

4    reporter, it's hard for him to write things down when we

5    talk over one another.  So if you would just answer after

6    I'm done with my question, I'd appreciate it.

7            So you were at home that day, and I thought I

8    heard you say that you heard the events.

9            PROSPECTIVE JUROR:  Yeah.

10           THE COURT:  Did you observe them from your home?

11           PROSPECTIVE JUROR:  Other than -- I saw police

12   cars and such.  So obviously lots of -- there was

13   helicopters, everything.

14           THE COURT:  All right.

15           And so let me just ask, you've answered 8 as well,

16   which is that you watched video about what happened that

17   day.  Can you tell us about the extent to which you watched

18   video?

19           PROSPECTIVE JUROR:  Yeah, I watched afterwards

20   quite a bit.  I haven't watched -- you know, I haven't

21   followed things recently, but afterwards, I certainly did --

22           THE COURT:  Okay.

23           PROSPECTIVE JUROR:  -- everything with the

24   chambers.

25           THE COURT:  And then question 10 asked about your

**-446-**

1   feelings about what took place on January the 6th.

2           PROSPECTIVE JUROR:  Yeah, as I mentioned, I worked

3   at the Senate and House.  I have a lot of colleagues, former

4   colleagues, who worked -- still work in the House and

5   Senate.  Many, fortunately, were teleworking, but others

6   were in their buildings, not actually in the Capitol itself.

7   I know of people, but not friends.  You know, these are

8   former colleagues.

9           I work also, right now and did at the time, at the

10  Executive Office of the President, so the White House.  So

11  I have former colleague who worked for the Vice President at

12  the time.  So I have a lot of people that I know who are

13  very affected.  I personally, my profession for over 20

14  years, has been working for Senate, House, and the

15  White House.  So it's very personal to me.

16          THE COURT:  Sure.

17          So, look, you've been a Washingtonian for some

18  years and been involved in government, it sounds like, in

19  multiple capacities, and you've talked to people who were

20  either there that day or know people.

21          PROSPECTIVE JUROR:  Yeah.

22          THE COURT:  So do you think that that relationship

23  or those relationships would cause you to think you couldn't

24  be fair and impartial in this case?

25          PROSPECTIVE JUROR:  I do, yeah.  I do.

1          THE COURT:  And even if you were instructed that

2     you'd have to set aside your experiences and what happened

3     outside the courtroom and what you've learned outside the

4     courtroom, do you think you could do that?

5          PROSPECTIVE JUROR:  I think it would be extremely

6     hard, because of my profession, that I've lived for over

7     20 years, and working.  It personally affects me

8     significantly, what happened the day --

9          THE COURT:  All right.

10          Okay, ma'am, thank you very much for your time and

11     your honesty.  We'll dismiss you as a juror, thank you very

12     much.

13          Hi, ma'am, how are you?

14          PROSPECTIVE JUROR:  Hello.

15          THE COURT:  You are juror 1312; is that right?

16          PROSPECTIVE JUROR:  I am, yes.

17          THE COURT:  So feel free to remove your mask for

18     present purposes if you'd like.

19          You have answered five questions, 7, 8, 13A, B,

20     and D.

21          So let's talk about 7 and 8, they're sort of

22     related questions about how much you follow the events of

23     January the 6th in the media and the video you've seen of

24     the episode.  And I should just note, you've written here on

25     the card next to Question 7, "not closely but do follow."

1          So could you just tell us a little bit about that?

2          PROSPECTIVE JUROR:  Just when I see it on the

3 news, it's interesting, and that's about it.  I mean,

4 I don't do a whole lot more than that.

5          THE COURT:  Okay.

6          So is it fair to say that you don't actively seek

7 out stories about --

8          PROSPECTIVE JUROR:  Correct.

9          THE COURT:  Okay.

10          And would you be able to put aside whatever you've

11 either seen on the news or read in the media about those

12 events and evaluate the facts and the evidence in this case

13 as they're presented fairly and impartially?

14          PROSPECTIVE JUROR:  I think so.  I mean, I'm

15 pretty open-minded.

16          THE COURT:  I'm sorry, can you say that last part?

17          PROSPECTIVE JUROR:  I said, I feel like I'm pretty

18 open-minded.  So, yes, I'm very logical, so I can do that.

19          THE COURT:  Okay.

20          So let's turn to questions 13A, B, and D.

21          Question 13A asked whether you or anyone you know

22 personally, closely, is in law enforcement.

23          PROSPECTIVE JUROR:  Uh-huh.

24          THE COURT:  Can you tell a little bit about that?

25          PROSPECTIVE JUROR:  Was in law enforcement.

1          THE COURT:  Was.  Okay.

2          PROSPECTIVE JUROR:  My nephew.  He's the same one

3    that was in the military.  I think that was the second

4    question.

5          THE COURT:  Right.

6          PROSPECTIVE JUROR:  So I had two nephews in the

7    military and one who came back and was a cop for a brief

8    period, a few years, and he didn't like the way things were

9    moving and he got out.

10          THE COURT:  And can you tell us where he was a

11    police officer?

12          PROSPECTIVE JUROR:  Florida.

13          THE COURT:  And you said he was a police officer

14    for a short time; is that right?

15          PROSPECTIVE JUROR:  For a short time, yeah.  Few

16    years, three, four years, something like that.

17          THE COURT:  Anything about his experience as a

18    police officer that might make you think you wouldn't be

19    able to fairly and honestly assess a police officer's

20    testimony?

21          PROSPECTIVE JUROR:  Oh, no.

22          THE COURT:  And then you said you have two nephews

23    in the Armed Forces, including the one you just talked about

24    or have served in the Armed Forces.  Can you just tell us

25    which branches of the Armed Forces they served in?

```
 1              PROSPECTIVE JUROR:  The one who was in the Army,

 2   the one that became a cop, he was in the Army in Iraq.  And

 3   the other one is a pilot, Navy pilot.

 4              THE COURT:  And then 13D asked whether any member

 5   of the group has been arrested for, charged with, or

 6   convicted of a crime or been the victim of or a witness to a

 7   crime.

 8              PROSPECTIVE JUROR:  Me.  Victim.

 9              THE COURT:  I'm sorry, you?

10              PROSPECTIVE JUROR:  Victim.

11              THE COURT:  And I hate to pry, but can you tell us

12   a little bit about that?

13              PROSPECTIVE JUROR:  Sexual assault and kidnapping.

14              THE COURT:  Okay.  Sorry to hear that.

15              Was there an arrest following that incident?

16              PROSPECTIVE JUROR:  No.

17              THE COURT:  No.  All right.

18              Anything about that incident that could cause you

19   to think you couldn't be fair in this case?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  All right.  Thank you, ma'am.

22              Anything from the government?

23              MR. KELLY:  Yes, Your Honor.

24              Good afternoon.

25              The crime that you said that you were a victim of,
```

1 did that happen here in D.C. or somewhere else?

2          PROSPECTIVE JUROR:  No.  Somewhere else.

3          MR. KELLY:  Not in D.C.

4          Earlier you said that your nephew, I think,

5 stopped being a police officer because he didn't like the

6 way things were moving.  Could you just elaborate on what

7 that is?

8          PROSPECTIVE JUROR:  I think, you know, when -- it

9 was pre-pandemic, but he could just see the writing on the

10 wall with all the cameras and everything, and he just -- you

11 know, he felt like people were viewing cops in a way that

12 would eventually be problematic for him.  He just didn't

13 want to deal with it.

14          MR. KELLY:  Okay.

15          Did you and him discuss those concerns a lot or

16 was there --

17          PROSPECTIVE JUROR:  No.  I mean, I don't see him

18 that often.  I got it more from my brother, his father.

19          MR. KELLY:  Okay.

20          And then last question is, you mentioned that you

21 follow some in passing in the news about what happened on

22 January 6th.  What are some of the typical sources where you

23 would get that news?

24          PROSPECTIVE JUROR:  What sources?

25          MR. KELLY:  Yeah.

```
 1                PROSPECTIVE JUROR:  I watch the evening news,
 2    usually CBS, PBS, and BBC.
 3                MR. KELLY:  Okay.
 4                PROSPECTIVE JUROR:  And Washington Post.
 5                MR. KELLY:  Thank you very much.
 6                THE COURT:  All right.  Mr. Monroe.
 7                MR. MONROE:  No inquiry, Judge.  Thank you.
 8                THE COURT:  Thank you, Mr. Monroe.
 9                All right, ma'am.  Mr. Douyon will show you out of
10    the courtroom.
11                PROSPECTIVE JUROR:  Thank you.
12                THE COURT:  Hi, sir.  How are you?
13                PROSPECTIVE JUROR:  Good.  How are you?
14                THE COURT:  Good.  Thank you.
15                You are juror 0030?
16                PROSPECTIVE JUROR:  Yes.
17                THE COURT:  And feel free to remove your mask if
18    you'd like for present purposes.
19                You have answered five questions, 7, 8, 13A, B,
20    and C.  So let's talk about 7 and 8 together.
21                And so those ask about your sort of media exposure
22    and exposure to videos concerning the events of January the
23    6th.  Can you tell us a little bit about that?
24                PROSPECTIVE JUROR:  Sure.
25                Yeah, I mean, I follow the news pretty closely.
```

1    So just the coverage from normal media services, *New York*

2    *Times*, *Washington Post*.  I live in town, so it's sort of

3    local news.

4                   THE COURT:  Okay.

5                   And would you say that you sort of follow the news

6    concerning January 6th any more closely or regularly than

7    you would any other topics of the news?

8                   PROSPECTIVE JUROR:  No, not at the moment, no.

9                   Immediately after the events, I would say so, but,

10   I mean, they were leading headlines for months, but now

11   we're over a year out, so not so much anymore.

12                  THE COURT:  Okay.

13                  And would you be able to set aside anything that

14   you've read or seen about those events and evaluate the

15   evidence fairly and impartially in this case?

16                  PROSPECTIVE JUROR:  Yes.

17                  THE COURT:  Questions 13A, B, and C.

18                  13A concerns whether you or anybody in that group

19   is a member of or was a member of law enforcement.  Can you

20   tell us about that?

21                  PROSPECTIVE JUROR:  Sure.

22                  My stepfather is a retired lieutenant for my

23   hometown.

24                  THE COURT:  I'm sorry, lieutenant where?

25                  PROSPECTIVE JUROR:  In the City of Fayetteville,

1   North Carolina.

2           THE COURT:  In North Carolina?

3           PROSPECTIVE JUROR:  Yeah, he was a lieutenant in

4   the police force there.

5           THE COURT:  I'm sorry, it was your stepfather, you

6   said?

7           PROSPECTIVE JUROR:  Yes.

8           THE COURT:  And so given your relationship with

9   your stepfather, you know, there obviously will be law

10   enforcement testimony in this case, do you think your

11   relationship with your stepfather would impact your ability

12   to evaluate law enforcement testimony favorably or

13   unfavorably?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Question 13B concerns whether any

16   member of the group had served or is serving in the Armed

17   Forces.

18           PROSPECTIVE JUROR:  Yeah.

19           THE COURT:  Can you tell us about that?

20           PROSPECTIVE JUROR:  Yeah, both my grandfathers,

21   one was in the Navy, the other one was in the Air Force,

22   obviously, but retired now.

23           THE COURT:  And then Question 13D concerned --

24   excuse me, 13C concerned attendance in law school, working

25   as a lawyer, or working in a law office.

```
 1              PROSPECTIVE JUROR:  Yeah, one of my good friends,
 2    he lives in town with me and he is a lawyer, yes.
 3              THE COURT:  And does that friend of yours, does he
 4    do any kind of criminal work, to your knowledge?
 5              PROSPECTIVE JUROR:  No, he does not.
 6              THE COURT:  All right.
 7              Any follow-up from the government?
 8              MR. KELLY:  No, Your Honor.
 9              THE COURT:  Mr. Monroe.
10              MR. MONROE:  I see in the paperwork you're an
11    accountant by trade?
12              PROSPECTIVE JUROR:  Yes.
13              MR. MONROE:  What type of accounting work do you
14    do?
15              PROSPECTIVE JUROR:  I do corporate accounting for
16    a publicly traded company here in town.
17              MR. MONROE:  Thanks so much, sir.
18              THE COURT:  All right, sir.  Thank you.
19    Mr. Douyon will show you out of the courtroom.
20              Hi, ma'am.  How are you?
21              PROSPECTIVE JUROR:  Good.
22              THE COURT:  You are juror 1216?
23              PROSPECTIVE JUROR:  Yes.
24              THE COURT:  And feel free to remove your mask if
25    you'd like while you're being questioned.
```

1          So you answered three questions yes, 8, 11, and

2    13B.

3          So let's start with 8 and that is question about

4    how much video you have watched of the events of January the

5    6th.  Can you give us a sense of that, please?

6          PROSPECTIVE JUROR:  I'm like most people, when

7    it happened, it was on the news, Instagram, on YouTube.  So

8    in the height of all of it, that's when I was watching.

9          But I kind of like tailed off, so I haven't been

10   really focusing on it after -- like, stuff like this, I just

11   haven't been paying attention after the height of it gone

12   away from the news and stuff like that.

13         THE COURT:  Thank you.

14         Do you think, if you were selected to serve, that

15   whatever you saw back then and maybe in the immediate

16   aftermath is something you could put aside and focus on the

17   evidence as it's presented in this case?

18         PROSPECTIVE JUROR:  Yes, because some people did

19   what they did and some people didn't.  So I don't know this

20   individual, so I don't know where that person was during all

21   that.  So yeah.

22         THE COURT:  Question 11 asked whether you have

23   such strong feelings about former-President Trump or his

24   supporters that would make it difficult for you to be fair

25   and impartial in this case.  Can you tell us why you

1  responded yes to that question?

2       PROSPECTIVE JUROR:  Just for being a black woman,

3  at that period of him being President, I just felt unsafe.

4  So it's just the environment it was creating for a person

5  like me.

6       So that's why the question was a little hard for

7  me.  That's why I said yes, because, for me, it just made me

8  feel unsafe.  So I didn't know if that was a -- can be a

9  bias or whatever, but that was the reason why I said yes.

10      THE COURT:  Yeah.

11      No, I appreciate you telling us that.  I think the

12 question is, you know, a lot of -- or -- a lot of people

13 have views about the current President, views about the

14 former President, and that's understandable.  I think the

15 question for you, though, is, would those views and how you

16 felt impact your ability to be fair and impartial in this

17 case?

18      PROSPECTIVE JUROR:  No, because that individual

19 has not put -- hasn't impacted me personally.  Like that's

20 why I say, the environment that was being created during his

21 presidency.  So, you know, that individual didn't personally

22 attack me or find me in the streets or nothing like that or

23 whatever.  But the environment of whatever he was creating

24 as a whole made me feel unsafe.

25      THE COURT:  Okay.

1          And if you were to learn during this trial that

2     the defendant was a supporter of the former President, maybe

3     believed in the former President's policies and politics, do

4     you think you could still judge him fairly?

5          PROSPECTIVE JUROR:  Everyone has their beliefs and

6     their stance in this world as much as I do.  And I don't

7     want nobody to think I am less than or evil for them.

8          So if that individual felt strongly about him that

9     this is why -- as much as I feel about him as well, we both

10    two different people, we live two different type of lives.

11    But I can't expect him to understand where I'm coming from

12    and vice versa.  So I believe I can, but, you know, again,

13    we're two different people, so I'm seeing him as -- this

14    individual as that person and what that person has done.

15          THE COURT:  Okay.

16          All right.  And then 13B asked whether any member

17    of your close, personal friends or family or perhaps

18    yourself has ever served in the Armed Forces?

19          PROSPECTIVE JUROR:  My brother-in-law served in

20    the military.

21          THE COURT:  Served in the military?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  And can you tell us which branch?

24          PROSPECTIVE JUROR:  The ones that's home base.

25    The ones that they at home, they stay at home when war

1    happens.  What do they call it?  I don't remember.

2         I don't remember.

3         THE COURT:  That's okay; we won't tell your

4    brother-in-law.

5         All right.  Any follow-up from the government?

6         MR. KELLY:  No, Your Honor.

7         THE COURT:  Mr. Monroe.

8         MR. MONROE:  Good afternoon.  I represent the

9    defendant, Mr. Webster.  I was listening closely about your

10   concerns about your safety as these things were unfolding.

11   But now we're more than a year later and --

12        THE COURT:  Mr. Monroe, I'm sorry to interrupt

13   you.  Just to be clear, I think she was talking about her

14   safety as to that era of that presidency, not specific to

15   January 6th.

16        MR. MONROE:  Is that true?

17        PROSPECTIVE JUROR:  Correct, yes.

18        MR. MONROE:  Then I'm going to sit down.

19        THE COURT:  All right.  Thank you very much,

20   ma'am.

21        Oh, I'm sorry.  Mr. Douyon will show you out of

22   the courtroom.  Thank you.

23        Hi, sir.  How are you?

24        PROSPECTIVE JUROR:  I'm well.  How are you?

25        THE COURT:  Good.  Thank you.

1          You are juror 0625?

2          PROSPECTIVE JUROR:  Correct.

3          THE COURT:  And feel free to remove your face

4   mask -- or your mask if you like while we're chatting here.

5          So taking a look at your card, you've got a

6   number -- quite a few numbers on here, but let me make sure

7   I understand how you've done this.  There are five numbers

8   that are circled and then four numbers that are not.  So

9   did you answer yes to all of the numbers regardless of

10  whether they were circled?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  All right.  So --

13         PROSPECTIVE JUROR:  I got tired of circling them

14  toward the end.

15         THE COURT:  All right.  I wanted to make sure.

16         PROSPECTIVE JUROR:  13 had A, B, and C.

17         THE COURT:  Got you.  Okay.

18         All right.  Let's start, you've answered 6, 7, 8,

19  10, 11, 13A, C, and D, and then 19.

20         So let's start with 19, which is the hardship

21  question.  Can you tell us how serving would cause a

22  hardship for you?

23         PROSPECTIVE JUROR:  Well, mostly for the teams I'm

24  working with.  This week, I have meetings every day with

25  analysts that are in Dallas and Atlanta.  And my job is with

**-461-**

1    the Government Accountability Office to facilitate teams of

2    investigators to synthesize the research they've collected

3    and start to turn it into a report.  And so I kind of

4    specialize in this technique for doing that, and I have

5    meetings scheduled every day of the week for this team.

6              THE COURT:  Okay.

7              And if you were unable to -- if you were selected

8    and unable to attend those meetings -- or let me put it

9    differently.  Would you be able to reschedule those meetings

10   until either after your jury service concluded for the day

11   or could those meetings be delayed until after the

12   conclusion of jury service?

13             PROSPECTIVE JUROR:  They would have to be

14   rescheduled for after jury service, yeah.

15             THE COURT:  Okay.

16             PROSPECTIVE JUROR:  And then that would then push

17   out the time frame for them getting their document through

18   the report and review process.

19             THE COURT:  All right.  So it won't surprise

20   you --

21             PROSPECTIVE JUROR:  It is what it is, you know.

22             THE COURT:  Yeah.

23             PROSPECTIVE JUROR:  I work for the government, so

24   they understand jury service.

25             THE COURT:  Right.  Okay.

1          Well, I appreciate that.

2          And you'll understand that.

3          PROSPECTIVE JUROR:  My colleagues may not; they'll

4    be bummed.

5          THE COURT:  Okay.

6          So let's go back to the top here, and Question 6

7    asked whether you or someone you know was a participant in

8    or physically present as a witness to the events of

9    January 6th.

10          PROSPECTIVE JUROR:  I thought that was the

11    question about the proximity of living on Capitol Hill and

12    near the Capitol.

13          THE COURT:  Yeah, so that was Question 5, which

14    asked whether you live or work at or near the U.S. Capitol.

15          PROSPECTIVE JUROR:  I got those flip-flopped.

16          It's 5, not 6.

17          THE COURT:  Okay.

18          And can you tell us whether you work at the

19    Capitol or near the Capitol or live there?

20          PROSPECTIVE JUROR:  Well, technically I work for

21    the Congress.  The Government Accountability Office is the

22    research arm of the Congress.  90 percent of our work is

23    done at their request.  They initiate our investigations and

24    tell us what to review.  So we're working with Congress all

25    the time.

1          I also coach Capitol Hill Little League, and so

2    I have lots of players, fellow coaches, parents that live on

3    Capitol Hill.

4          My ex-mother-in-law and my kids' grandmother is a

5    member of Congress and was in the Capitol that day.

6          THE COURT:  Your kids' grandmother, you said?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Okay.

9          So, look, you've got pretty deep ties to Capitol

10   Hill.

11         And let me, before I continue, let me ask, your

12   work for the GAO, does that require you to communicate

13   directly with either members of Congress or Hill staffers?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  And do you know people personally who

16   were on the Hill, either in the Capitol building or

17   elsewhere, on January the 6th?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  And have you spoken to them about the

20   events of that day?

21         PROSPECTIVE JUROR:  A few of them.  Mainly my

22   children's grandmother.

23         THE COURT:  Okay.

24         PROSPECTIVE JUROR:  Like I said, it's kind of

25   weird to say ex-mother-in-law.  I'm divorced from her

1  daughter, so she's my ex-mother-in-law.

2       THE COURT:  And can you tell us, the

3  ex-mother-in-law, your children's grandmother, whether she's

4  on the House or Senate side?

5       PROSPECTIVE JUROR:  She's a member of the House.

6       THE COURT:  She's a member of the House.

7       And is she on the January 6th Committee?

8       PROSPECTIVE JUROR:  She is not.

9       THE COURT:  She is not.  Okay.

10      And have you spoken to her about her experiences

11 that day?

12      PROSPECTIVE JUROR:  Shortly after it happened,

13 yes.

14      THE COURT:  So, look, putting all of this

15 together, all of your exposure to the Hill, people you know,

16 do you think you could be fair and impartial as a juror in

17 this case?

18      PROSPECTIVE JUROR:  Yes.

19      THE COURT:  Okay.

20      So you think you could put aside all of that

21 conversations you've had with people you know, your

22 mother -- ex-mother-in-law, and still be fair and impartial

23 to this defendant?

24      PROSPECTIVE JUROR:  I would just be looking at the

25 evidence before the Court in this particular case.

**-465-**

1         THE COURT:  Okay.

2         PROSPECTIVE JUROR:  I mean, if -- I can tell you

3    I was pretty upset that day.

4         THE COURT:  Okay.

5         Do you think that -- and, look, people have had

6    various reactions to what happened on January the 6th.

7    Do you think your reaction to that day would carry over and

8    affect your view of the evidence in this case and prevent

9    you from being fair and impartial?

10         PROSPECTIVE JUROR:  You know, honestly, I can't

11    say because I don't know what the evidence is.

12         THE COURT:  Okay.

13         PROSPECTIVE JUROR:  Yeah, I mean.

14         THE COURT:  So the defendant in this case is, by

15    law, presumed innocent.

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  And that presumption stays with him

18    throughout the trial unless and until the government proves

19    him guilty beyond a reasonable doubt.

20         Is the mere fact that he's charged with an offense

21    arising out of January the 6th, do you think that -- would

22    you have trouble presuming him innocent of those charges?

23         PROSPECTIVE JUROR:  No, not necessarily.

24         I mean, I'm a former academic and college-debate

25    judge, and so we're constantly able to compartmentalize and

1  set things aside and put principle over personal feelings.

2        THE COURT:  And if you were to conclude that the

3  government had not carried its burden of proof in this case,

4  do you think you would have any difficulty in returning a

5  not-guilty verdict?

6        PROSPECTIVE JUROR:  No.

7        THE COURT:  All right.

8        So questions 10 and 11 are a little bit related.

9  We've talked about, a little bit already, your feelings and

10  opinions about what happened at the Capitol.

11        Question 11 concerns your feelings about the

12  President, the former President and his supporters.

13        So let me ask -- a lot of folks have, you know,

14  feelings and views about politics, the current President,

15  the former President, those aren't at issue here.  And so do

16  you think you would be able to put aside those feelings and

17  views --

18        PROSPECTIVE JUROR:  I'm sorry, did you say "those

19  are"?

20        THE COURT:  They are not at issue here.  They are

21  not at issue here.

22        And do you think you would be able to set that

23  aside and view the evidence fairly and impartially in this

24  case?

25        PROSPECTIVE JUROR:  Sure.

1      THE COURT:  Okay.

2      PROSPECTIVE JUROR:  That's less important, my

3 feelings about the former President, than the other things I

4 would be setting aside in terms --

5      THE COURT:  And if you were to learn in this case

6 that the defendant was a supporter of the former President,

7 agreed, perhaps, with his views and policies, et cetera, do

8 you think that would cause you any trouble in being fair and

9 impartial toward him in this case?

10      PROSPECTIVE JUROR:  I spent lunch thinking about

11 that, because I assume he's a Trump supporter.  But, no, I

12 could, you know, again, do my role as a juror and look at

13 the facts that are presented in the courtroom.

14      THE COURT:  All right.

15      Let's turn to Question 13A, C, and D.

16      13A asked whether you know anyone in law

17 enforcement.

18      PROSPECTIVE JUROR:  Yes.

19      THE COURT:  And can you tell us who that might be?

20      PROSPECTIVE JUROR:  How long do you have?

21      THE COURT:  All right.  Well, let me narrow it

22 then perhaps.

23      Do you know any members of the Capitol Hill

24 police?

25      PROSPECTIVE JUROR:  I know one.

1          THE COURT:  And how close --

2          PROSPECTIVE JUROR:  I coach Little League with

3     him.

4          THE COURT:  And was that friend of yours or

5     co-coach on the Hill that day?

6          PROSPECTIVE JUROR:  He was, but not at the

7     Capitol.  I mean, not -- he was later mobilized there, but

8     he wasn't kind of in the thick of things, so to speak.

9          THE COURT:  Okay.

10         Anything about your relationship or friendship

11    with him that would cause you to think you couldn't be fair

12    to this defendant?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  And do you think you would have

15    trouble returning a not-guilty verdict and then sort of

16    talking to him and being in his presence if you were to

17    think that a not-guilty verdict was the correct verdict?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Any friends or close family members

20    who are members of the Metropolitan Police Department?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  How about the FBI?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Okay.

25         Any other local law enforcement that I haven't

1  mentioned already?

2          PROSPECTIVE JUROR:  They're all in other states.

3          THE COURT:  In other states, all right.

4          Anything about the fact -- it sounds like you know

5  a fair amount of people in law enforcement.  You know,

6  I will instruct you that the testimony of law enforcement

7  officers should not be given any greater or lesser weight

8  just by virtue of the fact that the person is a law

9  enforcement officer.  Do you think you can follow that

10  instruction?

11          PROSPECTIVE JUROR:  Absolutely.

12          THE COURT:  And could you fairly and honestly

13  evaluate the testimony of a law enforcement officer

14  notwithstanding your relationships with other people in law

15  enforcement?

16          PROSPECTIVE JUROR:  Yeah, sure.

17          THE COURT:  Okay.

18          Question 13C concerns whether any member of the

19  group has attended law school, worked as a lawyer, or worked

20  in a law office.

21          PROSPECTIVE JUROR:  It's D.C.; I know a few

22  lawyers.

23          THE COURT:  Right.

24          So among the lawyers that you know, are any of

25  them doing criminal work, to your knowledge?

1              PROSPECTIVE JUROR:  No.  Actually, no.

2              THE COURT:  Okay.

3              So no one you know is either a prosecutor or a

4    defense lawyer?

5              PROSPECTIVE JUROR:  Definitely not a prosecutor.

6    I'm hesitating on the criminal defense, but I don't think

7    so.

8              THE COURT:  Okay.  That's fine.

9              Question 13D then asked whether any member of the

10   group has been arrested for, charged with, or convicted of a

11   crime or been a victim of or witness to a crime.  Can you

12   tell us about that?

13             PROSPECTIVE JUROR:  I've had friends who have had

14   their homes broken into, a couple robbed at gunpoint, over

15   the last 20 yours.

16             THE COURT:  Okay.

17             Anything about their experiences that would cause

18   you to think you couldn't be fair and impartial in this

19   case?

20             PROSPECTIVE JUROR:  No.  Totally irrelevant.

21             THE COURT:  Anything about their experiences that

22   might cause you to think you would not be -- you have

23   negative views of MPD or the U.S. Attorney's Office?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Okay.

1          All right.  Any follow-up from the government?

2          MR. KELLY:  Yes, Your Honor.

3          Good afternoon, sir.

4          PROSPECTIVE JUROR:  Hello.

5          MR. KELLY:  What sorts of research do you do for

6    GAO typically?

7          PROSPECTIVE JUROR:  I'm in a natural resources

8    environment group.  We cover everything from climate change

9    to national parks to food safety and the national nuclear

10   security stockpile.  So it relates to the various agencies

11   that we have oversight over.

12         MR. KELLY:  So have you ever been involved in any

13   research that would in any way be related to what happened

14   on January 6th?

15         PROSPECTIVE JUROR:  No.

16         MR. KELLY:  And you mentioned, as an aside, you

17   were a former academic.  Could you just elaborate on that,

18   please?

19         PROSPECTIVE JUROR:  I taught environmental

20   communication at the University of Cincinnati prior to

21   coming to D.C.  And before that, I taught at the University

22   of Pittsburgh.

23         MR. KELLY:  And what were you teaching?

24         PROSPECTIVE JUROR:  Communication studies and

25   environmental communication.

1          MR. KELLY:  Thank you very much.

2          PROSPECTIVE JUROR:  Sure.

3          THE COURT:  Sir, can I just ask you to lean into

4   that microphone a little bit because I'm having a little bit

5   of trouble hearing you.

6          Mr. Monroe.

7          MR. MONROE:  Good afternoon, sir.

8          PROSPECTIVE JUROR:  Hello.

9          MR. MONROE:  I represent the defendant,

10  Mr. Webster.

11          I was listening carefully to your answers.

12  It sounds like you have very deep personal, professional

13  ties with the Capitol, the folks that work there; is that

14  true?

15          PROSPECTIVE JUROR:  I would say that's true.

16          MR. MONROE:  Okay.

17          Now, if you're impaneled as a juror, you preside

18  as the judge of the facts, the judge over my client,

19  Mr. Webster.  And I think you would agree with me, sir,

20  would you not, that everyone has a right to a fair trial and

21  an impartial jury?

22          PROSPECTIVE JUROR:  Absolutely.

23          MR. MONROE:  Okay.

24          Given your personal experience, because we all

25  come here with our own different personal experiences, do

1  you think your personal experiences and your relationship

2  with the Capitol would prevent you from being a fair and

3  impartial factfinder in this case?

4           PROSPECTIVE JUROR:  I would like to think not, no.

5           If I were the defendant, I probably wouldn't want

6  me on the trial given everything I've just said.  But I'm

7  being honest when I say that I can.

8           MR. MONROE:  Why do you say that?  Why wouldn't

9  you want yourself as a juror on a trial like this?  Because

10  that's the important part.

11           PROSPECTIVE JUROR:  Given the relationships and --

12  personal and professional that I have that you just pointed

13  out.

14           MR. MONROE:  Yeah.

15           PROSPECTIVE JUROR:  I mean, you would have to, not

16  knowing me, trust that I could actually separate all that

17  and compartmentalize it and base my decision solely on what

18  was presented in the courtroom.

19           MR. MONROE:  I think you said it as well as I can.

20           Thank you, sir.

21           PROSPECTIVE JUROR:  Sure.

22           THE COURT:  All right, sir.  Thank you.

23  Mr. Douyon will show you out of the courtroom.

24           Any motion?

25           MR. MONROE:  Yes, Judge.

1          I would move that this juror be excused for cause.

2     He has deep personal and professional relationships with the

3     Capitol and the staff.

4          I've heard his responses, you know, ultimately, he

5     could be fair and impartial.  But ultimately, he seizes the

6     day by saying, yeah, I wouldn't want me on this trial

7     either.  I think he understands -- whether he totally

8     appreciates the concept of how deeply --

9          THE COURT:  Let me ask the government, is there

10    any objection?

11         MR. KELLY:  Yes, Your Honor.

12         I think until that last comment where he said he

13    wouldn't want himself on the jury, there really wouldn't

14    have been any even arguable basis to strike him for cause.

15    Up till that point, he said he could be fair and impartial.

16    He would look at the evidence before the Court, he would

17    wait to see the evidence, he could return a not-guilty

18    verdict.

19         He did make that comment about not wanting to --

20    wouldn't want to see himself on the jury.  But when

21    Mr. Monroe followed up about why he said that, I think he

22    clearly said because he has been candid about his close

23    personal and professional relationships with people with

24    ties to the Capitol, and that the defendant, Mr. Webster,

25    would sort of have to take on faith that he would be able to

1   compartmentalize those relationships and assess the evidence

2   fairly, which he very clearly said he can, in fact, do.

3           THE COURT:  Look, I think this is a close call.

4   And I was with you until that last response.  I'm not quite

5   sure why he characterized the way that he did.  But I think

6   out of an abundance of caution and in consideration of the

7   rights of the defendant, I am going to strike him for cause

8   given that last response to suggest that he wouldn't want --

9   that if he were the defendant, he wouldn't want him on the

10  jury.  And though he clarified that a bit, the better side

11  of caution is to strike him for cause, it seems to me.  So

12  juror 0625 will be stricken for cause.  Let's have the next

13  juror come in.

14          COURTROOM DEPUTY:  Juror No. 0945.

15          THE COURT:  Hi, ma'am.  How are you?

16          PROSPECTIVE JUROR:  Fine.  And yourself?

17          THE COURT:  Good.  Thank you.

18          You are juror 0945; is that right?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Okay.

21          Feel free to remove your mask if you'd like,

22  that's up to you, while we're chatting.

23          So I have your card here and you didn't put any of

24  the numbers down; is that right?

25          PROSPECTIVE JUROR:  Right.

1          THE COURT:  Okay.

2          Did you have any difficulty hearing anything I

3   asked?

4          PROSPECTIVE JUROR:  Just a little bit.

5          THE COURT:  Okay.

6          PROSPECTIVE JUROR:  I did.

7          I think it's because I'm tired.  I'm a caretaker

8   with my mom and she's been in her dementia now for three

9   days and hasn't had no sleep and I'm just tired.  I was

10  tired this morning.

11         THE COURT:  Okay.

12         So do I understand correctly that you're the

13  primary caretaker of your mother?

14         PROSPECTIVE JUROR:  No.  It's myself and two other

15  sisters.

16         THE COURT:  Okay.

17         And if you were to serve as a juror in this case,

18  would somebody be able to take care of your mother?

19         PROSPECTIVE JUROR:  One of my sisters could, but

20  we rotate taking care of my mom.

21         THE COURT:  Okay.

22         All right.  So to the extent that you were able to

23  hear or not hear questions, can you give me a sense of the

24  number of questions that you think you didn't hear?

25         PROSPECTIVE JUROR:  Well, I think the one I did

1  hear was kind of when you said something about the Air Force

2  or something.

3          THE COURT:  I did ask a question about whether

4  anybody was in the Armed Forces.

5          PROSPECTIVE JUROR:  Yes, my granddaughter.

6          THE COURT:  Okay.

7          What about the other questions, did you hear any

8  of the other questions?

9          PROSPECTIVE JUROR:  Yeah, I heard if you live on

10 Capitol Hill, if you work on Capitol Hill.  Yeah, I got

11 that.

12         THE COURT:  Okay.

13         So do you live anywhere near Capitol Hill?

14         PROSPECTIVE JUROR:  Trinidad Avenue.

15         THE COURT:  You live in Trinidad.

16         Okay, that's close but a little bit away.

17         How about any news or your exposure to the events

18 of January the 6th.  Have you read any news about those

19 events?

20         PROSPECTIVE JUROR:  I didn't read it but I saw it

21 on the news.

22         THE COURT:  You did.  Okay.  So you have seen

23 video images of what happened on that day; is that right?

24         PROSPECTIVE JUROR:  Uh-huh, yes.

25         THE COURT:  And can you give us a sense of how

1    much you've viewed over time?

2          PROSPECTIVE JUROR:  I didn't really get too much

3    into it.  When I saw it, I'm just like, wow, that's

4    terrible.  And I just left it alone, move on.

5          THE COURT:  Okay.

6          Do you have a -- have you formed a view about

7    people who participated in the events of that day?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  And if you were to find out, for

10   example, in this case that the defendant was a supporter of

11   the former President, do you think you would have any

12   difficulty being able to be fair and impartial to him?

13         PROSPECTIVE JUROR:  I think I would -- I think I

14   could be.

15         THE COURT:  You think you could be.

16         PROSPECTIVE JUROR:  Uh-huh.

17         THE COURT:  So you paused a little bit.  Is there

18   a reason you're hesitating?

19         PROSPECTIVE JUROR:  No.  I'm going to tell you --

20   I think try to do the -- I think I would do best by trying

21   to do right by that person, yes.

22         THE COURT:  Okay.

23         So that means you think you could fairly and

24   honestly judge his conduct; is that right?

25         PROSPECTIVE JUROR:  Yes.

1          THE COURT:  And if the government in this case did

2     not meet its burden of proof, for example, would you be able

3     to return a guilty -- excuse me, a not-guilty verdict?

4          Let me ask the question again because I stumbled

5     over my words.

6          If the government failed to satisfy you that it

7     had met its burden of proof, would you be able to return a

8     not-guilty verdict?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.

11         So let me just ask also in terms of -- do you have

12    members of your family who are in law enforcement, ma'am?

13         PROSPECTIVE JUROR:  No, not that I know of.

14         THE COURT:  Anybody in your family who is a lawyer

15    or gone to law school?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  And anybody in your family who's been

18    either charged with a crime or been a victim of a crime?

19         PROSPECTIVE JUROR:  Yes, my brother.

20         THE COURT:  And can you tell us what -- whether

21    he's been charged with or a victim of.

22         PROSPECTIVE JUROR:  He was charged with -- oh,

23    it's been a while.  He was charged with -- they raided the

24    place and -- where they had drugs, it was drugs in there.

25    I think he was all high up.  The young man was stabbed

1  several -- multiple times.  But he was -- I guess they

2  charged him, I guess with accessory of the crime, because --

3  I guess because he was in there.

4          THE COURT:  Got you.

5          PROSPECTIVE JUROR:  But he didn't do it.

6          But he served just as much time of the person who

7  did do it.

8          THE COURT:  Okay.

9          And so did that person go to trial?  I mean, your

10 brother, did he go to trial?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  And so he was convicted; is that

13 right?

14         PROSPECTIVE JUROR:  Uh-huh.

15         THE COURT:  And do you have -- what, if any,

16 feelings do you have about the way your brother was treated

17 by the criminal justice system?

18         PROSPECTIVE JUROR:  Well, I didn't have no bad

19 feelings about it, because you were so worried that you

20 didn't have no business being --

21         THE COURT:  I'm sorry, say that again.

22         PROSPECTIVE JUROR:  At the time, I feel like this

23 world, if you had -- he shouldn't have been at the place

24 that he was, you know, doing the drugs.  So that was -- you

25 know, that was on him.

1          THE COURT:  Okay.

2          And is your brother, you said he's done some time.

3     Is he still incarcerated?

4          PROSPECTIVE JUROR:  No, no.

5          THE COURT:  So given what your brother's

6     experience has been, do you think you could still be fair to

7     the government in this case?

8          PROSPECTIVE JUROR:  Sure.

9          THE COURT:  Particularly if you were to -- and

10    I'm going to tell you -- was this in the District, did this

11    happen in the District?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  So the same prosecutors that

14    prosecuted your brother -- not these prosecutors but the

15    same office that prosecuted your brother, they're also --

16    it's the same office that's prosecuting this case.  Do you

17    think the fact that the same office prosecuted your brother

18    would affect your ability to be fair in this case?

19         PROSPECTIVE JUROR:  Yeah, I think I could be fair.

20    I want to be fair and give -- be fair to him.  I want to be

21    fair to that person.  If I felt that that person was right

22    and was wrong -- he was wrong, but if he's right, I'll speak

23    up, I could speak up about it, yeah.

24         THE COURT:  And so my question was a little bit

25    different, which is, could you be fair to the prosecutors in

1  this case and the government in this case in their

2  presentation of evidence?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Okay.

5          All right.  Let me just ask this, ma'am.  If you

6  were to serve as a juror, do think you'd have any difficulty

7  hearing the testimony and evidence?

8          PROSPECTIVE JUROR:  No.  I hope not to be tired,

9  but I don't think I'll have no problem.

10         THE COURT:  And do you think you would be able to

11  get coverage for your mother such that you could be here

12  every day and fully attentive and get enough sleep?

13         PROSPECTIVE JUROR:  It's not only with my mother

14  but with myself.  I've been dealing with heart -- with my

15  heart.

16         THE COURT:  Okay.

17         PROSPECTIVE JUROR:  It goes into these

18  palpitations.  I get these fast beating of the heart real

19  bad and then I have to go to the hospital.

20         THE COURT:  Now, is that something that happens --

21         PROSPECTIVE JUROR:  They come on -- frankly, they

22  come on -- every now and then, they'll come on.  What they

23  calls it.  Where the heart takes -- I don't have a

24  fibrillation.

25         THE COURT:  You mean an arhythmia.

1          PROSPECTIVE JUROR:  Yeah, arhythmia.

2          THE COURT:  And is that something that happens

3    frequently or --

4          PROSPECTIVE JUROR:  Here lately it's been

5    happening frequently a little bit, uh-huh.

6          THE COURT:  Do you think that would affect your

7    ability to serve as a juror?

8          PROSPECTIVE JUROR:  No, I don't think so, I don't

9    think it would.

10          THE COURT:  All right.

11          Okay.  So is there any other reason that you can

12    think of, ma'am, that you think might affect your ability to

13    be a fair and impartial juror in this case?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  All right.

16          Any follow-up from the government?

17          MR. KELLY:  Just briefly, Your Honor.

18          Good afternoon, ma'am.

19          I understand you take care of your mother.

20    Do you have a job by any chance in addition to that?

21          PROSPECTIVE JUROR:  Do I have?

22          MR. KELLY:  Did you have a job in addition to

23    caring for your mother?

24          PROSPECTIVE JUROR:  A job?

25          MR. KELLY:  Yeah, do you work anywhere?

```
 1              PROSPECTIVE JUROR:  No, I'm retired.  Retired for
 2   a year now.
 3              MR. KELLY:  What did you used to do before you
 4   retired?
 5              PROSPECTIVE JUROR:  I worked at Gallaudet
 6   dispatch.  Gallaudet University as a dispatcher.
 7              MR. KELLY:  So did you work with law enforcement
 8   people in that job?
 9              PROSPECTIVE JUROR:  Did I work with?
10              MR. KELLY:  Did you work with law enforcement in
11   that job?
12              PROSPECTIVE JUROR:  No.  I worked with deaf
13   children.
14              MR. KELLY:  Oh.  Understood.  Thank you.
15              THE COURT:  Mr. Monroe.
16              MR. MONROE:  No inquiry, Judge.  Thank you.
17              THE COURT:  Ma'am, thank you very much.
18   Mr. Douyon will show you out of the door.
19              PROSPECTIVE JUROR:  Okay.  Thank you.
20              MR. KELLY:  Before the next juror comes in, the
21   government would move to strike that juror for cause.
22   She said that she had trouble hearing Your Honor in the
23   Ceremonial Courtroom during voir dire.  She seemed to have
24   trouble hearing some of the questions that were being asked
25   in here today and required some follow-up just when I was
```

1  asking her a couple questions just now.

2        And the government is just concerned that she

3  didn't actually indicate an affirmative answer to a single

4  question on her card.  And Your Honor did some limited

5  follow-up voir dire with her here, and it turns out she had

6  a number of affirmative answers.

7        THE COURT:  Yeah, okay.

8        Look, I mean, I hear you.  But, you know, I think

9  she explained why she wasn't -- why she didn't hear the

10  questions.  Then when I brought her in here and asked her a

11  series of questions, I didn't think she had any trouble

12  hearing me.  Frankly, if anything, I may have had a little

13  trouble hearing her.  And I think, frankly, that was the

14  reason that you had to follow-up.  It wasn't that she

15  misheard you.

16        And she was asked any number of ways when she did

17  answer questions that might suggest bias, that she said she

18  wouldn't have any.  So I'm going to deny the strike for

19  cause.  So we'll bring the next juror in.  Thank you.

20        Ma'am, how are you?

21        PROSPECTIVE JUROR:  Good.  Hi.  How are you?

22        THE COURT:  Good.

23        You're juror 1194?

24        PROSPECTIVE JUROR:  Yes.

25        THE COURT:  Feel free to remove your mask if you'd

1  like.

2         You have answered five questions, 7, 8, 13B, C,

3  and E.

4         So let's start with 7 and 8 and we'll sort of

5  combine them.  That concerns your media exposure, as well as

6  the extent to which you've seen video of the events of

7  January the 6th.  Can you elaborate on those two questions

8  for us, please?

9         PROSPECTIVE JUROR:  Sure.

10        So I watched the news coverage on the day, on

11 January 6th.  I was actually watching it before it occurred,

12 so I kind of like saw it happen in real-time.  And kept up

13 pretty closely probably for the first couple of months with

14 the events.  Much less so lately.

15        THE COURT:  Okay.

16        And can you tell us sort of from what sources

17 you're viewing and reading your news about the January 6th

18 events?

19        PROSPECTIVE JUROR:  Sure.

20        I think I was watching CBS on the day.

21        THE COURT:  Okay.

22        PROSPECTIVE JUROR:  Usually probably *New York*

23 *Times*, *Washington Post*, CBS, kind of local news, that kind

24 of thing.

25        THE COURT:  Okay.

1          And, you know, given what you've seen and read, do

2     you think you would be able to set all of that aside and

3     focus on the evidence as it's presented in this case?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  And fairly and impartially judge the

6     conduct of this defendant?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  All right.

9          Questions 13B, C, and, I think, E; is that right?

10         PROSPECTIVE JUROR:  Yes, it's kind of --

11    I'll explain it more when we get to it.

12         THE COURT:  Okay.

13         So let's start with 13B.  That is -- asked about

14    members of the group who are in the Armed Forces.

15         PROSPECTIVE JUROR:  Yeah, I have -- both of my

16    grandfathers served, and my cousin is in the Air Force

17    currently.

18         THE COURT:  Okay.

19         Can you tell us what branches your grandfather

20    served in?

21         PROSPECTIVE JUROR:  One was in the Navy and one

22    was in the Army.

23         THE COURT:  All right.

24         Question 13C asked about law school, law firms,

25    and working as a lawyer.

1              PROSPECTIVE JUROR:  Sure.

2              My brother and sister-in-law are both attorneys.

3      And I worked at a law firm as a paralegal for two years

4      between 2015 and 2017.

5              THE COURT:  Okay.

6              Let's start with your relatives.  Do either of

7      them practice criminal law?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  And the law firm that you worked for

10     as a paralegal, did they do any criminal work?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  All right.

13             Question 13E concerned whether any member of the

14     group has been involved in a physical altercation with a

15     member of law enforcement.

16             PROSPECTIVE JUROR:  Yeah, this was iffy for me.

17             I got into a car accident with a police officer as

18     a teenager, so that's -- I was like, maybe I should answer

19     that.

20             THE COURT:  All right.

21             Not exactly the kind of altercation we're talking

22     about, but I appreciate you telling us that.

23             Okay.  Anything about that episode, that incident,

24     that might make you think you might have difficulty fairly

25     and honestly assessing an officer's testimony?

```
1              PROSPECTIVE JUROR:  No.

2              THE COURT:  All right.

3              Anything from the government?

4              MR. KELLY:  Very briefly, Your Honor.

5              Good afternoon.

6              What do you do for a living?

7              PROSPECTIVE JUROR:  I am an analyst at the

8    U.S. Government Accountability Office.

9              MR. KELLY:  And what kind of research do you

10   typically do for them?

11             PROSPECTIVE JUROR:  I do tax issues mostly.  But

12   in the past, I've worked on healthcare, environmental issues

13   as well.

14             MR. KELLY:  Any research related to anything that

15   happened on January 6th?

16             PROSPECTIVE JUROR:  No.

17             MR. KELLY:  Thank you.

18             THE COURT:  Mr. Monroe.

19             MR. MONROE:  Good afternoon.

20             PROSPECTIVE JUROR:  Hi.

21             MR. MONROE:  I wanted to know, could you describe

22   for us your personal and professional connections with those

23   people that work on Capitol Hill?

24             PROSPECTIVE JUROR:  On Capitol Hill?  Sure.

25             I interned on the Hill early in my tenure in D.C.
```

1   So 2014 to early 2015.  So from that time, I have several

2   friends who work on the Hill, most of whom I don't speak to

3   much anymore.  But that's about the extent of it.

4            And, of course, GAO is a Legislative Branch

5   agency, so we work frequently with people on the Hill in a

6   professional capacity.

7            MR. MONROE:  How far away do you live from the

8   Capitol?

9            PROSPECTIVE JUROR:  Like three, four miles.

10  Not close.

11           MR. MONROE:  You're far out.  Okay.

12           Anything about the -- would you say was there any

13  direct impact upon you by way of the January 6th event?

14           PROSPECTIVE JUROR:  Could you clarify?

15           MR. MONROE:  Yeah.

16           For that particular day and for the days and weeks

17  following, did that event have any impact on you

18  specifically?

19           PROSPECTIVE JUROR:  Tangibly, no.

20           MR. MONROE:  Okay.

21           That's all I have.  Thank you.

22           THE COURT:  All right, ma'am.  Thank you very

23  much.  Mr. Douyon will show you out of the courtroom.

24           Hi, sir.  How are you?

25           PROSPECTIVE JUROR:  Good.  How are you?

1          THE COURT:  Good.  Thank you.

2          You are juror 0284?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  All right.

5          You may remove your mask if you wish while we're

6    having a chat.

7          You've answered four questions, 7, 8, 13B, and

8    13C.

9          Let's start with 7 and 8 and we'll combine those

10   questions, which asked you essentially about your exposure

11   from the media -- to the media and video coverage of the

12   events of January the 6th.  Can you tell us a little bit

13   more about that?

14         PROSPECTIVE JUROR:  Yeah, I was at work at

15   GW Hospital.  And we were sort of on hold because they

16   didn't want anyone to leave the hospital, they were afraid

17   of a mass casualty event.  And so they had all of us who

18   work at the hospital stay.  So we were kind of tuned to the

19   news throughout the day and into the evening.

20         THE COURT:  Okay.

21         And did you -- are you a medical professional?

22         PROSPECTIVE JUROR:  Yeah, I'm a PA, physician

23   assistant.

24         THE COURT:  Okay.

25         And did you treat anybody that day on January 6th?

1          PROSPECTIVE JUROR:  We had one person, yeah.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR:  It was -- I do orthopedic

4     surgery.  It was of someone who had a finger injury and that

5     was it.

6          THE COURT:  I see.

7          And was that person in law enforcement, to your

8     knowledge?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  And you said that you watched it

11    unfold that day on television, it sounds like.  How about

12    afterwards, what's been your exposure by the media and

13    otherwise?

14         PROSPECTIVE JUROR:  I mean, I read the *New York*

15    *Times*.  That's pretty much it.  I haven't, like, been super

16    involved in following it.

17         THE COURT:  All right.

18         Anything about your exposure to the events of that

19    day that would cause you to think you couldn't be fair and

20    impartial in this case?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Any reason to think you couldn't

23    evaluate the evidence fairly and honestly in this case?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  All right.

1          13B and 13C.

2          13B asked whether any of the member of the group,

3   including yourself, has served in the Armed Forces.

4          PROSPECTIVE JUROR:  My father was in Vietnam, and

5   my grandfather was in World War II.

6          THE COURT:  And can you just tell us which

7   branches of the military they were in?

8          PROSPECTIVE JUROR:  My father was in the Air

9   Force, and my grandfather was in the Army.

10          THE COURT:  Okay.

11          And then 13C asked whether any member of the group

12  attended law school, worked as a lawyer, or worked in a law

13  office.

14          PROSPECTIVE JUROR:  Yeah, two of my best friends

15  are lawyers, but they don't practice.

16          THE COURT:  They don't practice.

17          PROSPECTIVE JUROR:  Yeah.

18          THE COURT:  And do you know whether those friends

19  have ever done any criminal work, even if they don't

20  practice now?

21          PROSPECTIVE JUROR:  They have not.

22          THE COURT:  Any follow-up from the government?

23          MR. KELLY:  No, Your Honor.

24          THE COURT:  Mr. Monroe.

25          MR. MONROE:  No inquiry, Judge.  Thank you.

```
 1            THE COURT:  Sir, thank you very much.  Mr. Douyon
 2   will show you out of the courtroom.
 3            Hi, sir.  How are you?
 4            PROSPECTIVE JUROR:  Good.  How are you doing
 5   today?
 6            THE COURT:  Good.
 7            You are juror 0327?
 8            PROSPECTIVE JUROR:  Yes, sir.
 9            THE COURT:  Feel free to remove your mask if you'd
10   like.
11            All right.  So you have answered a number of
12   questions yes, 7, 8, 10, 11, 13A, B, and C, and 19, and
13   you've written "potentially" next to 19.
14            So let's start there.  Tell us what might cause a
15   hardship for you if you were serving as a juror.
16            PROSPECTIVE JUROR:  From the time I got my summons
17   till today, I have accepted a new job offer that I start on
18   May 9th.  So I'm wrapping up my last week of work, starting
19   a new one on the 9th.
20            THE COURT:  Okay.
21            And the kind of wrap-up work you're doing, is that
22   something you think you could be able to sort of do after
23   jury service or before jury service?
24            PROSPECTIVE JUROR:  Yes.
25            THE COURT:  Okay.
```

1          Question 7 and 8, we'll take them together, they

2    concern sort of your exposure to the events of January 6th

3    either through the media or through video coverage.  Can you

4    tell us a little bit about that?

5          PROSPECTIVE JUROR:  Well, I currently work for

6    Politico, so I have seen a ton of articles, information from

7    various news outlets, obviously on the news, different

8    videos.  I keep myself fairly well-informed, so I've been

9    exposed to a lot of different evidence on that.

10          THE COURT:  So are you a journalist for Politico

11    or what capacity do you work with them?

12          PROSPECTIVE JUROR:  I'm not.  I'm an account

13    manager for their Politico Pro platform.

14          THE COURT:  Okay.

15          So let me just ask, as an account manager that

16    works at Politico, do you think you sort of consume any more

17    news at Politico than, say, the average reader of Politico

18    would?

19          PROSPECTIVE JUROR:  Probably, yes.

20          THE COURT:  And have you formed opinions -- you've

21    answered Question 10 and 11 yes.  That's about your feelings

22    and opinions about January 6th, as well as the former

23    President and his supporters.  So could you tell us about

24    that and why you answered those questions yes?

25          PROSPECTIVE JUROR:  I don't specifically remember

1  the questions that were asked, but in terms of the former

2  President, not somebody whose ideals align with mine in any

3  way, shape, or form.

4          And the events of January 6th were -- I view in a

5  fairly negative light.

6          THE COURT:  Okay.

7          So, look, you know, people have formed opinions

8  about the events of January the 6th, and people obviously

9  come into the courtroom with their own views of the current

10 President, the former President, but none of that is really

11 at issue.

12         What's at issue in this case is the evidence

13 against this defendant and the charges against him.  And so

14 the question is, would you be able to put aside your --

15 whatever opinions you've formed about the events of

16 January 6th and whatever opinions you may have about the

17 former President and view the evidence in this case fairly

18 and impartially?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  And would you be able to be fair and

21 impartial toward this defendant?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Okay.

24         Now, if you were to learn as part of this case

25 that the defendant was, in fact, a supporter of the former

1 President and perhaps shared views of the former President,

2 would that affect your ability to be fair and impartial?

3    PROSPECTIVE JUROR:  No.

4    THE COURT:  You paused.  Is there any doubt in

5 your mind?

6    PROSPECTIVE JUROR:  I just wanted to make sure I

7 answered correctly.

8    THE COURT:  Okay.

9    And when you say "correctly," you mean that's the

10 genuine answer, as opposed to the answer you --

11    PROSPECTIVE JUROR:  Genuine answer, yes.  The

12 phrasing of the question more so than anything.

13    THE COURT:  No.  That's fair.

14    Let me just ask a few more questions.

15 So this defendant, like any defendant, is presumed innocent.

16 And do you think you would be able to apply that presumption

17 of innocence notwithstanding what he's been charged with?

18    PROSPECTIVE JUROR:  Yes.

19    THE COURT:  And the government bears the burden of

20 proving guilt beyond a reasonable doubt.  And if you

21 determine that they had failed to prove guilt beyond a

22 reasonable doubt, would you have any trouble voting to

23 acquit this defendant?

24    PROSPECTIVE JUROR:  No.

25    THE COURT:  All right.

1          Let's turn to questions 13A, B, and C.

2          13A asked whether you know any members of law

3   enforcement.  Can you tell us about that?

4          PROSPECTIVE JUROR:  Yes.  My dad is a retired

5   police captain for Fairfax County.

6          THE COURT:  Okay.

7          And so, you know, your father is a former law

8   enforcement and perhaps you've met some of his former

9   colleagues.

10         There will be testimony in this case from law

11  enforcement officers, and the question to you is, do you

12  think you could fairly and honestly assess that testimony

13  notwithstanding the relationship -- notwithstanding the fact

14  your father was a longtime police officer?

15         PROSPECTIVE JUROR:  Yes, I believe so.

16         THE COURT:  Okay.

17         And do you think that just because an officer

18  testifies, that that law enforcement officer would be

19  entitled to greater deference or would you give that officer

20  greater deference or credibility in his or her testimony

21  just because the person is a police officer or a member of

22  law enforcement?

23         PROSPECTIVE JUROR:  No, I would not.

24         THE COURT:  Okay.

25         Question 13B asked whether any member of the group

1  has served in the Armed Forces.  Can you tell us about that?

2           PROSPECTIVE JUROR:  My brother is a veteran of the

3  Marines, cousin is a veteran of the Navy, grandpa is a Navy

4  veteran.  So a good amount of close family members that have

5  served.

6           THE COURT:  Okay.

7           And then 13C asked, has any member of the group

8  attended law school, worked as a lawyer, or worked at a law

9  office.

10          PROSPECTIVE JUROR:  My aunt is a lawyer and her

11 daughter is also a lawyer.

12          THE COURT:  Okay.

13          So both your aunt and cousin are lawyers.

14 Do either of them practice criminal law, to your knowledge?

15          PROSPECTIVE JUROR:  Not to my knowledge.

16          THE COURT:  Okay.

17          Any follow-up questions from the government?

18          MR. KELLY:  Just one, Your Honor.

19          Good afternoon, sir.

20          PROSPECTIVE JUROR:  Good afternoon.

21          MR. KELLY:  What is the new job that you'll be

22 starting in a couple of weeks?

23          PROSPECTIVE JUROR:  I will be working as the VP of

24 client and partner success for *MT Newswires*.

25          MR. KELLY:  For *MT Newswires*?

```
1              PROSPECTIVE JUROR:  Yes.
2              MR. KELLY:  Okay. thank you.
3              THE COURT:  Mr. Monroe.
4              MR. MONROE:  No inquiry, Your Honor.  Thank you.
5              THE COURT:  Thank you, sir.  Thank you very much.
6     Mr. Douyon will show you out of the courtroom.
7              So everybody knows, I've got 28 qualified so far.
8     Hopefully we're all at the same number.
9              JC, is that what you have?
10             COURTROOM DEPUTY:  That's correct, Your Honor.
11             Juror No. 0552.
12             THE COURT:  Hi, sir.  How are you?
13             PROSPECTIVE JUROR:  I'm well.  Thank you.
14             THE COURT:  Are you juror 0552?
15             PROSPECTIVE JUROR:  Yes, sir.
16             THE COURT:  Feel free to remove your mask if you
17    wish.
18             So you've answered four questions yes, Question 7,
19    8, 13C, and D.  Let's start with 7 and 8.  They ask
20    essentially about your exposure to the events of January the
21    6th.  Can you tell us a little bit about that?
22             PROSPECTIVE JUROR:  I mean, I watch the news,
23    I read the newspaper.  I know as much as someone who would
24    be generally informed on this situation.
25             THE COURT:  Okay.
```

1          And do you consider yourself someone who sort of

2    actively goes -- actively seeks out news and information

3    about January 6th?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  So it sounds like if it's something

6    that is in your newsfeed or --

7          PROSPECTIVE JUROR:  We get *The Washington Post* on

8    Sundays.

9          THE COURT:  Right.  Okay.

10         PROSPECTIVE JUROR:  I read it.

11         So I'm not actively seeking it out, but I'm

12   definitely informed.

13         THE COURT:  Okay.

14         And given what you've read and perhaps what you've

15   seen of those events, do you think you could set all of that

16   aside and judge the evidence in this case based upon --

17   well, judge the facts of this case based on the evidence

18   presented?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  And do you think you could be fair and

21   impartial with respect to this defendant?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  And if you were convinced that the

24   government had not met its burden of proof, would you have

25   any difficulty returning a not-guilty verdict?

```
1              PROSPECTIVE JUROR:  No.

2              THE COURT:  All right.

3              Question 13C and D.  13C asked whether you or any

4    member of the group had attended law school, worked as a

5    lawyer, or worked in a law firm.

6              PROSPECTIVE JUROR:  Uh-huh.

7              THE COURT:  And can you tell us about that?

8              PROSPECTIVE JUROR:  We have friends who are

9    lawyers.

10             THE COURT:  Okay.

11             And those friends who are lawyers, can you just

12   describe how close you are with them?

13             PROSPECTIVE JUROR:  We see them maybe once every

14   few months.  We have kids the same age.

15             THE COURT:  Okay.

16             And do those folks, do they either -- do they

17   practice in criminal law, to your knowledge?

18             PROSPECTIVE JUROR:  No, they don't.

19             THE COURT:  All right.

20             13D asks whether any member of the group has been

21   arrested for, charged with, or convicted of a crime or a

22   victim of or a witness to a crime.

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Can you tell us about that?

25             PROSPECTIVE JUROR:  Myself, I've been convicted of
```

1  a misdemeanor, operating while intoxicated.

2          THE COURT:  Okay.

3          And can you tell us about how long ago that was?

4          PROSPECTIVE JUROR:  Three years.

5          THE COURT:  And anything about that experience

6  that might cause you -- well, let me back up.  Was that in

7  the District of Columbia or elsewhere?

8          PROSPECTIVE JUROR:  District of Columbia, yes.

9          THE COURT:  And anything about that experience --

10 you were presumably pulled over by a Metropolitan Police

11 Department officer; is that right?

12         PROSPECTIVE JUROR:  Park Police.

13         THE COURT:  Park Police.

14         Anything about that experience and your treatment

15 by the government that might cause you to think you couldn't

16 be fair and impartial in this case?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  All right.

19         Any follow-up from the government?

20         MR. KELLY:  Just briefly, Your Honor.

21         Good afternoon, sir.

22         PROSPECTIVE JUROR:  Good afternoon.

23         MR. KELLY:  The conviction that you mentioned a

24 few moments ago, did that go to trial?

25         PROSPECTIVE JUROR:  No, it did not.

1          MR. KELLY:  So was it as a result of a plea,

2   I suppose?

3          PROSPECTIVE JUROR:  It was, yes.

4          MR. KELLY:  Thank you.

5          MR. MONROE:  Good afternoon.

6          PROSPECTIVE JUROR:  Hi.  Good morning.

7          MR. MONROE:  I'm Jim Monroe; I represent the

8   defendant, Mr. Webster.

9          Could you tell us what grade you teach?

10          PROSPECTIVE JUROR:  11th grade.

11          MR. MONROE:  And what's your subject?

12          PROSPECTIVE JUROR:  English.

13          MR. MONROE:  And we're now more than a year beyond

14   January 6th.  This is a January 6th case, as you've been

15   told.

16          What's your look-back, what's your take on the

17   subject matter?  Looking back at this event, what's your

18   assessment of what happened here?

19          PROSPECTIVE JUROR:  In terms of, like, how I will

20   teach it in a content area?

21          MR. MONROE:  No.  Just your view of things, you

22   individually.

23          PROSPECTIVE JUROR:  So January 6th, I view as an

24   insurrection.  I view that as an attack on the Capitol.

25          MR. MONROE:  And do you think everyone that was

1    there on January 6th were all involved or some of them

2    involved or what's your thought about that?

3             PROSPECTIVE JUROR:  No, I don't believe that

4    everyone was involved in attacking the Capitol.

5             MR. MONROE:  And I would imagine those are

6    strongly held beliefs that you've drawn upon from all of the

7    information you've received collectively since January 6th,

8    correct?

9             PROSPECTIVE JUROR:  Yes, that's correct.

10            MR. MONROE:  So I have to ask you this question.

11    With those strongly held beliefs in mind, do you think you

12    could sit as a judge of the facts as a prospective juror and

13    fairly and impartially deliberate over the evidence of this

14    case, giving favor neither to the government or the

15    defendant?

16            PROSPECTIVE JUROR:  I do.

17            MR. MONROE:  Okay.  Thanks so much for speaking

18    with me.

19            THE COURT:  All right, sir.  Let me just -- if I

20    could follow up.  You, for example, sort of put a descriptor

21    on what you think the events were on January the 6th.

22            Look, the entire day's events are not on trial

23    here, but, rather, just the events as they relate to the

24    defendant before us.  And so whatever opinions you may have

25    formed about the events generally speaking, do you think you

1  could still be fair and impartial as a juror with respect to

2  this defendant?

3      PROSPECTIVE JUROR:  I do, yes.

4      THE COURT:  And fairly and honestly assess his

5  conduct as has been alleged?

6      PROSPECTIVE JUROR:  I do, yes.

7      THE COURT:  Okay.  All right.

8      Thank you, sir.  Mr. Douyon will show you out the

9  door.

10     COURTROOM DEPUTY:  Juror No. 0780.

11     THE COURT:  Hi, sir.  How are you?

12     PROSPECTIVE JUROR:  Good.

13     THE COURT:  You are juror 0780?

14     PROSPECTIVE JUROR:  I am.

15     THE COURT:  Feel free to remove your mask if you'd

16  like while we're having this conversation.

17     All right.  You've answered yes to a number of

18  questions, 2.  And then you've written "maybe" in

19  parentheticals there, 5, 7, 8, 13A, B, C, and D.

20     So let's start with 2 and that was the question

21  whether you know any of the lawyers or any of the people

22  that sort of stood up and associated themselves with the

23  parties in this case.

24     PROSPECTIVE JUROR:  Yeah, and I think it's no, but

25  I worked some years ago in the U.S. Attorney's Office and

1    I know there was an AUSA with the last name "Kelly."

2    I don't know if it's the same Kelly, but I don't have any

3    recollection of meeting.

4            THE COURT:  I'll ask Mr. Kelly to just stand up

5    and remove his mask so the juror can have another look.

6            PROSPECTIVE JUROR:  Yeah, I don't have any

7    recollection of meeting Mr. Kelly.

8            THE COURT:  Okay.

9            So can you just tell us a little bit, it sounds

10   like you do not presently work at the

11   U.S. Attorney's Office; is that right?

12           PROSPECTIVE JUROR:  Correct.

13           THE COURT:  And it was the U.S. Attorney's Office

14   for the District of Columbia.  Can you tell us how long you

15   were there?

16           PROSPECTIVE JUROR:  I was there from 1998 to 2010,

17   except for three years in the middle when I was in the

18   Justice Department Public Integrity Section.

19           THE COURT:  Okay.

20           And do I take it then that you were a criminal

21   prosecutor at the U.S. Attorney's Office?

22           PROSPECTIVE JUROR:  That's correct.

23           THE COURT:  And what kind of work do you do now?

24           PROSPECTIVE JUROR:  I work in a law firm, Arnold &

25   Porter.

1          THE COURT:  Okay.

2          And can you tell us what kind of work you do

3    there?

4          PROSPECTIVE JUROR:  Mostly -- well, Food and Drug

5    Administration related work, because after 2010, I worked in

6    the Food and Drug Administration.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  So that work is mostly helping

9    companies get drugs approved, things like that, but some of

10   it is defending companies and individuals in

11   investigations --

12         THE COURT:  Right.  Okay.

13         PROSPECTIVE JUROR:  -- related to FDA.

14         THE COURT:  Let me ask you, you've had a career,

15   partial career as a prosecutor, you obviously know the

16   criminal law, you understand how the courts and justice

17   system works.

18         Given the fact that you've been employed by the

19   Department of Justice and, in fact, employed by the

20   U.S. Attorney's Office that's prosecuting this case, do you

21   think you could be fair and impartial to the defendant in

22   this case?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Do you have any reason to think that

25   you might partially -- have partiality toward the government

1  in this case because of your former career?

2       PROSPECTIVE JUROR:  No.

3       THE COURT:  And if you came to the conclusion that

4  the government in this case failed to meet its burden of

5  proof, do you think you would be able to vote to acquit the

6  defendant?

7       PROSPECTIVE JUROR:  Yes.

8       THE COURT:  All right.

9       Question 5 concerns whether you live or work near

10  the Capitol.  Can you tell us about that?

11       PROSPECTIVE JUROR:  Correct.

12       My office is at 6th and Massachusetts, Northwest.

13  So I guess about a mile.

14       THE COURT:  All right.

15       And were you present at your office on

16  January 6th?

17       PROSPECTIVE JUROR:  No.  I was working from home.

18       THE COURT:  All right.

19       And do you live near the Capitol?

20       PROSPECTIVE JUROR:  No.  I live near Glover Park.

21       THE COURT:  Okay.

22       Question 7 and 8 sort of related the concern, your

23  exposure to media or video, of the events of January the

24  6th.  Can you describe first generally what your exposure

25  has been to those events and stories about those events?

1          PROSPECTIVE JUROR:  Yes.

2          Just generally what I read in the newspaper.

3     I wouldn't say I pay special attention to it, but I don't

4     avoid it either.  It's whatever I read.

5          THE COURT:  Okay.

6          And can you just share with us what sources of

7     news?  You mentioned, I think you said, the newspaper and

8     maybe even *The Washington Post*, but any other news sources?

9          PROSPECTIVE JUROR:  *Washington Post*, the various

10    cable news channels.

11         THE COURT:  And can you tell us which ones?

12         PROSPECTIVE JUROR:  CNN mostly, I would say I

13    mostly watch when I watch that.

14         I -- you know, the Internet, Twitter, you know,

15    what people connect to and stuff.

16         THE COURT:  Right.  Okay.

17         So you've obviously learned some things through

18    the media and your exposure to the events of January the

19    6th.  Do you think you would be able to put all that aside

20    and evaluate the evidence that's presented in this case

21    about this defendant's conduct?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Any reason to think that what you've

24    learned might affect your ability to be fair and impartial?

25         PROSPECTIVE JUROR:  No.

1          THE COURT:  All right.

2          Questions 13A, B, C, and D, let's go through

3   those.

4          13A asks whether you know members of law

5   enforcement.  And as a U.S. Attorney, you certainly dealt

6   with them, but let's stick for a moment with those people

7   who are in your immediate friends and family or close,

8   personal friends.

9          PROSPECTIVE JUROR:  Yeah, there's no one in my

10  family that is in law enforcement.  I wouldn't -- I have

11  friends who were former prosecutors.  I probably have --

12  I wouldn't say I have any close friends who are currently

13  prosecutors or in law enforcement.

14         THE COURT:  Okay.

15         PROSPECTIVE JUROR:  I have some friends in the

16  Food and Drug Administration, but they're not really

17  prosecutors, they're more setting food safety standards and

18  things like that.

19         THE COURT:  Right.  Okay.

20         So let me ask this:  As a prosecutor in this

21  office, you would have worked with officers in the

22  Metropolitan Police Department, worked with the FBI

23  presumably, and I assume also sponsored the testimony of law

24  enforcement and FBI agents; is that fair?

25         PROSPECTIVE JUROR:  Correct.

1          And I also investigated them when I was in Public

2   Integrity.

3          THE COURT:  Right.

4          And you would have investigated them while you're

5   in Public Integrity.

6          So to the extent -- well, given those past

7   relationships with MPD officers and your professional

8   capacity and with the FBI, do you think you would favor the

9   testimony of a law enforcement official just because that

10  person is a member of law enforcement?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  And do you think if you doubted the

13  veracity of a law enforcement officer, that you could hold

14  that belief truly that the officer was not telling the truth

15  just as any other witness might not be telling the truth?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  All right.

18         Question 13B asks about service in the Armed

19  Forces.

20         PROSPECTIVE JUROR:  Just my father's a Korean War

21  veteran.

22         THE COURT:  Just which branch of the military?

23         PROSPECTIVE JUROR:  Air Force.

24         THE COURT:  13C asked about law school.  I think

25  we've gone over that quite a bit, so we'll pass through that

1  question.

2       And then 13C asks whether any member of the

3  group's been arrested for, charged with, or convicted of a

4  crime or been the victim of or a witness to a crime.

5       PROSPECTIVE JUROR:  Yeah, victim of a crime is

6  probably, you know, a bunch of people in the family.

7       I mean, I've had my car broken into.  I've had my

8  credit card number used.  My father was mugged.  My brother

9  was mugged.  I don't know about my sister.  I had -- I was

10 mugged maybe ten years ago.

11      THE COURT:  Okay.

12      Anything about those experiences that might affect

13 your ability to be fair and impartial?

14      PROSPECTIVE JUROR:  No.

15      THE COURT:  All right.

16      Government counsel, any questions?

17      MR. KELLY:  No, Your Honor.

18      THE COURT:  Mr. Monroe.

19      MR. MONROE:  Good afternoon, sir.

20      PROSPECTIVE JUROR:  Hello.

21      MR. MONROE:  How long has it been since you worked

22 for the U.S. Attorney's Office for the District of Columbia?

23      PROSPECTIVE JUROR:  I left in 2010.

24      MR. MONROE:  So about 12 years?

25      PROSPECTIVE JUROR:  Yep, that's right.

1    MR. MONROE:  And obviously once you see me rise to

2    my feet, you understand my concerns.

3    We have three capable U.S. Attorneys here,

4    Assistant U.S. Attorneys, one here back in the gallery, FBI

5    agent.

6    If you were impaneled as a factfinder, both you

7    and I as attorneys, we know what that means.  Is this --

8    could you separate your vast knowledge of the law, your

9    experience with the U.S. Attorney's Office, all of your

10   interactions with the FBI and the Metropolitan Police

11   Department and separate yourself from that vast quantity of

12   information and sit here and listen to this particular case

13   and view it fairly and impartially?

14   I'm asking you a bold and honest question, sir.

15   PROSPECTIVE JUROR:  Sure.

16   Absolutely.  I mean --

17   MR. MONROE:  I know you know how to answer the

18   question, but I need to know the truth that, am I putting a

19   prosecutor in the jury box?

20   PROSPECTIVE JUROR:  You know, I would have no

21   problem doing that.

22   I mean, I investigated FBI misconduct when I was

23   in Main Justice.

24   MR. MONROE:  Yeah.

25   So you understand the next question I'm going to

1  ask you, which is, if you're impaneled as a juror, would you

2  be able to not allow your knowledge and information about

3  the law and maybe the FBI and information about the MPD and

4  let it bleed into your other jurors and let them deliberate

5  based upon their own individual experiences as factfinders?

6              PROSPECTIVE JUROR:  I would follow the oath to

7  follow the law, and I would not try to be a judge.

8              MR. MONROE:  We've been more than a year since

9  January 6th.  This has been your town for a long time.

10  What's your feelings and thoughts about what transpired on

11  January the 6th at the Capitol?

12             PROSPECTIVE JUROR:  I think that it was a terrible

13  thing.

14             MR. MONROE:  In what way?

15             PROSPECTIVE JUROR:  I think -- you know, I think

16  an assault on the Capitol -- first of all, any assault on

17  the Capitol, but then in an effort to interfere with

18  Congress going about its business is something that should

19  not have happened.

20             MR. MONROE:  As you watched -- you watched some of

21  the video, correct?

22             PROSPECTIVE JUROR:  I didn't watch, you know,

23  hours of it.  I watched what I saw.

24             MR. MONROE:  But some of it, correct?

25             PROSPECTIVE JUROR:  Sure.  Absolutely.

1          MR. MONROE:  And as a former prosecutor, I'm sure

2    there were instances where you could say, well, that

3    obviously looks like a crime there.  And this person

4    standing there just looking, she's not doing much of

5    anything.  I mean, were you able to make that separation

6    between individual participants or was this -- is this one

7    event that you see sort of as a collective group?

8          PROSPECTIVE JUROR:  There were hundreds or

9    thousands of people there, and I assume each -- some of them

10   had no role, some had a big role, some had something in

11   between.  It's not my job -- it wasn't my job to assess

12   that, I was just looking at what was on TV.

13         MR. MONROE:  How far do you live from the Capitol?

14         PROSPECTIVE JUROR:  Probably about 5 miles, give

15   or take.

16         MR. MONROE:  You're far out.

17         And did the events of January 6th have any direct

18   impact on you --

19         PROSPECTIVE JUROR:  No.

20         MR. MONROE:  -- or close family members?

21         PROSPECTIVE JUROR:  No.

22         MR. MONROE:  Now, do you know any of the federal

23   staff officers or employees that were present on

24   January 6th?

25         PROSPECTIVE JUROR:  Not to my knowledge, no.

1          MR. MONROE:  All right, sir.  Thank you for

2     speaking with me.

3          THE COURT:  All right.

4          Thank you, sir.  You may step down.  Mr. Douyon

5     will show you out of the courtroom.

6          Mr. Monroe, are you going to strike for cause?

7          MR. MONROE:  Yes, sir.  I'm sure -- do you want me

8     to recite --

9          THE COURT:  Yeah, I don't need you to tell me the

10    basis.

11         Look, I'm not -- I'm going to deny it and I'll

12    tell you why.  In my experience, a prosecutor is actually

13    probably the defense -- juror you could actually have.

14         I've had prosecutors on my panels who are more

15    than happy to acquit when the government fails to meet its

16    burden of proof.  And I've asked -- you know, you asked him

17    repeatedly, I asked him repeatedly whether he could be fair

18    and impartial, and I think he can be.  And the fact that he

19    worked in this office, it's been 12 years, and it won't

20    surprise you, it's not unusual to have former prosecutors

21    come before the Court as potential jurors.

22         MR. MONROE:  I would just offer my respectful

23    exception.

24         THE COURT:  I understand.  Your objection is

25    noted.

 1          But like I said, my experience has been that when

 2   I was a defense lawyer, I actually had multiple cases where

 3   prosecutors ended up on the jury and acquitted, for what

 4   that's worth.

 5          Hi, ma'am.  Sorry about that.

 6          So you are juror 1113; is that right?

 7          PROSPECTIVE JUROR:  Yes.

 8          THE COURT:  Feel free to remove your mask if you

 9   feel comfortable doing so.

10          So you answered questions 6, 8, and you wrote 13A

11   maybe and 13C.

12          So let's start with question 6, whether you or

13   someone you know is a participant in or physically present

14   as a witness to the events of January 6th.

15          PROSPECTIVE JUROR:  Yeah, I know someone who -- my

16   friend's roommate was there.

17          THE COURT:  Okay.  Your friend's roommate.

18          PROSPECTIVE JUROR:  Yeah.

19          THE COURT:  So do you know -- your friend's

20   roommate, when you say "there," was there that day?

21          PROSPECTIVE JUROR:  Was there that day.

22          THE COURT:  And can you tell us in what capacity?

23          PROSPECTIVE JUROR:  She was part of the crowd.

24   Didn't go into the Capitol but was part of the protesting.

25          THE COURT:  Okay.

```
 1              PROSPECTIVE JUROR:  She wasn't violent, but she
 2    was part of the protesting.
 3              THE COURT:  And have you spoken to her about the
 4    events of that day?
 5              PROSPECTIVE JUROR:  No.
 6              THE COURT:  All right.
 7              Anything about the fact that your -- I think you
 8    said your roommate's friend was a participant --
 9              PROSPECTIVE JUROR:  Sorry, it's my friend's
10    roommate.
11              THE COURT:  Your friend's roommate, excuse me, was
12    a participant in those events.  Any reason to think you
13    couldn't be fair and impartial in this case?
14              PROSPECTIVE JUROR:  No reason to think that.
15    I can be fair.
16              THE COURT:  Question 8 concerns video that you've
17    seen of the events of January the 6th.  Can you tell us a
18    little bit about your exposure to that?
19              PROSPECTIVE JUROR:  Sure.
20              Yeah, just around the time of the events, I saw a
21    few videos on the news like that.
22              THE COURT:  How about since then?
23              PROSPECTIVE JUROR:  Nothing since then.
24              THE COURT:  All right.
25              And so given whatever you may have seen back then,
```

1  would you be able to put that to the side and view the

2  evidence fairly and impartially as it's presented in this

3  case?

4          PROSPECTIVE JUROR:  Yes, I could.

5          THE COURT:  All right.

6          Question 13A and 13C.

7          13A, and this is the one you said "maybe" with

8  respect to anybody that you know in law enforcement.

9          PROSPECTIVE JUROR:  I have a distant relative, so

10  he's not close family but first cousin once removed, haven't

11  seen in 20 years, but he's a police officer.

12          THE COURT:  Is that person a police officer in the

13  District of Columbia?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  All right.

16          And then 13C asks whether any member of this group

17  has attended law school, worked as a lawyer, or worked in a

18  law office.

19          PROSPECTIVE JUROR:  My sister is a lawyer.

20          THE COURT:  Okay.

21          And can you tell us, does she practice law?

22          PROSPECTIVE JUROR:  Sure.

23          Yes, she does.  She has a JD and an MBA.

24  She works in London.  She does, like, international business

25  law, helps companies on the IPO, like.  I don't know the

1  details, but she does that.

2  THE COURT:  No.  That's okay.  I understand.

3  All right.  Any follow-up questions from the

4  government?

5  MR. KELLY:  No, Your Honor.

6  THE COURT:  Mr. Monroe.

7  MR. MONROE:  No, sir.  No inquiry.

8  THE COURT:  All right, ma'am.  Thank you very

9  much.  Mr. Douyon will show you out of the courtroom.

10  Hi, ma'am.  How are you?

11  PROSPECTIVE JUROR:  Fine.  Thank you.

12  THE COURT:  All right.

13  You are juror 1114?

14  PROSPECTIVE JUROR:  Correct.

15  THE COURT:  Feel free to remove your mask if you

16  would like to do that while you're answering questions.

17  PROSPECTIVE JUROR:  Sure.

18  THE COURT:  So questions that you answered, 7, 8,

19  10, 11, 13C and 13D, as well as 19.

20  So why don't we turn to 19 which is the hardship

21  question.  Can you tell us what would be a hardship if you

22  were to serve?

23  PROSPECTIVE JUROR:  Oh, just that I might have to

24  take a business trip next week.

25  THE COURT:  Okay.

```
 1              PROSPECTIVE JUROR:  So I don't know if that
 2    qualifies.  But the 2nd through the 4th, I might need to be
 3    out of town for business.
 4              THE COURT:  All right.  Well, when you say "might
 5    have to take a business trip," is this something that's
 6    already set?
 7              PROSPECTIVE JUROR:  Yes.
 8              THE COURT:  Okay.
 9              And is it something that can be rescheduled?
10              PROSPECTIVE JUROR:  No, because there are other
11    people who invited me to participate in these meetings, so
12    I can't reschedule it.
13              THE COURT:  Okay.
14              All right.  Any objection?
15              MR. KELLY:  No, Your Honor.
16              MR. MONROE:  No, sir.
17              THE COURT:  All right.  Thank you, ma'am.  You'll
18    be excused.
19              Ma'am, you can leave the courtroom; you'll be
20    excused.  Thank you.
21              PROSPECTIVE JUROR:  Oh, I'm done?
22              THE COURT:  You're done.
23              PROSPECTIVE JUROR:  Oh, okay.
24              THE COURT:  She will be struck because of her
25    unavailability.
```

1        Hi, ma'am.  How are you?

2        PROSPECTIVE JUROR:  I'm fine.  Thank you.

3        THE COURT:  You are juror 0176?

4        PROSPECTIVE JUROR:  Yes.

5        THE COURT:  Okay.

6        So you can take your mask off if you'd like while

7   we're chatting.

8        You answered, looks like, two questions yes,

9   question 8 and question 20.

10       Let's start with question 20 which was the

11  question about COVID.  So I described for you what our

12  processes will be and the level of protections that we'll

13  follow.  Given all that, would you still be uncomfortable as

14  a juror -- serving as a juror in this case?

15       PROSPECTIVE JUROR:  Well, with large crowds, yes.

16  But just -- it's mainly because I'm coming back to my

17  children at home.  And it's just my concern for, you know,

18  them.  But it's just with crowds.

19       THE COURT:  Okay.

20       Just to be clear, when you say "crowds," what --

21       PROSPECTIVE JUROR:  Well, just a large of amount

22  of people.

23       THE COURT:  Yeah.

24       So just to sort of be more precise in terms of

25  what you would experience if you were selected, you would be

1  in a courtroom like this, there would be lawyers at one

2  table and the other table, and then you would be seated in

3  the jury box with 13 other people.  So everybody would be

4  masked, as I said, except for the person that's questioning

5  and the witness.

6          And so if those were the circumstances, do you

7  think you could be comfortable about serving as a juror in

8  this case?

9          PROSPECTIVE JUROR:  I guess.

10          THE COURT:  I'm sorry?

11          PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  All right.

13          Well, I don't want you to give me an answer that

14  you think I want to hear, I want to sort of elicit the truth

15  from you.  And if you have a discomfort, let us know.

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  No, you wouldn't feel comfortable or,

18  no, you don't have a discomfort?

19          PROSPECTIVE JUROR:  No, I would not feel

20  comfortable.

21          THE COURT:  You wouldn't feel comfortable.

22          And do you think it would -- your level of

23  discomfort would distract you in terms of listening to the

24  evidence and paying attention to the case?

25          PROSPECTIVE JUROR:  A little maybe, yes.

```
 1          THE COURT:  I'm sorry?

 2          PROSPECTIVE JUROR:  A little maybe, yes.

 3          THE COURT:  A little maybe.

 4          All right.  Any objections?

 5          MR. KELLY:  No, Your Honor.

 6          MR. MONROE:  No, sir.

 7          THE COURT:  All right, ma'am.  I'm going to

 8   dismiss you.  Thank you very much.

 9          Juror 0176 will be stricken for cause, I keep

10   forgetting to put that on the record, due to her concerns

11   about COVID exposure.

12          All right, ma'am.  You are juror 0735; is that

13   right?

14          PROSPECTIVE JUROR:  Yes, sir, yes.

15          THE COURT:  Feel free to remove your mask if you

16   feel comfortable doing so.

17          All right.  So you've answered questions 8 and 13C

18   and 19.  So let's start with 19 which was the hardship

19   question.  And you've written here in parentheticals

20   "(schedule/standardized testing."

21          PROSPECTIVE JUROR:  Yes.  I just wrote it just to

22   be careful.

23          I'm a teacher, and standardized testing starts

24   tomorrow --

25          THE COURT:  Okay.
```

1          PROSPECTIVE JUROR:  -- and it lasts the rest of

2     the month.

3          So I didn't know if that was a real excuse or not,

4     but I just wanted to be open about that.

5          THE COURT:  Okay.  I appreciate that.

6          I mean, I assume if you were serving, somebody

7     else could cover for you as proctor or for some other

8     reason?

9          PROSPECTIVE JUROR:  Yeah, of course.

10         THE COURT:  Hopefully you'll understand that

11    ordinary work obligations are not a basis for being excused.

12         PROSPECTIVE JUROR:  Yeah.

13         THE COURT:  All right.

14         You also answered 8 and 13C.

15         So Question 8 concerns exposure to video and to

16    the news.  Can you tell us a little bit about your exposure

17    to video and news about the events of January the 6th?

18         PROSPECTIVE JUROR:  Yeah.

19         So as I feel like a lot of people across the whole

20    country, when it happened, we saw -- I saw the news, I saw

21    it on Instagram.

22         I don't watch the news on, like, TV too much, but

23    social media is like my biggest exposure to it.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR:  I saw the initial events.

1   And then after that, it was just upsetting and kind of -- it

2   was very stressful just since I live here in D.C.  So I

3   tried not to watch too much after that just from the initial

4   stuff, because it was just a stressful time, still working

5   at home, and so it was just not fun to watch.

6                THE COURT:  Sure.  Of course.

7                PROSPECTIVE JUROR:  I saw some, but, after a

8   while, I just...

9                THE COURT:  Can I ask, when you say you saw video

10  on Instagram, was that video that was transmitted by media

11  or were you actually ending up looking at original video

12  that people were posting on the day of or after?

13               PROSPECTIVE JUROR:  It was all, like, through the

14  media.  So just through different news outlets that I

15  follow.  Nothing that I would think was anyone that was

16  there.  But, yeah, all from the news media.

17               THE COURT:  So, look, it's not surprising that

18  people had reactions to the events of January the 6th.  But

19  the question for us today is whether you could put those --

20  what you saw on that day to the side and evaluate the

21  evidence that's presented in this case fairly and

22  impartially?

23               PROSPECTIVE JUROR:  Uh-huh.

24               THE COURT:  Is that a yes?

25               PROSPECTIVE JUROR:  Yes.

1          I mean, I think when the case is said and all the

2   sides are said, I feel like it would be an easy -- once you

3   have all the information, you're able to make that decision.

4          THE COURT:  So it sounds like you -- you know, the

5   defendant in this case is presumed to be innocent.  And so

6   just because he is accused of events of conduct arising out

7   of January the 6th, do you think you would be able to

8   presume him to be innocent?

9          PROSPECTIVE JUROR:  If that's what the case -- the

10  evidence said.

11         THE COURT:  Right.  Well, that's the law, that's

12  the principle of law --

13         PROSPECTIVE JUROR:  Yep.

14         THE COURT:  -- that somebody is presumed innocent.

15         And then another principle of law is that the

16  government bears the burden of proving guilt beyond a

17  reasonable doubt.  And it's the government's burden, it's

18  not the defendant's burden at all.  Would you be able to --

19  if you concluded or developed the belief that the government

20  had not carried its burden of proof, would you be able to

21  advocate for acquittal and vote for acquittal of the

22  defendant?

23         PROSPECTIVE JUROR:  Can you rephrase that?

24         THE COURT:  Yeah, sorry, that was a mouthful.

25         PROSPECTIVE JUROR:  Sorry.

1          THE COURT:  It's okay.

2          It's another principle of law that the prosecutors

3   bear the burden of proving guilt beyond a reasonable doubt.

4   If after all the evidence was in you came to the conclusion

5   or the view that the government had not met its burden,

6   would you have any trouble returning a not-guilty verdict in

7   that case?

8          PROSPECTIVE JUROR:  I don't think so.

9          THE COURT:  Okay.

10         Any reason to doubt your ability to do that?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Okay.

13         All right.  Let's turn to Question 13C which is

14  whether you know anybody who's attended law school, worked

15  as a lawyer, or worked in a law office.

16         PROSPECTIVE JUROR:  Uh-huh.

17         My aunt is a lawyer, and my uncle is also a

18  lawyer.

19         THE COURT:  Okay.

20         And can you tell us whether either of them

21  practice in criminal law at all?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  All right.

24         Any questions from the government?

25         MR. KELLY:  No, Your Honor.

1        THE COURT:  Mr. Monroe.

2        MR. MONROE:  No inquiry, Judge.

3        THE COURT:  All right.  Thank you.  Mr. Douyon

4   will show you out of the courtroom.

5        PROSPECTIVE JUROR:  Thank you.

6        THE COURT:  So I was reminded that I had a case

7   similar to -- an issue arising in a separate case years ago

8   in which a prosecutor from the U.S. Attorney's Office was on

9   the panel.  That prosecutor came on, gave the answers that

10  would cause me to think that that person could be a fair and

11  impartial juror.

12       Defense counsel in that case objected, and I can't

13  remember whether they cited the case or I did some

14  additional research, but one or the other.  And I'm now --

15  I think this is the case that I remember happening upon at

16  the time.  It's called *United States versus Polichemi*,

17  P-o-l-i-c-h-e-m-i.  It's a Seventh Circuit case from 2000.

18  It's 219 F.3d 698.

19       And I'll just get to the holding of that case,

20  which was -- bottom line is that, you know, during the jury

21  selection process, prospective juror Lorena Nape came up as

22  a potential member of the final jury.  As a result of

23  questioning, the parties learned that she was a 15-year

24  employee of the U.S. Attorney's Office for the Northern

25  District of Illinois, precisely the same office from which

1    the prosecuting attorneys came.  Based on her affiliation

2    with the Prosecutor's Office, the defendants moved to strike

3    her for cause, even though Nape, in response to questions,

4    stated she could be fair and impartial, the defendants took

5    the position that, at a minimum, she was excludable on the

6    ground of implied bias.  The District Court denied their

7    motion and then used one of their -- they then used one of

8    their peremptory challenges to remove her from the jury.

9         The Court there holds that in spite of the

10   government's arguments to the contrary in its petition for

11   re-hearing, we continue to be of the view that the Implied

12   Bias doctrine applies in the particular circumstances of

13   this case and that it required the disqualification of the

14   prospective juror.

15        If she had sat on the final jury, this appeal

16   would be quite different.  And we note that an earlier case

17   from the Seventh Circuit rejected the contention that a

18   defendant is obligated to use a peremptory challenge to cure

19   the judge's error.

20        But here, the juror did not sit, and we suspect

21   that the prudent defense counsel will continue to use

22   peremptory challenges to protect their clients against

23   potentially biased jurors, rather than gambling everything

24   on their ability to show bias after the fact and to obtain

25   reversal of a conviction on this basis.  This concept of

1    Implied Bias is well-established in the law, et cetera.

2            So, look, this is something that I recall, and,

3    you know, thankfully, my brain has not become so addled that

4    I forget those things.

5            So unless there is contrary case law, I know it's

6    out of Circuit case law, but just out of an abundance of

7    caution, I think I will sort of reverse myself and grant the

8    motion to strike for cause.  This is juror 0780, okay?

9            All right.  Let's bring in the next juror.

10           Hi, ma'am.  How are you?

11           PROSPECTIVE JUROR:  Hi.  Good.

12           THE COURT:  Thank you your patience; I know it's

13   been a long day.

14           You're juror 0634?

15           PROSPECTIVE JUROR:  Correct.

16           THE COURT:  All right.

17           Feel free to remove your mask if you feel

18   comfortable doing so.

19           You answered three question, Question 7, 8, and

20   13A.

21           So let's start -- we'll combine 7 and 8, those

22   concern essentially your media and video exposure to the

23   events of January the 6th.

24           Can you tell us generally what your exposure has

25   been to news coverage and video of that day?

1          PROSPECTIVE JUROR:  I guess I actually saw it live

2    as it was happening.

3          And then just like since then, I've just seen

4    different footage on it.  I haven't watched any footage

5    recently, but I actually saw a lot of it the day that it

6    happened.

7          THE COURT:  Okay.

8          And can you tell us what news sources you were

9    watching on the day of and since then from which you've

10   gathered information?

11         PROSPECTIVE JUROR:  Mostly like MSNBC and CNN.

12         THE COURT:  Okay.

13         Would you consider yourself someone who's sort of

14   actively seeking out news about January the 6th?

15         PROSPECTIVE JUROR:  No.

16         I mean, just like when it comes on, I watch a lot

17   of -- I guess recently I haven't been watching a lot of

18   news.  But back then, I was watching news quite frequently.

19         THE COURT:  Okay.

20         So the question here today is whether you would be

21   able to be a fair and impartial juror with respect to this

22   defendant.

23         And would you be able to put aside what you

24   remember seeing of the events of that day and judge this

25   defendant and the evidence fairly and impartially?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.

3          And if you were convinced that the government had

4   not met its burden of proof in this case, would you have any

5   difficulty in acquitting this defendant?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  All right.

8          Question 13A asks whether you know anybody in law

9   enforcement, either yourself or persons who are close to

10  you?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  And can you tell us about that?

13         PROSPECTIVE JUROR:  Okay.

14         So my mom worked in law enforcement; she was,

15  like, a police dispatcher for most of her career.

16         THE COURT:  Okay.

17         PROSPECTIVE JUROR:  And then I have a cousin who's

18  a Texas state trooper currently.

19         THE COURT:  Okay.

20         PROSPECTIVE JUROR:  And then my next-door

21  neighbor's son works for Secret Service.

22         And then my neighbor on the other side, like,

23  formerly worked for the Department of Justice, but more,

24  like in an office type of role.

25         THE COURT:  Okay.

1          So do any of the -- you've named a few folks and

2  did identify their agencies.  Did any of them work for the

3  MPD?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Or the FBI?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  All right.

8          So you've had some relationships with people who

9  are in law enforcement.  There will be law enforcement

10  testimony expected in this case.  You'll be instructed that

11  the testimony of a law enforcement officer should not be

12  given any greater or lesser weight just because the person

13  is in law enforcement.  Is that an instruction you think you

14  could follow?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Any reason to think that your

17  relationship with people in law enforcement might cause you

18  to not be fair and impartial in this case?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  All right.

21          Any follow-up from the government?

22          MR. KELLY:  No, Your Honor.

23          MR. MONROE:  No inquiry, Judge.

24          THE COURT:  Ma'am, thank you very much.

25  Mr. Douyon will show you out of the courtroom.  Thank you.

 1              PROSPECTIVE JUROR:  Thank you.

 2              THE COURT:  Hi, sir.  How are you?

 3              PROSPECTIVE JUROR:  All right.  And yourself?

 4              THE COURT:  Good.  Thank you.

 5         You're juror 1262?

 6              PROSPECTIVE JUROR:  Yes, sir.

 7              THE COURT:  Feel free to remove your mask if you

 8    feel comfortable doing so.

 9         So I understand that you had your card but have

10    sort of misplaced it.

11              PROSPECTIVE JUROR:  Yeah.  When I went on lunch,

12    I misplaced it.  I was looking for it; I couldn't find it.

13              THE COURT:  Okay.

14         No problem.  Let me ask you, do you recall

15    answering any questions yes?

16              PROSPECTIVE JUROR:  Yes, sir.

17              THE COURT:  And do you remember which questions

18    that you may have put down a yes answer to?

19              PROSPECTIVE JUROR:  Yes, sir.

20              THE COURT:  All right.

21         Can you tell us what you remember answering yes?

22              PROSPECTIVE JUROR:  No. 7 and No. 8.

23              THE COURT:  Okay.

24         Were those the only two?

25              PROSPECTIVE JUROR:  And number -- I believe it was

1   the last one, I think No. 21.

2            THE COURT:  Okay.

3            21, that was the catch-all question about,

4   is there any reason that you think you might not be able to

5   sit as a fair and impartial juror in this case.  Did you

6   answer that yes?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  All right.

9            Can you tell us why you answered that yes?

10           PROSPECTIVE JUROR:  For my father's side, he's

11  Muslim.  And then from my mom's side, she's Catholic.

12           THE COURT:  I'm sorry, can you repeat that?

13           PROSPECTIVE JUROR:  I said, from my father's side,

14  he's Muslim, and they don't like to judge people.  And then

15  from my mom's side, they Catholic, so that's interfering

16  with me making a decision.

17           THE COURT:  I see.  Okay.

18           Well, let me ask you this.  I know you've

19  described the religious affiliation of your parents.

20  Is that a religious belief that you share with them?

21           PROSPECTIVE JUROR:  Yes, sir.

22           THE COURT:  Okay.

23           PROSPECTIVE JUROR:  Since I was born; since a

24  little kid.

25           THE COURT:  Say that again.

```
 1              PROSPECTIVE JUROR:  Since I was small, I've been
 2     knowing both religions.
 3              THE COURT:  I see.
 4              And so would you say that it is inconsistent with
 5     your religious beliefs to sit in judgment of someone?
 6              PROSPECTIVE JUROR:  From my father's side, yes,
 7     sir.
 8              THE COURT:  Okay.
 9              But, again, I'm asking about your religious
10     briefs, not your parents'.
11              PROSPECTIVE JUROR:  Yes, sir.
12              THE COURT:  All right.
13              Any objections?
14              MR. KELLY:  No, Your Honor.
15              MR. MONROE:  No, sir.
16              THE COURT:  All right, sir.  You'll be excused.
17     Thank you very much.
18              PROSPECTIVE JUROR:  Thank you, sir.  You have a
19     good one.
20              THE COURT:  All right, sir.  How are you?
21              PROSPECTIVE JUROR:  Fine.
22              THE COURT:  You are juror 1175?
23              PROSPECTIVE JUROR:  Correct.
24              THE COURT:  Okay.
25              You answered two questions, Questions 7 and 8.
```

```
 1              PROSPECTIVE JUROR:  Yes.

 2              THE COURT:  Those questions we'll take together

 3     because they ask about your exposure to the events of

 4     January 6th.

 5              Can you tell us to what extent you've been exposed

 6     to news and video about that day's events?

 7              PROSPECTIVE JUROR:  General news media.  You know,

 8     the network, regular broadcast networks, print, Washington

 9     Post.  I don't read stuff online, it just -- I don't appeal

10     to that kind of stuff.

11              THE COURT:  Okay.

12              So other than the Washington Post, any other print

13     media that you read?

14              PROSPECTIVE JUROR:  Something called The Week.

15              THE COURT:  And what about -- sounds like you

16     watch television news.  Can you tell us which networks?

17              PROSPECTIVE JUROR:  NBC.  All the major networks.

18     I don't watch CNN or MSNBC or any of the other ones, though.

19              THE COURT:  Okay.

20              So the question here is, for you, whatever you've

21     learned about the events of that day, what you recall

22     seeing, would you be able to set all of that aside and view

23     the evidence in this case fairly and impartially?

24              PROSPECTIVE JUROR:  I believe I can -- yes, I can.

25     I've served in -- I've been in here eight years.  I did a
```

1　　case eight years ago, so I know the drill.

2　　　　　　THE COURT:  Okay.  All right.

3　　　　　　All right.  Well, again, this is more about what

4　　your answers are, as opposed to what may have been in the

5　　case -- because every case is different.

6　　　　　　PROSPECTIVE JUROR:  Sure, of course, I understand.

7　　　　　　THE COURT:  So I want to make sure that you're

8　　confident that this defendant who's been accused of offenses

9　　arising out of January 6th, that you could be fair and

10　　impartial as to him.

11　　　　　　PROSPECTIVE JUROR:  Uh-huh.

12　　　　　　THE COURT:  Is that a yes?

13　　　　　　PROSPECTIVE JUROR:  Yes.

14　　　　　　THE COURT:  Okay.

15　　　　　　And if you came to the conclusion that the

16　　government had not carried its burden of proof, would you

17　　have any trouble voting to acquit him?

18　　　　　　PROSPECTIVE JUROR:  No, no.

19　　　　　　THE COURT:  Okay.

20　　　　　　Any follow-up from the government?

21　　　　　　MR. KELLY:  Yes, Your Honor, briefly.

22　　　　　　Good afternoon, sir, or evening.

23　　　　　　PROSPECTIVE JUROR:  Sure.

24　　　　　　MR. KELLY:  Sir, what do you do for a living?

25　　　　　　PROSPECTIVE JUROR:  I'm a retired DNA analyst.

```
 1              MR. KELLY:  Where were you a DNA analyst before

 2    you retired?

 3              PROSPECTIVE JUROR:  MedStar Washington Hospital

 4    Center.

 5              MR. KELLY:  And you said that you served on a jury

 6    about eight years ago; is that right?

 7              PROSPECTIVE JUROR:  Yes.

 8              MR. KELLY:  Was that a criminal case?

 9              PROSPECTIVE JUROR:  Civil case.

10              MR. KELLY:  Civil case?

11              PROSPECTIVE JUROR:  Yes.

12              MR. KELLY:  Without saying what it was, was the

13    jury able to come to a decision in that civil case?

14              PROSPECTIVE JUROR:  Yes, we did.

15              MR. KELLY:  Thank you.

16              THE COURT:  Okay.

17              Any follow-up?

18              MR. MONROE:  No inquiry, Judge.  Thank you.

19              THE COURT:  All right.

20              Sir, thank you very much.  Mr. Douyon will show

21    you out of the courtroom.

22              I'd like to try and get two more qualified.  We're

23    at 33.  If there's no objection, we can excuse the earlier

24    juror who had the medical appointment on Wednesday, and so

25    that we have a couple of extra to spare.
```

1          MR. KELLY:  No objection, Your Honor.

2          THE COURT:  Okay.

3          Hello, ma'am.  How are you?

4          PROSPECTIVE JUROR:  Quite well.  How are you?

5          THE COURT:  Good.

6          Thank you for your patience; I know it's been a

7    long day.

8          You are juror 0785; is that right?

9          I'm sorry --

10          PROSPECTIVE JUROR:  0485.

11          THE COURT:  -- 0485.  I misread your 4 as a 7.

12          So you're 0485?

13          PROSPECTIVE JUROR:  Yeah.

14          THE COURT:  Feel free to remove your mask, ma'am,

15    if you'd like, while I'm asking you questions.

16          You answered five questions yes, questions 5, 7,

17    8, 11, and 13A.

18          So let's start with question 5 which asks whether

19    you live near or work on the Capitol -- or at the Capitol.

20          PROSPECTIVE JUROR:  I live near the Capitol.

21          THE COURT:  Okay.

22          And can you tell us just approximately how far

23    away you live from the Capitol?

24          PROSPECTIVE JUROR:  Probably three quarters of a

25    mile.

         1              THE COURT:   Three quarters of a mile?

         2              PROSPECTIVE JUROR:  Yes.

         3              THE COURT:   And were you at your home on January

         4     the 6th?

         5              PROSPECTIVE JUROR:  Yes, I was.

         6              THE COURT:   And can you tell us what, if anything,

         7     you observed or heard that day?

         8              PROSPECTIVE JUROR:  Once I heard the news,

         9     I basically hunkered down in my house.

        10              THE COURT:   Okay.

        11              And so let me just turn then to that response

        12     which is -- I think gets to Question 7 and 8 which you

        13     answered, which asks about your media exposure and your

        14     exposure to video of the events of that day.

        15              Can you tell us a little bit about -- or can you

        16     tell us about what your exposure has been?

        17              PROSPECTIVE JUROR:  I watched the news, the

        18     broadcast news.

        19              THE COURT:   Okay.

        20              So can you tell us which networks you watch?

        21              PROSPECTIVE JUROR:  *PBS NewsHour*.

        22              THE COURT:   All right.

        23              And so is that -- to the extent that you've heard

        24     and seen news about the events that day, it's from PBS;

        25     is that right?

1          PROSPECTIVE JUROR:  Yes.

2          And NPR, on the radio.

3          THE COURT:  So let me ask you this.  So the issue

4    here in this case is not sort of generally what happened on

5    that day but, rather, the conduct and the allegations

6    against this defendant.

7          Would you be able to put aside whatever you saw or

8    recall seeing and what you've read from that day and about

9    that day and evaluate the evidence as it's presented in this

10   case?

11         PROSPECTIVE JUROR:  I could.

12         THE COURT:  And could you be fair and impartial to

13   this particular defendant even though his conduct arises out

14   of the events of January the 6th?

15         PROSPECTIVE JUROR:  I could.

16         THE COURT:  All right.

17         You answered Question 11 yes as well, which is, do

18   you have such strong feelings about the President,

19   former-President Trump or his supporters, that would make it

20   difficult for you to be fair and impartial?

21         Can you tell us about that?

22         PROSPECTIVE JUROR:  Well, that goes to the former

23   President.

24         THE COURT:  Okay.

25         So, you know, we all come into the courtroom with

1  our views, political views.  Those political views are not

2  on trial here, and it's this defendant that's on trial.

3          Now, if you were to learn that this defendant was

4  a supporter of the former President and perhaps believed in

5  policies and viewpoints of the former President, do you

6  think that would affect your ability to be fair and

7  impartial in this case?

8          PROSPECTIVE JUROR:  I think I would be fair.

9          THE COURT:  You would be fair?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  So notwithstanding the fact that Mr.

12  -- that the defendant here may have supported the former

13  President, you think you could be fair and impartial as to

14  him?

15         PROSPECTIVE JUROR:  I could.

16         THE COURT:  And the law says that you're required

17  to presume any defendant to be presumed innocent.  Is that

18  something you could apply in this case?

19         PROSPECTIVE JUROR:  I could.

20         THE COURT:  And if you were convinced that the

21  government had failed to carry its burden of proving his

22  guilt beyond a reasonable doubt, could you return a

23  not-guilty verdict?

24         PROSPECTIVE JUROR:  I could.

25         THE COURT:  All right.

```
 1              Question 13A asks whether you know members of law
 2   enforcement.  Can you tell us about that?
 3              PROSPECTIVE JUROR:  Yeah, it's actually kind of an
 4   extended -- my next-door neighbor, her daughter is part of
 5   the Sergeant of Arms staff.
 6              THE COURT:  Okay.
 7              PROSPECTIVE JUROR:  And I know her from growing up
 8   together.
 9              THE COURT:  Okay.
10              And so this is your neighbor's daughter, you said?
11              PROSPECTIVE JUROR:  Yes.
12              THE COURT:  Okay.
13              And so when you say the Sergeant of Arms staff,
14   you mean the Sergeant of Arms of the U.S. Capitol?
15              PROSPECTIVE JUROR:  Yes.
16              THE COURT:  Okay.
17              And was your neighbor's daughter there on January
18   the 6th?
19              PROSPECTIVE JUROR:  Yes.
20              THE COURT:  And have you spoken to her about those
21   events?
22              PROSPECTIVE JUROR:  No.
23              THE COURT:  All right.
24              Now, anything about the fact that she was there
25   that day, do you think you could still be fair and impartial
```

1    about judging this defendant's conduct on that day?

2              PROSPECTIVE JUROR:  I could.  They have to prove

3    that he was there.

4              THE COURT:  Right, and among other things.

5              PROSPECTIVE JUROR:  Yeah.

6              THE COURT:  I mean, that's one thing the

7    government would be required to prove, among other things,

8    and you would be able to hold them to their burden of proof;

9    is that correct?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  All right.

12             Anything from the government?

13             MR. KELLY:  Just very briefly, Your Honor.

14             Hello.

15             What is it that you do for a living?

16             PROSPECTIVE JUROR:  I'm retired.  I'm a retired

17   federal civil servant.

18             MR. KELLY:  Okay.

19             What did you do before retiring?

20             PROSPECTIVE JUROR:  I worked in the Defense area.

21   So I'm retired from the Defense department.

22             MR. KELLY:  Okay.

23             Nothing further.  Thank you.

24             THE COURT:  Counsel, anything from the defense?

25             MR. MONROE:  No inquiry, Judge.  Thank you.

1    THE COURT:  All right.  Thank you, Mr. Webster

2  [sic].

3    So, ma'am, thank you very much.  Mr. Douyon will

4  show you out of the courtroom.

5    Hi, sir.  How are you?

6    PROSPECTIVE JUROR:  Hello.

7    THE COURT:  I'm sorry?

8    PROSPECTIVE JUROR:  Hi.

9    THE COURT:  Hi.  How are you?

10    PROSPECTIVE JUROR:  Good.

11    THE COURT:  Good.  Thank you.

12    You're juror 0517?

13    PROSPECTIVE JUROR:  Yeah, that's me.

14    THE COURT:  Feel free to remove your mask if you'd

15  like while we're chatting.

16    You answered three questions yes, they're 5, 6,

17  and 8.

18    So let's start with 5 and that is whether you work

19  near or live near the Capitol.

20    PROSPECTIVE JUROR:  Yes, I live near the Capitol.

21    THE COURT:  Okay.

22    And can you tell us approximately how far?

23    PROSPECTIVE JUROR:  I would say a mile away.

24    THE COURT:  About a mile away.

25    And so what neighborhood are you in?

1          PROSPECTIVE JUROR:  Shaw.

2          THE COURT:  Oh, you're in Shaw.  Okay.  So you're

3   a bit of a distance away.

4          So next question, Question 6, concerns whether you

5   or someone you know was a participant in or physically

6   present as a witness to the events of January the 6th.

7   Can you tell us about that?

8          PROSPECTIVE JUROR:  I would say myself because,

9   like I say, I live in Shaw, but I'm on New Jersey Avenue.

10         THE COURT:  Okay.

11         PROSPECTIVE JUROR:  So it's kind of four mile

12  away, in the Fairmont Triangle.

13         So, yes, I was at home on the day of the event,

14  and so I saw.

15         THE COURT:  Okay.

16         And can you tell us when you say you saw, what did

17  you see that day that -- and just to be clear, not on

18  television, I'm talking about what you may have seen outside

19  your home or in the streets.

20         PROSPECTIVE JUROR:  I just saw some people that

21  was in the event.  Actually they park in front of my house

22  and around my neighborhood, so they walked towards the

23  Capitol.

24         THE COURT:  So you just saw -- it sounds like you

25  just saw people who may have ultimately ended up at the

1  Capitol that day, but you don't know one way or another.

2          PROSPECTIVE JUROR:  Exactly.

3          THE COURT:  Okay.

4          So Question 8 concerns video you have watched of

5  the events at the Capitol.  Can you tell us about what video

6  you may have seen at the Capitol, about the events of

7  January the 6th?

8          PROSPECTIVE JUROR:  That would be on TV, yes,

9  that's what I watched.  Watched it on TV, yes.

10          THE COURT:  And did you watch it on the day of,

11  is that right?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  And have you seen news stories on

14  television about those events?

15          PROSPECTIVE JUROR:  That's true.

16          THE COURT:  Can you tell us which networks you've

17  seen news on?

18          PROSPECTIVE JUROR:  CNN.

19          THE COURT:  So the question for you is -- the

20  question is, this defendant, could you -- notwithstanding

21  what you've seen about the events of that day, could you

22  evaluate the evidence against him fairly and impartially?

23          PROSPECTIVE JUROR:  Sorry, repeat the question.

24          THE COURT:  Could you evaluate the evidence

25  that's -- with respect to this defendant fairly,

1    impartially?

2         PROSPECTIVE JUROR:  Yes.

3         THE COURT:  And if this defendant, like all

4    defendants, is presumed to be innocent, could you apply that

5    presumption of innocence to him?

6         PROSPECTIVE JUROR:  Yes.

7         THE COURT:  And if the government bears the burden

8    of proving his guilt beyond a reasonable doubt, if you were

9    convinced that the government had failed to meet its burden,

10   would you have any difficulty in acquitting this defendant?

11        PROSPECTIVE JUROR:  No.

12        THE COURT:  Okay.

13        Any follow-up from the government?

14        MR. KELLY:  No, Your Honor.

15        THE COURT:  Anything from the defense?

16        MR. MONROE:  No, sir.

17        THE COURT:  All right.  Thank you, sir.

18   Mr. Douyon will show you out of the courtroom.

19        So with that, I am at 35.  And so if everybody --

20   if there's no objection, we will strike juror 0571, who is

21   in seat 31, who has the medical appointment on Wednesday.

22        Any objection?

23        MR. KELLY:  No, Your Honor.

24        MR. MONROE:  No, sir.

25        THE COURT:  Okay.

1    So we've got 34 qualified.  The afternoon went

2  much better than the morning.

3    All right.  So let's transition over to the other

4  courtroom, and be prepared to move immediately to your

5  peremptory strikes.

6    Just a reminder the way we're going to do this,

7  you'll each have peremptory sheets, ten for the defense, six

8  for the government.  You'll write down your peremptories.

9  You can strike either into the box or into the panel,

10  meaning any juror that's coming in.

11    Once you've written down your peremptories, you'll

12  exchange sheets so that each side knows who's been stricken.

13  If there happens to be an overlap in terms of the stricken

14  jurors, you don't get an extra peremptory.

15    You'll hand those sheets up to us, we'll figure

16  out who's been stricken, re-seat everybody -- or I don't

17  know whether we'll re-seat everybody.  But the bottom line

18  is, once we're done with the actual deliberating jurors,

19  then you'll each get one strike afterwards for your

20  alternates, okay?  Any questions about that?

21    MR. MONROE:  Just one round, Judge?

22    THE COURT:  Yes, just one round.  You'll sit down

23  with your sheet and do it; we're not going to alternate.

24    MR. MONROE:  All right.

25    THE COURT:  Okay?

1          Thank you.  We'll see everybody next door shortly.

2          COURTROOM DEPUTY:  All rise.

3          This court stands in recess.

4          (Recess from 5:29 p.m. to 5:41 p.m.)

5          COURTROOM DEPUTY:  All rise.

6          THE COURT:  Please have a seat, everyone.

7          All right.  First and foremost, thank you,

8     everybody.  I know it has been a long day, but I promised

9     you it was going to be a long day.  And I know we're past

10    5:00, but I suspect you all would rather stay a little bit

11    later and get this done, rather than all come back tomorrow

12    morning.  So if you will just be a little bit more patient

13    with us, I would be very grateful.

14         Where we are now is that we've qualified the

15    number of jurors we need to qualify.  The next step in the

16    process is to winnow down the qualified jurors to the number

17    of jurors who will actually be serving on the panel.  That

18    is going to probably take, I hope, no more than 20 to 30

19    minutes.  It shouldn't even be probably 20 minutes is my

20    hope.  So be patient with us and I promise you we will move

21    as quickly as we can.

22         Again, same rules as before, you can talk amongst

23    yourselves, read what you would like to read, be online.

24    But, again, no research about the case and no communications

25    about the case, all right?  Thank you, all, very much.

1          (Pause)

2          THE COURT:  Government counsel, let's try and wrap

3     up and provide your sheet to the defense.

4          (Pause)

5          THE COURT:  Any questions?  Just pick up the

6     phone; we can chat.

7          (Bench conference)

8          THE COURT:  Any questions or concerns?

9          MR. MONROE:  No.

10         MS. NIELSON:  We were just trying to figure out

11    how to work it.

12         MR. MONROE:  I was just trying to answer a

13    question about how we selected the alternates.

14         THE COURT:  Oh, okay.

15         So what we're going to do is we'll -- once you've

16    stricken your deliberating jurors and we'll then put a pause

17    on it and we'll know where the alternates are coming in

18    from, what those two numbers are, and then we'll give you

19    one more strike for the alternates.  Make sense?

20         MR. MONROE:  Yes, sir.

21         THE COURT:  Okay.

22         (Open court)

23         THE COURT:  Counsel, are you all done with respect

24    to your sheets, are you ready to hand those up?

25         MS. MIRELL:  Almost done, Your Honor.

1    THE COURT:  Okay.  Everybody ready to turn your

2  sheets in?

3    All right, counsel.  Are we about ready to go?

4    Mr. Monroe?

5    (Pause)

6    THE COURT:  Okay.

7    Ladies and gentlemen, we are getting very close.

8    The next step in the process is going to involve a

9  little bit of musical chairs or musical benches, as the case

10 may be.  So please listen to Mr. Douyon and he will provide

11 you with some instructions about moving about, okay?

12    COURTROOM DEPUTY:  So we will be moving.

13    Seat No. 1 will be juror No. 0864.

14    Seat No. 2 will now be juror No. 0269.

15    So juror No. 0269 is now in seat No. 2.

16    Seat No. 3 is juror No. 1419.

17    Seat No. 4 is juror No. 0479.

18    Seat 5, juror No. 0378.

19    Seated 5 is 0378.

20    Seat 6 will be juror No. 0178.

21    Is juror No. 0178 present?  You'll be in seat

22 No. 6.

23    Seat 7, juror No. 0634.

24    Seat 8, juror No. 0799.

25    Seat 9, juror No. 1543.

1              Seat 10, juror No. 1343.

2              Seat 11, juror No. 1312.

3              Seat 12 is juror No. 0030.

4              Seat 13 is juror No. 1216.

5              And seat 14 will be juror No. 0284.

6         THE COURT:  Okay.

7              So if you are in lucky numbers 1 through 14, you

8    will be part of our jury.

9              If you are not in seats 1 through 14, you are

10   dismissed for the day.  Please allow me to express my deep

11   gratitude for your service today, for your patience.  I know

12   it's been a long day.  Thank you very much, everyone, you

13   are free to leave.

14             (Prospective jurors exited the courtroom.)

15        THE COURT:  All right.

16             So those of you who remain, you are our jury for

17   this case.  I know -- I suspect none of you woke up this

18   morning and said to yourself, I can't wait to be on this

19   jury, but, nevertheless, here you are.  I appreciate it, and

20   I appreciate your good humor.

21             You have my word that we will be very sensitive to

22   your time.  We all understand that jury service is an

23   imposition on your lives.  Nevertheless, it is a civic duty,

24   and I'm grateful that you are performing it.

25             But as I said, we will be mindful of your time.

1   What that means is we will move as efficiently as we can

2   through the day with, hopefully, as few disruptions as

3   possible.

4           With that, we are going to dismiss you for the

5   evening.  Just a few reminders before I do so:

6           You are now on the jury, and the instructions that

7   I've given you to this point apply even more forcefully and

8   more substantially than before.

9           You can obviously now tell your loved ones and

10  your employer that you are on this jury and will be occupied

11  for the next week plus; however, I ask you not to share with

12  them the details or the nature of the case.  So no

13  communications with anyone beyond that limited information,

14  and, importantly, no communications about the case amongst

15  yourselves.  You will have the opportunity to discuss the

16  case when you retire to deliberate.

17          Again, I can't emphasize enough of no reviewing of

18  Internet sources, social media.  Just be very, very careful

19  as you go home this evening and look at the news.  I'm not

20  saying don't look at the news or social media, but it may be

21  that you may run across something about this case.  If you

22  do, please turn away from it immediately, particularly if

23  it's a link to a story; do not press that link and go to

24  that story.  If you do find yourself exposed overnight to

25  anything about this case, and this will be throughout the

1 duration of the case, please let Mr. Douyon know so that we

2 can talk to you about it separately, okay?

3          Finally, if at any point in time between now and

4 tomorrow morning or throughout the course of this trial you

5 run into the lawyers or anyone else participating in the

6 case and they walk away from you, it is not because they are

7 being rude, it is because they are under strict instructions

8 not to discuss or interact with you all, okay?

9          If by chance at any point, whether it's when

10 you're outside the courthouse walking into the courtroom or

11 you're out in the hallways, you overhear anybody talking

12 about this case, please turn around and move, go in the

13 other direction, please let Mr. Douyon know that you've

14 overheard something so that we can follow up with you and

15 discuss it with you, okay?

16          Mr. Douyon will give you further instructions

17 about tomorrow morning.  We will start at 9:30 tomorrow

18 morning.  There will be some initial instructions that

19 I will give you, and then we will move into the parties'

20 opening statements.

21          Please be in the other courtroom, which Mr. Douyon

22 will tell you about, by 9:20 tomorrow so that we can get

23 started on time.

24          Thank you very much for your attention, thank you

25 for your service, and we look forward to seeing you all

1    tomorrow morning.

2              Take care.  Thank you, everyone.

3              (Jury exited the courtroom.)

4              THE COURT:  Okay.

5              So 9:20, please be in courtroom 10 by 9:20

6    tomorrow so we can get started on time.  I'll come in a

7    little early just to make sure there are no preliminary

8    matters.

9              Have both sides shared with one another whatever

10   exhibits that you may be showing during the jury -- excuse

11   me, during the opening statements?

12             MR. MONROE:  We have, sir.

13             THE COURT:  No objections as to those exhibits?

14             MS. MIRELL:  I don't believe we've talked

15   informally.  We will follow up after this.

16             MR. MONROE:  I gave you a binder.

17             MS. MIRELL:  In terms of your opening?

18             MR. MONROE:  Oh, I'm sorry.  Yes.  All right.

19             THE COURT:  Yeah.  Just for opening.  I want to

20   make sure there are no objections to anything in opening.

21             I can't remember what else I had to say.

22             I understand it's your birthday, Mr. Monroe.

23   Happy birthday.

24             MR. MONROE:  Thank you.

25             THE COURT:  Happy birthday to you.  I know you

1  maybe wished to be doing something else on your birthday.

2          MR. MONROE:  My 54th trip around our planet.

3          THE COURT:  I'm glad we're able to share it with

4  you.

5          MR. MONROE:  Still looking good.

6          THE COURT:  Okay.

7          Anything else before we adjourn for the evening?

8  I'll obviously swear the jurors in tomorrow morning once we

9  get started.  I've probably got about 10 to 15 minutes'

10 worth of opening instructions, and then we will go right

11 into the government's opening, okay?

12         Oh, has the government disclosed its witnesses

13 that it intends to call tomorrow to Mr. Monroe?

14         MS. NIELSON:  Yes, Your Honor.

15         THE COURT:  Thank you, all.

16         Anything before we adjourn?

17         All right.  Thanks, everybody.  We'll see you

18 tomorrow.

19         (Proceedings concluded at 6:11 p.m.)

20

21

22

23

24

25

# C E R T I F I C A T E

   I, William P. Zaremba, RMR, CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-titled matter.


Date:__May 6, 2022_____



    William P. Zaremba, RMR, CRR