In The

# United States Court Of Appeals

## For The D.C. Circuit

### UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

### THOMAS WEBSTER,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————

### BRIEF OF APPELLANT

———————

Elizabeth A. Brandenburg
Marcia G. Shein
LAW FIRM OF SHEIN,
   BRANDENBURG & SCHROPE
2392 North Decatur Road
Decatur, GA  30033
(404) 633-3797

*Counsel for Appellant*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES (CIRCUIT Rule 28(A)(1))

**Parties:**

The following parties have appeared in this case:

1. Thomas Webster, Defendant/Appellant

2. United States of America, Appellee.

## Rulings Under Review: (District Court Judge: Hon. Amit P Mehta)

April 18, 2022, Order, denying Motion for Change of Venue. Doc. 78. No reported citation exists;

April 21, 2022, Oral order finding evidence of DOJ investigation into witness N.R. inadmissible. Doc. 126, 63, 68. No reported citation exists.

September 21, 2022, Sentencing determination that body armor enhancement applies. Doc. 124. No reported citation exists.

## __STATEMENT OF RELATED CASES__

There are no related cases.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully submits that oral argument is both necessary and appropriate in this case. There are important issues that are significant enough to warrant oral argument, including review of the effects of pretrial publicity on the jury venire and the application of *Skilling v. United States*, 561 U.S. 358, 378 (2010).

# TABLE OF CONTENTS

**Page:**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES (CIRCUIT Rule 28(A)(1)) ...................................... i

STATEMENT OF RELATED CASES .............................................. ii

STATEMENT REGARDING ORAL ARGUMENT ........................................ iii

TABLE OF CONTENTS .................................................. iv

TABLE OF AUTHORITIES .......................................... vi

JURISDICTIONAL STATEMENT .................................................1

ISSUES PRESENTED .................................................1

STATUTES AND REGULATIONS .................................................1

STATEMENT OF THE CASE .................................................1

SUMMARY OF THE ARGUMENT ................................................17

ARGUMENT ................................................18

    I.    Pretrial publicity caused presumed and actual prejudice preventing a fair trial from taking place in Washington D........18

        A.    Presumed Prejudice ..................................... 19

            1.    The characteristics of the District of Columbia jury pool...............................................20

            2.    Nature and Volume of the National Local Media.................................................23

            3.    The Timing of the Proceedings........................... 27

        B.    Actual Prejudice ................................................. 28

II.    The District Court abridged Appellant's Sixth Amendment rights to confront the witnesses against him, and thus abused its discretion, by excluding all evidence of the investigation into Rathbun's conduct ........................................ 34

    A.    That Rathbun was under investigation by the Government while he was cooperating as a witness for the Government is relevant and admissible to demonstrate bias ............................................................. 36

    B.    The risk of unfair prejudice to the Government from admitting evidence of Rathbun's pending charges does not substantially outweigh their probative value ..... 38

III.    The District Court committed plain error in instructing the jury on 18 U.S.C. §111(b) ............................................................. 40

IV.    The District Court erred when it sustained the sentencing enhancement of four additional points for wearing body armor during a crime of violence pursuant to USSG 3B1.5(2)(B) ................................................................. 48

V.    The District Court abused its discretion when sentencing Appellant disparately from similarly situated defendants ....... 52

CONCLUSION ............................................................................57

CERTIFICATE OF COMPLIANCE ................................................ 59

CERTIFICATE OF SERVICE ...................................................... 60

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Davis v. Alaska*,
415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) ............ 34, 36, 39

*Delaware v. Van Arsdall*,
475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) ................ 35, 37

*Eagleston v. U.S.*,
172 F.2d 194 (9th Cir. 1949) .................................................... 46

*Estes v. Texas*,
381 U.S. 532 (1964) .............................................................. 24

*Greene v. Wainwright*,
634 F.2d 272 (5th Cir. 1981) .................................................. 37

*In re D.T.*,
977 A.2d 346 (D.C. 2009) ...................................................... 45

*Irvin v. Dowd*,
366 U.S. 717 (1961) ......................................................... 20, 31

*Johnson v. U.S.*,
520 U.S. 461, 117 S. Ct. 1544 (1997) ....................................... 40

*Jones v. Gash*,
404 F.2d 1231 (D.C. Cir. 1967) .............................................. 28

*Medlin v. U.S.*,
207 F.2d 33 (D.C. Cir. 1953) ............................................ 45-46

*Murphy v. Florida*,
421 U.S. 794 (1975) ....................................................... 19, 25

*Patton v. Yount*,
467 U.S. 1025 (1984) .......................................................... 19

*Rideau v. Louisiana,*
    373 U.S. 723 (1963) .......................................................................23

*Sheppard v. Maxwell,*
    384 U.S. 333 (1966) ............................................................. 20, 24

*Skilling v. United States,*
    561 U.S. 358 (2010) ....................iii, 17, 18, 20, 24, 26, 27, , 27, 31, 34

*Taylor v. U.S.,*
    456 F.2d 1101 (5th Cir 1976) ....................................................46

*Thornton v. U.S.,*
    268 F.2d 583 (D.C. Cir. 1959) ..................................................45

*U.S. v. Abel,*
    469 U.S. 45 (1984) ............................................................... 35

*U.S. v. Albuquerque Cosper Head,*
    (1:21cr291 D.D.C. October 27, 2022) ....................................... 54

*U.S. v. Arrington,*
    309 F.3d 40 (D.C. Cir. 2002) .......................................... 40, 41, 42, 45

*U.S. v. Barrett,*
    552 F.3d 724 (8th Cir. 2009) ............................................... 50

*U.S. v. Bey,*
    667 F.2d 7 (5th Cir. 1982) ..................................................46

*U.S. v. Bochene,*
    2022 WL 123893 (D.D.C. 2022)........................................29

*U.S. v. Booker,*
    543 U.S. 220 (2005).........................................................52

*U.S. v. Brown,*
    504 F.3d 99 (D.C. Cir. 2007) ......................................46, 47, 52

*U.S. v. Cervantes,*
    706 F.3d 603 (5th Cir. 2013) ...........................................50

*U.S. v. Chambers*,
  268 F. App'x 707 (10th Cir. 2008) ...................................... 50

*U.S. v. Day*,
  524 F.3d 1361 (D.C. Cir. 2008) ......................................... 48

*U.S. v. Douglas*,
  242 F. App'x 324 (6th Cir. 2007) ....................................... 50

*U.S. v. Fairlamb*,
  1:21-cr-120 (D.D.C. February 1, 2023) ............................... 55

*U.S. v. Gahagen*,
  44 F.4th 99 (2d Cir. 2022) .............................................. 50

*U.S. v. Gonzalez*,
  214 F.3d 1109 (9th Cir. 2000) ......................................... 19

*U.S. v. Granderson*,
  511 U.S. 39 (1994) ...................................................... 50

*U.S. v. Guilbert*,
  692 F.2d 1340 (11th Cir. 1982) ........................................ 46

*U.S. v. Haldeman*,
  559 F.2d 31 (D.C. Cir. 1976).................................19, 20, 23, 28, 29

*U.S. v. Hamrick*,
  43 F.3d 877 (4th Cir. 1995) ........................................... 46

*U.S. v. Jean-Charles*,
  696 F. App'x 405 (11th Cir. 2017) .................................... 50

*U.S. v. Johnson*,
  324 F.2d 264 (4th Cir. 1963) .......................................... 46

*U.S. v. Julian Khater*,
  1:21cr222 .................................................................. 54

*U.S. v. Lankford*,
  955 F.2d 1545 (11th Cir. 1992) ................................. 34, 37, 39

*U.S. v. Loman*,
    551 F.2d 164 (7th Cir. 1977) .......................................................46

*U.S. v. Lonnie Leroy Coffman*,
    21cr614 .......................................................................................56

*U.S. v. Matthew*,
    451 F. App'x 296 (4th Cir. 2011) ..........................................50

*U.S. v. Miller*,
    589 F. Supp. 3d 60 (D.D.C. 2022) .........................................55

*U.S. v. Moore*,
    846 F.2d 1163 (8th Cir. 1988) ..........................................40, 45

*U.S. v. Murphy*,
    35 F.3d 143 (4th Cir. 1994) ...................................................46

*U.S. v. Narog*,
    372 F.3d 1243 (11th Cir. 2004) .......................................46, 47

*U.S. v. Parman*,
    461 F.2d 1203 (D.C. Cir. 1971) .............................................45

*U.S. v. Patrick McCaughey*,
    (1:21cr40, April 14, 2023) .....................................................54

*U.S. v. Quiles - Olivo*,
    *684* F.3d 172 (1st Cir. 2012) ...............................................24

*U.S. v. Rafidi*,
    829 F.3d 437 (6th Cir. 2016) .................................................41

*U.S. v. Rawlings*,
    522 F.3d 403 (D.C. Cir. 2008) ..............................................40

*U.S. v. Reffitt*,
    21-cr-32 (DLF) ........................................................................53

*U.S. v. Richardson*,
    21-cr-721 ...................................................................................53

*U.S. v. Robertson,*
  610 F. Supp. 3d 229 (D.C.C. District Court, 2022) ........................... 55

*U.S. v. Rocha,*
  598 F.3d 1144 (9th Cir. 2010) ............................................... 45

*U.S. v. Rubenacker,*
  1:21-cr-00193 (D.D.C. May 26, 2022) ................................... 55

*U.S. v. Sayan,*
  968 F.2d 55 (D.C. Cir. 1992) ......................................... 46, 47

*U.S. v. Shamah,*
  624 F.3d 449 (7th Cir. 2010) .............................................. 50

*U.S. v. Siler,*
  734 F.3d 1290 (11th Cir. 2013) ....................................... 41, 42

*U.S. v. Spoerke,*
  568 F.3d 1236 (11th Cir. 2009) ........................................... 39

*U.S. v. Sturgis,*
  48 F.3d 784 (4th Cir. 1994) ............................................... 45

*U.S. v. Weissman,*
  899 F.2d 1111 (11th Cir. 1990) ...................................... 46, 47

*U.S. v. Wilson,*
  605 F.3d 985 (D.C. Cir. 2010) ...................................... 34, 38

## Statutes:

18 U.S.C. § 111 ............................................................ 40, 41

18 U.S.C. § 111(a) ....................................................... 41, 42

18 U.S.C. § 111(a)(1) ............................................. 2, 40, 41

18 U.S.C. § 111(b) .....................1, 2, 17, 40, 41, 42, 44, 48, 54, 57

18 U.S.C. § 1752(a)(1) ...................................................... 2

18 U.S.C. § 1752(a)(2) ........................................................... 2

18 U.S.C. § 1752(a)(4) ........................................................... 2

18 U.S.C. § 1752(b)(1)(A) ....................................................... 2

18 U.S.C. § 231(a)(3) ............................................................. 2

18 U.S.C. § 3231 .................................................................... 1

18 U.S.C. § 3553 .................................................................. 50

18 U.S.C. § 3553(a)(6) .......................................................... 52

18 U.S.C. § 3742 .................................................................... 1

28 U.S.C. § 1291 .................................................................... 1

40 U.S.C. § 5104(e)(2)(F) ....................................................... 2

**Constitutional Provisions:**

U.S. Const. amend. V .............................................. 18, 19, 46

U.S. Const. amend. VI .................... 1, 17, 18, 19, 34, 36, 37, 40

**Sentencing Guidelines:**

U.S.S.G. § 2A2.2 .................................................................. 16

U.S.S.G. § 2A2.2(b)(2)(B) ................................................16, 44

U.S.S.G. § 2A2.2(b)(3)(A) ...................................................... 16

U.S.S.G. § 2A2.2(b)(7) ........................................................... 16

U.S.S.G. § 3A1.2(b) ............................................................... 16

U.S.S.G. § 3A1.3 ................................................................... 16

U.S.S.G. § 3B1.5(2)(B) ........................................................ 1, 16, 48

U.S.S.G. § 3C1.1 ....................................................................16

**Rules:**

Fed. R. Crim. P. 21(a) ............................................................. 18

Fed. R. Crim. P. 52(b) ............................................................ 40

Fed. R. Evid. 608 .................................................................. 35

Fed. R. Evid. 622 .................................................................. 35

**Other Authorities:**

Dan Burman, the latest in the Jan. 6th Investigation,
CNN (Nov. 28, 2021), https://www.cnn.com/2021/11/28/
politics/January-6-investigation/index.html ................................................. 28

https://www.huffpost.com/entry/former-nypd-cop-arrested-
for-capitol-riot_n_6036722cc5b6dfb6a735ba6c ........................................ 25

https://www.npr.org/2021/03/23/980511734/judge-criticizes-
doj-for-talking-about-capitol-riot-conspiracy-case-in-the-press ............... 25

https://www.nytimes.com/2021/02/23/nyregion/nypd-officer-
arrested-capitol-riot.html?searchResultPosition=1 ..................................... 24

https://www.washingtonpost.com/dc-md-va/2022/07/08/
jan6-defendants-guns/ ...............................................................56

www.Electionresults.dcboe.org/election_results/
2016-General-Election ................................................................ 22

www.Electionresults.dcboe.org/election_results/
2020-General-Election .................................................................22

www.insider.com/all-the-us-capitol-pro-trump-riot-arrest-
charges-deems-2021-1 .................................................................. 26

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. A timely notice of appeal having been filed, this Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

## ISSUES PRESENTED

**I.**    **Pretrial publicity caused presumed and actual prejudice preventing a fair trial from taking place in Washington D.C.**

**II.**   **The District Court abridged Appellant's Sixth Amendment rights to confront the witnesses against him, and thus abused its discretion, by excluding all evidence of the investigation into Officer Rathbun's conduct.**

**III.**  **The District Court committed plain error in instructing the jury on 18 U.S.C. §111(b).**

**IV.**   **The District Court erred when it sustained the sentencing enhancement of four additional points for wearing body armor during a crime of violence pursuant to USSG 3B1.5(2)(B).**

**V.**    **The District Court abused its discretion when sentencing Appellant disparately from similarly situated defendants.**

## STATUTES AND REGULATIONS

Relevant statutes, rules, and constitutional provisions are in the Addendum. Circuit Rule 28(a)(5)

## STATEMENT OF THE CASE

The charges and indictment in this case stem from the events at the U.S. Capitol on January 6, 2021. Appellant was present that day and was involved

in an altercation with Officer Noah Rathbun. He was later charged with Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon in violation of 18 U.S.C. §§111(a)(1) and (b); Civil Disorder in violation of 18 U.S.C. §231(a)(3); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §§1752(a)(1) and (b)(1)(A)); Disorderly and Disruptive Conduct in violation of 18 U.S.C. §§1752(a)(2) and (b)(1)(A)); Engaging in Physical Violence in a Restricted Building or Grounds with a deadly weapon in violation of 18 U.S.C. §§1752(a)(4) and (b)(1)(A); and Act of Physical Violence in the Capitol Grounds in violation of 40 U.S.C. §5104(e)(2)(F). Doc. 76. JA161-164.

The events of the day were highly publicized across the nation and affected nearly every resident of Washington D.C. A motion to change venue was filed, opposed, and denied. Doc. 49, 52, 78. JA18-54, 57-73, 165-167.

The voir dire in this trial lasted one day with almost every venireperson aware of the events, having watched them on television. Doc. 113. JA238-335. Those that expressed political opinion were antagonistic to former President Trump. Counsel was not permitted to explore the political leanings of at least one eventual juror, and the court cooled counsel's efforts to uncover the venire members' biases.

Juror 13 stated that she felt unsafe during the Trump years as a black woman, but counsel was limited by the court in questioning her further. Trial Transcript Day 1 PM 123.[1] JA458. Juror 1429/19[2] had a negative view of Trump, and thought Trump supporters were not smart. Day 1 AM 65. JA302. Juror 8 stated that he was not a fan of Trump or his supporters, and described it as "not fun" when his supporters are being wild in the streets, and "some of them do get a little chaotic." Day 1 PM 9. JA344. The defense had to use a preemptory strike on juror 0974 who refused to state for which federal agency she worked as an analyst, although she works with FBI agents. Day 1 PM 33. JA368. She testified that she felt more aligned with government attorneys. Day 1, PM, 38. JA373. She is more empathetic to the police because she has "special police that protect [her] every day [she goes] to work." Day 1 PM 38. JA373. After a motion to strike for cause, Day 1 PM 40 the court stated that counsel's question as to the juror's "alignment" was not "exactly a fair question" and denied the motion. Day 1 PM 41. JA376.

---

[1] Hereinafter the trial transcript will be referred to by the Day # followed by AM or PM as that is how the transcript volumes are organized, and the page number.

[2] This venire member's number is reflected in the transcript as 1429 and 1419.

As trial began, Capitol Police Captain Mendoza testified to the layout of the Capitol, including its boundaries and perimeters. Day 2 AM 60. JA622. She never saw Appellant on January 6. Day 2 AM 103, 104. JA665, 666. Bike racks, snow fencing, and signs were set up around the building. Day 2 AM 61. JA623. After Mendoza testified as to what occurred inside the Capitol, the Government was limited from discussing events inside the Capitol and the East Terrace. Day 2 AM 82-84. JA644-646.

Detective Jonathan Lauderdale of the Metropolitan Police testified that he investigated the events by going through social media photos, officer injury reports, and body cam videos. Day 2 PM 60-64. JA756-760. Rathbun reported an injury inside the Capitol later that day, so Lauderdale reviewed his body cam and saw the earlier incident between Rathbun and Appellant. Day 2 PM 70-74. JA766-770. Although Lauderdale had no firsthand knowledge of the events, he was permitted, with no objection, to testify as to what he viewed on the bodycam video he reviewed with his interpretations of the events. *Id.* Lauderdale twice claimed Appellant struck Rathbun multiple times. Day 2 PM 71, 98. JA767, 794. Lauderdale admitted that Rathbun "made contact with . . . the face of [Appellant]". Day 2 PM 73. JA769. He testified that he did not see this contact when he initially reviewed the video in January 2021. Day 2 PM 74.

JA770. He was also permitted to improperly testify as to his interpretation of Rathbun's and Appellant's intent. Day 1 PM 76, 98. JA411, 433.

Lauderdale spoke with Rathbun on the phone on January 14, 2021, and he did not initially remember the incident. Day 2 PM 78-79, 92. JA774-775, 788.

Rathbun did not mention hitting Appellant in the face in the January 14 phone interview. Day 2 PM 94. JA790. Lauderdale agreed that waiving on a civilian and inviting the civilian to fight would be antagonistic and administratively unprofessional, but disagreed that Rathbun used hand gestures to invite Appellant to fight him. Day 2 PM 95. JA791. Lauderdale testified that abusive language directed at a police officer is not a sufficient basis for an officer to use force. Day 2 PM 96. JA792.

In pretrial motions, the Court granted a government motion in limine to limit the cross examination of the officer except as pertained to potential bias. Doc. 75. JA158-160. At the pretrial conference on April 21, 2022, the week before trial, the parties discussed a use-of-force investigation into a shooting Rathbun was involved in approximately 4 months after January 6. PTC 59, JA226. Rathbun was investigated by the Department of Justice who cleared him while he was working with DOJ as a witness in this case. PTC 59, JA226. Counsel questioned whether "his role as an important witness for the [government] come[s] into play in their ultimate decision in clearing him in a

separate incident five or six months later?" PTC 59, JA226. An administrative investigation was thought to still be pending at the time of the pretrial hearing. PTC 43-44, 60, JA210-211, 227. Counsel requested a continuance on this basis that was denied. PTC 60-61, JA227-228. Counsel again raised DOJ and Rathbun's possible biased entanglement in investigating an officer who is a witness in a pending case: "I'm not casting any aspersions to the Department of Justice. But they've been very assertive in making sure that their relationship with Rathbun and them having conduct – cleared him in a separate shooting and his role in this case not be made part of public consumption. . . I think the public needs to know, just like the jury in this case would know, that there may have been a process in play where the Department of Justice clearing this officer because of his role in this case . . ." PTC 62, JA229. The Court stated that the DOJ is closed and no longer fair game. PTC 63. JA230 The Court mentioned that if the officer were cleared there would be no cross-examination on the issue. PTC 68, JA235. Counsel understood the Court's position. PTC. 68, JA235.

The investigation of Rathbun was closed on April 6, 2022; Rathbun learned of it after the pretrial conference, and the government received the information the previous Sunday night. Day 3 AM 5. JA824. Counsel agreed that the no-longer pending investigation was not permitted on cross. Day 3 AM 5. JA824.

Officer Rathbun testified that he responded to the Capitol around 1:30 on January 6 and when he arrived there were people everywhere, yelling and chaotic. Day 3 AM 13-14. JA832-833. People were throwing things and yelling at him to get out of the way and quit his job. Day 3 AM 17-18. JA836-837. He was wearing a yellow MPD jacket and ballistics helmet and worked to maintain the perimeter, chest-high metal bike racks that were not connected to the ground or each other. Day 3 AM 19. JA838. After an hour of this, he observed Appellant come to the front of the crowd carrying a flagpole with a marine flag yelling, "Communist bastard," "you're going to do this to a marine," and "take your shit off." Day 3 AM 25. JA844.

Rathbun wore a body cam and the video was played and replayed to Rathbun's narration. Day 3 AM 28. JA847. Appellant did not say "you're going to do this to a marine," he said "you're going to attack Americans?" Govt Ex. 204 14:28:26. Rathbun claimed to waive Appellant off with his left hand. Day 3 AM 28. JA847. Then he pushed Appellant away from the bike rack "to create some distance." Day 3 AM 29. JA848. Rathbun testified that Appellant grabbed the bike rack and pushed it into him after Rathbun had taken his hand off of it "for some reason." Day 3 AM 30. JA849. According to Rathbun, Appellant took his hand off the bike rack, then pushed it again. Day 3 AM 31. JA850. Rathbun admitted that he made contact with

Appellant's face, but claimed it was "incidental," that as he was trying to push Appellant back with his open hand, moving forward; Appellant also moved forward and Rathbun's hand came past Appellant's sleeve and hit his face. Day 3 Am 32; JA851. Govt Ex. 204 14:28:37.



Govt Ex. 204 14:28:37.

The force of the strike was more apparent from the other videos. Govt Ex. 213 0:00:44; Govt. Ex. 205 0:00:27/2:28:39.





Govt. Ex. 213 0:00:44

Rathbun then testified that Appellant took his flagpole and held it back,
striking towards Rathbun several times in a chopping motion. Day 3 AM 33.
JA852. He did not testify that Appellant hit him with the flagpole. The

sections of the bike rack came apart and the crowd started to move forward. Day 3 AM 34. JA853. Rathbun claims that Appellant helped moved the barrier, but Appellant can be seen in the video, standing several feet back from the bike rack, both hands on the flagpole, not touching the bike rack. Gov. Ex. 204 14:28:39. The bike rack is still intact up to 14:28:43.

Rathbun testified that Appellant ran up to him, and Rathbun took the flagpole from Appellant. Day 3 AM 34. JA853. But at that point in the bodycam video, Rathbun can be seen putting his right hand on the corner of a bike rack, and going around the bike rack towards Appellant, pushing another man who is wearing brown out of the way. Gov. Ex. 204 14:28:44.

Rathbun testified that he and the other officers tried to step back and regroup; he claimed that Appellant began running towards him with his arms up, fists clenched, knocking Rathbun down. Day 3 AM 35-36. JA854-855. Rathbun testified that Appellant grabbed his helmet and started pulling him forward, causing trouble breathing. Day 3 36. JA855. Appellant then pushed Rathbun and got on top of him, trying to pull his gasmask off. Day 3 36. JA855.

Rathbun claimed that he did not make any gestures towards Appellant to encourage Appellant to fight Rathbun; it would have been a mistake to do so. Day 3 39. JA858.

Rathbun testified to bruises and cuts to his legs and arm that did not require medical treatment or cause him to be out of work. Day 3 AM 41-43; 45-46. JA860-862; 864-865. He was on medical leave after January 6 for an injury to his hand that occurred after the incident with Appellant inside the Capitol. Day 3 AM 43-45. JA862-864. He did not recall reporting the incident with Appellant. Day 3 AM 46. JA865. It did not seem reportable to him. Day 3 AM 46. JA865.

Video from the Capitol Building was played. Rathbun is identified as wearing a yellow jacket on the right side of the screen at the fence line and Appellant can be seen holding the Marine Corps flag approaching him. Day 3 AM 50; JA869. Gov. Ex. 205. As Appellant approaches at 2:28:23, Rathbun can be seen gesturing with his hand almost immediately; his arm crosses the barrier 7 times between 2:28:24 and 2:28:30, while Appellant holds the flagpole away from Rathbun. Gov Ex. 205. The seventh time Rathbun's arm crossed the barrier, he leans toward Appellant, and only then does Appellant's hand come forward to the bike rack. Gov. Ex. 205 2:28:30. At 2:28:39, Rathbun appears to rear back to strike Appellant, causing him to move back with significant momentum, and only then does Appellant swing the flagpole. Gov. Ex. 205. Again in this video, Rathbun can be seen going around the bike rack towards Appellant, although he testified that he was backing away from the broken

perimeter. Gov. Ex. 205 2:28:47; Day 3 AM 51. JA870. He does back up next, and a person can be seen behind Appellant, pushing him forward towards Rathbun, they collide, Rathbun moves toward Appellant, and then they both go down. Gov. Ex. 205 2:28:53-2:29:00. When they separate, Rathbun moves back toward the wall quickly. Gov. Ex. 205 2:29:07-17. Appellant moves forward more slowly and Rathbun testifies that he ends up very close to him at the wall, but there is no further interaction, and the bodycam video ended before this moment. Day 3 AM 54; JA873. Gov. Ex. 205 2:29:37.

FBI Agent, Riley Palmertree testified how they located Appellant using facial recognition on Twitter and DMV cameras. Day 3 PM 51-53. JA975-977. He testified to political text messages and photographs from D.C. found on Appellant's phone. Day 3 PM 55-66. JA979-990. Without objection, and as with Detective Lauderdale, video evidence was again played through Palmertree even though he had no personal knowledge of the events, he was not present on the West Terrace; he merely investigated the case later. Day 3 PM 71-88; JA995-1012. Day 4 AM 12. JA1034.

Appellant testified in his defense. Day 4 AM 80. JA1102. He is married, has three children, and lives in New York. He attended one year of college then joined the marines where he was promoted three times and honorably discharged. Day 4 AM 80-82. JA1102-1104. He took the test for the police

department and agreed to work in the housing unit. Day 4 AM 83. JA1105. He was on uniformed patrol, then a project community officer, working with tenant patrols. Day 4 AM 83. JA1105. He applied for and was accepted into the intelligence division of NYPD and worked for four years on Mayor Bloomberg's uniformed protection. Day 4 AM 88. JA1110. He worked at city hall, Gracie Mansion, and the mayor's private residence. Day 4 AM 89. JA1111. He served as a police officer for twenty years, then he retired with his pension and started a landscape business to do more physical work and spend more time with his family. Day 4 AM 90-91. JA1112-1113.

Appellant was upset about the 2020 election based on the information he read. Day 4 AM 93. JA1115. He was not on social media or a member of any fringe groups. Day 4 AM 93. JA1115. He considered going to the rally in D.C., and decided that he would go if it did not snow since he does snow removal in the winter. Day 4 AM 95. JA1117. He brought MRE's (ready to eat meals) with him since he did not think restaurants would be open due to COVID. Day 4 AM 96. JA1118. He had a bulletproof vest from his police days, so he decided to bring it and his marine corps flag since he did not want his American flag to touch the ground. Day 4 AM 99-100. JA1121-1122. He drove down on the night of January 4th. Day 4 AM 103. JA1125. He went to the rally on the 5th at Freedom Plaza. Day 4 AM 104. JA1126.

He listened to the speeches, then got dinner from a food truck and went back to his hotel. Day 4 AM 104-106. JA1126-1128. The next morning he went to the ellipse and walked around the memorials, before taking a break at the hotel then going back to the ellipse where he heard President Trump speak. Day 4 AM 107-111. JA1129-1133. There was a joyous mood, a picnic type atmosphere. Day 4 AM 116. JA1138. From the crowd, Appellant heard that the Capitol was open, but that did not sound right to him, so he opted to stay outside. Day 4 AM 118. JA1140. As he got closer, the crowd grew thicker and he heard some flash bangs, saw injured people, and upset families, children, women, and teenagers. Day 4 AM 118. JA1140. He saw an older woman with blood all over her face. Day 4 AM 119. JA1141. He did not see any fencing, hear any announcements, and no officer told him to turn around. Day 4 AM 120-21. JA1142-1143. It took him about 15-20 minutes to make his way to the front of the crowd; he was upset that people were being injured so he started yelling, thinking the officer in front of him could handle that since he was wearing a gas mask. Day 4 AM 125-27. JA1147-1149. The officer started waiving his hand over the fence for him to approach. Day 4 AM 127. JA1149. The officer looked at Appellant's flag and looked at Appellant and started pushing. Day 4 AM 130. JA1152. The other officers were standing still like statues while he was being pushed by Rathbun. Day 4 AM 131. JA1153. Appellant tried to stay

away from the barrier, giving the officer distance. Day 4 AM 132. JA1154. The officer got close to him again, so Appellant became frustrated and put his hand on the bike rack and pushed it. Day 4 AM 134. JA1156. Rathbun then hit Appellant hard enough that he saw stars. Day 4 AM 136. JA1158. Although he could have hit Rathbun with the flagpole, he hit the bike rack and the two pieces of the flagpole came apart. Day 4 AM 138. JA1160. Rathbun separated the bike rack to come across the barrier. Day 4 AM 140. JA1162. Appellant felt the crowd pushing him from behind, so he felt he had to protect himself as they moved towards each other. Day 4 AM 148. JA1170. He put his hands on Rathbun's gas mask so Rathbun could see them, thinking it wouldn't hurt him. Day 4 AM 149. JA1171. Rathbun had the flagpole and he could see it coming up towards his eye, and then Rathbun punched him a second time. Day 4 AM 149-50. JA1171-1172. Rathbun got up and walked to the police line, and Appellant did not follow. Day 4 AM 151. JA1173.

Appellant did not see Rathbun later. Day 4 AM 151. JA1173. He was on a video later acting peacefully, (Govt Ex. 210) and he said he joined in with the chant that can be heard on that video saying "Don't hurt the cop." Day 4 PM 29. JA1205. Appellant did not go into the Capitol, he did not destroy any property, and had no other altercations. Day 4 PM 31. JA1207.

During the sentencing hearing the court addressed several objections to the PSR regarding sentencing enhancements. The guidelines were identified as follows:

1. **Base offense level: 14** pursuant to USSG §2A2.2

2. Use of dangerous weapon, USSG §2A2.2(b)(2)(B): **+4**

3. Victim sustained bodily injury, USSG §2A2.2(b)(3)(A): **+3**

4. 18 U.S.C. 111(b) conviction, USSG §2A2.2(b)(7): **+2**

5. Victim was an Official Victim, §3A1.2(b): **+6**

6. Victim was physically restrained, §3A1.3: **+2**

7. Use of body armor in a crime of violence, USSG §3B1.5(2)(B) **+4**

8. Adjustment for Obstruction of Justice: USSG §3C1.1: **+2**

The final offense level was 37. The District Court determined the above enhancements all applied and the guidelines were 210 to 262 with a criminal history score at Level I. The Court varied the sentence to a term of 120 months on Counts 1,3,4 and 5, a term of 60 months on Count 2, and 6 months on Count 6, all to run concurrent with each other for a total sentence of 120 months. The Court gave the variance due to the Appellant's history as a Marine and police officer as well as some consideration for accepting responsibility at sentencing. (Doc#124, 66). JA1916.

## SUMMARY OF THE ARGUMENT

The district court erred in denying Appellant's motion for change of venue based on pretrial publicity. As required by *Skilling v. U.S.,* 561 U.S. 358, 378 (2010) pretrial publicity caused presumptive prejudice that further revealed actual prejudice at voir dire.

Appellant's Sixth Amendment right to confrontation was impermissibly curtailed by the district court's refusal to allow cross examination into the officer's potential bias based on the decision by the Department of Justice to not prosecute for an officer-involved shooting.

In instructing the jury, the district court added an element to the violation of 18 U.S.C. §111(b), requiring a finding of both physical contact and the use of a deadly or dangerous weapon. This amounted to a constructive amendment that created a likelihood that the jury found Appellant guilty in a way not indicted by the Government. This amounted to plain error.

Appellant's sentence was improperly for wearing body armor during a crime of violence. Application of this enhancement was outside the heartland of the cases to which the enhancement was intended to apply.

Appellant was sentenced disparately from other similarly situation January 6 defendants.

# ARGUMENT

**I.    Pretrial publicity caused presumed and actual prejudice preventing a fair trial from taking place in Washington D.C.**

Appellate review of trial courts' decisions regarding jury impartiality is for abuse of discretions. *Skilling v. U.S.*, 561 U.S. 358, 386 (2010)

The Fifth and Sixth Amendments guarantee Appellant's right to a trial by an impartial jury. *See,* U.S. Const. Amends. V&VI; *See, also, Skilling,* 561 U.S. at 378. F.R.C.P. 21(a) provides that "[u]pon defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that prejudice against defendant exists in the transferring district that is so great that the defendant cannot obtain a fair and impartial trial there." Following the analysis offered by the Supreme Court in *Skilling,* a defendant must demonstrate either *presumed* or *actual* prejudice. Presumed prejudice refers to the conditions that existed before trial in the subject district. In this regard, the court typically considers whether there was a barrage of inflammatory publicity; whether news accounts were factual or opinionated; whether those news accounts included material that would not be admissible; the size of the overall jury pool; and the availability of judicial tools to mitigate the prejudicial effect of such publicity. *See, Skilling, supra.*

### A.    Presumed Prejudice

It is only in "extreme circumstances" that a court may presume prejudice before *voir dire. U.S. v. Haldeman,* 559 F.2d 31, 60 (1976). Such circumstances might arise, for example, where "the population of Washington, D.C. [is] so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that due process requires "a change of venue prior to attempting selection of a jury." *Id.* at 62. Based upon the empirical evidence presented before the district court, such "extreme circumstances" existed here.

It has been recognized that the open hostility evidenced by a particular community can be so severe to give rise to a presumption of juror prejudice. *See, Patton v. Yount,* 467 U.S. 1025, 1031 (1984) (distinguishing between presumed and actual bias). The bias of even a single juror is enough to violate defendant's Fifth & Sixth Amendment guarantee to an impartial jury. *U.S. v. Gonzalez,* 214 F.3d 1109, 1111-12 (9th Cir. 2000). The presumption of prejudice overrides a prospective juror's protestations of impartiality. *Murphy v. Florida,* 421 U.S. 794, 802 (1975) ("[e]ven this indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is

sufficiently inflammatory."); *see, also, Sheppard v. Maxwell,* 384 U.S. 333, 349-50 (1966); *Irvin v. Dowd,* 366 U.S. 717, 728 (1961).

The Government argued that this case is not exceptional, and is similar to *Haldeman*, but this case is dissimilar to *Haldeman* and *Skilling* in several key ways.

### 1. The characteristics of the District of Columbia jury pool

The characteristics of D.C.'s jury pool is exemplified by the survey conducted by Select Litigation, LLC on behalf of the Federal Public Defender's Office with the Eastern District of Virginia submitted with Appellant's original motion to transfer venue. Doc. 49, JA18-54. Exhibit "A". The survey polled 400 D.C. residents and 400 residents of the Northern District of Georgia. As a part of this survey, January 6th news coverage was analyzed. *See,* Exhibit "A" at Appendix B. The results of this polling established that the prospective jurors possessed a "decidedly negative impression of individuals arrested in conjunction with the activities of January 6, 2021." Doc. 49, JA18-54. Exhibit "A" 2. More importantly, the enclosed data established that such individuals are pre-oriented - - without having heard any evidence - - to be "inclined to vote 'guilty'" if called to serve as a juror. *Id.* The attitudes of prospective jurors in this District are decidedly more hostile toward the defendants than

adults nationwide or prospective jurors in a demographically comparable jurisdiction.

The polling data evidences that prospective jurors have pre-judged January 6th defendants as follows:

- Have unfavorable opinions of those arrested for participating in January 6th demonstration (84%); and
- Would categorize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, and 54% respectively). Exhibit "A" ,¶¶ 9,14

Such data confirms that most residents of the venue were predisposed to find Appellant guilty, and would likely consider him as posing a danger to the community, notwithstanding the strength or weakness of the evidence presented at trial. The empirical evidence also reveals that the prospective jury pool:

- Would categorize these individuals as "criminals" (62%); and
- Have already formed the opinion that these individuals are "guilty" of the charges brought against them (71%).

More than half of D.C. residents admitted in this survey that they are likely to vote "guilty" if they find themselves on a jury in one of the January 6th cases (52%). Exhibit "A" at ¶l1.

Seventy-six percent of those surveyed had already decided that the January 6th defendants are guilty. *Id.* at ¶ 12. This polling data also makes another obvious point - - that former President Donald Trump is/was inextricably connected with the events of January 6th. Of the individuals questioned, 84% believed that the January 6th defendants were:

- Trying to overturn the election and keep Donald Trump in power (84%);
- Insurrectionists (76%);
- Trying to overthrow the US Government (72%); and
- A protest that went too far (69%)

A one-sided political dynamic - - unique to D.C. - - is obvious by the 2016 presidential election results between Hillary Clinton and Donald Trump where an overwhelming majority of D.C. voters (i.e. 92.8%) supported Clinton over Trump, who received a scarce 4.1% of the votes.[3] In the most recent election in 2020, Trump fared only slightly better in the eyes of District voters by garnering a mere 5.4% of the votes compared to the overwhelming majority of votes (i.e. 92.1%) casted in favor of Joe Biden.[4] Given the lopsided political makeup of the District, it is impossible to panel a jury that is not entirely comprised of people preordained to find Appellant - - a Trump supporter - - guilty. Although

---

[3] www.Electionresults.dcboe.org/election_results/2016-General-Election
[4] www.Electionresults.dcboe.org/election_results/2020-General-Election

significantly more populous than the prospective jury pool in *Rideau v. Louisiana,* 373 U.S. 723, 726-27 (1963), Appellant submits that the impact of the events of January 6th were felt by a larger proportion of District residents who have universally concluded that the January 6th defendants are guilty as charged.

The Government dismissed, without disputing, the voting patterns of the District residents as irrelevant, supported by a footnote in *Haldeman*, 559 F.2d at 64 n.43, Doc. 52, 5. JA61. But while *Haldeman* had a political connection to Watergate, this case is directly tied to the 2020 Presidential election, the outcome, and voter reaction to the election, therefore voting patterns are significantly more relevant here than in *Haldeman*. All voters have a direct interest in the outcome of the election. Further, the voting patterns in this case are considerably more extreme than those in 1968 (81.8%) and 1972 (78.1%) that were examined in *Haldeman*.

### 2. Nature and Volume of the National Local Media

Where the enormity of the publicity given to the January 6th protest has "inflamed passions in the host community" and "permeate[d] the trial setting .. [such] that a defendant cannot possibly receive an impartial trial," the District Court must accept the presumption of prejudice and

transfer Appellant's case to a venue where defendant can receive a fair trial. *See, Estes v. Texas,* 381 U.S. 532 (1964); *Sheppard v. Maxwell,* 384 U.S. 333, 362 (1966); *U.S. v. Quiles - Olivo, 684* F.3d 172, 177 (1st Cir. 2012). In *Skilling,* 561 U.S. at 378-9, with regard to presumed prejudice, the Court held that even pervasive adverse pretrial publicity does not inevitably lead to an unfair trial. News stories about Enron and Skilling, while not unbiased, did not contain any confessions or present the kind of vivid and unforgettable information likely to produce prejudice. The Court observed that at trial, Skilling, had actually been acquitted of a number of insider trading counts.

Unlike Skilling, much of the evidence being used by the Government to prosecute the January 6th defendants - - including Appellant - - comprises of video evidence that was extensively shown in the media. As for Appellant's charges, the media, Congress, and the Government have all taken turns contributing to the public narrative as to their collective perception of the defendant's guilt. The Government likened the actions of Appellant on January 6th to "a junkyard dog".[5] The

---

[5] https://www.nytimes.com/2021/02/23/nyregion/nypd-officer-arrested-capitol-riot.html?searchResultPosition=1     The media has repeatedly dubbed defendant as the "eye gouger" in a case where there were no allegations being made by the Government or no proof offered in the video evidence of defendant gouging Officer Rathbun eyes.

local District of Columbia news media has taken a special interest spinning their views of Appellant's case - - inviting the public to track the progress of defendant's prosecution. A Google search using the terms "Thomas Webster Capitol" garnered 4,690,000 search results at the time of the motion to change venue. Doc. 49, 8. JA25. Approximately a week after Appellant was indicted, former acting U.S. Attorney Michael Sherwin gave a lengthy interview to 60 Minutes suggesting that some of the January 6th defendants could face the rarely used sedition charges. *Id.* Recognizing the Constitutional dangers posed by such Governmental misconduct, the District Court correctly noted at a subsequent hearing:

> No matter how much attention this matter gets, let me be clear that these defendants are entitled to a fair trial, not one that is conducted in the media …
> they are also entitled to defend against the charges that are currently brought against them, not speculation about what might or might not be coming.[6]

Customarily, "something more" than intense media attention or gruesome reporting is required to establish prejudice. *See, Murphy, supra,* 421 U.S. at 799 (1975) ("in those cases the influence of the news media either in the community at large, or in the courtroom itself,

---

https://www.huffpost.com/entry/former-nypd-cop-arrested-for-capitol-riot_n_6036722cc5b6dfb6a735ba6c.

[6]   https://www.npr.org/2021/03/23/980511734/judge-criticizes-doj-for-talking-about-capitol-riot-conspiracy-case-in-the-press

pervaded the proceedings"). At the time of the filing of the motion to change venue, approximately 769 American citizens had been charged by the Government with crimes connected with the January 6th protest.[7] Given the large number of arrests associated with January 6th together with the media coverage that has followed, the citizens of D.C. have been inundated with unrelenting information and news concerning the events occurring at the Capitol on January 6th. By comparison in *Skilling*, the defendant relied on hundreds of media reports about the Enron scandal in his motion for a transfer of venue. *Skilling, supra,* 561 U.S. at 358. Skilling argued that as the former Capital Chief Executive Officer, such articles implicated him by proxy, if not directly. *See Id.* The Court disagreed, referencing its early opinions concerning the ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See, Id.* at 382.

Just in the year preceding trial, D.C. newspapers published at least five hundred articles about January 6th and local news syndicates broadcasted over seven thousand news stories covering these events.

---

[7] 769 people have been charged in the Capitol insurrection so far. This surgical table shows them all. www.insider.com/all-the-us-capitol-pro-trump-riot-arrest-charges-deems-2021-1

Exhibit "A" at App.B-7[print data] JA53 & App.B- l(broadcast data). JA47. This coverage is substantially more expansive than the media attention encountered by Skilling. *See, Skilling, supra,* 561 U.S. at 428-30. The empirical evidence (Exhibit "A") establishes that D.C. residents had been inundated with news coverage about January 6th. *See,* Exhibit "A" ¶30 & App. B-1 & B2. JA47-48. With the advent of Facebook, Twitter and national news media outlets, the influence of local newspapers continues to decline. Notwithstanding these current realities, the news coverage in D.C. was unrelenting. Given the intense concentration of local media coverage of the January 6th protest, it was impossible for a prospective juror from the District to be truly fair and impartial.

### 3. The Timing of the Proceedings

The Court in *Skilling* empaneled a jury four years after the defendant was arrested. *Skilling, supra,* 561 U.S. at 383. Given the length of time involved there, the media attention concerning the Enron case all but disappeared. *Id.* Literally millions of news articles about the events which occurred on January 6th have circulated over the short span of the approximately 15 months between the events and the trial in April 2022.

Congress itself assisted in keeping the January 6th protest as a feature story in the media by the assembly of a House Select Committee to investigate the events of January 6th.[8] As the trial approached, coverage did not decrease. As more defendants have gone to trial, the coverage has continued even after trial.

## B. Actual Prejudice

Actual prejudice focuses on whether the opinions expressed by potential jurors during jury selection demonstrate impermissible bias. Historically, this Circuit has deferred to *voir dire* as a sufficient tool to protect a defendant's right to a fair trial. *See, Jones v. Gash,* 404 F.2d 1231, 1238 (D.C. Cir. 1967)("[t]he ultimate question" on the motion to transfer venue based upon prejudicial pretrial publicity "is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the *voir dire.* examination."); *U.S. v. Haldeman,* 559 F.2d 31, 63 (D.C. Cir. *l976)(en banc)(per curiam*)("[I]f an impartial jury actually cannot be selected, that fact should become evident at the *voir dire.* The defendant will then be entitled to any actions

---

[8] Dan Burman, the latest in the Jan. 6th Investigation, CNN (Nov. 28, 2021), https://www.cnn.com/2021/11/28/politics/January-6-investigation/index.html

necessary to assure that [they] receive a fair trial.") *See, also, U.S. v. Bochene,* 2022 WL 123893 at *2-3 (D.D.C. 2022).

The voir dire in this case was markedly different from that in *Skilling*, where the Supreme Court did not find actual prejudice. While "no hard-and-fast formula dictates the necessary depth or breadth of voir dire," and jury selection "is 'particularly within the province of the trial judge,' *Skilling*, 561 U.S. at 368, the voir dire in this case was inadequate and further impeded Appellant's chance of a fair trial.

In this case, voir dire lasted one day, with no pretrial questionnaires being distributed to the venire. In *Skilling*, the Court noted that questionnaires were distributed and so although voir dire lasted five hours, it was "the culmination of a lengthy process." *Id.* at 388 (citations omitted). In *Haldeman*, voir dire lasted 8 days. 559 F.2d at 43.

Fourteen jurors and alternates in *Skilling* reported that they had "paid scant attention to Enron-related news." *Id.* at 390. The Court quoted three jurors that did not follow the news, did not know much about it, and were not interested. *Id.* That cannot be said here, where each juror had seen at least some coverage and only one had not seen any videos in the last year. Day 1 PM 21. JA356. Several watched the coverage closely and had strong feelings about the events and/or President Trump. Day 1 AM 29, 64, 69, 81, JA266, 301, 306,

318. PM 8, 118, 121, 198. JA343, 453, 456, 533. They all had to be asked if they could put aside what they knew from seeing video coverage.

Juror 8 "wasn't a fan of Trump," or his supporters: "some of them do get a little chaotic, and they're not fun to be around when they're being wild around the streets. . ." Day 1 PM 9-10. JA344-345. He affirmed that "if the government failed in its burden to demonstrate his guilt beyond a reasonable doubt, [he] would[n't] have any trouble finding the defendant not guilty." Day 1 PM 10. JA345. Counsel did not question the juror and he was placed on the jury.

Juror 13 stated that she felt unsafe during the Trump presidency as a black woman, but counsel was limited by the court in questioning her further. 121. Juror 1429/19 had a negative view of Trump, thought Trump supporters were not smart. Day 1 PM 123. JA458. The defense had to use a preemptory strike on juror 0974 who refused to state for which federal agency she worked as an analyst, although she works with FBI agents. She also testified that she felt more aligned with government attorneys. Day 1, PM, 38. JA373. She is more empathetic to the police because she has "special police that protect [her] every day [she goes] to work." Day 1 PM 38. JA373. After a motion to strike for cause, Day 1 PM 40 JA375. the

court stated that counsel's question as to the juror's "alignment" was not "exactly a fair question" and denied the motion. Day 1 PM 41. JA376.

The district court in *Skilling* took pains to ensure candid and open responses to the venire, "repeatedly admonishing that there were 'no right and wrong answers to th[e] questions.'" *Id.* at 389. Here, however, the district court curtailed counsel's questioning both specifically with potential jurors, and outside the presence of the venire, directing how counsel should question the venire members.

The very subject matter of the case is dissimilar to *Skilling* where most juror questionnaires revealed general sympathy for the victims of the Enron bankruptcy, but the jurors' knowledge was removed in a way that the events of January 6th cannot be characterized. *Id.* at 391-92. The media and Government characterized the events as an assault on our democracy stoked by the outgoing president, which makes every citizen a victim. The Court in *Skilling* contrasted the Enron fraud with the subject matter in *Irvin*, describing a "horrifying . . . rampage of robberies and murders." 561 U.S. at 362. And although the subject matter here is also different, the media reports similarly focused on the "horrifying" nature of the events of January 6th.

In *Skilling*, the Court noted that the district court did not take venire members at their word claiming impartiality. *Id.* at 394. In contrast here, the

district court took an active role in rehabilitating venire members who made statements that revealed bias. One prospective juror revealed he lives one mile from the Capitol, is a regular news watcher, and the events of January 6th are "on the news quite a bit." Day 1 AM 85. JA322. When asked if he could put aside what he has "seen and read and whatever views [he] may have formed and view the evidence fairly and honestly against the defendant in this case," he answered, "Yeah, it's a hard question. I mean, I think we've all been affected by it in some way. Day 1 AM 86-87. JA323-324. He affirmed that he would not have "trouble in acquitting the defendant if [he] determine[d] the government has not carried it's burden of proof," Day 1 AM 87, JA324. but he admitted that he voted for President Biden and contributed to his campaign. Day 1 AM 91. JA328. He also testified that Appellant would be at a disadvantage with him because he "feel[s] strongly about the events." Day 1 AM 91-92. JA328-329. "[Appellant] [does not] start off with this as like a clean slate, I guess. I don't think of this as like a zero-zero game to start." Day 1 AM 93. JA330. When instructed by the court that he has to start from the presumption of innocence, and asked whether he could do that, the juror responded, "I really, I honestly don't think so. You know, I just generally - - again, I have strong feelings about this. I believe that folks who were there did something wrong and, you know, in some cases,

you know, feel sorry that they led - - read news articles or to believe that they should be there for those reasons. So - - " Day 1 AM 94. JA331. The court cut him off, and he stated that he could set aside his general views to listen to the evidence. Day 1 AM 94. JA331. The defense moved to strike this juror for cause which was denied after the court had continually asked the same question until the correct answer was delivered. Day 1 AM 96. JA333. The court took issue with counsel's use of the word "disadvantage" in questioning this juror. Day 1 AM 97. JA334. After lunch, the court reiterated a concern for the use of "disadvantage" as "indefinite" and instructed counsel to "keep it within the confines of presumptions and burdens and the like." Day 1 PM 3-4. JA338-339. It had already been shown that a troublesome juror who expressed reservations several times could be rehabilitated with the court's words. Counsel "adopt[ed]" the court's view. Day 1 PM 4. JA339.

This juror should have been struck for cause, when he clearly indicated that he did not consider Appellant on a level playing field with the Government contrary to his answer that he could presume him innocent. When put in layman's terms, he could not agree to that even though he agreed to the legal terms of presumption. The court's further instruction to counsel put a chilling effect on the afternoon session of voir dire. Counsel

was limited from using words that jurors may understand better than the legal jargon of presumption of innocence to get at real concerns of bias.

Finally, this case is different than *Skilling* in that Appellant was convicted on all counts, not acquitted of some as Skilling was, indicating impartiality on part of the jurors. *Id.* at 395.

The district court erred in not granting the motion to change venue, both before and after voir dire in this case. Presumed and actual prejudice were shown. Appellant could not, and did not, receive a fair trial in the venue.

## II. The District Court abridged Appellant's Sixth Amendment rights to confront the witnesses against him, and thus abused its discretion, by excluding all evidence of the investigation into Rathbun's conduct.

Appellate review is *de novo* of a district court's legal conclusions concerning the Confrontation Clause. *U.S. v. Wilson*, 605 F.3d 985, 1003 (D.C. Cir. 2010).

The district court's exclusion of the investigation into Rathbun's conduct was error as the fact of the investigation by DOJ, for whom Rathbun was a witness, was relevant to potential bias.

Appellant has a Sixth Amendment right to cross-examine the Government's witnesses on, *inter alia*, their potential bias. *See Davis v. Alaska*, 415 U.S. 308, 315–18(2) (1974); *see also U.S. v. Lankford*, 955 F.2d 1545, 1548(III)(A) (11th Cir. 1992). A trial court is within its discretion to set

"reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant[,]" *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Although the Government argued that Federal Rule of Evidence 608 excludes evidence of the investigations, Rule 608 deals only with witnesses' character for truthfulness, it does not speak to whether witnesses may be biased notwithstanding their reputations for or others' opinions of, their veracity. *See U.S. v. Abel*, 469 U.S. 45 (1984). Indeed, Rule 622 guarantees that "[t]he state of a witness's feelings towards the parties and the witness's relationship to the parties may *always* be proved for the consideration of the jury" (emphasis added). Simply because the investigations into Rathbun may be inadmissible under Rule 608 does not foreclose its admissibility under other rules to show a pro-prosecution bias.

The Supreme Court dealt with this problem in *U.S. v. Abel*, 469 U.S. 45 (1984). The issue there was whether the then-still-young Federal Rules of Evidence allowed a party to impeach a witness with extrinsic evidence that tended to show bias, though they did not expressly identify that means of impeachment. *Id.* at 49–50. The Court had no trouble answering that question in the affirmative: "We think the lesson to be drawn from [a review

of the common law and commentaries to the Rules] is that it is permissible to impeach a witness by showing his bias under the Federal Rules of Evidence just as it was permissible to do so before their adoption." *Id.* at 51.

**A. That Rathbun was under investigation by the Government while he was cooperating as a witness for the Government is relevant and admissible to demonstrate bias.**

"The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' ... [T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 315–17 (citations omitted). The investigation into Rathbun's conduct and his consequent motive to shade his statements and testimony are among the topics of inquiry that the Sixth Amendment protects. *Davis v. Alaska* and the cases cited therein, interpret the Confrontation Clause of the Sixth Amendment as guaranteeing the defendant in a criminal trial both the general right to cross-examine witnesses against him and the more specific right to cross-examine a key state's witness concerning potential criminal charges against the witness. In fact, Rathbun need not have struck a deal with the Government to resolve the investigation, or even have had a hope of one for that evidence to be relevant and admissible.

> The importance of such cross-examination does not depend upon whether or not some deal in fact exists between the witness and the government.
>
> What counts is whether the witness may be shading his testimony in an effort to please the prosecution. "A desire to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but such a subtle desire to assist the state nevertheless may cloud perception."

*Lankford*, 955 F.2d at 1548 (citation omitted) (quoting *Greene v. Wainwright*, 634 F.2d 272, 276 (5th Cir. 1981)).

This desire could have existed while Rathbun was cooperating with the government but also under investigation by them and continued to shade his testimony even after the investigations were complete. The district court erred in foreclosing confrontation with the investigations.

In *Van Arsdall*, the Supreme Court held that a Delaware trial court had breached the petitioner's Sixth Amendment rights by barring all cross-examination about a prosecution witness's public-drunkenness charge's having been dropped, 475 U.S. 676–77. In *Lankford*, the 11th Circuit held that a district court had erred by barring impeachment of a government witness with evidence of his pending state charges, 955 F.2d at 1548–49. So too here. The district court's ruling pretrial cut off all inquiry on a subject on which Appellant is entitled to reasonable cross-examination—whether Rathbun may shade his trial testimony because of the dismissed investigation.

In *U.S. v. Wilson*, 605 F.3d 985, 1006 (D.C. Cir. 2010), the court did not allow the subject matter of an internal affairs investigation into a law enforcement witness to be disclosed or explored at trial. However, the witness was rightly confronted with the existence of the investigation and the court agreed that the "fact of the existence of the investigation [] would have assisted in portraying [the witness] as biased." *Id.* This is all Appellant sought here, to confront Rathbun with the existence of the investigation in order to explore bias.

### B. The risk of unfair prejudice to the Government from admitting evidence of Rathbun's pending charges does not substantially outweigh their probative value.

The government argued, before recognizing that the existence of the investigation could be admitted without the subject matter, that because the fatal shooting of an armed suspect was not related to the events of January 6, 2021, that the probative value would be outweighed by the risk of unfair prejudice. Doc. 59 p. 10. JA83.

The government gave short shrift to the probative value of the investigation of Rathbun. It concluded that because the allegations against Rathbun postdated and had no nexus with the events of January 6, their probative value, if any, was minimal. Doc. 59 p. 10. JA83. But that reasoning misapprehends the purpose of admitting the evidence and does not

recognize the effect of limiting the confrontation to the existence of the investigation without delving into the subject matter. In *Davis,* the Supreme Court of the United States reversed the state court's decision because it disallowed evidence of a witness's fear of prosecution that might have informed his testimony, as that was nexus enough. 415 U.S. at 312–13, 316–18.

The Eleventh Circuit in *Lankford* found error when a district court disallowed evidence of a witness's pending state charges to show bias, even where there was no evidence that the witness had struck any deal regarding a federal investigation. 955 F.2d at 1544–45. If charges from a separate sovereign are admissible to show bias, it stands to reason that an investigation from the same sovereign surely are.

Further, a limiting instruction to the proper purpose for which the jury may consider that line of questioning can cure any unfair prejudice. *See U.S. v. Spoerke*, 568 F.3d 1236, 1251(2) (11th Cir. 2009).

Appellant has never asked to parade the details of the investigation across the courtroom. He sought only to introduce evidence sufficient to demonstrate the potential for bias.[9] In this regard, the district court's ruling

---

[9] Should this Court determine this issue is not properly preserved, this resulted from ineffective assistance of counsel that is apparent from the

shrouded evidence that the jury should plainly have been allowed to see. This Court should reverse Appellant's conviction so his trial can comport with what the Sixth Amendment demands.

### III. The District Court committed plain error in instructing the jury on 18 U.S.C. §111(b).

This issue was not raised by trial counsel below and thus is subject to plain error analysis. Fed. R. Crim. P. 52(b); *U.S. v. Rawlings*, 522 F.3d 403, 407 (D.C. Cir. 2008). Under the plain error standard, a trial court error is remedied only if there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights[ ]' . . . [and] (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* quoting *Johnson v. U.S.,* 520 U.S. 461, 466-67, 117 S.Ct. 1544 (1997)(citations omitted). An error "affec[ts] substantial rights" if it is "prejudicial" or "affected the outcome of the district court proceedings." *Id.*

There are three ways a person can violate 18 U.S.C. §111. First, §111(a)(1) describes the offense as when a defendant "(1) forcibly; (2) assault[s], resist[s], oppose[s], impede[s], intimidate[s], or interfere[s] with; (3) a designated federal officer; (4) while engaged in or on account of the performance of official duties;" (5) with intent. *U.S. v. Arrington*, 309 F.3d

---

record. *U.S. v. Moore*, 651 F.3d 30, 85 (D.C. Cir. 2011). Counsel argued the issue pretrial, including the DOJ investigation. PTC 59-68. App. 226-235

40, 44 (D.C. Cir. 2002) (examining a prior version of the statute, omitting internal citations). "Where the acts in violation of this section constitute only simple assault" the violation is a misdemeanor. 18 U.S.C. §111(a). "Where such acts involve physical contact with the victim of that assault or the intent to commit another felony," the violation is a felony punished by up to 8 years in prison. *Id.* Finally, if the defendant "uses a deadly or dangerous weapon . . . inflicts bodily injury," the violation is a felony punishable by up to 20 years. 18 U.S.C. §111(b). *See U.S. v. Rafidi*, 829 F.3d 437, 445 (6th Cir.2016); *U.S. v. Siler*, 734 F.3d 1290, 1294 (11th Cir. 2013) (describing the three ways to violate 18 U.S.C. §111). The two felonious ways of violating §111 include all of the elements found in subsection (a)(1) and described in *Arrington*, but also include an additional element of either (1) physical contact or intent to commit another felony, or (2) use of a deadly or dangerous weapon or bodily injury.

The District Court, however, described the elements of §111(b) to include physical contact or intent to commit another felony in addition to use of a deadly or dangerous weapon or bodily injury:

> First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with Officer Noah Rathbun, an officer from the Metropolitan Police Department.
>
> Second, the defendant did such acts forcibly.
>
> Third, the defendant did such acts voluntarily and intentionally.

Fourth, the person assaulted, resisted, opposed, impeded, intimidated, or interfered with assisting officers of the United States who were then engaged in the performance of their official duties.

Fifth, that the defendant made physical contact with a person who was assisting officers of the United States who were then engaged in the performance of their official duties, or acted with the intent to commit another felony. For purposes of this element, "another felony" refers to the offense charged in Count Two. And I'll instruct you as to that count in a moment.

And the sixth element, in doing the foregoing acts, the defendant used a deadly or dangerous weapon.

Day 5 PM 21. [10] JA1341.

The language of the statute is clear in stating that the enhanced penalty of subsection (b) applies to "whoever, in the commission of any acts described in subsection (a)." The Eleventh Circuit clarifies that the meaning of the statute does not require "physical contact" for (b) to apply. *Siler*, 734 F.3d at 1296-97. If the assault would have been simple assault but for the use of a deadly or dangerous weapon, (b) still applies. *Id.* at 1297.

Physical contact or intent to commit another felony is not required for conviction under §111(b), therefore the instruction of such was error that was plain by the plain meaning of the statute as addressed in *Siler.*

---

[10] *Arrington* numbers the elements of §111(a) to be five while the district court numbered those elements as four, combining the requirements that the victim be a "federal officer" and "engaged in the performance of official duties."

This error affected Appellant's substantial rights and seriously affected the fairness of the trial because the jury could have found Appellant guilty in a way that he was not charged in the indictment. In the indictment and argument, the Government contended that the deadly or dangerous weapon in question was the flagpole Appellant carried. Day 5 PM p. 42, 54. JA1362, 1374. Appellant used the flagpole to hit the bike rack in front of the officer, never striking the officer with it. The video evidence, the officer's testimony, and Appellant's testimony all agree that he did not strike Rathbun. The only evidence that Appellant struck Rathbun with the flagpole was Agent Lauderdale's false testimony (Day 2 PM 71, JA767.) based only on his interpretation of the video evidence; he was not present for the incident and was not a witness to any of the actions.[11] [12] The Government never contended that Appellant struck Rathbun, but they allowed Lauderdale to testify to this false claim without correcting it. While counsel argued that Appellant did not strike Rathbun with the flagpole, he did not point out Lauderdale's false testimony. Physical contact was not made until later when Appellant no longer possessed the

___

[11] A proper objection would likely have restricted this evidence.

[12] Lauderdale also glosses over the several times that Rathbun put his hand over the barrier before Appellant touched the bike rack, gesturing and pushing at Appellant that is clear from the video evidence. Day 2 PM 71. App. 767.

flagpole and collided with the officer, ending up on top of him, and putting his hands on Rathbun's gas mask. Day 5 PM 53. JA1373.

At first glance this error may appear to be to Appellant's benefit, adding an element to the Government's burden. However, the extra element is to Appellant's detriment in that the jury was then susceptible to finding that Appellant violated §111(b) only in the events that happened after he no longer possessed the flagpole. The jury was instructed that "[a]n object is a deadly or dangerous weapon if it is capable of causing serious bodily injury or death to another person and the defendant used it in that manner. In determining whether the object is a deadly or dangerous weapon you may consider both physical capabilities of the object used and the manner in which the object is used." Day 5 PM 25. JA1345. The flagpole was not mentioned in the instruction, and the jury could have found that Appellant's hands and body or the chin strap of the gas mask and helmet were a deadly or dangerous weapon as the evidence authorized them to find that "the manner in which" Appellant used his hands and body rendered them "capable of causing serious bodily injury or death."[13]

---

[13] The error is compounded by the court's statement in determining that the flagpole was a deadly or dangerous weapon to enhance the sentence under USSG §2A2.2(b)(2)(B) that "the jury in this case found that Mr. Webster had used a flagpole as a dangerous weapon." Sentencing T. 19. App. 1869

Several courts support the contention that body parts can be deadly or dangerous weapons: *U.S. v. Moore*, 846 F.2d 1163, 1167 (8th Cir. 1988); *U.S. v. Sturgis*, 48 F.3d 784, 789 (4th Cir. 1994) (both holding that a jury is authorized to determine that mouth and teeth can be deadly or dangerous weapons); *In re D.T.* 977 A.2d 346, 355 (D.C. 2009) (teeth may be "deadly or dangerous weapon" under D.C. Code). *See also U.S. v. Parman*, 461 F.2d 1203, 1204 n. 1 (D.C. Cir. 1971) (defendant indicted for assault with deadly weapon by "biting with teeth"). *But see U.S. v. Rocha*, 598 F.3d 1144, 1157 (9th Cir. 2010) (holding that body parts are not a dangerous weapon and listing 18 states that agree and 10 states that disagree).

The jury could have also found that Rathbun's helmet and chin strap were used as a deadly or dangerous weapon. Detective Lauderdale and Rathbun testified that Appellant was pulling on these items while Rathbun was on the ground, choking him. Day 2 PM 72, JA768.; Day 3 AM 36, JA855. Even if it is not plain that a body part could be a deadly or dangerous weapon, a myriad of cases in this Circuit and others have held that almost any instrumentality can be a weapon if capable of causing serious bodily injury or death and is used in that manner. *Arrington*, 309 F.3d at 45 (car qualifies if used as a deadly weapon, "not simply as a mode of transportation"); *Thornton v. U.S.*, 268 F.2d 583, 584 (D.C. Cir. 1959) (wine bottle); *Medlin v. U.S.*, 207

F.2d 33, 32 (D.C. Cir. 1953) (shoes). *See also U.S. v. Johnson*, 324 F.2d 264, 266 (4th Cir. 1963) (chair); *U.S. v. Loman*, 551 F.2d 164, 169 (7th Cir. 1977) (walking stick); *U.S. v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (pool cue and broken beer bottle); *U.S. v. Bey*, 667 F.2d 7, 11 (5th Cir. 1982) (mop handles); *Taylor v. U.S.*, 456 F.2d 1101, 1102 (5th Cir 1976) (citations omitted) (unloaded pistol); *U.S. v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) (steel bars of prison cell); *U.S. v. Hamrick*, 43 F.3d 877 (4th Cir. 1995) (citations omitted)(dysfunctional home-made mail bomb); *Eagleston v. U.S.*, 172 F.2d 194, 198 (9th Cir. 1949) (rake).

A constructive amendment of an indictment occurs when "the evidence presented at trial and the instructions given to the jury so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grandy jury's indictment." *U.S. v. Sayan*, 968 F.2d 55, 59 (D.C. Cir. 1992). Constructive amendments are not permissible because the Fifth Amendment guarantees the right to be tried only on the charges of which the defendant is informed of in the indictment. *Id. See also U.S. v. Brown*, 504 F.3d 99, 103 (D.C. Cir. 2007) (citing *U.S. v. Narog*, 372 F.3d 1243, 1249-50 (11th Cir. 2004) and *U.S. v. Weissman*, 899 F.2d 1111, 1116 (11th Cir. 1990). In *Narog*, the defendant was indicted for possession and distribution of pseudoephedrine knowing that it would be used to manufacture

methamphetamine, but the court instructed the jury that the government must prove "that the pseudoephedrine would be used to manufacture *some* controlled substance," rather than methamphetamine as charge in the indictment. *Narog*, 372 F.3d at 1247.

Similarly in *Weissman*, the indictment alleged that the defendant was associated with a particular crime family and the court instructed the jury they only needed to determine the defendants were associate with "an enterprise." 899 F.2d at 1112. "The Eleventh Circuit found that this created the possibility 'that appellants were convicted on grounds not charged in the indictment.'" *Brown*, 504 F.3d at 104 quoting *Weissman*, 899 F.2d at 1112.

That is what occurred here, Appellant was charged with using a flagpole as a deadly or dangerous weapon, but the jury was not instructed as to which item was alleged to be deadly or dangerous. This court held that *Brown* was not analogous to *Narog* and *Weissman* because the indictment included the means of committing the offense charged as instructed by the jury, not creating a danger that the defendant was convicted on grounds not charged in the indictment.

Although this court in *Sayan* found no constructive amendment where the evidence and arguments centered on the allegations made in the indictment, 968 F.2d at 60, this case is different in that the district court's

instruction added the physical contact element to a violation of §111(b), so the jury was required to find physical contact *and* a deadly or dangerous weapon, making it substantially likely that they would look beyond the use of the flagpole in the encounter to a moment when both elements could be found according to the evidence.

IV. **The District Court erred when it sustained the sentencing enhancement of four additional points for wearing body armor during a crime of violence pursuant to USSG 3B1.5(2)(B).**

In reviewing a sentencing decision, "[p]urely legal questions are reviewed *de novo*; factual findings are to be affirmed unless clearly erroneous; and due deference [is given] to the district court's application of the [sentencing] guidelines to facts." *U.S. v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008) (internal quotation marks omitted).

This enhancement was applied based on allegations that the body armor Appellant was wearing to the Capitol on January 6th, was in preparation for criminal conduct or to avoid apprehension. (Doc. 98 p. 11). JA1950. The District Court requested that the parties submit additional briefs on this issue. (Doc. 106, 107). JA1732, SJA1-4. USSG §3B1.5(2)(B) states that the application of this enhancement is designed to apply where it was specifically used during the commission of the offense, in preparation for the offense or in an attempt to avoid apprehension for the offense. There

is no evidence that when Appellant wore the vest he intended to engage in a crime of violence or that wearing it was not merely occasional. There is no indication Appellant was preparing to use the vest in his encounters at the Capitol more so than mere circumstantial to the encounter at the Capitol.

As a former police officer, Appellant was aware of the crowd size expected to be at the Trump rally. There is nothing suggesting he was concerned about the Capitol, and it was winter and cold outside. Appellant's use of body armor was for warmth and possible protection in the crowd not in preparation of criminal conduct or to avoid apprehension. (TT Day 4 pp. 98-99, 114, JA1120-1121, 1136.). The incident became a circumstance of the events but there is no indication Appellant intended to use or wear the body armor to commit any of the offenses charged. The actions of Appellant, even as interpreted by the government, do not support this enhancement. Any conviction for a crime of violence is not related to the purpose of wearing the vest and the latter should not enhance the former.

The encounter at the Capitol involving this enhancement was 45 seconds and did not involve usage, or threatened usage of firearms or was the vest employed in a way that could be interpreted as use. The Sentencing Commission never defined the term "use" to mean simply wearing body armor as it easily could have. The ambiguity of this enhancement for this

purpose must be construed in favor of *not* applying it. *See U.S. v. Granderson*, 511 U.S. 39, 53-54 (1994). ("Where the structure, and history fail to establish that the Governments position is unambiguously correct courts apply the rule of lenity and resolve the ambiguity in the Defendants favor"). (Here, the guidelines are statutorily applied pursuant to 18 U.S.C. §3553 and thus are subject to the Rule of Lenity).

The many cases dealing with body armor cited by the district court include this enhancement where drug trafficking or robbery convictions have occurred and violence is directly planned or anticipated.[14] The government in its brief on this issue has stated that the mere wearing of a vest with a conviction for a crime of violence is enough to apply this enhancement. (Doc. 106 p.1-2). JA1732-1733. Much of the government's reasoning is skewed to inferences of intent and purpose without regard for the initial purpose in wearing the vest.

---

[14] *See U.S. v. Gahagen*, 44 F.4th 99 (2d Cir. 2022) (armed bank robbery); *U.S. v. Jean-Charles*, 696 F. App'x 405, 411 (11th Cir. 2017) (Hobbs Act robbery); *U.S. v. Cervantes*, 706 F.3d 603, 621 (5th Cir. 2013) (home invasion with firearm); *U.S. v. Matthew*, 451 F. App'x 296, 296 (4th Cir. 2011) (drug trafficking with firearm); *U.S. v. Shamah*, 624 F.3d 449, 459 (7th Cir. 2010) (robbery with firearm); *U.S. v. Barrett*, 552 F.3d 724, 727 (8th Cir. 2009) (drug trafficking with firearm); *U.S. v. Chambers*, 268 F. App'x 707, 712 (10th Cir. 2008) (drug trafficking with firearm); *U.S. v. Douglas*, 242 F. App'x 324, 330 (6th Cir. 2007) (drug trafficking with firearm).

The Government also opined that the internet searches of Appellant suggest he was preparing for violence. (Doc. 106 p. 3-4). JA1734-1735. Appellant searched for a number of things on the internet before the rally including information about guns. He did not possess any guns and such searches could easily be interpreted as an ex-police officer being wary of people who might have guns and because he was a police officer felt safer with the vest on. Even if Appellant believed there could be violence at the rally, just wearing the vest for his own protection and warmth in the winter, is just not enough for application of this guideline enhancement for "use". The Government has admitted their analysis is based on inferences. (Doc. 106 p. 3). JA1734.

At Sentencing the court stated that:

"...I think the enhancement does apply by the preponderance of the evidence...his testimony at trial was that he wore it for warmth but also wore it...for his own safety and you have to query what his own safety was, and it undoubtedly, at least in part, was the fear of being shot, whether by what he thought may be walking the streets of Washington D.C., bad elements in Washington D.C. , or something else." (Doc#124 p.14-15). JA1864-1865.

The encounter with the officer at the Capitol does not prove intent to use the vest to further some other crime. This is about inferences and here

the inferences could be for safety from others, not for protection from officers of the law in committing a crime. That is exactly what the facts represent.

The mere wearing of a vest on January 6th is not enough to say it was used for intentional protection for appellant to commit a crime of violence or that it made his offense truly worse than it would have been without it.

## V. The District Court abused its discretion when sentencing Appellant disparately from similarly situated defendants.

A question of the reasonableness of a sentence is reviewed for abuse of discretion. *U.S. v. Brown*, 892 F.3d 385, 414 (2018).

At sentencing, Appellant raised the issue of sentencing disparity. (Doc. 124 p. 5-7). JA1855-1857. Sentencing disparity is a statutorily applied requirement of Sentencing considerations. (*See* 18 U.S.C. §3553(a)(6)). Many of those sentenced who received lesser sentences than Appellant were involved with more serious conduct, assault, and weapon possession. Many were also former military and/or police officers.

"The law's demand that a court explain why a defendant is treated more harshly than other similarly situated defendants safeguards a fundamental component of justice: parity in criminal sentencings." *U.S. v. Brown*, 892 F.3d 385, 408 (2018) (quoting *U.S. v. Booker*, 543 U.S. 220, 250 (2005) "Congress' basic statutory goal — a system that diminishes sentencing disparity — depends for its success upon judicial efforts to determine, and to

base punishment upon, the *real conduct* that underlies the crime of conviction.") The disparity of punishment in the below cited cases and the *real conduct* in this case is not justified.

Trial Counsel noted at sentencing that in *U.S. v. Richardson,* 21-cr-721, Howard Richardson was charged similarly to Appellant, including assault. Richardson took a plea and many of the charges were dropped. Richardson was sentenced to 46 months in prison. Even in taking a plea versus Appellant going to trial, the sentence imposed is significantly higher for Appellant's sentence for similar behavior. A minimal sentencing difference would have been reasonable and consistent with similar cases from the January 6, 2022 events.

In *U.S. v. Reffitt*, 21-CR-32, the defendant wore a plate carrier vest laden with armored plates that could stop a rifle round, possessed a handgun on Capitol Grounds, possessed plastic handcuffs and even had firearms attributed to him placed in various areas around Washington D.C. and distributed to others. Reffitt was sentenced to 87 months in prison after a jury trial. He was also found guilty of carrying a .40 caliber pistol. Reffit enjoyed the benefit of not having an enhancement imposed on him despite the significant evidence in support of the application because he was not convicted of a crime of violence. The outcome still contributed to an unwarranted disparity.

In *U.S. v. Patrick McCaughey*, (1:21cr40, April 14, 2023), after going to trial, the defendant was sentenced to 90 months for multiple counts of assaulting an officer, obstruction, and physical violence for helping to break into the Capitol building and trapping an officer against a door frame with a stolen police riot shield for two minutes and striking another officer with the same shield. 1:21-cr-40, Doc. 611 p. 2. The Government argued for all the same enhancements save for the body armor applied to Appellant, which could arguably have been applied as he used a police shield in the offense. *Id.* at 17-20. The difference in this one enhancement does not breach the gulf between the severe conduct of McCaughey and what happened in this case.

In *U.S. v. Julian Khater*, 1:21cr222, Khater was sentenced to 80 months for assault on an officer which included spraying an officer who later suffered two strokes and died. Khater pleaded guilty, but had many of the same sentencing enhancements including use of a dangerous weapon, bodily injury, conviction under §111(b) and official victim. (1:21cr222 Doc. 97 p. 21).

In *U.S. v. Albuquerque Cosper Head*, (1:21cr291 D.D.C. October 27, 2022), Head received a sentence of 90 months in prison. This Defendant admitted to grabbing Capitol Police officer around the neck and then forcibly hauling him down the Capitol steps into the mob where the officer was beaten, kicked, robbed of his badge and radio and attacked with a stun gun.

In *U.S. v. Robertson*, 610 F.Supp.3d 229 (D.D.C. 2022), Robertson received 87 months after going to trial. He was, as Appellant, a former police officer and an Army Veteran. He was convicted of six crimes. Robertson used a large wooden stick to block the path of officers. His social media was filled with violent rhetoric including such words as "If you are too much of a coward to risk arrest, being fired and actual gunfire to secure your rights, you have no words to speak I value."

In *U.S. v. Fairlamb*, 1:21-cr-120 (D.D.C. February 1, 2023) Fairlamb received a 41-month sentence in a plea agreement. He assaulted an officer by pushing him into a group of people and punching the officer's face shield. He also briefly entered the Capitol.

In *U.S. v. Rubenacker*, 1:21-cr-00193 (D.D.C. May 26, 2022) Rubenacker received a 41 month sentence; the government had asked for 15 years. He pleaded guilty to all 10 charges he faced including civil disorder and committing acts of physical violence on Capitol grounds.

In *U.S. v. Miller*, 589 F.Supp.3d 60 (D.D.C. 2022) Miller received a 33-month sentence after draping himself in a Confederate flag and was seen on video throwing objects at police officers and scaling the walls of the Capitol. He threw a full beer can and batteries in the direction of law enforcement and sprayed a fire extinguisher directly into the tunnel onto police officers.

*U.S. v. Lonnie Leroy Coffman,* 21cr614, Coffman received a sentence of 46 months. Coffman, a Vietnam War veteran who served in the U.S. Army, pleaded guilty in November to possession of an unregistered firearm and carrying a pistol without a license. He was carrying a loaded handgun and revolver without a license as he walked in Washington, D.C., on January 6, according to prosecutors. He was not accused of entering the Capitol or joining the mob during the riot that day. When Coffman parked his truck a few blocks from the Capitol on the morning of January 6, it contained a handgun, a rifle, a shotgun, hundreds of rounds of ammunition, a crossbow, machetes, a stun gun and a cooler containing eleven mason jars with holes punched in the lids, according to prosecutors. Each jar contained a mixture of gasoline and Styrofoam, which are components of the homemade incendiary devices called Molotov cocktails, prosecutors said. The Judge noted at sentencing "I don't think I've seen in all my years as a judge, quite such a collection of weapons."

https://www.washingtonpost.com/dc-md-va/2022/07/08/jan6-defendants-guns/

Appellant's guidelines without the enhancement for the body armor enhancement would have been a level 33, still in gross excess of similarly

situation defendants from the January 6 events. His guidelines would have been 135-168 months before any other variance application. The wearing of the vest does not significantly distinguish Appellant from any other January 6 defendant. It is clear that from the hundreds of arrests and convictions that the vest here was not a true aggravating factor.

Even with the variance applied, there is nothing that suggests a sentence of 120 months is reasonable in light of this guideline issue and disparity among similar or worse January 6 defendants, all or most of whom received downward variances from the guidelines. This shows how the guidelines are not a reasonable benchmark for sentencing in these cases which diminishes the significance of the variance in this case.

## CONCLUSION

Appellant did not receive a fair trial in Washington D.C., and was denied the ability to fully confront the main witness against him. For these reasons, Appellant's convictions should be overturned. Additionally, the jury was instructed in such a way that he was likely convicted of 18 U.S.C. §111(b) contrary to how he was indicted, therefore this conviction should be overturned and Appellant resentenced under the remaining counts. His

sentence was also unreasonable and disparate to other similar January 6 defendants, therefore resentencing is appropriate.

/s/ Elizabeth A. Brandenburg
Elizabeth A. Brandenburg
Marcia G. Shein
LAW FIRM OF SHEIN,
  BRANDENBURG & SCHROPE
2392 North Decatur Road
Decatur, GA  30033
(404) 633-3797

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains <u>12,885</u> words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in <u>Georgia 14-point font</u>.

<u>/s/ Elizabeth A. Brandenburg</u>
Elizabeth A. Brandenburg
Marcia G. Shein
LAW FIRM OF SHEIN,
  BRANDENBURG & SCHROPE
2392 North Decatur Road
Decatur, GA  30033
(404) 633-3797

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(d) and Cir. R. 25, that on November 22, 2023, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

/s/ Elizabeth A. Brandenburg
Elizabeth A. Brandenburg
Marcia G. Shein
LAW FIRM OF SHEIN,
  BRANDENBURG & SCHROPE
2392 North Decatur Road
Decatur, GA  30033
(404) 633-3797

*Counsel for Appellant*