# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 6, 2024                Decided May 28, 2024

No. 22-3064

UNITED STATES OF AMERICA,
APPELLEE

v.

THOMAS WEBSTER,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cr-00208-1)

———

*Elizabeth A. Brandenburg* argued the cause for appellant. With her on the briefs was *Marcia G. Shein*.

*David B. Goodhand*, Assistant U.S. Attorney, was on the brief for appellee. With him on the brief were *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Brian P. Kelly*, Assistant U.S. Attorneys.

Before: MILLETT, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

2

MILLETT, *Circuit Judge*:    Thomas Webster attended former-President Trump's rally on January 6, 2021, and then went to the Capitol.  Upon arriving, Webster confronted a line of police officers and violently assaulted Officer Rathbun of the Metropolitan Police Department.  A jury convicted Webster of five felonies and one misdemeanor offense.  The district court imposed a ten-year prison sentence.  Webster appeals, raising challenges both to his convictions and his sentence.  We have considered each of Webster's challenges and, because none of them succeed, we affirm his convictions and sentence.

**I**

**A**

Thomas Webster is a retired police officer and resident of New York.  In the days and months following the 2020 presidential election, Webster became convinced that the election had been stolen.  He planned to attend the January 6th rally convened by the former President, and he spoke with others about how they should prepare for the event.  For example, he texted two contacts:  "Guide to your Jan 6 trip includes D.C. gun laws, self-defense options, citizen's arrest policy, drone policy, common sense gear list, bonus prep info, and the Constitution for obvious reasons.  Don't be a liability, be prepared for it to get wild.  The Donald.  America first[.]"  J.A. 982.

Two days before the rally, Webster drove from his home in New York to Washington, D.C.  He brought an assortment of gear with him, including body armor and a United States Marine Corps flag on a metal flagpole.  J.A. 1120–1122.

Webster attended former-President Trump's speech on January 6th, wearing his body armor and carrying his Marine

3

Corps flag.  After that, he joined the crowd in marching on the Capitol.  Webster made his way toward the Capitol's West Terrace.  As he got closer, he heard "flash bangs going off[,]" "sense[d] that there was some gas[,]" and "saw people being injured."  J.A. 1140.  He continued forward until he reached the leading edge of the rioters.  A single row of bicycle racks separated them from a police line.  He recognized that the bicycle racks were meant to keep people back.  But he tried to get past them nonetheless.

Officer Noah Rathbun of the Metropolitan Police Department was one of the officers on the other side of the police line.  Webster approached him, yelling and accusing him of being a communist who was attacking Americans.  Officer Rathbun pushed Webster back from the barrier several times, and Webster responded by pushing the bicycle rack toward Officer Rathbun.  Webster then swung his flagpole toward Officer Rathbun "in a chopping motion."  J.A. 852.  The flagpole struck the bicycle rack.  Officer Rathbun grabbed the flagpole and wrested it from Webster.

Shortly thereafter, the mob broke through the police line.  Webster charged Officer Rathbun, knocking him to the ground.  He got on top of Officer Rathbun and began pushing Officer Rathbun's gas mask into his face.  After about ten seconds of struggling, Webster got up, and the two men broke apart.

**B**

A grand jury in the District of Columbia indicted Webster on five felony counts:  (1) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1),  (b);  (2)  Civil  Disorder,  *id.*  § 231(a)(3);  (3) Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, *id.* § 1752(a)(1),

4

(b)(1)(A); (4) Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, *id.* § 1752(a)(2), (b)(1)(A); and (5) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, *id.* § 1752(a)(4), (b)(1)(A).  The grand jury also indicted Webster on one misdemeanor:  Act of Physical Violence in the Capitol Grounds or Buildings.  40 U.S.C. § 5104(e)(2)(F).

Webster moved to change venue, arguing that he could not get an impartial jury in the District.  According to him, the District's jury pool was simply too Democratic, too connected to the federal government, and too steeped in January 6th news coverage to produce twelve unbiased jurors.

The district court denied his motion.  The court reasoned that the District's size and characteristics did not indicate that the jury pool was presumptively prejudiced against Webster.  The court also found that the January 6th news stories were not clearly prejudicial to Webster.  The district court added that other January 6th cases had proceeded to jury trial in the District without any jury-bias issues.  On that basis, the district court concluded that it could empanel an impartial jury.

A jury subsequently found Webster guilty on all counts.  The district court sentenced him to concurrent terms of 120 months for four of the felony counts, 60 months for another felony, and six months for the misdemeanor.  The court also ordered that Webster serve 36 months of supervised release and pay a $510 special assessment.

**II**

The district court had jurisdiction over Webster's criminal prosecution under federal law.  *See* 18 U.S.C. § 3231.  We have

5

jurisdiction over Webster's appeal of his conviction and sentence.  *See* 18 U.S.C. § 3742; 28 U.S.C. § 1291.

Several standards of review apply in this case.  We review legal questions that the defendant preserved *de novo*.  *United States v. Wilson*, 605 F.3d 985, 1003 (D.C. Cir. 2010).  We review his unpreserved claims for only plain error.  *United States v. Sayan*, 968 F.2d 55, 59 (D.C. Cir. 1992); FED. R. CRIM. P. 52(b).  We review a district court's finding of juror impartiality for manifest error, *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995), and its handling of *voir dire* for an abuse of discretion, *United States v. Tsarnaev*, 595 U.S. 302, 313 (2022).

Lastly, we review Webster's sentence for both procedural and substantive reasonableness.  At the procedural step, we review a district court's "purely legal" interpretation of the Guidelines *de novo*.  *United States v. Cooper*, 886 F.3d 146, 155 (D.C. Cir. 2018).  We give "due deference" to its "application of the Guidelines to facts."  *United States v. McKeever*, 824 F.3d 1113, 1119 (D.C. Cir. 2016).  We review the sentence's substantive reasonableness for an abuse of discretion.  *Id.*

**III**

Webster raises three challenges to his convictions.  First, he argues that the jury was not impartial.  Second, he contends that the district court wrongly denied him his right to effectively cross-examine Officer Rathbun.  Third, he objects to how the district court instructed the jury on his Section 111(b) charge.  Each of those objections fails.

6

**A**

The Sixth Amendment guarantees criminal defendants an "impartial jury of the State and district wherein the crime shall have been committed[.]" U.S. CONST. Amend. VI. So when "extraordinary local prejudice" prevents impartiality, courts must transfer the trial to a location where an impartial jury can be drawn. *Skilling v. United States*, 561 U.S. 358, 378 (2010). The Sixth Amendment's requirement of a local trial cannot "impede" the right to a fair one. *Id.*

Webster first argues that the District's entire jury pool was presumptively prejudiced against him, and so the district court should have transferred his case to a different venue before the start of the jury-selection process (known as *voir dire*). He also argues that the *voir dire* process was flawed and produced a biased jury. He is incorrect on both fronts.

**1**

Prejudice across an entire jury pool can be presumed "only [in] the extreme case[,]" *Skilling*, 561 U.S. at 381, where "prejudicial publicity so poisoned the proceedings that it was impossible for the accused to receive a fair trial by an impartial jury[,]" *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979); *see Skilling*, 561 U.S. at 380. The Supreme Court has found presumptive prejudice in only the rare case where a jury pool was so "pervasively exposed" to prejudicial pretrial publicity about the defendant and the case that "[a]ny subsequent court proceedings in [that] community * * * [w]ould be but a hollow formality." *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963).

Webster does not clear that very high bar.

7

First, nothing in the record suggests that the District's jury pool had any preconceived notions about Webster or his guilt or innocence, or even knew who he was. The record lacks any evidence of pervasive (or much of any) media coverage aimed at Webster and his conduct.

Webster points to two newspaper articles that name him and describe his January 6th conduct. Webster Opening Br. 24–25 & nn.5–6; *see* Jonah E. Bromwich, *Retired N.Y.P.D. Officer Who Guarded City Hall Charged in Capitol Riot*, N.Y. TIMES (Feb. 23, 2021, 1:16 PM), https://perma.cc/V6PC-QET6; Nina Golgowski, *Ex-NYPD Cop Charged with Assaulting Washington Officer with Pole During Riot*, HUFFPOST (Feb. 24, 2021, 3:19 PM), https://perma.cc/N92B-C4QV. Webster also claims that "[a] Google search using the terms 'Thomas Webster Capitol' garnered 4,690,000 search results at the time of the motion to change venue." Webster Opening Br. 25.

That evidence comes up short. To begin, neither of the newspaper articles contain the type of "vivid, unforgettable information" of the "smoking-gun variety" that is necessary to trigger presumptive prejudice concerns—that is, information that not only "invite[s]" jurors to prejudge the defendant's culpability, but also makes it nearly impossible for them not to. *Skilling*, 561 U.S. at 383–384. Instead, the articles provide "straightforward, unemotional factual accounts of events and of the progress of official * * * investigations." *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976) (en banc) (per curiam) (footnote omitted). Both simply recite the facts of the allegations confronting Webster, his surrender to authorities, and the details of his bond hearing. They also include a counternarrative from Webster's defense attorney. *See* Golgowski, *supra*; Bromwich, *supra*. True, one article notes that some on social media have called Webster the "eye

8

gouger[,]" Golgowski, *supra*, and they both mention that Webster's prosecutor referred to Webster as a "junkyard dog[,]" *id.*; Bromwich, *supra*. But those articles do not endorse either label. Without more, such routine and objective press coverage of a criminal prosecution does not trench upon the defendant's right to a fair trial.

As for Webster's Google search, Webster has not shown how many of the results actually referred to him as opposed to other Thomases or Websters. Neither does Webster claim that all—or even most—of the search results pertained to his activity at the Capitol rather than to some unrelated event Google's algorithm saw fit to include. He likewise offers no evidence as to how many readers actually engaged with any of these results, let alone that members of the District's jury pool were more exposed to those search results than were people living elsewhere.

Webster also relies on a poll purporting to gauge the sentiments of the District's jury pool. The poll surveyed 400 individuals registered to vote in the District and concluded that they had a "decidedly negative impression of individuals arrested in conjunction with the activities of January 6, 2021." Webster Opening Br. 20 (quoting J.A. 31).

But Webster's focus on the jury pool's opinion of January 6th and its perpetrators misses the point. We expect jurors to view significant criminal events in their hometown with an unapproving eye, whether it is the January 6th attack on the Capitol, a murder, or an armed robbery spree. Generalized disapproval of criminal conduct—even the specific conduct at issue in a defendant's case—says nothing about a juror's ability to be impartial in deciding whether a particular individual committed a crime or not. What the Constitution forbids is for a juror to hold a firmly entrenched view about an *individual*

9

*defendant's* guilt or innocence before the trial starts.  *See Skilling*, 561 U.S. at 384 n.17, 391–392 (emphasizing prejudicial impact of media coverage aimed at defendant over coverage of the criminal event); *United States v. Malmay*, 671 F.2d 869, 875–876 (5th Cir. 1982) (finding jury sufficiently impartial despite jurors' broad familiarity with alleged local vote-buying scheme because jury was relatively unfamiliar with defendant).  Webster's poll, in other words, does not answer the essential question:  Can the District's potential jurors "lay aside [their] impression or opinion" of Webster or events on January 6th and "render a verdict based on the evidence presented in court"?  *United States v. Nassif*, 628 F. Supp. 3d 169, 187 (D.D.C. 2022) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)), *aff'd*, 97 F.4th 968 (D.C. Cir. 2024) .

Second, Webster has not shown that the District's jury pool is structurally incapable of producing fair juries for January 6th defendants.  The District's size is no impediment to producing a fair jury.  It consists of more than 600,000 individuals.  *Contrast Rideau*, 373 U.S. at 724 (presuming prejudice when news coverage blanketed community of 150,000).  "Given this large, diverse pool of potential jurors," there is no basis to conclude "12 impartial individuals could not be empaneled[.]"  *Skilling*, 561 U.S. at 382 (citing *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion), for the proposition that there is a "reduced likelihood of prejudice where venire [i]s drawn from a pool of over 600,000 individuals"); *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (potential for prejudice mitigated by the size of the "metropolitan Washington [, D.C.] statistical area, which has a population of over 3 million").

Webster asserts that the District overwhelmingly voted for President Biden and historically votes for Democratic candidates.  Webster Opening Br. 22–23.  That may be.  But

10

the political inclinations of a populace writ large say nothing about an individual's ability to serve impartially in adjudicating the criminal conduct of an individual. *See Connors v. United States*, 158 U.S. 408, 414 (1895) ("The law assumes that every citizen is equally interested in the enforcement of the [law] * * * and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror[.]"). Indeed, we have held that District juries could impartially adjudicate other criminal cases arising out of political matters, including Watergate. *See Haldeman*, 559 F.2d at 59–64 (holding that a District jury could try President Nixon's aides for attempting to cover up Watergate).

Webster's own data illustrates the point. For example, when asked how they were "likely to vote if [they were] on a jury for a defendant charged with crimes for his or her activities on January 6th[,]" 46% of respondents either "[v]olunteered" that they did not know how they would vote or that their vote "[d]epend[ed]" on other factors, or "refused" to speculate about how they would decide such a case. J.A. 36.

Webster's last argument for presuming prejudice is that the timing of his trial, approximately twelve months after January 6th, was too soon for all the media attention about the riot to dissipate. Webster puts the cart before the horse: He must first show prejudice before arguing that the prejudice did not dissipate. He has failed to do so.

**2**

Webster's second tack—arguing that the "*voir dire* in this case was inadequate" and so failed to secure an impartial jury—also fails. Webster Opening Br. 29.

11

Demonstrating actual prejudice in the jury is an arduous task. "The test is whether the nature and strength of the opinion formed" by a juror before trial "necessarily" shows her to be partial. *Irvin*, 366 U.S. at 723 (quotation marks omitted). It is not enough to establish that a juror was familiar with the facts of the case because the law does not require that jurors be "totally ignorant of the facts and issues involved." *Id.* at 722; *see Skilling*, 561 U.S. at 398 (Jurors "need not enter the box with empty heads in order to determine the facts impartially."). As long as jurors can "lay aside their impressions or opinions and render a verdict" fairly and objectively based on the evidence, they are not prejudiced. *Irvin*, 366 U.S. at 723 (formatting modified).

In determining whether a defendant has shown actual prejudice on the part of a juror, the *voir dire* process is often critical. "No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." *Skilling*, 561 U.S. at 386; *see Mu'Min*, 500 U.S. at 427 ("Particularly with respect to pretrial publicity, we think * * * primary reliance on the judgment of the trial court [in conducting *voir dire*] makes good sense."). What matters is that the defendant be given "a full and fair opportunity" to expose any partiality in potential jurors. *United States v. West*, 458 F.3d 1, 6 (D.C. Cir. 2006) (quoting *United States v. Orenuga*, 430 F.3d 1158, 1163 (D.C. Cir. 2005)). To do so, we examine whether the *voir dire* process was searching enough to smoke out bias. *See id.* at 7; *Skilling*, 561 U.S. at 386–395. We also look to see if a juror's answers during *voir dire* reveal any "partiality or hostility against the defendant that cannot be laid aside[.]" *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (formatting modified).

Webster's jury-selection process involved an exacting search. The court first screened the potential jurors with 21 questions largely agreed upon by the defense and prosecution.

12

The questions probed (i) any relationship to the case, parties, attorneys, witnesses, or court personnel; (ii) any association with the U.S. Capitol, knowledge about the January 6th attack, or familiarity with Webster's role in the attack; (iii) feelings and opinions about January 6th, former-President Trump, or former-President Trump's supporters that could impact the ability to be impartial; (iv) relationships with or opinions about law enforcement officers; (v) the ability to follow and respect the rules of the trial including the presumption of innocence, privilege against self-incrimination, legal instructions, and instructions about avoiding media; and (vi) any unique hardships serving on a jury could pose.

Next, the district court brought prospective jurors into the courtroom one by one, sat them in the jury box, and asked them additional questions under oath. *See Skilling*, 561 U.S. at 389 (commending the district court for being "aware of the greater-than-normal need, due to pretrial publicity, to ensure against jury bias" by "examin[ing] each prospective juror individually"); *United States v. Edmond*, 52 F.3d 1080, 1095 (D.C. Cir. 1995) (endorsing the view that potential jurors should be questioned individually if possibly exposed to potentially prejudicial information). If the potential juror felt uncomfortable answering, the court offered to use a white-noise device known as a "husher" so the potential juror could relay sensitive information in a manner heard only by the court and the parties. *See Skilling*, 561 U.S. at 389 (steps that "encourage candor" strengthen the *voir dire* process). Unless the court had already resolved to dismiss a prospective juror for cause, it allowed the parties to follow up with additional questions. *See id.* (noting that the parties "were accorded an opportunity to ask followup questions of every prospective juror brought to the bench for colloquy").

13

Despite that searching inquiry, Webster raises four objections, none of which succeeds.

First, he criticizes the length of the process, suggesting it was truncated. But Webster's full-day *voir dire* is on par with what has passed constitutional muster in other cases. *See Skilling*, 561 U.S. at 388–389 (five-hour *voir dire* with questionnaire found to be constitutionally sufficient). And in evaluating the sufficiency of a particular *voir dire*, we generally focus on its substance, rather than its length, asking whether, in light of "the facts and circumstances of the particular case[,]" necessary questions were asked. *West*, 458 F.3d at 7–8. Webster tellingly cannot identify how the district court's timing or questioning prejudiced his defense, nor what questions should have been but were not asked. Neither does he assert that the court rushed his counsel or denied him adequate time to investigate or to evaluate the prospective jurors. The Constitution does not require courts to take more time just for more time's sake.

Second, Webster contends both that "each juror had seen at least some coverage [of January 6th] and only one had not seen any videos in the last year," and that several "had strong feelings about the events and/or President Trump[.]" Webster Opening Br. 29. Yet to demonstrate partiality, Webster needs to show that a juror was unable to judge Webster "solely on the basis of the evidence presented at trial." *Mu'Min*, 500 U.S. at 428. Webster's contentions reveal nothing about that metric.

Webster highlights Jurors 3, 8, and 13 as evidence of individual bias. Jurors 3 and 8 generally expressed negative views of former-President Trump and his supporters. J.A. 302 (Juror 3 explaining "I certainly don't have a high opinion of former-President Donald Trump, and by extension, I don't think his supporters are particularly smart for supporting him");

14

J.A. 344–345 (Juror 8 relaying that "I wasn't a fan of Trump
* * * . So his supporters, I mean, you know * * * some of them
do get a little chaotic, and they're not fun to be around when
they're being wild around the streets").  Juror 13 shared that,
as "a black woman, at that period of [Trump] being President,
I just felt unsafe."  J.A. 458.

Nothing in those jurors' statements suggests that they had
prejudged *Webster's* guilt or were incapable of deciding the
case objectively based on the evidence.   Webster's counsel, in
fact, was so unconcerned that he did not move to strike any of
them.  He also declined the offer to question Juror 8 further.
J.A. 346.  As for Juror 3, Webster's counsel asked only if
Webster was "at a disadvantage with" him.  J.A. 304.  When
Juror 3 said no, counsel responded, "[N]o?  Okay[,]" and
moved on.  J.A. 304.  Similarly, counsel questioned Juror 13
only to clarify whether her feelings of unsafety were related to
January 6th or the Trump presidency.  When she told him it
was the latter, he responded:  "Then I'm going to sit down."
J.A. 460.  Counsel's reactions and the absence of any motion
to strike are "strong evidence" that he "was convinced the
jurors were not biased and had not formed any opinions as to
[Webster's] guilt."  *Beck v. Washington*, 369 U.S. 541, 558
(1962).

Third, Webster points to two instances where the district
court denied his motion to strike potential jurors for cause.
Webster's counsel asked potential juror 0974 if, as a
government employee, she saw herself "more aligned with the
attorneys who are here representing the government as opposed
to [Webster's counsel.]"  J.A. 372.  She replied "I do.  I feel
more aligned with them."  J.A. 373.  Webster's counsel also
asked potential juror 1156 whether his support of President
Biden "put [Webster] at a disadvantage[.]"  J.A. 328–329.  The

15

potential juror said yes. The district court denied counsel's motion to strike both jurors for cause.

Pointing to those two potential jurors' answers does not help Webster's case for the simple reason that neither one sat on his jury. *See Skilling*, 561 U.S. at 389 n.24 ("Statements by nonjurors do not themselves call into question the adequacy of the jury-selection process."). Beyond that, Webster does not connect the district court's failure to strike those potential jurors to any asserted deeper flaw in the *voir dire* process that could have led to the seating of a biased juror. And the Supreme Court has rejected the proposition that "a defendant's peremptory challenge right is impaired when he peremptorily challenges a potential juror whom the district court erroneously refused to excuse for cause[.]" *United States v. Martinez-Salazar*, 528 U.S. 304, 310 (2000).

Having said that, and to be clear, the district court *should* have struck at least potential juror 1156 for cause. That juror said that he did not view the trial as "a zero-zero game to start" and, when asked if he could abide by the presumption of innocence, candidly responded, "I really, I honestly don't think so." J.A. 330–331. A district court should never allow a juror to sit after he admits he cannot presume the defendant innocent. Full stop. Still, that single error in a lengthy *voir dire* process does not indict the process itself given the absence of any prejudice tied to the jurors who actually decided Webster's case.

Fourth, Webster argues that the district court wrongfully prohibited his counsel from asking prospective jurors if Webster would be "disadvantaged" in their eyes. Webster Opening Br. 33. The court reasoned that the term "disadvantaged" was unclear and asked Webster's counsel to focus his questioning on the "presumptions and burdens and

16

the like; you know, would you presume this person would have done something wrong, et cetera[.]"  J.A. 338–339.  Webster did not object to the district court's ruling.  Yet Webster now asks this court to hold that the district court's rephrasing "caused counsel to not question any subsequent jurors in the same way, likely not uncovering similar biases[.]"  Webster Reply Br. 5.

Because Webster raises this argument for the first time on appeal, we review it for only plain error.  *United States v. Pole*, 741 F.3d 120, 124 (D.C. Cir. 2013); FED. R. CRIM. P. 52(b).  We find no error, let alone plain error.  Webster points to no case—and we are aware of none—holding that a court cannot avert juror confusion and focus *voir dire* questioning more directly on what matters:  the ability of a potential juror to objectively follow the law and fairly adjudge the defendant's guilt.  A district court, after all, has wide latitude to sculpt questioning to "cover the substance of the appropriate areas of concern by framing its own questions in its own words."  *United States v. Delgado-Marrero*, 744 F.3d 167, 201 (1st Cir. 2014) (formatting modified) (quoting *Real v. Hogan*, 828 F.2d 58, 62 (1st Cir. 1987)); *Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir. 1981) ("The court need not use the question in the precise form suggested by counsel.").  Besides, even if it were an error to modify counsel's question, Webster offers no evidence—beyond his own speculation—of prejudice that resulted from the district court's ruling.  *See Pole*, 741 F.3d at 124.

**B**

Webster separately argues that the district court abridged his Sixth Amendment right to confront the witnesses against him "by excluding all evidence of the investigation into [Officer] Rathbun's conduct" for an unrelated and ultimately

17

unsubstantiated use-of-force claim.  Webster Opening Br. 34. Webster did not preserve this argument below, and he cannot pass plain-error review now.

**1**

Five months after the riot at the Capitol, Officer Rathbun—the officer whom Webster assaulted at the Capitol—used force while responding to an alleged kidnapping.  The United States Attorney's Office for the District of Columbia reviewed the incident and declined to prosecute Officer Rathbun.  The Metropolitan Police Department opened its own administrative investigation, which was still pending at the time the *voir dire* process began.

The government moved to bar Webster from cross-examining Officer Rathbun about the Metropolitan Police Department investigation.  The district court promised to "discuss with the parties the scope of such cross-examination at the pretrial conference."  J.A. 159.

At that conference, Webster's counsel questioned whether Officer Rathbun's "role as an important witness" for the U.S. Attorney's Office "c[a]me into play in their ultimate decision in clearing him" during their review.  J.A. 226.  He noted the pending Metropolitan Police Department investigation and proposed that the district court delay Webster's trial until that investigation closed in case it uncovered any dishonesty or wrongdoing.  He then informed the district court about the type of questioning he wished to pursue:  "[I]sn't it true, sir, that there's a pending investigation against you regarding your use of force as a police officer[?]"  J.A. 232.

The district court ruled that Webster could not cross-examine Officer Rathbun about "the substance and the nature

18

of the investigation" because that would be "highly prejudicial" and "inflammatory[.]" J.A. 230. But the district court agreed that cross-examination about "the fact of a pending investigation" was "certainly fair game." J.A. 230; *see* J.A. 234 ("So the existence of the investigation is okay. And, you know—and I don't know whether you're going [to] follow up with that in terms of bias, et cetera, but I think that's about it. And if there's more, you'll let me know, though.").

Several days later, the government announced that the Metropolitan Police Department had found Officer Rathbun's use of force justified and closed its investigation. The government then renewed its request to bar Webster from asking Officer Rathbun about "any pending investigations, as there no longer [wa]s a pending investigation." J.A. 824. Webster's counsel responded that "the government's position is right[,]" and that, while he would "certainly like to delve into it," he agreed that he no longer could ask about the investigation since it had closed in favor of Officer Rathbun. J.A. 824. The district court simply responded, "[a]ll right." J.A. 824. No one brought the issue up again, and Webster's counsel chose not to ask Officer Rathbun about any use-of-force investigation at trial.

**2**

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" U.S. CONST. Amend. VI. The Clause demands that a defendant have "a realistic opportunity to ferret out a potential source of bias." *Wilson*, 605 F.3d at 1003 (quoting *United States v. Davis*, 127 F.3d 68, 70 (D.C. Cir. 1997)). A Confrontation Clause violation occurs if the court impaired counsel's ability to show "bias on the part of the witness," *id.*,

19

such that "a reasonable jury might have received a significantly
different impression of the witness's credibility had defense
counsel been permitted to pursue his proposed line of cross-
examination," *Davis*, 127 F.3d at 70–71 (formatting modified)
(quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).
At the same time, no violation occurs when the district court
blocks "only marginally relevant" questioning unlikely to
move the jury, *id.* at 71, or when the district court imposes
"reasonable limits" meant to curtail ills like "harassment,
prejudice, confusion of the issues, [or] the witness'[s] safety,"
*United States v. Derr*, 990 F.2d 1330, 1334 (D.C. Cir. 1993)
(quoting *Van Arsdall*, 475 U.S. at 679).

**3**

Webster forfeited any objection to the district court's
initial restrictions on questioning Officer Rathbun about the
use-of-force investigations.

Webster's counsel initially asked the district court to allow
him to question Officer Rathbun about the then-pending
investigation. The district court agreed that he could do so, as
long as he did not delve into the merits of the investigation
itself.

Once the investigation closed in Officer Rathbun's favor,
the government argued that the court should not allow any
inquiry into the existence of the closed investigation.
Webster's counsel then *expressly agreed* that such
impeachment was off the table. Counsel stated that he thought
"the government's position [wa]s right[,]," even though it was
"a detriment to the defense[.]" J.A. 824. With the parties
apparently having resolved the matter themselves, the district
court responded with only an "[a]ll right." J.A. 824. At no
time in that hearing did the district court expressly or implicitly

20

forbid Webster from cross-examining Officer Rathbun about the prior investigation. It was Webster's counsel who, of his own accord, dropped the subject. And when Officer Rathbun testified at trial, Webster's counsel neither attempted to question the officer about the investigation nor expressed any interest in doing so.

This appeal is the first time any court has had notice that Webster disagrees with the district court's approach to the cross-examination of Officer Rathbun about the closed investigation. We need not decide whether Webster waived this argument because he at least forfeited it. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("[F]orfeiture is the failure to make the timely assertion of a right[.]"); *United States v. Miller*, 890 F.3d 317, 326 (D.C. Cir. 2018) (same). To preserve an objection, a party must "first make his objection known to the trial-court judge." *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 764 (2020). A party makes their objection known only by informing the court of either "the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." FED. R. CRIM. P. 51(b). Webster did neither.

Because the objection was not made to the district court, we review Webster's argument for only plain error. *See Derr*, 990 F.2d at 1333 n.2; *United States v. Law*, 528 F.3d 888, 912 (D.C. Cir. 2008). To prevail, Webster must show not only that the district court plainly erred, but also that the error impacted his "substantial rights" and "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Long v. Howard Univ.*, 550 F.3d 21, 25 (D.C. Cir. 2008) (quoting *Muldrow ex rel. Estate of Muldrow v. Re–Direct, Inc.*, 493 F.3d 160, 169 (D.C. Cir. 2007)).

21

Webster's argument stumbles at the starting gate. There is no ruling by the district court that he can even label error. The court's first ruling allowed Webster to cross-examine the officer about the existence of the investigation, not its substance. Webster makes no objection to that decision on appeal. At the second hearing after the investigation closed, the district court made no ruling at all. It simply acknowledged with an "all right" Webster's own decision to forgo questioning on the topic. The court never stopped Webster from pursuing investigation-related questions when Officer Rathbun testified. Instead, Webster's counsel *sua sponte* stopped himself. *Cf. United States v. Celis*, 608 F.3d 818, 839 (D.C. Cir. 2010) ("It is simply not the case * * * that the court prevented [the defendant] from pursuing this line of questioning.").

Nor, in any event, could Webster show prejudice. Given the overwhelming evidence against him—including at least four videos of the assault—there is no "reasonable probability" that the jury would have acquitted him even if he had asked Officer Rathbun about a closed investigation that involved an entirely different incident occurring five months after Webster's offenses and that was resolved in the officer's favor. *United States v. Long*, 997 F.3d 342, 359 (D.C. Cir. 2021).

For the same reason, Webster's argument that counsel was ineffective for failing to obtain permission to cross-examine Officer Rathbun about the investigation fails. Counsel did obtain permission to cross-examine Officer Rathbun about the investigation and, in any event, any such error would not have prejudiced Webster's defense. *See Strickland v. Washington*, 466 U.S. 668, 691–692 (1984); *Porter v. McCollum*, 558 U.S. 30, 38–39 (2009).

22

**C**

Webster also challenges his conviction on the ground that the district court improperly instructed the jury on the elements of an 18 U.S.C. § 111(b) violation.  Because Webster did not object to the instruction at the time, we review for only plain error.  We find none.

**1**

Webster was charged with, and convicted of, violating 18 U.S.C. § 111(b).  That statute punishes anyone who (1) "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with" a designated federal officer "while [the officer is] engaged in or on account of the performance of official duties," 18 U.S.C. § 111(a)(1), and, in doing so, (2) "uses a deadly or dangerous weapon * * * or inflicts bodily injury," *id.* § 111(b).

When instructing the jury on this charge, the district court included as an element of the Section 111(b) offense that the defendant "made physical contact with a person who was assisting officers of the United States who were then engaged in the performance of their official duties, or acted with the intent to commit another felony."  J.A. 1341.  The court specified that the only other felony the jury could find that Webster intended to commit was the second count with which he was charged:  civil disorder.

Webster argues that the court erred because Section 111(b) can be violated without a defendant making "physical contact" with the victim or acting "with the intent to commit another felony."  J.A. 1341.

We need not decide whether the district court mistakenly added two additional elements to the Section 111(b) offense.

23

Any such mistake would have helped, rather than hurt, Webster by making it *harder* for the jury to convict him.  Webster, after all, does not dispute that the jury was properly instructed on and found each of the necessary elements for his offense.  So removing any surplus elements from the jury instructions would only have made it easier for the jury to convict.  The jury still found Webster committed every true element of the crime. *See Musacchio v. United States*, 577 U.S. 237, 243 (2016) ("When a jury finds guilt after being instructed on all elements of the charged crime plus one more element, the jury has made all the findings that due process requires.").  And without any basis to find prejudice from the asserted misstep, Webster cannot demonstrate that plain error occurred. *See United States v. Marcus*, 560 U.S. 258, 262–263 (2010).

Webster counters that the district court's allegedly erroneous instruction had the effect of constructively amending his indictment, creating a risk that the jury convicted him for uncharged conduct.  Specifically, Webster notes that his indictment alleged that he "forcibly assault[ed] * * * an officer and employee of the United States" "using a deadly or dangerous weapon, that is, a metal flagpole," and that the assault "involve[d] physical contact with the victim and the intent to commit another felony."  J.A. 162.  Webster objects that he never hit Officer Rathbun with the flagpole, and that Officer Rathbun took the flagpole before Webster tackled him.  Webster further reasons that, because the district court instructed the jury to find whether Webster made physical contact with Officer Rathbun with a deadly weapon, the jury must have convicted him for his actions *after* he lost the flagpole.  From that, Webster concludes that the district court's added element constructively amended his indictment, which charged conduct that occurred only when he had the flagpole.

24

That multi-tiered argument fails. An impermissible "constructive amendment" of an indictment occurs when "the evidence presented at trial and the instructions given to the jury so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *Sayan*, 968 F.2d at 59–60 (formatting modified).

No such constructive amendment occurred in this case. To convict for the conduct charged in the indictment, the jury must have found that Webster either made "physical contact with" Officer Rathbun while using a deadly weapon *or* "*acted with the intent to commit another felony*" while using a deadly or dangerous weapon. J.A. 1341 (jury instructions) (emphasis added). The indictment charged him with both types of conduct. J.A. 162 (indictment). And the jury instructions allowed conviction under either theory. J.A. 1341 (jury instructions); *see United States v. Brown*, 504 F.3d 99, 104 (D.C. Cir. 2007). The court specifically instructed the jury that Webster could be found guilty of violating Section 111(b) if it found that he assaulted Officer Rathbun with the intent to commit civil disorder—a felony that the jury convicted Webster of—in violation of 18 U.S.C. § 231(a)(3). *See* J.A. 1341. That instruction fell within the four corners of the indictment. *See* J.A. 162. We presume the jury followed the court's instructions. *United States v. Tucker*, 12 F.4th 804, 826 (D.C. Cir. 2021) ("We presume that juries follow the court's instructions when * * * there is no evidence to the contrary.").

The jury instructions, at worst, made it harder for the jury to convict Webster, and never took the jury beyond the scope of the indictment. That is not plain error.

25

**IV**

Turning to Webster's sentence, he challenges the district court's inclusion of a four-level, use-of-body-armor enhancement. He also argues that the length of his sentence was substantively unreasonable as compared to other January 6th defendants. Neither of those arguments succeeds.

**A**

Webster's first objection to his sentence is to the district court's imposition of an enhancement for "us[ing] body armor during the commission of the offense[.]" U.S. SENT'G GUIDELINES MANUAL § 3B1.5(2)(B) (U.S. SENT'G COMM'N 2021).[1] Under the relevant Guideline, "[u]se" means "active employment in a manner to protect the person from gunfire[,]" or "as a means of bartering." *Id.* § 3B1.5 cmt. n.1. It does not mean "mere possession[,]" such as if "the body armor was found in the trunk of the car but not used actively as protection[.]" *Id.*

Webster used body armor while committing his assault. *See* U.S.S.G. § 3B1.5(2)(B). He put it on that morning, in part, for protection. He wore it throughout the day, including as he attacked Officer Rathbun. Given those facts, the district court correctly applied the enhancement. *See United States v. Shamah*, 624 F.3d 449, 459 (7th Cir. 2010); *United States v. Barrett*, 552 F.3d 724, 727–728 (8th Cir. 2009).

Webster does not dispute that he wore body armor while participating in the Capitol riot. Instead, he argues that the

---

[1] All citations in this opinion are to the 2021 version of the Guidelines, which were in effect when the district court sentenced Webster.

26

enhancement applies only when the body armor is donned with the intent to commit a crime of violence.  He insists that he wore the body armor only for "warmth and possible protection in the crowd[.]"  Webster Opening Br. 49.  He also argues, in the alternative, that the enhancement applies only when a defendant wears body armor during a crime that involves the "usage, or threatened usage of firearms[.]"  Webster Opening Br. 49.

Webster's proposed intent requirement has no anchor in Section 3B1.5's text.  The provision requires only simple "use" of the body armor.  It contains no *mens rea* requirement.  The Guidelines commentary likewise defines "use" not in terms of intent, but as "active employment *in a manner* to protect the person from gunfire[.]"  U.S.S.G. § 3B1.5, cmt. n.1 (emphasis added); *see Long*, 997 F.3d at 355 ("[T]he commentary to the Guidelines, unless it is inconsistent with the Guidelines' plain text[,] * * * is authoritative.") (citing *Stinson v. United States*, 508 U.S. 36, 38 (1993)). [2]  "Manner" refers to the way something is performed; it is about objective process, actions, and methodology, not subjective intent.  *Manner*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1376 (1993) ("[A] characteristic or customary mode of acting[.]"); *id.* ("[T]he mode or method in which something is done or happens : a mode of procedure or way of acting[.]").

Notably, the definition of "use" hinges on protection from violence, not the commission of a crime.  *See* U.S.S.G. § 3B1.5 cmt. n.1 (explaining that mere possession of body armor would not trigger the enhancement as long as it was "not used actively

---

[2] The Sentencing Commission promulgated this Guideline and its commentary through notice-and-comment rulemaking.  68 Fed. Reg. 2615, 2623–2624 (January 17, 2003).  It also submitted both texts to Congress for review.  68 Fed. Reg. 26960, 26975 (May 16, 2003).

27

as protection"). So even if "use" of body armor required some level of intent, it would be an intent to avoid injury, not intent to commit a crime of violence. Webster had that intent: He admits he wore the body armor in part for "possible protection" from the crowd while attacking the Capitol. Webster Opening Br. 49.

As for Webster's alternative argument, we need not decide whether the enhancement applies only when there is a risk of gun violence because that limitation would be of no help to Webster. He assaulted a police line set up to protect Congress from an angry mob. As Webster himself recognized, that act carried with it the risk that officers would use armed force to protect members of Congress, their staffs, and themselves. *See* J.A. 1171. Since Webster's conduct would satisfy even his proposed interpretation of Section 3B1.5, there was no error in the district court's application of the enhancement.

**B**

In imposing a criminal sentence, a district court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). Webster argues that the district court failed that task because his 120-month sentence is disproportionate to ten January 6th–related cases in which the defendants received sentences ranging from 33–90 months.

That is a false comparison. There are material differences between Webster's case and each of those he cites. *See United States v. Alford*, 89 F.4th 943, 953–954 (D.C. Cir. 2024). For example, seven of the ten sentences Webster references

28

resulted from plea agreements rather than trials.[3]  Defendants who go to trial are not "similarly situated" to those who plead guilty, and therefore "the disparity in their treatment" is generally permissible.  *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023); *see Alford*, 89 F.4th at 954.

The remaining sentences Webster cites are equally incomparable.  Unlike the defendants in those cases, (i) Webster violently assaulted a police officer, (ii) received a four-level enhancement for using body armor, and (iii) was found to be an instigator in the January 6th crowd.  J.A. 1908 ("It's not until you arrive, Mr. Webster, that all hell broke loose.  It was your actions that, at least on that part of the police line, opened up the police line and allowed thousands of people through, many of whom ended up inside that Capitol building[.]").  That trifecta meaningfully differentiates his conduct from that of the defendants in *United States v. Reffitt*, Case No. 1:21-cr-00032, and *United States v. Robertson*, Case No. 1:21-cr-00034.  The district court found, and Webster does not contest, that neither defendant in those cases was charged with "touch[ing] a police officer" or was subject to the body-armor enhancement.  J.A. 1912; Webster Opening Br. 53–55.  While the defendant in *United States v. McCaughey*, No. 1:21-cr-00040, did assault a law enforcement officer, he did not receive a body-armor enhancement.  *See* Webster Opening Br. 54.

In short, the district court properly exercised its discretion after comparing other sentences to Webster's individual

---

[3] *See United States v. Richardson*, Case No. 1:21-cr-00721; *United States v. Khater*, Case No. 1:21-cr-00222; *United States v. Albuquerque Cosper Head*, Case No. 1:21-cr-00291; *United States v. Fairlamb*, Case No. 1:21-cr-00120; *United States v. Rubenacker*, Case No. 1:21-cr-00193; *United States v. Miller*, No. 1:21-cr-00119; *United States v. Coffman*, Case No. 1:21-cr-00614.

29

conduct, the full circumstances of his offense, and the other Section 3553(a) factors. *See Alford*, 89 F.4th at 953–955. That is all the law required.

**V**

For the foregoing reasons, we affirm Webster's convictions and sentence.

*So ordered.*